Docket No. 24-5064

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NANCY FIEDLER, et al.,

*Appellants,*

versus

UNITED STATES OF AMERICA,

*Appellee.*

_____

On Appeal from the United States District Court
for the Central District of California
U.S.D.C. Case No. 2:21-cv-07065-PA-MRW
Hon. Percy Anderson, Judge

---

## APPELLANTS' OPENING BRIEF

---

Gretchen M. Nelson (112566)
NELSON & FRAENKEL LLP
601 So. Figueroa, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469
Telecopier: (213)-622-6019
gnelson@nflawfirm.com

John R. Hillsman (71220)
MCGUINN HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, CA 94111
Telephone: (415) 421-9292
Telecopier: (415) 403-0202
jrhillsman@mhpsf.com

*Counsel for Plaintiffs-Appellants – Add'tl Counsel on Signature Page*

i

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................ ii,iii,iv

TABLE OF AUTHORITIES ...................................................... v

I.     INTRODUCTION ............................................................. 1

II.    JURISDICTIONAL STATEMENT ................................. 4

III.   ISSUES PRESENTED ..................................................... 4

IV.   STATUTORY AND REGULATORY AUTHORITIES .................... 6

V.    STATEMENT OF THE CASE ....................................... 6

      A.    It Was Supposed to be a Magical Weekend of Ocean Exploration ............................................................. 6

      B.    Their Lives Were Over in Minutes ........................... 8

      C.    It Should Never Have Happened-*Conception* was a Disaster Waiting to Happen .................................................. 9

      D.    During Seven Inspections Conducted between 2015 and 2019 There Were Obvious Fire Hazards That Should Have Been Removed or Fixed ................................................. 11

          i. The Plastic Trash Cans and Chairs .............................. 14

          ii. The Improper Electrical Wiring ................................... 16

      E.    The Government's Prosecution of Captain Boylan Hinged on the Fire Starting in the Plastic Trash Can under the Stairwell ................................................................ 19

VII. PROCEDURAL HISTORY ............................................. 21

VIII. SUMMARY OF THE ARGUMENT .............................. 26

ii

IX.   STANDARD OF REVIEW ............................................................29

X.    ARGUMENT ..................................................................................30

    A.   The SIAA Does Not Limit the Government's Liaiblty for
       Actions That Are Within Its Discretionary Function...........30

       1.   A Little History Explains A Lot...................................31

       2.   In *Thacker,* the Supreme Court Held That the
          Discretionary Function Exception Cannot Be Implied
          into an Immunity Waiving Statute That Contains No
          Such Exception.............................................................38

    B.   Inspecting Subchapter T Vessels and Refusing to Certify a
       Vessel That Contains Open and Obvious Safety Hazards Is
       Not a Discretionary Function ...............................................42

       1.   The Limits of Discretionary Function Immunity.......43

       2.   Both the "Old-T Regulations" and the "New-T
          Regulations" Placed Coast Guard Inspectors Under A
          Mandatory Duty to Prevent Small Passenger Vessels
          like *Conception* from Sailing When Freighted with
          Obvious Fire Hazards ...................................................47

       3.   The Applicable Statutes and Regulations All Mandate
          Vessel Inspections and Set Clear Direction Eliminating
          Any Discretion…………………………………………..49

       4.   There Was No Choice Here………………………….53

       5.   Even If There Was Choice, Which There Was Not,
          Disregarding Safety Directives is Not the Type of
          Decision that Congress Wants to Protect……………...62

    C.   The District Court Should Have Analyzed the Motion and its
       Welter of Factual Disputes Under Summary Judgment
       Standards……………………………………………………68

1.   The District Court Committed Clear Error in its
        Factual Findings…………………………………………70

D.   The Lower Court Abused its Discretion in Not Staying the
     Case So Plaintiffs Could Obtain Evidence Withheld by the
     Government……………………………………………………72

XI.   CONCLUSION ................................................................................ 74

STATEMENT OF RELATED CASES………………………………77

CERTIFICATE OF COMPLIANCE…………………………………78

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alabama v. North Carolina,*
  560 U.S. 330 (2010) ............................................................................ 36

*Allen v. Iranon,*
  283 F.3d 1070 (9th Cir. 2002) ............................................................ 71

*Allen v. United States,*
  816 F.2d 1417 (10th Cir.1987) ............................................................ 50

*ARA Leisure Services v. United States,*
  831 F.2d 193 (9th Cir. 1987) ............................................................... 44

*Augustine v. United States,*
  704 F.2d 1074 (9th Cir. 1983) .................................................. 68, 69, 70

*Bearce v. United States,*
  614 F.2d 556 (7th Cir. 1980) ............................................................... 35

*Berkovitz ex rel. Berkovitz v. United States,*
  ("Berkovitz"), 486 U.S. 531 (1988) ........................................... 43, 44, 63

*Blue Cross & Blue Shield of Alabama v. Unity Outpatient Surgery Center, Inc.,*
  490 F.3d 718 (9th Cir. 2007) ......................................................... 30, 74

*Brady v. United States,*
  211 F.3d 499 (9th Cir. 2000) ............................................................... 29

*Canadian Transp. Co. v. United States,*
  663 F.2d 1081 (D.C. Cir. 1980) ........................................................... 34

*Cassens v. St. Louis River Cruise Lines,*
44 F.3d 508 (7th Cir. 1995) ................................................................... 62

*Chance, Inc. v. United States,*
506 F.Supp.2d 1196 (M.D. Fla. 2007) .................................................. 28

*Compagnie Maritime Margret v. San Juan Bay Pilots Corp.,*
532 F.Supp.2d 369 (D.P.R. 2008) .................................................. 28, 70

*Cranford v. United States,*
466 F.3d 955 (11th Cir. 2006) ............................................................. 35

*Dalehite v. United States,*
346 U.S. 15 (1953) .............................................................................. 43

*Drake Towing Co. v. Meisner Marine Constr. Co.,*
765 F.2d 1060 (11th Cir. 1985) ........................................................... 35

*Duarte v. City of Stockton*,
60 F.4th 566 (9th Cir.) *cert. denied*, (2023).......................................... 46

*Dunn & Black, P.S. v. United States,*
492 F.3D 1084 (9th Cir. 2007) ............................................................ 31

*Earles v. United States,*
935 F.2d 1028 (9th Cir. 1991) ...................................................... passim

*Eastern Transp. Co. v. United States,*
272 U.S. 675 (1927) ............................................................................ 36

*Federal Housing Admin. v. Burr,*
309 U.S. 242 (1940) ....................................................................... 39, 40

*Gercey v. United States,*
540 F.2d 536 (1st Cir. 1976)................................................................ 34

*Gilbert v. DaGrossa,*
765 F.2d 1455 (9th Cir. 1985) ............................................................. 31

*Gonzalez v. Arizona,*
  677 F.3d 383 (9th Cir. 2012) ................................................................ 46

*Gonzalez v. United States,*
  814 F.3d 1022 (9th Cir. 2016) ............................................................. 46

*Hart v. Massanari,*
  266 F.3d 1155 (9th Cir. 2001) ............................................................. 47

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,*
  530 U.S. 1 (2000) ................................................................................ 40

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) .............................................................................. 40

*In re Glacier Bay,*
  71 F.3d 1447 (9th Cir. 1995) .................................................. 35, 46, 62

*In re Joint E. & S. Dists. Asbestos Litigation,*
  891 F.2d 31 (2d Cir. 1989) ............................................................... 1, 35

*Indian Towing Co. v. United States,*
  350 U.S. 61 (1955) .......................................................................... 37, 43

*InteliClear, LLC v. ETC Global Holdings, Inc.,*
  978 F.3d 653 (9th Cir. 2020) ............................................................. 73

*Kelly v. United States,*
  531 F.2d 1144 (2d Cir.1976) ............................................................... 34

*Kennewick Irrig. Dist. v. United States,*
  880 F.2d 1018 (9th Cir. 1989) ........................................................... 50

*Kerns v. United States,*
  585 F.3d 187 (4th Cir. 2009) ............................................................. 28

*Kim v. United States,*
   940 F.3d 484 (9th Cir. 2019) ................................................................ 62

*Kingdomware Techs., Inc. v. United States,*
   579 U.S. 162 (2016) ............................................................................. 50

*Lam v. United States,*
   979 F.3d 665 (9th Cir. 2020) ................................................................ 46

*Lawson v. FMR LLC,*
   571 U.S. 429 (2014) ............................................................................. 41

*Lebron v. National R.R. Passenger Corp.,*
   513 U.S. 374 (1995) ............................................................................. 42

*Leone v. United States,*
   690 F.Supp. 1182 (E.D. N.Y. 1988) ..................................................... 61

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
   523 U.S. 26 (1998) ............................................................................... 50

*Madison v. United States,*
   679 F.2d 736 (8th Cir. 1982) .......................................................... 60, 61

*Maine Community Health Options v. United States,*
   590 U.S. 296 (2020) ............................................................................. 50

*Marlys Bear Medicine v. United States ex rel. Sec'y of the Dep't of the Interior,*
   241 F.3d 1208 (9th Cir. 2001) ........................................................ 43, 45

*Matson Navigation Co. v. United* States,
   284 U.S. 352 (1932) ............................................................................. 33

*McMellon v. United States,*
   387 F.3d 329 (4th Cir. 2004) ......................................................... 35, 47

*McMichael v. United States,*
  751 F.2d 303 (8th Cir. 1985) ................................................................ 61

*Mid-South Holding Co. v. United States,*
  225 F.3d 1201 (11th Cir. 2000) ........................................................... 35

*N. Queen Inc. v. Kinnear,*
  298 F.3d 1090 (9th Cir. 2002) ............................................................ 71

*Nanouk v. United States,*
  974 F.3d 941 (9th Cir. 2020) ....................................................... 67, 68

*Napper v. United States,*
  374 F.Supp.3d 583 (S.D. W.Va. 2019) ................................................ 61

*Nelson v. United States,*
  2005 U.S. Dist LEXIS 45661 (S.D. Ala. 2005)..................................... 28

*New Prime Inv. v. Oliveira,*
  586 U.S. 105 (2019) ............................................................................ 51

*Niz-Chavez v. Garland,*
  593 U.S. 155 (2021) ............................................................................ 40

*O'Toole v. United States,*
  295 F.3d 1029 (9th Cir. 2002) ............................................................ 66

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland,*
  960 F.3d 603 (9th Cir. 2020) .............................................................. 71

*Oklahoma v. Castro-Huerta,*
  597 U.S. 629 (2022) ..................................................................... 36, 40

*Puerto Rico v. Franklin California Tax-Free Trust,*
  579 U.S. 115 (2016) ............................................................................ 37

*Qualls by and through Qualls v. Blue Cross of California, Inc.,*
  22 F.3d 839 (9th Cir. 1964) ................................................................ 30

ix

*Ramag Fasteners, Inc. v. Fossil, Inc.,*
  590 U.S. 212 (2020) ............................................................................ 37

*Rayonier Inc. v. United States,*
  352 U.S. 315 (1957) ............................................................................ 37

*Robinson v. United States,*
  586 F.3d 683 (9th Cir.2009) ................................................................ 69

*Safe Air for Everyone,*
  373 F.3d 1035 (9th Cir. 2004) ................................................. 28, 29, 68

*Sanko S.S. Co. v. United States,*
  2002 U.S. Dist. LEXIS 14936 (E.D. Cal. 2002) .................................... 28

*Sea-Land Serv., Inv. v. United States,*
  919 F.2d 888 (3d Cir. 1990)................................................................. 35

*Securities & Exchange Commission v. World Capital Market, Inc.,*
  864 F.3d 996 (9th Cir. 2017) ............................................................... 29

*Smith v. United States,*
  220 F.Supp.2d 275 (S.D. N.Y. 2002) ............................................. 65, 66

*Summers v. United States,*
  905 F.2d 1212 (9th Cir. 1990) ............................................................. 45

*Sutton v. Earles,*
  26 F.3d 903 (9th Cir. 1994)..................................................... 29, 45, 57

*Terbush v. United States,*
  516 F.3d 1125 (9th Cir. 2008) ................................................. 43, 45, 64

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,*
  574 U.S. 318 (2015). ........................................................................... 70

*Tew v. United States,*
  86 F.3d 1003 (10th Cir. 1996) .............................................................. 35

*Thacker v. Tennessee Valley Authority,*
  587 U.S. 218 (2019) ..................................................................... passim

*Thompson v. Runnels,*
  705 F.3d 1089 (9th Cir. 2013) .............................................................. 41

*Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.,*
  594 F.2d 730 (9th Cir. 1979) ......................................................... 69, 70

*United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.,*
  508 U.S. 439, (1993) ............................................................................ 41

*United States v. Alameda Gateway Ltd.,*
  213 F.3d 1161 (9th Cir. 2000) .............................................................. 41

*United States v. Bormes,*
  568 U.S. 6 (2012) ................................................................................. 33

*United States v. Gaubert,*
  499 U.S. 315 (1991) ..................................................................... passim

*United States v. Mellon Bank,*
  545 F.2d. 869 (3d Cir. 1976) ................................................................. 73

*United States v. Muniz,*
  374 U.S. 150 (1963) ............................................................................. 37

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig
  Airlines),*
  467 U.S. 797 (1984) ........................................................... 43, 59, 60, 63

*United States v. United Continental Tuna Corp.,*
  425 U.S. 164 (1976) ............................................................................. 33

*VISA Int'l Serv. Assoc. v. Bankcard Holders of America,*
    784 F.2d 1472 (9th Cir. 1986) ............................................................. 30

*Whisnant v. United States,*
    400 F.3d 1177 (9th Cir. 2005) ............................................. 29, 45, 62, 67

*Wiggins v. United States,*
    799 F.2d 962 (5th Cir. 1986) ............................................................... 35

*Williams ex rel. Sharpley v. United States,*
    481 F.Supp.  (S.D. Ga. 1983) ............................................................... 35

*Williams v. United States,*
    747 F.2d 700 ......................................................................................... 35

*Wisconsin Central Ltd. v. United States,*
    585 U.S. 274 (2018) ............................................................................. 40

*Young v. United States,*
    769 F.3d 1047 (9th Cir. 2014) ............................................................. 69

## STATUTES

14 U.S.C. § 102 ......................................................................................... 50

14 U.S.C. § 504 ......................................................................................... 50

16 U.S.C. § 831c(b) ............................................................................ 31, 38

18 U.S.C. § 1115 ................................................................................ 19, 77

28 U.S.C. § 1291 ......................................................................................... 4

28 U.S.C. § 1333 ................................................................................... 4, 22

28 U.S.C. § 1346(a) ............................................................................... 5, 33

28 U.S.C. § 1491 ....................................................................................... 33

46 U.S.C. § 2101 ................................................................................... 50

28 U.S.C. § 2674 ..................................................................................... 5

28 U.S.C. § 2680(a) .................................................................. 1, 4, 32, 34

46 U.S.C. § 3301 ................................................................................... 50

46 U.S.C. § 3305 ................................................................. 50, 51, 64, 65

46 U.S.C. § 3306 ....................................................................... 51, 52, 58

46 U.S.C. § 3307 ................................................................................... 58

46 U.S.C. § 3309 ................................................................................... 47

46 U.S.C. § 3311 ................................................................................... 47

46 U.S.C. § 3313 ............................................................................. 48, 62

46 U.S.C. §§ 30501-30511 ............................................................... 22, 31

46 U.S.C. § 30701 ................................................................................. 31

46 U.S.C. § 30903 ................................................................................. 34

46 U.S.C. § 30904 ................................................................................. 34

46 U.S.C. § 33087 ................................................................................. 58

46 U.S.C. §§30901 - 30916 ...................................................................... 1

46 U.S.C.A. App. § 781 (West 1975)....................................................... 32

## RULES

FRAP 32(a)(5) and (6)................................................................78

FRAP 32(f) ...............................................................................78

FRCP 9(h) ..................................................................................4

FRCP 12(b)(1) ......................................................................5, 25

## REGULATIONS

46 C.F.R. § 75.05-55 ...............................................................53

46 C.F.R. § 116.423(a) and (b)................................................53

46 C.F.R. § 175.100(a) ..............................................................9

46 C.F.R. § 176.100 ..................................................... 12, 47, 48

46 C.F.R. § 176.25-50(a) ............................................. 15, 20, 52

46 C.F.R. §§ 176.500 ........................................................ 16, 49

46 C.F.R. § 176.500(b) ............................................................48

46 C.F.R. § 176.500(b)(1)(ii) .............................................. 48, 58

46 C.F.R. § 176.500(b)(1)(iii) ..................................................48

46 C.F.R. § 176.600 ................................................................49

46 C.F.R. § 176.600(c)(1) ........................................................48

46 C.F.R. § 176.800(b) ............................................................66

46 C.F.R. § 176.806(a) ...................................................... 16, 49

46 C.F.R. § 176.830 ..................................................................3

46 C.F.R. § 176.830(a) ...................................................................... passim

46 C.F.R. § 177.115(b) ...................................................................... 13, 58

46 C.F.R. § 177.405(f) .............................................................................. 13

46 C.F.R. § 177.410(c)(5) ........................................................................ 53

46 C.F.R. § 183.115(c) ....................................................................... 12, 58

46 C.F.R. § 183.200 ................................................................................. 16

46 C.F.R. § 183.340 ................................................................................ 53

46 C.F.R. § 183.340(b)(1) ................................................................. 16, 17

46 C.F.R. § 183.340(d)(2) ................................................................. 16, 19

# I.

## INTRODUCTION

For nearly forty years, appellate courts have superimposed the discretionary function exception of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a), into the Suits In Admiralty Act ("SIAA"), 46 U.S.C. §§30901 - 30916, despite the absence of any such language in the SIAA. Disregarding the statute's text, almost all circuits invoked the separation of powers doctrine to justify this interpretive leap. See, e.g., *In re Joint E. & S. Dists. Asbestos Litigation,* 891 F.2d 31, 35 (2d Cir. 1989). This Court followed suit in *Earles v. United States,* 935 F.2d 1028, 1032 (9th Cir. 1991).

In *Thacker v. Tennessee Valley Authority,* 587 U.S. 218, 222, 224 (2019)—an opinion that followed these earlier circuit court decisions— the Supreme Court confirmed that the FTCA's discretionary function exception cannot be read into an immunity waiving statute where Congress did not otherwise explicitly include one.

Under the High Court's reasoning in *Thacker*, the discretionary function exception does not apply to this lawsuit brought under the

1

SIAA. Like the statute in *Thacker*, the SIAA is an immunity waiving statute that does not contain a discretionary function exception.

But even if *Thacker* does not bar reading the FTCA's discretionary function exception into the SIAA, the district court's decision should nonetheless be reversed because Plaintiffs' claims arise from the Coast Guard's contravention of clear mandatory duties it imposed on itself and not from any discretionary act.

When the *Conception* erupted in flames during the early morning hours of September 2, 2019—while her captain and crew were off watch and sound asleep—thirty-four people were killed and one seriously injured. When the Government prosecuted the *Conception*'s captain for seaman's manslaughter, it insisted the blaze originated in a plastic trash can located on the vessel's main deck.

The Coast Guard had inspected the vessel seven times during the five years prior to the fire. The Coast Guard acknowledged its "***mandate***" to ensure that "all observed fire hazards ***must be corrected***" at each vessel inspection. As Coast Guard Commander Hodgdon (Division Chief of the Office of Domestic Vessel Compliance) confirmed when deposed, it is a "mandate" that "all observed unsafe

2

practices, fire hazards, and other hazardous situations must be corrected" at any vessel inspection.  46 C.F.R. § 176.830; (2 E.R. 255:24-257:8). Such obvious fire hazards include plastic trash cans.  *Id.*

When the families of *Conception*'s victims sued under SIAA, alleging that the Coast Guard had repeatedly and improperly certified the *Conception* despite obvious fire hazards such as the plastic trash can identified by the Government as the fire's source, the Government invoked sovereign immunity and "the discretionary function exception." But there was nothing discretionary about the Coast Guard's failure to require correction of an obvious fire hazard, such as a plastic trash can.

As Commander Hodgdon testified, Coast Guard inspectors had "***a mandatory duty***" to refuse to certify the *Conception* until all the plastic trash cans were removed from the vessel.  (2 E.R. 259:13-260:3.)

The district court accepted the Government's poker-faced assertion that the Commander didn't mean what she said and declared the Government immune from the families' claims.  The court erred— both legally and procedurally—in granting the motion to dismiss.  A "mandatory" obligation cannot constitute a "discretionary" function.

3

## II.

## JURISDICTIONAL STATEMENT

Plaintiffs assert claims under the SIAA. (4 E.R. 735, 738 ¶¶1-3, 768 ¶131.)  The district court had jurisdiction over those claims under 28 U.S.C. § 1333 and Fed.R.Civ.Proc. 9(h).  (4 E.R. 738 ¶1.)

This Court has jurisdiction under 28 U.S.C. § 1291 because the district court dismissed all claims for lack of subject matter jurisdiction on August 1, 2024, entering final judgment on August 2, 2024. (1 E.R. 2.)

Plaintiffs timely appealed on August 14, 2024, within 60 days of the judgment. (4 E.R. 787-795.)

## III.

## ISSUES PRESENTED

1.    Whether this Court should continue to apply the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a), to claims arising under the SIAA, see, e.g., *Earles v. United States,* 935 F.2d 1028, 1032 (1991), in light of the Supreme Court's subsequent decision in *Thacker v. Tennessee Valley Authority,* 587 U.S. 218, 222,

4

224 (2019), which rejected reading the FTCA's discretionary function
exception into a statutory enactment analogous to the SIAA.

2.      Assuming the FTCA's discretionary function exception is
applicable to claims under the SIAA, whether the Government is
required to implement its own mandatory safety directives when
inspecting and issuing a Certificate of Inspection ("COI") for passenger
carrying vessels thus precluding the applicability of the discretionary
function exception.  28 U.S.C. §§ 1346, 2674, 2680.  And even if the
Government's own mandatory safety directives did constitute some
exercise of choice, whether that decision is of the type that Congress
intended to protect under the discretionary function exception.  28
U.S.C. §§ 1346, 2674, 2680.

3.      Whether the resolution of the discretionary function issue in
this case hinged on disputed factual issues going to the merits such that
the Government's Rule 12(b)(1) motion to dismiss should have been
determined under the standard applicable to motions for summary
judgment.  And, if not, whether the district court's factual
determinations under Rule 12(b)(1), were correct.

4.     Whether the district court abused its discretion when it refused to stay the case to allow Plaintiffs' time to obtain key discovery that the Government withheld because of its prosecution of a related criminal case.

## IV.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## V.

## STATEMENT OF THE CASE

## A. It was Supposed to be a Magical Weekend of Ocean Exploration.

On August 31, 2019, thirty-three passengers and six crew members set sail from Santa Barbara on a Labor Day weekend cruise aboard *M.V. Conception*, a small passenger vessel licensed by the Coast Guard to carry up to forty-five passengers on overnight voyages.  (4 E.R. 766 ¶126, 723, ¶126, 3 E.R. 434, 531.)  The passengers ranged in age from 16 to 63 — one celebrated her seventeenth birthday on the night

6

before the fire.  (4 E.R. 738-755, 741 ¶ 15, 5 E.R. 881 ¶169.) The cruise
was to include three days of scuba diving in the waters surrounding the
nearby Channel Islands.

The *Conception* was a 75-foot motorboat with three decks.  (4 E.R.
759 ¶113 – 762 ¶119; 5 E.R. 845 ¶19, 847 ¶ 25 – 854 ¶ 40.)  The
wheelhouse and crew quarters were located on the upper or "sun deck";
the middle or "main deck" housed the galley, a salon area where
passengers congregated for meals, and three bathrooms; and the lower
deck, which lay deep in the hull entirely below the water line, was
where all passengers and one crew member slept in single or double
wooden bunk beds. (*Id*.)

On Sunday night, September 1, 2019, after some passengers made
a night dive that ended around 10:00 p.m., the vessel motored east
along the northern coast of Santa Cruz Island to Platt's Harbor and
anchored just a few hundred yards from shore.  (4 E.R. 766 ¶127; 5 E.R.
864 ¶74-76.)  By 2:45 a.m. on Monday September 2, 2019, everyone was
asleep including the crew.

## A.  Their Lives Were Over In Minutes.

The last person to crawl into his bunk on Monday morning was the second cook Michael Kohls ("Kohls").  (4 E.R. 766 ¶127; 5 E.R. 864 ¶76, 866 ¶79.) Kohls finished cleaning the salon, galley and bathrooms around 2:35 a.m. and went up the stairway aft of the main deck house to his bunk in the wheelhouse on the upper deck.  (4 E.R. 766 ¶127; 5 E.R. 864 ¶¶75-76, 866 ¶79.)  There was no fire, or any indication of a fire, and no disturbances on any of the decks. (*Id.*)

Shortly after 3:00 a.m., Kohls was awoken by noises and a cry of distress.  (4 E.R. 767 ¶128; 5 E.R. 866 ¶80.) He got up to investigate, and when he reached the stairway down to the main deck, he found the lower portion of the stairway in flames.  Kohls immediately alerted Captain Jerry Boylan ("Boylan") and the rest of the crew.  (*Id*.)

By 3:14 a.m., when Boylan made a Mayday call from *Conception's* smoke-filled wheelhouse, the fire had engulfed the salon and galley area on the main deck and was raging beyond anyone's control.  (2 E.R. 194-195; 3 E.R. 478-479; 4 E.R. 767 ¶¶128-129; 5 E.R. 867 ¶81 – 868 ¶84, 869 ¶90 – 871 ¶91.) The crew abandoned ship.  (*Id*.) Everyone in the

8

lower deck was trapped except a sixteen-year old girl who somehow fled overboard.  (4 E.R. 767 ¶129; 5 E.R. 860 ¶62 – 863 ¶70.) Her body was found more than 5 days later.  (*Id*.) The remaining thirty-two passengers and one crew member died inside the burning *Conception*. (*Id*.)

In all, thirty-four lives were lost and one crew member suffered serious injuries leaping from the sun deck down to the main deck to escape.  (*Id.;* 5 E.R. 881 ¶¶171-172.)

## B.    It Should Never Have Happened -- *Conception* Was a Disaster Waiting to Happen.

*Conception* was originally built in 1981 by Richard Glen Fritzler and Dana Jeanne Fritzler (the "Fritzlers") who owned the vessel through their business, Truth Aquatics, Inc. ("Truth Aquatics"). (4 E.R. 756 ¶103, 757 ¶104; 5 E.R. 858 ¶47- 859 ¶50.)

When the *Conception* was launched in 1981, it was inspected and certified by the Coast Guard as mandated by 46 C.F.R. § 175.100(a). (4 E.R. 757 ¶¶104-106.)

9

The vessel was built (and rebuilt following a grounding in 2005) of wood and fiberglass. (2 E.R. 42-46; 3 E.R. 400-401, 481; 4 E.R. 759 ¶113 – 763 ¶119; 5 E.R. 844 ¶17 – 855 ¶42.) The main deck where the fire caught hold housed the galley where food was prepared and the salon area where passengers socialized and ate. (*Id*.) The salon was furnished with banquette style seating on the port and starboard walls. Wooden tables and plastic chairs were located inboard of the banquettes. (*Id*.) None of the furnishings, carpeting or acoustic ceiling tiles were fire-resistant, and Chief Warrant Officer Daniel Hager, the last Coast Guard inspector to inspect and certify *Conception* before the fire, admitted the plastic garden chairs which populated the salon were obvious fire hazards. (3 E.R. 384:20 – 386:19; 389:1 – 390:11.)

The bunkroom where the passengers and one crew member slept was approximately twenty-one feet long and twenty-five feet wide. (2 E.R. 43-44; 3 E.R. 428-431; 4 E.R. 762 ¶118 – 763 ¶119; 5 E.R. 854 ¶40.) There were no windows, portholes or skylights. (*Id*.) There were thirteen double bunks and twenty singles built on wooden frames and furnished with plastic covered foam mattresses and pillows. (2 E.R. 44; 3 E.R. 491; 4 E.R. 762-763 ¶119; 5 E.R. 854 ¶40.) There were two

10

residence-grade smoke alarms, (4 E.R. 763 ¶120; 5 E.R. 893 ¶218 – 894 ¶220), and a single, hand-held fire extinguisher in the bunk room.  (3 E.R. 427; 4 E.R. 763 ¶120; 5 E.R. 894-895 ¶222.)

There were only two ways in or out of the bunkroom and neither led outside.  There was a narrow, spiral staircase at the forward end of leading up to the enclosed galley area, and a twenty-two-inch square emergency hatch tucked above one of the single bunks.  (2 E.R. 42-44, 202; 3 E.R. 428-429, 433; 4 E.R. 761-763 ¶120; 5 E.R. 851 ¶33, 853-854 ¶37, 855 ¶41.) Tragically, both led to the same enclosed salon/galley area which was completely engulfed in flames by the time Kohls awoke and sounded the alarm.

**C.    During Seven Inspections Conducted Between 2015 and 2019, There Were Obvious Fire Hazards That Should Have Been Removed or Fixed.**

The Coast Guard classifies vessels in different categories each governed by different regulations.  The regulations governing small passenger vessels, like *Conception*, are spelled out in 46 C.F.R.

11

Subchapter T, 46 C.F.R. §§ 175.100 to 185.910.  Vessels that fall within this category are referred to as "T-boats."

In 1996, the T-boat regulations were updated and modified. Vessels built prior to March 10, 1996, are generally subject to the old Subchapter T regulations ("Old-T Regulations") except that some new Subchapter T regulations ("New-T Regulations") apply no matter when the vessel was built.

According to 46 C.F.R. § 176.830(a) of the New-T Regulations: "At each inspection for certification and at every other vessel inspection all observed unsafe practices, fire hazards, and other hazardous situations *must be* corrected and all required guards and protective devices must be in satisfactory condition."  (Emphasis added.)  Commander Hodgdon confirmed that this regulation was a "directive," a "mandate" and that at every inspection "all fire hazards must be corrected."  (2 E.R. 255:24-256:16.) And

The New-T Regulations do not permit application of the Old-T Regulations for "[n]ew installations of electrical equipment and material, and the repair or replacement of wire and cable." 46 C.F.R. §

12

183.115(c).  And under 46 C.F.R. § 177.115(b) "when outfit items such as furnishing and mattresses are renewed" after March 11, 1996, they "must comply with" the New-T Regulations.  *Id.*  Coast Guard representatives who testified on behalf of the Government confirmed that the plastic trash cans[1] and garden chairs aboard *Conception* were "furnishings" within the meaning of Section 177.115(b).  (3 E.R. 367:21 – 373:23, 389:1-390:11.)

Whether inspections of the *Conception* should have been conducted under the New-T Regulations or Old-T Regulations was disputed.  (3 E.R. 539-540; 553-554; 2 E.R. 175-176.)[2]  Regardless, mandatory language in ***both*** the New-T Regulations and the Old-T Regulations placed several such duties on the Coast Guard personnel who inspected *Conception*.

---

[1] The New-T Regulations provide that "[u]nless other means are provided to ensure that a potential waste receptacle fire would be limited to the receptacle, waste receptacles must be constructed of non-combustible materials with no openings in the sides or bottom.  46 C.F.R. § 177.405(f).

[2] The district court never decided whether the inspections should have been conducted under the Old-T or New-T Regulations accepting the Government's argument that neither placed any mandatory duty on the Coast Guard.  (1 E.R. 3-11.)

13

### i.  The Plastic Trash Bins and Chairs

Between the issuance of the *Conception*'s last COI on November 19, 2014, and the fatal fire on September 2, 2019, Coast Guard inspectors from Santa Barbara inspected *Conception* no fewer than 7 times.  (3 E.R. 336 - 363.)  She was last inspected on February 13, 2019, by Chief Warrant Officer Daniel Hager.  (3 E.R. 358-363.)

The combustible plastic chairs sat in their assigned places aboard *Conception* throughout her final five years and the plastic trash bin sat there for at least three years.  (2 E.R. 267:1-284:6, 286-288.) They were impossible to miss.  (*See images*: 2 E.R. 44; 3 E.R. 499, 500, 503; 4 E.R. 761, 760; 5 E.R. 848-850.)

Officer Hager performed annual inspections of the *Conception* on February 18, 2016, February 16, 2017, February 13, 2018, and February 13, 2019.  (3 E.R. 340-343, 350-360.) He recalled seeing the plastic garden chairs, knew they were potential fire hazards, yet failed to write them up in contravention of a clear mandatory duty. (3 E.R. 340-343, 350-360, 384:20–386:19, 389:1-390-11.)

14

Commander Hodgdon testified that one of the easiest "fire hazards" to identify is a "non-steel trash can." (2 E.R. 256:17-24.) She also testified that if she had boarded the *Conception* and seen the Rubbermaid trash bin under the wooden stairway, she would have identified it as a fire hazard. And, she confirmed an inspector would have had a "mandatory duty to list that deficiency, to log it, and to ensure that it had been rectified." (2 E.R. 457:4-8, 259:13-260:3.) She confirmed the plastic garden chairs in the salon were also a fire hazard. (2 E.R. 262:15-23.)

The Government argued that 46 C.F.R. § 176.830(a) was a New-T Regulation and therefore inapplicable to *Conception*. (2 E.R. 94:11-15.) But the Old-T Regulation (former 46 C.F.R. § 176.25-50(a)) contains nearly the exact same language as 46 C.F.R. § 176.830(a).[3] Hager and the other inspectors who certified *Conception* between at least 2016 and 2019 undoubtedly would have seen the obvious hazardous trash bins and chairs; they then should have logged them as deficiencies in the

---

[3] 46 C.F.R. § 176.25-50(a) (both the 1968 and 1995 versions) stated: "At reinspection and at every other vessel inspection the marine inspector shall require that all observed unsafe practices and hazardous situations be corrected."

15

MISLE database, and ensured they were corrected before permitting the vessel to sail — as mandated by both the Old-T Regulations and the New-T Regulations alike.

But those were not the only obvious fire hazards on *Conception*.

### ii.  The Improper Electrical Wiring

Hager permitted *Conception* to sail even though her 24-volt system was equipped with substandard wiring in violation of 46 C.F.R. §§ 176.500 and 176.806.  (2 E.R. 140-142, 3 E.R. 291-294, 295-298, 483.) Such wiring is another obvious fire hazard.  46 C.F.R. § 183.200.

46 C.F.R. § 176.806(a) requires that at "each initial and subsequent inspection for certification of a vessel," inspectors must examine "all cable as far as practicable without undue disturbance of the cable or electrical apparatus."  And 46 C.F.R. § 183.340(b)(1) provides that "all cable and wire must [h]ave stranded copper conductor with sufficient current carrying capacity for the circuit in which they are used." 46 C.F.R. § 183.340(d)(2) states that all "[c]able and wire for power and lighting circuits" must be "listed by Underwriters Laboratories (UL), as UL Boat or UL Marine cable."

16

Commander Hodgdon admitted that both the New-T Regulations and the Old-T Regulations set mandatory duties for inspectors to verify compliance with the safety standards and directives. (2 E.R. 250:15-254:23.) Commander Hodgdon likewise confirmed that "one of the obligations of a marine inspector is that he or she must review the MISLE database and review previous inspections to get a sense of the vessel's operational history." (2 E.R. 248:18–249:10.) That review enables the inspectors "to get a sense of [the vessel's] history and operations, but [also] to get a sense of what kinds of deficiencies have shown up in the past." (2 E.R. 249:6-10.)

Any inspector who reviewed the MISLE database for the prior inspections of *Conception* would have discovered an alarming history of electrical deficiencies. The first alarm was sounded on August 25, 2000, when an inspector filed a Deficiency Form warning that *Conception's* builder had equipped her with non-stranded wiring in violation of 46 C.F.R. § 183.340(b)(1). (3 E.R. 291-294.) Truth Aquatics requested a waiver, but the Coast Guard refused to grant it. (*Id.*) It is not clear whether the inspectors ever conducted a "more detailed inspection" to ensure that the vessel was "in satisfactory condition" before it

17

purportedly cleared that deficiency in March 2002. (3 E.R. 295-298.)

What is clear is that when Plaintiffs' experts inspected *Conception's*

burned-out hulk after the fire, they discovery shoddy wiring and non-

marine cable of the very type described in the August 25, 2000,

Deficiency Form.  (2 E.R. 140-142.)

The Coast Guard inspectors failed to examine any aspect of

*Conception'*s electrical system during the hull inspections conducted on

March 19, 2004, January 26, 2011, September 24, 2013, February 4,

2015, and most importantly during the final annual and hull

inspections on February 13, 2019, when Warrant Officer Hager last

certified the doomed vessel as safe to sail.  (3 E.R. 299-301, 313-315,

329-331, 336-338, 358-363.) At a minimum, the failure to inspect

*Conception*'s electrical system during the February 13, 2019, inspection

was a violation of the mandatory duties spelled out in 46 C.F.R. §

176.830(a).

Hagar not only failed to inspect any aspect of *Conception*'s

electrical system or wiring on his last inspection of the vessel, (3 E.R.

358-363; 463:12-465:20), he also failed to clear an "outstanding

deficiency" that Chief Warrant Officer William De Camp had written up

18

on July 20, 2011.  DeCamp had discovered deficient "welding cable" in *Conception*'s 24-volt system and had instructed Truth Aquatics to replace it with the "UL marine cable" required by 46 C.F.R. § 183.340(d)(2).  (3 E.R. 320-322.). But there is nothing in the MISLE database to confirm that DeCamp, Hagar or any other Coast Guard official ever cleared the July 20, 2011 deficiency properly.  It was purportedly cleared on January 24, 2013, when *Conception*'s electrical system was reported "satisfactory."  (3 E.R. 447-448.)  Following an administrative review on September 24, 2013, Hagar's report was corrected to reflect that there had been "no inspection" of *Conception's* electrical system on January 24, 2013. (3 E.R. 329-331.)

Between her combustible furnishings and her shoddy electrical system, the *Conception* was a disaster waiting to happen.

## D.    The Government's Prosecution of Capt. Boylan Centered on the Fire Starting in the Plastic Trash Can Under the Stairwell

Within four months of the tragedy, the Government filed a complaint for seaman's manslaughter under 18 U.S.C. § 1115 against

19

Captain Boylan. *United States v. Jerry Nehl Boylan*, U.S. D.C. Cal. Case

No. 2:20-cv-00600-GW.[4]  The Government's prosecution was primarily

based on the allegation that Boylan failed to maintain a roving watch

on the night of the fire.  (*United States v. Boylan,* Case 2:22-cr-00482-

GW, Dkt. 1, p. 3 ¶B(1) [Indictment]; Dkt. 335, 11:7-12:24 [Government's

Opening Statement].) The Government maintained that had Boylan

only posted such a watch, the fire would have been easy to spot and

simple to extinguish because it had started just aft of the main deck in

the plastic trash container under the wooden stairway to the upper deck

– the very trash bin Commander Hodgdon admitted the inspectors

should have ordered off the vessel "per" the mandatory directive of the

New-T Regulation 46 C.F.R. § 176.830(a) and Old-T Regulation 46

C.F.R. § 176.25-50(a).

The Government had Jonathan Butta, a senior fire research

engineer, testify at the Boylan trial.  Butta's testimony was that he

conducted testing to confirm that the fire originated in the Rubbermaid

---

[4] The case was dismissed in September 2022. The Government then
refiled the claims on October 18, 2022.  *United States v. Boylan*, Case
No. 2:22-cv-00482-GW.

20

trash bin under the stairs and then spread to the salon area.  (2 E.R. 204, 207:12-211:14.) The Government also called Derek Hill, Special Agent Certified Fire Investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to testify that the fire originated in the plastic trash can under the stairway and then spread to other plastic pails in the vicinity as well as a life ring hanging on the wall.  (2 E.R. 214, 216:17-222:20.)

Wherever the fire started, the plastic trash cans and garden chairs that Hager and his fellow inspectors failed to order off the vessel indisputably helped it spread.

After a 10 day trial, Boylan was convicted on November 6, 2023. *United States v. Boylan*, Case No. 2:22-cv-00482-GW, Dkt. 386. Judgment was entered on May 3, 2024, and an appeal was filed on May 14, 2024.  (*United States v. Boylan,* Ninth Circuit Case No. 24-3077.)

## VII

## Procedural History

Plaintiffs sued the Government on September 1, 2021 and filed their First Amended Complaint on February 25, 2022  (Dkt 1; 4 E.R.

21

735-782.)  The Government answered on July 13, 2022.  (4 E.R. 707-734.)

Plaintiffs alleged, among other things, that the Coast Guard had a mandatory duty to inspect and certify the *Conception* and to comply with statutory and regulatory procedures for inspections.  (4 E.R. 757, ¶104 – 759 ¶110, 768-769 ¶ 132.) Plaintiffs further alleged the Coast Guard violated its mandatory duties by repeatedly allowing the vessel to sail with obvious fire hazards and substandard wiring.  (4 E.R. 763 ¶120 – 764 ¶123, 768-769 ¶132.)[5]

---

[5] Shortly after the fire, Truth Aquatics and the Fritzlers filed suit in the District Court under the Limitation of Liability Act of 1851 ("LOLA"), 46 U.S.C. §§ 30501-30511, seeking to limit their liability to the value of *Conception*'s burnt hulk.  *In the Matter of Truth Aquatics, Inc. and Glen Richard Fritzler and Dana Jeanne Fritzler,* U.S.D.C. Case No. 2:19-cv-07693-PA-MRW. After Plaintiffs filed claims in that action, the parties agreed Plaintiffs could pursue their claims in cases to be filed in the Los Angeles Superior Court under the "savings to suitors" clause of the Federal Judiciary Act of 1789, 28 U.S.C. § 1333(1). The first, *Fiedler, et al. v. Truth Aquatics, Inc., et al.,* L.A.S.C. Case No. 21STCV08121 was filed on March 1, 2021. Other cases followed suit and were related (collectively the "State Court Action").  Plaintiffs' claims are for negligence and strict products liability against the vessel owner, individuals who designed and built the boat, companies responsible for the 2005 rebuild, as well as lithum and lithium-ion battery and electronic device manufacturers that Plaintiffs allege either caused or contributed to the fire.  (*Id.*)

22

The parties filed their Rule 26 report in August 2022, requesting that the court stay proceedings until after the conclusion of the Boylan criminal trial because, among other things, the Government refused to allow Plaintiffs access to the welter of evidence seized as part of the criminal investigation and prosecution. (4 E.R. 694, 696-701.)[6]

Nevertheless, the Government maintained that it should be permitted to file a motion for summary judgment on its affirmative defense that the court lacked subject matter jurisdiction because Plaintiffs' claims involved matters of discretionary function for which the Government had not waived sovereign immunity. (4 E.R. 694.)

On September 9, 2022, the court ordered the parties to explain why it should stay the case pending the criminal trial. (Dkt. 62.)

The parties responded by a supplemental report in which the Government did an about face, stating it no longer believed a stay was appropriate, and urged the court to set a deadline for filing its summary

---

[6] There was disagreement as to the length of the requested stay. The Government advocated for a stay until the Boylan criminal prosecution was concluded. Plaintiffs urged that the case be stayed until after the criminal case and State Court Action concluded. (4 E.R. 694.)

23

judgment motion. The Government conceded Plaintiffs should be allowed leave to conduct "limited discovery." Plaintiffs continued to urge the Court to stay the case pending resolution of the criminal case and the State Court Action. (4 E.R. 678-684.)

By Order dated October 14, 2022, the court agreed with the Government, refusing to stay proceedings and allowing only limited discovery. (4 E.R. 677.) The court ordered the Government to file a proposal as to the scope of discovery and allowed Plaintiffs leave to respond. (*Id*.)

The Government asserted that Plaintiffs should only be entitled to discovery of the "relevant policies and procedures" for T-Boat inspections, the documents available related to the Coast Guard's inspections of the *Conception,* and depositions of those individuals who carried out the policies and procedures and inspected the *Conception*. (4 E.R. 674.)

Plaintiffs responded that the scope of the Government's proposed discovery would likely be insufficient and requested additional

discovery including the Government's post fire inspection reports. (4 E.R. 667-668.)

The court rejected Plaintiffs' requested discovery and set a deadline of roughly four months to complete discovery. (4 E.R. 663.)

The schedule was amended at the Government's request to reflect its belief that the proper motion to raise the discretionary function exception defense was a Fed.R.Civ.P. Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. (4 E.R. 657-659.) Plaintiffs joined in the request executing a stipulation allowing the Government to file a Rule 12(b)(1) motion to dismiss having no knowledge of whether such motion would be a facial attack on the complaint or a factual challenge. Thus, Plaintiffs never conceded that the Government's motion should not be decided under the summary judgment standards. (*Id.*)

On May 15, 2024, the Government filed its Rule 12(b)(1) motion along with evidentiary exhibits that were outside the four corners of the complaint. (3 E.R. 517-563; 4 E.R. 565-653.)

In their opposition, Plaintiffs argued both the merits of the motion and also argued that the motion should be converted to one for

25

summary judgment in light questions of fact relating to the

jurisdictional issue and the merits.  Plaintiffs asked the court to

continue the motion until after the criminal case so they could obtain

discovery otherwise being withheld by the Government.  (2 E.R. 155-

160, 165-168.) Their request was accompanied by a sworn declaration

identifying the specific evidence Plaintiffs required. (2 E.R. 166-168.)

The Government filed its reply accompanied by additional

evidence.  (2 E.R.  77-97, 98-122.)

No hearing was held.  The district court dismissed the case in its

entirety in a nine-page Order rejecting the request for a continuance to

permit discovery because "[n]one of the additional discovery or evidence

identified by Plaintiffs would alter the Courts application of the

discretionary function exception."  (1 E.R. 5.)

# VIII

## Summary Of The Argument

The district court erred in deciding the Government was immune

from liability under the FTCA's discretionary function exception even

though this case was not brought under the FTCA but under the SIAA.

26

In *Earles v. United States, supra*, 935 F.2d at 1032, this Court joined other circuit courts of appeal in extending the FTCA's discretionary function exception to cases brought under the SIAA, even though as *Earles* noted, the SIAA "does not expressly immunize the government for the exercise of a discretionary function." *Id.,* at 1031. In light of subsequent Supreme Court precedent refusing to uphold interpretations of a statute that infer language which was not expressly stated, the holding in *Earles, supra,* should now be reconsidered. See *Thacker v. Tennessee Valley Authority, supra,* 587 U.S. 218.

Even if the discretionary function exception should be read into the SIAA, the overwhelming evidence shows that the Coast Guard failed to follow non-discretionary inspection mandates to ensure that fire hazards present on board the *Conception* were removed and that the vessel was not certified until such hazards were eliminated. But, even if the Coast Guard had discretion in applying the regulations, its disregard of safety mandates is not a social, economic or political policy decision that Congress intended to immunize.

The district court also erred in refusing to treat the motion to dismiss as one for summary judgment because the jurisdictional issue

27

was dependent on resolving disputed facts. *Safe Air for Everyone,* 373 F.3d 1035, 1039-1040 (9th Cir. 2004); *Kerns v. United States,* 585 F.3d 187 (4th Cir. 2009); *Compagnie Maritime Margret v. San Juan Bay Pilots Corp.,* 532 F.Supp.2d 369, 373 (D.P.R. 2008); *Capt. Chance, Inc. v. United States,* 506 F.Supp.2d 1196, 1200, n.3 (M.D. Fla. 2007); *Nelson v. United States*, 2005 U.S. Dist LEXIS 45661, ** 4-5 (S.D. Ala. 2005); *Sanko S.S. Co. v. United States,* 2002 U.S. Dist. LEXIS 14936, ** 11-14 (E.D. Cal. 2002).

And the district court abused its discretion in refusing to stay the proceedings so that Plaintiffs could obtain access to evidence the Government withheld because of the Boylan prosecution.  This included an 875-page report published by the ATF regarding the cause and origin of the fire as well as evidence of the fire hazards on board the *Conception* that the ATF relied on in preparing the report.  (2 E.R. 183 ¶4; 5 E.R. 839-1036.)[7]  Plaintiffs detailed the evidence they needed as well as their repeated and unsuccessful efforts to obtain it.  (2 E.R. 183 ¶4 – 185 ¶9.). The court refused the request.  (1 E.R. 4-5.)

---

[7] Plaintiffs were only provided 197 pages of the 875-page ATF report.  (2 E.R. 183 ¶5 – 185 ¶8.)

28

## IX

## Standard Of Review

The district court's legal determinations in an order dismissing Plaintiffs' claims for lack of subject matter jurisdiction are reviewed *de novo*, (*Whisnant v. United States ("Whisnant")*, 400 F.3d 1177, 1180 (9th Cir. 2005), *Brady v. United States,* 211 F.3d 499, 502 (9th Cir. 2000)), viewing the evidence in the light most favorable for the non-moving party. *Safe Air for Everyone,* 373 F.3d at 1040, n. 4.  Its factual determinations are reviewed for clear error.  *Securities & Exchange Commission v. World Capital Market, Inc.,* 864 F.3d 996, 1003 (9th Cir. 2017).

Whether the discretionary function exception applies to a particular case is reviewed *de novo.  Sutton v. Earles,* 26 F.3d 903, 907 (9th Cir. 1994).

This Court reviews *de novo* the district court's order declining to treat the motion to dismiss as a motion for summary judgment.  *Safe Air for Everyone, supra*, 373 F.3d. at 1038-1040.

29

The district court's refusal to stay the case and its denial of discovery withheld by the Government is reviewed for abuse of discretion. *Qualls by and through Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 843 (9th Cir. 1964); *VISA Int'l Serv. Assoc. v. Bankcard Holders of America*, 784 F.2d 1472, 1475 (9th Cir. 1986); *Blue Cross & Blue Shield of Alabama v. Unity Outpatient Surgery Center, Inc.,* 490 F.3d 718, 724 (9th Cir. 2007).

## X

## Argument

## A. The SIAA Does Not Limit the Government's Liability for Actions that Are Within its Discretionary Function

The district court's ruling is erroneous because it rests on an exception to the SIAA's waiver of sovereign immunity that does not exist in the SIAA. To conclude that Plaintiff's claims were subject to sovereign immunity, the district court adhered to this Court's opinions reading the FTCA's discretionary function exception into the SIAA. (1 E.R. 6.) However, in *Thacker v. Tennessee Valley Authority, supra*, 587 U.S. at 223, the Supreme Court rejected this analysis when it held that the FTCA's discretionary function exception may not be read into a

30

similar immunity waiving statute, the Tennessee Valley Authority Act
of 1933 ("TVA Act"), 48 Stat. 60, 16 U.S.C. § 831c(b).

### 1. A Little History Explains a Lot

The Government enjoys immunity from suit "unless it has
expressly waived such immunity and consented to be sued." *Dunn &
Black, P.S. v. United States,* 492 F.3D 1084, 1088 (9th Cir. 2007,
quoting *Gilbert v. DaGrossa,* 765 F.2d 1455, 1458 (9th Cir. 1985). When
the United States has not unequivocally consented to suit, a court must
dismiss the case, because such consent is a "prerequisite for
jurisdiction." *Id.*

In 1920, Congress passed the SIAA which authorized the filing of
suits in admiralty against the Government where injuries or damage
occurred involving government-owned or operated vessels that were
"employed as a merchant vessel." SIAA § 2, 41 Stat. 525-26 (1920). The
SIAA also granted the Government the right to take advantage of
statutory limitations of liability available to private parties, such as
those available under the Limitation of Liability Act of 1851, 46 U.S.C.
§§ 30501-30511, and the Carriage of Goods by Sea Act, 46 U.S.C. §§
30701, *et seq.* But it did not include any exception to Congress' decision

31

to waive the Government's sovereign immunity, including for discretionary functions.

The SIAA as originally enacted limited the Government's liability to merchant vessels, but it did not apply to public vessels such as U.S. Navy or Coast Guard vessels. To eliminate this anomaly, Congress passed the Public Vessels Act ("PVA") in 1925 which authorized *in personam* admiralty actions for damages caused by a "public vessel of the United States." 46 U.S.C.A. App. § 781 (West 1975). And just like the SIAA, the PVA did not carve out any exception to the Government's waiver of sovereign immunity for claims within its scope.

In 1946, Congress passed the FTCA, waiving sovereign immunity for most torts committed by government employees. However, unlike the SIAA and the PVA, the FTCA ***did include*** several explicit statutory exceptions to the Government's waiver of immunity, among them the discretionary function exception. 28 U.S.C. § 2680(a). Just as importantly, the FTCA expressly excludes from its reach any claim for which a remedy is provided under the SIAA or the PVA. 28 U.S.C. § 2680(d).

32

Between the enactment of the SIAA, the PVA, the FTCA and the Little Tucker Act, 28 U.S.C. § 1346(a) (requiring that general contract claims against the Government be filed either in the Court of Claims or the district court depending on the amount in controversy),[8] the courts and practitioners found themselves confounded by issues arising from the interplay of these four acts. These included problems identifying the difference between vessels subject to suit under the PVA or the SIAA, *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 172, n.1 (1976), and identifying whether maritime contract disputes were governed by the Tucker Act or the SIAA or the PVA. *Matson Navigation Co. v. United* States, 284 U.S. 352, 359-60 (1932).

In 1960, Congress rectified these problems by amending the SIAA to eliminate the reference to "merchant vessel" and amending the immunity language to provide "[i]n a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty *in*

---

[8] See, e.g., *United States v. Bormes,* 568 U.S. 6, 9-12 (2012) (explaining the difference in the Little Tucker Act and the Tucker Act, 28 U.S.C. § 1491.)

33

*personam* may be brought against the United States or a federally-

owned corporation." 46 U.S.C. § 30903. The 1960 amendments did not,

however, add any limitation to the Government's waiver of its sovereign

immunity under the SIAA, notwithstanding Congress' inclusion of such

exceptions in the FTCA fourteen years earlier.

Following the 1960 amendments, admiralty actions previously

brought under the FTCA had to be brought under the SIAA. *See* 46

U.S. Code § 30904 ("[i]f a remedy is provided by this chapter, it shall be

exclusive of any other action arising out of the same subject matter

against the officer, employee, or agent of the United States . . . whose

act or omission gave rise to the claim") and 28 U.S.C. § 2680(d)

(excluding from the FTCA any claim for which a remedy is provided by

the SIAA). See also *Kelly v. United States*, 531 F.2d 1144, 1148–49 (2d

Cir.1976).

Despite clear textual instructions from Congress, courts in the

1970s began to ignore the SIAA's text and read in an implied

discretionary function defense based largely on a separation of powers

argument. See, e.g., *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir.

1976); *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1085

34

(D.C. Cir. 1980); *Bearce v. United States,* 614 F.2d 556, 560 (7th Cir.

1980)*; Williams v. United States,* 747 F.2d 700 (11th Cir. 1984 (*per

curiam*), *aff'g Williams ex rel. Sharpley v. United States,* 481 F.Supp.

847 (S.D. Ga. 1983); *Drake Towing Co. v. Meisner Marine Constr. Co.,*

765 F.2d 1060, 1063-64 (11th Cir. 1985); *Wiggins v. United States,* 799

F.2d 962, 964-66 (5th Cir. 1986); *Robinson v. United States (In re Joint

E. & S. Dists. Asbestos Litig.*), 891 F.2d 31, 34-35 (2nd Cir. 1989); *Sea-

Land Serv., Inv. v. United States,* 919 F.2d 888, 893 (3d Cir. 1990);

*Earles v. United States, supra,* 935 F.2d 1028; *In re Glacier Bay,* 71 F.3d

1447, 1450 (9th Cir. 1995); *Tew v. United States,* 86 F.3d 1003, 1005

(10th Cir. 1996); *Mid-South Holding Co. v. United States,* 225 F.3d

1201, 1207 (11th Cir. 2000); *McMellon v. United States,* 387 F.3d 329

(4th Cir. 2004) (*en banc*); *Cranford v. United States,* 466 F.3d 955, 958

(11th Cir. 2006).

    In *Earles v. United States, supra*, which predates *Thacker* by

almost three decades, this Court embraced the Second Circuit's holding

in *In re Joint E. & S. Dists. Asbestos Litig., supra,* 891 F.2d at 35, which

read the FTCA's discretionary function exception into the SIAA. *Earles,*

935 F.2d at 1032, quoting from *In re Joint E. & S. Dists. Asbestos Litig.,*

35

891 F.2 at 35 (the "wellspring of the discretionary function exception is the doctrine of separation of powers . . . . principles of separation of powers mandate that the judiciary refrain from deciding questions consigned to the concurrent branches of the government").

These decisions run counter to Supreme Court precedent.

To begin with, from as far back as 1927, the High Court made clear that the SIAA's waiver of immunity is broad and makes the Government suable in admiralty "exactly as a private person" and "without anomaly." *Eastern Transp. Co. v. United States,* 272 U.S. 675, 688, 691 (1927). The language from this holding alone does not provide room for an implied discretionary function exception in the SIAA.

Additionally, the circuit court decisions reading language from the FTCA into the SIAA run counter to many other Supreme Court opinions that decline to read language into a statute that otherwise is not there. See, e.g., *Alabama v. North Carolina,* 560 U.S. 330, 352 (2010) (refusing to read into an interstate compact contract, which is a statute enacted by Congress, the duty of good faith and fair dealing because "[w]e do not – we cannot – add provisions to a federal statute"); *Oklahoma v. Castro-Huerta,* 597 U.S. 629, 642 (2022) ("text of a law controls over purported

36

legislative intentions unmoored from any statutory text"); *Puerto Rico v. Franklin California Tax-Free Trust,* 579 U.S. 115, 130 (2016) ("our constitutional structure does not permit this Court to rewrite the statute that Congress has enacted"); *Ramag Fasteners, Inc. v. Fossil, Inc.,* 590 U.S. 212, 219 (2020) ("[t]his Court's limited role is to read and apply the law those policymakers have ordained"); *United States v. Muniz,* 374 U.S. 150, 166 (1963) (refusing to read into the FTCA an exemption against claims brought by prisoners for the negligence of government employees).

Where, as here, Congress enacted the SIAA as an unambiguous waiver of sovereign immunity with no discretionary function exception, there is "no justification for [a court] to read exemptions into the Act beyond those provided by Congress" because "[i]f the Act is to be altered that is a function for the same body that adopted it." *Rayonier Inc. v. United States,* 352 U.S. 315, 320 (1957) (rejecting an argument that imposing liability on the United States for the negligence of fire-fighters under the FTCA might subject the United States to a heavy financial burden); *Indian Towing Co. v. United States,* 350 U.S. 61, 69 (1955) ("[w]hen dealing with a statute subjecting the Government to liability,"

37

a court cannot act "as a self-constituted guardian of the Treasury [and] import immunity back into a statute designed to limit it").

## 2. In *Thacker*, the Supreme Court held the Discretionary Function Exception Cannot be Read into An Immunity Waiving Statute That Contains No Such Exception

The Supreme Court has yet to take up the precise question of whether the FTCA's discretionary function exception can be impliedly written into the SIAA. But it has ruled under nearly identical circumstances that courts cannot append the discretionary function exception onto another statutory immunity waiver that contains no such language.

In *Thacker v. Tennessee Valley Authority, supra,* 587 U.S. 218, the plaintiff sued the TVA for injuries after his boat collided with a downed and unmarked TVA powerline.  In establishing the TVA, Congress waived  immunity through the TVA Act by simply stating that the TVA may "sue and be sued."  16 U.S.C. § 831c(b).  Nothing in the statute expressly recognized immunity for discretionary functions.  Despite this, the TVA moved to dismiss, claiming that it was immune under the

FTCA's discretionary function exception. The district court and
appellate court agreed. 587 U.S. at 222-223.

The Supreme Court unanimously rejected the argument. 587 U.S.
at 223-224. The Court held that by its plain terms the TVA Act
contained "no exceptions relevant to tort claims, let alone one turning
on whether the challenged conduct is discretionary." *Id*., at 223. Thus,
"the FTCA's discretionary function provision has no relevance to this
case." *Id.*

Significantly, *Thacker* rejected the argument that the FTCA's
discretionary function exception should be implied into the TVA Act
under principles of separation of powers — the line of reasoning
employed in *Earles v. United States, supra,* in reading the discretionary
function exception into the SIAA. As unequivocally explained in
*Thacker*:

> [T]he Government is wrong to think that waiving the TVA's
> immunity from suits based on discretionary functions would
> offend the separation of powers. As this Court explained in
> [*Federal Housing Admin. v. Burr,* 309 U.S. 242 (1940)], the
> scope of immunity that federal corporations enjoy is up to

39

Congress. That body "has full power to endow [such an entity] with the government's immunity from suit." [citation omitted]. And equally, it has full power to "waive [that] immunity" and "subject [the entity] to the judicial process" to whatever extent it wishes. *Id*. When Congress takes the latter route—even when it goes so far as to waive the corporation's immunity for discretionary functions—its action raises no separation of powers problems. The right governmental actor (Congress) is making a decision within its bailiwick (to waive immunity) that authorizes an appropriate body (a court) to render a legal judgment.

587 U.S. at 226.

*Thacker*'s reasoning is irreconcilable with this Court's decision in *Earles,* and it is also at odds with the Supreme Court's increasing focus on fidelity to the text of statutes.  See, e.g., *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642-643 (2022); *Niz-Chavez v. Garland,* 593 U.S. 155, 160-161 (2021); *Wisconsin Central Ltd. v. United States,* 585 U.S. 274, 277-278 (2018); *Henson v. Santander Consumer USA Inc.,* 582 U.S. 79, 89 (2017); *Hartford Underwriters Ins. Co. v.*

40

*Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000); *Lawson v. FMR LLC,* 571 U.S. 429, 440 (2014).

In short, because the SIAA does not expressly limit its waiver of immunity for discretionary functions, no such exception should or can be read into the SIAA. Applying this rule, the Court should reverse the district court's judgment and remand for further proceedings.

The Government may argue that Plaintiffs did not raise *Thacker* in the district court. But that is of no moment. This Court can decide a legal issue contrary to a party's concession or tacit assumption about the governing legal rules. *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) ("we have the authority to identify and apply the correct legal standard, whether argued by the parties or not"); *United States v. Alameda Gateway Ltd*., 213 F.3d 1161, 1167 (9th Cir. 2000) ("the Supreme Court has recognized that a court of appeals does not abuse its discretion when it raises the validity of a law even when the parties failed to raise the issue in the briefs or before the district court" citing *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am*., 508 U.S. 439, 448,

41

(1993) and *Lebron v. National R.R. Passenger Corp*., 513 U.S. 374, 383 n. 3, (1995)).

**B. Inspecting Subchapter T Vessels and Refusing to Certify a Vessel That Contains Open and Obvious Safety Hazards is not a Discretionary Function.**

Even if the FTCA's discretionary function exception could be read into the SIAA, and it cannot, it does not apply here for two reasons. First, the harm-causing conduct at issue arises from mandatory aspects of an inspection of the *Conception* that the Coast Guard actually performed, and thus, they are not acts vested with an element of judgment or choice. The discretionary function exception vests the Government with the discretion to decide *whether* to do something, not a blanket excuse for doing that thing negligently. Second, to the extent the acts giving rise to liability did involve discretion, which they did not, this discretion was not the type Congress meant to protect, in that they did not involve social, economic, or political policy analysis.

42

## 1. The Limits of Discretionary Function Immunity

In a series of decisions starting in 1953 and culminating in 1991, the Supreme Court addressed the scope of the discretionary function exception. *Dalehite v. United States,* 346 U.S. 15 (1953); *Indian Towing Co. v. United States,* 350 U.S. 61 (1955); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) ("Varig")*, 467 U.S. 797 (1984); *Berkovitz ex rel. Berkovitz v. United States ("Berkovitz"),* 486 U.S. 531 (1988); *United States v. Gaubert,* 499 U.S. 315 (1991).  As summarized in *Berkovitz,* "[t]he discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment."  486 U.S. at 539.  To determine whether such an exercise of policy judgment exists, *Berkovitz* articulated a two-part test.  486 U.S. at 536-38; *see also Terbush v. United States,* 516 F.3d 1125, 1129 (9th Cir. 2008).[9]

The first question to be answered is "whether the challenged actions involve an 'element of judgment or choice.'"  *Terbush, supra,* at

---

[9] The Government has the burden to prove the discretionary function exception applies. *Marlys Bear Medicine v. United States ex rel. Sec'y of the Dep't of the Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001).

1129, quoting *Gaubert*, 499 U.S. at 322. Where "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the exception will not apply. *Berkovitz*, 486 U.S. at 536.

The rationale behind excluding conduct that violates specific mandatory safety standards is straight forward. Once the government, having balanced economic, social and political policy considerations, adopts safety standards in the form of specific and mandatory regulations or policies, employees do not have any discretion to violate those standards. *ARA Leisure Services v. United States*, 831 F.2d 193, 195–96 (9th Cir. 1987).

Thus, "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Berkovitz,* 487 U.S. at 544.

The courts turn to the second question where there is no statute, regulation or policy directing a course of action. There, the question becomes whether the judgment involves considerations of social, economic or political policy, such that it is the sort of judgment

44

Congress meant to protect. *Sutton v. Earles, supra,* 26 F.3d at 907;

*Summers v. United States,* 905 F.2d 1212, 1214 (9th Cir. 1990).

Resolving the second question can be thorny; as this Court

explained in *Whisnant*, *supra,* 400 F.3d at 1181: "weaving [through]

lines of precedent regarding what decisions are susceptible to social,

economic, or political policy analysis" can be difficult because the issues

addressed fall on a wide spectrum of decisions that can range from the

simple act of driving a car, all the way to the complex regulation and

oversight of banks.  *Id.*

It is for this reason that this Court has been reluctant to "create

formulaic categories or to demarcate flashpoints on this spectrum to

illuminate which governmental decisions fall within the discretionary

function exception."  *Terbush v. United States, supra*, 516 F.3d at 1129.

*See also Marlys Bear Medicine v. United States ex rel. Sec'y of the Dep't

of the Interior ("Marlys Bear Medicine")*, 241 F.3d 1208, 1215 (9th Cir.

2001) ("[w]hile each case requires individual analysis," the

Government's requirement to monitor the safety of a logging project

were not protected policy judgments because "once the Government has

undertaken responsibility for the safety of a project, the execution of

45

that responsibility is not subject to the discretionary function exception").

This Court has instructed that the "proper question to ask is not whether the Government as a whole had discretion at any point, but what its allegedly negligent agents did in each instance." *In re Glacier Bay,* 71 F.3d 1447, 1451 (9th Cir. 1995). Thus, "[e]ach separate action must be examined to determine whether the specific actor had discretion of a type Congress intended to shield." *Id.*

The Government argued that *Gonzalez v. United States*, 814 F.3d 1022 (9th Cir. 2016) and *Lam v. United States ("Lam")*, 979 F.3d 665 (9th Cir. 2020) undermined the fundamental holdings in *Whisnant* and *Marlys Bear Medicine.* (2 E.R. 91-92.) They do not.[10] *Lam* and *Gonzalez* are three-judge panel decisions. Absent a decision by this Court *en banc* overruling *Whisnant* and *Marlys Bear Medicine*, those decisions are binding authority. See *Gonzalez v. Arizona,* 677 F.3d 383, 389, n. 4 (9th Cir. 2012) *en banc* ("[w]e now hold that the exceptions to

---

[10] In making this argument, the Government relied on the concurring opinion of District Judge Royal in *Lam.* (2 E.R. 91.) "[C]oncurring opinions have no binding precedential value." *Duarte v. City of Stockton,* 60 F.4th 566, 574 (9th Cir.), *cert. denied*, (2023).

the law of the case doctrine are not exceptions to our general "law of the circuit" rule, i.e., the rule that a published decision of this court constitutes binding authority which "must be followed unless and until overruled by a body competent to do so," citing *Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir. 2001));  see also *McMellon, supra,* 387 F.3d at 334 ("when there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting *en banc* or by the Supreme Court").

### 2. Both the "Old-T Regulations" and the "New-T Regulations" Placed Coast Guard Inspectors Under A Mandatory Duty to Prevent Small Passenger Vessels like *Conception* from Sailing When Freighted with Obvious Fire Hazards.

*Conception* was required to have a Certificate of Inspection ("COI") to operate.  46 U.S.C. §§ 3309 and 3311; 46 C.F.R. § 176.100 ("a vessel to which this subchapter applies may not be operated without having on board a valid U.S. Coast Guard Certificate of Inspection"). Without a COI, no inspected vessel is permitted to sail out of Santa

47

Barbara harbor much less one carrying thirty-three passengers and six crew on a weekend dive expedition.  *Id.* and 46 U.S.C. § 3313.

The COI *Conception* carried on September 2, 2019, had been in place since November 19, 2014, and was due to expire on November 19, 2019. (4 E.R. 627-628.) To maintain that COI, the Coast Guard had to conduct "an annual inspection" of *Conception* and all her furnishings "within 3 months before or after each anniversary date" of her original certification, 46 C.F.R. § 176.500(b), and a "drydock and internal structural examination" every two years.  46 C.F.R. § 176.600(c)(1). (See also 2 E.R. 233:8-20.)

If an inspector found a deficiency during any of the inspections, he/she had to fill out a "CG-835 Deficiency Form" for the Coast Guard's "Marine Information for Safety and Law Enforcement ("MISLE") database.  46 C.F.R. § 176.500(b)(1)(iii).  The inspector was obligated to (1) order the owner to correct the problem and, (2) perform a follow up "inspection more detailed in scope to ensure that the vessel [was] in satisfactory condition and fit for the service" before she could sail again. 46 C.F.R. § 176.500(b)(1)(ii).  (See also 2 E.R. 233:21-234:23, 235:14-238:21.)  Inspectors were also required to document the discovery and

48

correction of any deficiencies in a "MISLE Activity Summary Report."
(3 E.R. 461:18-462:17, 463:12-24, 468:7-15.)

These inspections are not random "spot checks" as the
Government claimed, and the district court accepted. (1 E.R. 3; 3 E.R.
534, 538, 539, 553.) Rather, they are regular, mandatory inspections
required on all vessels subject to the regulations, whether Old-T or
New-T Regulations.  46 C.F.R. § 176.500 and 46 C.F.R. § 176.600.

### 3. The Applicable Statutes and Regulations All Mandate Vessel Inspections and Set Clear Direction Eliminating any Discretion

Turning to the first prong of the analysis, it is hard to understand
how the Government can argue that the negligent inspections
performed by the Coast Guard were acts of discretion since the relevant
statutes and regulations clearly eliminate discretion.

Congress has made clear that the Coast Guard "***shall***" (i) "enforce
or assist in the enforcement of all applicable Federal laws . . ." and (ii)
"administer laws and promulgate and enforce regulations for the
promotion of safety of life and property on and under the high seas and

49

waters. . .." 14 U.S.C. § 102.[11]  It is apodictic that the term "shall"

imposes a mandatory duty.  *Kingdomware Techs., Inc. v. United States,*

579 U.S. 162, 171-172 (2016) ("[u]nlike the word 'may,' which implies

discretion, the word 'shall' usually connotes a requirement").  See also

*Maine Community Health Options v. United States,* 590 U.S. 296, 310

(2020) (same); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,

523 U.S. 26, 35 (1998) ("shall" typically "creates an obligation

impervious to judicial discretion")

There are statutes which expressly (i) outline the general powers

of the Commandant of the Coast Guard, 14 U.S.C. § 504, including

his/her responsibility for marine safety, 14 U.S.C. § 504(c); (ii) identify

the types of vessels subject to inspection, 46 U.S.C. § 3301;[12] and (iii) set

forth the scope and standards for vessel inspections. 46 U.S.C. § 3305.

---

[11] Although a general statutory duty to promote safety may not be
sufficient to overcome the discretionary function exception, *Allen v.
United States*, 816 F.2d 1417, 1421 (10th Cir.1987), *cert. denied*, 484
U.S. 1004 (1988), where, as here, it is coupled with all manner of
specific statutes and regulations mandating clear duties there is no
discretion under the FTCA. *Kennewick Irrig. Dist. v. United States,* 880
F.2d 1018, 1026 (9th Cir. 1989).

[12]  The types of vessels are defined in 46 U.S.C. § 2101.

50

The latter statute, 46 U.S.C. § 3305, mandates that "the inspection process **shall** ensure that a vessel subject to inspection . . . is equipped with proper appliances for lifesaving, fire prevention, and firefighting . . .; [and] is in a condition to be operated with safety to life and property." 46 U.S.C. § 3305 (a)(1)(B) and (E) (emphasis added). Further the statute provides that the Commandant "**shall** ensure" that marine inspectors "consistently interpret regulations and standards under this subtitle and chapter 700 to avoid disruption and undue expense to industry." 46 U.S.C. § 3305(d)(1) (emphasis added).[13]

Congress also authorized the Coast Guard to implement regulations to be used when conducting inspections "to secure the safety of individuals and property on board vessels subject to inspection" and "to ensure the proper execution of" the inspections. 46 U.S.C. § 3306(a). It made clear that the regulations were to set requirements related to

---

[13] The plain meaning of "consistently" is in a way that does not change or vary. See Cambridge Dictionary and Merriam-Webster. *New Prime Inv. v. Oliveira*, 586 U.S. 105, 113 (2019) (interpreting words with their ordinary meaning when the statute was enacted). Moreover, the statute identifies a specific process for resolving differences as to the meaning of regulations thus eliminating individual inspector discretion. 46 U.S.C. § 3305(d)(2). Stated otherwise, one inspector cannot in his/her discretion interpret a regulation in a way different from another.

51

the "design, construction, alteration, repair, and operation of those
vessels, including . . . hulls, fittings, equipment, appliances, . . . piping,
electric installations, and accommodations for passengers . . .;"
"firefighting equipment, . . . and precautionary measures to guard
against fire;" . . . "the use of vessel stores and other supplies of a
dangerous nature."  46 U.S.C. § 3306(a)(1), (3) and (5).

     The implementing New-T Regulations for vessel inspections
include the mandate that "[a]t each inspection for certification and at
every other vessel inspection all observed unsafe practices, fire hazards,
and other hazardous situations ***must be*** corrected, and all required
guards and protective devices ***must be*** in satisfactory condition."  46
C.F.R. § 176.830(a) (emphasis added).  This is the very regulation that
Commander Hodgdon pointed to as being a mandatory directive
requiring the removal of the plastic trash bins.

     And, significantly, both the 1968 and 1995 Old-T Regulations
imposed mandatory duties nearly identical to the New-T Regulations.
46 C.F.R. §176.25-50(a) ("[a]t each initial and subsequent inspection for
certification, reinspection and at every other vessel inspection the

marine inspector shall require that all observed unsafe practices and hazardous situations be corrected).

The regulations specify the standards for electrical systems and identify the type of wiring authorized on vessels. 46 C.F.R. § 183.340. And the regulations mandate that trash bins "be constructed of noncombustible materials" ("unless other means are provided to ensure that a potential waste receptacle fire would be limited to the receptacle"). 46 C.F.R. § (f). The regulations also mandate that furnishings be made of non-combustible materials. 46 C.F.R. § 177.410(c)(5); 46 C.F.R. § 116.423(a) and (b); 46 C.F.R. § 75.05-55.

### 4. There Was No Choice Here

The Government's principal argument that it is immune from liability under the discretionary function exception is that it was under no mandate to ensure that the *Conception* was safe to carry passengers or to eliminate unsafe fire hazards like the plastic chairs or the plastic trash bin that the Government in the Boylan criminal case argued was the source of the fire. And it claims it was not required to ensure that electrical wiring met the required standards.

53

The district court embraced the Government's argument that the Marine Safety Manual ("MSM") vested inspectors with vast amounts of discretion. But, the MSM makes clear that there are a "multitude of laws and regulations" that the Coast Guard "must enforce" and it directs inspectors to "have a working knowledge" of those laws and regulations in order to "recognize a deficiency." (4 E.R. 574.) Despite that express directive, the lower court effectively found that the MSM does not prescribe any mandatory, step-by-step procedures inspectors must follow on every inspection. (1 E.R. 8-10.)

According to the district court and the Government, Coast Guard inspections are conducted at the whim of the individual inspector, leaving to his/her discretion whether to certify, by way of example, a vessel with no working engines or one with a two-foot hole in its hull. (1 E.R. 8-10.) It is not surprising that the Government would take such an outlandish position, since it allows the Coast Guard to proclaim with impunity that it is immune from any liability for vessel inspections. But it is hard to reconcile the district court's acceptance of this position given the express language of the statutes and regulations at issue here

54

and the unequivocal testimony of Commander Hodgdon that the regulations imposed mandatory duties on the inspectors.

The mere fact that the MSM (which the Coast Guard concedes only provides "information and guidance"), (4 E.R. 574), purportedly allows inspectors to make "reasonable, discretionary decisions on case-by-case situations" does not mean that inspectors can flat out ignore regulations and statutes implemented for safety purposes. (3 E.R. 536.) In fact, the MSM makes clear that it is the "responsibility of the marine inspector to have a working knowledge of both U.S. and international laws and regulations so that he/she can recognize a deficiency when one occurs . . .." (4 E.R. 574.) The deficiencies include the plastic trash bin which Boylan's prosecutors identified as the fire's source and which Commander Hodgdon testified was an "obvious fire hazard within the meaning of the [regulations]" for which a deficiency notice should have been issued. (2 E.R. 256:17-257:8, 259:13-23.)

There is nothing that the Government can point to that alters the mandate that trash bins, salon chairs and other furnishings be manufactured of non-combustible materials, or electric wiring be of a marine grade. And yet, in the face of these safety mandates, for at least

55

five years and despite seven inspections, Coast Guard inspectors never issued any deficiency notice or ordered the removal of any of the plastic furnishings, or non-marine grade wiring.  (See 3 E.R. 336-363.)

There is also nothing that the Government can point to that alters the mandate for the Coast Guard to conduct inspections of the electrical systems, yet the evidence established that this basic safety directive was ignored altogether during at least the last six inspections before the fire.  (3 E.R. 336-363.)  Significantly, the Coast Guard failed to inspect any part of *Conception's* electrical system for potential fire hazards, safety or regulatory compliance during that ill-fated vessel's last annual inspection prior to the fire.  (3 E.R. 358-363.) This despite Commander Hodgdon's testimony that electrical inspections imposed mandatory duties on the inspectors to write up any deficiencies and ensure those deficiencies were fixed.  (2 E.R. 239:19-241:3, 242:19-243:9, 244:17-245:4, 246:12-247:14, 251:6-254:18.)

The Government also argued that it should not be responsible for failing to properly inspect the *Conception* because the responsibility to ensure that the vessel complied with any statute or regulation fell on the Fritzlers and Truth Aquatics.  (3 E.R. 544, 547, 550, 561; 2 E.R. 86-

88.) This finger-pointing argument is standard in cases like this, but it has no bearing on whether the discretionary function exception applies since it is nothing more than an argument of contributory negligence. *See, e.g., Sutton v. Earles*, 26 F.3d 903, 913-914 (1994).

Nevertheless, the district court accepted the Government's argument placing the obligation to comply with statutes and regulations exclusively on the vessel owner and giving the Government a pass on its inspection obligations. (1 E.R. 8-9, 10-11.) [14]

Unquestionably, there is some amount of discretion vested in every task performed by a government employee, as there was undoubtedly some form of discretion vested in the Coast Guard in connection with its inspections of the *Conception*. But the legally dispositive threshold issue is not the mere existence of discretion in connection with the performance of a task. Rather, the issue to be determined is "whether the challenged actions involve an 'element of judgment or choice.'" *Terbush, supra,* at 1129, quoting *Gaubert*, 499

---

[14] The district court focused on the electrical regulations claiming that they imposed obligations on the vessel owner. The court just plain ignored the regulations relating to combustible trash bins and furnishings. (1 E.R. 9-10.)

57

U.S. at 322. In other words, a nondiscretionary act is not cloaked with immunity merely because it is somehow adjacent to an act that involves an element of judgment or choice.

There is no dispute that the Coast Guard was under a mandatory duty to inspect the *Conception* annually to ensure compliance with laws and regulations. 46 U.S.C. §§ 3307 and 33087. The purpose of the inspections was to ensure that the vessel was safe to operate. 46 U.S.C. § 3306. Inspectors were under a mandatory duty to issue deficiency notices for items that did not meet regulatory standards including plastic trash bins, plastic chairs and improper electrical wiring. 46 C.F.R. § 176.830(a); 46 C.F.R. § 183.115(c); 46 C.F.R. § 177.115(b). (See also 2 E.R. 255:24-256:15.) Once a deficiency notice was issued, the Coast Guard was required to conduct a more detailed reinspection to ensure that the deficiency was corrected. 46 C.F.R. § 176.500(b)(1)(ii).

In the face of these mandates, the district court found that inspectors are vested with vast amounts of discretion over what parts of the vessel to inspect and whether to issue deficiency notices. In short, as far as the lower court is concerned, even though the Coast Guard is required to conduct inspections, it doesn't matter what the inspector

58

does during the inspection because he/she has discretion in deciding

whether to write up a safety hazard. (1 E.R. 8-10.) Read to its logical

conclusion, the entire inspection process would be meaningless,

defeating the statutory and regulatory mandates that decisional law

clearly holds gives rise to liability.

The district court's reliance on *United States v. S.A. Empresa de*

*Viacao Aerea Rio Grandense (Varig Airlines) ("Varig")*, 467 U.S. 797

(1984), is misplaced. If anything, *Varig* confirms that the Government

cannot escape liability under the discretionary function exception. In

*Varig,* the Court held that the exception barred tort claims against the

Government based on the Federal Aviation & Administration's ("FAA")

adoption and implementation of a "spot-checking program to ensure

that aircraft complied with FAA safety regulations." *Id.,* at 814-820.  In

*Varig,* the FAA made a policy decision to place primary responsibility

for safety compliance with the aircraft manufacturer and to have the

manufacturer perform all inspections subject only to FAA spot-checks

leaving the FAA with broad discretion to determine the number and

frequency of spot-checks. The FAA inspectors were not obligated to

inspect each plane and there was no evidence that the FAA had actually inspected the part at issue in the case. 467 U.S. 814-815.

The regimen the Coast Guard set up in Subchapter T did not call for mere spot-checks. The Coast Guard had a mandatory duty to inspect the *Conception* and her furnishings and electrical systems, regularly, systematically and thoroughly. Having undertaken a mandatory obligation to inspect all relevant vessels, and having actually performed inspections of the *Conception,* the Coast Guard cannot now avoid liability for ignoring the mandatory safety regulations that governed those inspections, including regulations barring plastic trash bins and chairs and those compelling inspections of the electrical systems.

As the court held in *Madison v. United States,* 679 F.2d 736 (8th Cir. 1982) when it refused to find the Government immune from suit for failing to enforce compliance with a contractor's safety manual:

> The government may not have a legal obligation to promulgate safety rules and conduct inspections for compliance. But once it has exercised its discretion to adopt such rules and to conduct safety inspections, it is obligated in circumstances

such as those allegedly present here to take reasonable steps to enforce compliance with the applicable safety regulations. . . . ***The failure to fulfill that obligation when the interests of safety plainly mandate it is an operational level decision that is not immune from suit under the FTCA***.

679 F.2d at 741 (emphasis added).  See also *Napper v. United States,* 374 F.Supp.3d 583 (S.D. W.Va. 2019) (discretionary function exception did not bar wrongful death claims of widow of minor killed in explosion alleging inspectors from the U.S. Mine & Safety Administration were negligent in inspecting the mine and violated mandatory inspection regulations); *McMichael v. United States,* 751 F.2d 303 (8th Cir. 1985) (discretionary function exception did not apply to wrongful death and injury claims caused by explosion at munitions plant that Government was required to inspect but failed to do so finding safety compliance check was mandatory not discretionary); *Leone v. United States,* 690 F.Supp. 1182 (E.D. N.Y. 1988) (allowing claims by estates of airplane passengers killed when pilot suffered a heart attack to proceed against the Government

based on the claim that the aviation medical examiners were negligent in performing medical exam of pilot).[15]

### 5. Even if There Was Choice, Which There was Not, Disregarding Safety Directives Is Not the Type of Decision that Congress Wants to Protect

With respect to the second step of the discretionary function exception analysis, the Coast Guard's decision to ignore mandates that trash bins and chairs be of non-combustible materials, and electrical wiring be of marine grade, does not require a court to "second guess" an administrative agency's "social, economic or political policy decisions." [16]

---

[15] The district court also relied on *Cassens v. St. Louis River Cruise Lines,* 44 F.3d 508 (7th Cir. 1995) affirming dismissal of claims brought under the SIAA under the discretionary function exception, holding that the regulatory requirements were "of no import" if the inspection "involve[d] the type of judgment protected by the discretionary function exception." *Id.,* at 513. *Cassens* is at odds with *Kim v. United States,* 940 F.3d 484, 488-89 (9th Cir. 2019), *Whisnant, supra,* 400 F.3d at 1181 and *In re Glacier Bay, supra,* 71 F.3d at 1451-1454. But even *Cassens* recognized that its decision would differ if there were allegations that a COI was issued to a non-complying vessel in violation of 46 U.S.C. § 3313(b)(1). 44 F.3d. at 515. Plaintiffs alleged here that the Government was negligent in issuing a COI for a non-complying vessel. (4 E.R. 769, ¶ 132(c).)

[16] The district court never analyzed the Coast Guard's actions under the second step of the discretionary function analysis.

The language of the discretionary function exception does not apply to every situation where there is an actual option to choose between action or inaction. Rather, the discretion that is immunized from "second-guessing" in the tort suit context applies to "legislative and administrative decisions grounded in social, economic, and political policy." *Varig,* 467 U.S. at 814.

In *Berkovitz*, 486 U.S. at 537, the Court explained that "[t]he [discretionary function] exception, properly construed ... protects only governmental actions and decisions based on consideration of public policy." And in *United States v. Gaubert*, 499 U.S. 315 at 325, the Court further explained that for a claim to survive, the challenged actions cannot "be grounded in the policy of the regulatory regime." Rather the "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*.

The Government bears the burden of proving that the Coast Guard inspectors' actions in certifying the *Conception* with plastic trash bins and chairs prohibited by regulations and deficient electrical wiring

63

were susceptible to a policy analysis. "It is not sufficient for the government merely to [wave] the flag of policy as a cover for anything and everything it does that is discretionary in nature. . . . if all that were required were a bald incantation of 'policy,' then such an approach would swallow the second prong of *Berkowitz*." *Terbush v. United States, supra,* 516 F.3d at 1134-35.

Here, the Government claimed it satisfied the second prong by arguing that because the acts were discretionary in the first instance (referring back to the first prong), it is "entitled to a 'strong presumption' that the second prong is also satisfied. (3 E.R. 557, citing *Gaubert,* 499 U.S. at 324).) That argument fails because, as explained above, the acts at issue were not discretionary.

As a fall back, the Government argued that the Coast Guard's marine safety programs, including inspection and certification decisions, balance "competing policy interests" in three ways. First it alleges that the Coast Guard is required "by statute to balance vessel safety with the goal of facilitating maritime commerce." (3 E.R. 558.) The Government points to 46 U.S.C. § 3305(d)(1) in support of this argument. (3 E.R. 558.) But that provision simply mandates that the

Commandant "ensure that Officers in Charge, Marine Inspections consistently interpret regulations and standards under this subtitle and chapter 700 to avoid disruption and undue expense to industry." 46 U.S. § 3305(d)(1). Fairly read, that provision speaks only to the need for an unvarying interpretation of the regulations by the inspectors. If anything, the provision eliminates discretion and undermines the Government's argument that this is an issue susceptible to policy considerations.[17]

Second, the Government claims "vessel inspections must balance the goal of uniformity with the express goal of inspecting and evaluating the safety of each vessel on an individual basis." (3 E.R. 559-560.) This is nothing more than an argument that the inspectors purportedly should consider "each vessel's unique characteristics and circumstances," including "routes operated," "capabilities of the vessel," and "other operational limits." *Id.* This is precisely what occurred in *Smith v. United States,* 220 F.Supp.2d 275 (S.D. N.Y. 2002). There, the

---

[17] 46 U.S.C. § 3305 mandates that "the inspection process shall ensure that a vessel subject to inspection ... is in a condition to be operated with safety to life and property and complies with applicable marine safety laws and regulations." 46 U.S.C. § 3305(1)(E) and (F).

65

Coast Guard made a conscious decision to depart from the requirements and only certified the vessel to operate under certain explicit restrictions. *Id.,* at 282, citing 46 C.F.R. § 176.800(b). Here no departure was authorized or even considered by the Coast Guard. But more significantly, there is no credible argument that certifying *Conception* to operate with the plastic trash bins and plastic garden chairs Commander Hodgdon testified were violative of the regulations or deficient electrical systems falls within any policy balancing the vessel's operations, routes or capabilities.

For its third argument, the Government invoked the Coast Guard's financial interests claiming it "must operate with a finite budget and resources to balance between eleven different statutory missions, only one of which is vessel inspections." (3 E.R. 561.) Invoking financial considerations is an argument that this Court has repeatedly rejected. See, e.g., *O'Toole v. United States,* 295 F.3d 1029, 1037 (9th Cir. 2002) ("every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources . . . were we to view inadequate funding alone as sufficient to garner the protection of the

discretionary function exception, we would read the rule too narrowly and the exception too broadly"); *Whisnant,* 400 F.3d at 1184 ("we decline to permit the government to use the mere presence of budgetary concerns to shield allegedly negligent conduct from suit under the FTCA").

Moreover, there is no financial imposition where the Coast Guard's liability rests on an inspection it actually performed as a result of its mandatory duty to inspect such vessels. And as for the vessel owner, it is hard to imagine any financial impediment to ordering the replacement of a plastic trash bin with a metal or steel trash bin – had that been done, at least as far as the Government's evidence in the Boylan criminal trial is concerned, thirty-four lives would not have been tragically lost in the *Conception* fire.

"The key factor in identifying judgments that are protected by the discretionary function exception is the presence of 'competing policy considerations' that must be weighed." *Nanouk v. United States,* 974 F.3d 941, 949 (9th Cir. 2020). And "when the government is charged with acting or failing to act in a way that jeopardizes safety, there must

be a legitimate *policy* consideration on the other side of the balance
before the discretionary function exception can be held to apply." *Id.*

There was no legitimate policy consideration on the other side
here. There was a simple failure to follow mandatory directives that
were enacted to ensure the safety of the vessel leading to the worst
maritime disaster in California since 1865.

## C. The District Court Should Have Analyzed the Motion and its Welter of Factual Disputes Under Summary Judgment Standards.

The lower court dismissed Plaintiffs' claims for lack of subject
matter jurisdiction under Rule 12(b)(1). A jurisdictional attack under
that rule may be facial or factual. *Safe Air for Everyone, supra,* 373
F.3d at 1039. A facial attack is based on the complaint's allegations and
concerns a pleading deficiency, while a factual attack challenges the
facts underpinning the allegations that otherwise support jurisdiction.
*Id.*

Here, the Government's attack was factual. *Augustine v. United
States,* 704 F.2d 1074, 1077 (9th Cir. 1983) ("[i]n ruling on a challenge
to subject matter jurisdiction, the district court is ordinarily free to hear

evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary"); *Young v. United States,* 769 F.3d 1047, 1052 (9th Cir. 2014) ("[a]llegations of jurisdictional facts, however, are not afforded presumptive truthfulness; on a motion to dismiss for lack of subject matter jurisdiction, the court may hear evidence of those facts and 'resolv[e] factual disputes where necessary'" citing *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir.2009).

The standards that apply to a Rule 12(b)(1) motion "differ greatly from the standards for ruling on a motion for summary judgment." *Thornhill Pub. Co., Inc. v. General Tel. & Electronics Corp.,* 594 F.2d 730, 733 (9th Cir. 1979). When presented with a factual attack on subject matter jurisdiction, among other things, "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims" and "plaintiff will have the burden of proof that jurisdiction does in fact exist." *Id.*

In contrast, a summary judgment motion allows the moving party to prevail "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Augustine v. United States, supra,* 704 F.2d at 1077. "Unless that standard is met,

69

the jurisdictional facts must be determined at trial by the trier of fact."
*Id.*, citing *Thornhill, supra*, 594 F.2d at 733-35. And summary
judgment is only appropriate if there are no genuine issues of material
fact. *Id.*

At a minimum there were factual disputes whether the Coast
Guard violated statutory and regulatory mandates by issuing COIs
knowing that the *Conception* had plastic trash bins and garden chairs
and improper electrical wiring. By ignoring unrefuted testimony of
Commander Hodgdon as to the nature of the mandatory duties imposed
on inspectors to require the removal of plastic trash bins and garden
chairs, the district court erred in failing to review the evidence under
the standards applicable to summary judgment motions. *Augustine v.
United States, supra,* 704 F.2d at 1077; *Compagnie Maritime Margret,
supra,* 532 F.Supp.2d at 373.

## 1. The District Court Committed Clear Error in its Factual Findings

When ruling on a factual motion to dismiss, factual findings are
reviewed for clear error. *Teva Pharmaceuticals, supra,* 574 U.S. at 324-
325. Under this "significantly deferential" standard, "we will accept the

lower court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed." *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002)).  This Court will reverse "if the district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020).

In dismissing this case under discretionary function exception, the district court found, among other things, that the regulations mandating electrical inspections did not impose any mandate on the inspectors but rather on the vessel owner.  (1 E.R. 9.)  Yet, this finding is contrary to Commander Hodgdon's testimony that inspectors were required (1) to conduct electrical inspections; (2) write up any deficiencies (3) to not clear the deficiency until an appropriate follow-up inspection is performed confirming the deficiencies was rectified.  (2 E.R. 239:19-241:3, 242:19-243:9, 244:17-245:4, 246:12-247:14, 251:6-254:18.)

Further, the district court gave no consideration to Commander
Hodgdon's testimony that plastic trash cans are an obvious fire hazard
for which there was a mandatory duty to issue a deficiency form and
require the correction of that deficiency.  (2 E.R. 256:17-257:8.)

The district court clearly erred in disregarding the testimony of
the Coast Guard officer who serves as the Division Chief for Domestic
Vessel Compliance and has conducted hundreds of inspections
throughout her career.  Instead, the court wrongly conclude that Coast
Guard inspectors had unfettered discretion in performing inspections.
(2 E.R. 228:1-231:23.)

# D. The Lower Court Abused its Discretion in Not Staying the Case So Plaintiffs Could Obtain Evidence Withheld by the Government.

The Government's criminal case against Boylan posed a
significant issue to Plaintiffs' ability to obtain discovery.  The
Government refused to turn over virtually all evidence that it seized
after the fire and used to, among other things, analyze the source or
location where the fire started.  The fact that the Government declined
to afford Plaintiffs access to such critical discovery was disclosed to the

district court.  (2 E.R. 182-184 ¶¶3-7, 185 ¶9.)  The court was also

informed of the extensive efforts undertaken by Plaintiffs to obtain

access to the discovery.  (2 E.R. 185 ¶9.)  Despite this, the court denied

Plaintiffs' request to stay the case pending the resolution of the criminal

case so that Plaintiffs would be able to obtain all of the evidence in the

Government's possession.  (1 E.R. 4-5.) Allowing access to that evidence

may have shed additional light on the Coast Guard's shortcomings and

the inspectors' mandatory duties including the removal of plastic trash

bin that the Government claimed was the source of the fire.  (2 E.R. 183

¶5 – 185 ¶8.)  By simply plunging ahead and refusing to stay the

proceedings, the district court short-circuited the process without

explaining why it refused the requested stay.  (Dkt. 62; 4 E.R. 677.)

Given Plaintiffs' constitutional and statutory right to prosecute

their civil claims and the fact that those rights could not be fully

vindicated without evidence in the Government's possession, the district

court's knee-jerk blanket refusal to stay the case was an abuse of

discretion.  *InteliClear, LLC v. ETC Global Holdings, Inc.,* 978 F.3d 653,

663-664 (9th Cir. 2020); *United States v. Mellon Bank,* 545 F.2d. 869,

872-873 (3d Cir. 1976); *Blue Cross & Blue Shield of Alabama, supra,* 490 F.3d at 724-725.

## XI

## CONCLUSION

For the foregoing reasons, this Court should reverse the Order dismissing Plaintiffs' case and remand for further proceedings.

Dated: January 21, 2025        Respectfully submitted,

NELSON & FRAENKEL LLP

MCGUINN HILLSMAN & PALEFSKY

By: *  /s/ Gretchen M. Nelson*
        Gretchen M. Nelson
Todd Abbott
ABBOTT & ABBOTT LAW
2127 Olympic Parkway, # 1006-348
Chula Vista, CA 91915
Tel: (619) 578-3429
Email: tmabbottlaw@gmail.com

Cory Itkin
ARNOLD & ITKIN LLP
6609 Memorial Dr.
Houston, TX 77007-7035
Tel: 713-222-3800
Fax: 713-222-3850
Email: citkin@arnolditkin.com

74

A. Edwards Fields
W. Russell Fields
W. Van Fields
LAW OFFICES OF W. RUSSELL FIELDS
1792 Tribute Road, Suite 400
Sacramento, CA 95815
Tel: (916) 646-6100
Fax: (916) 646-8769
Email: ed@russfieldslaw.com
russ@russfieldslaw.com
van@russfieldslaw.com

Jennifer Fiore
Sophia Achermann
FIORE ACHERMANN
340 Pine Street, Suite 503
San Francisco, CA 94104
Tel: (415)550-0650
Email: sophia@thefafirm.com
jennifer@thefafirm.com

Ilya Frangos
GALINE, FRYE, FITTING & FRANGOS
411 Borel Avenue, Suite 405
San Mateo, CA 94402
Telephone: (650) 345-8484
Facsimile: (650) 345-9875
Email: ifrangos@gff-law.com

Kevin Mahoney
Daniel Rose
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel: (212) 687-8181
Fax: (212) 972-9432
Email: kmahoney@kreindler.com
drose@kreindler.com

75

Robert J. Mongeluzzi
Jeffrey P. Goodmam
E.Douglas Disandro, Jr.
SALTZ MONGELUZZI & BENDESKY P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: 215-496-8282
Fax: 215-496-0999
Email:
rmonteluzzi@smbb.com
jgoodman@smbb.com
ddisandro@smbb.com

Theodore Poppinga
SCHUERING ZIMMERMAN & DOYLE, LLP
400 University Avenue
Sacramento, CA 95825
Tel: (916)567-0400
Fax: (916) 568-0400
Email:  tdp@szs.com

Michael A. Kelly
Matthew Davis
Spencer Pahlke
WALKUP, MELODIA, KELLY &
SCHOENBERGER
650 California Street, 26th Floor
San Francisco, CA 94108
Tel: 415-981-7210
Fax: 415-391-6965
Email: mdavis@walkuplawoffice.com
mkelly@walkuplawoffice.com
spahlke@walkuplawoffice.com

## STATEMENT OF RELATED CASES

The undersigned attorney states the following:

I am aware of one related case currently pending in this Court. The case number and name of the related case and its relationship to this case is as follows:

*United States v. Jerry Nehl Boylan* ("*U.S. v. Boylan*")*,* Ninth Circuit Case Nos. 24-3077 and 24-6045, on appeal from the U.S. District Court, Central District of California, Case No. 2:22-cr-00482-GW.  In *U.S. v. Boylan,* the United States prosecuted and obtained a conviction against Jerry Nehl Boylan, the Captain of the vessel *Conception* pursuant to the Seaman's Manslaughter Statute, 18 U.S.C. § 1115.  The case thus arises from the same event. Judgment and Commitment was entered May 3, 2024, and a notice of appeal was filed on May 14, 2024.  An amended judgment was entered on October 2, 2024, and a notice of appeal was filed as to the amended judgment on October 3, 2024.

Dated: January 21, 2025            */s/ Gretchen M. Nelson*
                                                    Gretchen M. Nelson

## CERTIFICATE OF COMPLIANCE

I am one of the attorneys for the Plaintiffs/Appellants in this case.

This brief contains 13,981 words, and excluding the items

exempted by Fed.R.App. 32(f). The brief's type size and typeface comply

with Fed.R.App. 32(a)(5) and (6).

I certify that this brief complies with the word count limitations

set forth in Cir. R. 32-1.

Dated: January 21, 2025          _____*/s/ Gretchen M. Nelson*_____
                                          Gretchen M. Nelson