No. 24-5064

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NANCY FIEDLER, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Central District of California

APPELLANTS' EXCERPTS OF RECORD

**VOLUME 2 of 5**

Gretchen M. Nelson (112566)
NELSON & FRAENKEL LLP
601 So. Figueroa, Suite 2050
Los Angeles, CA  90017
Telephone: (213) 622-6469
Telecopier:  (213)-622-6019
gnelson@nflawfirm.com

John R. Hillsman (71220)
MCGUINN HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, CA 94111
Telephone: (415) 421-9292
Telecopier:  (415) 403-0202
jrhillsman@mhpsf.com

*Counsel for Plaintiffs-Appellants – Add'tl Counsel on Signature Page*

**ER 12**



1 | GRETCHEN NELSON, ESQ. (S.B.N. 112566)
(gnelson@nflawfirm.com)
2 | CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
(cllinas@nflawfirm.com)
3 | NELSON & FRAENKEL LLP
4 | 601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
5 | Telephone: (213) 622-6469
6 |
7 | JOHN R. HILLSMAN (S.B.N. 71220)
(jrhillsman@mhpsf.com)
8 | MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
9 | San Francisco, CA 94 I 33
Telephone: ( 415) 421-9292
10 |
11 | DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
(ddisandro@smbb.com)
12 | SALTZ MONGELUZZI & BENDESKY P.C.
1650 Market Street
13 | Philadelphia, PA 19103
Telephone: (2I5) 496-8282
14 |
15 | *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16 | UNITED STATES DISTRICT COURT

17 | CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

18 |

19 | NANCY FIEDLER, et al.,                **Case No. 2:21-cv-07065-PA-MRW**

20 |         Plaintiffs,                **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE (DOC. NO. 107) AND UNDISPUTED CROSS-MOTION TO AMEND THEIR STATEMENT OF DISPUTED MATERIAL FACTS**

21 |

22 | vs.

23 | UNITED STATES OF AMERICA

24 |         Defendant.

25 |

26 |

27 |

28 |

1

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND
CROSS-MOTION TO AMEND THEIR STATEMENT OF DISPUTED MATERIAL FACTS

**ER 13**

1  Plaintiffs respectfully submit this opposition to Defendant's Motion to Strike
2  NTSB Report (Doc. No. 107) and undisputed cross-motion to amend their Statement
3  of Disputed Material Facts (Doc. No. 101).

4  Since the filing of the motion to strike, the parties have conferred and reached
5  an agreement. Plaintiffs will amend their Statement of Facts to remove references to
6  the NTSB Marine Accident Report, thereby mooting Defendant's motion to strike.
7  Plaintiffs therefore request an order: (1) granting them leave to file an Amended
8  Statement of Facts forthwith; and (2) denying Defendant's motion to strike as moot.
9  A proposed order is lodged concurrently.

10  **I.    PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND**
11  **THEIR STATEMENT OF FACTS, MOOTING DEFENDANT'S**
12  **MOTION TO STRIKE.**

13

14  In their initial opposition to Defendant's pending Rule 12(b)(1) motion to
15  dismiss, Plaintiffs' Statement of Disputed Material Facts cited the National
16  Transportation Safety Board's Marine Accident Report ("Marine Accident Report")
17  seven times. (Doc. No. 101, ¶¶ 1, 4, 28, 29, 30, 31, 32). On July 22, 2024, Defendant
18  filed a motion to strike those references to the Marine Accident Report, asserting
19  that Plaintiffs' reliance on the report violated 49 U.S.C. § 1154(b). (Doc. No. 107).
20  On July 23, 2024, this Court ordered Plaintiffs to submit an Opposition to the Motion
21  to Strike no later than July 29, 2024. (Doc. No. 108).

22  The parties have conferred and reached a resolution: Plaintiffs will amend
23  their Statement of Facts to replace the portions citing the Marine Accident Report
24  with citations to other exhibits already in the record. They will also  rely on the
25  National Transportation Safety Board's Group Chairman's Factual Report:
26  Operations related to the investigation of the fire on board Conception on September
27  2, 2019 to support those facts. (Hillsman Decl. ISO Pltffs' Cross-Mot. to Amend
28  Sep. Stmt., Ex. 24.) Plaintiffs therefore request that the Court grant them leave to

file an Amended Statement of Facts, attached as Exhibit 1, upon entry of the requested order. Defendant does not oppose this relief.

## II.    CERTIFICATION REGARDING MEET AND CONFER

The undersigned hereby certifies that they conferred with counsel for Defendant prior to filing this cross-motion and Defendant indicated they would not oppose the cross-motion, which will moot the pending motion to strike.

## III.    REQUESTED RELIEF

Plaintiffs request an order: (1) granting them leave to file their Amended Statement of Disputed Material Facts contained at Exhibit 1 of this motion forthwith; and (2) denying Defendant's motion to strike (Doc. No. 107) as moot.

Respectfully submitted,

Lead Counsel for All Plaintiffs

By:    /s/ *John R. Hillsman*    _
        JOHN R. HILLSMAN

WALKUP MELODIA KELLY SCHOENBERGER
PANISH SHEA BOYLE & RAVIPUDI LLP
FIORE ACHERMAN, A Law Corp.
SCHUERING ZIMMERMAN & DOYLE, LLP
KREINDLER & KREINDLER LLP
LAW OFFICE OF W. RUSSELL FIELDS
GALINE FRYE FITTING & FRANGOS
ARNOLD & ITKIN LLP

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND
CROSS-MOTION TO AMEND THEIR STATEMENT OF DISPUTED MATERIAL FACTS

1    TODD M. ABBOTT, ESQ.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE AND
CROSS-MOTION TO AMEND THEIR STATEMENT OF DISPUTED MATERIAL FACTS

**ER 16**

# EXHIBIT 1

1 | GRETCHEN NELSON, ESQ. (S.B.N. 112566)
(gnelson@nflawfirm.com)
2 | CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
(cllinas@nflawfirm.com)
3 | NELSON & FRAENKEL LLP
601 South Figueroa Street, Suite 2050
4 | Los Angeles, CA 90017
Telephone: (213) 622-6469
5 |
6 |
7 | JOHN R. HILLSMAN (S.B.N. 71220)
(jrhillsman@mhpsf.com)
8 | MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
9 | San Francisco, CA 94 I 33
Telephone: ( 415) 421-9292
10 |
11 | DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
(ddisandro@smbb.com)
12 | SALTZ MONGELUZZI & BENDESKY P.C.
1650 Market Street
13 | Philadelphia, PA 19103
Telephone: (2I5) 496-8282
14 |
15 | *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16 | UNITED STATES DISTRICT COURT

17 | CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

18 |

19 | NANCY FIEDLER, et al.,                    **Case No. 2:21-cv-07065-PA-MRW**

20 |         Plaintiffs,                       **PLAINTIFFS' AMENDED
                                               STATEMENT OF DISPUTED
21 |                                           MATERIAL FACTS**

22 | vs.

23 | UNITED STATES OF AMERICA

24 |         Defendant.

25 |

26 |

27 |

28 |

PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 18**

| FACT | SUPPORTING EVIDENCE |
|---|---|
| 1.     On September 2, 2019, a fire broke out on board the motor vessel *Conception* while she lay at anchor off the north shore of Santa Cruz Island. | 1.     *Exhibit 2*, Bureau of Alcohol, Tobacco Firearms and Explosives Origin and Cause Report, p. 2, Boylan_00062498. |
| 2.     Thirty-nine people were on board the vessel at the time of the fire – thirty-three passengers and six crew members. | 2.     *Exhibit 12* (NTSB Group Chairman's Report - Survival Factors Group at Pgs. 2:21-4:10).<br>. |
| 3.     Thirty-four of the people on board *Conception* -- all thirty-three passengers and one crew member -- perished in the fire. | 3.     *Exhibit 12* (NTSB Group Chairman's Report's - Survival Factors Group at Pgs. 2:21-4:10). |
| 4.     *Conception* had three decks: a sun deck atop the house (where the bridge and crew accommodations were situated); a main deck (where the galley and salon were housed); and a below-deck bunk room in the hull (where the passenger accommodations were located). | 5.     *Exhibit 12* (NTSB Group Chairman's Report's - Survival Factors Group Pgs. 5:21-6:9; see also *Exhibit 24*, NTSB Group Chairman's Factual Report – Operations, at pg. 6, figure 3, depicting a simple diagrammatic plan and profile view of the vessel). |
| 7.     At the time of the fire, *Conception* was furnished with a large plastic trash can that was located at the after end of the deck house, beneath the wooden stairs leading from the main deck to the sun deck. | 7.     *Exhibit 3* (NTSB Group Chairman's Factual Report – Fire and Explosions Group – dated May 7, 2020, at Pg. 20, Figure 9. |

| | |
|---|---|
| 8. At the time of the fire, *Conception's* galley and salon were furnished with fifteen to twenty-five plastic garden chairs manufactured by the Grosfillex Company ("Grosfillex garden chairs"). | 8. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified for Truth Aquatics at Pgs. 98:11-103:1; *Exhibit 3* (NTSB Group Chairman's Factual Report – Fire and Explosions Group - dated May 7, 2020. at Pg. 16, Figures 4 and 5). |
| 9. In addition to the Rubbermaid trash can described in Statement of Disputed Material Fact No. 7, the area at the after end of the deck house, beneath the wooden stairs leading from the main deck to the sun deck, was also furnished with a plastic waste container and a plastic rinse bucket. | 9. *Exhibit 3* (NTSSB Group Chairman's Factual Report – Fire and Explosions Group, dated May 7, 2020 at Pg. 20, Figure 9. |
| 10. In October of 2023, the United States Department of Justice prosecuted *Conception's* Captain, Jerry Nehl Boylan, for his role in events. | 10. *Hillsman Declaration* at Par. 7. |
| 11. During Captain Boylan's criminal trial, Senior ATF Fire Research Engineer, Jonathan Butta, and ATF Special Agent Certified Fire Investigator, Derrick Hill, testified that the fire on board *Conception* started in the large plastic trash can described in Statement of Disputed Material Fact No. 7. | 11. *Exhibit 5*]. (Trial testimony of Jonathan Butta, ATF Senior Fire Research Engineer, October 31, 2023, at Pgs. 28:3-18, 37:24-38:2, 53:2-14; *Exhibit 6*] (Trial Testimony of Derrick Hill, ATF Special Agent Certified Fire Investigator, October 31, 2023, Pgs. 125:21-129:20). |
| 12. The large plastic trash can described in Statement of Disputed Material Fact No. 7 was manufactured in May 2016 by Rubbermaid ("the Rubbermaid trash can"). | 12. *Exhibit 2* (ATF Report, Pg. 133, §§ 384-385; Pg. 196, § 570). |
| 13. In addition to the Rubbermaid trash can, *Conception* was also furnished with plastic waste receptacles in the galley, salon, and bunkroom. | 13. *Exhibit 3*. (NTSB Group Chairman's Factual Report, Fires and Explosions, dated May 7, 2020, at Pg. 9). |

3

ER 20

| | |
|---|---|
| 14. United States Coast Guard Commander Stephanie Hodgdon testified, in her capacity as the Person Most Qualified under Rule 30(b)(6), that 46 CFR § 176.830 left the Coast Guard Marine Inspectors ("OCMIs") from Marine Safety Detachment ("MSD") Santa Barbara under "a mandatory duty" to identify, write up, and rectify any potential fire hazards they observed whenever they inspected *Conception*. | 14. *Exhibit 6* (April 12, 2023, Deposition of United States Coast Guard Commander Stephanie Hodgdon at Pgs. 29:20-32:14, 217;18-218:10, and 229:24-232:6). |
| 15. The New T-Regulations, 46 CFR 177.405(f) provides:<br><br>"Unless other means are provided to ensure that a potential waste receptacle fire would be limited to the receptacle, waste receptacles must be constructed of non-combustible materials with no openings in the sides or bottom." | 15. *Exhibit 6* (April 12, 2023 deposition of United States Coast Guard Commander Stephanie Hodgdon, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 231:11-18). |
| 16. United States Coast Guard Commander Stephanie Hodgdon testified, in her capacity as the Person Most Qualified under Rule 30(b)(6), that the Rubbermaid trash can was an obvious fire hazard. | 16. *Exhibit 6* (April 12, 2023, deposition of United States Coast Guard Commander Stephanie Hodgdon, at Pgs. 235:11-236:3, 242:4-243:9). |
| 17. The *Conception* and two similar dive boats, the *Truth* and the *Vision*, were based in Santa Barbara and operated by Truth Aquatics, Inc. | 17. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois at Pgs. 47:12-22). |
| 18. *Conception* had been furnished with the Rubbermaid trash can and the other Non-metallic waste containers described in Statement of Disputed Material Fact No. 14 hazards for several years prior to the fire in positions aboard | 18. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 85:5-86:2, 86:21-87:1; 87:20-90:22; 92:19-25; 94:11-98:9). |

4

| | |
|---|---|
| the vessel that would and should have been obvious to any OCMI who boarded the vessel. | |
| 19. United States Coast Guard Commander Stephanie Hodgdon testified in her capacity as the Person Most Qualified under Rule 30(b)(6), that the Grosfillex garden chairs described in Statement of Disputed Material Fact No. 8 were also obvious fire hazards. | 19. *Exhibit 6*. (April 12, 2023, deposition of United States Coast Guard Commander Stephanie Hodgdon at Pgs. 232:2-6, 243:10-243:23). |
| 20. Truth Aquatics, Inc. purchased those Grosfillex garden chairs on July 11, 2008, and thereafter left them in positions aboard *Conception* that would and should have been obvious to any OCMI who boarded the vessel. | 20. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois at Pgs. 98:12-103:1; [Exhibit "8"]. (Invoice for 64 Miami Bistro Charcoal Outdoor Stacking side chairs shipped to Truth Aquatics on July 11, 2008, produced in response to Plaintiffs' Request for Production (Set Two) in the pending state court action captioned *Fiedler v. Truth Aquatics, Inc., et al*., Bates stamped No. Truth002801). |
| 21. OCMIs from MSD Santa Barbara Guard conducted seven inspections of the *Conception* between 2015 and 2019, but the Coast Guard never directed Truth Aquatics to remove or replace those combustible plastic chairs or trash cans from the vessel. | 21. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 98:12-103:1.); *Exhibit 3* (NTSB Group Chairman's Factual Report, Fires and Explosions, dated May 7, 2020 at Pg. 9.); *Exhibit 0* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspections of Conception dated February 4, 2015 (US000176- 000179), February 18, 2016 (US000172-000175), January 18, 2017 (US000100-000102), February 1, 2017 (US000096-000098), February 16, 2017 (US000092-000095), February 13, |

PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

| | |
|---|---|
| | 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 22. The United States Coast Guard Vessels Inspection Reports generated between July 2008 and February 2019 for the *Conception* contained no remarks, deficiencies, or directives concerning the obvious fire hazards acknowledged by United States Coast Guard Commander Stephanie Hodgdon. | 24. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections of the Conception dated November 25, 2008 (US002900-002902), January 26, 2009 (US000195-00198), June 10, 2009 (US000351-US000352), December 2, 2009 (US00346-00347), February 15, 2011 (US00339-000342), July 20, 2011 (US000275-000277), March 6, 2012 (US00230-000232), February 7, 2013 (US000191-000193), September 24, 2013 (US00188-000190), February 18, 2014 (US000184-00187), February 4, 2015 (US00176-00179), February 18, 2016 (US000172-00175), January 18, 2017 (US000100-000102), February 1, 2017 (USA000096-0098), February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067- 000072). |
| 24. The last U.S. Coast Guard inspector in a position to address and rectify these obvious fire hazards before the September 2, 2019, tragedy, was United States Coast Guard Chief Warrant Officer Daniel Hager, when he performed his inspection of Conception on February 13, 2019. | 25. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections for Conception dated February 13, 2019. (US000067-000072); *Exhibit 11* (June 8, 2023, deposition of Chief Warrant Officer Daniel Hager at Pgs. 12:6-14; 71:18-72:8; 127:16-128:6). |
| 26. Chief Warrant Officer Hager admitted the Grosfillex garden chairs were a potential fire hazard. | 26. *Exhibit 11* (June 8, 2023, deposition of the United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 93:1-10, 93:24-94:11). |

| | |
|---|---|
| 27.    Chief Warrant Officer Hager performed inspections of the Conception on February 18, 2016, February 16, 2017, February 13, 2018, and February 13, 2019, recalled observing the Grosfillex garden chairs in *Conception's* salon during those inspections, but failed to write them up as a potential fire hazard. | 27.    *Exhibit 11* (June 8, 2023 deposition of United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 62:20-64:19, 93:1-10, 93:25, 94:11; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections of *Conception* dated February 4, 2015 (US 000176-000179),February 18, 2016 (US000172-000175), January 18, 2017 (US000100-000102), February 1, 2017 (US000096-000098), February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 28.    On August 25, 2000, Coast Guard inspectors issued a deficiency notice to *Conception* for having non-approved wiring in some of its AC electrical system. | 28.    *Exhibit 18*, NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at p. 7 of 18; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-US003175). |
| 29.    Instead of stranded or braided conducted core wire, *Conception* was equipped with flexible service wire, similar in type to that used in commercially sold extension cords. | 29.    *Exhibit 18*, NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at p. 7 of 18; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-003175). |
| 30.    That flexible service wire had been installed by the boat builder and approved by Coast Guard inspectors in | 30.    *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report |

7

**ER 24**

| | |
|---|---|
| 1981 during the original construction of the vessel. | for the inspection of *Conception* dated August 25, 2000 (US003172-US003175); *Exhibit* 18, NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at p. 7 of 18 |
| 31. Truth Aquatics appealed the August 5, 2000, deficiency notice and requested a waiver to the Coast Guard's requirements, but the appeal was denied. | 31. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-US003175); *Exhibit* 18, NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at p. 7 of 18 |
| 31. Although the inspection reports indicated this deficiency was cleared by March 2002, inspections of the wreckage of the *Conception* conducted on June 27 and June 28, 2021, and during a subsequent inspection of the wreck in Port Hueneme on August 8 through August 12, 2022, plaintiffs' experts found non-marine grade wiring in the forward area of the bunkhouse. | 31. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated March 15, 2002 (US003134-US003137); *Ebersole Declaration.* |
| 32. Immediately after the *Conception* fire involving *Conception*, the Coast Guard OCMIs inspected the *Vision*, and discovered twenty electrical deficiencies aboard that vessel. | 32. *Exhibit 12* (NTSB Group Chairman's Report's - Survival Factors Group at p. 41 of 44). |
| 33. The OCMIs from MSD Santa Barbara failed to inspect, examine or test any aspect of *Conception's* electrical system during the inspections they conducted aboard that vessel on March 19, 2004, January 26, 2011, September 24, 2013, February 4, 2015, and February 13, 2019. | 33. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspection of Conception dated March 19, 2004 (US003127-US003139), January 26, 2011 (US000343-000345), September 24, 2013 (US000188-000190), February 4, |

8

**ER 25**

| | |
|---|---|
| | 2015 (US000176-000178), and February 13, 2019 (US000067-000072). |
| 34. Chief Warrant Officer Hager admitted that the provisions of 46 CFR § 176.806 required him and his fellow OCMIs to inspect *Conception's* electrical system each and every time they inspected that vessel. | 34 *Exhibit 11* (June 8, 2023, deposition of Chief Warrant Officer Daniel Hager at Pgs. 14:23-115:2). |
| 35. In his 2017 and 2018 MISLE entries memorializing his findings from the annual inspections of Conception, Chief Hager noted that he inspected the *Conception's* electrical system. | 35. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for Chief Warrant Officer Daniel Hager's inspections of *Conception* dated February 16, 2017 (US000092-000095) and February 13, 2018 (US000088-000091). |
| 36. However, in Chief Hager's final Annual Assessment Form for the *Conception* dated February 13, 2019, there is no notation that the vessel's electrical system was inspected. | 36. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspections of *Conception* dated February 13, 2019 (US000067-000072). |
| 37. Chief Hager admitted that this omission supported an inference that he did not inspect the vessel's electrical system during its last annual inspection before the fire." | 37. *Exhibit 11* (June 8, 2023, deposition of United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 132:12-133:3). |
| 38. Lieutenant Commander Joseph Price-Larson was the supervisor of the Marine Safety Detachment (MSD) in Santa Barbara from 2018 through 2021. | 38. *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Joe Price-Larson at Pgs. 22:21-25:20). |
| 39. Lieutenant Commander Price-Larson was also designated by the United States Coast Guard as the Person Most Qualified concerning the history, purpose, meaning and day-to-day | 39. *Exhibit 17* (May 25, 2023, deposition Lieutenant Commander Joe Price-Larson at Pgs. 63:18-64:18). |

PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

| | |
|---|---|
| application of the provisions of 46 CFR sections 175.100-185.910. | |
| 40.    In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson testified that the regulations in the Marine Safety Manual also imposed mandatory duties upon his contemporary OCMIs at MSD Santa Barbara to inspect and assess all vessel systems for safety issues, including, but not limited to: 1) electrical generator systems; 2) engineering; 3) firefighting; 4) navigation; 5) escape routes; and 6) engine issues. | 40.    *Exhibit 17* (May 25, 2023, deposition of the United States Coast Guard Lieutenant Commander Price-Larson at Pgs. 110:12-20). |
| 41.    In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson also testified that the OCMI's inspectors are obligated to document the scope of their inspections in their MISLE Activity Summary Reports. | 41.    *Exhibit 17* (May 25, 2023 deposition of Lieutenant Commander Price-Larson at Pgs. 89:12-24). |
| 42.    In his capacity as a PMQ, Lieutenant Commander Price-Larson also testified that his OCMIs were likewise obligated to document in their MISLE reports that they inspected the subject vessel's electrical system. | 42.    *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Price-Larson at Pgs. 90:21-92:8). |
| 43.    In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson further testified that during annual inspections that inspectors are obligated to inspect every vessel system and to document whether or not each system is in satisfactory condition. | 43.    *Exhibit 17* (May 25, 2023 deposition of Lieutenant Commander Joe Price-Larson at Pgs. 48:19-51:1). |
| 44.    When deficiencies are detected, the inspector is obligated to fill out a CG-835 Deficiency Form and perform an appropriate follow up inspection to ensure the safety deficiencies are rectified. | 44.    *Exhibit 17* (May 25, 2023 deposition of the United States Coast Guard Lieutenant Commander Joe Price-Larson in his capacity as Person Most Qualified under Rule 30(b)(6) at Pgs.103:7-15, 105:7-109:3). |

| | |
|---|---|
| 45. In his capacity as a PMQ, Lieutenant Commander Price-Larson finally testified that inspectors have a mandatory duty to verify that all electrical wiring and cable is listed by Underwriters Laboratories (UL) as UL Boat or UL Marine Cable, and to ensure that it is properly insulated. | 45. *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Price-Larson at Pgs. 94:11-15). |
| 46. The Chief Warrant Officer William DeCamp issued an electrical deficiency instructing Glenn Fritzler and Truth Aquatics, Inc., to remove all welding cable from the 24-volt electrical system aboard *Conception* and to replace it with approved cable, as required by 46 CFR 183.340. | 46. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated July 20, 2011 (US000275-000277). |
| 47. On January 24, 2013, Chief Warrant Officer DeCamp cleared the "outstanding deficiency from before to replace all welding cable in the 12-volt [sic] system." | 47. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated January 24, 2013 (US003834-003835). |
| 48. On July 19, 2013, DeCamp's previous January 24, 2013, Activity Summary Report was "submitted for review." | 48. *Exhibit 15* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated July 19, 2013 (US003832-003833). |
| 49. Superimposed in the right-hand corner of the July 19, 2013, MISLE Activity Summary Report is a stamp referencing the initials of personnel who signed off on the review on September 24, 2019. | 49. *Exhibit 15* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated July 19, 2013 (US003832-003833). |
| 50. In a MISLE Activity Summary Report dated September 24, 2013, DeCamp's previous representation that the electrical deficiency had been cleared on January 24, 2013, was deleted and changed to reflect that there had been "no inspection" of | 50. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated September 24, 2013 (US000188-000190). |

11

| | |
|---|---|
| *Conception's* electrical system on January 24, 2013. | |
| 51.    In her capacity as a PMQ, Commander Hodgdon, admitted that 46 CFR section 176.500 was a directive over which an OCMI had no discretion. | 51.    *Exhibit 6* (April 12, 2023 deposition of Commander Stefanie Hodgdon at Pg. 26:2-14). |
| 52.    In her capacity as a PMQ, During her deposition, Commander Hodgdon further admitted that OCMIs from MSD Santa Barbara had a mandatory duty to: 1) prepare for their periodic inspection by reviewing the information archived about that vessel and her prior inspections in the Coast Guard's MISLE database; 2) write up all safety deficiencies they spotted during the inspection; 3) log those deficiencies into the MISLE database by means of a CG Form 835; and 4) ensure through "objective evidence" that those deficiencies were rectified during an appropriate follow up inspection. | 52.    *Exhibit 6* (April 12, 2023, deposition of United States Coast Guard Commander Stefanie Hodgdon at Pgs. 217:18-218:10, Pgs. 90:21-91:23, Pg. 89:25-91:23, 93:14-98:3, 122:19-123:9; 168:17-169:4). |
| 53.    In her capacity as PMQ, Commander Hodgdon further conceded that both the Old-T and New-T Regulations placed vessel inspectors under a mandatory duty to verify "as far as practicable" per 46 CFR section 176.806, 183.200, and 183.340, that all electric wiring and cable was, at the very least "listed by Underwriters Laboratories (UL) as UL boat or UL marine cable." | 53.    *Exhibit 6* (April 12, 2023, deposition of Commander Stephanie Hodgdon at Pgs. 220:16-224:23). |
| 54.    In her capacity as PMQ, Commander Hodgdon stated that objective evidence in the form of repair records from a certified repair company, a licensed electrician, or an inspector's personnel observation, would be | 54.    *Exhibit 6* (April 12, 2023, deposition of Commander Stephanie Hodgdon at Pgs. 95:21-96:21). |

| | |
|---|---|
| required in order to clear a safety deficiency related to electrical wiring or cable. | |
| 55.    In   her   capacity   as   PMQ, Commander Hodgdon also confirmed that deficiencies cannot be cleared by doing nothing. | 55.    *Exhibit   6* (April   12,   2023, deposition of Stefanie Hodgdon at Pgs. 213:12-214:14,    97:19-99:3,    95:21-96:21). |
| 57.    No   objective   evidence   was produced by the United States Coast Guard indicating that any certified repair company or licensed electrician ever   rectified   the   welding   cable deficiency originally issued on July 20, 2011. | 57.    *Exhibit 9* (Marine Information for Safety     and     Law     Enforcement ("MISLE") Activity Summary Reports for inspections of the Conception dated March   6,   2012   (US00230-000232), February 7, 2013 (US000191-000193), September    24,    2013    (US00188-000190),    February    18,    2014 (US000184-00187), February 4, 2015 (US00176-00179), February 18, 2016 (US000172-00175), January 18, 2017 (US000100-000102), February 1, 2017 (USA000096-0098),    February    16, 2017   (US000092-000095),    February 13,   2018   (US000088-000091),   and February    13,    2019    (US000067-000072). |

| | |
|---|---|
| 58.    Photographs taken by the FBI during the post-accident investiga-tion of the *Conception* catastrophe, revealed a hole in the copper water main pipe caused by corrosion. | 60.    *Exhibit   18*   NTSB   Group Chairman's     Factual     Report     – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |
| 59.    Said pipe was designed to deliver water from the vessel's fire pump to the fire stations located aboard on the fire the port and starboard sides of the aft cabin with each fire station equipped with a 50-foot fire hose, a valve to open | 59.    *Exhibit   18*   NTSB   Group Chairman's     Factual     Report     – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |

13

**ER 30**

| | |
|---|---|
| or shut down the flow of water, and electric on and off buttons. | |
| 60.    The water supply was designed to be delivered via a fire pump located in the engine room; a valve in the engine room could be manipulated to use the pump to drain bilge water, if needed, and then to realign the valve to be ready to pump water to the fire stations through a common copper water main in the event of the fire. | *Exhibit 18* NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |
| 61.    The Annual Inspection Records generated by The United States Coast Guard pertaining to the *Conception* for 2017, 2018, and 2019 indicate the fire hoses and fire system was never activated and tested. | 61.    *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspections of Conception dated February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 62.    On February 18, 2016, Chief Warrant Officer Hager, issued a no-sail deficiency for *Conception* because access to the fire pump was not available.    In order to clear the deficiency, it was incumbent upon the owner to "prove proper operation of the fire pump" and this was presumably done on February 19, 2016, when the deficiency was cleared by Chief Warrant Officer, Michael Young.    On that date, Chief Warrant Officer Young attended the vessel and witnessed proper operation of the fire pump with a 50 foot hose, noting that the condition was " . . . all sat" (i.e., satisfactory). | 62.    *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for inspections of Conception dated February 18, 2016 (US000171-000178). |
| 63.    On February 16, 2017, Chief Warrant Officer Officer Hager inspected *Conception's* firefighting appliances for the very last time but | 63.    *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated |

PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 31**

| | |
|---|---|
| there was no indication in his MISLE Activity Summary Report that the fire pump or fire main was actually activated and tested. | February 16, 2017 (US000092-US000095). |
| 64. Nor is there any indication that the fire pump or fire main was actually activated or tested during the penultimate, annual inspection performed February 13, 2018. | 64. *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2018 (US000088-US000091). |
| 65. There is nothing in the February 13, 2018, MISLE Activity Summary Report generated by Chief Warrant Officer Hager to indicate that the fire pump or fire main for the fire stations was actually activated, or that that the fire hoses were actively charged to see if they were in working condition. | 65. *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 66. Chief Warrant Officer Hager last performed an annual inspection of the Conception on February 13, 2019. Under the heading "Fire Fighting," Hager noted: "Inspected vessel firefighting appliances to include six portable fire extinguishers and a fixed C02 system for the emergency room which were all serviced by Langkilde's Fire Protection." | 66. *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 67. In his last report, Chief Warrant Officer Hager also documented that the crew completed satisfactory Man Overboard and Simulated Fire Drills; however, there was documentation that the fire pumps or hoses were actually activated or inspected by Hager during the 2019 annual inspection. | 67. *Exhibit 10* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 70. *Conception* was built of wood and fiberglass, was launched in 1981, was based in Santa Barbara, and was | 70. *Defense Exhibit F* (Certificate of Inspection Issued on November 19, 2014). *Exhibit 21 (*Certificate of |

15

**ER 32**

| | |
|---|---|
| inspected and certified by the United States Coast Guard to carry up to ninety-nine passengers on coastwise voyages under 46 CFR, Chapter I, Subchapter T. | Inspection Issued on November 19, 2014) |
| 71.    Plaintiffs petitioned this Court under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), to compel the Department of Justice ("DOJ") to produce information the DOJ was withholding pending the outcome of the *Boylan* procecution. | *CV 23-985 PA (MRWx) ECF 55* |

Dated: July 29, 2024

McGUINN, HILLSMAN & PALEFSKY
NELSON & FRAENKEL LLP
SALTZ MONGELUZZI & BENDESKY
Lead Counsel for All Plaintiffs


By:    /s/ *John R. Hillsman*
       JOHN R. HILLSMAN


WALKUP MELODIA KELLY
    SCHOENBERGER
PANISH SHEA BOYLE & RAVIPUDI LLP
FIORE ACHERMAN, A Law Corp.
SCHUERING ZIMMERMAN & DOYLE,
    LLP
KREINDLER & KREINDLER LLP
LAW OFFICE OF W. RUSSELL FIELDS
GALINE FRYE FITTING & FRANGOS
ARNOLD & ITKIN LLP
TODD M. ABBOTT, ESQ.

16

1  GRETCHEN NELSON, ESQ. (S.B.N. 112566)
   (gnelson@nflawfirm.com)
2  CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
   (cllinas@nflawfirm.com)
3  NELSON & FRAENKEL LLP
4  601 South Figueroa Street, Suite 2050
   Los Angeles, CA 90017
5  Telephone: (213) 622-6469

6
7  JOHN R. HILLSMAN (S.B.N. 71f220)
   (jrhillsman@mhpsf.com)
8  MCGUINN, HILLSMAN & PALEFSKY
   535 Pacific Avenue
9  San Francisco, CA 94 I 33
   Telephone: ( 415) 421-9292
10

11  DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
    (ddisandro@smbb.com)
12  SALTZ MONGELUZZI & BENDESKY P.C.
    1650 Market Street
13  Philadelphia, PA 19103
    Telephone: (2I5) 496-8282
14

15  *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16          IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

17                        COUNTY OF LOS ANGELES

18  NANCY FIEDLER, et al.,                     **Case No. 2:21-cv-07065-PA-MRW**
                                               Honorable Percy Anderson
19                                             Courtroom 9A
     Plaintiffs,
20
21  vs.
                                               **DECLARATION OF JOHN**
22                                             **HILLSMAN IN SUPPORT OF**
                                               **PLAINTIFFS' OPPOSITION TO**
23  UNITED STATES OF AMERICA                   **DEFENDANT'S MOTION TO**
                                               **STRIKE (DOC. NO. 107) AND**
24   Defendant.                                **UNDISPUTED CROSS-MOTION**
                                               **TO AMEND THEIR**
25                                             **STATEMENT OF DISPUTED**
                                               **MATERIAL FACTS**
26
27
28

                                    1
                DECLARATION OF JOHN HILLSMAN IN FURTHER SUPPORT OF
                  PLTFS' OPP TO DFDT'S MOTION TO DISMISS

**ER 34**

I, JOHN R. HILLSMAN, declare as follows:

1.     I am an attorney at law admitted to practice by the State of California and before this Honorable Court. I am one of the attorneys of record for Plaintiffs Christine Dignam, Jasmine Lord, Vicki Moore, Yuka Otashi Merritt, and Vikram Singh and am co-lead counsel for all the Plaintiffs in this action.

2.     I respectfully submit this Declaration in Further Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss and in Opposition to Defendant's Motion to Strike. I have personal knowledge of the matters stated herein and could and would competently so testify if called as a witness herein.

3.     On July 29, 2024, I spoke with Eric Kaufman-Cohen, counsel for Defendant United States. As part of that meet and confer, the parties have reached a resolution to Defendant's Motion to Strike. Plaintiffs will amend their Statement of Facts to replace the portions citing the Marine Accident Report with citations to other exhibits already in the record. They will also rely on the National Transportation Safety Board's Group Chairman's Factual Report: Operations related to the investigation of the fire on board Conception on September 2, 2019 to support those facts (*new* Exhibit 24).

4.     Mr. Kaufman-Cohen confirmed Defendant United States does not oppose the amendments to the Plaintiffs' Statement of Facts, and the inclusion of Exhibit 24 as part of the record.

5.     Attached hereto as Exhibit 24 is a true and correct copy of the National Transportation Safety Board's Group Chairman's Factual Report: Operations related to the investigation of the fire on board *Conception* on September 2, 2019 (NTSB ID No: DCA19MM047).

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 29, 2024, in the City and County of San Francisco, California.

/s/*John R. Hillsman*_____

2

DECLARATION OF JOHN HILLSMAN IN FURTHER SUPPORT OF
PLTFS' OPP TO DFDT'S MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHN R. HILLSMAN

Additional Plaintiffs Counsel:

WALKUP MELODIA KELLY
    SCHOENBERGER

PANISH SHEA BOYLE & RAVIPUDI LLP

FIORE ACHERMAN, A Law Corp.

SCHUERING ZIMMERMAN & DOYLE,
    LLP

KREINDLER & KREINDLER LLP

LAW OFFICE OF W. RUSSELL FIELDS

GALINE FRYE FITTING & FRANGOS

ARNOLD & ITKIN LLP

TODD M. ABBOTT, ESQ.

DECLARATION OF JOHN HILLSMAN IN FURTHER SUPPORT OF
PLTFS' OPP TO DFDT'S MOTION TO DISMISS

**ER 36**

# EXHIBIT 24



## NATIONAL TRANSPORTATION SAFETY BOARD

Office of Marine Safety

Washington, DC

August 19, 2020

### Group Chairman's Factual Report

# Operations

### 1.    EVENT SUMMARY

**Location:**    Off Channel Islands; 26 nautical miles offshore of Ventura, California
**Date:**    September 2, 2019
**Type:**    Fire/explosion
**NTSB #:**    DCA19MM047

### 2.    GROUP MEMBERS

Chairman:  Andrew Ehlers, Marine Accident Investigator
            National Transportation Safety Board
            490 L'Enfant Plaza SW
            Washington, DC 20594
And no others.

NOTE: This report was reissued on November 4, 2020, with a correction to the toxicology information on page 18.

CORRECTED COPY

**3.      SUMMARY**

On Monday, September 2, 2019, about 0314 Pacific daylight time, US Coast Guard Sector Los Angeles (LA)/Long Beach received a distress call from the 75-foot small passenger vessel *Conception*. The vessel was anchored in Platts Harbor on the north side of Santa Cruz Island, 21.5 nautical miles south-southwest of Santa Barbara, California, when it caught fire. The *Conception* was carrying 39 persons, 6 of whom were crew.

The wood and fiberglass vessel had three levels: the upper deck, which included the wheelhouse, two crew staterooms, and a sun deck; the main deck, which included a salon with a galley and a large exterior deck; and the lower deck within the hull, which included passenger berthing (bunkroom), a shower room, an engine room, and a lazarette.



**Figure 1.** Preaccident photograph of the *Conception* (Source: www.seawayboats.com)

At the time the fire started, 5 crewmembers were asleep in their bunks in the wheelhouse and in the crew staterooms on the upper deck, and 1 crewmember and all 33 passengers were asleep in the bunkroom. A crewmember sleeping in an upper deck stateroom was awakened by a noise and got up to investigate. He saw a fire at the aft end of the sun deck, rising up from the salon compartment below. The crewmember alerted the four other crewmembers sleeping on that deck. As crewmembers awoke, the captain radioed a quick distress message to the Coast Guard before evacuating the smoke-filled wheelhouse.

Unable to use the aft ladder, which was on fire, the crewmembers jumped down to the main deck (one crewmember broke his leg when he jumped) and tried to access the salon to reach the passengers below. The salon was fully engulfed by fire at the aft end and by thick smoke in the forward end. Unable to open a window at the forward end of the salon and overwhelmed by smoke

CORRECTED COPY

from the fire, the crew jumped overboard.

Two crewmembers swam to the stern and re-boarded the vessel. Access to the salon through the aft corridor was blocked by fire, so, along with the captain who had also swum to the stern, they launched a small skiff and picked up the remaining two crewmembers in the water. They transferred to a recreational vessel anchored nearby where the captain continued to radio for help, while two crewmembers returned to the waters around the burning *Conception* to search for possible survivors. No survivors were found.

About 78 minutes after the initial distress call, Coast Guard and other first responder boats arrived on scene to extinguish the fire and search for survivors. Helicopters also aided in search efforts. The vessel burned to the waterline and, just after daybreak, sank in about 60 feet of water. Thirty-three passengers and one crewmember died.



**Figure 2.** Accident location, as indicated by the red triangle. (Background source: Google Maps)

## 4    DETAILS OF THE INVESTIGATION

### 4.1    Vessel Operator and Owner

The *Conception* and two other similar dive boats, the *Truth* and the *Vision*, were operated by Truth Aquatics, Inc., a small company based in Santa Barbara, California. The business was founded in 1974, and the current owner became a partner in the company in 1979 before eventually assuming

CORRECTED COPY

full ownership. Ownership of the three vessels was under a trust set up by the owner of Truth Aquatics. In addition to 6 crewmembers assigned to each vessel, Truth Aquatics employed a shore staff of about 10 people to handle logistics, scheduling, and the overall operation of the company.

Current and former employees described the Truth Aquatics' owner as being "very involved" in the operation. According to the company's website, the owner had personally overseen the construction of the *Conceptio*n and the *Vision*. He held a valid US Coast Guard merchant mariner credential as a master of self-propelled vessels (not including auxiliary sail) of less than 100 gross register tons upon near coastal waters and occasionally captained the company's vessels. The owner was a member of the Sportfishing Association of California, an industry advocacy and advisory group.[1]

According to the company owner and former captains of Truth Aquatics vessels, the captains of the *Conception*, *Vision*, and *Truth* were given broad authority over the operations of their vessels, to include the hiring, training, and dismissal of crewmembers, the conduct of routine maintenance, and the establishment and enforcement of vessel operating procedures. The owner stated that there were no company-wide operating procedures or crew work/rest policies; these were left to the qualified captains of each vessel to establish and manage.

Truth Aquatics was generally well regarded among regulators, current and former employees, customers, and other dive boat operators in Southern California. According to the Assistant Chief, Inspection Division, Coast Guard Sector LA/Long Beach, Truth Aquatics and the company owner "had a good reputation for being good operators. They were always more than willing to engage in conversation about vessel operations. . . . We've always had a good relationship with Truth Aquatics." A customer who had made several trips on Truth Aquatics vessels stated that the company was "considered to be the top [dive boat] outfitter," and a former captain of the *Vision* described the vessels as "the safest boats on the coast. . . . No expenses were spared."

## 4.2   Vessel Charterer

For the accident voyage, the *Conception* was chartered by Worldwide Diving Adventures, Inc., a scuba diving tour, instruction, and guide company, to take a group of 33 passengers on a 3-day dive trip to locations around the Channel Islands over the 2019 Labor Day weekend. Worldwide Diving Adventures had been in business for about 50 years, and the organizer and leader of the chartered trip was one of the company owners. According to Truth Aquatics' owner, the group leader had been "coming out with us for probably 30 years," and many of the group's participants were regular customers. Per the charter agreement, Worldwide Dive Adventures was not responsible for the operation of the *Conception* or its equipment, which was handled by the crew employed by Truth Aquatics.

---

[1] According to the organizations website, "The Sportfishing Association of California (SAC) was founded in 1972 by industry leaders speaking out on behalf of their interests. SAC works with several agencies and stakeholders, including the California Department of Fish and Wildlife, United States Coast Guard, Navy, National Marine Fisheries Service, Federal Communications Commission, Congress, California Legislature, and the Mexican Government. SAC employees serve on multiple advisory panels in the state and federal arena, and represent industry interests on a variety of topics." www.californiasportfishing.org/about, accessed on April 28, 2020.

CORRECTED COPY

### 4.3     The *Conception*

The 75-foot-long *Conception* was constructed in 1981 by Seaway Boats, Inc, in Long Beach, California. Like the other boats in the Truth Aquatics fleet, it was purpose-built to take recreational divers on one-day and overnight trips to dive sites around the Channel Islands off the coast of Southern California. The *Conception* was constructed of fiberglass laid over plywood and had three decks.

On the main deck was the salon with food service counters centerline and fixed dining tables on either side.[2] Installed benches along the port and starboard bulkheads provided seating outboard of the tables, and plastic (outdoor-type) chairs provided seating inboard of the tables. Forward of the eating area was a galley with a refrigerator, a two-burner stove, an oven, and a griddle. All galley appliances were electric. On the forward starboard side of the salon, two sets of stairways led down below to the shower room (forward) and the bunkroom (aft). Doors at the aft end of the salon opened to the large open aft deck. According to the owner, the doors were kept open when passengers were on board. There were no other doors to the exterior from the salon. On either side of the salon were three sets of windows that could be opened by sliding the forward half of the window aft. On the port forward and center starboard windows, the owner had affixed "emergency exit window" labels to the sliding section of the window. These markings were not required by Coast Guard regulations. On the forward bulkhead of the salon in the galley area, three windows faced toward the bow of the vessel. The center window was hinged at the top and could be opened by pushing at the bottom. It was held open by brackets on either side of the window (it was not a designated emergency exit). When closed, the window was secured from the inside by threaded knobs. The forward bulkhead windows on either side of the center window were not designed to be opened.

Three small restrooms, each with a single toilet and a small sink, were located just aft of the salon. Two of the restrooms were accessed via doors on either side of the salon doors. The third restroom was accessed from the exterior via a sliding door at the bottom of the stairway leading to the upper deck. Exterior walkways on either side of the salon and the restrooms extended from the bow to the aft open deck. Fire hose stations were located on both port and starboard walkways.

The open deck aft of the salon had a raised platform centerline with racks on either side for storing scuba tanks and other gear. The raised platform also contained hatches for accessing the engine room (forward) and lazarette (aft). An overhead rack on the aft deck was used to store kayaks and other watercraft. On the stern of the vessel, a large swim platform accessible by stairs from the open deck could be raised and lowered using an electrically powered hydraulic winch. When in the raised position, the metal swim platform served as a cradle for a small outboard-powered inflatable skiff.

---

[2] During interviews, the crew of the *Conception* referred to the entire salon and galley space as the "galley." For clarity, this report will refer to the full space as the "salon," unless specifically referring to the food preparation area.

CORRECTED COPY

**ER 42**



**Figure 3.** Conception general arrangements.

CORRECTED COPY

Below the main deck, the vessel was divided into four compartments. The forwardmost space was an anchor chain locker that was accessible via a small hatch on the forward weather deck. The shower room was aft of the chain locker, followed by the bunkroom. The bunkroom contained 33 bunks, arranged around two aisles with bunks on either side of each aisle. Thirteen bunks were double bunks—allowing two persons to sleep in the same space—stacked two-high and located on the outside of the aisles. The remaining bunks were single bunks, stacked three-high. The maximum occupancy of the bunkroom was 46 persons (45 passengers and 1 crewmember).

An escape hatch provided an alternate means of exiting the bunkroom (the stairway at the forward end was the primary means). The escape hatch, which consisted of a removable wooden panel that was about 22-inches-by-22-inches in size, was located in the overhead between the aftmost centerline bunks.[3] It could be reached from either aisle by climbing a wooden ladder installed on the side of each centerline aft set of bunks. The hatch exited into the rear of the salon, and thus both escape routes from the bunkroom exited into the salon. When the *Conception* was constructed and underwent sea trials in 1981, the Coast Guard "Sea Trials; T new construction and conversion" inspection form required the attending Coast Guard inspector to "physically use each emergency escape on board." The inspection item was checked as completed on the form. The inspector wrote on the signed form that the sea trials were satisfactory.



**Figure 4.** Photo left is the escape hatch, viewed from the bunkroom, on the *Vision*, a Truth Aquatics dive vessel with arrangements nearly the same as the *Conception*. (Source: NTSB) Photo right is the

---

[3] The measurements for the escape hatch are from the similar vessel *Vision*, which was built from the design of the *Conception*. There was no difference in the design of the escape hatch between both vessels.

CORRECTED COPY

escape hatch, viewed from aft in the salon, on the *Conception*. (Source: J. Palmer)

A watertight bulkhead divided the bunkroom from the engine room. The engine room contained two Detroit Diesel 8V92 550 hp main diesel engines, which drove two shafts providing propulsion via fixed-pitch propellers. A single Northern Lights MP55C 55kW generator driven by a John Deere diesel engine, located aft of the port main propulsion engine, provided electrical power for the vessel. Fuel tanks that supplied the engines and generator were located forward in the space, outboard of each of the main propulsion engines. Two air compressors used for filling scuba diving tanks were mounted aft of the starboard main propulsion engine.

A fire pump, powered by an electric motor, was installed in the engine room and, when on line, provided firefighting water to hoses at two stations located on the main deck aft on the port and starboard exterior bulkheads of the salon. The fire pump could also be aligned to pump out the bilge. According to the first deckhand on the *Conception*, the fire pump was only aligned in this way when needed to empty the bilge and was realigned to the fire stations at the completion of bilge pumping. The fire pump system was in addition to a dedicated bilge pump, located in the engine room and driven by the main engine. The fire pump could be started locally in the engine room or remotely at the port fire hose station.

The lazarette was the aftmost space below the main deck and contained the steering gear for two rudders, a refrigerator/freezer for storing seafood caught during dives, a clothes dryer, and a generator/compressor for enriched-oxygen air—commonly referred to as nitrox—used in diving. The generator produced nitrox on demand and did not store the compressed gas within the system. (Compressed air and nitrox were only stored in scuba tanks brought on board by passengers and secured in the main deck racks.) In addition to the mechanical equipment, wet suits were dried and stored in the lazarette.

The *Conception*'s wheelhouse sat atop the forward end of the salon. In addition to controls for the engines and rudders, the wheelhouse contained radar and depth sounder displays, GPS receivers, an electronic charting system, and a watch alarm system.[4] Two crew bunks with privacy curtains were installed at the back of the wheelhouse. A short passageway led aft from the wheelhouse to a door out to the sun deck. On either side of the passageway were two small crew staterooms; the port side room contained two crew bunks and the starboard side room held a single bunk. A small shower room on the starboard side aft was also accessed from the passageway. The sun deck contained benches and large boxes for storing the vessel's lifejackets and lifefloats. A single staircase on the aft starboard side of the sun deck provided access between the main deck and the sun deck.

By regulation, the *Conception* was required to have four crew, with two being credentialled mariners. The vessel normally operated with six crew, including a captain and second captain, two deckhands, and two galleyhands. During overnight voyages, the second captain and first deckhand slept in the wheelhouse bunks, the galleyhands slept in the two-bunk stateroom, and the captain slept

---

[4] Watch alarm systems are designed to ensure that bridge crew remain awake and alert while on watch. A system clock counts down a designated amount of time, and the watchstander must reset the system prior to the end of each count down. If the system is not reset, a loud alarm sounds.

CORRECTED COPY

in the single-bunk stateroom. The second deckhand slept below in the passenger bunkroom.

## 4.4   Accident Events

The accident voyage was scheduled to get under way at 0400 on Saturday, August 31, and return by 1700 on Monday, September 2. Truth Aquatics encouraged customers to board the vessel the night before early morning departures, and passengers for the accident voyage began arriving in the evening on August 30. Per the Truth Aquatics' website and the company's *General Information Handbook*, passengers were instructed to sign their name to a posted blank manifest upon boarding, store their gear, and then proceed to their bunks.[5] A laminated "welcome aboard" briefing card was available to the passengers in the salon area and provided information such as meal times and the rules and considerations for the use of the bunkroom, shower room, drying room (lazarette) and kayak rack. It also described the location and procedures for issuing lifejackets and deploying lifefloats and instructed passengers to "review the safety card located in each bunk for proper adjustment of life jackets."

The second captain was the first crewmember to arrive at the *Conception*, boarding sometime between 2200 and 2300. The first and second galleyhands were next to arrive, between 2300 and midnight. The second captain and galleyhands each told investigators that, after boarding, they went to their bunks and went to sleep. The first deckhand stated that he and the second deckhand arrived at the vessel at 0320 the next morning, and, according to crewmembers interviewed after the accident, the captain embarked about 10 minutes later. Once on board, the deck crew began conducting pre-underway checks of the vessel's equipment. The generator was then started and shore power removed, a visual inspection of the bilges was performed, and the main engines were started and tested. The deckhands cast off lines, and, according to recorded data from the vessel's automatic identification system (AIS), the *Conception* was under way at 0404 outbound from Santa Barbara Harbor.[6] The captain took the helm for the outbound voyage, while the rest of the crew went to sleep until about 0600.

During Truth Aquatics' dive trips, the destinations were at the discretion of the captain based on weather conditions and the charterer's preferences. For this voyage, the captain of the *Conception* chose to head toward Santa Cruz Island, which provided dive sites that were protected from moderate to high winds in the area. The vessel transited to the south side of the island and anchored at a dive site near Albert Anchorage at 0830 that morning. Once anchored, the passengers gathered in the salon to eat breakfast and listen to a safety brief by the crew.

---

[5] According to crewmembers, passenger bunks were generally assigned by the charterer.

[6] *AIS* is a maritime navigation safety communications system. At 2- to 12-second intervals on a moving vessel, the AIS automatically transmits vessel information, including the vessel's name, type, position, course, speed, navigational status, and other safety-related information, to appropriately equipped shore stations, other vessels, and aircraft. The rate at which the AIS information is updated depends on vessel speed and whether the vessel is changing course. AIS also automatically receives information from similarly equipped vessels.

CORRECTED COPY



**Figure 5.** *Conception* accident voyage reconstructed from AIS data, with selected diving and anchoring sites at Santa Cruz Island. (Background source: Google Earth Pro)

The safety brief normally included information on the lifejackets and other lifesaving equipment, escape routes from the bunkroom and salon, the location for mustering in the event of an emergency, and dive safety information. During the accident voyage, the safety briefing, which was being conducted by the first deckhand, was interrupted when a passenger fainted. After the passenger was revived and his vital signs checked, the remainder of the safety brief was conducted by the captain, who, according to the first deckhand, provided "an abridged version" of the dive safety section of the brief.

Over the next 2 days, the *Conception* transited between sites around Santa Cruz Island, anchoring at each location to allow the passengers to dive. The vessel spent the first overnight anchored at Smugglers Cove on the eastern side of the island.

Between 2030 and 2130 on Sunday, September 1, seventeen divers conducted a night dive at a location known as Quail Rock on the northwest side of the island. While the divers were in the water, the second galleyhand turned off the electrical circuit breakers for the galley burners and griddle. (He told investigators that this had been the normal practice each night, ever since a burner had been left on inadvertently on a previous voyage.) He also energized the circuit breakers for the air conditioning unit to allow the bunkroom to cool before the passengers went to sleep.

Once the divers were back on board, items such as underwater flashlights, cameras, and photo flashes/strobes that they used during the dive were stowed on the two aft tables in the salon. The second captain recalled that, because the devices had just come out of the water, they were wet when they were set on the tables. Crewmembers stated that some of these electronics, along with cellular phones and tablets, were plugged in to recharge via outlets located between the bench seat padding and on the aft bulkhead. The first deckhand said that it was not uncommon to have batteries charging next to camera equipment that was still drying after a dive. Crewmembers remembered that, on the accident voyage, at least one passenger-owned power strip was being used to recharge the electronics.

CORRECTED COPY

After the night dive, the *Conception* relocated to Platts Harbor, a natural protected anchorage to the east of Quail Rock, to anchor for the night. The *Conception* second captain remembered seeing a large sportfishing boat (later identified as the *Grape Escape*) in the anchorage when the dive boat arrived about 2300. After setting the anchor, the first deckhand rigged a "squid light." The squid light was a large light affixed to a 4-foot pole that hung out over the starboard side of the vessel shining down into the water, attracting sea life for passengers to observe. The electrical cable from the light was plugged into a socket on the exterior bulkhead of the salon. According to the second captain, the crew then conducted a walkthrough of the main deck to check for trip hazards and to stow loose gear. Sometime before midnight, each of the crewmembers went to bed. Before going to sleep, the first galleyhand stated that he plugged in his cell phone to recharge and "saw sparks" at the receptacle. The first deckhand stated that he and the second deckhand were the last to go to sleep and that a few passengers were still awake when they left the salon to head to their bunks. Crewmembers reported that the salon lights remained on through the night, as was the normal practice during voyages.

According to the second galleyhand, he woke up about 0130 on Monday. Although he was not required to work until 0600, he stated that when he awoke in the middle of the night he would often go down to the galley to wash any used coffee cups and dishes and to conduct general cleaning. He told investigators that there were no passengers or crew awake or in the salon at the time he was working in the galley. When he finished cleaning up, the second galleyhand emptied the trash cans in each restroom into a large trash can under the exterior stairs leading up to the sun deck. He stated that the large trash can was nearly full because he had to use one of the smaller trash cans to push the trash down. After gathering and dumping the trash, he used the restroom, went to his bunk, and laid down to go back to sleep. He said that as he came out of the restroom, he looked up at a wall clock and noted that it was 0235.

Sometime later after returning to his bunk, the second galleyhand was awoken by the sound of what he thought was a plastic chair sliding on the salon deck. He stated that "I heard that, and it sounded like someone fell." He considered getting up, concerned that a person might be injured, but then heard what he thought to be the sound of the restroom door shutting. He continued to lay in his bunk, and, between 5 and 15 minutes later by his estimation, he heard a voice yell, "ahhh!" He told investigators that "it was definitely a human voice." The second galleyhand got out of his bunk to go check on the person and, looking out through the aft door of the crew stateroom area, saw a yellow glow emanating from below the aft starboard side of the sun deck. Realizing what he was seeing, the second galleyhand turned around and yelled "fire! fire!" to wake up the other crewmembers sleeping on the upper deck. Shortly thereafter, he saw the captain come out of his stateroom.

The first galleyhand told investigators that, while still in a sleep-like state, he had heard "a pop, and then a crackle downstairs." He then heard the second galleyhand jump down from his bunk, and shortly thereafter yell "fire!"

After warning the crew, the second galleyhand ran to the staircase at the aft end of the sun deck to attempt to get down to the main deck. He told investigators that when he reached the staircase and looked down, the restroom below the staircase was on fire, and flames blocked the way down. He returned to the wheelhouse, told the other crewmembers that the way was blocked, and then proceeded to the port side of the sun deck. There, he climbed over the railing and lowered himself down onto the main deck.

CORRECTED COPY

The second galleyhand stated that he ran back to the aft open deck, intending to enter the salon through the rear doors to retrieve fire extinguishers. However, he could not get into the salon because the entire space was on fire. He told investigators that he saw the escape hatch engulfed in flames, and the fiberglass on the ceiling was melting and dripping down. He said that he ran aft toward the lazarette hatch, but finding nothing that he could do, he turned around again.

When they were awakened by the second galleyhand, the second captain and first deckhand had both preceded aft toward the door to the sun deck and saw the flames on the aft starboard side. They were met at the door by the second galleyhand, who had told them that the staircase was blocked. Returning to the wheelhouse, they were instructed by the captain to lower themselves to the main deck via the wheelhouse wing stations. In a statement to investigators, the captain wrote that he opened the wing station doors on either side of the wheelhouse.

The second captain exited through the wing station door on the port side and lowered himself down to the main deck. From there, he looked to go aft, but he said that the exterior walkway was blocked by smoke and flames billowing out of the salon windows. He proceeded forward and opened the bow gate on the port side, reasoning that passengers could more easily evacuate through the gate.

The first deckhand had also exited the wheelhouse via the port wing station door, but he recalled that, before leaving the wheelhouse, he heard the sound of an alarm that was "really quiet, really distant." He thought the alarm was coming from the dashboard in the wheelhouse, but he said that it was "barely a little chirp."

From the aft deck, the second galleyhand had seen a crewmember lowering himself down to the main deck, so he ran forward through the smoke along the port exterior walkway. About the same time, the first galleyhand was attempting to jump down to the main deck from the port wheelhouse wing station. The first galleyhand told investigators that he misjudged the distance to the deck and landed with all his weight on his left leg, breaking it as he hit the deck. He landed in front of the second galleyhand, who leapt over him and continued forward to the bow.

After the first deckhand had lowered himself down to the main deck, he looked aft and saw that the port exterior walkway was blocked by smoke and flames coming out of the salon windows and wrapping around the sun deck above. He proceeded to the bow and tried to open the center window on the forward bulkhead of the salon. The deckhand, aided by the second galleyhand, struggled to pry the window open, but could not. The two crewmembers told investigators that the window was warm, but not hot, and when they looked through the window, the view was completely obscured by thick black smoke.

CORRECTED COPY



**Figure 6.** Preaccident photo of *Conception* forward salon windows. In this photo the center window is open. However, during the accident, the window was closed and secured as the crew attempted to access the space. The port and starboard windows were not designed to be opened. (Source: T. Thompson)

During this time, the captain was in the wheelhouse making a distress call over VHF radio. At 0314, he transmitted "Mayday, Mayday, Mayday. *Conception*, Platts Harbor, north side Santa Cruz." When Coast Guard Sector LA/Long Beach watchstanders responded to the distress call, the captain transmitted, "39 POB. I can't breathe. 39 POB. Platts."[7] The smoke filling the wheelhouse then forced the captain out of the space, and he jumped into the water from the starboard side wing station. None of the crewmembers who were interviewed reported hearing any public address system announcement or warning to the passengers. The second captain stated, "I don't think that there was time. I don't think [the captain] was even able to finish his distress call before having to exit the wheelhouse." The second galleyhand recalled that when the captain came to the surface of the water, he said "Oh my God, all those people."

As the first deckhand continued to try to open the forward salon window, he remembered a fire axe mounted in the wheelhouse. He looked up to the wheelhouse and was about to yell to the captain to get the axe when he and the second captain saw the captain leap into the water. As the captain jumped, smoke followed him down to the water. Both the first deckhand and the second captain believed the captain was on fire as he jumped. Consequently, the second captain dove into the water on the starboard side to attend to the captain.

Attempting to find another way to reach passengers, the first deckhand opened the anchor locker hatch on the bow. Looking inside, he saw that there was no access aft. The first deckhand told investigators that there was no smoke in the space at the time. He then checked the port and starboard exterior walkways, and both were blocked by smoke and flames.

---

[7] *POB* is an abbreviation for persons on board.

CORRECTED COPY

Realizing that there was little they could do from the bow, the second galleyhand and the first deckhand decided to jump into the water. The second galleyhand encouraged the first galleyhand, who was laying on the deck on the bow, to jump as well. The first galleyhand was in a great deal of pain due to his broken leg, but he eventually entered the water through the port bow gate. In the water, the first and second galleyhand swam away from the vessel, while the first deckhand swam toward the stern. None of the crew were able to acquire or don lifejackets or obtain other lifesaving devices before entering the water.

After finding that the captain was unharmed, the second captain had swum to the stern and reboarded the *Conception* via the swim platform, which was in the raised position with the skiff stowed on it. He proceeded up onto the main deck toward the salon, where he found that the entire salon and upper deck were consumed by fire. He then opened the hatch to the engine room but was blocked from entering by black smoke (he told investigators that he did not see flames).

The second captain's next thought was to launch the skiff so that the crew could pick up any survivors that had made it off the *Conception*. As he proceeded aft, he noted that the lights were on in the lazarette (the hatch was normally left open), so he knew that the vessel still had electrical power. He energized the hydraulic pump for the winch that raised and lowered the swim platform and prepared to lower the skiff into the water. By this time, the first deckhand had also climbed up on the stern of the *Conception*, and he assisted the second captain in launching the inflatable boat.

Once the boat was in the water, the second captain assisted the captain, who had swum to the stern of the *Conception*, into the boat. Meanwhile, the first deckhand went up onto the aft deck of the *Conception* to once again look for a way to help any passengers. The fire had continued to consume the vessel, and he found no way to get into the salon or to the bunkroom below.[8] Like the second captain, he checked the engine room but was prevented from entering due to smoke. (He also reported seeing no flames in the engine room.) The captain yelled at him to get in the skiff, so he went aft and boarded the small boat.

After the crew got the engine on the skiff running, they drove to where the galleyhands were located and helped both into the boat. The first deckhand then took the controls and drove the skiff over to the anchored sportfishing vessel *Grape Escape* to ask for help. When they arrived at the vessel, the crewmembers yelled and banged on the hull and back door to the salon until the *Grape Escape*'s owners were awakened. One of the owners then took the captain and second captain up to the bridge to make radio calls to the Coast Guard, while the other owner assisted the remaining crewmembers.

At 0329, the owner of the *Grape Escape* called the Coast Guard on VHF radio, stating "We have a Mayday. I have a commercial boat on fire. Santa Cruz Island." The owner and the *Conception* captain then provided information about the emergency, the location of the vessel, and the missing passengers and crewmember. Based on the initial call from the *Conception* captain 15 minutes earlier, the Coast Guard had begun alerting and dispatching nearby response units along the California coast

---

[8] The *Conception* was not equipped with, nor was it required to be equipped with, with any personal protective firefighting equipment or breathing apparatuses.

CORRECTED COPY

about the emergency, although the nature of the emergency was not initially clear. With the calls from the *Grape Escape*, the responders were now aware that the *Conception* was on fire.



**Figure 7.** Cell phone photo of *Conception* on fire, taken from sportfisher *Grape Escape*. (Source: S. Hansen)

The second captain, who had returned to the main deck of the *Grape Escape*, along with the first deckhand and second galleyhand, assisted the injured first galleyhand onto the sportfisher. The second captain and first deckhand then reboarded the skiff to go search for survivors, while the second galleyhand remained on the *Grape Escape* with the first galleyhand. According to the second captain, the crew on the skiff conducted an initial search, returned to the *Grape Escape* to get handheld radios, then recommenced the search. The second captain stated that while the skiff circled the burning *Conception*, he and the first deckhand heard several explosions. They also found the squid light, which appeared to be intact, floating in the water (when the squid light was recovered after the accident, the housing and bulb were found intact). The crew did not locate any survivors, so they returned to the *Grape Escape*.

The *Conception* captain and *Grape Escape* owner had continued to communicate with Coast Guard Sector LA/Long Beach, providing weather and more accurate location information. At 0417, Sector LA/Long Beach watchstanders instructed them to send the skiff out again to search for survivors. Accordingly, the second captain and first deckhand reboarded the skiff and proceeded to search. The second captain told investigators that they searched around the *Conception* and also around the rocks surrounding Platts Harbor, finding no one.

As the crew in the skiff was conducting their search, Coast Guard helicopters and boats began arriving on scene. At 0438, a Ventura County Fire Department paramedic and engineer who were aboard a Coast Guard boat boarded the *Grape Escape* to attend to the injured first galleyhand. After assessing the injury, the firefighters recommended a medical evacuation. However, due to high obstructions and entanglement hazards on the *Grape Escape*, evacuation via helicopter was deemed unsafe. Therefore, the *Grape Escape* was instructed to transport the crew to Channel Islands Harbor in Ventura. The skiff returned to the *Grape Escape*, the second captain and first deckhand boarded the sportfisher, and the *Grape Escape* proceeded to Ventura. The captain remained aboard a Coast Guard vessel at the accident site to assist responders. (For more information about the emergency response to this accident, please see the Survival Factors Group Chairman's Factual Report.)

4.5    *Conception* **Crew**

**4.5.1  Captain**

The 65-year-old captain of the *Conception* held a valid merchant mariner credential as a master of self-propelled vessels (not including auxiliary sail) of less than 100 gross register tons upon near coastal waters. He had worked for Truth Aquatics since 1984 (with a 3-year hiatus in the late

CORRECTED COPY

1990s), starting as a deckhand and then rising to captain in 1985 once he had obtained his 100-ton master's credential. According to Truth Aquatics and Coast Guard documents, he had captained all three of the company's vessels, but was primarily assigned to the *Conception* throughout his 3 decades of employment with the company. Although the company did not complete any type of employee evaluations, the owner told investigators he had never had any concerns with the captain's performance.

The captain was in overall charge of the vessel. Crewmembers, both current and former, told investigators that the captain was the primary operator of the helm and engine controls, turning over to the second captain or first deckhand for designated periods when transiting at night, or for short periods during the day for breaks.

### 4.5.2   Second Captain

The 28-year-old second captain held a valid merchant mariner credential, issued on March 19, 2019, as a master of self-propelled vessels (not including auxiliary sail) of less than 100 gross register tons upon near coastal waters. He told investigators that he had been hired by Truth Aquatics in late June or early July 2019 and that this was his first job as a credentialed mariner. Prior to this position, he had worked as a deckhand on several boats operating off the Southern California coast and the Channel Islands from 2017 to 2019.

The second captain stated that, as a new crewmember, his duties were primarily deck related, including working with the deckhands to anchor the vessel, launch and recover the skiff, and conduct general cleaning. He said that on the accident voyage, the captain had allowed him to spend more time at the controls in the wheelhouse so that he could gain experience maneuvering the vessel.

### 4.5.3   First Deckhand

The 28-year-old first deckhand had been employed by Truth Aquatics on board the *Conception* since November 2018.  He did not hold, nor was he required to hold, a merchant mariner credential. He told investigators that he held an American Sailing Association certification for bareboat cruising, and for the 3 years prior to being hired by Truth Aquatics, he had worked aboard a 70-foot sailing vessel that conducted 2-hour passenger cruises in Monterrey Bay, California.

The first deckhand's duties included line and anchor chain handling, monitoring engineering equipment and diving compressors, filling scuba diving tanks, monitoring and assisting divers, operating the skiff, minor maintenance, pumping bilges, general cleaning, and occasional turns at the helm.

### 4.5.4   Second Deckhand

The 26-year-old second deckhand had been working on the *Conception* for about a week when the accident occurred. It was her second voyage aboard the vessel. She did not hold, nor was she required to hold, a merchant mariner credential. Prior to joining the *Conception* crew, she had worked for a couple months as a galleyhand on another Truth Aquatics vessel.

CORRECTED COPY

The second deckhand's duties were similar to the first deckhand. According to other crewmembers, she was being trained on the various duties of the position during the previous and accident voyages. She was also designated as the safety diver, requiring her to stand by with a wetsuit on while divers were in the water. As such, she held an advanced open water diver certification.

### 4.5.5 First Galleyhand

The 34-year-old first galleyhand had been working on the *Conception* for about 3 weeks before the accident. Before being hired by Truth Aquatics, he had worked in the hospitality industry for about 11 years. He had no prior experience working on vessels; he did not hold, nor was he required to hold, a merchant mariner credential. During an interview with law enforcement officials, the first galleyhand stated that he had made about five or six voyages on the *Conception*, the first two under the supervision of the first galleyhand whom he eventually replaced.

The first galleyhand's duties included purchasing food and stores for each voyage, developing the menu and preparing food, and supervising the second galleyhand.

### 4.5.6 Second Galleyhand

The 58-year-old second galleyhand had worked on the *Conception* since October 2017. He stated that, prior to being hired by Truth Aquatics, he had worked in the restaurant industry for about 30 years. He did not hold, nor was he required to hold, a merchant mariner credential.

The duties of the second galleyhand included food preparation, making coffee, washing dishes and silverware, and general cleaning in the galley and salon.

### 4.6 Toxicology

Truth Aquatics had a workplace pre-employment and periodic drug and alcohol testing program in place as required by Title 46 *Code of Federal Regulations* (CFR) part 16 and Title 49 CFR part 40. Per regulations, if an individual failed a drug test under the program, they could not be reemployed aboard a vessel until a medical review officer determined that that the individual was drug-free and the risk of subsequent use of dangerous drugs by that person was sufficiently low to justify his or her return to work. During annual inspections by the Coast Guard, inspectors were required to verify that the company's program was in place and being properly followed.

According to Truth Aquatics' *Employee Education Program for the Drug and Alcohol Free Workplace*, a document that was provided to employees when they were hired, employees were "prohibited from unlawful manufacture, distribution, dispensing, possession of, or use of a controlled substances without authority on Truth Aquatics, Inc.'s premises." Further, the document stated that "The presence of any detectable amount of any illegal drug in an employee while performing Truth Aquatics, Inc.'s business or while on Truth Aquatics, Inc.'s premises is prohibited." Surviving crewmembers told investigators that there was a strict no-alcohol/no-drugs policy for employees while on board the *Conception*, but passengers were permitted to bring aboard and consume alcohol.

Just after 0800 on the accident date, upon the arrival ashore at Channel Island Harbor, the second captain, first deckhand, and the second galleyhand were administered blood alcohol content

CORRECTED COPY

(BAC) tests. The captain was tested when he arrived at the harbor about 45 minutes later. All tests results were 0.0% BAC. The first galleyhand was not tested prior to being transported to the hospital.

On the day after the accident, all surviving crewmembers underwent required postaccident urine drug testing. The first galleyhand tested positive for marijuana metabolites. He told law enforcement officials that he had smoked marijuana a few days before the accident voyage but not during the voyage. The second galleyhand tested negative-dilute for tested drugs.[9] The remaining survivors tested negative for any tested drugs.

Toxicology testing was performed during the autopsy of the deceased second deckhand. Results were negative for alcohol and other drugs.

### 4.7    Regulatory Oversight

#### 4.7.1    Applicable Regulations

Title 46 *Code of Federal Regulations* (CFR) Subchapter T governs the construction, outfitting, and operation of small passenger vessels, like the *Conception*, that are under 100 gross tons and carry 150 or less passengers or have overnight accommodations for 49 or less passengers. The current regulations under this subchapter were significantly updated in 1996, and vessels constructed after 1996 are required to comply with all of the current regulations. Vessels constructed before 1996 are required to comply with portions of the current regulations, including those pertaining to inspections and certification, vessel control and other systems and equipment, and operations. For regulations relating to construction and arrangement, lifesaving equipment and arrangements, fire protection equipment, machinery installation, and electrical installation, vessels that existed prior to 1996 are subject to those portions of Subchapter T regulations that were in force at the time the vessel was built, with certain exceptions. When referring to the post-1996 regulations, Coast Guard inspectors use the term "New Subchapter T" or, more simply, "New T" regulations, and when referring to the pre-1996 regulations, they use the term "Old Subchapter T" or "Old T." As a vessel built in 1981, the *Conception* was subject to portions of both the pre- and post-1996 regulations. In this report, "New Subchapter T" and "Old Subchapter T" will be used to differentiate between the two sets of regulations as they applied to the accident vessel.

#### 4.7.2    Certification and Inspections

The *Conception* was required to have a valid Certificate of Inspection (COI) issued by the Coast Guard. As stated in the regulations, the COI "describes the vessel, the route(s) that it may travel, the minimum manning requirements, the survival and rescue craft carried, the minimum fire extinguishing equipment and lifejackets required to be carried, the maximum number of passengers and total persons that may be carried, the number of passengers the vessel may carry in overnight accommodation spaces, the name of the owner and managing operator,…and such other conditions of operations as may be determined by the cognizant [Coast Guard Officer in Charge, Marine

---

[9] A *negative dilute* sample can occur when the donor consumes a large quantity of fluids before providing the urine specimen. The urine results for the second galley hand were labeled negative dilute; both creatinine and specific gravity were out of range. No follow-up urine testing under direct observation was performed.

CORRECTED COPY

**ER 55**

Inspection (OCMI)]."

After a vessel is built, a COI is issued by the Coast Guard upon the acceptance of vessel plans, manuals, and stability calculations and the successful completion of an initial inspection. A COI for vessels traveling on domestic routes is valid for 5 years. Prior to renewal at the end of 5 years, the vessel must be reinspected to ensure that it is in satisfactory condition, fit for the service intended, and complies with regulations. The inspection includes examination and testing of the vessel's structure, machinery, and equipment, and may include fire, abandon ship, or man overboard drills. The OCMI may require the vessel to get under way for the inspection.

A vessel carrying a COI valid for 5 years must also be inspected annually. The scope of the annual inspection is the same as the inspection for certification but in less detail, unless the Coast Guard inspector finds deficiencies or determines that a major change has occurred since the last inspection. If deficiencies are found or a major change to the vessel has occurred, the inspector will conduct an inspection more detailed in scope. If the vessel passes the annual inspection, the inspector endorses the COI. If a vessel does not pass an inspection, the attending marine inspector may place operational controls on the vessel, such as an order requiring a correction "prior to carriage of passengers," until deficiencies are rectified to the satisfaction of the marine inspector. Coast Guard inspectors also have the authority to issue civil penalties to vessel owners and operators for non-compliance with regulations or the vessel's COI.

In addition to certifications and annual inspections, vessels that operate on domestic routes and are exposed to salt water more than 3 months per year are required to undergo a drydock hull examination and an internal structure examination every 2 years. During the hull examination, "all accessible parts of the vessel's underwater body and all through hull fittings, including the hull plating and planking, appendages, propellers, shafts, bearings, rudders, sea chests, sea valves, and sea strainers shall be made available for examination. Sea chests, sea valves, and sea strainers must be opened for examination." On wood vessels, the inspector may require fasteners on the hull to be pulled for inspection. An internal structure examination "consists of a complete examination of the vessel's main strength members, including the major internal framing, the hull plating and planking, voids, and ballast, cargo, and fuel oil tanks. Where the internal framing, plating, or planking of the vessel is concealed, sections of the lining, ceiling, or insulation may be removed or the parts otherwise probed or exposed so that the inspector may be satisfied as to the condition of the hull structure."

To aid in the conduct of these inspections, the Coast Guard has issued inspectors the *T-Boat Inspection Book*, CG-840 TI, which contains checklists for each of the areas normally covered during an inspection. The CG-840-TI was last updated in 2011. Coast Guard sector commands and marine safety detachments (MSD) may also have supplemental or compressed checklists for inspections. MSD Santa Barbara, a sub-unit of Sector LA/Long Beach that was responsible for conducting the regulatorily-mandated inspections of the *Conception*, had a "Small Passenger Vessel – T" checklist that was last updated in 2014.

### 4.7.3  *Conception* **Inspection History**

The *Conception* had a valid COI issued on November 19, 2014, and signed by the Coast Guard Sector LA/Long Beach Chief of Prevention, "by direction" of the Officer in Charge, Marine

CORRECTED COPY

**ER 56**

Inspections. Per the COI, the vessel was required to be manned by a credentialed master and mate, as well as two uncredentialed deckhands.[10] The vessel could carry up to 99 passengers but was limited to 46 passengers for overnight accommodations. It was permitted to operate in the Pacific Ocean, not on an international voyage, and not more than 100 miles from mainland shore, between 31°45' north latitude (off northern Baja, Mexico) and 35°47.5' north latitude (the San Luis Obispo/Monterey, California county line, extended to sea). The COI required that "a member of the vessel's crew shall be designated by the master as a roving patrol at all times, whether or not the vessel is underway, when the passenger's bunks are occupied."

MSD Santa Barbara conducted the 5-year COI renewal inspections, annual compliance inspections, and biannual hull and structural examinations on the *Conception*. The detachment had two officers assigned as inspectors, and, according to the Coast Guard, the inspectors were appropriately qualified for the inspection of small passenger vessels under Subchapter T. The MSD Supervisor, the officer overall responsible for all activities at the detachment, was also a qualified inspector.

During the 2014 inspection for certification, subsequent annual inspections, and biannual hull and structural inspections aboard the *Conception*, minor discrepancies were reported, and the vessel owner corrected the discrepancies either immediately upon discovery or soon thereafter. One "prior to carriage of passengers" operational control was issued in February 2016 because the operator could not prove that the fire pump was operational. The operational control was removed the day after it was issued when the inspector witnessed the proper operation of the pump. There were no discrepancies reported in the annual inspection and hull examination conducted in February 2019.

The 2014 inspection for certification and subsequent annual inspections were conducted by the same MSD-Santa Barbara inspector. For the inspection for certification and 2016 annual inspections, he was joined by the second MSD-Santa Barbara inspector. For the annual inspections in 2017, 2018, and 2019, he conducted the inspections alone. The hull and structural examinations in 2015 and 2019 were also conducted by the same inspector, the former with the assistance of the second inspector, and the latter without. The 2017 hull examination was conducted by the second inspector alone.

When NTSB investigators spoke with Coast Guard inspectors at the MSD, sector, and headquarters level, the NTSB staff was told that, at larger commands with larger staffs such as a sector, inspections of small passenger vessels were normally conducted by at least two officers, and it was uncommon for the same officer to conduct an inspection on a single vessel several years in a row. However, at smaller commands such as an MSD, it was common for the same officer to conduct an inspection alone and to conduct multiple successive inspections on the same vessel due to the small number of inspectors assigned to the area. There is no Coast Guard policy governing how many inspectors are required to conduct an inspection or whether successive inspections can be conducted by the same inspector.

---

[10] For voyages of less than 12 hours, the crew requirement was reduced to a credentialed master and two uncredentialed deckhands.

CORRECTED COPY

## 4.8   Watchstanding

### 4.8.1   Navigation Watches

Per New Subchapter T regulations, "the movement of vessel shall be under the direction and control of the master or a licensed mate at all times." (The terms "licensed" as used in this section of Subchapter T is equivalent to "credentialled" as used in this report and other portions of Title 46 of the *Code of Federal Regulations*.) The captain of the *Conception* was the principal operator of the vessel's controls, and during the accident voyage the credentialled second captain also took the helm for brief periods.

In an interview with law enforcement officials, the first deckhand stated that, on previous voyages, the deckhands would be assigned helm watches at night. When a deckhand had the watch, all other crewmembers were asleep, including the captain and second captain. He said that the captain would "strategically pick the legs that the deckhands would take so that we're not going to be crossing the channel, or intercepting islands, or basically anything like that." The deckhands were instructed to monitor the radar, the VHF radio, and the electronic charting system and to wake up the captain if the engines made unusual noises or if other vessels came within 2 miles of the *Conception*.

There is no requirement in New or Old Subchapter T to maintain a navigation watch while a vessel is at anchor.

### 4.8.2   Roving Patrols

Per Title 46 *United States Code* (USC) Section 8102, "the owner, operator, or charterer of a vessel carrying passengers during the nighttime shall keep a suitable number of watchmen in the vicinity of cabins or staterooms and on each deck to guard against and give alarm in case of fire or other danger." An owner, operator, or charterer who fails to comply with this law is subject to a civil penalty of $1,000. In interpreting the statute for small passenger vessels under the New Subchapter T regulations (Section 185.410), the Coast Guard requires a roving watchman (or watchmen) to "patrol throughout the vessel during the nighttime, whether or not the vessel is underway, to guard against, and give alarm in case of, a fire, man overboard, or other dangerous situation."

As previously noted, a related provision requiring a roving patrol when passengers were in their bunks was included in the "Route Permitted And Conditions of Operation" section of the *Conception*'s certificate of inspection. NTSB investigators reviewed COIs from other small passenger vessels with overnight accommodations, and all of the certificates had a similar statement regarding the requirement for a roving watch, both under way and not under way.

Truth Aquatics' owner stated that there were no company-wide policies or procedures regarding watchstanding on board its vessels; watches were at the discretion of the captain of each dive boat. *Conception* crewmembers and former crewmembers interviewed by investigators stated that there was no formal watch rotation for the vessel.

When the vessel was not under way, whether moored in harbor in Santa Barbara or anchored around the Channel Islands, there was no designated watch or roving patrol while passengers were aboard, according to crewmembers and former crewmembers. When passengers

CORRECTED COPY

boarded the vessel the night before an early departure, it was common for there to be no crew on board until hours after the passengers had arrived. While at anchor, no watch was set, and all crewmembers normally slept after the day's activities had ended until the next morning.

The NTSB interviewed captains and crewmembers from other Truth Aquatics vessels, and all stated that the practices on their vessels were the same as those on the *Conception*. A captain of the *Vision* stated, "We'd prep the boat the day before, and then leave the boat open for the passengers to board…all of the deck crew would arrive a half hour before our scheduled departure." No watches were set while in port or at anchor. The *Vision* captain stated that he believed that having one of the crew sleep in the bunkroom "somehow fulfilled" the roving watch requirement. He said he had followed the practice that was shown to him when he began working for Truth Aquatics, and he thought "the boat's been operating this way for so long successfully after so many inspections that it must be fine." Referring to the roving watch requirement, a former captain of the *Truth* told Los Angeles Times reporters, "It's a regulation, but it wasn't really followed."[11]

After the accident, NTSB staff visited other dive boats operating in Southern California waters to gather information about industry-wide practices. During informal discussions with investigators, the owners and operators of all vessels that were visited stated that crewmembers were aboard the vessel and night watches were conducted when passengers were embarked. However, procedures for the conduct of night watches varied from boat to boat, ranging from active roving patrols to stationary watches located in the wheelhouse or salon.

When asked by NTSB investigators, Coast Guard representatives stated that during inspections for certification and annual inspections, inspectors have no practical way of verifying that operators were complying with the law, regulation, and COIs requiring a night watchman or roving patrol on small passenger vessels. A Coast Guard senior marine inspector stated, "The master of the vessel is responsible for operating the vessel within the parameters on the certificate. But there's no way during an inspection to know, because the inspection is conducted dockside, and even if you took the vessel out to do drills, it wouldn't be with passengers." Neither the CG-840 TI inspection book nor MSD Santa Barbara's Small Passenger Vessel – T checklist include a line item for verifying that a roving watch is being conducted. Coast Guard records show that, nationwide since 1991, no citations have been issued and no fines have been levied for failure to post a night watch or roving patrol.

## 4.9   Crew Training for Fire Emergencies

New Subchapter T regulations require the owner, operator, or master of a small passenger vessel to "instruct each crew member, upon first being employed and prior to getting underway for the first time on a particular vessel and at least once every three months, as to the duties that the crew member is expected to perform in an emergency including, but not limited to, the emergency instructions listed on the emergency instruction placard." For small passenger vessels, the emergency instruction placard must include the actions to be taken in the event of fire, heavy weather, or man

---

[11] Puente, Mark, Richard Winton, Leila Miller, "Before Conception boat fire, captains say Coast Guard safety rule was ignored," *The Los Angeles Times*, December 30, 2019.

CORRECTED COPY

overboard. Training of crewmembers must be logged or otherwise recorded.

Current and former crewmembers interviewed by NTSB investigators described the hiring and training process for employees on board Truth Aquatics vessels. A prospective employee was first invited to participate in a voyage without pay. During this voyage, the prospective employee was provided the opportunity to interact with and work alongside the crew, and the captain evaluated the person to determine whether they would be a "good fit." Upon completion of the unpaid voyage, a suitable candidate was offered a job if there was an opening on the vessel. Once hired, the new employee began work immediately in their assigned position. Current and former crewmembers stated that there was no formal training (company-wide or aboard the vessel) for new employees prior to getting under way as a paid employee. All training was on-the-job instruction by the vessel's crew.

*Conception* crewmembers stated that, with the exception of first aid and CPR training, the captain conducted training with new employees individually, showing the new employee where various equipment was located, how to align the fire pump, and other normal operating and emergency procedures. Experienced crewmembers also conducted informal training with the new employees. Training was conducted when time allowed during normal commercial operations of the vessel. For first aid and CPR, Truth Aquatics provided training to company employees annually.

New Subchapter T regulations also require the master of a small passenger vessel to "conduct sufficient fire drills to make sure that each crew member is familiar with his or her duties." The regulations do not specify the frequency that the drills must conducted. The regulations state that the drills shall include a muster of the passengers, reporting of the crew to assigned stations and demonstration of assigned duties, and instruction in the use of fire alarms, extinguishers, and any other firefighting equipment on board. The drills must be logged and include the date of the drill and a general description of the drill scenario or training topics.

The second captain, first deckhand, and second galleyhand told investigators that they had not participated in a fire drill aboard the *Conception*. The first deckhand stated that he had never pulled out a firehose on the vessel and had "never done a dry run on anything, with the exception of during the Coast Guard inspections." He stated that he had participated in one fire drill on another Truth Aquatics vessel during a Coast Guard inspection, and the drill log for the *Truth* reflected his participation in a drill during an April 2019 inspection of that vessel. A former first galleyhand stated that the crew had pulled out fire hoses during a training session while she was on the *Conception*. Other former crewmembers told investigators that they had never participated in a fire drill.

According to the Truth Aquatics owner, logs for drills and other training activities on the *Conception* were kept on the vessel. No logbooks were found after the accident – the wheelhouse where the logs were stored was completely destroyed by the fire. During a 2017 Coast Guard annual inspection of the *Conception*, inspectors noted that the drill log was not up to date. The inspectors cleared the discrepancy once underway drills were completed and logged. No other discrepancies with logs or the conduct of drills were noted by inspectors in the 5 years prior to the accident.

Coast Guard inspectors told investigators that they validated compliance with periodic training regulations by reviewing the required training logs and evaluating proficiency during drills conducted at inspections. Coast Guard records show that, nationwide since 1991, fourteen small passenger vessel owners, operators, or charterers have been cited for failure to conduct or properly

CORRECTED COPY

record crew training in accordance with regulations (Truth Aquatics was not among the cited operators). None have been cited during this period for failure to conduct fire drills.

### 4.10  Coast Guard Navigation and Vessel Inspection Circular No. 1-91

In February 1991, the Coast Guard issued Navigation and Vessel Inspection Circular No. 1-91 (NVIC 1-91), entitled "Recommended Qualifications for Small Passenger Vessel Deckhands." The circular provided the marine industry with guidelines for the recommended qualifications and training topics for deckhands engaged or employed on small passenger vessels to ensure the safe operation of the vessels. It provided recommendations for basic physical requirements for deckhands, as well as emergency conditions for which a deckhand should be familiar: man overboard, fire, abandon ship, foul weather, medical emergency, and collision. Further, it recommended seamanship, engineering, and passenger safety/control duties for which a deckhand should be familiar. NVIC 1-91 was updated in 2003 to add specific guidelines for deckhands on high speed small passenger vessels, and this version is still in effect today. The guidelines in the NVIC are not mandatory, but rather, they are intended to "allow the industry to undertake a voluntary training program which will provide an increased level of knowledge and skill for their crew members."

The NVIC recommended that Coast Guard inspectors use the guidance "during inspections for certification and reinspections, when evaluating training programs, and during drills conducted to ensure crew competency." The CG-840 TI inspection book included a checklist item to "discuss recommended Deckhand qualifications," but this was only required for high speed small passenger vessels. The owner of Truth Aquatics told investigators that he was not familiar with NVIC 1-91, but he stated that captains of the company vessels normally oversaw inspections on their vessels with the Coast Guard and could not comment on whether the document had been reviewed with the crews.

### 4.11  Passenger Safety Briefing

Per New Subchapter T, the master of a small passenger vessel must ensure that, "before getting underway on a voyage or as soon as practicable thereafter," public announcements are made to provide passengers with a safety orientation. The announcements must include:

(1) The location of emergency exits, survival craft embarkation areas, and ring life buoys;

(2) The stowage location(s) of life jackets;

(3) Either:

(i) The proper method of donning and adjusting life jackets of the type(s) carried on the vessel including a demonstration of the proper donning of a lifejacket, or

(ii) That passengers may contact a crew member for a demonstration as appropriate, prior to beginning an oceans or coastwise voyage;

(4) The location of the instruction placards for life jackets and other lifesaving devices;

CORRECTED COPY

(5) That all passengers will be required to don life jackets when possible hazardous conditions exist, as directed by the master; and

(6) If the vessel is operating with reduced manning or equipment requirements.

Crewmembers told investigators that the 15–20-minute safety briefing on the *Conception* was conducted by the crew following a standard bullet-point script. For trips that began late at night or early in the morning, such as the accident voyage, the safety briefing was normally conducted following breakfast, after the vessel had anchored at the first dive site. All passengers were required to attend. Former passengers confirmed that during the briefing the location of the bunkroom escape hatch was discussed, as the briefer normally stood directly aft of the hatch in the salon during the presentation. Passengers were informed but not shown where the hatch was located in the bunkroom. According to current and former crewmembers, the briefer did not demonstrate donning of life jackets. During interviews with investigators, current and former crewmembers on other Truth Aquatics vessels confirmed that the safety orientation procedures on their vessels were the same or similar to the procedures on the *Conception*.

As an alternative to the safety orientation announcements, New Subchapter T permits the use of a card or pamphlet, delivered to each passenger before getting under way, with the above listed information on it. If using the pamphlet, an abbreviated announcement must be made prior to getting under way that consists of a statement that passengers are to follow the instructions of the crew in an emergency, the location of life jackets; and that further information, including instructions for the donning of life jackets, the location of other emergency equipment, and emergency evacuation procedures are provided on the card or pamphlet.

As previously noted, a "Welcome Aboard" card was available in the *Conception* salon containing general information as well as the location of lifesaving equipment. Additionally, placards in each bunk provided lifejacket donning instructions.

New Subchapter T also required that passengers "shall be requested to don life jackets and go to the appropriate embarkation station during the safety orientation" for vessels on a voyage of over 24 hours." According to crewmembers' accounts of the safety brief on the accident voyage, the passengers on the Conception were not requested to don lifejackets or muster at the embarkation station.

4.12  **Crew and Passenger List**

New Subchapter T regulations require the owner, charterer, managing operator, or master of a vessel to "keep a correct list of the names of all persons that embark on and disembark from a vessel …where passengers are carried overnight." The list "must be communicated verbally or in writing ashore at the vessel's normal berthing location or with a representative of the owner or managing operator of the vessel."

On the *Conception*, a handwritten crew and passenger list was kept on board the vessel, and a copy of the list for the accident voyage was found in the company office ashore. Passengers were required to write their own names on the list after boarding, and some of the names appeared to be signatures, making them difficult to read. The list had the names of 32 passengers; the name of 1

CORRECTED COPY

**ER 62**

passenger was missing.

### 4.13  Safety Management Systems and Company Loss Control Program

The International Maritime Organization (IMO) developed international safety management standards in the 1980s following serious marine casualties caused by human error or management failure. This led to the development of the *International Safety Management Code* (ISM Code), the purpose of which is "to provide an international standard for the safe management and operation of ships and for pollution prevention."[12] The IMO adopted the ISM Code in 1993. In 1994, IMO members, including the United States, adopted the ISM Code as Chapter IX of the *International Convention for the Safety of Life at Sea* (SOLAS).[13] In 1998, the ISM Code was made mandatory for vessels on international voyages, such as passenger ships, high-speed craft, tankers, and cargo carrier ships. For other cargo ships on international voyage, the ISM Code took effect in July 2002.

The ISM Code, along with Title 46 *US Code* Section 3203 and Title 33 CFR part 96 that implement the code for US and other applicable vessels, requires that vessel operators implement a safety management system (SMS). An SMS defines the roles and responsibilities of all personnel, outlines safe practices in vessel operation and navigation, and establishes safeguards against identified risks. According to US law, an SMS must contain the following elements:

(1) a safety and environmental protection policy;

(2) instructions and procedures to ensure safe operation of those vessels and protection of the environment in compliance with international and United States law;

(3) defined levels of authority and lines of communications between, and among, personnel on shore and on the vessel;

(4) procedures for reporting accidents and nonconformities with this chapter;

(5) procedures for preparing for and responding to emergency situations; and

(6) procedures for internal audits and management reviews of the system.

Current regulations for SMSs do not apply to small passenger vessels operating on domestic routes. However, the Coast Guard Authorization Act of 2010 authorized the Secretary of the Department of Homeland Security (in which the Coast Guard operates) to "prescribe regulations

---

[12] IMO, ISM Code and Guideline of Implementation of the ISM Code, http://www.imo.org/en/OurWork/HumanElement/SafetyManagement/Pages/ISMCode.aspx, accessed April 6, 2020.

[13] The SOLAS Convention is generally regarded as the most important of all international treaties concerning the safety of merchant ships. The main objective of the convention is to specify minimum standards for the construction, equipment, and operation of ships, compatible with their safety. Flag states are responsible for ensuring that ships under their flag comply with its requirements. The first version of the SOLAS Convention was adopted in 1914 in response to the Titanic disaster. The current version in force is the 1974 Convention, as amended on numerous occasions. Source: International Maritime Organization (IMO), International Convention for the Safety of Life at Sea (SOLAS), 1974, http://www.imo.org/en/About/Conventions/ListOfConventions/Pages/International-Convention-for-the-Safety-of-Life-at-Sea-(SOLAS),-1974.aspx.

CORRECTED COPY

which establish a safety management system" for all small passenger vessel operators, including domestic. To date, the Coast Guard has not issued the regulations authorized in the 2010 law, nor are the regulations currently under development.[14] Truth Aquatics did not have an SMS for its vessels, nor was it required to.

Although Truth Aquatics did not have an SMS, paperwork that was presented to new employees when they were hired by the company included a *Loss Control Program*, which included some elements common to an SMS. ("Loss control" is an insurance industry term for a program to manage risk and reduce losses.) The first element of the program document, titled "Purpose, Duties, Responsibilities and Administration," provided an overall safety policy for the company. The policy included the following:

> The health and safety of employees and passengers on Truth Aquatics' property is of critical concern. We strive to attain a high level of safety in all activities and comply with all health and safety laws applicable to our operations. The company expects that every employee will accept the responsibility for loss prevention and reduction.

> Captains of each vessel will be directly responsible for maintaining safe working conditions and practices and for the safety of passengers and crewmen under their supervision. They will direct the program to each of their crewmembers in the form of instruction and control. Any safety deficiencies should be brought to the attention of the captain.

> All employees have a safety responsibility to themselves, their fellow crewmen, and to the company. Their performance must reflect this mutually beneficial obligation through active support of the safety and loss control program and compliance with established safety practices and procedures. The captains will provide training and instruction to help meet these responsibilities.

Follow on sections of the document included instructions for the conduct of inspections for safety hazards, accident investigation and reporting requirements, and guidance for annual safety meetings between vessel captains, management, and the owner.

The fifth element of the program, "Training," stated the following:

> Truth Aquatics will provide adequate training to all employees so that they can perform their assigned tasks. Training programs shall be performed by captains on an as-needed basis. Records shall be kept of meeting agendas and attendance. Management shall maintain these records in the Sea Landing office and they will be made available to all employees.

---

[14] Office of Management and Budget, Fall 2019 Unified Agenda of Regulatory and Deregulatory Action, Department of Homeland Security Agency Rule List, 2019, https://www.reginfo.gov/public/do/eAgendaMain.

CORRECTED COPY

Annual CPR training classes will be held at appropriate times and all crewmembers are encouraged to attend.

The final element of the *Loss Control Program*, "Emergency Procedures," contained a list of nine emergencies, including fires, flooding, and abandon ship, with step-by-step instructions for crew responses to each emergency. The section lead paragraph stated, "This list is required to be reviewed by all participants." The first procedure on the list was firefighting and consisted of the following instructions:

- Shut off all engines, generators and ventilation systems, unless they are needed to maneuver the vessel.
- Recover and evacuate anyone injured.
- Locate the fire and evaluate the extent of the fire.
- Cut off air supply to fire – close items such as hatches, ports, doors, ventilators, louvers, and shut off power ventilation system (blowers).
- Cut off electrical system supplying affected compartment if possible.
- If safe, immediately use portable fire extinguishers at base of flames for flammable liquid or grease fires, or water for fires in ordinary combustible materials. Do not use water on electrical fires.
- If fire is in machinery spaces, shut off fuel supply and ventilation, and activate fixed extinguishing system.
- Maneuver vessel to minimize effect of wind on fire.
- If unable to control fire, immediately notify the Coast Guard and other craft in the vicinity by radiotelephone (VHF).
- Move passengers away from fire, have them put on lifejackets, and if necessary, prepare to **abandon ship** [emphasis in original] (see 3A for Abandon Ship procedures).

The second captain, first galleyhand, and alternate second captain who had been on *Conception* during the previous voyage stated that they had received a copy of the *Loss Control Program*, as well as an employee handbook and other documents, after being hired by Truth Aquatics. The second captain and alternate second captain (who had been hired in August 2019) stated that they had received the documents in an email with attachments.

The employee handbook stated, "The *Loss Control Program* manual is designed for the safety of all employees. You are responsible for reading this manual and are required to sign and date that you have read and understand it." The second captain stated that he was asked to read the *Loss Control Program* (as well as the other new employee documents) and review it with the crew when he got on board the vessel for the first time. The alternate second captain stated that he had reviewed the program document, but that no one verified that he had read it or understood the policies and procedures within before he got under way on the *Conception*. The first galleyhand said that he did not receive the new employment documents until just prior to the accident voyage, his fifth or sixth on the vessel. He stated that he wrote down the headings of the emergency procedures listed in the *Loss Control Program* and asked the captain to discuss the procedures on the day before the accident. The first galleyhand stated

CORRECTED COPY

**ER 65**

that the captain's response was "when we have time." He further said that during the accident, "I didn't know what the procedures were supposed to be."

CORRECTED COPY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-7065 PA (MRWx) | Date | July 23, 2024 |
|---|---|---|---|
| Title | Nancy Fiedler, et al. v. United States of America | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |
|---|---|

| Kamilla Sali-Suleyman | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**          **IN CHAMBERS — COURT ORDER**

Defendant United States (the "Government") has filed a Motion to Strike NTSB Report (Docket No. 107). The Motion to Strike does not have a hearing date as required by Local Rules 6-1 and 7-4 and there is no statement of compliance with Local Rule 7-3's meet and confer requirement. The Court construes the Motion to Strike as an objection to evidence. Plaintiffs' Opposition, if any, to the Government's evidentiary objection shall be filed by no later than July 29, 2024. After that date, the matter shall be deemed under submission. Future violations of the Federal Rules of Civil Procedure, the Local Rules, or the Court's Orders may result in the imposition of sanctions.

IT IS SO ORDERED.

**ER 67**

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN BOYNTON
Principal Deputy Assistant Attorney General
ERIC KAUFMAN-COHEN, Cal. SBN 171064
eric.kaufman-cohen@usdoj.gov
Attorney in Charge, West Coast Office
SCOTT PERRYGO, Cal. SBN 341834
Scott.perrygo@usdoj.gov
Trial Attorneys
Torts Branch, Civil Division
U.S. Department of Justice
450 Golden Gate Avenue, Room 7-5395
San Francisco, California 94102-3463
Telephone: (415) 436-6648
             (415) 436-6644

Attorneys for United States of America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal Representative of the Estate of VAIDEHI DEVI CAMPBELL WILLIAMS (Deceased); CHRISTINE

Case No.: 2:21-cv-07065-PA-MRW

In Admiralty

**MOTION TO STRIKE NTSB REPORT (ECF 98-2)**

**Supporting documents:**

**1) Proposed Order**

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                                Case No.: 2:21-cv-07065-PA-MRW

**ER 68**

ALEXANDRA DIGNAM, Personal )
Representative of the Estate of JUSTIN )
DIGNAM (Deceased); JASMINE )
LORD, Personal Representative of the )
Estate of CHARLES McILVAIN )
(Deceased); VICTORIA E. MOORE, )
Personal Representative of the Estates of )
RAYMOND SCOTT CHAN (Deceased) )
and KENDRA CHAN (Deceased); )
YUKA OHASHI MERRITT, Personal )
Representative of the Estate of YUKO )
HATANO (Deceased); VIKRAM )
SINGH, Personal Representative of the )
Estate of SUNIL SINGH SANDHU )
(Deceased); NINA HUTTEGGER, )
Personal Representative of the Estate of )
JUHA-PEKKA AHOPELTO )
(Deceased); YADIRA ALVAREZ, )
Personal Representative of the Estate of )
BERENICE FELIPE (Deceased); SEJAY )
TAN, Personal Representative of the )
Estate of WEI TAN (Deceased); ERIC )
BALTZ, Personal Representative of the )
Estate of NEAL BALTZ (Deceased); )
ANTHONY BEITZINGER, Personal )
Representative of the Estate of )
PATRICIA BEITZINGER (Deceased); )
SHRUTI DEOPUJARI, Personal )
Representative of the Estate of )
SANJEERI DEOPUJARI (Deceased); )
ATLEE FRITZ, Personal )
Representative of the Estate of )
ANDREW FRITZ (Deceased); SEEMA )
SHARMA, Personal )
Representative of the Estate of )
KAUSTUBH NIRMAL (Deceased); )
MARGARET STROM, Personal )
representative of the Estate of TED )
STROM (Deceased); RICHARD X. LIU, )
Personal Representative of the Estate of )
XIANG LIN; SUSANA SOLANO )
ROSAS, Personal Representative of the )
Estates of EVANMICHEL SOLANO )
QUITASOL (Deceased), ANGELA )
ROSE SOLANO QUITASOL )
(Deceased), and NICOLE SOLANO )
QUITASOL (Deceased); ARIEL )
TAKVAM, Personal Representative of )
the Estate of KRISTIAN TAKVAM )
(Deceased); DOMINIC MICAEL )
SELGA, Personal Representative of the )
Estate of FERNISA JUNE SISON )
(Deceased); ROBERT KURTZ and )

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                                    Case No.: 2:21-cv-07065-PA-MRW

**ER 69**

CHERIE MCDONOUGH, Personal )
Representatives of the Estate of )
ALEXANDRA HALEY KURTZ; JEAN )
ANNE ALLEN as Executor of the Estate )
of STEVEN JOHN SALIKA, Executor )
of the Estate OF CAROL DIANA )
ADAMIC and Administrator of the )
Estate of TIA NICOLE ADAMIC )
SALIKA; JAMES ADAMIC, )
individually and as beneficiary of the )
Estate of CAROL DIANA ADAMIC )
(Deceased); ANGELIKA ADAMIC, )
individually and as beneficiary of the )
Estate of CAROL DIANA ADAMIC )
(Deceased); MARK ADAMIC, )
individually and as beneficiary of the )
Estate of CAROL DIANA ADAMIC )
(Deceased); SHIRLEY SALIKA, )
individually, and as beneficiary of the )
Estate of STEVEN JOHN SALIKA )
(Deceased) and TIA NICOLE SALIKA )
(Deceased); DANIEL POH-HOCK )
CHUA, Personal Representative of the )
Estate of KRISTINA OLINE FINSTAD )
(Deceased), and RYAN SIMS, )
individually, )
                                                    )
            Plaintiffs,                             )
                                                    )
      vs.                                           )
                                                    )
UNITED STATES OF AMERICA,                           )
                                                    )
            Defendant.                              )
                                                    )

Defendant United States of America hereby moves to strike the National Transportation Safety Board (NTSB) report attached to the Declaration of John Hillsman in Support of Opposition to Motion to Dismiss, ECF 98-2, from the record of this action. Federal law prohibits the use of any part of that report in civil damages litigation. 49 U.S.C. § 1154(b). Plaintiffs omitted the warning label about this prohibition in the excerpt of the report they filed with the Court.

### Background

In support of their opposition to the United States' motion to dismiss Plaintiffs filed the Declaration of John Hillsman. ECF 98-1 (Hillsman Declaration.) Attached as Exhibit 1 to the Hillsman Declaration are portions of the Marine Accident Report adopted by the (NTSB. ECF 98-2. The document is an excerpt of a 77-page document.

The report is titled, "Fire Aboard Small Passenger Vessel *Conception*, Platts Harbor, Channel Islands National Park, Santa Cruz Island, 21.5 miles South-Southwest of Santa Barbara, California, September 2, 2019," Marine Accident Report, NTSB/MAR-20/03. The report is dated October 20, 2020. It is signed by the Chairman of the Board, the Vice Chairman of the Board, and three Board Members. *Id*. at 77. Pages vi and 75 of the report contain the Board's Probable Cause. On the third page of the PDF document, after the cover page but before the Table of Contents, is a page containing a legend warning about the usage of the report. The warning states:

> Assignment of fault or legal liability is not relevant to the NTSB's statutory mission to improve transportation safety by investigating accidents and incidents and issuing safety recommendations. In addition, statutory language prohibits the admission into evidence or use of *any part* of an NTSB report related to an accident in a civil action for damages resulting from a matter mentioned in the report (Title 49 United States Code section 1154(b)) (emphasis added).

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                           1                    Case No.: 2:21-cv-07065-PA-MRW

As stated above, Plaintiffs neglected to include this admonition in the excerpt of the report attached as Exhibit 1 to the Hillsman Declaration.

## Argument

Congress created the NTSB as an independent investigatory Board and passed legislation to insulate it from civil damages litigation. Accordingly, by statute, "No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b). This statute is complemented by an implementing regulation, which states:

> Board accident report means the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative report or in a computer format ("briefs" of accidents). Pursuant to section 701(e) of the Federal Aviation Act of 1958 (FAA Act), and section 304(c) of the Independent Safety Board Act of 1974 (49 U.S.C. 1154(b)) (Safety Act), *no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports*.

> Factual accident report means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports. In the case of a major investigation, group chairman factual reports are factual accident reports.

49 C.F.R. § 835.2 (emphasis added).

The report filed as Exhibit 1 to the Hillsman Declaration is a Board accident report because it is a single report, signed by the Board, that contains the Board's statement of probable cause. The report thus falls under 49 U.S.C. § 1154(b) and 49 C.F.R. § 835.2. No part of it can be used in this litigation.

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                                    2                    Case No.: 2:21-cv-07065-PA-MRW

Plaintiffs may assert they can use the exhibit because they excerpted the NTSB report and did not include the probable cause. A similar argument was roundly rejected in *Olympic Air, Inc. v. Helicopter Tech. Co.*, No. 17-cv-1257, 2022 WL 823545 (W.D. Wash. Mar. 18, 2022), wherein the court held:

> The NTSB Report at issue contains the NTSB's probable cause determination regarding the helicopter crash that is the subject of this case. . . . It is therefore a "Board accident report" as defined in the relevant regulation. This determination is bolstered by the fact that the "factual accident report" is separately linked on the NTSB's database website. . . . It is even further bolstered by the fact that the NTSB Report bears a legend warning that 49 U.S.C. § 1154(b) "precludes the admission into evidence or use of any part of an NTSB report related to an incident or accident in a civil action for damages resulting from a matter mentioned in the report." Dkts. # 119-1 at 10, # 150-4 at 10. Because the NTSB Report is a "Board accident report" about the helicopter crash at issue, it therefore follows that "no part" of it may be admitted as evidence or used in the instant matter. See 49 U.S.C. § 1154(b); 49 C.F.R. § 835.2; accord Chiron Corp. & PerSeptive Biosystems v. Nat'l Transp. Safety Bd., 198 F.3d 935, 941 (D.C. Cir. 1999) ("Thus, the statute means what it says: No part of the Board's actual report is admissible as evidence in a civil suit.")
>
> * * *
>
> Even assuming, arguendo, that HTC is correct that it relies only on statements of fact derived from the NTSB Report, *it is inconsequential. The statute and the regulation prohibit using any part of the NTSB Report. Fact or not, these statements are derived from the NTSB Report. Their use is therefore prohibited.*

*Id.* at *2 (emphasis added).[1]

---

[1] *See also In re Crash of Aircraft N93PC on July 7, 2013, at Soldotna, Alaska*, No. 15-cv-0112, 2021 WL 3412552, at *3 (D. Alaska Aug. 4, 2021) (striking NTSB studies because they "walk right up to the Board's conclusion as to probable cause"); *Panting v. United States*, No. 19-cv-317, 2020 WL 6318889, at *3 (D. Neb. Oct. 28, 2020) (striking NTSB report but not separate factual report); *Fleming v. Robinson*

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                                 3                    Case No.: 2:21-cv-07065-PA-MRW

In addition to omitting the warning page from the exhibit, counsel for Plaintiffs stated in his declaration that this exhibit "contains none of the NTSB's opinions or conclusions about the fire, and Plaintiffs have offered it solely for the factual findings it sets forth." ECF 98-1, ¶ 10. The omission of the warning legend and the statement in the declaration are misleading because Exhibit 1 to the Hillsman Declaration is indeed the prohibited Board accident report that contains the NTSB's probable cause.

In addition to improperly "using" the prohibited report, Plaintiffs seek to have it admitted into evidence under Federal Rule of Evidence 1005 ("copies of public records to prove content"). However, as discussed above, the NTSB statute, as well as case law, prohibits the admission of any part of an NTSB report for any reason into evidence in a civil action arising from an incident investigated by the NTSB. As such, Plaintiffs' attempt to circumvent this prohibition by resorting to Fed. R. Evid. 1005 should not be endorsed by the Court. Consequently, the United States respectfully moves the Court to strike the NTSB report from the record of this action.

---

*Aviation (RVA), Inc.*, No. 18-cv-1511, 2020 WL 12182613, at *3 (D.P.R. Oct. 7, 2020) (striking all parts of NTSB report); *Escobar v. Nevada Helicopter Leasing LLC*, No. 13-cv-00598, 2020 WL 104672, at *4 (D. Haw. Jan. 8, 2020) (prohibiting use of NTSB board accident report at trial); *LeBlanc v. Panther Helicopters, Inc.*, No. 14-cv-01772, 2018 WL 1392897, at *2 (E.D. La. Mar. 20, 2018) (striking all of NTSB report that contained factual information as well as probable cause); *Credle v. Smith & Smith, Inc.*, 42 F. Supp. 3d 596, 599 (D.N.J. 2013) (striking expert opinion that improperly relied upon facts in NTSB Marine Accident Brief); *Knous v. United States*, 981 F. Supp. 2d 1365, 1367 (N.D. Ga. 2013) (rejecting attempt to backdoor NTSB findings into civil litigation).

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                               4                    Case No.: 2:21-cv-07065-PA-MRW

Date: July 22, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney
                                       DAVID M. HARRIS
                                       Assistant United States Attorney
                                       Chief, Civil Division

                                       BRIAN BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       s/Eric Kaufman-Cohen
                                       ERIC KAUFMAN-COHEN
                                       Attorney in Charge, West Coast Field Office
                                       SCOTT PERRYGO, Trial Attorney
                                       Torts Branch, Civil Division
                                       450 Golden Gate Avenue, Room 7-5395
                                       San Francisco, California 94102-3463
                                       415-436-6648
                                       Email: eric.kaufman-cohen@usdoj.gov
                                       U.S. Department of Justice
                                       Attorneys for United States of America

MOTION TO STRIKE NTSB REPORT
(ECF 98-2)                           5              Case No.: 2:21-cv-07065-PA-MRW

CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, a copy of the foregoing MOTION TO STRIKE NTSB REPORT was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.

s/Eric Kaufman-Cohen
ERIC KAUFMAN-COHEN

6

**ER 76**

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
ERIC KAUFMAN-COHEN, Cal. SBN 171064
Eric.Kaufman-Cohen@usdoj.gov
Attorney in Charge, West Coast Office
SCOTT PERRYGO, Cal. SBN 341834
Scott.Perrygo@usdoj.gov
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
450 Golden Gate Avenue, Room 7-5395
San Francisco, California 94102-3463
Telephone: (415) 436-6648/(415) 436-6645
Facsimile: (415) 436-6632

Attorneys for United States of America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal Representative of the Estate of VAIDEHI DEVI CAMPBELL WILLIAMS (Deceased); CHRISTINE ALEXANDRA DIGNAM, Personal Representative of the Estate of JUSTIN DIGNAM (Deceased); JASMINE LORD, Personal Representative of the | Case No.: 2:21-cv-07065-PA-MRW<br><br>In Admiralty<br><br>**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION [ECF 88]**<br><br>**[Fed. R. Civ. P. 12(b)(1)]**<br><br>Date: TBD<br>Time:<br>Courtroom:<br><br>Hon. Percy Anderson |

REPLY IN SUPPORT OF MOT. TO DISMISS                Case No.: 2:21-cv-07065-PA-MRW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Estate of CHARLES McILVAIN )
(Deceased); VICTORIA E. MOORE, )
Personal Representative of the Estates of )
RAYMOND SCOTT CHAN (Deceased) )
and KENDRA CHAN (Deceased); )
YUKA OHASHI MERRITT, Personal )
Representative of the Estate of YUKO )
HATANO (Deceased); VIKRAM )
SINGH, Personal Representative of the )
Estate of SUNIL SINGH SANDHU )
(Deceased); NINA HUTTEGGER, )
Personal Representative of the Estate of )
JUHA-PEKKA AHOPELTO )
(Deceased); YADIRA ALVAREZ, )
Personal Representative of the Estate of )
BERENICE FELIPE (Deceased); SEJAY )
TAN, Personal Representative of the )
Estate of WEI TAN (Deceased); ERIC )
BALTZ, Personal Representative of the )
Estate of NEAL BALTZ (Deceased); )
ANTHONY BEITZINGER, Personal )
Representative of the Estate of )
PATRICIA BEITZINGER (Deceased); )
SHRUTI DEOPUJARI, Personal )
Representative of the Estate of )
SANJEERI DEOPUJARI (Deceased); )
ATLEE FRITZ, Personal )
Representative of the Estate of )
ANDREW FRITZ (Deceased); SEEMA )
SHARMA, Personal )
Representative of the Estate of )
KAUSTUBH NIRMAL (Deceased); )
MARGARET STROM, Personal )
representative of the Estate of TED )
STROM (Deceased); RICHARD X. LIU, )
Personal Representative of the Estate of )
XIANG LIN; SUSANA SOLANO )
ROSAS, Personal Representative of the )
Estates of EVANMICHEL SOLANO )
QUITASOL (Deceased), ANGELA )
ROSE SOLANO QUITASOL )
(Deceased), and NICOLE SOLANO )
QUITASOL (Deceased); ARIEL )
TAKVAM, Personal Representative of )
the Estate of KRISTIAN TAKVAM )
(Deceased); DOMINIC MICAEL )
SELGA, Personal Representative of the )
Estate of FERNISA JUNE SISON )
(Deceased); ROBERT KURTZ and )
CHERIE MCDONOUGH, Personal )
Representatives of the Estate of )
ALEXANDRA HALEY KURTZ; JEAN )
ANNE ALLEN as Executor of the Estate )

REPLY IN SUPPORT OF MOT. TO DISMISS                    Case No.: 2:21-cv-07065-PA-MRW

**ER 78**

of STEVEN JOHN SALIKA, Executor of the Estate OF CAROL DIANA ADAMIC and Administrator of the Estate of TIA NICOLE ADAMIC SALIKA; JAMES ADAMIC, individually and as beneficiary of the Estate of CAROL DIANA ADAMIC (Deceased); ANGELIKA ADAMIC, individually and as beneficiary of the Estate of CAROL DIANA ADAMIC (Deceased); MARK ADAMIC, individually and as beneficiary of the Estate of CAROL DIANA ADAMIC (Deceased); SHIRLEY SALIKA, individually, and as beneficiary of the Estate of STEVEN JOHN SALIKA (Deceased) and TIA NICOLE SALIKA (Deceased) DANIEL POH-HOCK CHUA, Personal Representative of the Estate of KRISTINA OLINE FINSTAD (Deceased), and RYAN SIMS, individually,

        Plaintiffs,

     vs.

UNITED STATES OF AMERICA,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

REPLY IN SUPPORT OF MOT. TO DISMISS                    Case No.: 2:21-cv-07065-PA-MRW

**TABLE OF CONTENTS**

1.   This is a Motion to Dismiss Under Rule 12(b)(1) ……………...……….. 1

2.   The Regulations Place the Burden of Compliance on Private
     Industry …………………………………………………………..…… 3

3.   The Challenged Acts Were Discretionary ………………………….....  4

4.   *Varig Airlines* Is Applicable and Binding Authority Here ………………… 6

5.   *Whisnant* and *Bear Medicine* Do Not Apply ………………………..…….. 8

6.   Commander Hodgdon's Testimony Supports Application
     Of the DFE ……………………………………………………………   9

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bear Medicine v. United States,*

   241 F.3d 1208 (9th Cir. 2001) ...................................................................8

*Chadd v. United States,*

   794 F.3d 1104 (9th Cir. 2015) ...................................................................2

*Dearborn v. Mar Ship Operations, Inc.,*

   113 F.3d 995 (9th Cir. 1997) .....................................................................2

*Family Home & Fin. Ctr., Inc. v. Federal Home Loan Mort. Corp.,*

   525 F.3d 822 (9th Cir. 2008) .....................................................................3

*Farr v. United States,*

   990 F.2d 451 (9th Cir. 1993) .....................................................................3

*Gonzalez v. United States,*

   814 F.3d 1022 (9th Cir. 2016) ................................................................8, 9

*Irving v. United States,*

   162 F.3d 154 (1st Cir. 1998) ...................................................................4, 9

*Lam v. United States,*

   979 F.3d 665 (9th Cir. 2020) .....................................................................8

*McCarthy v. United States,*

   850 F.2d 558 (9th Cir. 1988) .....................................................................3

*Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.,*

   594 F.2d 730 (9th Cir. 1979) .....................................................................3

*United States v. Gaubert,*

   499 U.S. 315 (1991) ..................................................................................4

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*

   467 U.S. 797 (1984) .......................................................................... 1, 6, 7

*Whisnant v. United States,*

    400 F.3d 1177 (9th Cir. 2005) ..............................................................8, 9

**Statutes**

14 U.S.C. § 102(3) ..............................................................................4, 5

46 U.S.C. § 30301, *et seq.* ..........................................................................2

46 U.S.C. § 30903 ......................................................................................2

49 U.S.C. § 1154(b) ....................................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................... 1, 2, 3

**Regulations**

46 C.F.R. § 72.05-55(c) ............................................................................12

46 C.F.R. § 116.423 ..................................................................................12

46 C.F.R. § 175.112 ..................................................................................11

46 C.F.R. § 176.500 ....................................................................................5

46 C.F.R. § 176.500(b)(iv) ..........................................................................5

46 C.F.R. § 176.610 ..................................................................................10

46 C.F.R. § 176.806 ....................................................................................6

46 C.F.R. § 176.830 ....................................................................................6

46 C.F.R. § 176.830(a) ............................................................... 5, 9, 10, 11

46 C.F.R. § 177.115 ..................................................................................11

46 C.F.R. § 177.15(b) ...........................................................................6, 12

46 C.F.R. § 177.405 ..................................................................................11

46 C.F.R. § 177.405(f) ..............................................................................12

46 C.F.R. § 177.410 ..................................................................................12

MEM. IN SUPPORT OF MOT. TO DISMISS    iii    Case No.: 2:21-cv-07065-PA-MRW

46 C.F.R. § 183.115 ...................................................................................................12

46 C.F.R. § 183.115(a) ...............................................................................................12

46 C.F.R. § 183.115(b) ...............................................................................................12

46 C.F.R. § 183.340(b) .................................................................................................6

46 C.F.R. § 183.340(d)(2) ............................................................................................6

46 C.F.R. § 183.420 ...................................................................................................12

46 C.F.R. § 183.430 ...................................................................................................12

46 C.F.R. §§ 176.500 ...................................................................................................5

46 C.F.R. §§ 177.115(b) ..............................................................................................6

The United States of America hereby replies to the opposition to its Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction (ECF 88).[1] First, Plaintiffs insist that this is a motion for summary judgment even though, as this Court specifically ordered, the discretionary function exception ("DFE") is properly the subject of a Rule 12(b)(1) motion. ECF 82. Second, Plaintiffs' arguments presume that vessel regulations mandate the Coast Guard to guarantee compliance with all requirements; yet the regulatory regime created by Congress places that duty squarely on vessel owners and operators. Third, they misconstrue the terms of these regulations, which are inherently discretionary. Fourth, Plaintiffs are off base in casting aside *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984); rather, that case—which involved allegations that government inspectors negligently certified an airliner by failing to identify safety hazards—is highly salient here. Fifth, their DFE arguments depend on this Court applying an outdated decision-implementation doctrine that the Ninth Circuit has more recently curtailed. Lastly, Plaintiffs misconstrue deposition testimony of Coast Guard witnesses.

**1. This Is a Motion to Dismiss Under Rule 12(b)(1).**

Plaintiffs argue that this motion should be decided under a summary judgment standard for two reasons. First, they claim that the Court granted the United States leave to file a motion for summary judgment. To the contrary, this Court specifically ordered that "the United States is hereby granted leave of Court to file a motion to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1)." ECF 82.

---

[1]    The United States moves separately to strike Exhibit 1 to John Hillsman's Declaration, ECF 98-2, the National Transportation Safety Board's Marine Accident Report, NTSB/MAR-20-03. By statute, no part of that report may be used or admitted into evidence in civil litigation for damages. 49 U.S.C. § 1154(b). The page in the report setting forth this statutory prohibition was omitted from the Exhibit.

MEM. IN SUPPORT OF MOT. TO DISMISS          1          Case No.: 2:21-cv-07065-PA-MRW

1        Second, Plaintiffs erroneously argue that a summary judgment standard

2    applies because the analysis of the DFE is so intertwined with the merits that the

3    Court must apply a summary judgment standard because "[t]he SIAA provides both

4    the substantive basis" for the claims "and the 'jurisdictional hook.'" Pls.' Opp'n,

5    ECF 98 at 16. This is incorrect. The Suits in Admiralty Act ("SIAA") provides a

6    jurisdictional hook only; it does not provide the substantive law for an admiralty

7    action. *See Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995, 996 n.1 (9th Cir.

8    1997)( SIAA "does not itself provide a cause of action"). The statute merely waives

9    the United States' sovereign immunity in a case where, "if a vessel were privately

10   owned or operated, or if cargo were privately owned or possessed, or if a private

11   person or property were involved, a civil action in admiralty could be maintained."

12   46 U.S.C. § 30903. Even if sovereign immunity is waived, Plaintiffs must still

13   demonstrate a cause of action either under the general maritime law or by statute

14   (*e.g.,* the Death on the High Seas Act, 46 U.S.C. § 30301, *et seq.*).

15       The discretionary function question, which goes to this Court's subject matter

16   jurisdiction, focuses on whether the statutes and regulations governing the Coast

17   Guard's vessel inspection program grant the Coast Guard inspectors discretion in

18   performing their inspections and whether those discretionary decisions are

19   susceptible to a policy analysis. As such, the jurisdictional issue is separate and

20   distinct from the issue of negligence on the merits (duty, breach, causation and

21   damages). Plaintiffs are therefore wrong to rely (Opp'n at 6-8, 16) on the line of

22   cases where the jurisdictional question is dependent on factual issues going to the

23   merits. Here, as in most cases, "with regard to the discretionary function exception,

24   . . . analysis of subject matter jurisdiction is distinct from . . . analysis of the merits."

25   *Chadd v. United States*, 794 F.3d 1104, 1111–12 (9th Cir. 2015).[2]

26   

27   [2]        Because this is a Rule 12(b)(1) motion and not a Rule 56 motion, the United States
does not respond to Plaintiffs' invocation of various local rules governing Rule 56 motions,

28   such as a statement of undisputed facts. These procedures are inapplicable to the present

MEM. IN SUPPORT OF MOT. TO DISMISS      2      Case No.: 2:21-cv-07065-PA-MRW

In adjudicating a Rule 12(b)(1) motion, a court is not limited to the pleadings. *Farr v. United States*, 990 F.2d 451, 454 (9th Cir. 1993), but may instead review and weigh extrinsic evidence, including affidavits and testimony, to resolve factual disputes about jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). In considering this evidence, the Court does not convert the dismissal motion to a motion for summary judgment. *Id*. No presumption of truthfulness attaches to a plaintiff's allegations, and the existence of disputed material facts does not preclude evaluation of the jurisdictional question. *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp*., 594 F.2d 730, 733 (9th Cir. 1979).

**2. The Regulations Place the Burden of Compliance on Private Industry.**

Plaintiffs seek to upend the structure of the Coast Guard's vessel safety program, which sets safety standards and requires private industry actors to comply with those standards. *See* U.S. Br. at 19-20. The burden of compliance is at all times on the owners and operators of vessels. Neither Congress nor the Coast Guard has sought to transfer that burden to the Coast Guard. No specific mandate requires the Coast Guard to detect all violations of the regulatory standards it administers. *See*

---

motion. In declining to respond to them, the United States does not admit any of the asserted facts. Regarding Plaintiffs' assertion (Opp'n at 17) that it has been allowed "only limited discovery" here, the Court afforded Plaintiffs seven months of discovery on this jurisdictional issue. As for Plaintiffs' argument (Opp'n at 15-16) that the Court should wait to decide this motion until after Plaintiffs can obtain supporting documents attached to the ATF report on the cause of the fire (withheld, for now, by federal prosecutors of the vessel's captain), Plaintiffs already have the ATF report itself, including the ATF's conclusions as to causes of the fire. Even if the cause were relevant to the DFE question, Plaintiffs are free to argue what statutes and regulations might relate to those causes. However, none of these statutes or Subchapter T regulations impose any mandatory directives on Coast Guard inspectors. *See* U.S. Br., ECF 88-1, at 28. Plaintiffs have thus failed to demonstrate that the "sought-after facts are essential to oppose" this motion where the jurisdictional question (existence of discretion and policy balancing) is separate from the merits (cause of the fire). *Cf. generally Family Home & Fin. Ctr., Inc. v. Federal Home Loan Mort. Corp*., 525 F.3d 822, 827 (9th Cir. 2008) (affirming district court's ruling that the evidence sought was not essential to oppose summary judgment).

*generally* 14 U.S.C. § 102(3) (directing Coast Guard to promulgate and enforce regulations for the promotion of safety of life and property at sea).

Plaintiffs argue the Coast Guard inspector should have found various alleged violations, such as a hole in a fire main, various electrical wiring problems, and plastic trash cans and chairs that were allegedly hazardous. *See* Opp'n at 1, 4. Yet they fail to identify any statute, regulation, or official Coast Guard policy that required an inspector to detect those specific items during an inspection and find them to be hazardous. Plaintiffs allege that the Coast Guard "abused its discretion" (Am. Compl., ECF 49, ¶ 132) and was "derelict" (Opp'n at 32-33) in failing to find alleged deficiencies. This amounts to an argument that the Coast Guard acted negligently in conducting its inspections by failing to observe fire hazards. Negligence, however, has no place in a discretionary function exception analysis. *United States v. Gaubert*, 499 U.S. 315, 334 (1991). The exception applies even if the discretion is "abused." *Id*. at 322. The question here is not whether any particular inspector acted negligently, but whether the statutes, regulations, and policies that establish the vessel safety program allowed Coast Guard inspectors discretion to determine the scope of their inspections and whether to issue *Conception* a Certificate of Inspection. Plaintiffs have identified no statute, regulation, or policy that withdrew Coast Guard inspectors' discretion.

### 3. The Challenged Acts Were Discretionary.

The challenged acts in establishing and implementing the maritime safety program were discretionary, including determining the scope of inspections and issuing *Conception* a Certificate of Inspection. Plaintiffs fail to identify a specific mandate that required the Coast Guard to detect any of the alleged deficiencies. As a preliminary matter, the Court first needs to consider relevant statutes to determine whether they grant discretion to the Coast Guard, as the alleged mandate must come from an official source. *Irving v. United States*, 162 F.3d 154, 165-66 (1st Cir. 1998) (in the discretionary function exception analysis, "it matters who speaks" when

MEM. IN SUPPORT OF MOT. TO DISMISS          4          Case No.: 2:21-cv-07065-PA-MRW

determining whether a mandate exists). The statutory basis for the challenged conduct is 14 U.S.C. §§ 102(3), 503, and 504(c), which grant the Coast Guard discretion to create and implement a vessel safety program, including promulgating regulations as the agency deems appropriate, and taking administrative actions such as inspections to promote the industry's compliance with those standards. These statutes explicitly vest discretion in the Coast Guard and did not mandate the inspector to find any particular deficiency alleged.

Plaintiffs cite three regulations for a purported mandatory duty that the Coast Guard violated: 46 C.F.R. §§ 176.500, 176.806(a), and 176.830(a). These regulations do not prescribe a course of conduct so specific as to remove discretion from the Coast Guard. As an initial matter, these regulations impose requirements on vessel owners and operators, not on the Coast Guard. Section 176.500 establishes when inspections are required. Plaintiffs focus on language providing that when an inspector finds a deficiency under this regulation, she is to conduct a "more detailed" inspection. However, the provision as a whole governs the conduct of vessel owners while also referencing the discretion afforded to the Coast Guard by stating the inspector can conduct inspections "he or she deems necessary." 46 C.F.R. § 176.500(b)(iv). The point of this regulation is to inform the vessel owner and operator about the inspection program and the owner's obligation to make required repairs or improvements. Nothing in the text indicates the regulation was meant as a specific mandate for the Coast Guard. 46 C.F.R. § 176.500 ("your vessel must" undergo inspection; "you must" contact the inspector to set it up; "you must" make required repairs). In any event, Plaintiffs do not allege the inspector found any deficiencies, thus prompting any requirement to conduct a more detailed inspection.

Similarly, Section 176.806(a) sets standards for electrical systems on a vessel and states that the "owner or managing operator shall be prepared" to conduct tests

and have the vessel ready for inspection. 46 C.F.R. § 176.806.[3] The regulation imposes no specific mandate upon the Coast Guard to inspect every item on the list or to affirmatively find any violations. The mandate of this regulation is on the vessel owner and operator, only. Section 176.830(a) is also directed at the vessel owner and operator, instructing them to correct "all observed unsafe practices, fire hazards, and other hazardous situations." 46 C.F.R. § 176.830. Nothing in this regulation mandates an inspector to discover any particular hazard.

In sum, the statutes give discretion to the Coast Guard to promulgate regulations and develop a program to check compliance therewith. The regulations impose standards and obligations on vessel owners and operators. Plaintiffs have not identified a single statute, regulation, or official agency policy that removed discretion from the Coast Guard or specified how the Coast Guard must perform inspections. To the contrary, the nature of vessel inspections requires the Coast Guard and its inspectors to have discretion to develop and implement the vessel safety program, including inspections designed to spot-check, using the inspector's discretion.

### 4. *Varig Airlines* Is Applicable and Binding Authority Here.

*Varig Airlines,* 467 U.S. 797 (1984), is directly applicable and binding. The case features striking similarities to this one, because it arose following a fire in a trashcan on a private airliner in an industry regulated similarly to the maritime industry.

Plaintiffs wrongly try to distinguish *Varig Airlines* by claiming that the plaintiffs there brought a different type of challenge to the FAA's overall compliance

---

[3] Plaintiffs also allege that the Coast Guard violated mandatory duties imposed by 46 C.F.R. §§ 177.115(b), 177.405(f), 183.340(b) and 183.340(d)(2). However, this argument misses the forest for the trees: these are substantive regulations for specific equipment that owners and operators must comply with, per the procedural regulations cited above that place the duty on their shoulders. The Coast Guard may or may not inspect compliance with these specific regulations on any given inspection.

1    process. Opp'n at 25. However, the *Varig* plaintiffs brought negligence claims—just

2    like the Complaint here—based on "the offending inspection" done by FAA

3    employees of a lavatory waste receptacle design. Ex. K, *United States v. Mascher*,

4    Br. of Respondents Emma Rosa Mascher, *et al*., S. Ct. No. 82-1349, filed Oct. 28,

5    1983, at 8. Specifically, the plaintiffs alleged the FAA "negligently and carelessly

6    failed to review and inspect" the aircraft for the purpose of ascertaining whether the

7    aircraft complied with regulatory standards governing aircraft safety and further

8    alleged that "[a]gents of the [FAA] or its predecessor agency negligently failed to

9    make inspections which the said agency undertook to make, or in the alternative,

10   conducted said inspections negligently." Ex. K, *Varig Airlines v. United States*, No.

11   76-cv-0187 (C.D. Cal.), Compl. ¶ 13 (filed Jan. 16, 1976); *Mascher, et al. v. United

12   State*s, No. 78-cv-0914 (C.D. Cal.); Am. Compl. ¶ XXV (filed Nov. 20, 1980). They

13   alleged the negligence "proximately caused a cabin fire which was a clearly

14   foreseeable result of a failure to inspect, or a negligent inspection." *Id*., ¶ XXIX.

15       Like this case, the *Varig* plaintiffs thus alleged the FAA should have

16   discovered in an inspection that certain parts of the plane, including a trash container,

17   did not comply. The Supreme Court, however, looked beyond these plain negligence

18   allegations to define the challenged conduct as a challenge to the agency's

19   compliance review process, including its decision to promote regulatory compliance

20   through spot-check inspections. 467 U.S. at 814-18. Thus, defining the issue as a

21   challenge to the agency's oversight of private industry actors, the Supreme Court

22   made its seminal ruling: "whatever else the discretionary function exception may

23   include, it plainly was intended to encompass the discretionary acts of the

24   Government acting in its role as a regulator of the conduct of private individuals….

25   Congress wished to prevent judicial 'second-guessing' of legislative and

26   administrative decisions grounded in social, economic, and political policy through

27   the medium of an action in tort." 467 U.S. at 813-14. The issue here is identical to

28   that in *Varig;* the outcome should be the same too.

**5.  *Whisnant* and *Bear Medicine* Do Not Apply.**

Plaintiffs rely heavily on *Whisnant* and *Bear Medicine* for the proposition that the design of a course of action may be protected by the DFE, but the implementation of it is not. Opp'n at 2, 6, 19-21. These cases are distinguishable and contain an outdated legal analysis that has been read narrowly by subsequent cases. *Whisnant* arose from injuries caused by the spread of toxic mold in a military-operated grocery store on a Navy base. Unlike the present case, *Whisnant* concerned federal maintenance of federal property and not the regulation of private industry. *Whisnant v. United States*, 400 F.3d 1177, 1184 (9th Cir. 2005). In that case, while acknowledging a lack of discretion in the government's cleaning of its own meat department, the Ninth Circuit pointedly distinguished the discretion accorded to the government's regulatory compliance schemes: "maximizing compliance with regulations, and allocation of limited resources among competing safety-promoting tasks hardly resemble the type of decision *Whisnant* attributes to [grocery] safety personnel." *Whisnant*, 400 F.3d at 1184. Similarly, in *Bear Medicine v. United States*, 241 F.3d 1208, 217 (9th Cir. 2001) the court applied a "design-implementation" analysis to find no policy basis for the BIA's failure to oversee a contract for a timber operation on Indian lands held under trust.

However, the Ninth Circuit more recently recognized that this "design-implementation" distinction must be "cautiously applied" to the narrow circumstances where, as is not the case here, "a private party would likely be held liable for the same conduct or omission." *Gonzalez v. United States*, 814 F.3d 1022, 1035 (9th Cir. 2016) (ruling that an interpretation of *Whisnant* and *Bear Medicine* similar to that suggested by Plaintiffs here "would simply swallow" the DFE analysis established by the Supreme Court); *see also Lam v. United States*, 979 F.3d 665, 687 (9th Cir. 2020) (Royal, D.J., concurring) (noting that *Whisnant* is not in harmony with other Ninth Circuit cases, and further questioning its analysis). Moreover, the Ninth Circuit recognized that "the doctrine does not permit liability where 'the

1  implementation itself implicates policy concerns.'" *Gonzalez*, 814 F.3d at 1035
2  (quoting *Whisnant,* 400 F.3d at 1182 n.3). The doctrine, to the extent it remains good
3  law, does not apply here. Plaintiffs fail to distinguish cases directly on point, such
4  as *Cassens* and *Lam*, which demonstrate that the DFE squarely applies, because
5  implementation of Coast Guard vessel inspections implicates policy concerns. Not
6  only has Congress vested the Coast Guard with high level discretion to design a
7  vessel safety program, so too has the Coast Guard vested its inspectors with
8  significant discretion in implementing this program through vessel inspections. *See*
9  U.S. Br. at 20, 28-33.

10  **6. Commander Hodgdon's Testimony Supports Application of the DFE.**

11  Plaintiffs quote testimony of Commander Hodgdon, U.S. Coast Guard, which
12  they claim establishes a mandate. ECF 98 at 3-4. With respect to the testimony
13  quoted on Page 3 of Plaintiffs' brief, Plaintiffs inquired about 46 C.F.R.
14  § 176.830(a). As an initial matter, nothing in Commander Hodgdon's testimony can
15  change the language of the regulation or its underlying policy, which imposes a
16  burden on vessel owners and operators to correct observed hazards, not on the Coast
17  Guard to detect specific hazards. *See Irving v. United States*, 162 F.3d, 165-66 (5th
18  Cir. 1998) (rejecting testimony about agency policy in a discretionary function
19  analysis because the mandate must come from a statute, regulation, or official
20  policy).

21  Moreover, while Plaintiffs asked Commander Hodgdon whether the
22  regulation was a "mandate" and she said yes, Plaintiffs failed to inquire *who* is bound
23  by that mandate. The only reading of this regulation is that it requires *vessel owners*
24  and operators to correct those items that an inspector observes and deems to be
25  hazards. The regulation does not impose a mandate on a Coast Guard inspector to
26  observe every hazard that may exist. Commander Hodgdon's testimony thus referred
27  to the burden on vessel owners and did not (nor could it) place a burden on the Coast
28  Guard beyond that set by statute, regulation, or official agency policy. Further, the

MEM. IN SUPPORT OF MOT. TO DISMISS          9          Case No.: 2:21-cv-07065-PA-MRW

regulation requires correction only of "observed" hazards, acknowledging that an inspector may not observe every single hazard on a vessel, or may observe something and, in his discretion, not consider it to be a hazard on this particular vessel. Plaintiffs' questions then veered into hypothetical assumptions ("assume that you boarded Conception, that you saw . . ."). Opp'n at 3. This hypothetical has no relationship to this case; there is no evidence here that any inspector saw any deficiency that, in his discretion, constituted a hazard to the vessel, but failed to require the vessel to correct it, nor have Plaintiffs made such an allegation. *See* Activity Summary Report, USA Ex. H, ECF 89.[4] As explained in the opening brief (U.S. Br. at 9-10, 31-32), inspectors make numerous decisions and judgment calls during an inspection and cannot possibly examine every single part of every single vessel at every inspection.[5] Indeed, doing so would be contrary to Congress's

---

[4]     Plaintiffs also allege that there was a hole in the vessel's fire main, pointing to this as a violation of 46 C.F.R. § 176.830(a). First, there is no evidence that there was a hole in the fire main. Exhibit 18 to the Hillsman Declaration, ECF 98-16, (citing Section 8 of the NTSB report), makes no mention of a hole in the fire main. Plaintiffs' assertion that a photograph taken by the FBI "revealed a hole in the copper water main pipe" is at best a misstatement. Second, 46 C.F.R. § 176.830(a) is a broad and nonspecific regulation, referring only generally to "unsafe practices, fire hazards, and other hazardous situations," as well as "guards and protective devices." Like the other regulations in Subchapter T, it is directed at vessel owners, not Coast Guard inspectors. Third, and most significantly, assuming, *arguendo,* that such a hole existed, it is irrelevant because there is no evidence that anyone on *Conception* tried to fight the fire with a fire hose or chose not to do so due to a hole in the fire main.

[5]     Plaintiffs claim the Coast Guard had a history of failing to inspect the vessel's electrical system. Opp'n at 13 (citing inspections in 2004, 2011, 2013, and 2015). However, each of the inspections Plaintiffs cite was a hull exam or drydock inspection, not an inspection of an electrical system. *See* ECF 98-9 (each of which indicates "Hull" or "Hull Exam" in the "Title/Description" field). Hull exams are distinct from annual or five-year inspections and examine only those structural elements of a vessel's hull that cannot be inspected in the water. *See* 46 C.F.R. § 176.610. This includes the 2013 inspection in which Plaintiffs (wrongly) allege that Chief Warrant Officer DeCamp cleared the vessel's 2011 wiring deficiency—ordering the vessel to replace non-marine grade wiring at its next drydocking—without ever inspecting the wiring. Opp'n at 13-14; *see also* ECF 98-9 at 40-

---

MEM. IN SUPPORT OF MOT. TO DISMISS          10          Case No.: 2:21-cv-07065-PA-MRW

instruction that the Coast Guard must balance safety with the need to facilitate and safeguard commerce. U.S. Br. at 28-33. While the fire aboard the *Conception* was a tragedy, that does not mean that Coast Guard regulations require inspectors to detect any particular issue during a particular inspection.

Additionally, in their memorandum and in their deposition questions, Plaintiffs fail to distinguish between Old T and New T standards. The distinction is important here because *Conception* was an Old T vessel. In the section of her deposition they quoted, Plaintiffs asked Commander Hodgdon about two specific New T regulations: 46 C.F.R. § 176.830(a) and 46 C.F.R. § 177.405. Opp'n at 2-3. Their questions specified those regulations by number. Commander Hodgdon testified about those two New T regulations specifically. Plaintiffs did not ask her whether those two New T regulations would have applied to *Conception*, despite her testimony that *Conception* was a vessel that "would have been inspected under Old T." Hodgdon Dep. at 84, USA Ex. B, ECF 88-4 at 8. Commander Hodgdon's testimony cannot create a mandate where one does not otherwise exist.

Plaintiffs further argue that the Court should look only at New T regulations because "the New-T Regs do not permit grandfathering for electrical standards." Opp'n at 24 (internal quotation marks omitted). This is simply incorrect: grandfathering is the rule, not the exception. The regulatory scheme states that "an existing vessel must comply with" the regulations applicable before the adoption of New T. 46 C.F.R. § 177.115. Section 175.112 provides that each Part under

---

42 ("Title/Description: CONCEPTION: HULL"). In any event, the inspector in 2013 had discretion to determine how exactly to verify the prior wiring discrepancy was cleared, and he did not need to do a full inspection of the electrical system to clear it. *See* ECF 98-6, Hodgdon Dep. at 95:21-96:9, 97:1-98:17. Separate from the hull and drydock inspections, the 2019 report of the annual spot check inspection conducted by Chief Warrant Officer Hager did not list an inspection of the electrical system. He testified, however, that this was most likely a clerical error in entering the report into the computer as it would be highly unlikely for him to do no inspection of an electrical system at all. Ex. L, Hager Dep. at 129:3-132:11; *see also* ECF 88-4, Hodgdon Dep. at 166:17-167:2 (to log an inspection of the electrical system, inspector need inspect merely a single item).

Subchapter T defines limited exceptions when "an existing vessel must comply with certain portions of [New T]." The electrical regulation cited by Plaintiffs, 46 C.F.R. § 183.115, proves this point. Opp'n at 24. It restates the general rule of grandfathering and then specifies just two requirements of the 32 sections in Part 183 that are excepted from grandfathering. 46 C.F.R. § 183.115(a), (b). The two exceptions deal with navigation lights and battery-powered emergency lights, irrelevant to Plaintiffs' claims here. 46 C.F.R. § 183.115(b) (citing §§ 183.420, 183.430). Plaintiffs make a similar argument that a vessel's "furnishings" must comply with New T regulations. Opp'n at 24-25 (citing 46 C.F.R. § 177.115(b)). However, the New T regulations, even if they applied here, do not prohibit the plastic deck chairs Plaintiffs allege *Conception* carried. *See* 46 C.F.R. § 177.410.[6] Nor can this generic "furnishing" regulation be read to refer to trash cans, which are the subject of another regulation. *See* 46 C.F.R. 177.405(f); Caputo Dep., Ex. M, at 94:8-23.. In short, the regulatory scheme establishes that the Coast Guard's vessel safety program allows inspectors discretion to determine the scope of their inspections and whether to issue *Conception* a Certificate of Inspection, *see* U.S. Br. at 18-28, and the discretionary decisions the Coast Guard inspectors make are susceptible to policy analysis. *Id.* at 28-33.

For the reasons set forth herein, and in the United States' opening brief, the United States respectfully requests that the Court dismiss this action for lack of subject matter jurisdiction.

---

[6] This regulation requires that "furnishings must comply with 116.423 in subchapter K of this chapter." § 177.410(c)(5). Subchapter K—more rigorous regulations governing larger passenger vessels—does not prohibit plastic deck chairs, regulating only "upholstered furniture." 46 C.F.R. § 116.423. Further, this Subchapter K regulation also allows vessels to comply with an alternative, § 72.05-55 of Subchapter H. Subchapter H is the most rigorous regulation governing the largest passenger vessels. Yet even that most stringent of regulations only requires "fire resistant furnishings" in "[p]assageways and stairway enclosures" and thus did not prohibit the deck chairs in Conception's lounge area that Plaintiffs repeatedly cite as a violation. 46 C.F.R. § 72.05-55(c).

MEM. IN SUPPORT OF MOT. TO DISMISS        12        Case No.: 2:21-cv-07065-PA-MRW

Date: July 22, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney
                                       DAVID M. HARRIS
                                       Assistant United States Attorney
                                       Chief, Civil Division

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General
                                       ERIC KAUFMAN-COHEN
                                       Attorney in Charge, West Coast Office

                                        *s/ Scott Perrygo*
                                       SCOTT PERRYGO
                                       Trial Attorney
                                       Torts Branch, Civil Division
                                       U.S. Department of Justice

                                       Attorneys for United States of America

**CERTIFICATE OF SERVICE**

     I hereby certify that on July 22, 2024, a copy of the foregoing UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.

                *s/Scott Perrygo*
                SCOTT PERRYGO

MEM. IN SUPPORT OF MOT. TO DISMISS     14     Case No.: 2:21-cv-07065-PA-MRW

1  E. MARTIN ESTRADA
   United States Attorney
2  DAVID M. HARRIS
   Assistant United States Attorney
3  Chief, Civil Division

4
   BRIAN BOYNTON
5  Principal Deputy Assistant Attorney General
   ERIC KAUFMAN-COHEN, Cal. SBN 171064
6  eric.kaufman-cohen@usdoj.gov
   Attorney in Charge, West Coast Office
7  SCOTT PERRYGO, Cal. SBN 341834
   Scott.perrygo@usdoj.gov
8  Trial Attorney
   Torts Branch, Civil Division
9  U.S. Department of Justice
   450 Golden Gate Avenue, Room 7-5395
10 San Francisco, California 94102-3463
   Telephone: (415) 436-6648/(415) 436-6645
11 Facsimile: (415) 436-6632
   Attorneys for United States of America
12
13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16
   NANCY FIEDLER, Personal          )  Case No.: 2:21-cv-07065-PA-MRW
17 Representative of the Estate of LISA )
   FIEDLER (Deceased); MATTHEW     )  In Admiralty
18 GUINEY, Personal Representative of the )
   Estate of MARYBETH GUINEY       )
19 (Deceased); OLGA FAYNSHTEYN,    )  **DECLARATION OF SCOTT**
   Personal Representative of the Estate of )  **PERRYGO IN SUPPORT OF THE**
20 YULIYA KRASHENNAYA              )  **UNITED STATES' REPLY IN**
   (Deceased); KATIE OSBORNE,       )  **SUPPORT OF ITS MOTION TO**
21 Personal Representative of the Estate of )  **DISMISS**
   DANIEL GARCIA (Deceased);        )
22 CHRISTINA QUITASOL, Personal    )  [L.R. 7-7]
   Representative of the Estate of     )
23 MICHAEL QUITASOL (Deceased);    )
   SARMA WILLIAMS, Personal        )  Date: TBD
24 Representative of the Estate of VAIDEHI )  Time:
   DEVI CAMPBELL WILLIAMS          )  Courtroom:
25 (Deceased); CHRISTINE            )
   ALEXANDRA DIGNAM, Personal      )
26 Representative of the Estate of JUSTIN )  Hon. Percy Anderson
   DIGNAM (Deceased); JASMINE      )
27 LORD, Personal Representative of the )
28

   DECLARATION OF SCOTT
   PERRYGO IN SUPPORT OF UNITED
   STATES' REPLY BRIEF                    Case No.: 2:21-cv-07065-PA-MRW

**ER 98**

Estate of CHARLES McILVAIN )
(Deceased); VICTORIA E. MOORE, )
Personal Representative of the Estates of )
RAYMOND SCOTT CHAN (Deceased) )
and KENDRA CHAN (Deceased); )
YUKA OHASHI MERRITT, Personal )
Representative of the Estate of YUKO )
HATANO (Deceased); VIKRAM )
SINGH, Personal Representative of the )
Estate of SUNIL SINGH SANDHU )
(Deceased); NINA HUTTEGGER, )
Personal Representative of the Estate of )
JUHA-PEKKA AHOPELTO )
(Deceased); YADIRA ALVAREZ, )
Personal Representative of the Estate of )
BERENICE FELIPE (Deceased); SEJAY )
TAN, Personal Representative of the )
Estate of WEI TAN (Deceased); ERIC )
BALTZ, Personal Representative of the )
Estate of NEAL BALTZ (Deceased); )
ANTHONY BEITZINGER, Personal )
Representative of the Estate of )
PATRICIA BEITZINGER (Deceased); )
SHRUTI DEOPUJARI, Personal )
Representative of the Estate of )
SANJEERI DEOPUJARI (Deceased); )
ATLEE FRITZ, Personal )
Representative of the Estate of )
ANDREW FRITZ (Deceased); SEEMA )
SHARMA, Personal )
Representative of the Estate of )
KAUSTUBH NIRMAL (Deceased); )
MARGARET STROM, Personal )
representative of the Estate of TED )
STROM (Deceased); RICHARD X. LIU, )
Personal Representative of the Estate of )
XIANG LIN; SUSANA SOLANO )
ROSAS, Personal Representative of the )
Estates of EVANMICHEL SOLANO )
QUITASOL (Deceased), ANGELA )
ROSE SOLANO QUITASOL )
(Deceased), and NICOLE SOLANO )
QUITASOL (Deceased); ARIEL )
TAKVAM, Personal Representative of )
the Estate of KRISTIAN TAKVAM )
(Deceased); DOMINIC MICAEL )
SELGA, Personal Representative of the )
Estate of FERNISA JUNE SISON )
(Deceased); ROBERT KURTZ and )
CHERIE MCDONOUGH, Personal )
Representatives of the Estate of )
ALEXANDRA HALEY KURTZ; JEAN )
ANNE ALLEN as Executor of the Estate )

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' REPLY BRIEF                    Case No.: 2:21-cv-07065-PA-MRW

**ER 99**

of STEVEN JOHN SALIKA, Executor
of the Estate OF CAROL DIANA
ADAMIC and Administrator of the
Estate of TIA NICOLE ADAMIC
SALIKA; JAMES ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); ANGELIKA ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); MARK ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); SHIRLEY SALIKA,
individually, and as beneficiary of the
Estate of STEVEN JOHN SALIKA
(Deceased) and TIA NICOLE SALIKA
(Deceased); DANIEL POH-HOCK
CHUA, Personal Representative of the
Estate of KRISTINA OLINE FINSTAD
(Deceased), and RYAN SIMS,
individually,

    Plaintiffs,

  vs.

UNITED STATES OF AMERICA,

    Defendant.

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' REPLY BRIEF      Case No.: 2:21-cv-07065-PA-MRW

**ER 100**

1    I, Scott Perrygo hereby declare as follows:

2    1.    I am a Trial Attorney of the United States Department of Justice, Civil
3    Division, Aviation Space & Admiralty West Coast Field Office and one of the
4    attorneys for defendant United States of America in this action. I have personal
5    knowledge of the matters stated herein.

6    2.    Attached hereto as Exhibit "K" is a true and correct copy of excerpts of
7    the Supreme Court brief and Joint Appendix Materials from *United States v. S.A.*
8    *Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984), of
9    which the United States requests that the Court take judicial notice of pursuant to
10   Fed. R. Evid. 201.

11   3.    Attached hereto as Exhibit "L" is a true and correct copy of excerpts
12   from the deposition of Chief Warrant Officer ("CWO") Daniel Hager, U.S. Coast
13   Guard.

14   4.    Attached hereto as Exhibit "M" is a true and correct copy of excerpts
15   from the deposition of Captain Ronald Caputo, U.S. Coast Guard.

16   I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that
17   the foregoing is true and correct.

18   Executed this 22nd day of July, 2024

19

20    s/Scott Perrygo
      SCOTT PERRYGO

21

22

23

24

25

26

27

28

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' REPLY BRIEF                    1              Case No.: 2:21-cv-07065-PA-MRW

**ER 101**

CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, a copy of the foregoing DECLARATION OF SCOTT PERRYGO IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.

s/Scott Perrygo
SCOTT PERRYGO

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' REPLY BRIEF                    2                    Case No.: 2:21-cv-07065-PA-MRW

Exhibit K

No. 82-1349

Office of the Court, U.S.
FILED
OCT 28 1983
ALEXANDER L. STEVAS,
CLERK

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1983

UNITED STATES OF AMERICA, *Petitioner*,

v.

EMMA ROSA MASCHER, *et al.*

On Writ Of *Certiorari* To The United States
Court Of Appeals For The Ninth Circuit

## BRIEF OF RESPONDENTS
## EMMA ROSA MASCHER, *ET AL.*

\*ROBERT R. SMILEY III
SMILEY, OLSON, GILMAN & PANGIA
1815 H St., N.W., Suite 600
Washington, D.C. 20006
(202) 466-5100

\*Counsel of Record
for Respondents

PRESS OF BYRON S. ADAMS PRINTING, INC., WASHINGTON, D.C. (202) 317-8203

Declaration of Scott Perrygo, Exhibit K, Page 1 of 9

BEST AVAILABLE COPY

ER 104

8

who are *usually* employees of the manufacturer carrying special FAA designation.[25]

In the instant case, however, the record shows that the offending inspection was done by FAA employees, and the lavatory waste receptacle design which they supposedly inspected could not conceivably have met the minimum standards required by the regulations. Examination of a sister ship in Rio de Janeiro, Brazil, after the accident, revealed that the trash "container" under the sink in the lavatory was in reality no container at all. Paper towels stuffed into the flapper door at one side of the sink module simply fell down into the area directly below the sink. This volume of space also contained the electric water heaters and a source of air. Not only was there no container, as such, but the module walls themselves were penetrated in several spots by large round holes, the purpose of which was never established and the presence of which simply assured that any fire developing below the sink would have an adequate supply of oxygen and immediate access to the plastics on the inside of the aircraft pressure hull.

In fact, even the FAA engineer detailed to investigate the accident stated in a report addressed to his seniors:

> It was also observed in the waste container area of most lavatories that there were numerous holes through the vertical panels between compartments leading to other compartments and in some cases to the aircraft skin. This created an interesting revelation and *it was not clear how the waste containers could possibly contain fire*, as required by CAR 4b 381(d) and FAR 25.853(d).[26]

That same engineer drafted a proposed Airworthiness Directive in which he made the determination that "most

---

[25] *Id.* at 8.

[26] 1 Nelson Deposition at 17, Exhibit 26 (emphasis added).

FILED

AUG 15 19○

ALEXANDER L. STEVAS
CLERK

Nos. 82-1349 and 82-1350

# In the Supreme Court of the United States

OCTOBER TERM, 1983

UNITED STATES OF AMERICA, PETITIONER

*v.*

S. A. EMPRESA DE VIACAO AEREA RIO GRANDENSE
(VARIG AIRLINES)

UNITED STATES OF AMERICA, PETITIONER

*v.*

EMMA ROSA MASCHER, ET AL.

UNITED STATES OF AMERICA, PETITIONER

*v.*

UNITED SCOTTISH INSURANCE CO., ET AL.

*ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT*

## JOINT APPENDIX

PHILLIP D. BOSTWICK, ESQ.
*Shaw, Pittman, Potts & Trowbridge*
*1800 M Street, N.W.*
*Washington, D.C. 20036*
*(202) 822-1000*

ROBERT R. SMILEY, III, ESQ.       REX E. LEE
*Smiley, Olson & Gilman*            *Solicitor General*
*1815 H Street, N.W., Suite 600*    *Department of Justice*
*Washington, D.C. 20006*            *Washington, D.C. 20530*
*(202) 466-5100*                    *(202) 633-2217*

RICHARD F. GERRY, ESQ.             *Counsel for Petitioners*
*110 Laurel Street*
*San Diego, California 92101*
*(819) 238-1811*

*Counsel for Respondents*

**PETITIONS FOR WRITS OF CERTIORARI FILED
FEBRUARY 10, 1983
CERTIORARI GRANTED MAY 16, 1983**

Declaration of Scott Perrygo, Exhibit K, Page 3 of 9

BEST AVAILABLE COPY

ER 106

16

PHILLIP D. BOSTWICK, ESQUIRE
 SHAW, PITTMAN, POTTS & TROWBRIDGE
 1800 M Street, N.W.
 Washington, D.C. 20036
 (202) 311-4100

and

DANIEL N. BELIN, ESQUIRE
 McKENNA & FITTING
 3435 Wilshire Boulevard
 Los Angeles, California 90010
 *Attorneys for Plaintiff*
 *VARIG Airlines*

*UNITED STATES DISTRICT COURT*
*CENTRAL DISTRICT OF CALIFORNIA*

*Civil Action No.*
*CV 76-0187-WPG*

S.A. EMPRESA DE VIACAO AEREA RIO GRANDENSE
(VARIG AIRLINES), PLAINTIFF,

*v.*

THE UNITED STATES OF AMERICA, DEFENDANT

**FIRST AMENDED COMPLAINT
FOR MONEY DAMAGES**

**COUNT I**

1. Plaintiff, S.A. EMPRESA DE VIACAO AEREA RIO GRANDENS (VARIG AIRLINES) (hereinafter "VARIG") is a corporation incorporated under the laws of the Republic of the United States of Brazil, having its principal place of business in Rio de Janerio, Brazil. As Brazil's international "flag" airline, VARIG flies its passenger-carrying aircraft into and out of the International Airport at Los Angeles, California, where it maintains offices and does business.

2. Plaintiff's claim against defendant UNITED STATES OF AMERICA (hereinafter "UNITED STATES") arises

Declaration of Scott Perrygo, Exhibit K, Page 4 of 9

20

including the BOEING 707 type aircraft, as were required in the interests of safety and to show compliance with the applicable FARs and the aforesaid minimum standards. The FAA further undertook to review the in-service operating and safety experience of aircraft which had been issued the aforesaid certificates, including the BOEING Model 707 type aircraft, after their delivery to operators, including VARIG, for the purpose of discovering said dangers and defects; to determine the continuing safety and airworthiness of such aircraft; and to warn all operators of such aircraft of all such dangers and defects and of the means or methods of correcting or minimizing them. In furtherance of that undertaking the FAA issued ADs and other communications to operators of such aircraft during the operating life of the aircraft.

12. Prior to July 11, 1973, operators and users of BOEING Model 707 type aircraft, including VARIG, reasonably relied on the FAA's various undertakings described above, including but not limited to the issuance of type certificates, certificates of airworthiness and ADs for the BOEING Model 707 type aircraft, including PP-VJZ, and the FAA was aware of such reliance.

13. Prior to July 11, 1973, in California and elsewhere in the UNITED STATES, the defendant UNITED STATES, through its agency the FAA, negligently and carelessly issued a type certificate for the BOEING Model 707 type aircraft, which aircraft the FAA knew or should have known did not comply with the applicable FARs and other minimum standards governing the design and performance of passenger-carrying aircraft, and which aircraft the FAA knew or should have known had defects and dangers in its design and manufacture; negligently and carelessly failed to review and inspect BOEING's and KIDDE's designs, drawings, tests, analyses, and aircraft and its components for the purpose of ascertaining whether the BOEING Model 707 type aircraft complied with the applicable FARs and the aforementioned minimum standards governing the design and performance of passenger-carrying aircraft; negligently and carelessly failed to make, or failed to require BOEING and KIDDE to make, such tests during the man-

Declaration of Scott Perrygo, Exhibit K, Page 5 of 9

21

ufacture and upon completion of the BOEING Model 707 type aircraft, including PP-VJZ, as were necessary in the interests of safety; negligently and carelessly failed to require BOEING and KIDDE to modify or alter the design and manufacture of the BOEING Model 707 type aircraft, including PP-VJZ, prior to July 11, 1973, when it knew or reasonably should have known that said aircraft was defective, dangerous and not in compliance with the applicable FARs and aforementioned minimum standards, governing the design and performance of passenger-carrying aircraft; and negligently and carelessly failed to notify and/or warn operators and users of BOEING Model 707 type aircraft, including VARIG, prior to July 11, 1973, through the issuance of ADs or otherwise of the defects and dangers in said aircraft, including PP-VJZ, of which defects and dangers the FAA knew or should have known.

14. As a proximate result of the negligence of the defendant UNITED STATES as alleged, the risk of harm to users and operators of BOEING Model 707 type aircraft, including VARIG, was increased.

15. As a proximate result of the negligence of the defendant UNITED STATES as alleged, on July 11, 1973, PP-VJZ crash-landed near Paris, France, following an in-flight fire in the aircraft which became uncontrollable.

16. As a proximate result of defendant UNITED STATES' negligence as alleged, PP-VJZ was totally destroyed, all to plaintiff's damage in the sum of SIX MILLION DOLLARS ($6,000,000.00).

WHEREOF, VARIG demands judgment against the UNITED STATES in the sum of SIX MILLION DOLLARS ($6,000,000.00), for interest, for the costs of this action, and for all other proper relief.

Declaration of Scott Perrygo, Exhibit K, Page 6 of 9

45

ROBERT R. SMILEY, ESQ.
SMILEY, MURPHY, OLSON & GILMAN
*1819 H Street, N.W.*
*Washington, D.C. 20006*
*Telephone: (202) 466-8171*

JOSEPH T. COOK, ESQ.
SPEISER, KRAUS & MADOLE
*700 South Flower Street*
*Los Angeles, California 90017*

CHARLES F. KRAUSE, ESQ.
SPEISER & KRAUSE
*200 Park Avenue*
*New York, New York 10017*

Attorneys for Plaintiffs
Mascher, et al.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case NO. CV-78-0914-WPG

EMMA ROSA MASCHER; ALFRED ROSA; GUIDO ROSA;
RAYMOND ROSA; BRUNO ROSA; CORIDO ROSA; AND ERNEST
ROSAD, INDIVIDUALLY AND AS HEIRS AND LEGATEES OF
EILO ROSA, DECEASED, ET AL., PLAINTIFFS,

*v.*

DEFENDANT

**PLAINTIFFS MASCHER ET AL.'S FIRST AMENDED
COMPLAINT FOR WRONGFUL DEATH, SECOND COUNT**

Plaintiffs, through their undersigned attorneys Timothy
J. Cook, Robert R. Smiley, Speiser and Krause P.C. and
Speiser, Krause and Madole, amending their complaint to
add a second Cause of Action against defendant United
States of America allege as follows:

I

Plaintiffs incorporate by reference, paragraphs I-X,
XIII-XVII, XXI and XXII of the Complaint herein filed on
March 9, 1980 as if fully restated herein.

Declaration of Scott Perrygo, Exhibit K, Page 7 of 9

**ER 110**

46

### XXIII

That on and prior to July 11, 1973, pursuant to the Federal Aviation Act, defendant United States of America by and through the Administrator of the Federal Aviation Administration and its employees and agents, acting within the scope of their employment, undertook to issue such minimum standards governing the design, materials, workmanship, and construction of civil aircraft as was necessary to promote the safety of passengers of such aircraft in air commerce, including international air commerce, thereby inducing reliance on such activities by the airlines and passengers alike.

### XXIV

Prior to July 11, 1973, pursuant to certain bilateral agreements between the United States of America and the Government of Brazil, and in reliance upon certain inspections of the subject aircraft allegedly conducted by employees of the Federal Aviation Administration or its predecessor agency, the Government of Brazil certified the subject aircraft as airworthy.

### XXV

Agents of the Federal Aviation Administration or its predecessor agency negligently failed to make inspections which the said agency undertook to make, or in the alternative, conducted said inspections negligently.

### XXVI

That as a direct and proximate result of the defendant's negligent inspection, or failure to inspect, plaintiffs have sustained pecuniary damages, including loss of support, services, counsel, society, companionship, consortium, care, nurture, training, the prospect of inheritance of future accumulations, and other damages, including grief and moral damages, as more particularly appears in paragraph XX of the complaint.

### XXVII

That as a direct and proximate result of the defendant's negligent inspection or failure to inspect, each of the pas-

Declaration of Scott Perrygo, Exhibit K, Page 8 of 9

**ER 111**

47

sengers aboard the subject aircraft suffered great physical pain and mental anguish in contemplation of impending disaster and death, personal injuries and property loss. As a result, the estate of each of the plaintiffs' decedents has sustained these and other damages, as more particularly appears in paragraph XXI of the complaint.

## XXVIII

That the aforesaid acts or omissions of the defendant, by and through its employees and agents, acting within the scope of their employment, was in breach of duties arising from the undertaking of inspection which, if negligently performed or omitted, increased the risk of harm to plaintiffs and their decedents.

## XXIX

That the aforesaid acts or omission of the defendant, by and through its employees and agents, acting within the scope of their employment:

1. were undertaken to protect the safety of aircraft and passengers in air commerce, including international air commerce;

2. proximately caused a cabin fire which was a clearly foreseeable result of a failure to inspect, or a negligent inspection;

3. were the direct proximate causes of the deaths of plaintiffs' decedents;

5. was clearly contrary to the explicit safety policies of air commerce of the United States and the international community.

WHEREFORE, the plaintiffs demand judgment against the defendant United States of America in the total sum of One Hundred Million, Six Hundred Five Thousand ($100,605,000.00) Dollars, and each of them individually as set forth more particularly in paragraph XXII of the Complaint, incorporated herein by reference, together with interest thereon, and the costs and disbursements of this action.

Declaration of Scott Perrygo, Exhibit K, Page 9 of 9

Exhibit L

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                      --oOo--
 3
 4    NANCY FIEDLER, Personal            )
      Representative of the Estate       )
 5    of LISA FIEDLER (Deceased), et     )
      al.,                               )
 6                                       )
               Plaintiffs,               )
 7                                       )
               vs.                       ) CV-21-7065 PA
 8                                       )
      UNITED STATES OF AMERICA,          )
 9                                       )
               Defendant.                )
10    _____         )
11
12    REMOTE VIDEO DEPOSITION OF CHIEF WARRANT OFFICER
13                    DANIEL HAGER
14
15              Thursday, June 8, 2023
16
17
18
19
20
21
22
23
24    REPORTED BY: DENISE A. FORD, CSR 7525
25    JOB NO. 10120765
```

**Page 2**

```
 1                    I N D E X
 2              INDEX OF EXAMINATIONS
 3                                          Page
 4    EXAMINATION BY MR. MAHONEY               7
 5
 6
 7
 8
 9           EXHIBITS MARKED               Page
10    Exhibit 44  Plaintiff's Notice of The   31
11                Rescheduled Videoconference
12                Deposition
13    Exhibit 45  46 CFR 176.500             52
14    Exhibit 46  46 CFR 176.801             54
15    Exhibit 47  46 CFR 177.115             73
16    Exhibit 48  Final Report of Repairs    80
17    Exhibit 49  46 CFR 177.405             95
18    Exhibit 50  Activity Summary Report    103
19    Exhibit 51  Activity Summary Report    111
20    Exhibit 52  Activity Summary Report    116
21    Exhibit 53  Activity Summary Report    119
22    Exhibit 54  Activity Summary Report    124
23    Exhibit 55  Activity Summary Report    127
24    Exhibit 56  Activity Summary Report    135
25
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:  KREINDLER & KREINDLER, 750
 4    Third Avenue, New York, NY 10017, KEVIN MAHONEY,
 5    ESQ.
 6
 7    FOR THE PLAINTIFFS:  ARNOLD & ITKIN, 6009 Memorial
 8    Drive, Houston, TX 77007, CORY ITKIN, ESQ.
 9
10    FOR THE PLAINTIFFS:  LESSER & ASSOCIATES, 1444
11    Aviation Blvd, Suite 103, Redondo Beach, CA 90278,
12    RICK LESSER, ESQ.
13
14    FOR SEA LANDING DIVE CENTER:  MARK WILLIAMS, ESQ.,
15    P.O. Box 90193, Pasadena, CA 91109.
16
17    FOR THE FRITZLERS and TRUSTEES OF THE FRITZLER
18    FAMILY TRUST: LARSON LLP, 555 South Flower Street,
19    Suite 4400, Los Angeles, CA 90071, JULIETTE TRAN,
20    ESQ.
21
22    FOR THE UNITED STATES OF AMERICA:  U.S. Department
23    of Justice, 450 Golden Gate Ave, Room 7-5395, San
24    Francisco, CA 94102, ERIC KAUFMAN-COHEN, ESQ. and
25    SCOTT PERRYGO, ESQ.
```

**Page 4**

```
 1
 2
 3
 4    FOR VENTURA HARBOR BOATYARD:   COX WOOTTON LERNER
 5    GRIFFIN & HANSEN, 900 Front Street, Suite 350, San
 6    Francisco, CA 94111, NEIL LERNER, ESQ. and CHRIS
 7    KIELIGER, ESQ.
 8
 9    FOR LANGKILDE FIRE PROTECTION SERVICES:  BREMER
10    WHYTE BROWN & O'MEARA, 20320 South West Birch
11    Street, Second Floor, Newport Beach, CA 92660,
12    MATTHEW STEIN, ESQ.
13
14
15              ALSO PRESENT:
16    Samuel Apuna, video operator.
17
18
19                   --oOo--
20
21
22
23
24
25
```

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

Page 5

```
 1
 2
 3                      --oOo--
 4        BE IT REMEMBERED that pursuant to Notice and
 5   on Thursday, June 8, 2023, commencing at 10:04 a.m.
 6   thereof, before me, Denise A. Ford, a Certified
 7   Shorthand Reporter, appeared
 8        CHIEF WARRANT OFFICER DANIEL HAGER
 9   called as a witness herein, who, having been first
10   duly sworn, was examined and testified as follows:
11                      --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1        VIDEO OPERATOR:  Today is June 8,
 2   2023.  The time is 10:04 a.m.
 3        My name is Samuel Apuna, certified legal
 4   video specialist with Legal Video Hawaii.  The
 5   address is 665 Halekauwila Street, Honolulu, Hawaii.
 6        This is the beginning of the deposition of
 7   Daniel Hager in the matter of Nancy Fiedler, et al.
 8   v. United States of America filed in the United
 9   States District Court, Central District of
10   California, Case No. CV-21-7065 PA.
11        Counsel and all present please identify and
12   state whom you represent for the record.
13        MR. MAHONEY:  Good morning.  Kevin
14   Mahoney, Kreindler & Kreindler on behalf of Nina
15   Huttegger.
16        MR. KIELIGER:  Good morning.  Chris
17   Kieliger of Cox Wootton representing Ventura Harbor
18   Boatyard in the state court matter attending.
19        MR. WILLIAMS:  Mark Williams on
20   behalf of defendant Daniel Bader dba Sea Landing
21   Dive Center in the state court action appearing
22   specially.
23        MR. LERNER:  Neil Lerner representing
24   Ventura Harbor Boatyard in the state court case.
25        MR. LESSER:  Richard Lesser
```

Page 7

```
 1   representing plaintiffs in all cases.
 2        MS. TRAN:  Juliette Tran for Truth
 3   Aquatics and Glen and Dana Fritzler in the state
 4   case.
 5        MR. STEIN:  Matthew Stein, Langkilde
 6   Fire Protection in the state court case.
 7        MR. KAUFMAN-COHEN:  Eric
 8   Kaufman-Cohen, United States Department of Justice
 9   on behalf of the United States.
10        MR. PERRYGO:  Scott Perrygo, US
11   Department of Justice on behalf of the United
12   States.
13        VIDEO OPERATOR:  The witness now may
14   be sworn in.
15        (Witness sworn.)
16        EXAMINATION BY MR. MAHONEY
17        MR. MAHONEY:  Q.  God morning, sir.  Can
18   you state your name once more for the record, please?
19     A.    Daniel Hager.
20     Q.    And, Mr. Hager, you are presently a
21   chief warrant officer in the United States Coast
22   Guard; is that correct, sir?
23     A.    Yes, sir.
24     Q.    And what specifically is your rank?
25     A.    Chief warrant officer 4.
```

Page 8

```
 1     Q.    And, sir, are you presently in Hawaii?
 2     A.    Yes, sir, Honolulu.
 3     Q.    And is that where you are stationed
 4   currently with the Coast Guard?
 5     A.    Yes, sir.
 6     Q.    And you were previously stationed in
 7   Santa Barbara; is that correct, sir?
 8     A.    Yes, sir.
 9     Q.    And my name is Kevin Mahoney, and I
10   represent Nina Huttegger, one of the plaintiffs in
11   the present action and other actions that are
12   pending arising from the fire on the CONCEPTION
13   vessel on September 2, 2019.
14        Do you understand that Ms. Huttegger and
15   other plaintiffs have brought a lawsuit in
16   California federal court against the United States
17   of America?
18     A.    Yes, sir.
19     Q.    And do you understand, sir, that you
20   are testifying this morning in that litigation?
21     A.    Yes, sir.
22     Q.    And, sir, is it true that you as a
23   marine inspector for the United States Coast Guard
24   inspected the CONCEPTION at some point prior to
25   September 2, 2019?
```

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

**Page 129**

1   Is that right, sir?
2       A.   Yes, sir.
3       Q.   And so if the electrical system is not
4   identified in the inspection results section of the
5   activity summary report, that means that you didn't
6   conduct an electrical system inspection, agreed?
7       A.   Not necessarily.  It could have been a
8   clerical error.
9       Q.   Meaning you forgot to click electrical
10  systems?
11      A.   Correct.
12      Q.   Would it be documented anywhere else
13  had you -- had you inspected the electrical system.
14      A.   Maybe in the narrative if you scroll
15  down.
16      Q.   Can you read the narrative?
17      Is it large enough to read?
18      A.   Yes, sir.
19      Q.   I just want to make sure he can read
20  it.  I am not sure how far the screen is from his
21  eyes.
22      Can you read that sufficiently, sir?
23      A.   Yes, sir, I am reading it right now.
24      Q.   Take your time.
25      Sir, according to your narrative, I take it

**Page 130**

1   this annual was conducted over the course of about
2   two weeks?
3       A.   Yes, sir.
4       Q.   And you know that you attended the
5   vessel on blocks, meaning it was at the dry dock; is
6   that right?
7       A.   Yes.
8       Q.   And then later, a few weeks later, on
9   March 1 it was back in the water?
10      A.   Yes, sir.
11      Q.   And moored starboard side, what does
12  that mean?
13      A.   So the vessel was moored to the pier
14  on its starboard side, which is the right side of
15  the vessel.
16      Q.   That means you would enter on the
17  starboard side?
18      A.   Yes.
19      Q.   Now, do you have any recollection
20  independent of any document you reviewed of
21  conducting an inspection of the electrical system on
22  CONCEPTION during the 2019 annual inspection that
23  you conducted?
24      A.   I don't see it on the report, but like
25  I said before, it could have been a clerical error.

**Page 131**

1       Q.   And my question is, outside of any
2   documents you reviewed, do you have any recollection
3   in your mind about conducting an electrical
4   inspection on CONCEPTION in February or March of
5   2019?
6       A.   I don't have a memory to state that,
7   but I would assume I did because that would be my
8   normal procedure.
9       Q.   All right.  But I just want to
10  be clear for the record, outside of that assumption,
11  you have no recollection one way or the other
12  whether you did an electrical inspection on
13  CONCEPTION in February or March?
14      A.   I don't have a clear memory of that
15  date doing the electrical.
16      Q.   So to the extent that there is
17  evidence that you conducted an inspection of the
18  electrical system on CONCEPTION, it would have to be
19  in a document somewhere, agree?
20      A.   I mean, to prove it, yes.
21      Q.   And I guess you do agree that unlike
22  the other reports that we reviewed, which you
23  created, there is no electrical system referenced in
24  the inspection results, right, in this document?
25      A.   Correct.

**Page 132**

1       Q.   And I guess there are two
2   possibilities, either, as you said, there is a
3   clerical error and you didn't enter your inspection
4   into MISLE, right?
5       A.   Yes, I didn't correctly document the
6   inspection in MISLE.
7       Q.   But another potential based on this
8   document is that you didn't do an electrical
9   inspection on CONCEPTION, agree?
10      A.   Which I find highly unlikely.  There
11  is no proof to that fact in the report.
12      Q.   I am reading the list of systems
13  inspected.
14      One could conclude that the electrical
15  system was not inspected on the vessel during the
16  2019 annual inspection, agreed?
17      A.   Correct.
18      Q.   And would that be a deficiency if
19  someone were to review this report to say, hey,
20  there is no electrical system, inspection noted?
21      A.   Yes.
22      Q.   That's because you have to inspect the
23  electrical system during annual inspections of the
24  T-vessel?
25

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

Page 145

1  in Hawaii?
2      A.   Correct.
3      **Q.   Where specifically in Hawaii?**
4      A.   Honolulu.
5      You mean the unit name?
6      **Q.   Yes.  What's the word?  Billet?**
7      A.   Yes.  My billet is at Sector Honolulu.
8      **Q.   All right.  And was June of 2019 the**
9  **last time you were a marine vessel inspector?**
10     A.   Yes.
11     **Q.   And your duties in Hawaii have been**
12 **exclusively with marine investigation?**
13     A.   Correct.
14     **Q.   Sir, before the fire -- actually,**
15 **before your last annual inspection of CONCEPTION,**
16 **did you have any knowledge or awareness of the**
17 **dangers of lithium-ion batteries?**
18     A.   Not that I recall.
19     **Q.   And was that something that was talked**
20 **about among Coast Guard inspectors about potential**
21 **fire hazards pertaining to lithium-ion?**
22     A.   I don't recall conversations about
23 lithium-ion batteries.
24        MR. MAHONEY:  Well, sir, I want to
25 look for the transcript, if there is one, of your

Page 146

1  NTSB interview, but in the meantime, other counsel
2  may have questions, so I will pass the witness for
3  now, if that's okay with Eric.
4      Eric, do you know if that transcript exists?
5  I haven't seen it, but I could be wrong.
6        MR. KAUFMAN-COHEN:  I haven't seen it
7  either.
8      Any other attorneys in the federal case can
9  ask questions.
10       MR. MAHONEY:  Fair enough.  I am not
11 sure there are any.
12     I will pass the witness to see if there are
13 any other counsel on from the federal case.
14     Okay.  Well, sir, can you give me five
15 minutes?
16       THE WITNESS:  Yes.  No problem.
17       MR. MAHONEY:  I think I will be done
18 anyway, but give me five minutes.
19       MR. KAUFMAN-COHEN:  Do you want to go
20 off the record?
21       VIDEO OPERATOR:  The time is
22 3:06 p.m., and we are now off the record.
23        (Break taken.)
24       VIDEO OPERATOR:  The time is
25 3:10 p.m.  We are now on record.

Page 147

1      You may proceed.
2        MR. MAHONEY:  Sir, I have nothing
3  further this afternoon at the moment.  Thank you for
4  making yourself available.
5        THE WITNESS:  Thank you.
6        MR. KAUFMAN-COHEN:  I guess that
7  concludes the depo.
8        VIDEO OPERATOR:  Having heard the
9  approval to go off the record at this time, this
10 concludes the deposition of Daniel Hager.
11     The original copy of today's testimony will
12 remain in the custody of Legal Video Hawaii whose
13 address is 665 Halekauwila Street, Honolulu, Hawaii.
14     Time is now 3:10 p.m.
15     We are now off the record.
16        (Whereupon, the deposition was
17        adjourned at 3:10 p.m.)
18        --oOo--
19
20
21
22
23
24
25

Page 148

1            CERTIFICATE OF REPORTER
2
3      I, DENISE A. FORD, a Certified Shorthand
4  Reporter, hereby certify that the witness in the
5  foregoing deposition was by me duly sworn to tell
6  the truth, the whole truth, and nothing but the
7  truth in the within-entitled cause;
8        That said deposition was taken down in
9  shorthand by me, a disinterested person, at the time
10 and place therein stated, and that the testimony of
11 the said witness was thereafter reduced to
12 typewriting, by computer, under my direction and
13 supervision;
14       I further certify that I am not of counsel
15 or attorney for either or any of the parties to the
16 said deposition, nor in any way interested in the
17 event of this cause, and that I am not related to
18 any of the parties thereto.
19
20     DATED:  June 20, 2023.
21
22
23     _____
24     DENISE A. FORD, CSR No. 7525
25

Declaration of Scott Perrygo, Exhibit L, Page 4 of 4  **Page 145..148**
**www.aptusCR.com**

## ER 117

Exhibit M

Captain Ronald Caputo                                                    Fiedler vs.
                                                                  United States of America

| | Page 1 |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | CENTRAL DISTRICT OF CALIFORNIA |
| 2 | --oOo-- |
| | NANCY FIEDLER, Personal        ) |
| 3 | Representative of the Estate   ) |
| | of LISA FIEDLER (Deceased), et ) |
| 4 | al.,                           ) |
| | ) |
| 5 | Plaintiffs,        ) |
| | ) |
| 6 | vs.                  ) CV-21-7065 PA |
| | ) |
| 7 | UNITED STATES OF AMERICA,      ) |
| | ) |
| 8 | Defendant.         ) |
| | _____ ) |
| 9 | |
| 10 | |
| 11 | |
| 12 | REMOTE VIDEO DEPOSITION OF |
| 13 | |
| 14 | CAPTAIN RONALD CAPUTO - PMQ |
| 15 | |
| 16 | Wednesday, June 21, 2023 |
| 17 | |
| 18 | CONFIDENTIAL |
| 19 | |
| 20 | |
| 21 | |
| 22 | REPORTED BY: DENISE A. FORD, CSR 7525 |
| 23 | JOB NO: 10122300 |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | FOR THE PLAINTIFFS:  KREINDLER & KREINDLER, 750 |
| 4 | Third Avenue, New York, NY 10017, KEVIN MAHONEY, |
| 5 | ESQ. |
| 6 | |
| 7 | FOR THE PLAINTIFFS: McGUINN, HILLSMAN & PALEFSKY, |
| 8 | 535 Pacific Avenue, San Francisco, CA 94133, JOHN |
| 9 | HILLSMAN, ESQ. |
| 10 | |
| 11 | FOR THE PLAINTIFFS:  SALTZ MONGELUZZI & BENDESKY, |
| 12 | 1650 Market Street, Philadelphia, PA 19103, DOUGLAS |
| 13 | DiSANDRO, JR., ESQ. |
| 14 | |
| 15 | FOR THE PLAINTIFFS:  LAW OFFICES OF W. RUSSELL |
| 16 | FIELDS, 1792 Tribute Road, Suite 400, Sacramento, CA |
| 17 | 95815, A. EDWARD FIELDS, ESQ. |
| 18 | |
| 19 | FOR THE PLAINTIFFS:  SCHUERING ZIMMERMAN & DOYLE, |
| 20 | 400 University Avenue, Sacramento CA 95825, THEODORE |
| 21 | POPPINGA, ESQ. |
| 22 | |
| 23 | FOR THE PLAINTIFFS:  LESSER & ASSOCIATES, 1444 |
| 24 | Aviation Blvd, Suite 103, Redondo Beach, CA 90278, |
| 25 | RICK LESSER, ESQ. |

| | Page 2 |
|---|---|
| 1 | I N D E X |
| 2 | INDEX OF EXAMINATIONS |
| 3 | Page |
| 4 | EXAMINATION BY MR. HILLSMAN        7 |
| 5 | |
| 6 | |
| 7 | (Exhibits 59-63 marked CONFIDENTIAL) |
| 8 | |
| 9 | EXHIBITS MARKED        Page |
| 10 | Exhibit 57  Stipulated Protective Order        6 |
| 11 | Exhibit 58  Plaintiff's Notice of Second        6 |
| 12 | "PMQ" Deposition |
| 13 | Exhibit 59  Major Conversion Determination        6 |
| 14 | Exhibit 60  Memorandum        6 |
| 15 | Exhibit 61  Memorandum        6 |
| 16 | Exhibit 62  Memorandum        6 |
| 17 | Exhibit 63  Review of Major Conversion        6 |
| 18 | Determination Policies and Procedures |
| 19 | Exhibit 64  Sea Trials "T" Boat New Construction 6 |
| 20 | and Conversion |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | FOR THE UNITED STATES OF AMERICA:  U.S. Department |
| 2 | of Justice, 450 Golden Gate Ave, Room 7-5395, San |
| 3 | Francisco, CA 94102, ERIC KAUFMAN-COHEN, ESQ. and |
| 4 | SCOTT PERRYGO, ESQ. |
| 5 | |
| 6 | ALSO PRESENT: |
| 7 | Lorenzo Ferdandez-Kopec, video operator. |
| 8 | Loyd Sherwood and Julie Harrison, McGuinn, Hillsman |
| 9 | & Palefsky. |
| 10 | |
| 11 | |
| 12 | --oOo-- |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Declaration of Scott Perrygo, Exhibit M, Page 1 of 4        **Page 1..4**
**www.aptusCR.com**

Captain Ronald Caputo

Fiedler vs.
United States of America

**Page 5**

1

2

3                        --oOo--

4         BE IT REMEMBERED that pursuant to Notice and

5   on Wednesday, June 21, 2023, commencing at 10:08

6   a.m. thereof, before me, Denise A. Ford, a Certified

7   Shorthand Reporter, appeared

8                   CAPTAIN RONALD CAPUTO

9   called as a witness herein, who, having been first

10  duly sworn, was examined and testified as follows:

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 6**

1   (Whereupon Exhibits 57-64 were marked for

2   identification.)

3           VIDEO OPERATOR:  This begins the

4   videotaped deposition of the PMQ of the United

5   States of America filed in the case Nancy Fiedler v.

6   United States of America, Case No. CV07065-PA-MRW.

7       This deposition is being held at 1300 Clay

8   Street, Suite 600 in Oakland, California on

9   Wednesday, June 21, 2023.

10      My name is Lorenzo Fernandez-Kopec.  I am

11  the videographer.  The court reporter is Denise

12  Ford.  We are both here helping Aptus Court

13  Reporting located at 235 Pine Street, Suite 1100 in

14  San Francisco, California.

15          Please note that audio and video recording

16  will take place unless all parties agree to go off

17  the record.

18          The time is 10:07 a.m.  We are on the record

19  now.

20          Counsel, will you please state your

21  appearance and affiliation.

22          MR. HILLSMAN:  This is John Hillsman.

23  I represent five of the named plaintiffs herein.

24          MR. KAUFMAN-COHEN:  Eric

25  Kaufman-Cohen, US Department of Justice on behalf of

**Page 7**

1   the United States.

2           MR. PERRYGO:  Scott Perrygo on behalf

3   of the United States.

4           MR. POPPINGA:  Ted Poppinga on behalf

5   of plaintiff Susana Solano Rosas.

6           MR. DiSANDRO:  Doug DiSandro on

7   behalf of a number of the plaintiffs in this case.

8           MR. MAHONEY:  Kevin Mahoney on behalf

9   of Nina Hutteger, plaintiff.

10          MR. HILLSMAN:  I think that's our

11  quorum.

12          MR. LESSER:  Richard Lesser on behalf

13  of plaintiffs.

14          VIDEO OPERATOR:  Will the court

15  reporter please swear in the witness.

16           (Witness sworn.)

17          EXAMINATION BY MR. HILLSMAN

18          MR. HILLSMAN:  Q.  Captain Caputo, would

19  you please be good enough to state your full name for

20  the record?

21      A.  Sure.  Ronald J. Caputo, Captain U.S.

22  Coast Guard.

23      **Q.  And where are you currently stationed,**

24  **Captain, that is to say, what is your current office**

25  **address?**

**Page 8**

1       A.  It is the 11th District in Coast Guard

2   Island in Alameda, California.

3       **Q.  Is that where you are located now?**

4       A.  At this present moment?

5       **Q.  Yes, sir.**

6       A.  No.

7       **Q.  Where are you located now?**

8       A.  At the Aptus offices at 1300 Clay

9   Street in Oakland, California.

10      **Q.  And is anybody present with you?**

11      A.  Yes, the Department of Justice

12  attorneys Mr. Kaufman and Mr. Perrygo.

13      **Q.  Do you have any devices with you other**

14  **than the computer laptop over which you are speaking**

15  **that are capable of connecting with the internet?**

16      A.  My cell phone is in my bag here.

17      **Q.  Here's why I mention that, because we**

18  **are proceeding remotely and because the questions I**

19  **ask of you are for you and you alone, you can't call**

20  **a friend.  You can't communicate with anybody other**

21  **than counsel, and I would ask that you don't**

22  **communicate with counsel while a question is**

23  **pending.**

24      **Do you understand that?**

25      A.  Yes.

Captain Ronald Caputo       Confidential       Fiedler vs. United States of America

Page 93

1  regulations in this part."
2      Have I read that correctly?
3      A.  Yes.
4      Q.  What does that mean to you?
5      A.  Basically if furnishings, furniture or
6  mattresses are renewed, they have to comply with new
7  Subchapter T requirements.
8      Q.  And that was true back in September of
9  2019 when CONCEPTION was last -- strike that.  Let
10  me rephrase that.
11      That was true back in February of 2019 when
12  CONCEPTION was last inspected prior to the fire; am
13  I right?
14      A.  Yes, it should have been.
15      Q.  Now, furnishings, what are we talking
16  about there?  I could not find a definition for
17  furnishings anywhere either in the shipping code or
18  in the CFRs.
19      What -- are you aware of any such
20  definitions?
21      A.  I would have to honestly do a review
22  of the CFRs myself in the manual in order to try to
23  get to that.
24      Q.  I am not going to ask you to do that
25  again.  Let me ask you to draw on your experience as

Page 94

1  a marine inspector and on your experience as the
2  chief of prevention in Sector San Diego.
3      What are we talking about there when we talk
4  about furnishings?
5      A.  As I mentioned, furniture, items that
6  could be seating, tables, is what I would interpret
7  that to be.
8      Q.  Would that include waste receptacles?
9      A.  It could.  Waste receptacles however
10  are called out in the new Subchapter T.
11      Q.  I understand.
12      But indeed if there are furnishings, the
13  fact that they are called out in new Subchapter T
14  would mean, at least as I read this regulation, I am
15  referring now to 177.15(b) that they had to comply
16  with the new T regs when they were first placed
17  aboard the vessel.
18      Is that how you read it as well?
19      A.  I honestly -- the fact that
20  furnishings was called out specifically, and that
21  word being used and the waste receptacles has its
22  own regulations in the new Subchapter T, I don't
23  necessarily think I could make that connection.
24      Q.  Okay.  Who would you call on to --
25  other than Eric -- to make that call if you were

Page 95

1  faced with it as the chief of prevention down in
2  Sector San Diego?
3      A.  I would refer back to the Office of
4  Engineering, Design and Standards and possibly the
5  Marine Safety Center as well.
6      Q.  So as I understand it, when an owner
7  like Truth Aquatics has to replace outfit items like
8  bunkroom mattresses or, for example, chairs aboard a
9  vessel like CONCEPTION, those new furnishings have
10  to comply with the new T regs if they are replaced
11  after March 11, 1996?
12      A.  Yes.
13      MR. HILLSMAN:  Loyd, would you post
14  chip no. 20.
15      We are looking at a photograph that has been
16  marked as Exhibit 42 in the parallel litigation in
17  Los Angeles Superior Court.
18      Eric, if you want me to make this an exhibit
19  to these proceedings, I would be happy to do so.  It
20  is entirely up to you, but I warrant to you that
21  this is a photograph that was taken in CONCEPTION's
22  bunkroom prior to the fire.
23      Do you see the mattresses there?
24      A.  Yes, I do see the mattresses in the
25  picture.

Page 96

1      Q.  Do those comprise furnishing within
2  the meaning of 177.115(b)?
3      A.  Mattresses was specifically called out
4  within that part of the regulation.
5      Q.  So those mattresses, even as to -- as
6  of September of -- beg your pardon.  Let me start
7  again.
8      Those mattresses, if they were replaced at
9  any time after March 11, 1996, would have to comply
10  with the new T regs; do I have that right?
11      A.  I would agree with that, yes.
12      Q.  And an inspector aboard the vessel
13  would have to confirm as part of his or her
14  inspection that those mattresses were in compliance
15  with the new T regs, true?
16      A.  Yes.
17      MR. HILLSMAN:  Loyd, would you please
18  post clip 15.
19      I will warrant to you that this a photograph
20  of CONCEPTION's salon.  It has been marked as
21  Exhibit 35 to the parallel LA Superior Court
22  proceedings.
23      Eric, if you want me to mark it as an
24  exhibit in this case, I would be happy to do so.  We
25  can discuss that at the end of the deposition.

Captain Ronald Caputo                                    Confidential                                    Fiedler vs. United States of America

Page 169

1      Captain, I will warrant to you that this is
2  a document we received in our discovery in the Los
3  Angeles case from CONCEPTION's owner Truth Aquatics.
4  It is entitled Sea Trials, T Boat New Construction
5  and Conversion.
6      The first paragraph reads, "The purpose of
7  the sea trial is to determine the vessel's
8  characteristics under operating conditions.  Sea
9  trials shall be conducted on all sub T vessels prior
10  to issuance of a certificate of inspection.
11  Currently certificated or previously certificated
12  vessel that have undergone extensive modification or
13  machinery modification or anything that may affect
14  the safe navigation of a vessel must undergo sea
15  trials.  It is the policy of this port to take the
16  vessel beyond the breakwater to a safe area and
17  perform and observe at least the following."  And
18  there is a list of 12 different factors.
19      First of all, have I read that paragraph
20  correctly?
21      A.  Yes.  Yes, you have.
22      Q.  Have you ever seen this document
23  before today?
24      A.  Not before, no.
25      Q.  The sentence, "It is the policy of

Page 170

1  this port to take the vessel beyond the breakwater"
2  suggested to me at least that this was either a
3  Coast Guard document or one that was prepared by MSD
4  Santa Barbara.
5      Can you lend me any insight on that?
6      We don't know where this thing came from.
7      A.  I can't.  I don't know where this came
8  from.
9      I don't know -- the term "the port" could be
10  interpreted to mean anything.
11      Q.  Okay.  Did the district have any
12  policies or protocols back when you were prevention
13  chief at Sector San Diego concerning the requirement
14  for sea trials following major repair projects?
15      A.  No.
16      MR. HILLSMAN:  I think that's all I
17  have got.
18      Why don't we, if we can, take a break for
19  about ten minutes so I can confer with my superiors,
20  and we can decide whether or not we are through.
21      VIDEO OPERATOR:  The time is 2:01.
22  We are going off the record.
23          (Break taken.)
24      VIDEO OPERATOR:  The time is 2:09.
25      We are back on the record.

Page 171

1      MR. HILLSMAN:  Captain Caputo, thank
2  you very much for your time and cooperation today.
3      I have no further questions.  I have
4  conferred with my colleagues, and I don't believe
5  they do either.
6      VIDEO OPERATOR:  That concludes the
7  deposition for today.  The time is 2:10.
8      We are off the record.
9          (Whereupon, the deposition was
10          adjourned at 2:10 p.m.)
11          --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

1          CERTIFICATE OF REPORTER
2
3      I, DENISE A. FORD, a Certified Shorthand
4  Reporter, hereby certify that the witness in the
5  foregoing deposition was by me duly sworn to tell
6  the truth, the whole truth, and nothing but the
7  truth in the within-entitled cause;
8      That said deposition was taken down in
9  shorthand by me, a disinterested person, at the time
10  and place therein stated, and that the testimony of
11  the said witness was thereafter reduced to
12  typewriting, by computer, under my direction and
13  supervision.
14      I further certify that I am not of counsel
15  or attorney for either or any of the parties in the
16  said deposition, nor in any way interested in the
17  event of this cause, and that I am not related to
18  any of the parties thereto.
19
20      DATED:  June 30, 2023.
21
22
23
24  DENISE A. FORD, CSR No. 7525
25

1  GRETCHEN M. NELSON, SBN 112566
2  gnelson@nflawfirm.com
   CARLOS F. LLINAS NEGRET, SBN 284746
3  cllinas@nflawfirm.com
4  NELSON & FRAENKEL, LLP
   601 S. Figueroa St., Suite 2050
5  Los Angeles, CA 90017
6  Tel. No.: (844) 622 – 6469
   Fax No. (213) 622 - 6019
7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10 | NANCY FIEDLER, Personal            | Case No. 2:21-cv-07065-PA-PVC
11 | Representative of the Estate of LISA | Honorable Percy Anderson
   | FIEDLER (Deceased), et al.         |
12 | .                                  | ORDER GRANTING PALINTIFFS'
   |                                    | APPLICATION FOR LEAVE TO
13 |              Plaintiffs,           | FILE DOCUMENTS UNDER SEAL
14 |      v.                            |
15 | UNITED STATES OF AMERICA,          |
16 |              Defendant.            |
17 |

18

19     Having carefully considered the Plaintiffs' Application for Leave to File

20 Documents under Seal Pursuant to Local Rule 79-5.2.2(a), the Court hereby rules as

21 follows: The Application is Granted.

22     Plaintiffs have leave to file under seal the following document in support of

23 their Response in Opposition to Defendant United States of America's Motion to

24 Dismiss for Lack of Personal Jurisdiction: Exhibit 2 to the Declaration of John

25 Hillsman consisting of the 197-page ATF Report and attachments.

26     IT IS SO ORDERED.

27     DATED: July 9, 2024

28
                                              _____
                                                        Percy Anderson
                                                 United States District Judge

                                    1
       [PROPOSED] ORDER GRANTING PALINTIFFS' APPLICATION FOR LEAVE TO FILE
                          DOCUMENTS UNDER SEAL



1  GRETCHEN NELSON, ESQ. (S.B.N. 112566)
   (gnelson@nflawfirm.com)
2  CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
   (cllinas@nflawfirm.com)
3  NELSON & FRAENKEL LLP
4  601 South Figueroa Street, Suite 2050
   Los Angeles, CA 90017
5  Telephone: (213) 622-6469

6
7  JOHN R. HILLSMAN (S.B.N. 71220)
   (jrhillsman@mhpsf.com)
8  MCGUINN, HILLSMAN & PALEFSKY
   535 Pacific Avenue
9  San Francisco, CA 94 I 33
   Telephone: ( 415) 421-9292
10
11  DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
    (ddisandro@smbb.com)
12  SALTZ MONGELUZZI & BENDESKY P.C.
    1650 Market Street
13  Philadelphia, PA 19103
    Telephone: (2I5) 496-8282
14

15  *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16              UNITED STATES DISTRICT COURT

17       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

18

19  NANCY FIEDLER, et al.,              **Case No. 2:21-cv-07065-PA-MRW**

20       Plaintiffs,                    **PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS**

21
22  vs.
23  UNITED STATES OF AMERICA
24       Defendant.
25
26
27
28

                          1
─────────────────────────────────────────
PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 124**

| FACT | SUPPORTING EVIDENCE |
|---|---|
| 1.    On September 2, 2019, a fire broke out on board the motor vessel *Conception* while she lay at anchor off the north shore of Santa Cruz Island. | 1.    *Exhibit 1* (NTSB Board Marine Accident Report at Pgs. 10-11, 61). |
| 2.    Thirty-nine people were on board the vessel at the time of the fire – thirty-three passengers and six crew members. | 2.    *Exhibit 12* (NTSB Group Chairman's Report - Survival Factors Group at Pgs. 2:21-4:10). . |
| 3.    Thirty-four of the people on board *Conception* -- all thirty-three passengers and one crew member -- perished in the fire. | 3.    *Exhibit 12* (NTSB Group Chairman's Report's - Survival Factors Group at Pgs. 2:21-4:10). |
| 4.    *Conception* had three decks: a sun deck atop the house (where the bridge and crew accommodations were situated); a main deck (where the galley and salon were housed); and a below-deck bunk room in the hull (where the passenger accommodations were located). | 5.    *Exhibit 12* (NTSB Group Chairman's Report's - Survival Factors Group Pgs. 5:21-6:9; see also Exhibit "1" National Transportation Safety Board Marine Accident Report at Pg. 3 depicting a simple diagrammatic plan and profile view of the vessel). |
| 7.    At the time of the fire, *Conception* was furnished with a large plastic trash can that was located at the after end of the deck house, beneath the wooden stairs leading from the main deck to the sun deck. | 7.    *Exhibit 3* (NTSB Group Chairman's Factual Report – Fire and Explosions Group – dated May 7, 2020, at Pg. 20, Figure 9. |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 125**

| | |
|---|---|
| 8. At the time of the fire, *Conception's* galley and salon were furnished with fifteen to twenty-five plastic garden chairs manufactured by the Grosfillex Company ("Grosfillex garden chairs"). | 8. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified for Truth Aquatics at Pgs. 98:11-103:1; *Exhibit 3* (NTSB Group Chairman's Factual Report – Fire and Explosions Group - dated May 7, 2020. at Pg. 16, Figures 4 and 5). |
| 9. In addition to the Rubbermaid trash can described in Statement of Disputed Material Fact No. 7, the area at the after end of the deck house, beneath the wooden stairs leading from the main deck to the sun deck, was also furnished with a plastic waste container and a plastic rinse bucket. | 9. *Exhibit 3* (NTSSB Group Chairman's Factual Report – Fire and Explosions Group, dated May 7, 2020 at Pg. 20, Figure 9. |
| 10. In October of 2023, the United States Department of Justice prosecuted *Conception's* Captain, Jerry Nehl Boylan, for his role in events. | 10. *Hillsman Declaration* at Par. 7. |
| 11. During Captain Boylan's criminal trial, Senior ATF Fire Research Engineer, Jonathan Butta, and ATF Special Agent Certified Fire Investigator, Derrick Hill, testified that the fire on board *Conception* started in the large plastic trash can described in Statement of Disputed Material Fact No. 7. | 11. *Exhibit 5*]. (Trial testimony of Jonathan Butta, ATF Senior Fire Research Engineer, October 31, 2023, at Pgs. 28:3-18, 37:24-38:2, 53:2-14; *Exhibit 6*] (Trial Testimony of Derrick Hill, ATF Special Agent Certified Fire Investigator, October 31, 2023, Pgs. 125:21-129:20). |
| 12. The large plastic trash can described in Statement of Disputed Material Fact No. 7 was manufactured in May 2016 by Rubbermaid ("the Rubbermaid trash can"). | 12. *Exhibit 2* (ATF Report, Pg. 133, §§ 384-385; Pg. 196, § 570). |
| 13. In addition to the Rubbermaid trash can, *Conception* was also furnished with plastic waste receptacles in the galley, salon, and bunkroom. | 13. *Exhibit 3*. (NTSB Group Chairman's Factual Report, Fires and Explosions, dated May 7, 2020, at Pg. 9). |

| | |
|---|---|
| 14. United States Coast Guard Commander Stephanie Hodgdon testified, in her capacity as the Person Most Qualified under Rule 30(b)(6), that 46 CFR § 176.830 left the Coast Guard Marine Inspectors ("OCMIs") from Marine Safety Detachment ("MSD") Santa Barbara under "a mandatory duty" to identify, write up, and rectify any potential fire hazards they observed whenever they inspected *Conception.* | 14. *Exhibit 6* (April 12, 2023, Deposition of United States Coast Guard Commander Stephanie Hodgdon at Pgs. 29:20-32:14, 217;18-218:10, and 229:24-232:6). |
| 15. The New T-Regulations, 46 CFR 177.405(f) provides:<br><br>"Unless other means are provided to ensure that a potential waste receptacle fire would be limited to the receptacle, waste receptacles must be constructed of non-combustible materials with no openings in the sides or bottom." | 15. *Exhibit 6* (April 12, 2023 deposition of United States Coast Guard Commander Stephanie Hodgdon, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 231:11-18). |
| 16. United States Coast Guard Commander Stephanie Hodgdon testified, in her capacity as the Person Most Qualified under Rule 30(b)(6), that the Rubbermaid trash can was an obvious fire hazard. | 16. *Exhibit 6* (April 12, 2023, deposition of United States Coast Guard Commander Stephanie Hodgdon, at Pgs. 235:11-236:3, 242:4-243:9). |
| 17. The *Conception* and two similar dive boats, the *Truth* and the *Vision*, were based in Santa Barbara and operated by Truth Aquatics, Inc. | 17. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois at Pgs. 47:12-22). |
| 18. *Conception* had been furnished with the Rubbermaid trash can and the other Non-metallic waste containers described in Statement of Disputed Material Fact No. 14 hazards for several years prior to the fire in positions aboard | 18. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 85:5-86:2, 86:21-87:1; 87:20-90:22; 92:19-25; 94:11-98:9). |

| | |
|---|---|
| the vessel that would and should have been obvious to any OCMI who boarded the vessel. | |
| 19. United States Coast Guard Commander Stephanie Hodgdon testified in her capacity as the Person Most Qualified under Rule 30(b)(6), that the Grosfillex garden chairs described in Statement of Disputed Material Fact No. 8 were also obvious fire hazards. | 19. *Exhibit 6*. (April 12, 2023, deposition of United States Coast Guard Commander Stephanie Hodgdon at Pgs. 232:2-6, 243:10-243:23). |
| 20. Truth Aquatics, Inc. purchased those Grosfillex garden chairs on July 11, 2008, and thereafter left them in positions aboard *Conception* that would and should have been obvious to any OCMI who boarded the vessel. | 20. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois at Pgs. 98:12-103:1; [Exhibit "8"]. (Invoice for 64 Miami Bistro Charcoal Outdoor Stacking side chairs shipped to Truth Aquatics on July 11, 2008, produced in response to Plaintiffs' Request for Production (Set Two) in the pending state court action captioned *Fiedler v. Truth Aquatics, Inc., et al*., Bates stamped No. Truth002801). |
| 21. OCMIs from MSD Santa Barbara Guard conducted seven inspections of the *Conception* between 2015 and 2019, but the Coast Guard never directed Truth Aquatics to remove or replace those combustible plastic chairs or trash cans from the vessel. | 21. *Exhibit 7* (May 26, 2023, deposition of Inge Courtois, in her capacity as Person Most Qualified under Rule 30(b)(6), at Pgs. 98:12-103:1.); *Exhibit 3* (NTSB Group Chairman's Factual Report, Fires and Explosions, dated May 7, 2020 at Pg. 9.); *Exhibit 0* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspections of Conception dated February 4, 2015 (US000176- 000179), February 18, 2016 (US000172-000175), January 18, 2017 (US000100-000102), February 1, 2017 (US000096-000098), February 16, 2017 (US000092-000095), February 13, |

| | |
|---|---|
| | 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 22. The United States Coast Guard Vessels Inspection Reports generated between July 2008 and February 2019 for the *Conception* contained no remarks, deficiencies, or directives concerning the obvious fire hazards acknowledged by United States Coast Guard Commander Stephanie Hodgdon. | 24. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections of the Conception dated November 25, 2008 (US002900-002902), January 26, 2009 (US000195-00198), June 10, 2009 (US000351-US000352), December 2, 2009 (US00346-00347), February 15, 2011 (US00339-000342), July 20, 2011 (US000275-000277), March 6, 2012 (US00230-000232), February 7, 2013 (US000191-000193), September 24, 2013 (US00188-000190), February 18, 2014 (US000184-00187), February 4, 2015 (US00176-00179), February 18, 2016 (US000172-000175), January 18, 2017 (US000100-000102), February 1, 2017 (USA000096-00098), February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 24. The last U.S. Coast Guard inspector in a position to address and rectify these obvious fire hazards before the September 2, 2019, tragedy, was United States Coast Guard Chief Warrant Officer Daniel Hager, when he performed his inspection of Conception on February 13, 2019. | 25. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections for Conception dated February 13, 2019. (US000067-000072); *Exhibit 11* (June 8, 2023, deposition of Chief Warrant Officer Daniel Hager at Pgs. 12:6-14; 71:18-72:8; 127:16-128:6). |
| 26. Chief Warrant Officer Hager admitted the Grosfillex garden chairs were a potential fire hazard. | 26. *Exhibit 11* (June 8, 2023, deposition of the United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 93:1-10, 93:24-94:11). |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 129**

| | |
|---|---|
| 27.   Chief Warrant Officer Hager performed inspections of the Conception on February 18, 2016, February 16, 2017, February 13, 2018, and February 13, 2019, recalled observing the Grosfillex garden chairs in *Conception's* salon during those inspections, but failed to write them up as a potential fire hazard. | 27.   *Exhibit 11* (June 8, 2023 deposition of United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 62:20-64:19, 93:1-10, 93:25, 94:11; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for inspections of *Conception* dated February 4, 2015 (US 000176-000179),February 18, 2016 (US000172-000175), January 18, 2017 (US000100-000102), February 1, 2017 (US000096-000098), February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 28.   On August 25, 2000, Coast Guard inspectors issued a deficiency notice to *Conception* for having non-approved wiring in some of its AC electrical system. | 28.   *Exhibit 1* (NTSB Marine Accident Report at pg. 22; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-US003175). |
| 29.   Instead of stranded or braided conducted core wire, *Conception* was equipped with flexible service wire, similar in type to that used in commercially sold extension cords. | 29.   *Exhibit 1* (NTSB Marine Accident Report at Pg. 22; *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-003175). |
| 30.   That flexible service wire had been installed by the boat builder and approved by Coast Guard inspectors in 1981 during the original construction of the vessel. | 30.   *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-US003175); *Exhibit 1* (NTSB Marine Accident Report at Pg. 22.) |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

| | |
|---|---|
| 31. Truth Aquatics appealed the August 5, 2000, deficiency notice and requested a waiver to the Coast Guard's requirements, but the appeal was denied. | 31. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated August 25, 2000 (US003172-US003175); *Exhibit 1* (NTSB Marine Accident Report at Pg. 22). |
| 31. Although the inspection reports indicated this deficiency was cleared by March 2002, inspections of the wreckage of the *Conception* conducted on June 27 and June 28, 2021, and during a subsequent inspection of the wreck in Port Hueneme on August 8 through August 12, 2022, plaintiffs' experts found non-marine grade wiring in the forward area of the bunkhouse. | 31. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated March 15, 2002 (US003134-US003137); *Ebersole Declaration.* |
| 32. Immediately after the *Conception* fire involving *Conception*, the Coast Guard OCMIs inspected the *Vision*, and discovered nineteen aboard that vessel. | 32. *Exhibit 1* (NTSB Marine Accident Report at Pg. 60). |
| 33. The OCMIs from MSD Santa Barbara failed to inspect, examine or test any aspect of *Conception's* electrical system during the inspections they conducted aboard that vessel on March 19, 2004, January 26, 2011, September 24, 2013, February 4, 2015, and February 13, 2019. | 33. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspection of Conception dated March 19, 2004 (US003127-US003139), January 26, 2011 (US000343-000345), September 24, 2013 (US000188-000190), February 4, 2015 (US000176-000178), and February 13, 2019 (US000067-000072). |
| 34. Chief Warrant Officer Hager admitted that the provisions of 46 CFR § 176.806 required him and his fellow OCMIs to inspect *Conception's* electrical system each and every time they inspected that vessel. | 34 *Exhibit 11* (June 8, 2023, deposition of Chief Warrant Officer Daniel Hager at Pgs. 14:23-115:2). |
| 35. In his 2017 and 2018 MISLE entries memorializing his findings from | 35. *Exhibit 9* (Marine Information for Safety and Law Enforcement |

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

| | |
|---|---|
| the annual inspections of *Conception*, Chief Hager noted that he inspected the *Conception's* electrical system. | ("MISLE") Activity Summary Reports for Chief Warrant Officer Daniel Hager's inspections of *Conception* dated February 16, 2017 (US000092-000095) and February 13, 2018 (US000088-000091). |
| 36.    However, in Chief Hager's final Annual Assessment Form for the *Conception* dated February 13, 2019, there is no notation that the vessel's electrical system was inspected. | 36.    *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspections of *Conception* dated February 13, 2019 (US000067-000072). |
| 37.    Chief Hager admitted that this omission supported an inference that he did not inspect the vessel's electrical system during its last annual inspection before the fire." | 37.    *Exhibit 11* (June 8, 2023, deposition of United States Coast Guard Chief Warrant Officer Daniel Hager at Pgs. 132:12-133:3). |
| 38.    Lieutenant Commander Joseph Price-Larson was the supervisor of the Marine Safety Detachment (MSD) in Santa Barbara from 2018 through 2021. | 38.    *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Joe Price-Larson at Pgs. 22:21-25:20). |
| 39.    Lieutenant Commander Price-Larson was also designated by the United States Coast Guard as the Person Most Qualified concerning the history, purpose, meaning and day-to-day application of the provisions of 46 CFR sections 175.100-185.910. | 39.    *Exhibit 17* (May 25, 2023, deposition Lieutenant Commander Joe Price-Larson at Pgs. 63:18-64:18). |
| 40.    In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson testified that the regulations in the Marine Safety Manual also imposed mandatory duties upon his contemporary OCMIs at MSD Santa Barbara to inspect and assess all vessel systems for safety issues, including, but not limited to: 1) electrical generator | 40.    *Exhibit 17* (May 25, 2023, deposition of the United States Coast Guard Lieutenant Commander Price-Larson at Pgs. 110:12-20). |

**ER 132**

| | |
|---|---|
| systems; 2) engineering; 3) firefighting; 4) navigation; 5) escape routes; and 6) engine issues. | |
| 41. In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson also testified that the OCMI's inspectors are obligated to document the scope of their inspections in their MISLE Activity Summary Reports. | 41. *Exhibit 17* (May 25, 2023 deposition of Lieutenant Commander Price-Larson at Pgs. 89:12-24). |
| 42. In his capacity as a PMQ, Lieutenant Commander Price-Larson also testified that his OCMIs were likewise obligated to document in their MISLE reports that they inspected the subject vessel's electrical system. | 42. *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Price-Larson at Pgs. 90:21-92:8). |
| 43. In his capacity as a PMQ, Lieutenant Commander Joseph Price-Larson further testified that during annual inspections that inspectors are obligated to inspect every vessel system and to document whether or not each system is in satisfactory condition. | 43. *Exhibit 17* (May 25, 2023 deposition of Lieutenant Commander Joe Price-Larson at Pgs. 48:19-51:1). |
| 44. When deficiencies are detected, the inspector is obligated to fill out a CG-835 Deficiency Form and perform an appropriate follow up inspection to ensure the safety deficiencies are rectified. | 44. *Exhibit 17* (May 25, 2023 deposition of the United States Coast Guard Lieutenant Commander Joe Price-Larson in his capacity as Person Most Qualified under Rule 30(b)(6) at Pgs.103:7-15, 105:7-109:3). |
| 45. In his capacity as a PMQ, Lieutenant Commander Price-Larson finally testified that inspectors have a mandatory duty to verify that all electrical wiring and cable is listed by Underwriters Laboratories (UL) as UL Boat or UL Marine Cable, and to ensure that it is properly insulated. | 45. *Exhibit 17* (May 25, 2023, deposition of Lieutenant Commander Price-Larson at Pgs. 94:11-15). |
| 46. The Chief Warrant Officer William DeCamp issued an electrical deficiency instructing Glenn Fritzler | 46. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report |

10

**ER 133**

| | |
|---|---|
| and Truth Aquatics, Inc., to remove all welding cable from the 24-volt electrical system aboard *Conception* and to replace it with approved cable, as required by 46 CFR 183.340. | for the inspection of *Conception* dated July 20, 2011 (US000275-000277). |
| 47.    On January 24, 2013, Chief Warrant Officer DeCamp cleared the "outstanding deficiency from before to replace all welding cable in the 12-volt [sic] system." | 47.    *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated January 24, 2013 (US003834-003835). |
| 48.    On July 19, 2013, DeCamp's previous January 24, 2013, Activity Summary Report was "submitted for review." | 48.    *Exhibit 15* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of *Conception* dated July 19, 2013 (US003832-003833). |
| 49.    Superimposed in the right-hand corner of the July 19, 2013, MISLE Activity Summary Report is a stamp referencing the initials of personnel who signed off on the review on September 24, 2019. | 49.    *Exhibit 15* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated July 19, 2013 (US003832-003833). |
| 50.    In a MISLE Activity Summary Report dated September 24, 2013, DeCamp's previous representation that the electrical deficiency had been cleared on January 24, 2013, was deleted and changed to reflect that there had been "no inspection" of *Conception's* electrical system on January 24, 2013. | 50.    *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated September 24, 2013 (US000188-000190). |
| 51.    In her capacity as a PMQ, Commander Hodgdon, admitted that 46 CFR section 176.500 was a directive over which an OCMI had no discretion. | 51.    *Exhibit 6* (April 12, 2023, deposition of Commander Stefanie Hodgdon at Pg. 26:2-14). |
| 52.    In her capacity as a PMQ, During her deposition, Commander Hodgdon further admitted that OCMIs from MSD Santa Barbara had a mandatory duty to: 1) prepare for their periodic inspection | 52.    *Exhibit 6* (April 12, 2023, deposition of United States Coast Guard Commander Stefanie Hodgdon at Pgs. 217:18-218:10, Pgs. |

| | |
|---|---|
| by reviewing the information archived about that vessel and her prior inspections in the Coast Guard's MISLE database; 2) write up all safety deficiencies they spotted during the inspection; 3) log those deficiencies into the MISLE database by means of a CG Form 835; and 4) ensure through "objective evidence" that those deficiencies were rectified during an appropriate follow up inspection. | 90:21-91:23, Pg. 89:25-91:23, 93:14-98:3, 122:19-123:9; 168:17-169:4). |
| 53. In her capacity as PMQ, Commander Hodgdon further conceded that both the Old-T and New-T Regulations placed vessel inspectors under a mandatory duty to verify "as far as practicable" per 46 CFR section 176.806, 183.200, and 183.340, that all electric wiring and cable was, at the very least "listed by Underwriters Laboratories (UL) as UL boat or UL marine cable." | 53. *Exhibit 6* (April 12, 2023, deposition of Commander Stephanie Hodgdon at Pgs. 220:16-224:23). |
| 54. In her capacity as PMQ, Commander Hodgdon stated that objective evidence in the form of repair records from a certified repair company, a licensed electrician, or an inspector's personnel observation, would be required in order to clear a safety deficiency related to electrical wiring or cable. | 54. *Exhibit 6* (April 12, 2023, deposition of Commander Stephanie Hodgdon at Pgs. 95:21-96:21). |
| 55. In her capacity as PMQ, Commander Hodgdon also confirmed that deficiencies cannot be cleared by doing nothing. | 55. *Exhibit 6* (April 12, 2023, deposition of Stefanie Hodgdon at Pgs. 213:12-214:14, 97:19-99:3, 95:21-96:21). |
| 57. No objective evidence was produced by the United States Coast Guard indicating that any certified | 57. *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports |

| | |
|---|---|
| repair company or licensed electrician ever rectified the welding cable deficiency originally issued on July 20, 2011. | for inspections of the Conception dated March 6, 2012 (US00230-000232), February 7, 2013 (US000191-000193), September 24, 2013 (US00188-000190), February 18, 2014 (US000184-00187), February 4, 2015 (US00176-00179), February 18, 2016 (US000172-00175), January 18, 2017 (US000100-000102), February 1, 2017 (USA000096-00098), February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |

| | |
|---|---|
| 58.    Photographs taken by the FBI during the post-accident investiga-tion of the *Conception* catastrophe, revealed a hole in the copper water main pipe caused by corrosion. | 60.    *Exhibit 18* NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |
| 59.    Said pipe was designed to deliver water from the vessel's fire pump to the fire stations located aboard on the fire the port and starboard sides of *Conception's* main deck housthe aft cabin with each fire station equipped with a 50-foot fire hose, a valve to open or shut down the flow of water, and electric on and off buttons. | 59.    *Exhibit 18* NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |
| 60.    The water supply was designed to be delivered via a fire pump located in the engine room; a valve in the engine room could be manipulated to use the pump to drain bilge water, if needed, and then to realign the valve to be ready to pump water to the fire stations through a common copper water main in the event of the fire. | *Exhibit 18* NTSB Group Chairman's Factual Report – Engineering Group dated August 18, 2020, at Pgs. 10:12-27). |

13

**ER 136**

| | |
|---|---|
| 61.     The Annual Inspection Records generated by The United States Coast Guard pertaining to the *Conception* for 2017, 2018, and 2019 indicate the fire hoses and fire system was never activated and tested. | 61.     *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports for the inspections of Conception dated February 16, 2017 (US000092-000095), February 13, 2018 (US000088-000091), and February 13, 2019 (US000067-000072). |
| 62.     On February 18, 2016, Chief Warrant Officer Hager, issued a no-sail deficiency for *Conception* because access to the fire pump was not available.     In order to clear the deficiency, it was incumbent upon the owner to "prove proper operation of the fire pump" and this was presumably done on February 19, 2016, when the deficiency was cleared by Chief Warrant Officer, Michael Young.  On that date, Chief Warrant Officer Young attended the vessel and witnessed proper operation of the fire pump with a 50 foot hose, noting that the condition was " . . . all sat" (i.e., satisfactory). | 62.     *Exhibit 9* (Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for inspections of Conception dated February 18, 2016 (US000171-000178). |
| 63.     On February 16, 2017, Chief Warrant Officer Hager Officer Hager inspected *Conception's* firefighting appliances for the very last time but there was no indication in his MISLE Activity Summary Report that the fire pump or fire main was actually activated and tested. | 63.     *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 16, 2017 (US000092-US000095). |
| 64.     Nor is there any indication that the fire pump or fire main was actually activated or tested during the penultimate, annual inspection performed February 13, 2018. | 64.     *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2018 (US000088-US000091). |

14

**ER 137**

| | |
|---|---|
| 65.    There is nothing in the February 13, 2018, MISLE Activity Summary Report generated by Chief Warrant Officer Hager to indicate that the fire pump or fire main for the fire stations was actually activated, or that that the fire hoses were actively charged to see if they were in working condition. | 65.    *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 66.    Chief Warrant Officer Hager last performed an annual inspection of the Conception on February 13, 2019. Under the heading "Fire Fighting," Hager noted:  "Inspected vessel firefighting appliances to include six portable fire extinguishers and a fixed C02 system for the emergency room which were all serviced by Langkilde's Fire Protection." | 66.    *Exhibit 9* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 67.    In his last report, Chief Warrant Officer Hager also documented that the crew completed satisfactory Man Overboard and Simulated Fire Drills; however, there was documentation that the fire pumps or hoses were actually activated or inspected by Hager during the 2019 annual inspection. | 67.    *Exhibit 10* Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Report for the inspection of Conception dated February 13, 2019 (US000088-US000091). |
| 70. *Conception* was built of wood and fiberglass, was launched in 1981, was based in Santa Barbara, and was inspected and certified by the United States Coast Guard to carry up to ninety-nine passengers on coastwise voyages under 46 CFR, Chapter I, Subchapter T. | 70. *Defense Exhibit F* (Certificate of Inspection Issued on November 19, 2014). *Exhibit 21 (*Certificate of Inspection Issued on November 19, 2014) |
| 71.    Plaintiffs petitioned this Court under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951), to compel the Department of Justice ("DOJ") to produce information the | *CV 23-985 PA (MRWx) ECF 55* |

15

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 138**

| 1<br>2 | DOJ was withholding pending the outcome of the *Boylan* procecution. | |
|---|---|---|

3

4   Dated: July 8, 2024                    McGUINN, HILLSMAN & PALEFSKY

5                                          NELSON & FRAENKEL LLP

6                                          SALTZ MONGELUZZI & BENDESKY
                                           Lead Counsel for All Plaintiffs
7

8                                          By:   /s/ *John R. Hillsman*

9                                                JOHN R. HILLSMAN

10

11                                         WALKUP MELODIA KELLY

12                                              SCHOENBERGER

13                                         PANISH SHEA BOYLE & RAVIPUDI LLP

14                                         FIORE ACHERMAN, A Law Corp.

15                                         SCHUERING ZIMMERMAN & DOYLE,

16                                              LLP

17                                         KREINDLER & KREINDLER LLP

18                                         LAW OFFICE OF W. RUSSELL FIELDS

19                                         GALINE FRYE FITTING & FRANGOS

20                                         ARNOLD & ITKIN LLP

21                                         TODD M. ABBOTT, ESQ.

22

23

24

25

26

27

28

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 139**



GRETCHEN NELSON, ESQ. (S.B.N. 112566)
(gnelson@nflawfirm.com)
CARLOS NEGRET, ESQ. (S.B.N. 284746)
(cllinas@nflawfirm.com)
NELSON & FRAENKEL LLP
601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469

JOHN R. HILLSMAN (S.B.N. 71220)
(jrhillsman@mhpsf.com)
DEREK B. JACOBSON (S.B.N. 88417)
(dbjacobson@mhpsf.com)
ABRAHAM F. HILLSMAN (S.B.N 241810)
(bfh@mhpsf.com)
MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94 I 33
Telephone: ( 415) 421-9292

DOUGLAS DISANDRO, JR., ESQ.
(ddisandro@smbb.com)
JEFFREY GOODMAN, ESQ.
(jgoodman@smbb.com)
ROBERT MONGELUZZI, ESQ.
(rmongeluzzi@smbb.com)
SALTZ MONGELUZZI & BENDESKY P.C.
1650 Market Street
Philadelphia, PA 19103
Telephone: (2I5) 496-8282
*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| NANCY FIEDLER, et al.,<br><br>  Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA<br><br>  Defendant. | **Case No. 2:21-cv-07065-PA-MRW**<br>Honorable Percy Anderson<br><br>**DECLARATION OF DARYL EBERSOLE, P.E., CFEI IN SUPPORT OF OPPOSITION TO UNITED STATES' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION [Fed.R.Civ.P.12(b)(1)]** |

1

DECLARATION OF DARYL EBERSOLE, P.E., CFEI IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

I, DARYL EBERSOLE, P.E., CFEI, declare as follows:

1.      I respectfully submit this Declaration pursuant to F.R.C.P. Rule 56(d) on behalf of all Plaintiffs. I have personal knowledge of the matters stated herein and could and would competently so testify if called as a witness herein.

2.      I am a Professional Engineer, licensed in the State of California and 36 other states, and am a Certified Fire and Explosion Investigator.

3.      I have over 40 years of experience including in the fields of electrical power and control systems.  My experience includes investigations of causes of fires.  I have in the past led the fire investigation practice group and I currently lead the electrical engineering practice group at Robson Forensic, Inc.

4.      My experience includes electrical system design, operation, maintenance, and inspections.  I have significant experience in management and supervision of others in electrical system design, operation, maintenance, and inspections.  This experience includes selection of proper materials, electrical raceways, conduit, routing of electrical conductors, protection of electrical conductors, and fire ignition prevention of electrical conductors and systems.  It also includes proper design and selection of materials for harsh environmental conditions of aggressive contaminants and moisture.

5.      Based on my education, experience, and training as an electrical engineer, I was hired on behalf of Plaintiffs in this matter as an expert on issues related to, among other things, the Conception's electrical systems and wiring.

6.      In my capacity as an expert electrical engineer, I was asked to attend inspections of the wreckage of the Conception on behalf of Plaintiffs.

7.      I personally participated in several inspections, which took place at Port Hueneme Naval Base.

8.      My inspections occurred on the dates of June 28 – 29, 2021, and August 9 – 10, 2022.

9.      The inspections of the wreckage of the Conception revealed the presence of non-marine grade electrical conditions, including wiring, wiring practices, insufficient electrical raceways, and insufficient wiring protection, located in the bunkhouse area.

DECLARATION OF DARYL EBERSOLE, P.E., CFEI IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 141**

10.     The presence of these electrical conditions in that area of the vessel posed a fire hazard in the context of a marine environment.

11.     It is well known in the engineering and scientific communities that safe electrical systems and prevention of fires in the marine environment require elimination of the conditions that were found on the Conception.

12.     I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 6, 2024, in the County of Lancaster, Pennsylvania.

DARYL EBERSOLE, P.E., CFEI

DECLARATION OF DARYL EBERSOLE, P.E., CFEI IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

ER 142

GRETCHEN NELSON, ESQ. (S.B.N. 112566)
(gnelson@nflawfirm.com)
CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
(cllinas@nflawfirm.com)
NELSON & FRAENKEL LLP
601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469

JOHN R. HILLSMAN (S.B.N. 71220)
(jrhillsman@mhpsf.com)
MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94 I 33
Telephone: ( 415) 421-9292

DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
(ddisandro@smbb.com)
SALTZ MONGELUZZI & BENDESKY P.C.
1650 Market Street
Philadelphia, PA 19103
Telephone: (2I5) 496-8282

*Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| NANCY FIEDLER, et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>        Defendant. | Case No. 2:21-cv-07065-PA-MRW<br>Honorable Percy Anderson<br>Courtroom 9A<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO UNITED STATES' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION [Fed.R.Civ.P.12(b)(1)]**<br><br>Hearing Date: Not Set |

conception oppo. 2024.07.08 final

# **TABLE OF CONTENTS**

I.    SUMMARY OF PLAINTIFFS' OPPOSITION ................................................ 1

II.    THE GOVERNMENT'S MOTION .................................................................. 4

III.    THE APPLICABLE LEGAL STANDARDS .................................................. 5

IV.  THE DISPUTED MATERIAL FACTS.......................................................... 9

V.  ARGUMENT ................................................................................................... 9

    1.  THE GOVERNMENT'S MOTION MAY BE DENIED ON
       PROCEDURAL GROUNDS ALONE ...................................................... 14

      A. THE GOVERNMENT DID NOT COMPLY WITH LOCAL RULE 56.1
          ............................................................................................................... 14

      B. THE COURT SHOULD ALSO DENY THE MOTION UNDER FED.
        R. CIV. P 56(d), BECAUSE PLAINTIFFS HAVE NOT BEEN
        AFFORDED FULL ACCESS TO EVIDENCE AND THUS HAVE
        BEEN HAMPERED IN THEIR ABILITY TO OFFER ALL
        EVIDENCE ESSENTIAL TO THEIR OPPOSITION .......................... 15

    2.  THE GOVERNMET'S MOTION SHOULD ALSO BE DENIED ON
       SUBSTANTIVE GROUDS ..................................................................... 14

      A. AS THE PARTY SEEKING SUMMARY DISMISSAL, THE
        GOVERNMENT MUST "SATISFY A DEMANDING STANDARD"
        ............................................................................................................... 17

      B. THE GOVERNMENT DID NOT AND CANNOT SATIFY THAT
        DEMANDING STANDARD .................................................................. 18

       i.  TO OBTAIN SUMMARY JUDGMENT IN ITS FAVIR UNDER THE
         DISCRETIONARY FUNCTION DEFENSE, THE GOVERNMENT
         MUST ESTABLISH, AS A MATTER OF LAW, BOTH THAT THE
         OFFICIAL CONDUCT IT IS TRYING TO SHIELD WAS
         DISCRETIONARY AND THAT IT INVOLVED A SOCIAL,
         ECONOMIC, OR POLITICAL DECISION .......................................... 18

       ii. THE GOVERNMENT DID NOT AND CANNOT ESTABLISH AS A
         MATTER OF LAW THAT THE CONDUCT IT IS TRYING TO
         SHIELD WAS INDEED DISCRETIONARY ..................................... 20

        a. WHILE THE DESIGN OF A COURSE OF GOVERNMENTAL
          ACTION MAY BE A POLICY CHOICE SHIELDED BY THE
          DISCRETIONARY FUNCTION EXCEPTION, THE FAILURE
          TO FOLLOW POLICY CHOICES ALREADY MADE IS NOT .. 20

        b. THE OCMIS FROM MSD SANTA BARBARA FAILED TO
          FOLLOW POLICY CHOICES ALREADY MADE WHEN THEY
          VIOLATED THE MANDATORY DUTIES SPELLED OUT IN
          THE T-REGS ..................................................................................... 21

i

**ER 144**

iii.   NOR CAN THE GOVERNMENT ESTABLISH, AS A MATTER OF LAW, THAT THE MISJUDGMENTS ITS OCMIs MADE WERE BASED ON SOCIAL, ECONOMIC, OR POLITICAL POLICY ..... 23

C. THE GOVERNMENT'S COUNTERARGUMENTS ARE UNAVAILING ........................................................................... 24

i.   THE DISTINCTION THE GOVERNMENT HOPES TO DRAW BETWEEN THE 'OLD T REGS" AND THE "NEW T REGS" DOES NOT PROVIDE IT ANY REFUGE ...................................................... 24

ii.   THE AUTHORITIES ON WHICH THE GOVERNMENT RELIES ARE INAPPOSITE ................................................................. 25

iii.   THE GOVERNMENT SHOULD NOT BE HEARD TO ARGUE THAT PLAINTIFFS' COMPLAINT DOES NOT SPECIFY ALL THEIR THEORIES OF RECOVERY .................................................. 26

VI.   CONCLUSION ............................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca,*
   747 F.3d 1162 (9th Cir. 2014) ........................................................ 18

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)............................................................... 12, 17

*Anzai v. Chevron Corp.,*
   158 F.Supp.2d 1180 (D. Haw. 2001) ............................................... 5

*Arbaugh v. Y & H Corp.,*
   546 U.S. 500 (2006).................................................................... 27

*Autery v. United States,*
   424 F.3d 944 (9th Cir.2005) ........................................................... 8

*Autery v. United States,*
   992 F.2d 1523 (11th Cir. 1993) .................................................... 25

*Ayala v. United States,*
   980 F.2d 1342 (10th Cir. 1992) .................................................... 20

*Baker v. United States,*
   817 F.2d 560 (9th Cir. 1987) ........................................................ 21

*Barnson v. United States,*
   630 F.Supp. 418 (D. Utah 1985)................................................... 21

*Bear Medicine v. United States,*
   241 F.3d 1208 (9th Cir. 2001) ............................................... passim

*Beck-Wilson v. Principi,*
   441 F.3d 353 (6th Cir. 2006) ........................................................ 17

*Berkovitz v. United States,*
   486 U.S. 531 (1988)..................................................... 2, 19, 21, 24

*Camozzi v. Roland/Miller and Hope Consulting Group,*
   866 F.2d 287 (9th Cir. 1989) .................................................... 2, 21

*Cassens v. St. Louis River Cruise Lines, Inc.,*
   44 F.3d 508 (7th Cir. 1995) ......................................................... 25

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)............................................................... 15, 17

*Chance, Inc. v. United States,*
   506 F.Supp.2d. 1196 ................................................................. 6, 8

iii

**ER 146**

*Cline v. Dart Transit Co.*,
  2023 U.S. App. LEXIS 9521 (6th Cir. 2023) ............................................ 18

*Cohen v. United States*,
  151 F.3d 1338 (11th Cir.1998) ................................................ 4

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ................................................ 26

*Collins v. United States*,
  783 F.2d 1225 (5th Cir. 1986) ................................................ 21

*Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*,
  532 F.Supp.2d 369 (D.P.R. 2008)................................... 6, 8, 9, 28

*Da Silva v. Kinsho Int'l Corp.*,
  229 F.3d 358 (2d Cir. 2000) ................................................ 27

*Dalehite v. United States*,
  346 U.S. 15 (1953) ................................................ 19, 26

*Earles v. United States*,
  935 F.2d 1028 (9th Cir. 1991) ................................................ 2, 18, 19

*Foster Logging, Inc. v. United States*,
  973 F.3d 1152 (11th Cir. 2020) ................................................ 25

*Garcia v. Copenhaver, Bell & Assocs.*,
  104 F.3d 1256 (11th Cir.1997) ................................................ 8

*Gatx/Airlog Co. v. United States*,
  286 F.3d 1168 (9th Cir. 2002) ................................................ 6

*Gordon v. Lykes Bros. S.S. Co.*,
  835 F.2d 96 (5th Cir. 1988) ................................................ 1

*Griffin v. United States*,
  500 F.2d 1059 (3d Cir. 1974) ................................................ 21

*Holloway v. Pagan River Dockside Seafood*,
  669 F.3d 448 (4th Cir. 2012) ................................................ 27, 28

*In re Airport Car Rental Antitrust Litigation*,
  474 F.Supp. 1072 ................................................ 5

*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*,
  513 U.S. 527 (1995)................................................ 7

*Jones v. Community Redevelopment Agency*,
  733 F.2d 646 (9th Cir.1984) ................................................ 26

*Kennewick Irrigation Dist. v. United States*,
  880 F.2d 1018 (9th Cir. 1989) ................................................ 16

*Kielwien v. United States*,
  540 F.2d 676 (4th Cir. 1976) ................................................ 20

iv

*Laface v. Eastern Suffolk BOCES*,
   349 F. Supp. 3d 126 (E.D. N.Y, 2018) ........................................................ 26

*Lam v. United States*,
   979 F.2d 665 (9th Cir. 2020) ...................................................................... 25

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ...................................................................... 5

*Markes v. United States*,
   704 F. Supp. 337 (N.D. N.Y. 1988) ........................................................... 21

*Medoil Corp. v. Clark*,
   753 F. Supp. 592 (W.D. N.C. 1990) ........................................................... 27

*Mid-South Holding Co. v. United States*,
   225 F.3d 1201 (11th Cir. 2000) ................................................................... 4

*Morrison v. Amway Corp.*,
   323 F.3d 920 (11th Cir. 2003) ..................................................................... 8

*Nelson v. United States*,
   2005 U.S. Dist. LEXIS 45661 (S.D. Ala. 2005) .......................................... 6

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ................................................................... 18

*Olson v. United States*,
   306 Fed. Appx. 360 (9th Cir. 2008) ............................................................ 6

*O'Toole v. United States*,
   295 F.3d 1029 (9th Cir. 2002) ........................................................ 2, 19, 20

*Prescott v. United States*,
   973 F.2d 696 (9th Cir. 1992) ..................................................................... 19

*Program Engineering, Inc. v. Triangle Publications, Inc.*,
   634 F.2d 1188 (9th Cir. 1980) ................................................................... 15

*Rodriguez v. Countrywide Homes*,
   668 F. Supp. 2d 1239 (E.D. Cal. 2009) ..................................................... 26

*Rosales v. United States*,
   824 F.2d 799 (9th Cir. 1987) ................................................................. 6, 16

*Sanko S.S. Co. v. United States*,
   2002 U.S. Dist. LEXIS 14936 (E. D. Cal. 2002) ......................................... 6

*Snyder v. Kohl's Dep't Stores, Inc.*,
   580 F. App'x 458 (6th Cir. 2014) .............................................................. 17

*Soldano v. United States*,
   453 F.3d 1140 (9th Cir. 2006) ................................................................... 20

*Speedeon Data, LLC v. Integrated Direct Mktg., LLC*,
   718 F. App'x 333 (6th Cir. 2017) .............................................................. 17

v

*Steel Co.,*
    523 U.S. ........................................................................................................ 27

*Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.,*
    ("Sun Valley"), 711 F.2d 138 (9th Cir. 1983) ........................................ 6, 7

*Thornhill Pub. Co. v. General Tel. & Electronics Corp.,*
    594 F.2d 730 (9th Cir. 1979) ........................................................................ 5

*Timberlane Lumber Co. v. Bank of America,*
    549 F.2d 597 (9th Cir. 1976) .................................................................... 6, 7

*Torres-Negron v. J & N Records, LLC,*
    504 F.3d 151 (1st Cir.2007) ...................................................................... 6, 8

*Trautman v. Buck Steber, Inc.,*
    693 F.2d 440 (5th Cir. 1982) ........................................................................ 7

*U.S. ex rel. Fisher v. Network Software Associates,*
    227 F.R.D. 4 (D. D.C. 2005) ...................................................................... 15

*United States ex rel. Touhy v. Ragen,*
    340 U.S. 462 (1951) .................................................................................... 16

*United States v. Gaubert,*
    499 U.S. 315 (1991) .................................................................... 19, 21, 24

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense,*
    467 U.S. 797 (1984) ............................................................ 2, 19, 25, 26

*United States v. Webb,*
    655 F.2d 977 (9th Cir. 1981) ...................................................................... 27

*Vought v. Brighton,*
    2024 U.S. Dist. LEXIS 59006 (M.D. Penn. 2024) .................................... 15

*Wabun-Inini v. Sessions,*
    900 F.2d 1234 (8th Cir. 1990) .................................................................... 17

*Whisnant v. United States,*
    ("Whisnant"), 400 F.3d 1177 (9th Cir. 2005) ...................................... passim

*Wiggins v. United States, through Dep't of Army,*
    799 F.2d 962 (5th Cir. 1986) ........................................................................ 1

**Statutes**

18 U.S.C. § 1115 .................................................................................................. 1

18 U.S.C. § 1118 ................................................................................................ 10

28 U.S.C. § 2680(a) .......................................................................... 2, 18, 19, 25

46 U.S.C. § 2101(47) ........................................................................................ 10

46 U.S.C. § 30903(a) .......................................................................................... 2

vi

**ER 149**

46 U.S.C. §§ 30901-30916 ........................................................................................ 1

49 U.S.C. § 1421(a)(1) ........................................................................................... 25

## Rules

Fed. R. Civ. P. 8 ....................................................................................................... 26

Fed. R. Civ. P. 30(b)(6) ............................................................................................. 2

FED. R. CIV. P. 56(d) ......................................................................................... 15, 17

Fed. R. Civ. P. 56(d)(1) ........................................................................................... 15

Fed. R. Civ. P. Rule 15(a)(2) ................................................................................... 26

Fed.R.Civ.P.12(b)(1) .................................................................................... passim

Rule 12(b)(6) ............................................................................................................. 5

Rule 15 .................................................................................................................... 27

Rule 15(a) ................................................................................................................ 27

## Regulations

45 C.F.R. § 177.405(f) .............................................................................................. 10

46 C.F.R. 176.100(a) ................................................................................................ 11

46 C.F.R. Parts 175-186 ............................................................................................. 1

46 C.F.R. § 175.110(a) ............................................................................................. 10

46 C.F.R. § 176.500(b) ............................................................................................. 11

46 C.F.R. § 176.500(b)(1)(ii) ................................................................................... 11

46 C.F.R. § 176.500(b)(1)(iii) .................................................................................. 11

46 C.F.R. § 176.500(d)(ii) ................................................................................. 23, 26

46 C.F.R. § 176.600(c) ............................................................................................. 11

46 C.F.R. § 176.806(a) ....................................................................................... 12, 13

46 C.F.R. § 176.830(a) ...................................................................................... passim

46 C.F.R. § 177.115(b) ............................................................................................. 24

46 C.F.R. § 183.200 ................................................................................................... 4

46 C.F.R. § 183.340(b)(1) ................................................................................... 12, 13

46 C.F.R. § 183.340(d)(2) ................................................................................... 12, 13

46 C.F.R. §§ 175.112 and 183.115(b) ..................................................................... 24

vii

46 C.F.R. §§ 176.500 and 176.806 ........................................................................ 4

46 CFR § 175.806(a) ........................................................................................... 23

46 CFR, Chapter I, Subchapter T ....................................................................... 10

C.F.R.s, §§ 176.500(d)(ii), 175.806(a), and 176.830(a) .................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs respectfully submit this Memorandum of Points and Authorities in opposition to the Motion to Dismiss the United States of America ("Defendant" or the "Government") filed under Fed. R. Civ. P. 12(b)(1). In addition, Plaintiffs are filing concurrently herewith a Separate Statement of Disputed Material Facts and the Declaration of John R. Hillsman which attaches the various exhibits on which Plaintiffs rely.

## I.    SUMMARY OF PLAINTIFFS' OPPOSITION

When the dive boat *Conception* erupted in flames during the early morning hours of September 2, 2019 -- catching her captain and crew off guard and sound asleep -- she burned to the waterline killing 34 people. When the United States prosecuted *Conception's* master, Jerry Boylan, for "seaman's manslaughter" under 18 U.S.C. § 1115 – charging, *inter alia,* that he had failed to maintain a 24-hour roving watch on the night of the fire -- the Government insisted that the blaze had originated in a plastic trash can located on the vessel's weather deck just aft of the salon. But when the families of *Conception's* victims ("the *Conception* families") sued the Government under the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901-30916 – charging, *inter alia,* that Coast Guard inspectors ("OCMI's") had repeatedly and improperly certified *Conception* for overnight operation as a "small passenger vessel" under Subchapter T of the Coast Guard Regulations (the so-called "T Regs"), 46 C.F.R. Parts 175-186, while her galley, salon, and weather decks were outfitted with such obvious fire hazards as plastic trash cans, plastic garden chairs, and non-marine wiring -- the Government invoked "the discretionary function exception" and moved to dismiss their action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

"The discretionary function exception is based on a 'combination of the doctrines of sovereign immunity and separation of powers.'"[1] Although the SIAA

---

[1]    *Gordon v. Lykes Bros. S.S. Co.*, 835 F.2d 96, 99 (5th Cir. 1988) (quoting *Wiggins v. United States, through Dep't of Army*, 799 F.2d 962, 965 (5th Cir. 1986)), cert. denied, 488 U.S. 825, 109 S. Ct. 73 (1988).

---

1

explicitly waives sovereign immunity in cases where a proceeding in admiralty could be maintained *in personam* against a private defendant, 46 U.S.C. § 30903(a), that waiver has been held to incorporate the discretionary-function exception spelled out in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).[2] Congress enacted that exception to fortify its powers under Article I and "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[3] But the discretionary function exception "should be read narrowly."[4] Not all Governmental decisions or omissions comprise social, economic, or political judgments, and "'a failure to effectuate policy choices already made' will not be protected[.]"[5] "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not."[6] It follows that: "When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."[7] This suit charges the Coast Guard with just such a failure.

According to 46 C.F.R. § 176.830(a): "At each inspection for certification and at every other vessel inspection all observed unsafe practices, fire hazards, and other hazardous situations must be corrected, and all required guards and protective devices must be in satisfactory condition." The Government designated Cmdr. Stephanie Hodgdon, the contemporary Chief of the Coast Guard's Commercial Vessel Compliance Division, as its PMQ under Fed. R. Civ. P. 30(b)(6) with respect to "the

---

[2]    *Earles v. United States*, 935 F.2d 1028, 1031 (9th Cir. 1991).
[3]    *United States v. S. A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984).
[4]    *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).
[5]    *Bear Medicine v. United States,* 241 F.3d 1208, 1215 (9th Cir. 2001) (quoting *Camozzi v. Roland/Miller and Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir. 1989)).
[6]    *Bear Medicine*, 241 F.3d at 1215.
[7]    *Berkovitz v. United States*, 486 U.S. 531, 544 (1988).

2

1  day-to-day application of Subchapter T."[8] Cmdr. Hodgdon is also a fully qualified
2  OCMI.[9] When asked about § 176.830(a) at her deposition in this case, she testified:

3    Q. Can we agree that this is a directive?

4    A. Yes.

5    Q.  It's a mandate?

6    A. Yes.

7    Q. And to restate that mandate in terms material to the instant question, can
8       we agree that at each inspection for certification and at every other vessel
9       inspection, all observed fire hazards must be corrected?

10   A. Yes.

11   Q. Okay.  Now, just generally speaking, and drawing on your own personal
12      experience, what are we talking about when we use the phrase 'fire
13      hazards'?

14   A. There is a broad range of what fire hazards could be.

15   Q   That's why I'm asking you to describe it.

16   A.  So, the easiest one would be a non-steel trash can."[10]

17   When we showed Cmdr. Hodgdon a video frame of the plastic trash
18  Government prosecutors in Capt.Boylan's criminal case identified as the source of the
19  fire and asked the Cmdr. "to assume that you boarded *Conception*, that you saw that
20  polypropylene receptacle on the afterdeck, that you saw it situated directly beneath a
21  wooden stairway and wooden shelves directly aft of a wooden bulkhead in the position
22  that's depicted in this video still," she answered as follows:

23   Q. My question to you is -- do you recognize that as an obvious fire hazard
24      within the meaning of the regs?"

25   A. Yes.

26  _____
27  [8]    Hillsman Decl., *Exhibit 6* at 29:20-30:23; Material Statement of Facts (hereinafter, "MSF") 14.
28  [9]    *Id.* at 30:24-32:14; MSF 14.
    [10]   *Id*. at 230:7-24; MSF 14.

1    Q. Okay. Now, given that hypothetical, can we agree that a marine inspector

2         had a mandatory duty to list that deficiency, to log it, and to ensure that it

3         had been rectified?

4    A. Per policy, yes.[11]

5  An OCMI could not inspect or even visit *Conception's* after deck, sun deck, salon,

6  galley, or passenger accommodations without seeing those trash cans and plastic chairs.

7  (MSF 17-20, 24-26.)

8      What is more, according to 46 C.F.R. § 176.830(a), all of *Conception's* "required

9  guards and protective devices must be in satisfactory condition" at "each inspection for

10  certification and at every other vessel inspection." Post-accident inspections revealed

11  an old and obviously unsatisfactory hole in the fire main that delivered high-pressure

12  water from *Conception's* fire pump to her fire hoses. (MSF 60-69.) Finally, the Coast

13  Guard's own inspection records show that the OCMI who last inspected *Conception*

14  cleared her to sail even though he knew or should have known that her 24-volt system

15  was equipped with substandard wiring in violation of 46 C.F.R. §§ 176.500 and

16  176.806. (MSF 27-59.) Such wiring is another obvious fire hazard. 46 C.F.R. §

17  183.200. The *Conception* was freighted with such hazards on February 13, 2019, when

18  the Coast Guard's Marine Safety Detachment ("MSD") in Santa Barbara certified her

19  as fit for coastwise service as a small passenger vessel.

20      The Government's Motion does not mention any of those obvious fire hazards

21  much less prove, as a matter of law, that their fatal presence aboard *Conception* can be

22  excused by social, economic, or political considerations.

## II.  THE GOVERNMENT'S MOTION

24      Where applicable, the discretionary function exception abrogates federal subject

25  matter jurisdiction. See e.g. *Mid-South Holding Co. v. United States*, 225 F.3d 1201,

26  1203-1204 (11th Cir. 2000); *Cohen v. United States*, 151 F.3d 1338, 1340 (11th

27  Cir.1998). That is why the Government seeks relief under Fed. R. Civ. P. 12(b)(1). The

28

[11] *Id.* at 235:24-236: 3; MSF 16.

4

1   Government does not ask for an interlocutory legal ruling under Rule 16(c), see e.g. *In*

2   *re Airport Car Rental Antitrust Litigation*, 474 F.Supp. 1072, 1109, n. 41 (N.D. Cal.

3   1979), or partial summary judgment under Rule 56(a). See e.g. *Anzai v. Chevron Corp*.,

4   158 F.Supp.2d 1180, 1183 (D. Haw. 2001). Rather, it requests "an Order dismissing

5   Plaintiffs' entire First Amended Complaint (ECF 49) on the ground that the Court lacks

6   subject matter jurisdiction over this action." ECF 88 at 4:3-5.

7         Rule 12(b)(1) allows a defendant to challenge subject matter jurisdiction with

8   either a "facial attack" or a "factual attack." *Leite v. Crane Co*., 749 F.3d 1117, 1121

9   (9th Cir. 2014) (compiling cases). A facial attack "accepts the truth of the plaintiff's

10   allegations" and is decided like "a motion to dismiss under Rule 12(b)(6)", while a

11   factual attack "contests the truth of the plaintiff's factual allegations" with "evidence

12   outside the pleadings" and is decided "under the same evidentiary standard that governs

13   in the summary judgment context" under Rule 56. *Leite*, 749 F.3d at 1121.

14         The Government brings a factual attack.

15             **III.    THE APPLICABLE LEGAL STANDARDS**

16         A motion to dismiss for lack of subject matter jurisdiction may be made

17         as a 'speaking motion' attacking the existence of subject matter

18         jurisdiction in fact. Where the jurisdictional issue is separable from the

19         merits of the case, the judge may consider the evidence presented with

20         respect to the jurisdictional issue and rule on that issue, resolving

21         factual disputes if necessary. [] No presumptive truthfulness attaches to

22         plaintiff's allegations, and the existence of disputed material facts will

23         not preclude the trial court from evaluating for itself the merits of

24         jurisdictional claims. Moreover, the plaintiff will have the burden of

25         proof that jurisdiction does in fact exist.

26   *Thornhill Pub. Co. v. General Tel. & Electronics Corp*., 594 F.2d 730, 733 (9th Cir.

27   1979) (citations omitted). But the rule is otherwise where the Government brings a

28   speaking motion under Rule 12(b)(1) based on the discretionary function exception.

1    *Olson v. United States,* 306 Fed. Appx. 360, 362 (9th Cir. 2008). Such motions should

2    be "treated as a motion for summary judgment", *id.,* and granted "only if the material

3    jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

4    matter of law." *Torres-Negron v. J & N Records, LLC*, 504 F.3d 151, 162 (1st

5    Cir.2007): see also *Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*, 532

6    F.Supp.2d 369, 373 (D.P.R. 2008); *Capt. Chance, Inc. v. United States,* 506 F.Supp.2d.

7    1196, 1200, n. 3 (M. D. Fla 2007); *Nelson v. United States*, 2005 U.S. Dist. LEXIS

8    45661, **4-5 (S.D. Ala. 2005); *Sanko S.S. Co. v. United States*, 2002 U.S. Dist. LEXIS

9    14936, **11-14 (E. D. Cal. 2002). There are several reasons for that.

10    First, while the burden of establishing jurisdiction ordinarily rests on the

11    plaintiff, "[t]he burden of proving the applicability of the discretionary function

12    exception is on the United States." *Bear Medicine v. United States*, 241 F.3d 1208,

13    1213 (9th Cir. 2001); see also *Gatx/Airlog Co. v. United States*, 286 F.3d 1168, 1174

14    (9th Cir. 2002) ("Whether a challenged action falls within the discretionary function

15    exception requires a particularized analysis of the specific agency action challenged.

16    The government bears the burden of proving that the discretionary function exception

17    applies.") (citations omitted); *Whisnant v. United States ("Whisnant"),* 400 F.3d 1177,

18    1181 (9th Cir. 2005) ("It is the government's burden to demonstrate the applicability

19    of the discretionary function.").

20    What is more, "a jurisdictional finding of genuinely disputed facts is

21    inappropriate whenever 'the jurisdictional issue and substantive issues are so

22    intertwined that the question of jurisdiction is dependent on the resolution of factual

23    issues going to the merits' of an action.'" *Sun Valley Gasoline, Inc. v. Ernst

24    Enterprises, Inc*. ("*Sun Valley*"), 711 F.2d 138, 139 (9th Cir. 1983) (quoting

25    *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 602 (9th Cir. 1976)); see

26    also *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("If the jurisdictional

27    issue and substantive claims are so intertwined that resolution of the jurisdictional

28    question is dependent on factual issues going to the merits, the district court should

PLAINTIFFS' OPP. TO MOTION TO DISMISS                                    2:21-cv-07605-PA (MRWx)

1    employ the standard applicable to a motion for summary judgment and grant the motion

2    to dismiss for lack of jurisdiction **only** if the material jurisdictional facts are not in

3    dispute and the moving party is entitled to prevail as a matter of law" (emphasis

4    added)). As the Supreme Court explained in *Jerome B. Grubart v. Great Lakes Dredge*

5    *& Dock Co*., 513 U.S. 527 (1995), the assumption "that the truth of jurisdictional

6    allegations must always be determined with finality at the threshold of litigation" under

7    Rule 12(b)(1) "is erroneous." *Id.* at 537. Ordinary "practice permits a party to establish

8    jurisdiction at the outset of a case by means of a nonfrivolous assertion of jurisdictional

9    elements, and any litigation of a contested subject-matter jurisdictional fact issue

10   occurs in comparatively summary procedure before a judge alone (as distinct from

11   litigation of the same fact issue as an element of the cause of action, if the claim

12   survives the jurisdictional objection)." *Id.* at 537-538 (citations omitted).

13          "Normally, the question of jurisdiction and the merits of an action will be

14   considered intertwined where, as here, 'a statute provides the basis for both the subject

15   matter jurisdiction of the federal court and the plaintiff's substantive claim for relief.'"

16   *Sun Valley*, 711 F.2d at 139-140 (quoting *Timberlane*, 549 F.2d at 602). The SIAA

17   provides both the substantive basis for the *Conception* families' claims **and** the

18   "jurisdictional hook" on which those claims hang. See *Trautman v. Buck Steber, Inc.*,

19   693 F.2d 440, 443 (5th Cir. 1982). Another admiralty court encountered the same

20   situation in *Compagnie Maritime Marfret v. United States, supra,* where the

21   Government brought a Rule 12(b)(1) motion that invoked the discretionary function

22   exception as grounds for abrogating subject matter jurisdiction over a SIAA claim in

23   which the owners of a grounded vessel alleged "the grounding was due to the failure

24   of the United States to: (1) properly position and maintain the aids to navigation that

25   marked the entrance to the San Juan Harbor; (2) adequately warn mariners about

26   inaccuracies in the position of these aids to navigation in the Bar Channel; and (3)

27   properly notify mariners of the changes in the configuration of San Juan Harbor's Bar

28

PLAINTIFFS' OPP. TO MOTION TO DISMISS                                2:21-cv-07605-PA (MRWx)

**ER 158**

1  Channel." 532 F.Supp.2d at 371-372. As that court explained when it applied the

2  summary judgment standard to the motion before it:

> 3  When a motion to dismiss for lack of subject matter jurisdiction under
>
> 4  Fed. R. Civ. P. 12(b)(1) involves factual questions, the court must
>
> 5  engage in a two-part inquiry. *Torres-Negron,* 504 F.3d at 162. First, the
>
> 6  court must determine whether the relevant facts, which would
>
> 7  determine the court's jurisdiction, also implicate elements of the
>
> 8  plaintiff's cause of action. *Id.* at 163 (citing *Garcia v. Copenhaver, Bell*
>
> 9  *& Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997)). Where the court finds
>
> 10  that 'the jurisdictional issue and substantive claims are so intertwined
>
> 11  the resolution of the jurisdictional question is dependent on factual
>
> 12  issues going to the merits, the district court should employ the standard
>
> 13  applicable to a motion for summary judgment.' *Torres-Negron*, 504
>
> 14  F.3d at 162 (citing *Autery v. United States*, 424 F.3d 944, 956 (9th
>
> 15  Cir.2005)). In this situation, the trial court should grant the motion to
>
> 16  dismiss only if the material jurisdictional facts are not in dispute and
>
> 17  the moving party is entitled to prevail as a matter of law. *Torres-*
>
> 18  *Negron*, 504 F.3d at 162 (internal citations omitted). Therefore, 'if the
>
> 19  plaintiff presents sufficient evidence to create a genuine dispute of
>
> 20  material (jurisdictional) facts, then the case proceeds to trial, so that the
>
> 21  factfinder can determine the facts, and the jurisdictional dispute will be
>
> 22  reevaluated at that point.' *Id.*

23  *Id.* at 373; see also *Capt. Chance,* 506 F.Supp.2d at 1200, n. 3 ("In addressing a

24  challenge to subject matter jurisdiction, a court may rely on Rule 12(b)(1) only 'if the

25  facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of

26  action.'") (quoting *Morrison v. Amway Corp*., 323 F.3d 920, 925 (11th Cir. 2003). As

27  the *Compagnie Maritime Marfret* court summed up:

28

PLAINTIFFS' OPP. TO MOTION TO DISMISS                 2:21-cv-07605-PA (MRWx)

1
2
3
4
5
6
7

> [T]his case involves the determination of whether the relevant statutes, regulations, and internal guidelines provide the United States with discretion to act or not to act, rendering it, thus, immune from suit in accordance with the tenets of the discretionary function exception. Persuaded by the analysis employed by other courts, we hold that the United States' request for dismissal shall be reviewed under the summary judgment standard.

8   532 F.Supp.2d at 374.[12]

9       Here, the Government's motion also calls for a determination of whether the
10  relevant statutes, regulations, and internal guidelines leave the United States with
11  discretion to act or not to act under the tenets of the discretionary function exception.
12  The Court should therefore review the Motion at bar under the summary judgment
13  standard. Indeed, this Court ordered Government "to file a motion for summary
14  judgment." (ECF 70.) Because the Government did not file a motion for summary
15  judgment and instead seeks dismissal under Rule 12(b)(1), the motion is procedurally
16  and substantively flawed.

17  ### IV.   THE DISPUTED MATERIAL FACTS

18      During the pre-dawn hours of September 2, 2019, a fast-moving fire broke out
19  on the vessel *Conception* while she was anchored off the northern coast of Santa Cruz
20  Island. (Material Fact Statement No. ("MSF") 1.)[13] She had 33 passengers and 6 crew
21  members on board. (MSF 2.) That fire swept through the vessel and burned her to the
22  waterline, killing all 33 passengers and 1 crew member and seriously injuring a second
23  crew member. (MSF 3.)

24

25  [12]    Although the court in *Compagnie Maritime Marfret* ultimately granted the
26  motion to dismiss, it did so because decisions as to where to place buoys in a harbor, on which plaintiff based its claim, were grounded in the exercise of discretionary decisions and did not invoke any mandatory act required by a regulation, as is true
27  in the present case.
    [13]    References to the Material Fact Statement are to the separate Statement of
28  Material Facts in Dispute that Plaintiffs' have filed concurrently.

9

1    *Conception* (O.V. 638133) was built of wood and fiberglass and was launched

2    in 1981. (MSF 70.) She was 75 feet long, *id.*, measured 97 gross tons, *id.*, and was

3    licensed by the United States Coast Guard, under 46 CFR, Chapter I, Subchapter T (the

4    so-called "T Regs"), to carry up to 99 passengers on coastwise voyages. (*Id.*)

5    *Conception* was based in Santa Barbara. (*Id.*) Her owner, Truth Aquatics, Inc., operated

6    *Conception* and her two sisterships, *M/V Vision* and *M/Truth,* as "small passenger

7    vessels" within the meaning of 46 C.F.R. § 175.110(a) and 46 U.S.C. § 2101(47).

8    (MSF 2 and 17.) Like her two sisters, *Conception* had three decks: a sun deck atop the

9    house (where the bridge and crew sleeping accommodations where situated); a main

10   deck (where the salon and galley where housed); and a below-deck, bunk room deep

11   in the hull (where all the passengers were berthed).  (MSF 4.)

12       When the Department of Justice prosecuted *Conception's* captain, Jerry Boylan,

13   under 18 U.S.C. § 1118, witnesses from the Bureau of Alcohol, Tobacco, and Firearms

14   ("ATF") testified at the trial that the fire had started in a "Rubbermaid plastic trash can"

15   that was customarily stowed on *Conception's* main deck, just aft of the salon, beneath

16   a wooden ladder leading up to the sun deck. (MSF 6 and 11.) According to 45 C.F.R.

17   § 177.405(f), "waste receptacles" aboard small passenger vessels like *Conception*

18   "must be constructed of noncombustible materials with no openings in the sides or

19   bottom." The Government admits that the plastic trash can identified by Boylan's

20   prosecutors was combustible. (MSF 16.) *Conception's* after deck, salon, and galley

21   were outfitted with several combustible trash cans. (MSF 18.) The trash can Boylan's

22   prosecutors targeted as the source of the *Conception* fire had likely been on board the

23   vessel since 2016. (MSF 12.) *Conception's* salon and galley were also outfitted with

24   between 15 and 25 plastic garden chairs manufactured by the Grosfillex Company.

25   (MSF 20.) Those chairs were also obvious fire hazards and had been sitting in

26   *Conception's* salon and galley since 2008. (*Id.*)

27       It is hard to understand how MSD Santa Barbara could repeatedly certify that

28   vessel as fit for service in the face of those obvious hazards. (MSF 18 and 21.) It is

1    harder still to grasp how the Government hopes to sweep all those careless
2    certifications under the discretionary function rug.

3        A small passenger vessel like *Conception "*may not be operated without having
4    on board a valid U.S. Coast Guard Certificate of Inspection." 46 C.F.R. 176.100(a).
5    The Certificate of Inspection ("COI") *Conception* carried on September 2, 2019, had
6    been in place since November 19, 2014, and was due to expire on November 19, 2019.
7    (MSF 70); see also *Defense Exhibit F.* (ECF 88.8).) To keep that COI valid, the Coast
8    Guard had to conduct "an annual inspection" of *Conception* and all her furnishings
9    "within the 3 months before or after each anniversary date" of her original certification,
10   46 C.F.R. § 176.500(b), and "a drydock and internal structural examination" every five
11   years. 46 C.F.R. § 176.600(c). If an OCMI detected a problem during such an
12   inspection, he or she had to fill out a "CG-835 Deficiency Form" for the Coast Guard's
13   "Marine Information for Safety and Law Enforcement" ("MISLE") database, 46 C.F.R.
14   § 176.500(b)(1)(iii), direct the owner to correct the problem, *id.*, and perform a follow-
15   up "inspection more detailed in scope to ensure that the vessel [was] in satisfactory
16   condition and fit for the service" before she could sail again.   46 C.F.R. §
17   176.500(b)(1)(ii).  (See also MSF 44, 45, and 46.) The OCMIs must also document the
18   discovery and correction of such deficiencies in a "MISLE Activity Summary Report."
19   (See e.g. MSF 22, 42-47.)

20       Between the issuance of the *Conception's* last COI on November 19, 2014, and
21   the tragic fire on September 2, 2019, OCMIs from MSD Santa Barbara inspected
22   *Conception* no fewer than 7 times.  (MSF 21 and 22.) Those OCMIs could not have
23   visited, much less inspected the vessel's sun deck, main deck, salon, galley, or
24   bunkroom, without spotting the various Rubbermaid trash cans and multiple Grosfillex
25   garden chairs. (MSF 18-20, 24-26.) Those combustible furnishings sat in their assigned
26   places aboard *Conception* throughout her final five years, *id.*, and as evidenced by the
27   digital images attached as Hillsman Decl., Exhibits 22 and 23, they were impossible to
28   miss. Plaintiffs are therefore entitled to the inference that the hazards posed by those

---

combustible furnishings were obvious to any OCMI who boarded the vessel. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The undisputed evidence nonetheless shows that no one from the Coast Guard ever submitted a CG-835 or a MISLE Report calling for the removal of those hazards. (MSF 22, 25, and 26.) That is why the plastic trash can which the Government contends sparked this blaze was still aboard *Conception* on the night of the fire, and that is why the plastic garden chairs which helped spread the blaze so lethally still filled her salon.

*Conception* was also freighted with electrical problems. According to 46 C.F.R. § 176.806(a), at "each initial and subsequent inspection for certification of a vessel," OCMI's must examine "all cable as far as practicable without undue disturbance of the cable or electrical apparatus." 46 C.F.R. 176.806(a). According to 46 C.F.R. § 183.340(b)(1): "All cable and wire must [h]ave stranded copper conductors with sufficient current carrying capacity for the circuit in which they are used." According to 46 C.F.R. § 183.340(d)(2), all "[c]able and wire for power and lighting circuits" must be "listed by Underwriters Laboratories (UL), as UL Boat or UL Marine cable."

As Cmdr. Hodgson affirmed, "one of the obligations of a marine inspector is that he or she must review the MISLE database and review previous inspections to get a sense of the vessel's operational history." (Hillsman Decl., Exhibit 6 [Hodgson Trans.] at 217:25-218:5; MSF 14.) That obligation enables OCMIs "to get a sense of [the vessel's] history and operations, but [also] to get a sense of what kinds of deficiencies have shown up in the past." (*Id.* at 218: 6-10; MSF 14.) To repeat the key point, the catchall mandate in § 176.830(a) dictates that if an OCMI observes a deficiency that poses a "hazardous situation," that hazard "must be corrected" for the vessel's COI to remain valid and for the vessel to be permitted to sail.

Anyone who reviewed *Conception's* MISLE database would have discovered a long and alarming history of electrical deficiencies. An OCMI from MSD Santa Barbara sounded an early alarm on August 25, 2000, when he filed a Deficiency Form

warning that *Conception's* builder had equipped her with non-stranded wiring in violation of 46 C.F.R. § 183.340(b)(1). (MSF 27, 28, and 29.) Truth Aquatics promptly requested a waiver of § 183.340(b)(1), but the Coast Guard refused to grant it. (MSF 30.) It is not clear whether MDS Santa Barbara ever conducted a "more detailed inspection" to ensure that the vessel was "in satisfactory condition" before clearing that deficiency in March of 2002. (MSF 31.) What *is* clear is that when Plaintiffs' experts inspected *Conception's* burned-out hulk in the yard at Port Hueneme, they discovered shoddy wiring and non-marine cable of the very type described in that August 25, 2000, Deficiency Form. (Id.)

The Coast Guard plainly failed to root out *Conception's* built-in wiring deficiencies. When OCMIs from MSD Santa Barbara took an urgent look at *Conception's* sistership, *M/V Vision*, immediately after the fire, they discovered no less than 19 such deficiencies. (MSF 33.) By then, of course, it was too late for the people who died aboard *Conception*. MISLE Activity Summary Reports reveal that MSD Santa Barabara failed to conduct **any** examination of *Conception's* wiring during the annual inspections they conducted on March 19, 2004, January 26, 2011, September 24, 2013, February 4, 2015, and most importantly February 13, 2019 -- when the Coast Guard last certified that doomed vessel as safe to sail. (MSF 35.) Those omissions were blackletter violations of the mandatory duties spelled out in 46 C.F.R. § 176.806(a). (MSF 36, 38, and 39.)

The last OCMI to inspect *Conception* was Chief Warrant Officer Daniel Hagar. (MSF 26.) Hagar not only failed to inspect *Conception*'s wiring on his last visit to the vessel, (MSF 39)*,* he also failed to clear an "outstanding deficiency" that Chief Warrant Officer William DeCamp had written up on July 20, 2011. (MSF 48-52.) Chief DeCamp had discovered deficient "welding cable" in *Conception's* 24-volt system and had instructed *Conception's* owner, Glen Fritzler, to replace it with the "UL marine cable" required by 46 C.F.R. § 183.340(d)(2). But there is nothing in the MISLE database to suggest that DeCamp, Hagar, or anyone else ever cleared the July 20, 2011,

13

deficiency properly. DeCamp purported to clear it on January 24, 2013, when he reported *Conception's* electrical system "satisfactory." (MSF 49.) But following an administrative review on September 24, 2013, Hagar's report was corrected to "reflect that there had been ***no*** inspection of *Conception's* electrical system on January 24, 2013." (MSF 52.) Nor did Hagar inspect the electrical system on February 13, 2019, when he declared *Conception* "fit for service" for the very last time. (MSF 39.) Between her combustible furnishings and her shoddy electrical system, the *Conception* was a disaster waiting to happen.

## V. <u>ARGUMENT</u>

### 1. THE GOVERNMENT'S MOTION MAY BE DENIED ON PROCEDURAL GROUNDS ALONE

#### A.    THE GOVERNMENT DID NOT COMPLY WITH LOCAL RULE 56.1

Although the Government has brought their threshold jurisdictional challenge as a motion under Rule 12(b)(1), this Court ordered them "to file a motion for summary judgment to determine whether the discretionary function exception to the Federal Tort Claims Act shields the United States from liability." (ECF 70.) According to L.R. 56-1:

> A party filing a notice of motion for summary judgment or partial summary judgment must file a separate "Statement of Uncontroverted Facts." This Statement must set forth the material facts as to which the moving party contends there is no genuine dispute. Each such fact must be numbered and must be supported by pinpoint citations (including page and line numbers, if available) to evidence in the record.

The Government failed to comply with that Rule. That failure constitutes sufficient grounds by itself for denying the Government's Motion.

> 'When a moving party fails to comply with Local Rule 56.1 the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

14

1    We may deny or dismiss a motion for summary judgment for failure to

2    comply with Local Rule 56.1.

3    *Vought v. Brighton,* 2024 U.S. Dist. LEXIS 59006, **2-3 (M.D. Penn. 2024)

4    (internal quotation marks and citation omitted).

5    **B.    THE COURT SHOULD ALSO DENY THE MOTION UNDER FED. R. CIV.**

6    **P. 56(d), BECAUSE PLAINTIFFS HAVE NOT BEEN AFFORDED FULL**

7    **ACCESS TO EVIDENCE AND THUS HAVE BEEN HAMPERED IN THEIR**

8    **ABILITY TO OFFER ALL EVIDENCE ESSENTIAL TO THEIR**

9    **OPPOSITION.**

10    "If a nonmovant shows by affidavit or declaration that, for specified reasons, it

11    cannot present facts essential to justify its opposition" to a motion for summary

12    judgment, "the court may defer considering the motion or deny it." Fed. R. Civ. P.

13    56(d)(1); see also *Program Engineering, Inc. v. Triangle Publications, Inc.*, 634 F.2d

14    1188, 1193 (9th Cir. 1980). The purpose of Rule 56(d) "is to prevent 'railroading' the

15    non-moving party through a premature motion for summary judgment before the non-

16    moving party has had the opportunity to make full discovery." *U.S. ex rel. Fisher v.*

17    *Network Software Associates*, 227 F.R.D. 4, 9 (D. D.C. 2005) (partial citation omitted)

18    (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).) The accompanying

19    affidavit of Plaintiffs' counsel shows that additional facts essential to justify opposition

20    to the Government's motion may exist but cannot currently be presented to the Court.

21    (Hillsman Decl., ¶¶ 2-3.)

22    For starters, the Government has not yet granted Plaintiffs access to all the

23    evidence the ATF relied on or any of the exhibits, reports and appendices it attached to

24    its Final Report ("underlying materials"). (Hillsman Decl., ¶¶ 2-3, 7.) The Department

25    of Justice refuses to release any of those materials until the Ninth Circuit has decided

26    the appeal Boylan is expected to take from his criminal conviction. (*Id.,* ¶¶ 7-8.)

27    Among other things, they include the results of the numerous intermediate- and full-

28    scale reproductions the ATF staged to test its "varying hypotheses regarding the area

---

15

PLAINTIFFS' OPP. TO MOTION TO DISMISS                    2:21-cv-07605-PA (MRWx)

1    of origin for the fire." (*Id.,* ¶ 6.) Since the jurisdictional issue raised by the
2    Government's discretionary function arguments and the merits of the Plaintiffs' claims
3    "are so intertwined that resolution of the jurisdictional question is dependent on factual
4    issues going to the merits," see *Rosales*, 824 F.2d at 803, and since Plaintiffs cannot
5    prevail on the merits without establishing a causal link between the Government's
6    alleged violation of a mandatory duty and the fire in which *Conception's* victims
7    perished, see e.g. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1031-
8    1032 (9th Cir. 1989), Plaintiffs should not face summary dismissal until they have been
9    given access to all the fire-origin information the ATF compiled. Indeed, since
10   Plaintiffs maintain the fire was either precipitated or accelerated by the "thermal
11   runaway" of lithium-ion batteries recharging in the after starboard quarter of the salon,
12   (ECF 1 [Complaint] at 33:1-38), the Government may itself have an interest in
13   deferring judgment on Plaintiffs' SIAA claims.

14        Plaintiffs and their attorneys have been diligently and persistently pursuing the
15   information the Government has sequestered. They even asked this Court to compel
16   the Government to produce that evidence under *United States ex rel. Touhy v. Ragen*,
17   340 U.S. 462, 468 (1951). (MSF 71.) While in January and February of 2034, the
18   Government provided Plaintiffs with an opportunity to inspect and photograph various
19   electronic items recovered from the wreck, the Government still refuses to produce all
20   the fire-origin information complied by the ATF. (Hillsman Decl., ¶ 10.) The Court
21   should not decide this case on a summary motion until Your Honor and all parties have
22   had a full and fair opportunity to weigh that evidence.

23        What is more, after the fire, FBI investigators discovered a hole in the piping of
24   *Conception's* firefighting system. (MSF 60-62.) How and when did that hole develop?
25   Should OCMI's have discovered and written it up? Since a firefighting system is
26   clearly a "protective device" within the meaning of 46 C.F.R. § 176.830(a), the
27   regulations required OCMIs from MSD Santa Barbara to ensure that the system's
28   piping was "in satisfactory condition" at "each inspection for certification and at every

---

16

other vessel inspection." Plaintiffs have thus far been allowed only limited discovery, (ECF 70), and should not be required to oppose the instant Motion until the parties have the evidence necessary to resolve the issues posed by the hole the FBI discovered in that fire main.

The Court thus has ample grounds for denying this Motion under Rule 56(d).

## 2. THE GOVERNMENT'S MOTION SHOULD ALSO BE DENIED ON SUBSTANTIVE GROUNDS

### A. AS THE PARTY SEEKING SUMMARY DISMISSAL, THE GOVERNMENT MUST "SATISFY A DEMANDING STANDARD"

Summary judgment is "a drastic remedy and must be exercised with extreme care[.]" *Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990). The dispositive question is always "whether the evidence presents a sufficient disagreement to require [a trial on the merits] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252. As the moving party, the Government has both "an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).

Where, as here, a defendant seeks summary judgment 'on an affirmative defense on which it will bear the ultimate burden of proof at trial,' the defendant must satisfy a demanding standard. *Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461 (6th Cir. 2014). Under these circumstances, summary judgment is proper 'only if the record shows that the defendant established the defense so clearly that no rational jury could have found to the contrary.' *Id.* (internal quotations omitted) (quoting *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006)); see *Speedeon Data, LLC v. Integrated Direct Mktg., LLC*, 718 F. App'x 333, 337 (6th Cir. 2017) (explaining that affirmative defenses

---

**ER 168**

1    may be resolved at summary judgment, but that 'the defendant has the

2    burden to show that it is entitled to the defense').

3

4    *Cline v. Dart Transit Co.*, 2023 U.S. App. LEXIS 9521, **10-11 (6th Cir. 2023). If a

5    moving defendant carries its initial burden of production, nonmoving parties like the

6    instant Plaintiffs, must produce evidence from which a trier of fact could reasonably

7    infer that they have a *prima facie* claim. *Nissan Fire & Marine Ins. Co. v. Fritz Cos*.,

8    210 F.3d 1099, 1102 (9th Cir. 2000). When reviewing such evidence, "a district court

9    cannot resolve disputed questions of material fact; rather, that court must view all of

10   the facts in the record in the light most favorable to the non-moving party and rule, as

11   a matter of law, based on those facts." *Albino v. Baca*, 747 F.3d 1162, 1173 (9th Cir.

12   2014). And "if a moving party fails to carry its initial burden of production, the

13   nonmoving party has no obligation to produce anything," especially where, as in this

14   instance, the moving party would have had the ultimate burden of persuasion at trial.

15   *Nissan,* 210 F.3d at 1102.  That is the situation here.

16   **B.    THE GOVERNMENT DID NOT AND CANNOT SATISFY THAT DEMANDING**

17   **STANDARD**

18   **i.    TO OBTAIN SUMMARY JUDGMENT IN ITS FAVOR UNDER THE**

19   **DISCRETIONARY FUNCTION DEFENSE, THE GOVERNMENT MUST**

20   **ESTABLISH, AS A MATTER OF LAW, BOTH THAT THE OFFICIAL**

21   **CONDUCT IT IS TRYING TO SHIELD WAS DISCRETIONARY AND THAT IT**

22   **INVOLVED A SOCIAL, ECONOMIC, OR POLITICAL DECISION**

23   The discretionary function exception is "a qualification" to the waiver of

24   sovereign immunity.  *Earles v. United States*, 935 F.2d 1028, 1030 (9th Cir. 1991). It

25   exempts the Government from tort liability for "the exercise or performance or the

26   failure to exercise or perform a discretionary function or duty on the part of a federal

27   agency or an employee of the Government, whether or not the discretion involved be

28   abused." 28 U.S.C.S. § 2680(a). While that exception was codified as a "clarifying

amendment" to the FTCA, *Dalehite v. United States*, 346 U.S. 15, 26 (1953), the Ninth Circuit has held that it "applies to the SIAA as well[.]" *Earles*, 935 F.2d at 1031-1032.

The Supreme Court handed down a two-part test for determining the applicability of § 2680(a) in *United States v. Gaubert*, 499 U.S. 315, 322-325 (1991) and *Berkovitz v. United States*, 486 U.S. 531, 536-537 (1988):

> Courts are to ask first whether the challenged action was a discretionary one – i.e., whether it was governed by a mandatory statute, policy, or regulation. If the action is not discretionary, it cannot be shielded under the discretionary function exception.  Second, courts ask whether the challenged action is of the type Congress meant to protect – i.e., whether the action involves a decision susceptible to social, economic, or political policy analysis. *O'Toole v. United States*, 295 F.3d 1029, 1033-1034 (9th Cir. 2002) (summarizing *Gaubert/Berkovitz* test).

*Whisnant*, 400 F.3d at 1180-1181.

As noted above: "The burden of proving the applicability of the discretionary function exception" under that two-part test "is on the United States." *Bear Medicine*, 241 F.3d at 1213 (citing *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992)). To bear that burden, the Government must show that: 1) Its agent's action was not mandatory but "involve[d] an element of judgment" and; 2) the judgment was "of the kind that the discretionary function exception was designed to protect," to wit, a decision "based on considerations of public policy." *Gaubert*, 499 U.S. at 323. Congress adopted the discretionary function exception "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S. A. Empresa De Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 814 (1984). It is thus "'the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *Gaubert*, 499 U.S. at 322 (quoting *Varig Airlines*, 467 U.S. at 813).

---

19

1       A review of the Ninth Circuit case law applying those principles reveals two

2  important trends:

3       First, a dominant theme in our case law is the need to distinguish

4       between design and implementation: we have generally held that the

5       design of a course of governmental action is shielded by the

6       discretionary function exception, whereas the implementation of that

7       course of action is not. Second, and relatedly, matters of scientific and

8       professional judgment – particularly judgments concerning safety – are

9       rarely considered to be susceptible to social, economic, or political

10      policy.

11  *Whisnant*, 400 F.3d at 1181.  Both themes are inimical to the Government's Motion.

12       **ii.**    **THE GOVERNMENT DID NOT AND CANNOT ESTABLISH AS A MATTER**

13               **OF LAW THAT THE CONDUCT IT IS TRYING TO SHIELD WAS INDEED**

14               **DISCRETIONARY**

15            **a.**    **WHILE THE DESIGN OF A COURSE OF GOVERNMENTAL**

16                   **ACTION MAY BE A POLICY CHOICE SHIELDED BY THE**

17                   **DISCRETIONARY FUNCTION EXCEPTION, THE FAILURE TO**

18                   **FOLLOW POLICY CHOICES ALREADY MADE IS NOT**

19       It is well settled that a remedial statute like the FTCA or SIAA "should be

20  construed liberally, and its exceptions should be read narrowly." *O'Toole*, 295 F.3d at

21  1037 (citing *Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir. 1976)). It follows

22  "that not all types of judgment are protected by the discretionary function exception."

23  *Ayala v. United States*, 980 F.2d 1342, 1348 (10th Cir. 1992). Most importantly for our

24  case: "The decision to adopt safety precautions may be based in policy considerations,

25  but the implementation of those precautions is not." *Bear Medicine*, 241 F.3d at 1215;

26  see also *Soldano v. United States,* 453 F.3d 1140, 1148 (9th Cir. 2006) ("'We have

27  generally held that the ***design*** of a course of governmental action is shielded by the

28  discretionary function exception, whereas the implementation of that course of action

---

20

1   is not.'") (quoting *Whisnant*, 400 F.3d at 1181) (original emphasis).  It follows that "'a

2   failure to effectuate policy choices already made' will not be protected under the

3   discretionary function exception." *Bear Medicine*, 241 F.3d at 1215 (quoting *Camozzi*

4   *v. Roland/Miller and Hope Consulting Group,* 866 F.2d 287, 290 (9th Cir. 1989).

5               b.    **THE OCMIS FROM MSD SANTA BARBARA FAILED TO**

6                     **FOLLOW POLICY CHOICES ALREADY MADE WHEN THEY**

7                     **VIOLATED THE MANDATORY DUTIES SPELLED OUT IN THE T-**

8                     **REGS.**

9        In determining whether the discretionary function exception applies, courts

10  "must 'consider whether the action is a matter of choice for the acting government

11  employee.'" *Bear Medicine*, 241 F.3d at 1213 (quoting *Berkovitz*, 486 U.S. at 536)

12  (brackets omitted). "The requirement of judgment or choice is not satisfied if a 'federal

13  statute, regulation, or policy specifically prescribes a course of action for an employee

14  to follow,' because 'the employee has no rightful option but to adhere to the directive.'"

15  *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). In other words: "An

16  action specifically prescribed by a 'federal statute, regulation, or policy' is not within

17  an agent's discretion and therefore not subject to the exception." *Bear Medicine*, 241

18  F.3d at 1213 (quoting *Gaubert*, 499 U.S. at 324-325); see also *Baker v. United States*,

19  817 F.2d 560, 566 (9th Cir. 1987) (discretionary function exception does not insulate

20  the government from liability for "a negligent failure to obey a mandatory regulatory

21  command"); *Collins v. United States*, 783 F.2d 1225, 1231 (5th Cir. 1986) ("To the

22  extent than an employee refuses to carry out a mandatory statute or regulation, one

23  which leaves him no discretion in the manner or extent to which it will be enforced, the

24  employee is simply disobeying a flat command"); *Griffin v. United States*, 500 F.2d

25  1059, 1068 (3d Cir. 1974) ("no discretion was conferred to disregard [a] mandatory

26  regulatory command"); *Markes v. United States*, 704 F. Supp. 337, 339 (N.D. N.Y.

27  1988) ("The discretionary function exception does not apply where mandatory agency

28  guidelines or regulations are violated by federal employees"); *Barnson v. United States*,

1    630 F.Supp. 418, 422 (D. Utah 1985) ("The discretionary function exception does not

2    immunize failure to comply with a mandatory duty.").

3          According to the Government, Plaintiffs are challenging "the Coast Guard's

4    inspection and certification policies in their totality." (ECF No. 88-1 at 28:14-15.)

5    As we explain below, the Government fashioned that argument in hopes of bringing

6    this case under the rule handed down by *Varig Airlines*. But far from challenging a

7    federal agency's inspection and certification policies in their totality, we are

8    challenging only Chief Warrant Officer Hagar's and his fellow OCMIs' failure to

9    comply with mandates spelled out by regulations that reflect policy choices that were

10    already made.

11          As the individual designated by the Government to testify on its behalf as to

12    the "the day-to-day application of Subchapter T," Cmdr. Hodgson explained that 46

13    C.F.R. § 176.830(a) placed Hagar and his fellow OCMIs "under a mandatory duty

14    to identify, write up, and rectify all observed unsafe practices, fire hazards, and other

15    hazardous situations" aboard *Conception,* (MSF 14), "at each inspection for

16    certification and at every other vessel inspection." (Hillsman Decl., Exhibit 6

17    [Hodgson Trans.] at 29:20-30:23 and 230:7-24.) Cmdr. Hodgson admitted that the

18    Rubbermaid trash can and the Grosfillex garden chairs were obvious fire hazards.

19    (MSF 16 and 19.) And when asked at his deposition about the garden chairs, OCMI

20    Hagar testified:

21          Q. Are you aware that plastic chairs are potentially a fire hazard on

22             vessels?

23          A. Yes. I think there is a regulation that speaks to – I think we are

24             talking about furnishings.

25    (MSF 25; see also Hillsman Decl., Exhibit 11 [Hagar Trans.] at 93:25-94:4.) The

26    failure to identify, write up, and rectify those combustible trash cans and garden

27    chairs during inspection after inspection after inspection is indefensible; it was a

28    violation of the Government's mandatory duty to insure the fire safety of a vessel

PLAINTIFFS' OPP. TO MOTION TO DISMISS          2:21-cv-07605-PA (MRWx)

1   that ultimately burned to the waterline – a fire that cause the deaths of 34 people.
2   (MSF 11, 20, 21, 22, and 26.)

3   "At each initial and subsequent inspection for certification of a vessel," the
4   directives in 46 CFR § 175.806(a) also placed Hagar and his fellow OCMIs under a
5   mandatory duty to inspect "all [electrical] cable as far as practicable." (MSF 36.)
6   Hagar affirmed that "inspecting the electrical system is required to be done by all
7   vessel inspectors conducting and annual inspection on a T-vessel." (Hillsman Decl.,
8   Exhibit 11 [Hagar Trans.] at 114:23-115:2; see also MSF 36.) But the MISLE
9   database shows, and Hagar admits, that he did not inspect *Conception's* electrical
10  system on February 13, 2019, when he last certified that doomed vessel as fit for
11  service. (MSF 38 and  39.) In fact, Hagar and his fellow OCMI's also failed to
12  inspect *Conception's* electrical system on March 19, 2004, January 26, 2011,
13  September 24, 2013, and February 4, 2015. (UMF 35.) That too was inexcusable.

14  "If deficiencies are found" during an annual inspection, 46 C.F.R. §
15  176.500(d)(ii) places the inspecting OCMI under a mandatory duty to "conduct an
16  inspection more detailed in scope to ensure that the vessel is in satisfactory condition
17  and fit for the service for which it is intended." (*Id.*) As Cmdr. Hodgdon admitted,
18  "a marine inspector does not have discretion to ignore that obligation[.]" (UMF 53.)
19  Chief Warrant Officer William De Camp violated that obligation on January 23,
20  2013, when he "cleared" the July 20, 2011, deficiency he had found in *Conception's*
21  24-volt system without re-inspecting her electrical system. (MSF 48-52.) The
22  discretionary function exception does not shield such derelictions.

       **iii.**   **NOR CAN THE GOVERNMENT ESTABLISH, AS A MATTER OF LAW,**
23
24                 **THAT THE MISJUDGMENTS ITS OCMIS MADE WERE BASED ON**
25                 **SOCIAL, ECONOMIC, OR POLITICAL POLICY.**

26  Closing its eyes to the mandatory duties spelled out the C.F.R.s, §§
27  176.500(d)(ii), 175.806(a), and 176.830(a), and still hoping to shoehorn our case
28  into the *Varig Airline* rule, the Government argues that "the question here is whether

1  the statutes, regulations, and policies that establish the maritime safety program

2  allowed Coast Guard inspectors to determine the scope of their inspections and

3  whether to issue *Conception* a certificate of inspection." (ECF No. 88-1 at 30:15-

4  19.) But to repeat the key point: "The decision to adopt safety precautions may be

5  based in policy considerations, but the implementation of those precautions is not."

6  *Bear Medicine*, 241 F.3d at 1215. It is well settled that the day-to-day judgments of

7  those charged with implementing precautions which have already been adopted "–

8  particularly judgments concerning safety – are rarely considered to be susceptible to

9  social, economic, or political policy." *Whisnant,* 400 F.3d at 1181. "The requirement

10  of judgment or choice is not satisfied if a 'federal statute, regulation, or policy

11  specifically prescribes a course of action for an employee to follow,' because 'the

12  employee has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S.

13  at 322 (quoting *Berkovitz*, 486 U.S. at 536).  That is the situation here.

14      **C.**    **THE GOVERNMENT'S COUNTERARGUMENTS ARE UNAVAILING**

15          **i.**    **THE DISTINCTION THE GOVERNMENT HOPES TO DRAW**

16                  **BETWEEN THE "OLD T REGS" AND THE "NEW T REGS" DOES**

17                  **NOT PROVIDE IT ANY REFUGE**

18      The Government hopes to excuse MSD Santa Barbara's derelictions by noting

19  that the Old-T Regs make "an allowance for 'existing vessels'" like *Conception,*

20  "with only limited exceptions where grandfathering is not allowed." (ECF 88-1 at

21  19:25-28.) But this case falls squarely within those exceptions. As the Government

22  tacitly concedes, the New-T Regs do not permit grandfathering "for electrical

23  standards." (*Id.* (citing 46 C.F.R. §§ 175.112 and 183.115(b)). What is more, 46

24  C.F.R. § 177.115(b) dictates that "when outfit items such as furnishings and

25  mattresses are renewed" aboard an older vessel like *Conception*, they "must comply

26  with" the New-T regs.

27      It cannot be reasonably disputed that the combustible Rubbermaid trash cans

28  and plastic Grosifillex garden chairs were "furnishings" within the meaning of §

---

24

1   177.115(b). (MSF 23.) If follows that Chief Hagar and his fellow OCMIs had a
2   mandatory duty under 46 C.F.R. 176.830(a) to write those trash cans and garden
3   chairs up as "obvious fire hazards" and order them off the vessel. (MSF 14, 16, and
4   19.) According to Boylan's prosecutors, the failure to do so was a precipitating cause
5   of this catastrophe. (MSF  11.)

6               ii.    THE AUTHORITIES ON WHICH THE GOVERNMENT RELIES ARE
7                      INAPPOSITE

8           Using the holding in *Varig Airlines* as its primary springboard, the
9   Government leaps to the conclusion that the discretionary function exception "bars
10  [the *Conception* families'] challenge to the Coast Guard's oversight role because
11  Congress did not intend to impose liability on the United States for the type of
12  regulatory enforcement activities at issue in this case." (ECF No. 88-1 at 14:11-14.)
13  But the regulatory enforcement activities at issue in *Varig Airlines* and the other
14  cases on which the Government relies[14] are very different from the ones at issue
15  here.

16          The plaintiffs in *Varig Airlines* challenged the entire "compliance review
17  process" that was spelled out "in handbooks and manuals developed by the [Civil
18  Aeronautics Agency] and [Federal Aviation Administration]."  467 U.S. at 805-806.
19  That process permitted those agencies to certify aircraft types based on a "spot
20  check" of the manufacturer's work. *Id.* at 817. The Supreme Court barred that
21  challenge under 28 U. S. C. § 2680(a) because the Federal Aviation Act, 49 U.S.C.

22  _____
23  [14]    See *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 513 (7th Cir.
        1995) ("the checklists did not prescribe a specific mandatory course of action for the
24      inspectors to follow"), *Foster Logging, Inc. v. United States,* 973 F.3d 1152, 1162
        (11th Cir. 2020) ("There was no mandatory statute, regulation, or policy controlling
25      the Park Service's process for inspecting and maintaining trees"), *Autery v. United
        States,* 992 F.2d 1523, 1528 (11th Cir. 1993) ("It is the governing administrative
26      policy, not the Park Service's knowledge of danger . . . that determines whether
        certain conduct is mandatory"), and *Lam v. United States,* 979 F.2d 665, 670 (9th
27      Cir. 2020) ("this case turns on the Corps' policies [which] are not mandatory and
        allow for discretion").
28

_____

PLAINTIFFS' OPP. TO MOTION TO DISMISS                              2:21-cv-07605-PA (MRWx)

§ 1421(a)(1), gave the Secretary of Transportation discretion "to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her 'judgment of the best course.'" *Varig Airlines,* 467 U.S. at 816 (quoting *Dalehite*, 346 U.S. at 34). The Secretary's adoption of the FAA's compliance review process thus involved "political, social, and economic judgments" of the very type the discretionary function exception was designed to protect. *Id.* at 820. Chief Hagar's and his fellow OCMIs' repeated failure to comply with the mandatory duties spelled out in 46 CFR §§ 176.500(d)(ii), 175.806(a), and 176.830(a) did not.

        **iii.**      **THE GOVERNMENT SHOULD NOT BE HEARD TO ARGUE THAT PLAINTIFFS' COMPLAINT DOES NOT SPECIFY ALL THEIR THEORIES OF RECOVERY**

The issues on summary judgment are generally "framed by the complaint." *Rodriguez v. Countrywide Homes*, 668 F. Supp. 2d 1239, 1246 (E.D. Cal. 2009) (citing *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292-1293 (9th Cir. 2000)). Under Fed. R. Civ. P. 8, however, the complaint "serve[s] the limited role of providing the opposing party with notice of the claim or defense to be litigated and 'mere technicalities' should not prevent cases from being decided on the merits." *Laface v. Eastern Suffolk BOCES*, 349 F. Supp. 3d 126, 163 (E.D. N.Y, 2018) (internal quotation marks, ellipses, and citations omitted). The Government may argue that Plaintiffs' complaint did not give the defense sufficient notice of Plaintiffs' theories. Not so. (See ECF No. 1 [Complaint] at 34:21-35:22.) But should the Court find otherwise, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. Rule 15(a)(2).

"[A]n action should not be dismissed for lack of jurisdiction without giving the plaintiff an opportunity to be heard unless it is clear the deficiency cannot be overcome by amendment." *Jones v. Community Redevelopment Agency,* 733 F.2d 646, 650 (9th Cir.1984).   As a consequence:

---

26

1  The Courts have shown a strong liberality . . . in allowing amendments under
2  Rule 15(a). Leave should be freely given to allow amendment for the purpose
3  of presenting the real issues of the case, where the moving party has not
4  exercised bad faith and is not acting to delay the disposition of the case, where
5  the opposing party would not be prejudiced, and when unnecessary delay will
6  not result if the motion to amend is granted. The clearest cases for leave to
7  amend are correction of an insufficient claim or defense and clarification of
8  previously alleged claims. Leave to amend should also be freely granted to
9  correct or clarify an insufficient statement of the jurisdictional basis of the
10  suit.

11  *Medoil Corp. v. Clark*, 753 F. Supp. 592, 596 (W.D. N.C. 1990) (internal quotation
12  marks and citations omitted).  No one in this case has acted in bad faith, discovery has
13  barely begun, the Government has not been "blindsided," and most importantly,
14  Plaintiffs will be severely prejudiced if their case is not decided on the merits. We
15  should therefore "be guided by the underlying purpose of Rule 15 – to facilitate
16  decision on the merits rather than on the pleadings or technicalities." *United States v.*
17  *Webb,* 655 F.2d 977, 979 (9th Cir. 1981).

18                               **VI.    CONCLUSION**

19         As the Fourth Circuit instructed in *Holloway v. Pagan River Dockside Seafood*,
20  669 F.3d 448 (4th Cir. 2012), where the defendant asked the court to dismiss a Jones
21  Act case under Rule 12(b)(1) on the "fact-intensive" ground that plaintiff was not a
22  "seaman":

23         [T]he Supreme Court has cautioned against 'drive-by jurisdictional
24         rulings,' *Steel Co.*, 523 U.S. at 91, that dismiss a claim '"for lack of
25         jurisdiction" when some threshold fact has not been established,
26         without explicitly considering whether the dismissal should be for lack
27         of subject matter jurisdiction or for failure to state a claim,' *Arbaugh v.*
28         *Y & H Corp.*, 546 U.S. 500, 511 (2006) (quoting *Da Silva v. Kinsho*

1   *Int'l Corp.*, 229 F.3d 358, 361 (2d Cir. 2000)).   Its admonition is
2   grounded in the principle that the subject matter jurisdiction of a federal
3   court is not generally resolved by concluding that the plaintiff has failed
4   to allege an element of a federal cause of action or that the plaintiff
5   might not be able to prove an element of a federal cause of action.
6   Rather, a court must look more fundamentally at whether the plaintiff's
7   claim is determined by application of a federal law over which
8   Congress has given the federal courts jurisdiction. If it is, his complaint
9   should not be dismissed for a lack of subject matter jurisdiction, as the
10  federal courts have been given the power and the authority to hear and
11  resolve such claims.

12  *Id.* at 452.

13      That is the situation here. The Government is asking this Court to abrogate subject
14  matter jurisdiction by concluding that the *Conception* families' SIAA claims might be
15  subject to the discretionary function exception. Since those claims will be determined
16  by application of a federal law over which Congress has given this Court jurisdiction,
17  this Court has the authority to hear and resolve them on the merits and should not
18  dismiss them in a "drive-by jurisdictional ruling." Where, as here, Plaintiffs have
19  presented sufficient evidence to create a genuine dispute of material fact concerning
20  the applicability of the discretionary function exception, their claims should proceed to
21  trial whence the Court can decide that dispute and evaluate the jurisdictional question
22  after a full and fair hearing on the merits. *Marfret,* 532 F.Supp.2d at 373.

23      For all of the reasons set forth above, and in Plaintiffs' supporting evidence
24  set forth in the Statement of Material Facts in Dispute and the supporting
25  declarations, deposition testimony and documentary evidence, Plaintiffs respectfully
26  request that the Court deny the motion to dismiss in its entirety.

27

28

Dated:  July 8, 2024,                              Respectfully Submitted,

NELSON & FRAENKEL LLP

MCGUINN, HILLSMAN & PALEFSKY

SALTZ MONGELUZZI & BENDESKY, P.C.


By ___//s// Gretchen M. Nelson_____

Gretchen M. Nelson

Attorneys for Plaintiffs


Additional Plaintiffs Counsel:


WALKUP MELODIA KELLY

SCHOENBERGER

PANISH SHEA BOYLE & RAVIPUDI LLP

FIORE ACHERMAN, A Law Corp.

SCHUERING ZIMMERMAN & DOYLE, LLP

KREINDLER & KREINDLER LLP

LAW OFFICE OF W. RUSSELL FIELDS

GALINE FRYE FITTING & FRANGOS

ARNOLD & ITKIN LLP

TODD M. ABBOTT, ESQ.

**Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed and on whose behalf the filing is submitted, concur in the content of the filing and have authorized the filing.

Dated:  July 8, 2024

By ___/s/ Gretchen M. Nelson_____

Gretchen M. Nelson

---

29

**ER 180**



1  GRETCHEN NELSON, ESQ. (S.B.N. 112566)
   (gnelson@nflawfirm.com)
2  CARLOS LLINAS NEGRET, ESQ. (S.B.N. 284746)
   (cllinas@nflawfirm.com)
3  NELSON & FRAENKEL LLP
4  601 South Figueroa Street, Suite 2050
   Los Angeles, CA 90017
5  Telephone: (213) 622-6469

6
   JOHN R. HILLSMAN (S.B.N. 71f220)
7  (jrhillsman@mhpsf.com)
   MCGUINN, HILLSMAN & PALEFSKY
8  535 Pacific Avenue
   San Francisco, CA 94 I 33
9  Telephone: ( 415) 421-9292

10
11 DOUGLAS DISANDRO, JR., ESQ.  (admitted pro hac vice)
   (ddisandro@smbb.com)
12 SALTZ MONGELUZZI & BENDESKY P.C.
   1650 Market Street
13 Philadelphia, PA 19103
   Telephone: (2I5) 496-8282
14

15 *Counsel for Plaintiffs (Additional Plaintiffs' counsel identified on signature page)*

16        IN THE SUPERIOR COURT FOR THE STATE OF CALIFORNIA

17                        COUNTY OF LOS ANGELES

18

19 NANCY FIEDLER, et al.,                    | **Case No. 2:21-cv-07065-PA-MRW**
                                             | Honorable Percy Anderson
20   Plaintiffs,                             | Courtroom 9A
21
22 vs.
23 UNITED STATES OF AMERICA                  | **DECLARATION OF JOHN
                                             | HILLSMAN IN SUPPORT OF
24   Defendant.                              | OPPOSITION TO UNITED
                                             | STATES' MOTION TO DISMISS
25                                           | PLAINTIFFS' FIRST AMENDED
                                             | COMPLAINT FOR LACK OF
26                                           | SUBJECT MATTER
                                             | JURISDICTION
27                                           | [Fed.R.Civ.P.12(b)(1)]**
28

                                    1
                 DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
                 OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 181**

I, JOHN R. HILLSMAN, declare as follows:

1.    I am an attorney at law admitted to practice by the State of California and before this Honorable Court. I am one of the attorneys of record for Plaintiffs Christine Dignam, Jasmine Lord, Vicki Moore, Yuka Otashi Merritt, and Vikram Singh and am co-lead counsel for all the Plaintiffs in this action.

2.    I respectfully submit this Declaration in Support of Opposition to United States' Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction on behalf of all Plaintiffs. I have personal knowledge of the matters stated herein and could and would competently so testify if called as a witness herein.

3.    I can affirm that facts essential to justify opposition to the Defendant United States of America's motion to dismiss exist but cannot currently be presented to the Court in that Plaintiffs have not been able to examine all the evidence bearing on the question of the cause and origin of the fire on board *Conception*, which is essential to determining the Coast Guard's mandatory duties in this case. Until Plaintiffs and their experts have been allowed to examine all the evidence and testing conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Plaintiffs cannot determine the following:

(A) the extent to which multiple combustible plastic trash cans and 15 to 25 plastic garden chairs caused or contributed to the fire, and, therefore, a basis for the Coast Guard's mandatory duties under the New T-Regulations to identify and rectify these fire hazards during inspections under 46 CFR 176.830;

(B) the extent to which non-marine grade wiring caused or contributed to the fire, and, therefore, a basis for the Coast Guard's mandatory duty under the Old-T and New-T Regulations (46 CFR Sections 176.500, 176.806, 183.200, and 183.340) to prohibit and rectify unsafe wirings despite the deficiency allegedly being cleared in 2002;

(C) the extent to which the shoddy electrical system caused or contributed to the fire, and, therefore, a basis for the Coast Guard's mandatory duty under 46 CFR

DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

1   section 176.806 to inspect, examine or test the electrical system between 2004
2   and February 2019, and ensure the safety deficiencies are rectified;
3   (D) the extent to which an electrical deficiency related to the use of a welding
4   cable caused or contributed to the fire, and, therefore, a basis for the Coast
5   Guard's mandatory duty under 46 CFR sections 176.806, 183.200, and 183.340
6   to inspect and rectify the welding cable deficiency; and
7   (E) the extent to which the fire pump and hoses caused or contributed to the fire,
8   based in part on the Federal Bureau of Investigation's post-accident photographs
9   showing a hole in the copper water main pipe of the fire suppression system,
10  and, therefore, a basis for the Coast Guard's mandatory duty to inspect the fire
11  hoses and fire system, and rectify any deficiencies.

12  4.    The ATF published an 875-page Report about the cause and origin of that
13  fire. In May 2021, Assistant United States Attorney Mark Williams ("AUSA
14  Williams"), released 197 pages of that 875-page Report to Plaintiffs and their attorneys
15  subject to the terms of a strict Non-Disclosure Agreement ("NDA"). The 197 pages
16  released are the ATF's Report of Investigation, titled "Origin and Cause Report" ("ATF
17  Report").

18  5.    Plaintiffs have not yet been given access to all the evidence relied on by
19  the ATF (e.g., countless items collected by the FBI, ATF and other agencies referenced
20  in the ATF Report) and all the data, exhibits, reports and appendices attached to and/or
21  referenced in the ATF Report (referred to herein as "underlying materials").

22  6.    I am informed and believe that those as-yet unreleased materials include
23  Fire Research Lab ("FRL") intermediate scale testing conducted "to aid in determining
24  the origin of the fire" and FRL full-scale testing "to assist the investigators in testing
25  varying hypotheses regarding the area of origin for the fire."

26  7.    Many of the underlying materials appear to have been by the Government
27  as Prosecution Exhibits on the Government's Exhibits List for trial in the seaman's
28  manslaughter trial brought by the United States against the *Conception's* Captain, Jerry

3

DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

**ER 183**

1  Nehl Boylan, U.S.D.C., C.D. Cal. Case No. CR 22-482-GW (filed under seal in with
2  the Declaration of Gretchen Nelson, Docket No. 50-1, in Case 2:23-cv-00985 PA-
3  MRW, which was pending before this Court.) The ATF Origin and Cause Report, for
4  example, is listed as Exhibit No. 312 in Section 7 ("Origin and Cause Analysis"). Those
5  underlying materials were relevant to the manslaughter case against Captain Boylan,
6  and are likewise relevant to Plaintiffs' case as to the origin and cause of the fire. Since
7  Captain Boylan apparently had access to evidence and underlying materials in order to
8  defend himself in the manslaughter case, so too should Plaintiffs be given access to
9  them so they can prosecute their action against the Coast Guard.

10        8.    Some of the underlying materials listed as Prosecution Exhibits in the
11  seaman's manslaughter case against Capt. Boylan include:

| 314 | ATF Fire Research Laboratory Report re: Burning Characteristics of Vessel Deck Materials (BOYLAN_00290351-539) |
|-----|----------------------------------------------------------------------------------------------------------------|
| 315 | ATF Fire Research Laboratory Report re: Remains of MV Conception (BOYLAN_00289302-324) |
| 316 | ATF Fire Research Laboratory Report re: Report of Scene Exam (BOYLAN_00061839-949) |
| 317 | ATF Fire Research Laboratory Report re: Report of X-Ray Images (Amended) (BOYLAN_00298368-8407) |
| 318 | ATF Fire Research Laboratory Report re: Fire Development Under a Staircase with Shelves (BOYLAN_00061952-2318) |
| 319 | ATF Fire Research Laboratory Report re: Burning Characteristics of FRP Samples and Flooring (BOYLAN_00062319-460) |
| 320 | ATF Fire Research Laboratory Report re: Burning Characteristics of FRP Samples (BOYLAN_00290111-350) |
| 321 | ATF Fire Research Laboratory Report re: Discrete Event Simulation Combustibles (BOYLAN_00290540-800) |
| 322 | ATF Fire Research Laboratory Report re: Ignitability of FRP Exterior Flooring and Vinyl Cushion Samples (BOYLAN_00062461-497) |

4

DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

ER 184

| 323 | ATF Fire Research Laboratory Report re: Examination of Batteries (BOYLAN_00289325-455) |
|---|---|

9.     Plaintiffs and their attorneys have been diligently and persistently attempting to gain access to the undisclosed evidence and underlying materials since the Spring of 2021. For example, on August 6, 2021, and again on September 10, 2021, Plaintiffs served formal requests to the ATF for the documents and data that were not released under the NDA. As recent on May 31, 2023, I emailed AUSA Williams about several issues, including using the released 197 Report in Plaintiffs' opposition, and stated: "We would also like to discuss your producing all the materials the ATF marshaled and prepared in support of that Report." On June 3, 2024, AUSA Williams responded by email, but did not address that request. I then followed up by email on June 3, 2024, and asked: "Are you likewise in a position to respond to our request for the underlying materials the ATF produced and assembled in support of its report." On June 1, 2024, AUSA responded that the DOJ was still unable to produce those materials.

10.     I have reviewed the document attached as *Exhibit 1* hereto and can confirm that it is a true and accurate copy of the indicated excerpted pages of the National Transportation Safety Board ("NTSB") Marine Accident Report adopted on October 20, 2020, concerning the "Fire Aboard Small Passenger Vessel *Conception*." That Report is a domestic public document bearing the official seal of the NTSB and is self-authenticating under Fed. R. Evid. 902(1). Plaintiffs respectfully offer *Exhibit 1* under Fed. R. Evid. 1005 and *Lobel v. American Airlines, Inc.*, 192 F.2d 217 (2d Cir. 1951). It contains none of the NTSB's opinions or conclusions about the fire, and Plaintiffs have offered it solely for the factual findings it sets forth.

11.     I have reviewed the document attached as *Exhibit 3* hereto and can confirm that it is a true and accurate copy of the indicated excerpted pages of the NTSB Group Chairman's Factual Report that contains the Summary the Fire and Explosions Group issued on May 20, 2020, concerning the *Conception* Fire. That Report is a

1   domestic public document that does not bear an official seal and is self-authenticating
2   under Fed. R. Evid. 902(3).  Plaintiffs respectfully offer *Exhibit 3* under Fed. R. Evid.
3   1005 and *Lobel v. American Airlines, Inc*., 192 F.2d 217 (2d Cir.  1951). It contains
4   none of the NTSB's opinions or conclusions about the fire and has been offered solely
5   for the factual findings it sets forth.

6      12.    I have reviewed the document attached as *Exhibit 4* hereto and can
7   confirm that it is a true and correct photocopy of the indicated excerpted pages from the
8   Official Reporter's Transcript of Day 6 of the criminal trial of Jerry Neal Boylan
9   containing the sworn testimony that NTSB Special Investigator Derrick Hill gave in
10  those proceedings on the morning of October 31, 2023. Plaintiffs herewith respectfully
11  offer *Exhibit 4* in lieu of the original thereof, pursuant to Federal Rules of Evidence
12  1003 and 1004(3) and (4).

13     13.    I have reviewed the document attached as *Exhibit 5* hereto and can
14  confirm that it is a true and correct photocopy of the indicated excerpted pages from the
15  Official Reporter's Transcript of Day 6 of the criminal trial of Jerry Neal Boylan
16  containing the sworn testimony that NTSB Special Investigator Jonathan Butta gave in
17  those proceedings on the morning of October 31, 2023. Plaintiffs herewith respectfully
18  offer *Exhibit 5* in lieu of the original thereof, pursuant to Federal Rules of Evidence
19  1003 and 1004(3) and (4).

20     14.    I have reviewed the document attached as *Exhibit 6* hereto and can
21  confirm that it is a true and correct photocopy of the indicated excerpted pages from the
22  Official Reporter's Transcript of the Deposition that Coast Guard Commander Stefanie
23  Hodgdon gave in this case, under Fed. R. Civ. P. 30(b)(6), on April 12, 2023.  Plaintiffs
24  herewith respectfully offer *Exhibit 6* in lieu of the original thereof, pursuant to Federal
25  Rules of Evidence 1003 and 1004(3) and (4).

26     15.    I have reviewed the document attached as *Exhibit 7* hereto and can
27  confirm that it is a true and correct photocopy of the indicated excerpted pages from the
28  Official Reporter's Transcript of the Deposition that Truth Aquatics, Inc. General

DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

Manager Inge Courtois Coast gave in this case on May 26, 2023.  Plaintiffs herewith respectfully offer *Exhibit 7* in lieu of the original thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

16.    I have reviewed the document attached hereto as *Exhibit 8* hereto and can confirm that it is a true and correct photocopy of the July 11, 2008, Invoice that Defendant Truth Aquatics, Inc. authenticated and produced as Bates-stamped pages TAI00002812-2813 of its verified responses to Plaintiffs' Second Set of Requests for Production in the matter of *Feilder et al. v. Truth Aquatics, Inc*. et al., Los Angeles Superior Court Civ. Action No. 21STCV08121 and Related Cases.  Plaintiffs herewith respectfully offer *Exhibit 8* in lieu of the original thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

17.    I have reviewed the document attached hereto as *Exhibit 9* hereto and can confirm that it is a true and correct photocopy of the indicated, excerpted "Marine Information for Safety and Law Enforcement" ("MISLE") "Activity Summary Reports" the Government produced in its verified responses to Plaintiffs' Request for Production of Documents herein. Those Reports are domestic public documents bearing the official seal of the United States Coast Guard and are self-authenticating under Fed. R. Evid. 902(1).  Plaintiffs herewith respectfully offer *Exhibit 9* in lieu of the original thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

18.    I have reviewed the document attached as *Exhibit 10* hereto and can confirm that it is a true and correct photocopy of the indicated excerpted pages from the Official Reporter's Transcript of the Deposition that Coast Guard Captain Robert C. Compher gave in this case, under Fed. R. Civ. P. 30(b)(6), on June 29, 2023.  Plaintiffs herewith respectfully offer *Exhibit 10* in lieu of the original thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

19.    I have reviewed the document attached as *Exhibit 11* hereto and can confirm that it is a true and correct photocopy of the indicated excerpted pages from the Official Reporter's Transcript of the Deposition that Coast Guard Chief Warrant Officer

1   Daniel Hagar (Ret.) gave in this case on June 8, 2023.  Plaintiffs herewith respectfully

2   offer *Exhibit 11* in lieu of the original thereof, pursuant to Federal Rules of Evidence

3   1003 and 1004(3) and (4).

4         20.    I have reviewed the document attached as *Exhibit 12* hereto and can

5   confirm that it is a true and accurate copy of the indicated excerpted pages of the NTSB

6   Group Chairman's Factual Report that contains the indicated excerpted pages from the

7   Summary the Survival Factors Group issued on September 4, 2020, concerning the

8   *Conception* Fire.  That Report is a domestic public document that does not bear an

9   official seal and is self-authenticating under Fed. R. Evid. 902(3). Plaintiffs respectfully

10  offer *Exhibit 12* under Fed. R. Evid. 1005 and *Lobel v. American Airlines, Inc*., 192

11  F.2d 217 (2d Cir.  1951). It contains none of the NTSB's opinions or conclusions about

12  the fire and has been offered solely for the factual findings it sets forth.

13        21.    I have reviewed the document attached hereto as *Exhibit 14* hereto and

14  can confirm that it is a true and correct photocopy of additional indicated excerpted

15  "Marine Information for Safety and Law Enforcement" ("MISLE") "Activity Summary

16  Reports" the Government produced in its verified responses to Plaintiffs' Request for

17  Production of Documents herein. Those Reports are domestic public documents bearing

18  the official seal of the United States Coast Guard and are self-authenticating under Fed.

19  R. Evid. 902(1).  Plaintiffs herewith respectfully offer *Exhibit 14* in lieu of the original

20  thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

21        22.    I have reviewed the document attached hereto as *Exhibit 15* hereto and

22  can confirm that it is a true and correct photocopy of additional indicated, excerpted

23  "Marine Information for Safety and Law Enforcement" ("MISLE") "Activity Summary

24  Reports" the Government produced in its verified responses to Plaintiffs' Request for

25  Production of Documents herein. Those Reports are domestic public documents bearing

26  the official seal of the United States Coast Guard and are self-authenticating under Fed.

27  R. Evid. 902(1).  Plaintiffs herewith respectfully offer *Exhibit 15* in lieu of the original

28  thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

DECLARATION OF JOHN HILLSMAN IN SUPPORT OF
OPPOSITION TO UNITED STATES' MOTION TO DISMISS

23.    I have reviewed the document attached as *Exhibit 17* hereto and can confirm that it is a true and correct photocopy of the indicated excerpted pages from the Official Reporter's Transcript of the Deposition that Coast Guard Lieutenant Commander Joe Price Larson gave in this case on May 25, 2023.  Plaintiffs herewith respectfully offer *Exhibit 17* in lieu of the original thereof, pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

24.    I have reviewed the document attached as *Exhibit 18* hereto and can confirm that it is a true and accurate copy of the indicated excerpted pages of the NTSB Group Chairman's Factual Report that contains the indicated excerpted pages from the Summary the Engineering Group issued on August 18, 2020, concerning the *Conception* Fire.  That Report is a domestic public document that does not bear an official seal and is self-authenticating under Fed. R. Evid. 902(3). Plaintiffs respectfully offer *Exhibit 12* under Fed. R. Evid. 1005 and *Lobel v. American Airlines, Inc*., 192 F.2d 217 (2d Cir.  1951). It contains none of the NTSB's opinions or conclusions about the fire and has been offered solely for the factual findings it sets forth.

25.    I have reviewed the document attached as *Exhibit 21* hereto and can confirm that it is a true and accurate copy of the Certificate of Inspection the United States Coast Guard issued to the small passenger vessel *Conception* on November 19, 2014.  That Certificate of Inspection is a domestic public document bearing the official seal of the United States Coast Guard and is self-authenticating under Fed. R. Evid. 902(1).  Plaintiffs respectfully offer *Exhibit 21* under Fed. R. Evid. 1005.

26.    I have reviewed the document attached as *Exhibit 22* hereto and can confirm that it is a true and accurate video still frame depicting the grey, plastic Rubbermaid trash can that ATF Special Investigators Butta and Hill identified as the source of the *Conception* fire.  That video still frame was marked and authenticated as *Exhibit 34* to the Deposition that Steve James gave herein on May 17, 2023.  It is also the video still frame that I showed to Cmdr. Hodgdon at her April 12, 2023, Deposition herein.  Plaintiffs herewith respectfully offer *Exhibit 22* in lieu of the original thereof,

1    pursuant to Federal Rules of Evidence 1003 and 1004(3) and (4).

2        27.   I have reviewed the document attached as *Exhibit 23* hereto and can
3 confirm that it is a true and accurate copy of the indicated excerpted pages from the
4 Group Chairman's Factual Report that contains the Summary the Fire and Explosions
5 Group issued on May 7, 2020, containing photographs depicting the plastic Grosfillex
6 garden chairs in *Conception's* salon. That Report is a domestic public document that
7 does not bear an official seal and is self-authenticating under Fed. R. Evid. 902(3).
8 Plaintiffs respectfully offer *Exhibit 23* under Fed. R. Evid. 1005 and *Lobel v. American*
9 *Airlines, Inc.*, 192 F.2d 217 (2d Cir. 1951).

10      I declare under the penalty of perjury under the laws of the United States of
11 America that the foregoing is true and correct. Executed on July 8, 2024, in the City and
12 County of San Francisco, California.

13                          /s/ John R.
                           JOHN R. HILLSMAN

14

15                          Additional Plaintiffs Counsel:

16

17                          WALKUP MELODIA KELLY

18                              SCHOENBERGER

19                          PANISH SHEA BOYLE & RAVIPUDI LLP

20                          FIORE ACHERMAN, A Law Corp.

21                          SCHUERING ZIMMERMAN & DOYLE,

22                              LLP

23                          KREINDLER & KREINDLER LLP

24                          LAW OFFICE OF W. RUSSELL FIELDS

25                          GALINE FRYE FITTING & FRANGOS

26                          ARNOLD & ITKIN LLP

27                          TODD M. ABBOTT, ESQ.

28

# EXHIBIT 1

# Fire Aboard Small Passenger Vessel *Conception*
## Platts Harbor, Channel Islands National Park, Santa Cruz Island, 21.5 miles South-Southwest of Santa Barbara, California
### September 2, 2019



**Marine Accident Report**

NTSB/MAR-20/03
PB2020-101011



**National Transportation Safety Board**

NTSB/MAR-20/03
PB2020-101011
Notation 65936
Adopted October 20, 2020

# Marine Accident Report

Fire Aboard Small Passenger Vessel *Conception*
Platts Harbor, Channel Islands National Park, Santa Cruz Island,
21.5 miles South-Southwest of Santa Barbara, California
September 2, 2019



**National
Transportation
Safety Board**

490 L'Enfant Plaza SW
Washington, DC 20594

NTSB                                                                Marine Accident Report

According to the second galley hand, he woke up about 0130 on Monday, and, as was his usual practice when he awoke in the middle of the night, he went down to the galley to collect and wash any used coffee cups and other dishes and to conduct general cleaning. He told investigators that there were no passengers or crew awake or in the salon at the time he was working in the galley. After cleaning up, he used one of the restrooms on the aft main deck and went to his bunk on the upper deck to go back to sleep. He stated that as he came out of the restroom, he looked up at a wall clock and noted that it was 0235.

Sometime later, the second galley hand was awoken by the sound of what he thought was a plastic chair sliding on the salon deck. He stated that then he heard a noise that "sounded like someone fell." He considered getting up, concerned that a person might be injured, but then heard what he thought to be the sound of the restroom door shutting. He continued to lay in his bunk, and next heard what he thought was a person yelling, "ahhh!" The second galley hand got out of his bunk to go check on the person and, looking out through the door to the sun deck, saw a yellow glow emanating from the main deck below the aft starboard side of the sun deck. Realizing what he was seeing, the second galley hand turned around and yelled "fire! fire!" to wake up the four other crewmembers sleeping on the upper deck.

The first galley hand told investigators that he had heard "a pop, and then a crackle downstairs." He then heard the second galley hand jump down from his bunk, and shortly thereafter yell, "fire!"

After warning the crew, the second galley hand ran to the staircase at the aft end of the sun deck to attempt to get down to the main deck. He stated that when he reached the staircase and looked down, the restroom at the bottom of the staircase was on fire, and flames blocked the way down. He returned to the upper deck stateroom area, told the other crewmembers that the way was blocked, and then proceeded to the port side of the sun deck. There, he climbed over the railing and lowered himself down onto the main deck.

The second galley hand stated that he ran back to the open deck, intending to enter the salon through the open rear doors to retrieve fire extinguishers. However, he could not get into the salon because the entire entryway was on fire. He told investigators that the area where the bunkroom escape hatch was located was engulfed in flames and was not visible, and the fiberglass on the ceiling of the entryway to the salon was melting and dripping down. He said that he ran aft toward the stern, but, realizing there was nothing that he could do there, he turned around again.

The second captain and first deckhand slept in the bunks in the wheelhouse, and when awakened by the second galley hand, they had both proceeded aft toward the door to the sun deck and saw the flames on the aft starboard side. They were met at the door by the second galley hand, who told them that the staircase to the main deck was blocked. Returning to the wheelhouse, the second captain and the first deckhand were instructed by the captain to lower themselves to the main deck via the wheelhouse wing stations. In a statement to investigators, the captain wrote that he opened the wing station doors on either side of the wheelhouse.

The second captain exited through the wing station door on the port side and lowered himself down to the main deck. From there, he looked to go aft, but he said that the exterior passageway was blocked by smoke and flames emanating from the salon windows. He stated that he proceeded forward and opened the bow gate on the port side, reasoning that if passengers could escape the bunkroom and get to the main deck bow, they would be able to more easily evacuate through the open gate.

10

**ER 194**

NTSB                                                            Marine Accident Report

From the aft deck, the second galley hand saw a crewmember lowering himself down to the main deck, so he ran forward through the smoke along the port exterior passageway. About the same time, the first galley hand was attempting to jump down to the main deck from the port wheelhouse wing station. The first galley hand told investigators that he misjudged the distance to the deck and landed with all his weight on his left leg, breaking his leg as he hit the deck. He landed in front of the second galley hand, who leapt over him and continued forward to the bow.

The first deckhand had also exited the wheelhouse via the port wing station. Once on the main deck, he looked aft and saw that the port exterior passageway was blocked by smoke and flames coming out of the salon windows and wrapping around the sun deck above. He proceeded to the bow and tried to open the center window on the forward bulkhead of the salon, which looked into the galley area, in an attempt to reach the passengers. The center window was the only window on the front of the salon that was designed to open, but it was secured from the inside by threaded knobs (it was not a designated emergency exit). The deckhand, aided by the second galley hand, struggled to pry the window open, but could not. The two crewmembers told investigators that the window was warm, but not hot, and when they looked through the window, the view was completely obscured by thick, black smoke.



**Figure 9.** Preaccident photo of *Conception* forward salon windows. In this photo, the center window is open. However, during the accident, the window was closed and secured as the crew attempted to access the space. The port and starboard windows were not designed to be opened. (Source: T. Thompson)

During this time, the captain was in the wheelhouse making a distress call over VHF radio. At 0314, he transmitted, "Mayday, Mayday, Mayday. *Conception*, Platts Harbor, north side Santa Cruz." When Coast Guard Sector Los Angeles/Long Beach watchstanders responded to the distress call, the captain transmitted, "39 P-O-B. I can't breathe. 39 P-O-B. Platts." The smoke filling the wheelhouse then forced the captain out of the space, and he jumped into the water from the starboard side wheelhouse wing station.

As the first deckhand continued to try to open the forward salon window, he remembered a fire axe mounted in the wheelhouse. He looked up to the wheelhouse and was about to yell to the captain to get the axe when he and the second captain saw the captain leap into the water. As the captain jumped, smoke followed him down to the water. Both the first deckhand and the second captain believed the captain was on fire as he jumped. Consequently, the second captain dove into the water on the starboard side to attend to the captain.

11

NTSB                                                                      Marine Accident Report

under the console in the wheelhouse. The plans indicated that the 12-volt system was set up to power navigation lights, radio equipment, and selected lighting in the engine room, lazarette, bunkroom, anchor room, and restrooms. The propulsion engines' starters and shifting actuators operated on 24 volts, while the propulsion engines' controls and the vessel's diesel generator starter and control systems operated on 12 volts. The batteries used for both main engines and generator set were located on the forward workbench in the engine room. Battery chargers were set up for respective voltages and located on the forward bulkhead. Aboard the *Conception*, normal charging of the main engine batteries was accomplished via the ship's service 120-volt system. The main engines' attached alternators had their drive belts manually removed and were only used in a stand-by capacity. In contrast, the generator set's alternator was used and charged its batteries while the generator was running.

In August of 2000, Coast Guard inspectors issued a deficiency for the vessel having non-approved wiring in some of its AC electrical system. The *Conception* was required by Old T (existing vessel) regulations to use stranded or braided conductor core wire. Instead, the wiring being used was flexible "service" wire, commonly referred to in industry as SO, SJO, or STO wiring. It was similar in type to that used in commercially sold extension cords. Both Old T and New T regulations prohibited the use of this wire in the way it was being used aboard the *Conception*. This wiring had been installed by the boat builder and approved by Coast Guard inspectors in 1981 during the original construction of the vessel. Truth Aquatics appealed the Coast Guard's decision and requested a waiver to the Coast Guard's requirements but was denied. In 2002, all non-approved wiring was replaced with approved wiring, and, following a Coast Guard inspection, the vessel was deemed to be in compliance and the deficiency cleared.



**Figure 14.** Bunkroom emergency lighting on board the similar vessel *Vision*. The lighting was of the same make and in a similar location as was on board the *Conception*. Also note the public address system speaker to the right of the lights.

**Emergency Lighting.** The *Conception* had emergency lighting in the bunkroom. It was mounted near the main stairs going up to the galley/salon at the top of the forward bulkhead of the bunkroom, and was designed to automatically activate, in the event of the loss of the vessel's service supply power, to provide lighting along the escape path to the main deck from accommodation spaces below. The emergency lighting was powered from the ship's service 120-volt AC system, and if this source was lost, batteries internal to the unit would supply power for lighting.

**Replacement of Electrical Components.** Throughout the 39-year operation of the *Conception*, many electrical components had been changed with "replacement in kind" alternatives, such as circuit breakers and receptacle

22

NTSB                                                                          Marine Accident Report

In eyewitness photos and videos of the *Conception,* large polyethylene trash cans can be seen throughout the interior and exterior areas of the vessel, including the bunkroom. The trash cans were manufactured by Rubbermaid from 2016 onward. Neither the Old T nor the New T regulations allow for these types of trash cans to be used in passenger bunkrooms and instead require that trash cans be constructed of non-combustible materials. New T regulations extend the prohibition on combustible trash cans to all compartments, but only apply to existing (Old T) vessels when the trash cans are replaced. Throughout the inspection history of the *Conception,* there were no remarks or deficiencies related to the waste receptacles on board.

 

**Figure 18.** Left: Photo from a previous voyage of stairway to the upper deck and restrooms of the *Conception.* Note the regular stowage of a polyethylene trash can under the stairway aft of the salon. Right: Still image from a 2019 video taken of the stairway on board the *Conception* with shelving installed. (Source: M. Ryan [left], R. Clevenger [right])

## 1.6  Accident Damage

Evidence was recovered from the accident site, including equipment and small parts of the hull, and brought ashore, where it was photographed and catalogued by the FBI Evidence Response Team. The wreckage was recovered on September 12 and transported by barge to the NBVC–Port Hueneme on September 13. The Coast Guard; Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); FBI; and Santa Barbara Fire Department inspected the wreck. All debris and personal effects recovered from the seafloor were also brought to the wreckage site for examination.

On September 25–27, the NTSB examined the wreckage and debris recovered from the seafloor and surface. The wreckage and debris were laid out by the ATF and FBI in a secure parking lot into three sections consisting of the main hull with the below deck spaces, the main deck, and the upper deck (figure 19). There were also bags full of items that had been floating in the water and/or collected from the seabed. The ATF and FBI, with Coast Guard assistance, placed the recovered items and portions of structure that could be identified in their corresponding places for each of the three sections of the wreckage representing the three decks. Identifiable engine room machinery and equipment, such as the generator and sewage tank, were placed back in their original position in the engine room within the hull. For the main deck and upper deck portions, an outline was made on tarpaulin underlays, and the items and structure were placed within the

29

NTSB                                                                    Marine Accident Report

## 2.3.2  Ignition

**Potential Sources.** In the interior of the aft portion of the salon, the potential sources of ignition available included the vessel's electrical system and the electronic devices and batteries being charged at the aftmost tables and aft bulkhead area. On the aft exterior of the salon, the potential ignition sources would likely be limited to improperly discarded smoking materials in the trash can.

An energized electrical system has the potential to become a source of ignition when elements of the system age, are improperly installed, or are accidentally damaged. Crew interviews revealed that, on occasion, electrical work, such as the replacement of lighting electrical fixtures in the salon, was completed by crewmembers, who were not licensed electricians. Although examination of the *Conception*'s electrical system was not possible, the examination of the *Vision* and the similarity of the two vessels would suggest similar electrical installations and condition. On October 2, 2019, a Coast Guard inspection found 19 electrical system deficiencies throughout the *Vision*. Some of the deficiencies cited were a result of work being done at the time. Deficiencies in the salon and galley area included corrosion, improper connectors, and signs of overload on a power strip. Deficiencies of this type can lead to electrical system malfunctions capable of initiating a fire.

Since the salon compartment was a critical element in the egress pathway from the passenger bunkroom, prudent fire safety planning would suggest that risky activities (unattended charging of batteries) and materials, such as the plastic chairs and polyethylene trash cans, that could contribute to a fire should have been minimized in this area. This was not the case on the *Conception*. Crew statements, as well as statements from previous passengers, indicated that the overnight, unattended charging of a large number of batteries was a normal practice in the salon compartment and was a risk that had not been considered. Each device and battery represented a separate potential source of ignition. The passengers on the *Conception* were recreational divers, so in addition to common types of electronic items, such as phones, tablets, digital cameras, and laptops, divers also used underwater cameras, flashes, strobes, and flashlights.

Batteries (in particular, lithium-ion batteries) have a known and documented history of initiating accidental fires. In the past, the Consumer Product Safety Commission has issued numerous product safety recalls due to fires caused by electronic devices with defective batteries and chargers. The NTSB has investigated accidents in which battery failures led to fires, and, based on the history of incidents involving fires, the Federal Aviation Administration enforces regulations on the carriage of lithium-ion batteries aboard passenger aircraft.[36] About a year prior to the fire on board the *Conception*, a small fire involving a charging lithium-ion battery took place on board the similar vessel *Vision*; a passenger was able to extinguish the fire by unplugging the charger and throwing it in a rinse bin. However, unlike in the incident on board the *Vision*, the fire aboard the *Conception* grew, and the vessel burned for almost four hours, thus destroying much of the materials in the salon and aft deck area. Further, based on past accidents that the NTSB has investigated, conclusive causal physical evidence identifying a thermal runaway of a lithium-ion

---

[36] Recent NTSB investigations involving battery fires include *Lithium-Ion Battery Truck Fire Following Aerial Transport, Brampton, Ontario, Canada, June 3, 2016* (HZB-20/01) and *Auxiliary Power Unit Battery Fire Japan Airlines Boeing 787-8, JA829J, Boston, Massachusetts, January 7, 2013* (AIR-14/01). These reports and other information regarding investigations involving battery fires are available at www.ntsb.gov.

60

NTSB                                                           Marine Accident Report

battery is difficult to differentiate from a lithium-ion battery thermal runaway caused by exposure to fire.

At the exterior of the aft portion of the salon (in the area where the stairs lead to the upper deck), the only potential sources of ignition would include transient types, such as discarded smoking materials. Based on the examination of the *Vision* and the statements from previous passengers, there was no evidence of electrical systems or electronic devices being charged in this area. There was, however, one large polyethylene trash can located aft of the salon underneath the stairs to the upper deck where one could potentially discard smoking materials. Old T regulations did not allow for the use of these trash cans in the passenger bunkroom but did not preclude their use in any other area of the vessel. New T regulations do not allow the use of these combustible trash cans in any areas of the vessel but do not retroactively apply to vessels built under the Old T regulations unless they are replaced. As stated earlier, polyethylene trash cans are highly combustible, making them susceptible to accidental fires that could be caused by the improper disposal of smoking materials or other unforeseen sources of ignition. The NTSB concludes that although a definitive ignition source cannot be determined, the most likely ignition sources include the electrical distribution system of the vessel, unattended batteries being charged, improperly discarded smoking materials, or another undetermined ignition source.

**Time of Ignition.** Fires not involving accelerants (such as fuel) typically go through an incipient stage following the ignition and then transition into a growth stage. The rate of the growth stage is highly dependent on the type of materials burning and the geometry of the compartment in which the fire is taking place. Fires inside compartments such as the *Conception*'s salon, which had a low ceiling (about 7.5 feet), tend to have high growth rates due to the heat from the fire and products of combustion accumulating at the ceiling and thermally radiating down to the unburned materials. This radiative heating causes the materials to begin to thermally break down and emit flammable vapors. Once this happens, the compartment fire can enter a stage called flashover during which all the combustible materials start to become involved, and the compartment becomes filled with flames. At this point, the compartment is deemed untenable for human survival.

Based on the crew interviews, the fire likely reached the flashover stage around the time or shortly after it was discovered. The crew interviews indicated that a window of approximately 30 minutes passed between the time the salon compartment was last visited to when the fire was discovered. Sometime within that 30-minute window, an incipient fire became established and transitioned into a fast-growing fire, followed by flashover. The construction materials of the vessel (fiberglass over wood) were not fire-resistant and are, in fact, known to burn quite freely. Additionally, the interior furnishings such as the wooden tables, plastic chairs, polyethylene trash cans, seat cushions, and FRP laminates would have added to the fast-growing fire. The compartment configuration would compound the ease of combustibility by trapping the heat and preheating the materials not yet involved. It is not unusual under these circumstances for a fire to reach the flashover point in a short timeframe. The unknown in this accident is the incipient stage of the fire, which depends on the ignition source, the location of the ignition, and the first materials to become involved. Therefore, the NTSB concludes that the exact timing of the ignition cannot be determined.

EXHIBIT 3

ER 200

# National Transportation Safety Board

Office of Marine Safety

Washington, D.C. 20594

Group Chairman's Factual Report

**Fire and Explosions Group**

**Conception**

DCA19MM047

**May 7, 2020**

CLAIMANTS' JT ID 001460 – NTSB 001460

DCA19MM047

Report No. 20-020
Page No. 20



Figure 9. Toilets and stairway to the upper deck of the *Conception*. Note the stowage of a polyethylene trash can, food waste containers, and a rinsing container under the stairway in front of the life ring. (Source: M. Ryan)



Figure 10. Staircase from the main deck galley/salon leading down to the bunkroom on the *Conception*. (Source: G. Boyer)

CLAIMANTS' JT ID 001479 - NTSB 001479

ER 202

EXHIBIT 4

1

1                      UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3            HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,

6                  Plaintiff,

7       vs.                Case No. CR 22-0482

8   JERRY NEHL BOYLAN,

9                Defendants.

10  _____/

11

12

13             REPORTER'S TRANSCRIPT OF
            JURY TRIAL DAY 6 - MORNING SESSION

14            Tuesday, October 31, 2023
                 8:25 a.m.

15            LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22     _____

23        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
         FEDERAL OFFICIAL COURT REPORTER

24       350 WEST FIRST STREET, ROOM 4311
        LOS ANGELES, CALIFORNIA  90012

25           (213) 894-2849

UNITED STATES DISTRICT COURT

3

```
 1                          WITNESS INDEX

 2                             * * *

 3   WITNESS:                              Page

 4   JONATHAN BUTTA

 5      Direct Examination by Mr. Williams

 6       (resumed)                         15

 7      Cross-Examination by Ms. Wakefield

 8      Redirect Examination by Mr. Williams   93

 9

10   DEREK HILL

11      Direct Examination by Mr. Williams    95

12      Cross-Examination by Ms. Wakefield   133

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

**ER 205**

14

```
 1              THE COURTROOM DEPUTY:  We're missing a juror.

 2              THE COURT:  So, we're missing a juror.  When that

 3    juror comes in, we will start.

 4          Also, did the parties give me the language that you want

 5    insofar as the language is concerned?

 6              MR. WEISS:  We filed a document with the two

 7    proposed limiting instructions with no other language in it

 8    last night.

 9              THE COURT:  Last night?

10              MR. WEISS:  Yes.

11              THE COURT:  Okay.  I will take a look.

12              MR. WEISS:  Thank you, Your Honor.

13                       (Brief recess.)

14              THE COURTROOM DEPUTY:  Please remain seated and come

15    to order.

16              THE COURT:  All right.  Shall we bring the jury in?

17              MR. WILLIAMS:  Yes, Your Honor.

18              THE COURT:  Okay.

19          (Jury enters the courtroom at 8:48 a.m.)

20              THE COURTROOM DEPUTY:  You may be seated.

21              THE COURT:  All right.  Good morning, ladies and

22    gentlemen.  At this point in time, we will continue with the

23    examination.

24          Let me remind the witness, sir, you are were previously

25    placed under oath.  That oath is still applicable at that point
```

**UNITED STATES DISTRICT COURT**

**ER 206**

15

```
 1   in time.
 2          Do you understand that?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Thank you.  All right.
 5              MR. WILLIAMS:  May I proceed, Your Honor?
 6              THE COURT:  Yes.
 7                        JONATHAN BUTTA,
 8                   having been previously sworn,
 9                     testified as follows:
10                   DIRECT EXAMINATION (resumed)
11   BY MR. WILLIAMS:
12   Q    Good morning, Mr. Butta.
13   A    Good morning.
14   Q    Yesterday, you talked about your training and experience
15   and qualifications as a senior fire research engineer.
16          Do you remember that?
17   A    Yes.
18   Q    And at this point, I want to transition to talking about
19   the work you did with respect to the Conception fire.
20          At some point were you called out with respect to a boat
21   fire in Santa Barbara?
22   A    Yes.  On September 5th, 2019, I received a page on my
23   government issued mobile device indicating that there was an
24   activation of the ATF National Response Team to Santa Barbara,
25   California, for a multiple fatality commercial boat fire.
```

**UNITED STATES DISTRICT COURT**

**ER 207**

28

1    opening, similar to the passageway for the stair to go up to

2    the second deck.

3        Underneath of the stair, we have a Slim Jim 23-gallon

4    Rubbermaid plastic trash can, consistent with what was

5    recovered at the scene, as well as some plastic 5-gallon

6    buckets, a plastic wash bin, as well as a life ring hanging on

7    the wall behind the trash can.

8    Q    And were the items you chose under the stairs consistent

9    with the items that were on the *Conception*?

10   A    Yes.

11   Q    And why did you do this test?

12   A    The primary purpose of this test was to test Special Agent

13   Hill's hypothesis that the fire originated in the trash can

14   underneath the stair.

15       That hypothesis was based on Mr. Kohls's statement that

16   when he first discovered the fire, he went to the top of the

17   stairs, looked down the stairs, and observed the bottom three

18   or four stair treads on fire.

19   Q    And what did you do next as part of your intermediate

20   scale testing?

21   A    We conducted the tests.

22   Q    What does that mean?  Starting the fire?

23   A    Yes.  So, we ignited the fires inside of the plastic

24   garbage can and observed how those fires would grow.

25       So, again, there is a couple of things that we're

**UNITED STATES DISTRICT COURT**

**ER 208**

37

```
1    A    Yes, it is.

2    Q    Okay.  Let's take a look at Exhibit 334-D, please.  What

3    do we see here?

4    A    We are 29 minutes into the test.

5         The fire is beginning to grow in size as that liquid

6    pool fire becomes more and more involved.

7         We're going to soon begin imparting energy onto that

8    life ring, which is going to ignite.

9         Again, pay attention to the bottom right view, which is

10   the view from the top of the stairs looking down.

11        At this point, 29 minutes and 23 seconds, we have fire

12   on the bottom three or four stair treads, consistent with how

13   Mr. Kohls described the fire.

14        And that is without wind, and with the garbage can

15   spaced away from the wall.

16   Q    Okay.  Let's take a look at Exhibit 334-E, please.

17        What do we see here?

18   A    We see full involvement of that stair with the flames

19   jetting through that stairway opening.

20        We see the garbage can and the stairs on fire, floor to

21   ceiling, similar to how witnesses have described the fire.

22   Q    Okay.  And what time period did it take for this develop?

23   A    Under 30 minutes.

24   Q    What were some of your initial conclusions after this

25   intermediate scale testing?
```

**UNITED STATES DISTRICT COURT**

**ER 209**

38

1   A    My conclusions were that a fire originating within the

2   plastic garbage can spread fire to adjacent fuel package items.

3   Q    Were you able to determine if this fire could have started

4   small and then spread?

5   A    Yes.  In all of these tests, the fire began small and then

6   eventually grew.  I also concluded that the -- adjacent fuel

7   package items, once involved, burned with enough energy to

8   ignite the Fiberglas which was on board *Conception*.

9        And again, that is based upon my characterization tests

10  of the evidence which was actually submitted to the laboratory

11  and evaluated.

12       Lastly, when viewing from the top of the stairs and

13  looking down, the overall fire presentation as these fires grew

14  underneath the stairs was consistent with how Mr. Kohls

15  described seeing the fire, specifically the bottom three or

16  four stair treads on fire.

17       Twenty tests were conducted overall.  In 12 of those

18  tests, or 60 percent of the time, fire was observed on the

19  bottom three or four stair treads.

20       The timeline for that observation, on average, was 27

21  and a half minutes.

22  Q    Thank you.

23       Let's talk about the full scale testing next.

24       What is full scale testing?

25  A    In this instance, full scale testing was two structures

**UNITED STATES DISTRICT COURT**

**ER 210**

53

```
1    A     Yes, we were.

2    Q     What did you find?

3    A     Our determinations were that the fire could not have

4    originated in the salon with respect to known witness

5    statements.

6    Q     Were you able to test your hypothesis about whether or not

7    the fire could have originated in the trash can under the

8    stairs?

9    A     Yes, we did.

10   Q     What did you find?

11   A     We determined that the fire could originate in the garbage

12   can underneath the stair, and ultimately spread into the salon

13   space -- into the salon space both with and without air flow or

14   simulated wind.

15             MR. WILLIAMS:  One minute, Your Honor.

16             THE COURT:  Okay.

17             MR. WILLIAMS:  Nothing further on direct, Your

18   Honor.

19             THE COURT:  All right.  Cross?

20             MS. WAKEFIELD:  Thank you, Your Honor.

21        I just need one minute to get set up here.

22                      CROSS-EXAMINATION

23   BY MS. WAKEFIELD:

24   Q    Good morning.

25   A    Good morning.
```

UNITED STATES DISTRICT COURT

**ER 211**

154

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5

 6            I, TERRI A. HOURIGAN, Federal Official Realtime

 7   Court Reporter, in and for the United States District Court for

 8   the Central District of California, do hereby certify that

 9   pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 28th day of November, 2023.

17

18

19                          /s/ TERRI A. HOURIGAN
                     _____
20                   TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                              Federal Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**ER 212**

EXHIBIT 5

1

1                       UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3             HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,

6                   Plaintiff,

7       vs.                   Case No. CR 22-0482

8  JERRY NEHL BOYLAN,

9                 Defendants.

10 _____/

11

12

13              REPORTER'S TRANSCRIPT OF
           JURY TRIAL DAY 6 - MORNING SESSION

14            Tuesday, October 31, 2023
                  8:25 a.m.

15            LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
         FEDERAL OFFICIAL COURT REPORTER

24         350 WEST FIRST STREET, ROOM 4311
         LOS ANGELES, CALIFORNIA  90012

25            (213) 894-2849

UNITED STATES DISTRICT COURT

ER 214

3

```
 1                        WITNESS INDEX

 2                          * * *

 3   WITNESS:                              Page

 4   JONATHAN BUTTA

 5       Direct Examination by Mr. Williams

 6        (resumed)                        15

 7       Cross-Examination by Ms. Wakefield

 8       Redirect Examination by Mr. Williams   93

 9

10   DEREK HILL

11       Direct Examination by Mr. Williams    95

12       Cross-Examination by Ms. Wakefield   133

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

**ER 215**

94

```
 1   A     Again, we're trying to bound the problem.

 2         A lot of times, we maybe don't know exactly how things

 3   were arranged or how many buckets there were, et cetera.

 4         So, it's important for us to gain a -- do testing and

 5   gain a better understanding of how those variables may effect

 6   overall results.

 7   Q   And based on your testing and analysis, could a fire have

 8   started in the trash can and developed between 2:35 and

 9   3:14 a.m.?

10   A     Yes.

11             MR. WILLIAMS:  No further questions.

12             THE COURT:  Recross?

13             MS. WAKEFIELD:  No, Your Honor.

14             THE COURT:  All right.  The witness is excused.

15   Thank you very much.

16         The next government's witness.

17             MR. WILLIAMS:  The government calls Special Agent

18   Certified Fire Investigator Derek Hill.

19             THE COURTROOM DEPUTY:  Please your right hand.

20                   (Oath was administered.)

21             THE WITNESS:  I do.

22             THE COURTROOM DEPUTY:  Thank you.  Have a seat

23   please.

24                      DEREK HILL,

25                 having been duly sworn,
```

UNITED STATES DISTRICT COURT

ER 216

95

```
1                            testified as follows:
2                THE COURTROOM DEPUTY:  State your name and spell
3    your last name for the record.
4                THE WITNESS:  My name is Derek Hill, last name
5    spelled H-I-L-L.
6                MR. WILLIAMS:  May I proceed, Your Honor?
7                THE COURT:  Yes.
8                            DIRECT EXAMINATION
9    BY MR. WILLIAMS:
10   Q    Good morning.
11   A    Good morning.
12   Q    Where do you work?
13   A    I am employed as a Special Agent Certified Fire
14   Investigator with Bureau of Alcohol, Tobacco, Firearms, and
15   Explosives or more commonly referred to as ATF.
16   Q    And what is a Special Agent Certified Fire Investigator?
17   A    As a Special Agent Certified Fire Investigator, I
18   investigate fires where the federal government may have an
19   interest or where state and local and other federal partners
20   request assistance with a fire investigation.
21   Q    What are some of your primary duties and responsibilities
22   as a Special Agent Certified Fire Investigator?
23   A    So, as a Special Agent Certified Fire Investigator or
24   SACFI, we provide support in the form of assistance on fire
25   investigations to include fire scene examinations.
```

UNITED STATES DISTRICT COURT

ER 217

125

```
 1   underneath the stairs on the aft deck of the salon of the
 2   Conception.
 3   Q    Take a look at Exhibit 347 in one of the binders in front
 4   of you.
 5   A    347?
 6   Q    347, please.  It's Volume 8.
 7   A    Yes.
 8   Q    Do you recognize that?
 9   A    I do.
10   Q    What is it?
11   A    That is -- that is what our Fire Research Lab built to --
12   as kind of a mockup or to show what the salon/aft of the salon
13   looked like for purposes of our fire testing.
14   Q    Is it a true and correct copy?
15   A    Yes.
16        MR. WILLIAMS:  Your Honor, the government moves in
17   Exhibit 347.
18        MS. WAKEFIELD:  One moment, please.
19        THE COURT:  All right.
20   BY MR. WILLIAMS:
21   Q    Special Agent Hill, I just want to make sure you are
22   looking at 347.
23   A    I'm sorry.  Yes, I'm looking at 347 now.
24        I had the wrong tab.
25   Q    Okay.  What's 347?
```

UNITED STATES DISTRICT COURT

ER 218

126

```
 1   A      347 depicts the way that -- when we did our
 2   reconstruction --
 3   Q      Just generally.
 4   A      Okay.  It's the remains of a wash bin, trash can, and blue
 5   buckets.
 6   Q      From the Conception?
 7   A      From the Conception.
 8   Q      True and correct copy?
 9   A      Yes.
10          MR. WILLIAMS:  The government moves in 347, Your
11   Honor.
12          MS. WAKEFIELD:  I think we need a foundation for the
13   outlines on it.
14   BY MR. WILLIAMS:
15   Q      Did you place the outlines on that exhibit?
16   A      Yes, I did.
17   Q      Why did you do that?
18   A      I did it as to better show where the particular items
19   were; in this case, the wash basin, the garbage can, and the
20   blue buckets.
21   Q      And --
22   A      That's because it was just a blob of debris.
23   Q      Based on your review of the salvaged materials?
24   A      Yes.
25          MR. WILLIAMS:  The government moves in 347.
```

UNITED STATES DISTRICT COURT

ER 219

127

```
1                MS. WAKEFIELD:  No objection.

2                THE WITNESS:  Okay.  It's admitted.

3                (Exhibit 347 received into evidence.)

4   BY MR. WILLIAMS:

5   Q    Let's take a look on the screen, please.

6        Okay.  What do we see here?

7   A    So, what we're seeing here, if you can kind of envision

8   that you are -- you just came out of the salon and you kind of

9   looked to your left, you could see the yellow outline is where

10  the wash basin would have been, or is -- the remains of it

11  there.

12       The red outline is the remains of the Rubbermaid Slim

13  Jim garbage container, and then the blue is all the remains of

14  the melted buckets.

15       And then the green kind of little rectangle you see

16  there, it kind of signifies where the bottom step of the stairs

17  would have been.

18  Q    Okay.  And the bow of the *Conception* would have been where

19  in this particular picture?

20  A    To your left.

21  Q    So, toward the blue, correct?

22  A    Correct.

23  Q    And that is the front of the boat?

24  A    Yes.

25  Q    The back of the boat or the stern would have been where
```

**UNITED STATES DISTRICT COURT**

**ER 220**

128

1    the red and yellow items are kind of toward the right?

2    A    Yes.

3          MR. WILLIAMS:  Okay.  Let's put this exhibit on the

4    left, please.

5          And if you could put up 90-D, which has already been

6    admitted, on the right?

7    BY MR. WILLIAMS:

8    Q    Okay.  You see on the right those stairs?

9    A    Yes, I do.

10   Q    What is under the stairs?

11   A    Under the stairs are several blue 5-gallon buckets.

12         It looks like the Rubbermaid trash can and then the wash

13   basin with a life ring behind them all.

14   Q    And do the items that are in blue and red and yellow on

15   the left signify the items under the stairs on the right?

16   A    Yes.

17   Q    And the items on the left that you outlined in blue and

18   red and yellow, those are recovered as part of the salvage

19   operations on the *Conception*?

20   A    Yes, they were.

21   Q    And were you able to determine if the fire originated in

22   this location?

23   A    That is our belief that it originated in that location.

24   Q    And based on your analysis and testing of this case, how

25   did the fire likely spread from the trash can?

UNITED STATES DISTRICT COURT

ER 221

129

```
1    A    The fire from the trash can would have melted down the
2    trash can until it created, like, a small pool fire where the
3    plastics itself are kind of burning as a pool.
4          It would then extend to nearby combustibles, such as the
5    pails, while at same time kind of impacting on the wash basin,
6    ultimately leading to the life ring, which would have then
7    caught on fire.
8          Right above these items, about the fourth step on the
9    ladder was actually some shelving that came off the back side
10   of the ladder.
11         So, if you picture the ladder going up where you walk up
12   and then a shelf coming out the back side of it, so once the
13   fire develops, it actually hits the bottom of that shelf and is
14   kind of trapped in there.
15         So, once it's kind of trapped there, then you see it
16   started spreading out from the front of the steps so it ends up
17   coming out about that third or fourth step, and then, again, it
18   starts spreading.
19         It's got the life ring now and the Fiberglas wall
20   covering and then it just continues to glow.
21   Q    Have you heard the term "curtain fire"?
22   A    Yes.
23   Q    What is that?
24   A    That is what I would describe this as being, like, a
25   curtain of fire across the back end.
```

**UNITED STATES DISTRICT COURT**

154

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3    COUNTY OF LOS ANGELES    )
                               )
 4    STATE OF CALIFORNIA      )

 5

 6            I, TERRI A. HOURIGAN, Federal Official Realtime

 7    Court Reporter, in and for the United States District Court for

 8    the Central District of California, do hereby certify that

 9    pursuant to Section 753, Title 28, United States Code that the

10    foregoing is a true and correct transcript of the

11    stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page format is in

13    conformance with the regulations of the judicial conference of

14    the United States.

15

16    Date: 28th day of November, 2023.

17

18

19                              /s/ TERRI A. HOURIGAN
                         _____
20                         TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                                    Federal Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

**ER 223**

EXHIBIT 6

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3   NANCY FIEDLER, Personal      )
     Representative of the        )
 4   Estate of LISA FIEDLER       )
     (Deceased), et al.,          )
 5                                )
     [Abbreviated caption]        )
 6                                )
              Plaintiffs,         )
 7                                )
         vs.                      ) Case No. CV-21-7065 PA
 8                                )
     UNITED STATES OF AMERICA,    )
 9                                )
              Defendant.          )
10                                )

11

12

13              VIDEOTAPED DEPOSITION OF

14          COMMANDER STEFANIE HODGDON

15                  30(b)(6)

16          UNITED STATES COAST GUARD

17   _____

18          Wednesday, April 12, 2023

19

20

21

22

23

24   REPORTED BY:
     ANGELA KOTT, CSR 7811
25   JOB NO: 10117560
```

Page 1

ER 225

Commander Stefanie Hodgdon

**Fiedler vs.
United States of America**

```
 1                P R O C E E D I N G S

 2

 3          APTUS VIDEO TECHNICIAN:  Good afternoon.

 4   We are now on the record.  Today's date is

 5   April 12th, 2023, and the time is approximately

 6   1:13 p.m. Eastern time.

 7          This is the videotaped deposition of

 8   Commander Stefanie Hodgdon in the matter of Nancy

 9   Fiedler verse United States of America.  All counsel

10   and parties present will be noted on the

11   stenographic record.

12          Will the court reporter who is appearing

13   remotely place swear in the witness.

14

15             COMMANDER STEFANIE HODGDON,

16           having been first duly sworn,

17        was examined and testified as follows:

18

19          THE REPORTER:  Thank you.  Please begin.

20                     EXAMINATION

21   BY MR. HILLSMAN:

22      Q.  Commander Hodgdon, would you be good enough

23   to state your full name and current residence

24   address for our record.

25          MR. KAUFMAN-COHEN:  Just give your name,
```

**www.aptusCR.com**

**ER 226**

Fiedler vs.
**Commander Stefanie Hodgdon**                         United States of America

1   not the residence address.  That's Privacy Act

2   stuff.

3   BY MR. HILLSMAN:

4       **Q.  Fair enough.  How about business or office**

5   **address?**

6       A.  Sure.  My name is Stefanie Hodgdon.  I'm a

7   commander in the US Coast Guard.  And my work

8   address is 2703 Martin Luther King, Junior, Avenue

9   Southeast, Washington, DC.

10          MR. HILLSMAN:  Let me note for the record,

11   Eric, that we've agreed that while the court

12   reporter and the witness are in different states,

13   that the court reporter has been empowered by

14   stipulation to administer the oath as if she were

15   present in the room back with you guys on the East

16   Coast.  True?

17          MR. KAUFMAN-COHEN:  So stipulated, yes.

18   BY MR. HILLSMAN:

19       **Q.  Okay.  First of all, Commander, thank you**

20   **for your service and for the time you're lending us**

21   **this morning.  I want to assure you that my clients**

22   **and I appreciate both.**

23          **My name is John Hillsman.  I represent six**

24   **of the families who lost loved ones in the**

25   **Conception fire, and I'll be asking questions on**

Fiedler vs.
United States of America

Commander Stefanie Hodgdon

1      A.   Sure.   Upon completion of the commissioning

2   program, I was assigned to Sector Houston-Galveston

3   where I was an apprentice marine inspector.

4           And then in 2011 I transferred to Sector

5   Honolulu and I was the port state control branch

6   chief and investigation officer.

7           Then in --

8      **Q.  Can I interrupt you for just a second.  Can**

9   **you repeat that assignment in Sector Honolulu one**

10  **more time for us?**

11     A.   I was the port state control branch chief.

12     **Q.  Okay.**

13     A.   And I was also -- I performed the

14  investigation officer duties, marine investigation

15  officer duties.

16     **Q.  All right.**

17     A.   And then in 2015 I transferred to Sector

18  San Diego and I was the senior investigation officer

19  for marine investigations.

20          And then in 2019, I transferred to Coast

21  Guard headquarters.  And I was assigned to the

22  officer -- Office of Commercial Vessel Compliance in

23  the Domestic Vessel Compliance division.

24          And then when I was promoted to commander

25  last June in 2022, I was then elevated to the

www.aptusCR.com

**ER 228**

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1   division chief of the Domestic Vessel Compliance

2   division under the Office of Commercial Vessel

3   Compliance.

4       Q.  And is the Office of Commercial Vessel

5   Compliance sometimes referred to by the initials or

6   acronym CVC?

7       A.  Yes, sir.

8       Q.  And are you currently the division chief at

9   CVC back at headquarters?

10      A.  Yes, sir.

11      Q.  And would you explain to me briefly what

12  your duties in that position are?

13      A.  So I am in the division of CVC-1, which is

14  domestic vessel compliance and offshore compliance.

15  And I supervise and manage all the policy and

16  guidance that the Office of Commercial Vessel

17  Compliance puts out under that fleet.

18          The fleet is comprised of approximately

19  18,000 US flagged inspected vessels.  And these are

20  vessels that are in commercial service.

21      Q.  And do those 18,000 vessels include small

22  passenger vessels subject to Subchapter T?

23      A.  Yes, sir.

24      Q.  Okay.  Now, I gather that you worked as a

25  marine inspector in Houston.  Is that sometimes

Page 30

www.aptusCR.com

ER 229

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1  referred to as an OCMI, or officer in charge of

2  marine inspection?

3       A.  Yes, sir.

4       Q.  Have you ever worked as an OCMI at -- for

5  any Coast Guard sector other than Houston?

6       A.  I'm sorry.  Could you rephrase the

7  question?

8       Q.  Sure.  Have you ever worked as a marine

9  inspector for any Coast Guard sector other than

10 Sector Houston?

11      A.  So my job in Sector Honolulu as the port

12 state control branch chief, I was a marine inspector

13 for the foreign flagged vessels that arrived.

14          And then in San Diego, I performed some

15 marine inspector -- some marine inspector jobs when

16 they needed a qualified person to fill in.

17      Q.  And have you ever had occasion to inspect a

18 small passenger vessel subject to Subchapter T?

19      A.  Yes, sir.

20      Q.  Tell us when and where you did that.

21      A.  In Sector Honolulu.

22      Q.  All right.  And just so we understand, what

23 kind of Subchapter T vessels were you inspecting out

24 there and how often were you called on to inspect

25 them?

Page 31

www.aptusCR.com

ER 230

| Commander Stefanie Hodgdon | Fiedler vs.<br>United States of America |
|---|---|

```
 1        A.  I don't recall the specifics.
 2        Q.  Okay.  Are we talking dozens, scores,
 3   hundreds?  I'm just looking for an order of
 4   magnitude.
 5        A.  I can't answer that question.  I don't
 6   know.
 7        Q.  Okay.  And forgive me, I'm looking for an
 8   estimate or opinion at this point.  I certainly
 9   don't expect you to recall how many Subchapter T
10   vessels you inspected out in Honolulu, but can you
11   give me just an estimate of the overall number?
12            Is it something between 10 and 20, 20 and
13   50?  What's your best estimate?
14        A.  Twenty.
15        Q.  Okay.  At any point in your career were you
16   ever called upon to inspect overnight or liveaboard
17   dive boats similar to Conception?
18        A.  I don't recall.
19        Q.  And when you performed marine inspections
20   of domestic vessels, did you typically do so as a
21   member of a team, or did you do so as the solo or
22   single inspector?
23        A.  Both.
24        Q.  Are there any rules or protocols or
25   standards that you're familiar with that indicate
```

**www.aptusCR.com**

**ER 231**

**Commander Stefanie Hodgdon**                                    Fiedler vs.
                                                    United States of America

```
 1   problem, Eric.  But let's move on.
 2          Would you please post Clip, let's see --
 3   hang on.
 4   BY MR. HILLSMAN:
 5      Q.   Let me ask you this:  Generally speaking,
 6   Commander, how long do COIs last?
 7      A.   The COI is valid for five years, sir.
 8      Q.   All right.  And would you post Clip 10
 9   again, Lloyd.  That's the COI.  And could you go
10   down to the issue date on the bottom.
11          Commander, I'm sorry, we've gone past it.
12   Where do we need to go to determine the issue date
13   on this COI?
14      A.   It's at the top, sir.
15      Q.   All right.  The top of the first page?
16      A.   It's on every top page, sir.
17      Q.   Okay.  And this COI was issued on
18   November 19, 2014, and its expiration date would
19   have therefore been November 19, 2019?
20      A.   Yes, sir.
21      Q.   So the COI we're looking at is the COI that
22   was in effect on the date of the fire,
23   September 2nd, 2019.  Agreed?
24      A.   Yes, sir.
25      Q.   Okay.  In order to maintain that COI, the
```

www.aptusCR.com

**ER 232**

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1    inspection -- I beg your pardon -- the Conception
2    has to be inspected annually?
3           Do I have that correct?
4       A.  Yes, sir.
5       Q.  In addition to annual inspections, she also
6    has to undergo five-year inspections?
7       A.  Yes, sir.
8       Q.  Are there any inspections other than the
9    five-year and the annual inspection that a vessel, a
10   saltwater vessel like Conception, has to undergo?
11      A.  They would have a dry dock and an internal
12   service exam.
13      Q.  And those take place every two years?
14      A.  Yes, sir.  Whatever the regs say.
15      Q.  Okay.  And as I understand it, if a vessel
16   passes those inspections, the annual, the two-year,
17   the five-year, the inspector endorses the COI and
18   the vessel is good to go until the next inspection.
19          Do I have that right?
20      A.  Yes, sir.
21      Q.  Now, what happens if a vessel does not pass
22   an inspection?  What happens if the inspector
23   determines that there's a deficiency?
24      A.  They would write a CG-835, which is the
25   Coast Guard form for issuing deficiencies.  And they

Page 90

ER 233

Commander Stefanie Hodgdon                              Fiedler vs.
                                            United States of America

 1   would make a notation in the MISLE file.

 2        Q.   And the CG-835 places operational controls

 3   on the vessel?

 4        A.   It depends.

 5        Q.   Depends on the nature of the deficiency?

 6        A.   Yes, sir.

 7        Q.   The CG-835 remains in place until the

 8   deficiency has been rectified?

 9        A.   Yes, sir.

10        Q.   How does the Coast Guard go about

11   determining whether or when a deficiency noted in

12   the CG-835 is rectified?

13        A.   I'm sorry.  Restate the question.

14        Q.   Sure.  How does the Coast Guard go about

15   determining whether a deficiency noted in a CG-835

16   is rectified?

17        A.   The owner and operator notifies the marine

18   inspector.  They attend the vessel or they get

19   objective evidence that supports that the deficiency

20   has been resolved.

21        Q.   And must the resolution of the deficiency

22   be noted in the MISLE file?

23        A.   Yes, sir.

24        Q.   Okay.  And how is that notation typically

25   made?

Page 91

www.aptusCR.com

ER 234

Commander Stefanie Hodgdon                              Fiedler vs.
                                              United States of America

 1          A.  Not recently.  No, sir.

 2          Q.  Got it.  Let me ask you this:  Are all the

 3  inspections, the five-year, the annual, the

 4  three-year, equally rigorous or are some more

 5  extensive than others?

 6          A.  Some are more extensive than the others.

 7          Q.  Tell us about that.

 8          A.  The -- per regulation, the reinspection,

 9  that's the five-year --

10          Q.  Huh-uh.

11          A.  -- would be -- have a greater scope, versus

12  the annual inspection, which can be reduced in

13  scope.

14          Q.  Now, how about where an annual inspection

15  turns up a deficiency?  Must the vessel be

16  reinspected before the deficiency is noted as having

17  been rectified in the MISLE file?

18          A.  No, sir.

19          Q.  Then how does the Coast Guard satisfy

20  itself without a reinspection that the deficiency

21  has been rectified?

22          A.  They do not do a reinspection.  They do a

23  deficiency -- which we call a deficiency check or a

24  deficiency follow-up.

25          Q.  Okay.

Page 93

www.aptusCR.com

ER 235

Commander Stefanie Hodgdon                              Fiedler vs.
                                              United States of America

1        A.  They specifically go to ensure that the

2   deficiency was resolved.

3        Q.  Okay.  I'm sorry.  I was using the term

4   "inspection" generically and I appreciate that

5   you're using it more as a term of art.

6            So tell us about the deficiency follow-up.

7            First of all, am I correct in assuming that

8   when a deficiency has been identified, that

9   deficiency cannot be rectified without a deficiency

10  follow-up?

11       A.  Yes, sir.

12       Q.  And is that mandatory?

13           That is to say, does the Coast Guard oblige

14  itself to conduct deficiency follow-ups after a

15  deficiency has been notated or can somebody at MSD

16  Santa Barbara waive that requirement?

17       A.  There -- by policy, there should be a

18  deficiency follow-up or a deficiency check.

19       Q.  And who typically performs the deficiency

20  follow-up?  The same inspector who saw the

21  deficiency in the first place?

22       A.  It depends on the -- it depends on the

23  unit.

24       Q.  Tell us about that.  In what way does it

25  depend on the unit?

www.aptusCR.com

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1      A.  It's up to the unit to determine who --

2   there's policies and procedures on who does that.

3      Q.  Okay.  Policies and procedures in Sector

4   Honolulu may be different from those in Sector Long

5   Beach/Los Angeles.

6         Is that what you're telling us?

7      A.  Yes, sir.

8      Q.  Okay.  And they indeed may be different

9   than those in MSD Santa Barbara?

10     A.  Yes, sir.

11     Q.  The policies and procedures for deficiency

12  follow-ups are determined by the unit commander?

13     A.  Yes, sir.

14     Q.  And in this case -- and by "this case" I

15  mean the inspection of Conception -- that would be

16  the unit commander of MSD Santa Barbara?

17     A.  I don't know.  That -- it may, or it could

18  be the parent unit, which is Sector LA/LB.

19     Q.  Got it.

20     A.  Long Beach.

21     Q.  All right.  Have you personally

22  participated in deficiency follow-ups?

23     A.  Yes, sir.

24     Q.  What do they typically involve?

25     A.  I've done both, using objective evidence

Page 95

Commander Stefanie Hodgdon                                    Fiedler vs.
                                                 United States of America

1  and actually attending the vessel.

2      Q.  And tell us what you mean by that.

3      A.  When I was -- when I personally was

4  conducting port state deficiency follow-ups, we

5  would accept a document from a certified repair

6  company saying that the issue has been resolved.

7          I've also on some vessels physically

8  attended to ensure that the item that had the

9  deficiency was in compliance with the regulations.

10     Q.  When you say "personally attended," you

11 mean you went back aboard the vessel and inspected

12 the area where you noted the deficiency to determine

13 by your own eyes and experience whether the

14 deficiency had been rectified?

15     A.  Yes, sir.

16     Q.  Got it.  Other than eyes on confirmation or

17 the receipt of paperwork from a qualified repair

18 yard, are there any other methods for resolving

19 deficiencies by way of follow-up that you're

20 familiar with?

21     A.  No, sir.

22     Q.  But whichever follow-up you use, is that

23 typically noted in the MISLE database?

24     A.  You're talking about what specific method

25 was used or --

Commander Stefanie Hodgdon                          Fiedler vs.
                                          United States of America

1          Q.   Yeah.   Let me ask you this:   What kind of

2   paperwork is necessary to clear a deficiency

3   following the deficiency follow-up?

4             What should I be looking for in the MISLE

5   database?

6          A.   It would depend on the inspector.   It would

7   depend on the action.   It would depend on the

8   deficiency.

9          Q.   Explain the variations, if you would.

10         A.   If -- personally, if there was a gyro

11  compass that was not operating, we would -- I

12  personally saw documents from a repair that it was

13  operating, and to clear it.

14            If it was an engineering deficiency, I --

15  and say, like the transmission wasn't working, I may

16  attend the vessel and confirm that it was working

17  and that it could go ahead in a stern and engage

18  properly.   It depends on the deficiency.

19         Q.   All right.   How about electrical

20  deficiencies?   Do you have any experience in that

21  regard?

22         A.   I am not a qualified electrician, so I --

23  again, it would depend on the deficiency.

24         Q.   All right.   Well, we'll talk more about

25  this in a moment, but I think we'll discover that

Page 97

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1   the regs require vessels like Conception to use UL

2   marine grade wiring.

3          Let's assume that a marine inspector

4   discovers that the vessel has used non-marine grade

5   wiring.  What, in your experience, would the Coast

6   Guard do by way of follow-up before clearing a

7   deficiency like that?

8      A.  It would depend on the marine inspector's

9   qualifications and comfort level and background.

10     Q.  Okay.  Give me the range.

11     A.  There's nothing by policy that says what

12  you can -- what you're -- there's no guidelines on

13  how you clear deficiency.

14         You issue deficiency.  You obtain objective

15  evidence, whether it's in person or documentation,

16  that you are comfortable and you use your discretion

17  and you resolve the deficiency in MISLE.

18     Q.  Okay.  The guidelines require that the

19  efficiency -- the deficiency be rectified, but

20  you're telling us that there's no specific

21  guidelines on how that rectification occurs?

22     A.  That is true.

23     Q.  Okay.  But certainly, a marine safety

24  division like Santa Barbara doesn't have the

25  discretion to ignore a deficiency or to clear it

Page 98

www.aptusCR.com

ER 240

| | Fiedler vs. |
|---|---|
| Commander Stefanie Hodgdon | United States of America |

1   without some kind of follow-up.

2         Do I have that right?

3      A.  Yes, sir.

4      Q.  Okay.  Let's turn to Topic 2.  Lloyd, would

5   you post Clip 49.

6         Turn your attention to the highlighted

7   language at the bottom of page 4.  Scroll down a

8   little bit.

9         Topic 2, "The history, purpose, meaning,

10  and day-to-day application of the provisions in the

11  Marine Safety Manual (MSM) Volumes I and II relating

12  to the inspection of small passenger vessels like

13  Motor Vessel Conception that were in effect during

14  the period between January 1st, 2000 and

15  September 2, 2019."

16        First of all, you're the person who has

17  been designated as the PMQ to testify on this

18  matter.

19        What is it about your background and

20  experience with the Coast Guard that qualifies you

21  to testify as that PMQ?

22     A.  I currently work in the program office that

23  the Marine Safety Manual belongs to.  We are the

24  program office and I've personally used it for

25  15 years.

www.aptusCR.com

ER 241

Commander Stefanie Hodgdon                                         Fiedler vs.
                                                                  United States of America

1   that deficiency and not clear it until a follow-up

2   inspection had been conducted?

3        A.   If they -- if the marine inspector had

4   reason to believe that whatever was -- whatever

5   cabling that was -- the electrical apparatus did not

6   meet the requirements, they would write it up.  Yes,

7   sir.

8        Q.   Okay.  And again, would not clear that

9   write-up until there had been some kind of

10  deficiency follow-up.

11          Am I right?

12       A.   Yes, sir.

13       Q.   Okay.  Once there was a write-up, once a

14  deficiency was noted, the inspector didn't have the

15  discretion to clear that deficiency without

16  conducting some kind of appropriate follow-up?

17       A.   Well, when -- I guess my question to you

18  being, when would this deficiency be observed?

19       Q.   During initial inspection -- during an

20  annual inspection, let's say.

21          If during an annual inspection an inspector

22  discovers a deficiency with respect to electrical

23  wiring or cable, they would write up the deficiency.

24  True?

25       A.   Yes, sir.

www.aptusCR.com

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1    Q.   And then would not clear that deficiency
2  until they had satisfied themselves through an
3  appropriate follow-up that the deficiency had been
4  rectified?
5    A.   Yes, sir.
6    Q.   And both the initial write-up and the
7  rectification should be noted in writing in the
8  MISLE database somewhere?
9    A.   Yes, sir.
10    Q.   Okay.  Let me turn your attention to Clip
11  66.  Lloyd, would you put that up.
12       That's T-Boat inspection book, Bates stamp
13  page 2860.  It's also Exhibit 10.  And I'm referring
14  to Task 7, step 7.5, "Verify a means of escape."
15       Do you see that?
16    A.   Yes, sir.
17    Q.   And I gather that the statutory reference
18  with respect to the means of escape, at least in the
19  New T regs, is set forth in 46 CFR 177.500?
20    A.   Yes, sir.
21    Q.   Was the verification of means of escape
22  something which the marine inspectors had to confirm
23  during each inspection, whether it was a five-year,
24  an annual or a two-year?
25    A.   No, sir.

Page 123

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1    just perform, for example, an inspection of the

2    lighting and ignore the other eight categories?

3        A.   They did.

4        Q.   Okay.  And upon what do you base that

5    opinion?

6        A.   On --

7        Q.   I mean, is there anything about the list

8    that says pick and choose which ones you're going to

9    use today?

10       A.   On the regulatory cite that says the marine

11   inspector has the discretion, I'm paraphrasing, to

12   adjust the scope of the annual exam.

13       Q.   Okay.  And which regulatory cite are you

14   referring to -- I beg your pardon.  Which regulatory

15   cite are you referring us to?

16       A.   46 CFR 176.500, what is that, (b)(1)(ii).

17       Q.   Okay.  Now, notwithstanding that, if a

18   marine inspector in the course of his or her

19   inspection actually spots a deficiency that perhaps

20   wasn't on his or her checklist at the outset, can we

21   agree that that marine inspector has a duty to write

22   up that deficiency and to log it in the MISLE

23   database?

24       A.   Yes.

25       Q.   And once again, once that's done, that

www.aptusCR.com

ER 244

Commander Stefanie Hodgdon                                      Fiedler vs.
                                                      United States of America

 1   marine inspector has an obligation to ensure that he

 2   or she has conducted a deficiency follow-up before

 3   clearing the deficiency?

 4        A.  Yes.

 5        Q.  Okay.  Lloyd, would you go back to Clip 26

 6   for just a moment, the first page of the checklist.

 7   Yeah.

 8            Beg your pardon -- I'm talking about the

 9   first page of the checklist that we were just

10   examining right now.

11            MR. SHERWOOD:  That would be 2031?

12            MR. HILLSMAN:  Yeah.  That's 13, I guess,

13   page 1.

14            MR. SHERWOOD:  13.  I got you.

15            MR. HILLSMAN:  My fault.  Yeah.

16            MR. SHERWOOD:  Clip 13, no?

17            MR. HILLSMAN:  No, Exhibit 13, Clip 31.

18            MR. SHERWOOD:  Okay.

19            MR. HILLSMAN:  Clip 30.

20            MR. SHERWOOD:  Gotchya.

21            MR. HILLSMAN:  Lloyd, do you think you have

22   discretion to ignore me on these matters or --

23            MR. SHERWOOD:  Never.

24   BY MR. HILLSMAN:

25        Q.  Commander, I'm looking at the

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

```
 1   that -- what are you basing that question on?
 2           MR. HILLSMAN:  Does it matter?
 3   BY MR. HILLSMAN:
 4       Q.  Here's the question.
 5           Can we agree, Commander, that where
 6   deficiencies are discovered, a marine inspector must
 7   take -- must undertake a more detailed inspection to
 8   ensure that the vessel is truly fit for service
 9   before letting her go back to sea?
10       A.  No.
11       Q.  No?
12           Would you please post Clip 58.
13           We're looking at 46 CFR Section 176.500,
14   subpart (b) (ii).  "The scope of the annual
15   inspection is the same as the inspection for
16   certification but in less detail unless the
17   cognizant marine inspector finds deficiencies or
18   determines that a major change has occurred since
19   the last inspection.  If deficiencies are found, or
20   a major change to the vessel has occurred, the
21   marine inspector will conduct an inspection more
22   detailed in scope to ensure that the vessel is in
23   satisfactory condition and fit or the service for
24   which it is intended."
25           Have I read that correctly?
```

Page 213

Commander Stefanie Hodgdon                      Fiedler vs.
                                        United States of America

```
 1        A.  You have.

 2        Q.  That's a directive, is it not?

 3        A.  It's in the regulations, yes.

 4        Q.  In other words, a marine inspector doesn't

 5   have the discretion to ignore that directive.

 6            If and when deficiencies are found, the

 7   marine inspector will conduct an inspection more

 8   detailed in scope to ensure that the vessel is in

 9   satisfactory condition.   True?

10        A.  Yes.

11        Q.  Okay.  And again, a marine inspector does

12   not have discretion to ignore that obligation, that

13   is his or her obligation under the reg?

14        A.  Yes.

15        Q.  Okay.  Now, what in your experience are we

16   talking about there, when the reg says the marine

17   inspector will conduct an inspection more detailed

18   in scope?

19            I understand that it varies from condition

20   to condition and deficiency to deficiency.

21            But speaking as an experienced marine

22   inspector and as the PMQ on this topic, can you tell

23   us what the Coast Guard has in mind when it directs

24   the inspector to conduct a more detailed inspection

25   in the wake of a deficiency?
```

Page 214

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1   operator shall be prepared to conduct tests and have

2   the vessel ready for inspection of electrical

3   equipment and systems, including the following:  (a)

4   Inspection of all cable as far as practicable

5   without undue disturbance of the cable or electrical

6   apparatus."

7         Have I read that correctly?

8     A.   You have.

9     Q.   Again, when it comes to electric cable,

10  what are we talking about when we're talking about

11  an inspection that examines the cables or eyeballs

12  the cables as far as practicable?

13    A.   I stated it earlier.  You're not going to

14  go far -- if it's not reasonably accessible or --

15  you're not going to pull down paneling to go check

16  to make sure that it's in compliance.

17    Q.   All right.  What if former -- strike that.

18        What if your review of previous inspection

19  showed that there had been previous problems with

20  cable, indeed with that cable that have not yet been

21  corrected, does that alter the further inspection

22  that you conduct in the wake of discovering the

23  present deficiency?

24    A.   I'm sorry.  Say that one more time.

25    Q.   Sure.  One -- I think we've agreed that one

www.aptusCR.com

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1  of the obligations of a marine inspector is that he

2  or she must review the MISLE database and review

3  previous inspections to get a sense of the vessel's

4  operational history.  True?

5      A.  It's good marine practice.

6      Q.  Okay.  And it's also, you do that not to

7  get a sense of its history and operations, but you

8  want to get a sense of what kinds of deficiencies

9  have shown up in the past.  Agreed?

10     A.  That's true.  Yes.

11     Q.  And if you find an electrical deficiency,

12  and after reviewing the MISLE records you realize

13  that this is just one of a series of electrical

14  deficiencies, would that have an effect on how you

15  determine what the scope of the subsequent

16  inspection would be?

17         I hope you understand that.  If you

18  haven't, I'll be happy to rephrase.

19     A.  I would say it would depend on the marine

20  inspector and the vessel in the situation.

21     Q.  All right.  And explain what you mean by

22  that.

23     A.  So if there was a series of electrical

24  deficiencies and then you review them and you see a

25  MISLE entry that says they've been rectified or they

Page 218

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1   depicted here.

2       Q.   I'm sorry.  What list?

3       A.   The list in the regulations.  I would

4   expect the fuses.  I'd like at the machinery that's

5   rotating and the generators and the inspection of

6   batteries.

7       Q.   I understand.

8       A.   That's what I would personally do.

9       Q.   Right now I'm talking about cable.  What

10  are you looking for?  Insulation, composition,

11  conductivity, what is it that you're inspecting

12  cable for?

13      A.   I don't remember off the top of my head.

14  So if I was going out there right now today doing

15  it, I would have to bring the 840 book.

16      Q.   All right.  Are you familiar with

17  Underwriters Laboratory?

18      A.   I know of the recognized organization, yes.

19      Q.   All right.  And as you understand it, what

20  is that?

21      A.   It's a set of standards that the Coast

22  Guard has incorporated into reference as being an

23  acceptable standard.

24      Q.   Can we agree that one of the first things

25  you're looking for when you're inspecting cable is

www.aptusCR.com

| | | Fiedler vs. |
|---|---|---|
| Commander Stefanie Hodgdon | | United States of America |

```
 1   to determine whether or not cables that provide

 2   power or lighting are UL marine cable?

 3        A.  I don't know if that's the first thing.

 4   That depends on the person.

 5        Q.  Let me rephrase it, then.

 6            Is that one of the things an inspector is

 7   looking to determine, whether cable is UL marine

 8   cable aboard a small passenger vessel like

 9   Conception?

10        A.  If it is to be seen without disturbing the

11   area and you can see it, yes.

12        Q.  Okay.  Would you please post Clip 53.

13            According to 46 CFR 183.340 (b), all cable

14   and wire must:  (1) Have stranded copper conductors

15   with sufficient current carrying capacity for the

16   circuit in which they are used."  True?

17        A.  Yes.

18        Q.  "Be installed in a manner to avoid or

19   reduce interference with radio reception and compass

20   indication."  True?

21        A.  Yes.

22        Q.  "Be protected from the weather."

23            Those are among the things you're looking

24   for when examining cable.  True?

25        A.  Yes.
```

www.aptusCR.com

ER 251

Commander Stefanie Hodgdon                                    Fiedler vs.
                                                    United States of America

1          Q.   And those, once again, are not guides, they

2     are not suggestions, they are directives as to which

3     the marine inspector has no discretion.  You've got

4     to look for that stuff.

5          A.   Well, it says you have to ensure that they

6     comply with those regs.

7          Q.   Okay.

8          A.   You have to comply with that list.  How

9     they do that is up to the marine inspector, but as

10    long they meet those requirements, then yes.

11         Q.   Understood.  And if they do not then you

12    have to write it up as a deficiency?

13         A.   You have to identify that as a deficiency,

14    yes.

15         Q.   You have to log the deficiency in the

16    database?

17         A.   Yes.

18         Q.   And you have to conduct a deficiency review

19    to make sure that the deficiency has been rectified?

20         A.   Well, I would have to counter and say what

21    kind of -- what are we talking about?  Are we

22    talking about inspection?  Are we talking about when

23    the vessel is in dry dock?

24         Q.   I'm talking about annual inspection.

25         A.   For an official annual inspection, yes, if

**www.aptusCR.com**

**ER 252**

Commander Stefanie Hodgdon                    Fiedler vs.
                                      United States of America

1    you identify that the vessel does not meet one of

2    those things, the policy is that you notate it and

3    put it into MISLE, yes.

4         Q.   Okay.  And then let's take a look at --

5    yeah, you've got it, Lloyd.  This is Clip Number 54.

6    And this is the same reg (d) (2), "The cable and

7    wire for power and lighting circuits must:  Be

8    listed by Underwriters Laboratories (UL), as UL Boat

9    or UL Marine cable."

10            Have I read that correctly?

11        A.   You have.

12        Q.   What is that?  What is UL boat or UL marine

13   cable?

14        A.   I'm not understanding the question.

15        Q.   What is it that confuses you?

16            I'm asking you as a marine -- as a former

17   marine inspector yourself to tell us what is UL boat

18   or UL marine cable?  What's the reg talking about?

19        A.   That the reg is speaking to that the wiring

20   is -- meets the standard.

21        Q.   Okay.  And how do you as a marine inspector

22   tell whether or not a particular wiring or cable in

23   a vessel meets the standard of 183.340 (d)(2)?

24        A.   From the inspections that I've personally

25   done, it's notated on the actual wire.  It will

Page 223

www.aptusCR.com

ER 253

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1    say --

2        Q.  Now -- I didn't mean to interrupt.

3    Continue, please.

4            THE REPORTER:  Sorry, I didn't catch that.

5    It will say --

6            THE WITNESS:  It will have a UL and it will

7    say that it's -- it's the UL marine -- actually, I

8    don't remember if it's UL marine or if there's an

9    actual, like, number that's associated with it.

10           But it will say it right there on the

11   outside of the coating of the wire -- maybe,

12   assuming that it hasn't been worn over time.  Like

13   on brand-new wire it will have an indicator.

14       Q.  And can we agree that if a marine inspector

15   discovers non-marine grade cable aboard a vessel

16   like Conception, he or she must record a deficiency

17   in the MISLE database?

18       A.  Yes.

19       Q.  Can we agree that if he or she records such

20   a deficiency, that marine inspector should conduct

21   an inspection more detailed in scope to ensure that

22   the vessel is in satisfactory condition?

23       A.  Yes.

24       Q.  Okay.  And can we likewise agree that the

25   MSM further directs marine inspectors to determine

Page 224

**Commander Stefanie Hodgdon**                    **Fiedler vs.**
                                          **United States of America**

1   condition, i.e., they replaced the whole thing and a

2   qualified electrician has provided me objective

3   evidence, I would say that it is in good condition.

4        Q.   Let me return you to my question.  This is

5   not a deficiency follow-up.

6        A.   It doesn't matter.

7        Q.   My -- let me just finish.  My hypothetical

8   poses a question where the inspector in the first

9   instance is inspecting cable.  And in the first

10  instance, at least as I read this directive, it

11  indicates to me that the inspector must, among other

12  things, determine the condition of that cable by

13  insulation resistance readings using the device that

14  you just identified.

15       Do you disagree?

16       A.   I do.  This is all guidance.

17       Q.   Okay.  Let's turn your attention to

18  something else.

19       Apart from electrical inspections, did

20  marine inspectors who examined Conception also have

21  an obligation to write up all observed fire hazards?

22       A.   Can you be more specific?

23       Q.   Sure.  Lloyd, would you post Clip 59.

24       46 CFR 176.830 (a), "At each inspection for

25  certification and at every other vessel inspection

**ER 255**

Commander Stefanie Hodgdon                                         Fiedler vs.
                                                   United States of America

1    all observed unsafe practices, fire hazards, and

2    other hazardous situations must be corrected and all

3    required guards and protective devices must be in

4    satisfactory condition."

5            Have I read that accurately?

6        A.  You have.

7        Q.  Can we agree that this is a directive?

8        A.  Yes.

9        Q.  It's a mandate?

10       A.  Yes.

11       Q.  And to restate that mandate in terms of

12   material to the instant question, can we agree that

13   at each inspection for certification and at every

14   other vessel inspection, all observed fire hazards

15   must be corrected?

16       A.  Yes.

17       Q.  Okay.  Now, just generally speaking, and

18   drawing on your own personal experience, what are we

19   talking about when we use the phrase "fire hazards"?

20       A.  There is a broad range of what fire hazards

21   could be.

22       Q.  That's why I'm asking you to describe it.

23       A.  So the easiest one would be a non-steel

24   trash can.

25       Q.  Okay.

Page 230

www.aptusCR.com

**ER 256**

Commander Stefanie Hodgdon                                    Fiedler vs.
                                                   United States of America

```
 1          A.   Obviously if you have a trash can and
 2   there's paper in it and somebody throws a cigarette
 3   in it, it could potentially have a fire hazard.
 4          Q.   And were such a fire hazard, a non-steel
 5   trash can is observed, at least according 176.830,
 6   the inspector should take action to correct it.
 7   True?
 8          A.   Yes.
 9          Q.   Okay.  Now, would you please post Clip 60,
10   which is 46 CFR 177.405.
11          And let me call your attention to subpart
12   (f) Waste receptacles.  "Unless other means are
13   provided to ensure that a potential waste receptacle
14   fire would be limited to the receptacle.  Waste
15   receptacle must be constructed of noncombustible
16   materials with no openings in the sides or bottom.
17          Have I read that correctly?
18          A.   Yes.
19          Q.   Speaking as a marine inspector yourself, as
20   a member of the CVC program, as the PMQ on this
21   topic, can you tell me what we're talking about
22   there?
23          What are -- how can we tell when a waste
24   receptacle has been constructed of combustible
25   materials as opposed to noncombustible materials?
```

Page 231

| Commander Stefanie Hodgdon | Fiedler vs. United States of America |
|---|---|

```
 1        A.   You'd just have to look at it.

 2        Q.   Have you ever heard of polypropylene?

 3        A.   Yes.

 4        Q.   Can we agree that polypropylene is a

 5   combustible material?

 6        A.   Yes.

 7        Q.   Can we agree that a waste receptacle

 8   manufactured of polypropylene aboard a vessel is an

 9   obvious violation of 46 CRF 177.40(f)?

10        A.   Give me a second.

11        Q.   No problem.

12        A.   Well, you have to read the first part of

13   the regulation.  So it says, "unless other means are

14   provided."

15             So if they do provide other means to ensure

16   that it would be limited, then you could make the

17   argument that it doesn't have to be constructed of

18   noncombustible materials.

19        Q.   And when you refer to that other means by

20   which it would be limited, could you tell us what

21   you're talking about?

22        A.   The owner and operator would have to prove

23   that it -- it is another means that it would be

24   limited to that receptacle.

25        Q.   In other words, what you're telling us is
```

www.aptusCR.com

**ER 258**

Commander Stefanie Hodgdon                                    Fiedler vs.
                                                      United States of America

1   that is indeed a polypropylene receptacle,

2   combustible material.  You can also assume that it's

3   directly beneath wooden stairs.

4          My question to you as a marine inspector

5   and as the PMQ is, do you at the very least

6   recognize this as a deficiency within the meaning of

7   the Coast Guard regs that we just looked at?

8       A.  So how do we know that vessel -- that -- as

9   a marine inspector how do I know that that wasn't

10  removed before the vessel got underway?

11      Q.  Well, we know because it was aboard the

12  vessel the night the fire took place.

13          But for the purposes of my hypothetical

14  right now, I'm asking you to assume that you boarded

15  Conception, that you saw that polypropylene

16  receptacle on the afterdeck, that you saw it

17  situated directly beneath a wooden stairway and

18  wooden shelves directly aft of a wooden bulkhead in

19  the position that's depicted in this video still.

20          My question to you is, would you -- do you

21  recognize that as an obvious fire hazard within the

22  meaning of the regs?

23      A.  Yes.

24      Q.  Okay.  Now, given that hypothetical, can we

25  agree that a marine inspector had a mandatory duty

www.aptusCR.com

**Commander Stefanie Hodgson**

Fiedler vs.
United States of America

1    to list that deficiency, to log it, and to ensure

2    that it had been rectified?

3         A.  Per policy, yes.

4         Q.  Let me turn your attention back to Clip 60,

5    46 CFR 177.405.

6              Take a look at paragraph (c) "Separation of

7    machinery and fuel tank spaces from accommodation

8    spaces.  Machinery and fuel tank spaces must be

9    separated from accommodation spaces by boundaries

10   that prevent the passage of vapors."

11             Have I read that correctly?

12        A.  I'm just checking to see if this is

13   applicable to Old T.

14        Q.  Understood.

15             We may be violating the 15-second pitch

16   rule here.

17        A.  So that requirement is not outlined in Old

18   T.

19        Q.  And you're assuming, of course, that Old T

20   applies, notwithstanding the major conversion that

21   the vessel underwent in 2005?

22        A.  Yes.  I've seen no evidence that this

23   vessel would be applicable to New T.

24        Q.  Okay.  Do you remember what the question

25   was?

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

```
 1   hazard and deficiency absent an exemption in the
 2   record?
 3        A.   I can't give an answer.
 4        Q.   Okay.  Would you please play Clip 16 one
 5   last time.
 6             (Video shown).
 7             Let me stop you right there, Lloyd.
 8             We're looking at another polypropylene
 9   waste receptacle?  Go back, Lloyd.
10             Do you recognize that as another
11   polypropylene waste receptacle?
12        A.   Maybe.
13        Q.   Maybe.  I'll warrant to you that the
14   evidence is going to show that that's exactly what
15   it is.
16             Based on what you can see here, a
17   photograph which was taken or a film that was taken
18   shortly before the fire in September of 2019, can
19   you tell me whether that receptacle is located in
20   such a location that a fire that began in the
21   receptacle was likely to be confined to the
22   receptacle?
23        A.   Maybe.
24        Q.   Okay.  Would you have recognized that as an
25   obvious fire hazard had you been the marine
```

Page 242

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

1  inspector who was inspecting Conception for her
2  annual COI?
3          MR. KAUFMAN-COHEN:  Does this question
4  assume that the trash cans were there when the
5  vessel was inspected, is that what you're asking?
6          MR. HILLSMAN:  Exactly.
7          MR. KAUFMAN-COHEN:  With that assumption
8  that they were there, would you recognize it?
9          THE WITNESS:  Yes.
10          MR. HILLSMAN:  Okay.  Would you step back,
11  Lloyd, and show us the chairs.
12  BY MR. HILLSMAN:
13      Q.  Commander, you're looking -- take a step
14  back again.  And stop it.
15          Take a look at the chairs.  I'll warrant to
16  you that those are stacking polypropylene salon
17  chairs.  They had been aboard the vessel for several
18  years prior to the accident and have been aboard the
19  vessel for several inspections.
20          Would you recognize polypropylene salon
21  chairs as a potential fire hazard, speaking as an
22  experienced marine inspector?
23      A.  Yes.
24      Q.  Okay.  When I refer to an ullage hole or a
25  vent hole for a fuel tank, do you know what I'm

Page 243

| Commander Stefanie Hodgdon | Fiedler vs.<br>United States of America |
|---|---|

```
1                CERTIFICATE OF REPORTER

2         I, ANGELA T. KOTT, Certified Shorthand

3  Reporter, hereby certify that the witness in the

4  forgoing deposition was duly sworn to tell the

5  truth, the whole truth and nothing but the truth in

6  the within-entitled cause;

7         That said deposition was taken down in

8  shorthand by me, a disinterested person, at the time

9  and place therein stated, and that the testimony of

10 the said witness was thereafter reduced to

11 typewriting, by computer, under my direction and

12 supervision;

13        That before completion of the deposition,

14 review of the transcript [ X ] was [   ] was not

15 requested.  If requested, any changes made by the

16 deponent (and provided to the reporter) during the

17 period allowed are appended hereto.

18        I further certify that I am not of counsel

19 or attorney for either or any of the parties to the

20 said deposition, nor in any way interested in the

21 event of this cause, and that I am not related to

22 any of the parties thereto.

23                   Dated: April 17, 2023.

24

25                   ANGELA T. KOTT, CSR 7811
```

Page 247

EXHIBIT 7

Inge Courtois

**Fiedler vs.
United States of America**

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                      --oOo--

 4   NANCY FIEDLER, Personal           )

 5   Representative of the Estate      )

 6   of LISA FIEDLER (Deceased), et    )

 7   al.,                              )

 8                                     )

 9          Plaintiffs,                )

10                                     )

11       vs.                           ) CV-21-7065 PA

12                                     )

13   UNITED STATES OF AMERICA,         )

14                                     )

15          Defendant.                 )

16   _____  )

17

18

19

20      REMOTE VIDEO DEPOSITION OF INGE COURTOIS

21

22

23              Friday, May 26, 2023

24   REPORTED BY: DENISE A. FORD, CSR 7525

25   JOB NO. 10120113
```

**Page 1**

**ER 265**

**Inge Courtois**                                          **Fiedler vs.
United States of America**

1

2

3                              --oOo--

4          BE IT REMEMBERED that pursuant to Notice and

5    on Friday, May 26, 2023, commencing at 2:03 p.m.

6    thereof, before me, Denise A. Ford, a Certified

7    Shorthand Reporter, appeared

8                        INGE COURTOIS

9    called as a witness herein, who, having been first

10   duly sworn, was examined and testified as follows:

11                             --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Inge Courtois

Fiedler vs.
United States of America

```
 1    several.
 2            Q.    And when you say you have seen
 3    several, I gather that what you mean is that you saw
 4    the Coast Guard inspector come down from your
 5    position inside the office, true?
 6            A.    Yes.  I think I even may have gone on
 7    the boat during one of those potentially.  I can't
 8    remember.
 9            Q.    Fair enough.
10            A.    But I was around, let's put it like
11    that.
12            Q.    The evidence is going to show that the
13    Coast Guard conducted its annual inspections of
14    CONCEPTION during the period between 2016 and 2019
15    in February of those years.
16            If you were hired, was -- did I remember
17    correctly, October of 2016?
18            A.    Yes.
19            Q.    So you would have been present for the
20    2017, 2018 and 2019 inspections.
21            Does that jog your recollection at all?
22            A.    Potentially, yes.
23            Q.    And you said that you have a
24    recollection of going along aboard -- strike that.
25            Did you ever accompany a Coast Guard
```

www.aptusCR.com

Inge Courtois

Fiedler vs.
United States of America

```
 1              Q.      Now looking at this clip and speaking
 2    as Truth Aquatics' PMQ, can you confirm that this
 3    image was taken on the starboard side of
 4    CONCEPTION's afterdeck facing to port just aft of
 5    the house?
 6              A.      Yes.
 7              Q.      And in the foreground it depicts the
 8    stairs leading up to the sundeck, correct?
 9              A.      Yes.
10              Q.      Do you see the gray trash can sitting
11    just beneath those stairs?
12              A.      I do.
13              Q.      Just so we are clear on it, does that
14    gray trash can also appear to have a black trash
15    liner in it?
16              A.      Yes.
17              Q.      Now is that where that trash can was
18    typically situated aboard CONCEPTION?
19              A.      Yes.
20              Q.      And in other words, it generally sat
21    aft of the main deckhouse underneath the stairs
22    leading up to the sundeck, true?
23              A.      Yes.
24              Q.      What was it used for?
25              A.      Trash.
```

Page 85

ER 268

Inge Courtois

Fiedler vs.
United States of America

1        Q.    It is a waste container, true?

2        A.    Yes.

3        Q.    Were you able to determine the size or

4    model or manufacturer of that trash can?

5        A.    No.

6        Q.    What did you do in order to try to do

7    that?

8        A.    I am looking at the picture, and I

9    have seen it in real life, but I wouldn't know.

10       Q.    But as the PMK, did you make some

11   attempt to determine whether Truth Aquatics still

12   had in its possession any documentation that might

13   help you determine the manufacturer or date of

14   purchase of that trash can?

15       A.    No.

16            MR. LOWDER:  John, for the record, I

17   will represent that any available documentation to

18   answer that question was searched for.

19            MR. HILLSMAN:  And I will accept that

20   representation.  Thanks, Alex.

21       Q.    Speaking as Truth Aquatics' PMQ on

22   this topic, can you nonetheless confirm that that

23   trash can was indeed nonmetallic?

24       A.    Yes.

25       Q.    Can we agree that it was plastic?

www.aptusCR.com

ER 269

Inge Courtois

Fiedler vs.
United States of America

```
 1              A.     Yes.

 2              Q.     Can you tell us one way or the other

 3    whether it was polyethylene?

 4              A.     I couldn't tell you.

 5                     MR. HILLSMAN:   Here's why I ask --

 6    Loyd, would you post clip 94.

 7              And I will warrant to you that this is an

 8    excerpt from the National Transportation Safety

 9    Board's fire and explosion group chairman dealing

10    with the origins of the fire.

11              And would you turn to DCA19MM047, the

12    highlighted portion, Loyd.

13              94, I believe -- I beg pardon.  It is my

14    fault, Loyd.

15              Q.     Did you -- in your preparation for

16    this testimony, did you by chance read the factual

17    summary that the NTSB prepared concerning

18    CONCEPTION's loss?

19              A.     No.

20              Q.     Well, I will warrant to you then that

21    on May 7, 2020, the chairman of the NTSB's fire and

22    explosion group released a factual summary which

23    recounted its findings about the CONCEPTION fire.

24              And what you are looking at now is a passage

25    from DCA19MM047, page 3 of the report, which reads,
```

www.aptusCR.com

Case 2:21-cv-07065-PA-MRW    Document 98-7    Filed 07/08/24    Page 8 of 22    Page ID #:1387

Inge Courtois

1    "In the galley and salon compartment, as well as

2    underneath the stairs leading to the sundeck, large

3    polyethylene trash cans were being used."

4         Have I read that correctly?

5         A.    Yes.

6         Q.    Speaking as Truth Aquatics' PMQ on

7    this topic, do you have any reason to disagree with

8    the NTSB statement that the trash can underneath the

9    stairs leading to the sundeck aboard CONCEPTION was

10   made of polyethylene?

11        A.    No.

12        Q.    From now on if I refer to that as the

13   polyethylene trash can beneath the stairs leading to

14   the sundeck, will you know what I am talking about?

15        A.    Yes.

16             MR. HILLSMAN:  Will you please put

17   clip 89 back up once again.

18        Q.    Can we agree that that image was taken

19   inside CONCEPTION's main deckhouse?

20        A.    Yes.

21        Q.    In the galley compartment?

22        A.    Yes.

23        Q.    Looking forward towards the galley?

24        A.    Yes.

25        Q.    Do you see the fridge -- the

Page 88

www.aptusCR.com

ER 271

Inge Courtois

Fiedler vs.
United States of America

```
 1    refrigerator on the port side of the galley there?
 2          A.    I do.
 3          Q.    Do you see the trash can sitting
 4    inboard of the galley -- inboard of the
 5    refrigerator?
 6          A.    Yes.
 7          Q.    Is that where that trash can was
 8    typically situated aboard CONCEPTION, that is to
 9    say, inside the house in the galley area?
10          A.    Yes.
11          Q.    And was that its typical location?
12          A.    Yes.
13          Q.    Was that trash can also used as a
14    waste container?
15          A.    Yes.
16          Q.    And so that we are clear what we are
17    talking about, does that gray trash can have a
18    plastic trash can liner inside of it?
19          A.    Yes.
20          Q.    What kinds of trash did that waste
21    container typically contain?
22          A.    I would say food waste.
23          Q.    And did you ever actually see that
24    trash can in place aboard CONCEPTION in the spot
25    where it is depicted right now?
```

Page 89

Inge Courtois                                                    Fiedler vs.
                                                  United States of America

1          A.    Yes.

2          Q.    Now, were you able to determine the

3    size, model or manufacturer of that trash can?

4          A.    No.

5          Q.    Speaking as Truth Aquatics' PMQ on

6    this topic, can you nonetheless confirm that it was

7    indeed nonmetallic?

8          A.    Yes.

9          Q.    Can we agree it was plastic?

10         A.    Yes.

11         Q.    Again, can you tell us one way or the

12   other whether it was polyethylene?

13         A.    No.

14         Q.    But do you have any reason, speaking

15   as Truth Aquatics' PMQ on this topic, to disagree

16   with the NTSB statement that that trash can was made

17   of polyethylene?

18         A.    No.

19         Q.    From now on if I refer to that as the

20   polyethylene trash can in the galley and salon

21   compartment, will you know what I am talking about?

22         A.    Yes.

23         Q.    Was the polyethylene trash can beneath

24   the stairs leading up to the main deck the same make

25   and model as the polyethylene trash can in the

Page 90

www.aptusCR.com

Inge Courtois

Fiedler vs.
United States of America

```
 1    anyone is going to able to say that that specific
 2    trash can -- if you want to broaden your question
 3    about the type, that might be easier.
 4          That's my objection because that specific
 5    trash can, I don't know that anyone can really speak
 6    to that.
 7          Does that make sense?
 8                MR. HILLSMAN:  It does make sense.  I
 9    don't know whether it was at all clear until you
10    raised it or whether it would have been clear, but
11    now that it is, let me ask about it.
12          Q.   I had assumed that the trash cans we
13    were looking at were -- when I am talking about
14    trash cans, I am talking about both the one in the
15    galley and the one on the afterdeck were the same
16    make and model.
17          You can't confirm that I gather?
18          A.   No.
19          Q.   When you first reported to work --
20    strike that.
21          When you first started work as the GM for
22    Truth Aquatics back in October of 2016, was
23    CONCEPTION already equipped with the trash cans that
24    we are talking about here?
25          A.   With those type of trash cans, yes.
```

www.aptusCR.com

Inge Courtois

Fiedler vs.
United States of America

| | |
|---|---|
| 1 | aboard CONCEPTION? |
| 2 | A.    Yes. |
| 3 | MR. HILLSMAN:  And let's go back to |
| 4 | the other one, the galley shot, Loyd. |
| 5 | Q.    During your tenure as GM at Truth |
| 6 | Aquatics, was CONCEPTION always equipped with at |
| 7 | least one nonmetallic plastic trash can like the one |
| 8 | we are seeing here in this photograph in the galley |
| 9 | salon compartment? |
| 10 | A.    Yes. |
| 11 | Q.    Speaking as Truth Aquatics' |
| 12 | duly-appointed PMQ on this topic, can you confirm |
| 13 | that CONCEPTION was carrying the trash can -- strike |
| 14 | that -- was carrying a nonmetallic waste container |
| 15 | of the type we are looking at in this photograph |
| 16 | once she departed Santa Barbara on her last voyage? |
| 17 | A.    Yes. |
| 18 | MR. HILLSMAN:  And would you please |
| 19 | post the outside picture, Loyd. |
| 20 | Q.    Speaking as Truth Aquatics' |
| 21 | duly-appointed and fully-prepared PMQ on this topic, |
| 22 | can you confirm that CONCEPTION was carrying a |
| 23 | nonmetallic plastic trash can of the type we are |
| 24 | looking at here underneath the stairway to the |
| 25 | sundeck aft of the main deckhouse when she departed |

www.aptusCR.com

Inge Courtois

Fiedler vs.
United States of America

1    Santa Barbara on her last voyage on August 31, 2019?

2         A.    Yes.

3         Q.    Now I will warrant to you,

4    Ms. Courtois, that the MISLE files -- by that I am

5    referring to the Marine Information for Safety and

6    Law Enforcement files -- show that inspectors from

7    MSD Santa Barbara boarded and inspected CONCEPTION

8    at least seven times between January of 2015 and the

9    date of the fire, September 2, 2019.  And I will

10   just warrant to you that there was a February 4,

11   2015 inspection conducted by Chief Warrant Officer

12   Hager, there was a February 18, 2016 inspection

13   performed by Chief Warrant Officer Hager, there was

14   a January 18, 2017 inspection performed by Chief

15   Warrant Officer Daniel Hager, a February 1, 2017

16   inspection performed by Chief Warrant Officer

17   Michael Young, a February 16, 2017 inspection

18   performed by Chief Warrant Officer Daniel Hager, a

19   February 13, 2018 inspection performed by Chief

20   Warrant Officer Daniel Hager, and a February 13,

21   2019 inspection performed by Daniel Hager.

22        Here's my question:  Speaking as Truth

23   Aquatics' PMQ, is it your understanding that the

24   polyethylene trash can beneath the stairs leading to

25   the sundeck aboard CONCEPTION was aboard CONCEPTION

Page 95

Inge Courtois

Fiedler vs.
United States of America

1   during the time period between February 15, 2015 and

2   February 13, 2019?

3        A.   Yes.

4        Q.   Do you have any reason to believe that

5   that polyethylene trash can beneath the stairs was

6   not sitting in its customary position aboard

7   CONCEPTION when the Coast Guard inspected the vessel

8   on the dates that I've just recited?

9        A.   No.

10            MR. HILLSMAN:  Loyd, would you post

11   clip 89 again.

12       Q.   Ms. Courtois, the same questions with

13   respect to the polyethylene trash can in the galley

14   and salon area.

15            Do you have any reason to believe that the

16   polyethylene trash can in the salon and galley area

17   that we have been talking about was not aboard

18   CONCEPTION during each of the seven inspections that

19   I just recited?

20       A.   I am sorry, I want to make sure I

21   reply correctly.

22       Q.   Sure.  Let me rephrase it.

23       A.   Yes, please.

24       Q.   Can we agree -- strike that.

25            Speaking as Truth Aquatics' duly-designated

Page 96

ER 277

Inge Courtois

Fiedler vs.
United States of America

```
1    and properly-prepared PMQ, can you confirm that the
2    polyethylene trash can or that a polyethylene trash
3    can of the type we have been talking about was
4    aboard CONCEPTION during the period between February
5    4, 2015 and February 13, 2019, throughout that
6    period?
7            A.    Yes, they were aboard.
8            Q.    Do you have any reason to believe that
9    a polyethylene trash can of the type depicted in
10   this photograph was not in its customary position in
11   the salon and galley area when those seven Coast
12   Guard inspections I recited earlier were conducted
13   aboard CONCEPTION?
14           A.    No.
15           Q.    Did the Coast Guard, so far as you
16   know, ever direct Truth Aquatics to remove or
17   replace those trash cans at any time prior to
18   September 2, 2019?
19           A.    Not to my knowledge, no.
20           Q.    Before September 2, 2019, did the
21   VISION carry nonmetallic trash cans like the ones
22   aboard CONCEPTION?
23           A.    Yes.
24           Q.    Did the TRUTH carry nonmetallic trash
25   cans like the ones aboard CONCEPTION?
```

**www.aptusCR.com**

**ER 278**

Inge Courtois

Fiedler vs.
United States of America

```
 1            A.    Yes.

 2            Q.    At any time before the night of the

 3   fire, did the Coast Guard ever require Truth

 4   Aquatics to remove or replace those trash cans?

 5            A.    Not to my knowledge, no.

 6            Q.    Do you know one way or the other

 7   whether the Coast Guard required Truth Aquatics to

 8   remove or replace the trash cans aboard VISION and

 9   TRUTH after the fire?

10            A.    Not to my knowledge.

11            Q.    Let's turn our attention to topic no.

12   12, which is "the model and manufacturer of the

13   stackable nonmetallic chairs depicted in Exhibit 8

14   hereto, their typical purpose and location aboard

15   CONCEPTION, and the inclusive dates during which

16   they remained aboard the vessel."

17            Loyd, would you please post clip 90.

18            Ms. Courtois, what is it about your

19   background or experience with Truth Aquatics that

20   qualifies you to testify about that topic as the

21   PMQ?

22            MR. LOWDER:  Objection, calls for a

23   legal conclusion.  The witness has been designated

24   and duly prepared as required under the code.

25            MR. HILLSMAN:  I am not disputing
```

www.aptusCR.com

Inge Courtois                                    Fiedler vs.
                                    United States of America

```
1    that.  I am simply asking her to illuminate the
2    qualifications that she has got.
3              THE WITNESS:  I think I was well
4    prepared, and I have also been on the boats several
5    times.
6              MR. HILLSMAN:  Q.  So with respect to
7    this topic, that is to say once again, the model,
8    manufacturer of the stackable nonmetallic chairs we are
9    looking at, you will be testifying from your own
10   personal knowledge?
11        A.    About the model and make, no.
12        Q.    But you have been aboard CONCEPTION, I
13   gather you have seen the appointments in the
14   vessel's salon?
15        A.    Yes.
16        Q.    We are looking at a photograph of that
17   salon, correct?
18        A.    Yes.
19        Q.    And you will see a bunch of
20   nonmetallic chairs in this photograph, correct?
21        A.    Yes.
22        Q.    Were those nonmetallic chairs already
23   aboard CONCEPTION when you first -- let me rephrase
24   this.
25             Was CONCEPTION already equipped or appointed
```

Page 99

www.aptusCR.com

**ER 280**

Inge Courtois

Fiedler vs.
United States of America

1    with nonmetallic movable chairs when you first came

2    aboard as GM back in October of 2016?

3         A.    Yes.

4         Q.    Were those chairs ever replaced at any

5    time during your tenure with the company, so far as

6    you know?

7         A.    Not unless they were broken.

8         Q.    Speaking as the PMQ on this topic, can

9    you tell us what the make or model of those plastic

10   chairs was?

11        A.    No.

12        Q.    I will warrant to you that in the

13   responses to interrogatories Truth Aquatics

14   identified them as an outdoor type Grosfillex

15   stacking chairs.

16        Does that sound correct to you?

17        A.    Yes.

18        Q.    All told, do you require [sic]

19   approximately how many such chairs there were?

20        A.    Between 15 and 25.

21        Q.    And --

22        A.    That's an estimate, by the way.

23        Q.    I understand.

24        And can we agree that those chairs were

25   nonmetallic?

Page 100

Inge Courtois

Fiedler vs.
United States of America

```
 1            A.     Yes.
 2            Q.     Speaking as the PMQ on this topic, can
 3    you agree that they were plastic?
 4            A.     Yes.
 5            Q.     Speaking as the PMQ on this topic, can
 6    you confirm one way or the other whether they were
 7    polyurethane?
 8            A.     I don't know.
 9            Q.     Now, I gather that those chairs were
10    movable, in other words, they weren't fixed in any
11    fashion to the deck?
12            A.     That's correct.
13            Q.     But am I correct in assuming that
14    their customary location aboard CONCEPTION was in
15    the salon?
16            A.     Yes.
17            Q.     And during your tenure as GM, is that
18    where they typically remained?
19            A.     Yes.
20            Q.     Now, were those plastic chairs in the
21    salon during the period between February of 2015 and
22    February of 2019 when those seven Coast Guard
23    inspections that I recited earlier took place?
24            A.     Yes.
25            Q.     Do you have any reason at all to
```

Page 101

www.aptusCR.com

ER 282

Inge Courtois                                           Fiedler vs.
                                              United States of America

```
1    believe, speaking as the Truth Aquatics PMQ on this
2    topic, that those chairs were anywhere other than
3    their customary position aboard CONCEPTION when
4    those inspections were conducted?
5            A.    No.
6            Q.    Did the Coast Guard ever direct you to
7    remove or replace those chairs, and by -- strike
8    that.  Let me rephrase.
9            Speaking as the PMQ on this topic, can you
10   tell us whether the Coast Guard ever directed Truth
11   Aquatics to remove or replace those plastic chairs
12   at any time prior to September 2, 2019?
13           A.    No.
14           Q.    Did the VISION carry plastic chairs in
15   its galley and salon area prior to the night of the
16   fire?
17           A.    Yes.
18           Q.    Did the TRUTH?
19           A.    Yes.
20           Q.    And were they all of roughly the same
21   design or manufacturer?
22           A.    Yes.
23           Q.    Did the Coast Guard ever require Truth
24   Aquatics to remove or replace those chairs at any
25   time prior to the fire?
```

Page 102

ER 283

Inge Courtois

Fiedler vs.
United States of America

```
1          A.    No.

2          Q.    Speaking as Truth Aquatics' former GM,

3    do you know one way or the other whether the Coast

4    Guard ever directed Truth Aquatics to remove or

5    replace those chairs after the fire?

6          A.    No.

7          Q.    Let's then turn to topic no. 1, the

8    hijacking and subsequent grounding of the small

9    passenger vessel CONCEPTION.

10          Again, I gather you first learned you were

11    being designated as Truth Aquatics' PMQ on this

12    topic a couple of weeks ago?

13          A.    Yes.

14          Q.    And as you sit here today, can you

15    think of anyone who is more qualified to address

16    this topic at Truth Aquatics than you are?

17                MR. LOWDER:  Objection, calls for a

18    legal conclusion.  The code just requires that

19    someone be designated to speak on behalf of the

20    company.

21                MR. HILLSMAN:  Q.  You can answer.

22          A.    I would say the guy that hijacked the

23    boat.

24          Q.    I don't know that he is within Truth

25    Aquatics' employer control.
```

www.aptusCR.com

ER 284

Inge Courtois

Fiedler vs.
United States of America

```
1              CERTIFICATE OF REPORTER

2

3         I, DENISE A. FORD, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell

6    the truth, the whole truth, and nothing but the

7    truth in the within-entitled cause;

8            That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   the said witness was thereafter reduced to

12   typewriting, by computer, under my direction and

13   supervision;

14           I further certify that I am not of counsel

15   or attorney for either or any of the parties to the

16   said deposition, nor in any way interested in the

17   event of this cause, and that I am not related to

18   any of the parties thereto.

19

20               DATED:  June 6, 2023.

21

22

23         _____

24         DENISE A. FORD, CSR No. 7525

25
```

www.aptusCR.com

EXHIBIT 8

E-Served: Dec 23 2022  1:37PM PST  Via Case Anywhere

# INVOICE
## CONTRACT FURNITURE COMPANY

*Professional Grade Furniture*

1874 S. Pacific Coast Highway, Suite 377
Redondo Beach, CA 90277.6158
www.ContractFurniture.com
Tel.800.507.1785  Fax.800.507.1789
Email: Sales@ContractFurniture.com

BILL TO:
Glen Fritzler
Truth Aquatics
glen@truthaquatics.com

SHIP TO:
Truth Aquatics
301 West Cabrillo Blvd
Santa Barbara, CA 93101.3886
Attn: Glen
Ph 805.962.1127

INVOICE NUMBER:
07351

DATE:
7/11/2008

| QTY | PART NUMBER | DESCRIPTION | COLOR | WT | PACK QTY | PRICE | EXTEND |
|-----|-------------|-------------|-------|-----|----------|-------|--------|
| 64 | US495537 | MIAMI BISTRO Stacking Sidechair | Bronze Mist | | 32 | $19.95 | $1,276.80 |
| | | Tax Exempt | | | | | |
| | | Freight Quote: DL177 | | | | | |

**TERMS**: Detailed terms on following page.  Your order will be
processed  upon receipt of payment.  Freight quoted is FOB Origin, dock
to dock commercial delivery.  Quote is good for 30 days. We accept  Visa,
MasterCard,  American Express, Discover Card and company check.
Please  make check payable  to Contract  Furniture Co.  Thank you for the
order!

I accept the terms and conditions  of this invoice.

Signed:_____
Name:_____  Title:_____
Credit Card:_____  Exp:_____
Credit Card Number:_____
Name on Credit Card:_____
Billing Address of Credit Card: _____
_____

| | |
|---|---|
| SUB-TOTAL | $1,276.80 |
| FREIGHT | $128.79 |
| TAX | |
| TOTAL | $1,405.59 |

TAI00002812

**ER 287**

# TERMS AND CONDITIONS

## Prices
All merchandise is priced F.O.B. warehouse/origin. All prices are subject to change without notice. All orders accepted subject to prices prevailing at time of shipment. Prices do not include shipping costs or freight, if applicable. All forms of payment and terms must be reviewed and approved by Contract Furniture Company.

## Orders and Revisions
Confirmation of orders may be made by fax or in writing by mail or email. Any changes made to original orders that are in process may be subject to additional charges and delays. In the event of cancellation purchasers may be charged for materials and supplies whether work is in process or in stock. Prices are subject to change.

## Availability of Stock
Contract Furniture Company does not guarantee availability of items shown in the catalog or website. Certain items may be discontinued at manufacturer's discretion without notice.

## Minimum Order
All orders must exceed $800.00, not including tax or freight. All orders that do not exceed this amount are subject to a $100.00 Small Order Charge Fee.

## Broken Master Pack
A $50.00 broken master pack charge will be incurred for any broken master pack or carton, excluding sample orders.

## Call before Delivery
All orders requesting a call before delivery are subject to a $30.00 charge.

## Freight
All merchandise is F.O.B. warehouse/origin, prepay and add and will be shipped upon receipt of full payment unless otherwise agreed upon Please furnish shipping and routing instructions with each order. If not such instructions are received we have the option to ship accordance with what we judge to be the best possible way. All orders are shipped dock to dock, weekdays during normal business hours unless specified. Additional services such as lift-gate, inside delivery, re-routing, re-delivery, or other requests are subject to an additional fee at the customer's expense.

## Transport Claims
Contract Furniture Company is not responsible for damages or loss incurred in transit. All furniture shipped at purchaser's own risk after it has been inspected and securely packed. Before accepting merchandise from the carrier, inspect cartons for visible signs of damage and note any loss or damage on the delivery receipt. If there is loss or damage, make an immediate claim with the delivery carrier. In case damage is concealed and not determined until furniture is unpacked, keep the packing slip and notify the carrier immediately for an inspection. All claims of damage from transport should be filed directly to the carrier by the customer within 5 days of receiving.

## Maintenance
To insure durability and longevity of the product, it is important to clean and care for the merchandise. Cleaning and inspecting the product is part of standard maintenance and upkeep, and should be done at regular intervals. Clean and tighten all screws and bolts. Any item which shows signs of loose joints (please inspect regularly) should be taken out of service.
Note: Warranty may be voided if proper maintenance intervals are not followed.

## Warranty
Contract Furniture Company provides a limited warranty in workmanship and materials. Our warranty becomes null and void in the event of damage to the product resulting from unauthorized repairs, breakage due to abuse or misuse, repair, alteration or modification of the product by anyone other than authorized representatives thereof, damage resulting from accidents, vandalism, and improper use. Warranty varies on products purchased.

## Returns
No merchandise can be returned without express authorization of Contract Furniture Company. All returns are subject to a restocking and handling charge. All freight and other applicable charges will be at the customer's expense. If a defect is noticed it should be reported to Contract Furniture Company within 5 days of shipment arrival.

TAI00002813