No. 24-5064

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NANCY FIEDLER, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court

for the Central District of California

APPELLANTS' EXCERPTS OF RECORD

**VOLUME 3 of 5**

Gretchen M. Nelson (112566)
NELSON & FRAENKEL LLP
601 So. Figueroa, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469
Telecopier: (213)-622-6019
gnelson@nflawfirm.com

John R. Hillsman (71220)
MCGUINN HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, CA 94111
Telephone: (415) 421-9292
Telecopier: (415) 403-0202
jrhillsman@mhpsf.com

*Counsel for Plaintiffs-Appellants – Add'tl Counsel on Signature Page*

# EXHIBIT 9



U.S. Department of
Homeland Security

United States
Coast Guard

## Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 1439079 |
| Activity Type: | Vessel Inspection |
| Title/Description: | MI00027731: CONCEPTION |
| Status: | Closed - Agency Action Complete |
| Point Of Contact: | |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | MSO LOS ANGELES/LONG BEACH |
| Start Date/Time: | 25AUG2000 00:00Z |
| Prompt Date: | |
| Team Lead: | ADG |

### Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** 97 | **Year Completed:** 1981 |
| **Engine Compartment In An Open Space:** Not Applicable | **Fuel Compartment In An Open Space:** Not Applicable | **Vessel Constructed Of All Open Spaces:** Not Applicable |
| **Propulsion System Type:** Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

Inspection Results: (None)

### Deficiencies:

| Item Number: 001 | Due Date: 30SEP2000 | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| | | | ☐ Security Violation |
| **Issued Date:** 25AUG2000 | **Resolved Date:** 30SEP2000 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** Fire Fighting | **Subsystem:** | **Component:** | ☐ Self Reported |
| | | | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| | | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

US003172

SUBMIT PLANS TO INSTALL FIRE DETECTION SYSTEM FOR GALLEY GREASE EXTRACTION HOOD IAW MOC POLICY LETTER 4-98.

**Resolution:**

INSTALL FIRE DETECTION SYSTEM FOR GALLEY GREASE EXTRACTION HOOD.

| **Item Number:** | **Due Date:** | **Extended Due Date:** | ☐ Not Available For Inspection |
|---|---|---|---|
| 002 | 25AUG2000 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 25AUG2000 | 25AUG2000 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Engineering | | | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| | | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

RENEW ALL PVC PIPING FROM MAIN ENGINE R/W/ COOLING SYSTEM AND RENEW WITH   METALLIC PIPE.

**Resolution:**

| **Item Number:** | **Due Date:** | **Extended Due Date:** | ☐ Not Available For Inspection |
|---|---|---|---|
| 003 | 31JAN2002 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 25AUG2000 | 12FEB2002 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | | | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| | | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

SUBMIT PLANS TO REPLACE ALL NON APPROVED ELECTRICAL WIRING IN THE VESSEL'S AC ELECTRICAL SYSTEM USING APPROVED WIRE.

**Resolution:**

The owner submitted a letter intending to replace the cable in the March Hull Exam.

**Narrative:**

US003173

Received appeal letter from Mr. Glen Fritzler regarding several issues on the vessel Conception. See MINS for details concerning MSD Santa Barbara & MSO/GRU LA-LB response.

16 FEB 00 - RECEIVED AN APPEAL LETTER FROM THE OWNER REGARDING SEVERAL ISSUES SPECIFICALLY:

1. THE USE OF SO, SOW, AND SJO WIRING USED IN THE VESSEL'S AC ELECTRICAL SYSTEM,

2. MAIN ENGINE COOLING RAW WATER LINES (CURRENTLY CONSTRUCTED OF PVC), AND

3. GREASE EXTRACTION HOOD IN THE GALLEY AND WAIVER REQUEST UNDER 46 CFR 181.425.

THE OWNER BELIEVES THE ELECTRICAL WIRING IS SAFE AND SHOULD NOT HAVE TO BE REPLACED. THE PVC RAW WATER COOLING LINES ARE LESS CORROSION RESISTANT AND SHOULD BE ALLOWED ESPECIALLY WITH THE ADDITION OF THE VESSEL'S NEW MACHINERY SPACE FIXED FIRE EXTINGUISHING SYSTEM, AND THE UL 710 GREASE EXTRACTION HOOD AS REQUIRED BY THE 1996 VERSION OF SUBCHAPTER "T" SHOULD NOT APPLY TO HIS VESSEL.

06 JUL 2000 - MSD SANTA BARBARA DRAFTED RESPONSE TO APPEAL LETTER AFTER A THROUGH INVESTIGATION OF REQUIREMENTS. THE LETTER, WHICH WAS SIGNED BY THE OCMI, MSO LA-LB STATED THE FOLLOWING:

1. SO/SJO/STO WIRING CANNOT BE USED FOR ELECTRICAL SYSTEMS EXCEEDING 50 VAC

AND THEREFORE IT MUST BE REPLACED WITH "APPROVED" WIRING PER 46 CFR 183 PRIOR

TO THE END OF THE NEXT HULL EXAM (31 MAR 02)

2. PVC PIPING USED IN VITAL SYSTEMS SUCH AS MAIN ENGINE COOLING LINES ARE NOT ALLOWED. THE PIPING USED IN VITAL SYSTEMS MUST BE METALLIC.

3. THE GREASE EXTRACTION HOOD REQUIREMENTS LISTED IN 46 CFR 181.425 ARE

WAIVED SUBJECT TO THE REQUIREMENTS LISTED IN G-MSE-4 POLICY LETTER 1-99. THE VESSEL MUST ESTABLISH A MAINTENANCE PROGRAM FOR THE EXISTING HOOD, INSTALL A FIRE DETECTION SYSTEM FOR THE GALLEY, AND ADD ONE ADDITIONAL B-II FIRE EXTINGUISHER TO THE GALLEY.

THE OWNER WAS INFORMED OF HIS RIGHT TO APPEAL TO A HIGHER AUTHORITY.

//A.D. GUILD//

CHIEF WARRANT OFFICER

MSD SANTA BARBARA

Inspection/Examination Details: (None)

**Streamlined Inspection Program (SIP) Summary:**

| | |
|---|---|
| Vessel Name: | CONCEPTION |
| Company Name: | |

US003174

**PHASE I**
Inspector Comments:
**PHASE II**
Inspector Comments:
**PHASE III**
Inspector Comments:
**PHASE IV**
Inspector Comments:
Location(s): (None)


Associated Parties: (None)


TWIC Details: (None)


**Radiation Details:**

| **Radiation:** | Unknown |
|---|---|


Operational Controls: (None)


**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 04OCT2000 | Status_DtTm | Sector Los Angeles/Long Beach | Admin, System |

Documents: (None)


Certificates: (None)


US003175

**ER 294**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 1493784 |
| Activity Type: | Vessel Inspection |
| Title/Description: | S/V T Credit Hull Exam |
| Status: | Closed – Agency Action Complete |
| Point Of Contact: | Glen Fitzler  (805) 962-1127 |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 15MAR2002 09:00Z |
| Prompt Date: | |
| Team Lead: | Leonard, David C. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Construction/Loadline | Inspected Satisfactory | 25FEB2002 |
| Electrical | Inspected Satisfactory | 15MAR2002 |

US003134

**ER 295**

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 05APR2002 | | ☐ Not Available For Inspection<br>☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX<br>☐ SMS Related/Objective Evidence For MSO |
| 15MAR2002 | 05APR2002 | | ☐ Self Reported |
| **System:** | **Subsystem:** | **Component:** | ☐ Reported Via PR17 |
| Construction/Loadline | Hull | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 701 - Prior to carriage of passengers/cargo | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Submit repair proposal for approval and make permanent repairs to hull. LEGACY COMPONENT DESC: Hull Plating

**Resolution:**

Satisfactory repairs made and inspected.

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 2 | 31MAR2002 | | ☐ Not Available For Inspection<br>☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX<br>☐ SMS Related/Objective Evidence For MSO |
| 15MAR2002 | 29MAR2002 | | ☐ Self Reported |
| **System:** | **Subsystem:** | **Component:** | ☐ Reported Via PR17 |
| Electrical | Electrical Distribution System (service) | Wiring | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Remove wire nut and replace with proper crimp connection for wires in circuit breaker panel by forward ladder.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 3 | 31MAR2002 | | ☐ Not Available For Inspection<br>☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX<br>☐ SMS Related/Objective Evidence For MSO |
| 15MAR2002 | 29MAR2002 | | ☐ Self Reported |
| **System:** | **Subsystem:** | **Component:** | ☐ Reported Via PR17 |
| Electrical | Electrical Distribution System (service) | Conductor | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Remove solid core wire conductors in circuit breaker panel by forward ladder and replace with stranded wire.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 4 | 31MAR2002 | | ☐ Not Available For Inspection<br>☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX<br>☐ SMS Related/Objective Evidence For MSO |
| 12FEB2002 | 05APR2002 | | ☐ Self Reported |
| **System:** | **Subsystem:** | **Component:** | ☐ Reported Via PR17 |
| Electrical | Electric Supply System (service) | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Replace all non-approved cable onboard vessel. LEGACY COMPONENT DESC: Cable

**Resolution:**

## Narrative:

US003135

**ER 296**

This examination was conducted in accordance with applicable U.S. laws, regulations and polices set forth in the Marine Safety Manual and current instructions, directives, and notices. Copies of documents have been placed in the vessel's official file. The vessel was found to be in compliance with all applicable regulations and found satisfactory unless noted in vessel activity report. Details are as follows:

NARRATIVE:
25FEB2002 - Visited vessel to conduct damage survey. Vessel hauled for emergency drydock due to fracture in plywood skins and water intrusion into the bilge in the bunk room. Examined area and discussed repairs with vessel operator and boat yard personnel. Issued rqmt to submit repair proposal for approval and to make permanent repairs to the hull iwo the damaged area. Inspection to continue.


//Y.V. GRAVES, LT//
MSD SANTA BARBARA

15MAR2002 – Attended vessel to examine repairs in progress and to conduct a credit hull examination. Repairs progressing smoothly and in accordance with approved repair proposal submitted by Mr. Doug Shumpert's dtd March 11, 2002. Final report from yard outlining scope of repairs on file in vessel file at SBCD. Numerous drop-by visits made to the vessel while the repairs were ongoing to check on the status and workmanship of repairs.

All appeared satisfactory during hull examination w/exception of items noted above in the inspection results-deficiencies section and repairs to damaged hull area. Repairs being effected during this availability period are in same area identified in inspection note #7.

05APR2002 - Completed satisfactory credit drydock examination. Final inspection of repairs conducted 02APR2002 and check ride conducted this date. Vessel also removed all unapproved wiring/cable and replaced with approved marine grade wiring. Cleared outstanding deficiency to change out wiring. All outstanding deficiencies associated with damage repairs and credit hull exam cleared at this time and no other deficiencies remaining outstanding.

In my opinion, at this time this vessel is fit for the route and service specified on the COI.


//D.C. LEONARD, CWO4//
MSD SANTA BARBARA


## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 15MAR2002 | Marine Safety Detachment Santa Barbara |
| Inspection Type: | Date: | Unit: |
| Damage Survey | 15MAR2002 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|

Company Name:
**PHASE I**
Inspector Comments:
**PHASE II**
Inspector Comments:
**PHASE III**
Inspector Comments:
**PHASE IV**
Inspector Comments:
Location(s): (None)


Associated Parties: (None)


TWIC Details: (None)


US003136

**ER 297**

**Radiation Details:**

| Radiation: | Unknown |
| --- | --- |

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
| --- | --- | --- | --- |
| 14MAR2002 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 09AUG2002 | Status Changed to "Closed - Agency Action Complete" | MSO LOS ANGELES/LONG BEACH | Admin, System |
| 11APR2002 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 09AUG2002 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |
| 01AUG2002 | XFerred Control to MSO LOS ANGELES/LONG BEACH for Approval | Marine Safety Detachment Santa Barbara | Admin, System |
| 08AUG2002 | XFerred Ownership and Control to MSO LOS ANGELES/LONG BEACH for Approval | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
| --- | --- | --- |
| CONCEPTION_COI_Amended_09Jul2002. xls | Certificate of Inspection - Amended | Cert_Id=3285147 |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
| --- | --- | --- | --- |
| Sector Los Angeles/Long Beach | DEACTIVATED | 06FEB2002 | 06FEB2007 |

US003137



U.S. Department of
Homeland Security

United States
Coast Guard

### Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 2027465 |
| Activity Type: | Vessel Inspection |
| Title/Description: | SV-T HULL EXAM |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan    805-962-1127 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 19MAR2004 08:02Z |
| Prompt Date: | |
| Team Lead: | Leonard, David C. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| Classification: | Primary VIN: | Length: |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| ITC/Convention (Subpart B): | Regulatory (Subpart C or D): | Year Completed: |
| | 97 | 1981 |
| Engine Compartment In An Open Space: | Fuel Compartment In An Open Space: | Vessel Constructed Of All Open Spaces: |
| Not Applicable | Not Applicable | Not Applicable |
| Propulsion System Type: | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| Address: | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| Name: | Type: | Role: |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| Address: | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Construction/Loadline | Inspected Satisfactory | 19MAR2004 |

### Narrative:

US003127

**ER 299**

This examination was conducted in accordance with applicable U.S. laws, regulations and polices set forth in the Marine Safety Manual and current instructions, directives, and notices. Copies of documents have been placed in the vessel's official file. The below items were examined and/or tested and found satisfactory unless noted. Details are as follows:

DESIGN CONSTRUCTION / VESSEL TYPE: PLYWOOD HULL SMALL PASSENGER VESSEL
LENGTH / GROSS TONNAGE: 75' / 97GT
PROPULSION: DIESEL REDUCTION
ROUTE: OCEANS

NARRATIVE:
March 19, 2004
Visited vessel at location above to conduct credit hull examination. Examined condition of underwater body, hull bottom, transom, keel and other underwater appendages. Examined rudders, propellers, tailshafts, struts and all associated bearings. All appeared satisfactory.

Examined internal spaces including accessible structural members in way of fore peak, fwd shower compartment and accommodation space, engine room and lazarette. All appeared satisfactory.

Examined vessels watertight integrity including hatches, scuttles, freeing ports and other thru hull fittings above the waterline. All appeared satisfactory.

Completed satisfactory hull examination. There were no requirements issued, none cleared and one remaining outstanding. Amended COI to reflect new hull exam dates and changed route to reflect change in communications equipment requirements.

In my opinion, at this time this vessel is fit for the route and service specified on the COI.


//s//D. C. LEONARD, CWO4//
MSD SANTA BARBARA


## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 19MAR2004 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

**Vessel Name:** CONCEPTION
**Company Name:**
**PHASE I**
Inspector Comments:
**PHASE II**
Inspector Comments:
**PHASE III**
Inspector Comments:
**PHASE IV**
Inspector Comments:
Location(s): (None)


Associated Parties: (None)


TWIC Details: (None)


## Radiation Details:

**Radiation:**     Unknown


Operational Controls: (None)

US003128

**ER 300**

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 19MAR2004 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 23MAR2004 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 19MAR2004 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 23MAR2004 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
|---|---|---|
| CONCEPTION_COI_Amended_19Mar2004.xls | Certificate of Inspection - Amended | Cert_Id=3365075 |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
|---|---|---|---|
| Marine Safety Detachment Santa Barbara | DEACTIVATED | 06FEB2002 | 06FEB2007 |

US003129

ER 301



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3371896 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) - Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 25NOV2008 09:27Z |
| Prompt Date: | |
| Team Lead: | Giles, John P. |

## Vessel Information:

| **Vessel Name:** | **Call Sign:** | **Current Flag / Flag At Time Of Activity:** |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| **Name:** | **Type:** | **Role:** |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd<br>SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD<br>SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 25DEC2008 |
| Communications | Inspected Satisfactory | 25DEC2008 |
| Construction/Loadline | Inspected Satisfactory | 25DEC2008 |
| Deck/Cargo | Inspected Satisfactory | 25DEC2008 |
| Documentation | Inspected Satisfactory | 25DEC2008 |
| Electrical | Inspected With Deficiencies Noted | 25DEC2008 |
| Engineering | Inspected Satisfactory | 25DEC2008 |
| Fire Fighting | Inspected Satisfactory | 25DEC2008 |
| Lifesaving | Inspected With Deficiencies Noted | 25DEC2008 |
| Navigation | Inspected Satisfactory | 25DEC2008 |
| Operations/Management | Inspected Satisfactory | 25DEC2008 |

US002900

| Personnel | Inspected Satisfactory | 25DEC2008 |
| Pollution Prevention/Response | Inspected Satisfactory | 25DEC2008 |
| Stability | Inspected Satisfactory | 25DEC2008 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 28FEB2009 | | ☐ Not Available For Inspection |
| | | | ☐ Security Violation |
| Issued Date: | Resolved Date: | | ☐ Worklist Item/Do Not Show In PSIX |
| 25DEC2008 | 26FEB2009 | | ☐ SMS Related/Objective Evidence For MSO |
| System: | Subsystem: | Component: | ☐ Self Reported |
| Lifesaving | Buoyant Apparatus | Serviceable | ☐ Reported Via PR17 |
| Action: | Action Code: | ACS/RO/TPO Finding Number: | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**
Renew/repair two 25 person ea lifefloats above pilot house.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 2 | 30JAN2009 | | ☐ Not Available For Inspection |
| | | | ☐ Security Violation |
| Issued Date: | Resolved Date: | | ☐ Worklist Item/Do Not Show In PSIX |
| 25DEC2008 | 27JAN2009 | | ☐ SMS Related/Objective Evidence For MSO |
| System: | Subsystem: | Component: | ☐ Self Reported |
| Electrical | Lighting (emergency) | Lighting Fixture | ☐ Reported Via PR17 |
| Action: | Action Code: | ACS/RO/TPO Finding Number: | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**
Make operational emergency lighting in accommodation space below decks.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 3 | 30JAN2009 | | ☐ Not Available For Inspection |
| | | | ☐ Security Violation |
| Issued Date: | Resolved Date: | | ☐ Worklist Item/Do Not Show In PSIX |
| 25DEC2008 | 27JAN2009 | | ☐ SMS Related/Objective Evidence For MSO |
| System: | Subsystem: | Component: | ☐ Self Reported |
| Electrical | Electrical Distribution System (service) | Distribution Panel Bus | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| Action: | Action Code: | ACS/RO/TPO Finding Number: | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**
provide cover for blank switch in distribution panel located in pilot house.

**Resolution:**

## Narrative:

US002901

ER 303

This inspection was conducted in accordance with applicable US laws, regulations, and the policies set forth in the Marine Safety Manual, current instructions, directives, and notices. The applicable CG-840 inspection book has been referenced as a job-aid.

Insp Type: ANNUAL
Vsl Type: T-Boat, 75', Wood, Over Night Accommodations, Oceans.
Vsl Operations: Excursion, Dive Ops
Preparation: Conducted a thorough review of the vessel critical profile and relevant inspection notes.

25NOV2008; CWO Giles visited vessel to conduct annual re-inspection. Conducted satisfactory thorough inspection, including operational propulsion machinery and steering gear checks. Satisfactory inspection of all fire fighting, navigational and lifesaving equipment. Conducted satisfactory inspection of all compartments, accommodation spaces and deck areas. All pertinent documentation, logs, records and procedures in order. U/W emergency drills conducted satisfactory. Satisfactory DAPI Audit conducted within the past 12 months. Issued CG-835 for the following items;
1. Renew/repair two 25 person ea life floats above pilot house.
2. Make operational emergency lighting located in passenger accommodation space below decks.
3. Provide cover for blank switch in distribution panel located in pilot house.
To be corrected NLT 30JAN2009.
Endorsed COI for annual inspection. "In my opinion this vessel is fit for the route and service intended on the COI."
//S// CWO J P Giles.

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 25NOV2008 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.9 N | 119°40.2 W | 25NOV2008 09:27Z | SANTA BARBARA HARBOR-SANTA BARBARA HARBOR, CA |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

US002902

**ER 304**

Case 2:21-cv-07065-PA-MRW    Document 98-9    Filed 07/08/24    Page 16 of 74    Page ID #:1420



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3404000 |
| Activity Type: | Vessel Inspection |
| Title/Description: | "T" Hull Exam |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Bowlen 705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 26JAN2009 09:47Z |
| Prompt Date: | |
| Team Lead: | Giles, John P. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |

**Address:**

301 W. Cabrillo Blvd
SANTA BARBARA, CALIFORNIA 93101

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |

**Address:**

301 WEST CABRILLO BLVD
SANTA BARBARA, CALIFORNIA 93101-3886

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 26JAN2009 |
| Communications | Inspected Satisfactory | 26JAN2009 |
| Construction/Loadline | Inspected Satisfactory | 26JAN2009 |
| Deck/Cargo | Inspected Satisfactory | 26JAN2009 |
| Documentation | Inspected Satisfactory | 26JAN2009 |
| Electrical | Inspected Satisfactory | 26JAN2009 |
| Engineering | Inspected Satisfactory | 26JAN2009 |
| Fire Fighting | Inspected Satisfactory | 26JAN2009 |
| Lifesaving | Inspected Satisfactory | 27JAN2009 |
| Navigation | Inspected Satisfactory | 26JAN2009 |
| Operations/Management | Inspected Satisfactory | 26JAN2009 |

US000195

US000382

**ER 305**

| Pollution Prevention/Response | Inspected Satisfactory | 26JAN2009 |
| Stability | Inspected Satisfactory | 26JAN2009 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 28FEB2009 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 25DEC2008 | 26FEB2009 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Buoyant Apparatus | Serviceable | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Renew/repair two 25 person ea lifefloats above pilot house.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 2 | 30JAN2009 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 25DEC2008 | 27JAN2009 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Lighting (emergency) | Lighting Fixture | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Make operational emergency lighting in accommodation space below decks.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 23 | 01MAR2009 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 26JAN2009 | 25FEB2009 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifefloat | Serviceable | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Renew, replace and/or completely overhaul lifefloats located above pilot house (2 total, 50 persons total).  Vessel is limited to 60 pax max until this requirement is corrected.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 3 | 30JAN2009 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 25DEC2008 | 27JAN2009 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Electrical Distribution System (service) | Distribution Panel Bus | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

provide cover for blank switch in distribution panel located in pilot house.

**Resolution:**

US000196                                                    US000383

**ER 306**

## Narrative:

This inspection was conducted in accordance with applicable US laws, regulations, and the policies set forth in the Marine Safety Manual, current instructions, directives, and notices.  The applicable CG-840 inspection book has been referenced as a job-aid.

27JAN2009;  CWO Giles attended vessel  at  Ventura B/Y to conduct hull exam.  Satisfactorily inspected all external and internal hull structures including all through hull fittings, propulsion and steering system.  Vessel renewed all strutt bearing at this drydock.  Issued CG-835 for the follwing;
1.  Replace/overhaul two lifefloats located ontop of pilot house due to excessive deterioration.  Vessel limited to 60 pax until this requirement is corrected.

30JAN2007:  Vessel placed back in water, credit drydock given this date.  Amended hull exam dates for satisfactory credit drydock exam.
"In my opinion this vessel is fit for the route and service intended on the COI."  //S// CWO J P Giles

25FEB2007:  Visited vsl moored Santa Barbara Harbor for purpose of DFU.  Lifefloats repair satisfactorily.  0 Defs remain outstanding.

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 27JAN2009 | Marine Safety Detachment Santa Barbara |
| Inspection Type: | Date: | Unit: |
| Deficiency Check | 25FEB2009 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

**Vessel Name:**    CONCEPTION

**Company Name:**

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:
Location(s): (None)

Associated Parties: (None)

TWIC Details: (None)

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

## Log:

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 02FEB2009 | Activity Created. Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 04MAR2009 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |

US000197                                                     US000384

**ER 307**

| 23FEB2009 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 04MAR2009 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

---

**Certificates:**

| Name: | Type: | Description: |
|---|---|---|
| CONCEPTION_COI_Amended_26Jan2009.xls | Certificate of Inspection - Amended | Cert_Id=3787997 |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
|---|---|---|---|
| Marine Safety Detachment Santa Barbara | DEACTIVATED | 02SEP2005 | 02SEP2010 |

US000198                                                                                   US000385

**ER 308**



**U.S. Department of Homeland Security**

**United States Coast Guard**

## Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3500348 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION - DAPI AUDIT |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jim Lenaburg @ 805-962-1127 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 10JUN2009 09:53Z |
| Prompt Date: | |
| Team Lead: | Young, Michael S. |

### Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

### Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Operations/Management | Inspected Satisfactory | 10JUN2009 |

### Narrative:

Conducted DAPI audit iaw D11 msg 201942Z JUN08. Reviewed all available company documentation of chem. testing program, which included electronic files transmitted by company's contracted consortium/TPA.

There were no defs noted. This company has an examplary chemical testing program in place, overseen by a part-time administrative worker who is very familiar with, and conversant in, the DOT chem testing regs.

//s// CWO3 M. S. Young

US000164                                    US000351

**ER 309**

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| DAPI Audit | 10JUN2009 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| Company Name: | |

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.9 N | 119°40.2 W | 10JUN2009 09:53Z | SANTA BARBARA HARBOR-SANTA BARBARA HARBOR, CA |

Associated Parties: (None)

### TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Other | 0 | 0 | 0 | |

### Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

### Log:

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 10JUN2009 | Activity Created. Status: "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 10JUN2009 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 10JUN2009 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 10JUN2009 | Status Changed to "Open - Returned for Revision" | Marine Safety Detachment Santa Barbara | Admin, System |
| 10JUN2009 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

### Documents:

| Name: | Type: | Description: |
|---|---|---|
| Truth Aquatics DAPI JUN09 | Legacy - Unknown | |

Certificates: (None)

US000165                                      US000352

**ER 310**



**U.S. Department of Homeland Security**

**United States Coast Guard**

## Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3643281 |
| Activity Type: | Vessel Inspection |
| Title/Description: | "CONCEPTION" (T) COI |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry 805-705-1740 |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 02DEC2009 07:31Z |
| Prompt Date: | |
| Team Lead: | Giles, John P. |

### Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

### Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 02DEC2009 |
| Communications | Inspected Satisfactory | 02DEC2009 |
| Construction/Loadline | Inspected Satisfactory | 02DEC2009 |
| Deck/Cargo | Inspected Satisfactory | 02DEC2009 |
| Documentation | Inspected Satisfactory | 02DEC2009 |
| Electrical | Inspected Satisfactory | 02DEC2009 |
| Engineering | Inspected Satisfactory | 02DEC2009 |
| Fire Fighting | Inspected Satisfactory | 02DEC2009 |
| Lifesaving | Inspected Satisfactory | 02DEC2009 |
| Navigation | Inspected Satisfactory | 02DEC2009 |
| Operations/Management | Inspected Satisfactory | 02DEC2009 |

US000159                                                                US000346

| | | |
|---|---|---|
| Personnel | Inspected Satisfactory | 02DEC2009 |
| Pollution Prevention/Response | Inspected Satisfactory | 02DEC2009 |
| Stability | Inspected Satisfactory | 02DEC2009 |

**Deficiencies:**

| **Item Number:** | **Due Date:** | **Extended Due Date:** | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | 10JAN2010 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 02DEC2009 | 24DEC2009 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Communications | Radio Communications | VHF Radiotelephone | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Provide valid Communications Acy Safety Radiotelephony Certificate.

**Resolution:**

**Narrative:**

US000160

US000347

**ER 312**



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3937754 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION - Hull |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Bowlan |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 26JAN2011 09:00Z |
| Prompt Date: | |
| Team Lead: | Shultz, John W. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 26JAN2011 |
| Construction/Loadline | Inspected Satisfactory | 26JAN2011 |
| Deck/Cargo | Inspected Satisfactory | 26JAN2011 |
| Documentation | Inspected Satisfactory | 26JAN2011 |
| Stability | Inspected Satisfactory | 26JAN2011 |

## Narrative:

US000156                                                          US000343

**ER 313**

02FEB11: Attended vessel on stands in Ventura Boat Yard, for the purpose of conducting a credit drydock. Issued (00) work list items, (00) cleared, and (00) remain outstanding. There are no requirements outstanding from previous inspections and no Special Notes specific to this inspection. This vessel is a 75 foot, 97 gross ton, wood monohull vessel built in 1981. The vessel is certificated for the carriage of 106 passengers on an Oceans route. Met with vessel Operator Jerry Bowlan to discuss scope of examination. The CG-840(T) book was referenced as a guide.

HULL STRUCTURAL MEMBERS/WATERTIGHT INTEGRITY
Examined hull exterior and interior spaces for signs of damage and unauthorized repairs. No discrepancies noted.

RUDDERS, PROPELLERS AND TAILSHAFTS
Examined rudders, propellers & tail shafts. No discrepancies noted.

VALVES AND THROUGH-HULL FITTINGS
Examined sea valves and through-hull fittings. No discrepancies noted.

GROUND TACKLE
No discrepancies noted.

COMMENTS
Completed satisfactory hull examination. There were no requirements issued, none cleared and none remaining outstanding. In my opinion, the vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection. Inspection complete.

ITEMS RETAINED FOR MSD SANTA BARBARA FILES:
1. Copy of amended COI.


//s//
J. W. SHULTZ, CWO2, USCG
MSD Santa Barbara

## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Hull Examination | 26JAN2011 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
| --- | --- |
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
| --- | --- | --- | --- |
| 34°14.9 N | 119°16.0 W | 26JAN2011 09:00Z | VENTURA HARBOR-VENTURA HARBOR, CA |


Associated Parties: (None)


### TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
| --- | --- | --- | --- | --- |
| Licensed Mariner | 1 | 1 | 0 | |

US000157                    US000344

**Radiation Details:**

| | |
|---|---|
| **Radiation:** | No Radiation Detected |

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 02FEB2011 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 28FEB2011 | Open - Submitted to Sector LA-LB for review and approval. | Marine Safety Detachment Santa Barbara | Admin, System |
| 29APR2011 | Status Changed to "Closed - Approved Inspection" | Sector Los Angeles/Long Beach | Admin, System |
| 03FEB2011 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 28FEB2011 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 22APR2011 | Status Changed to "Open - Submitted for Review" | Sector Los Angeles/Long Beach | Admin, System |
| 29APR2011 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |
| 28FEB2011 | XFerred Ownership and Control to SEC LA/LB for Approval | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
|---|---|---|
| CONCEPTION_COI_Amended_26Jan2011.xls | Certificate of Inspection - Amended | Cert_Id=3967860 |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
|---|---|---|---|
| Sector Los Angeles/Long Beach | DEACTIVATED | 02DEC2009 | 02DEC2014 |

US000158

US000345



**U.S. Department of Homeland Security**

**United States Coast Guard**

## Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 3946011 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION - Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry (805) 705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 15FEB2011 13:44Z |
| Prompt Date: | |
| Team Lead: | Shultz, John W. |

### Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

### Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 15FEB2011 |
| Communications | Inspected Satisfactory | 15FEB2011 |
| Construction/Loadline | Inspected Satisfactory | 15FEB2011 |
| Deck/Cargo | Inspected Satisfactory | 15FEB2011 |
| Documentation | Inspected Satisfactory | 15FEB2011 |
| Electrical | Inspected Satisfactory | 15FEB2011 |
| Engineering | Inspected Satisfactory | 15FEB2011 |
| Fire Fighting | Inspected Satisfactory | 15FEB2011 |
| Lifesaving | Inspected Satisfactory | 15FEB2011 |
| Navigation | Inspected Satisfactory | 15FEB2011 |
| Operations/Management | Inspected Satisfactory | 15FEB2011 |

US000152                                                              US000339

| | | |
|---|---|---|
| Personnel | Inspected Satisfactory | 15FEB2011 |
| Pollution Prevention/Response | Inspected Satisfactory | 15FEB2011 |
| Stability | Inspected Satisfactory | 15FEB2011 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | | | ☐ Security Violation |
| | | | ☐ Worklist Item/Do Not Show In PSIX |
| **Issued Date:** | **Resolved Date:** | | ☐ SMS Related/Objective Evidence For MSO |
| 15FEB2011 | 22FEB2011 | | |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Engineering | Diesel Engine (propulsion/auxiliary-electric) | Charge Air Cooling | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 701 - Prior to carriage of passengers/cargo | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Prove proper operation on Ships Service Generator

**Resolution:**

Proved proper operation of Ships Service Generator

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 2 | 17MAR2011 | | ☐ Security Violation |
| | | | ☐ Worklist Item/Do Not Show In PSIX |
| **Issued Date:** | **Resolved Date:** | | ☐ SMS Related/Objective Evidence For MSO |
| 15FEB2011 | 23FEB2011 | | |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifejacket/PFD (Type I) | Condition | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Replace 32 rejected Type I life Jackets. Passenger count reduced by 32 Pax

**Resolution:**

Replaced 32 rejected Type I life Jackets

## Narrative:

16FEB11:  Attended vessel moored starboard side to, Santa Barbara Harbor, CA, for the purpose of conducting Annual exam.  Issued (02) requirements, (00) cleared and (02) remains outstanding.  There are no outstanding requirements from previous inspections and four special notes specific to this inspection.  This vessel is a 75 foot, 97 gross ton, wood mono hull, built in 1981.  The vessel is currently certificated for the carriage of 106 passengers on an Oceans route.  This inspection was conducted using the CG-840 book as a guide. Met with vessel representative Jerry Boylan to discuss the scope of the inspection.

LIC, DOCS, & CERTS
Examined all vessel documents, captain licenses, certificates, and training records.  (00) def noted

NAVIGATION SAFETY/COMMUNICATIONS
Tested VHF radio and marine radar.  Energized all navigation lights and inspected magnetic compass, signaling devices and navigation publications.  (00) def noted

STRUCTURAL INTEGRITY
Entered all accessible internal voids and visually examined outer hull to the waterline to inspect for damage and unauthorized repairs. (00) def noted

GENERAL HEALTH AND SAFETY
Inspected vessels first-aid kit, overnight accommodation space and conducted operational test of public address system and general alarm. (00) def noted

GROUND TACKLE
Visually inspected vessels anchor and line (00) def noted.

LIFESAVING EQUIPMENT
Examined all life saving appliances & PFDs.  (01) def noted

1. replace 32 rejected Kapok Type I life Jackets

FIRE PROTECTION
Examined portable, fixed firefighting equipment and fire pump.  Conducted test and inspection of fire detection system in galley including grease extraction hood IAW special notes #3, 4 & 5.  (00) def noted

MACHINERY
Operationally tested propulsion machinery and steering system.  Exercised vessel's power and portable bilge pumps, high water alarms and emergency fuel shut off valves.  Inspected vital system piping throughout engine room IAW special note #2.  (01) def noted

1. Prove proper operation of Ships Service Generator

STEERING
Steering system is a hydraulic assembly.  Conducted satisfactory operational test of bridge steering stations.  Examined the entire system while exercising the helm.  All hoses and fittings were examined and found satisfactory.  Examined securing devices and connections; all satisfactory.  Rudder post, packing and tiller examined and found satisfactory.

ELECTRICAL EQUIPMENT
Examined vessel's generators, batteries, wiring, switchboards and distribution panels.  (00) def noted

POLLUTION PREVENTION
(00) def noted

DRILLS:
Conducted satisfactory man-overboard and firefighting drills.  (00) def noted

COMMENTS:
Issued (02) requirements, (00) cleared and (02) remain outstanding.  No requirements remain outstanding from previous inspections.  In my opinion, vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection.  Endorsed COI.  Inspection complete.

ITEMS RETAINED FOR MSD SANTA BARBARA FILES:
1. Copy of issued CG-835 requirements.
2. Copy of DAPI Audit

NOTES: Added MISLE NOTE; Operator was issued stability flyers regarding pax weight increase.  Advised operator that based upon the weight ratio option the vessels passenger count on its COI would be reduced by 7 pax.

//s//
J. W. Shultz, CWO2, USCG
MSD Santa Barbara

23FEB11: Attended vessel moored starboard side to, Santa Barbara Harbor, CA, for the purpose of conducting follow-up exam.  The 32 Type I Life Jackets have been properly outfitted and are properly stored.  Ships Service Generator was found to have had a faulty oiler cooler which was allowing the ingress of coolant into the crankcase.  Proper repairs were conducted and the generator was tested with and without load, all sat.

Inspection Complete

//s//
J. W. Shultz, CWO2, USCG
MSD Santa Barbara

## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Annual Inspection | 16FEB2011 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| DAPI Audit | 16FEB2011 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
| --- | --- |
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |

US000154                    US000341

**ER 318**

**PHASE IV**

Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.9 N | 119°40.2 W | 15FEB2011 13:44Z | SANTA BARBARA HARBOR-SANTA BARBARA HARBOR, CA |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 1 | 1 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

## Log:

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 15FEB2011 | Activity Created. Status: "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 30MAR2011 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 23FEB2011 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 30MAR2011 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

Certificates: (None)

US000155                                                US000342

**ER 319**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 4119646 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION: ADMIN DEF ISSU |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | GLEN F. 805-962-1127 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 20JUL2011 11:52Z |
| Prompt Date: | |
| Team Lead: | Decamp, William . |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Electrical | Inspected With Deficiencies Noted | 20JUL2011 |

US000088                                                                US000275

**ER 320**

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 01APR2012 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 20JUL2011 | 24JAN2013 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Electric Supply System (service) | Cable | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Remove all welding cable from electrical circuit and replace with approved marine cable.

**Resolution:**

**Narrative:**

20JUL211: CWO DeCamp/Schultz identified 01 gauge welding cable utilized in the 24 V system. Welding is not approved for shipboard electrical use, however, USCG vsl construction plans from 1995 approved it as is. Issued requirement to replace cable with approved marine grade cable at next DD exam.

/s/ W. DeCamp CWO4

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Administrative Inspection | 20JUL2011 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|

**Company Name:**

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

Location(s): (None)

Associated Parties: (None)

TWIC Details: (None)

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

US000089                                                US000276

# ER 321

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 18AUG2011 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 18AUG2011 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 18AUG2011 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)


Certificates: (None)

US000277



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 4257804 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) 2nd Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Glen Fritzler; 805-962-1127 |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 06MAR2012 09:00Z |
| Prompt Date: | |
| Team Lead: | Robuck, Chad J. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| Name: | Type: | Role: |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 06MAR2012 |
| Communications | Inspected Satisfactory | 06MAR2012 |
| Construction/Loadline | Inspected Satisfactory | 06MAR2012 |
| Deck/Cargo | Inspected Satisfactory | 06MAR2012 |
| Documentation | Inspected Satisfactory | 06MAR2012 |
| Electrical | Inspected Satisfactory | 06MAR2012 |
| Engineering | Inspected Satisfactory | 06MAR2012 |
| Fire Fighting | Inspected Satisfactory | 06MAR2012 |
| Lifesaving | Inspected Satisfactory | 06MAR2012 |
| Navigation | Inspected Satisfactory | 06MAR2012 |
| Operations/Management | Inspected Satisfactory | 06MAR2012 |

US000043                                    US000230

**ER 323**

| Personnel | Inspected Satisfactory | 06MAR2012 |
|---|---|---|
| Pollution Prevention/Response | Inspected Satisfactory | 06MAR2012 |
| Stability | Inspected Satisfactory | 06MAR2012 |

## Narrative:

06Mar2012:
Attended vessel moored starboard side to, Sea Landing dock, Santa Barbara, CA. for the purpose of conducting second annual inspection. Issued (0) requirements, (0) cleared and (0) remain outstanding from this inspection. There is (1) outstanding requirement from previous inspections. This vessel is a 75ft, 97 gross ton, wood, mono-hull built in 1981. The vessel is currently certificated for operation on an Oceans route not more than 100 miles from the mainland shore, not on an international voyage. Met with the vessel Master to discuss the scope of inspection.

DOCUMENTATION:
Vessel's original stability letter previously allowed the carriage of 120 persons on an exposed route. A new stability letter addendum will be issued reducing the maximum allowable persons to 103 in accordance with AAWPP standards. The COI will be amended to reflect carriage of the same.

Vessel has one outstanding requirement to replace all welding cable from electrical circuits and replace with approved marine cable. Inspector witnessed spool of approved marine cable however, it has not been installed. Owner requested an extension of the CG-835 to 01 Apr 2012 to complete.

Conducted operational tests of the vessel's bilge pump, high water alarms, fire pump, fuel shut off valves and engine room ventilation closures. Firefighting and Manoverboard drills were not conducted due to heavy weather. Additionally, completed a satisfactory operational test of the vessel's 406MHz EPIRB.

Issued (0) requirements, (0) cleared and (0) remain outstanding from this inspection. There is (1) outstanding requirement from a previous inspection which has been extended for completion no later than 01 Apr 2012.

In my opinion, the vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection, with the above mentioned discrepancy noted. Endorsed COI. Amended passengers permitted to reflect new AAWPP standards. Inspection complete.

ITEMS RETAINED FOR MSD SANTA BARBARA FILES:
1. Copy of amended COI.
2. Copy of Stability Letter Addendum.

//s//
C. J. ROBUCK, LT, USCG
MSD Santa Barbara

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 06MAR2012 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|

**Company Name:**

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.6 N | 119°41.5 W | 06MAR2012 09:00Z | Sea Landing |

Associated Parties: (None)

US000231

**TWIC Details:**

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 2 | 2 | 0 | |

**Radiation Details:**

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 06MAR2012 | Activity Created. Status: "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 06MAR2012 | Open - Submitted to Sector LA-LB for review and approval. | Marine Safety Detachment Santa Barbara | Admin, System |
| 03APR2012 | Status Changed to "Closed - Approved Inspection" | Sector Los Angeles/Long Beach | Admin, System |
| 06MAR2012 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 13MAR2012 | Status Changed to "Open - Submitted for Review" | Sector Los Angeles/Long Beach | Admin, System |
| 03APR2012 | Status_DtTm | Sector Los Angeles/Long Beach | Admin, System |
| 06MAR2012 | XFerred Ownership and Control to SEC LA/LB for Approval | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
|---|---|---|
| CONCEPTION_COI_Amended_06Mar2012.xls | Certificate of Inspection - Amended | Cert_Id=4075195 |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
|---|---|---|---|
| Sector Los Angeles/Long Beach | DEACTIVATED | 02DEC2009 | 02DEC2014 |

US000045

US000232

**ER 325**



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 4530050 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION: ANNUAL |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | GLEN FRITZLER |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 07FEB2013 15:06Z |
| Prompt Date: | |
| Team Lead: | Shultz, John W. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 07FEB2013 |
| Communications | Inspected Satisfactory | 07FEB2013 |
| Construction/Loadline | Inspected Satisfactory | 07FEB2013 |
| Deck/Cargo | Inspected Satisfactory | 07FEB2013 |
| Documentation | Inspected Satisfactory | 07FEB2013 |
| Electrical | Inspected With Deficiencies Noted | 07FEB2013 |
| Engineering | Inspected Satisfactory | 07FEB2013 |
| Fire Fighting | Inspected Satisfactory | 07FEB2013 |
| Lifesaving | Inspected With Deficiencies Noted | 07FEB2013 |
| Navigation | Inspected Satisfactory | 07FEB2013 |
| Operations/Management | Inspected Satisfactory | 07FEB2013 |

US000004                                                                                  US000191

| Personnel | Inspected Satisfactory | 07FEB2013 |
| Pollution Prevention/Response | Inspected Satisfactory | 07FEB2013 |
| Stability | Inspected Satisfactory | 07FEB2013 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| 1 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifejacket/PFD (Type I) | Quantity | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Condemned 31 adult and 02 lifejackets. Until that time, total amount of permitted passengers are limited to the limited jackets on board.

**Resolution:**

Replaced 31 adult and 2 child Type I PFDs

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| 2 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifebuoys | Quantity | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Replace one ring buoy at the pilots port bridge wing.

**Resolution:**

Replaced one ring buoy

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| 3 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Lighting (service) | Lighting Branch Circuit | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Secure wiring resting on the post link bar.

**Resolution:**

Secured wiring on post link bar

## Narrative:

07Mar2012:  CWO DeCamp attended vessel moored Santa Barbara, CA, for the purpose of conducting ANN inspection. This vessel is a 75 ft, 97 gross ton, plywood hull, built in 1981.  The vessel is currently certificated for the carriage of 103 POB on Oceans route.  Vessel represented by Jerry.

LIFESAVING: 02 def issued.

1. Condemned 31 adult and 02 Childs lifejackets. Until that time, total amount of permitted passengers are limited to the limited jackets on board.
2. Replace one ring buoy at the pilots port bridge wing.

ELECTRICAL EQUIPMENT
1. Secure wiring resting on the post link bar.

DRILLS:
Completed satisfactory MOB and main space fire drill.

COMMENTS:
Satisfactory DAPI audit conducted within the past 12 months by Sector LA/LB.  03 requirement issued, 00 cleared, 03 outstanding. In my opinion, vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection.  Endorsed COI. Inspection complete.

//s//
W. DeCamp, CWO4, USCG
MSD Santa Barbara

24JUN13 - Corrected next inspection due date.  //S// J.A. FRY, LT


## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Annual Inspection | 08FEB2013 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
| --- | --- |
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
| --- | --- | --- | --- |
| 34°24.9 N | 119°40.2 W | 07FEB2013 15:06Z | SANTA BARBARA HARBOR-SANTA BARBARA HARBOR, CA |

Associated Parties: (None)


## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
| --- | --- | --- | --- | --- |
| Licensed Mariner | 1 | 1 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
| --- | --- |

Operational Controls: (None)

US000006                                    US000193

**ER 328**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 4521627 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION: HULL |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Glenn Fritzler |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 24SEP2013 07:27Z |
| Prompt Date: | |
| Team Lead: | Decamp, William . |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Construction/Loadline | Inspected Satisfactory | 24JAN2013 |
| Deck/Cargo | Inspected Satisfactory | 24JAN2013 |
| Electrical | Not Inspected | 24JAN2013 |
| Stability | Inspected Satisfactory | 24JAN2013 |

US000001                                                                                     US000188

**ER 329**

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | 01APR2012 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 20JUL2011 | 24JAN2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Electric Supply System (service) | Cable | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Remove all welding cable from electrical circuit and replace with approved marine cable.

**Resolution:**

### Narrative:

24Jan13: CWO DeCamp and CPO Udland attended vessel at Ventura B/Y, CA, for the purpose of conducting hull inspection. This vessel is a 75 foot, 97 gross ton, plywood hull dive boat.  The vessel is currently certificated for the carriage of 103 POB on Coastwise route. Vessel represented by Glen Fritzler.

CONSTRUCTION/LOADLINE.

Make repair to shaft strut foundation as indicated.
Complete hull check ride for hull credit.
Repair fresh water leak at the shower.
Treat soft rot port side FWD lax blkh.
Make vapor tight aft E/R blkh.

ENGINEERING- Conducted exam of 8 overboard ball valve, all sat. Clear outstanding def from before to replace all welding cable in the 12V system, all sat.

01Feb13: Attended vessel and conducted DEF ck. Required worklist items completed to satisfaction. Conduced wood boat post DD check ride, all sat. Hull credit DD granted.

COMMENTS:
In my opinion, vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection. Amended COI for hull credit. Inspection complete.
Declaration

//s//
W. DeCamp, CWO4, USCG
MSD Santa Barbara

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 24SEP2013 | Sector Los Angeles/Long Beach |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 24SEP2013 | Sector Los Angeles/Long Beach |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| Company Name: | |

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°14.9 N | 119°16.0 W | 24JAN2013 07:27Z | VENTURA HARBOR-VENTURA HARBOR, CA |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 1 | 1 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

## Log:

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 24JAN2013 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 01FEB2013 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 19OCT2013 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 19JUL2013 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 03SEP2013 | Status Changed to "Open - Submitted for Review" | Sector Los Angeles/Long Beach | Admin, System |
| 23SEP2013 | Status Changed to "Open - Submitted for Review" | Sector Los Angeles/Long Beach | Admin, System |
| 19OCT2013 | Status_DtTm | Sector Los Angeles/Long Beach | Admin, System |
| 27SEP2013 | XFerred Ownership and Control to MSD StBarbara for Completion | Sector Los Angeles/Long Beach | Admin, System |
| 24JUL2013 | XFerred Ownership and Control to SEC LA/LB for Completion | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

## Certificates:

| Name: | Type: | Description: | |
|---|---|---|---|
| CONCEPTION_COI_Amended_24Jan2013.xls | Certificate of Inspection - Amended | Cert_Id=4168674 | |
| **Owning Unit:** | **Status:** | **Issued Date:** | **Expired Date:** |
| Marine Safety Detachment Santa Barbara | DEACTIVATED | 02DEC2009 | 02DEC2014 |
| Name: | Type: | Description: | |
| CONCEPTION_COI_Amended_24Sep2013.xls | Certificate of Inspection - Amended | Cert_Id=4231813 | |
| **Owning Unit:** | **Status:** | **Issued Date:** | **Expired Date:** |
| Sector Los Angeles/Long Beach | DEACTIVATED | 02DEC2009 | 02DEC2014 |



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 4795767 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION - 4th Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry (805) 705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 18FEB2014 09:00Z |
| Prompt Date: | |
| Team Lead: | Shultz, John W. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 18FEB2014 |
| Communications | Inspected Satisfactory | 18FEB2014 |
| Construction/Loadline | Inspected Satisfactory | 18FEB2014 |
| Deck/Cargo | Inspected Satisfactory | 18FEB2014 |
| Documentation | Inspected Satisfactory | 18FEB2014 |
| Electrical | Inspected Satisfactory | 18FEB2014 |
| Engineering | Inspected Satisfactory | 18FEB2014 |
| Fire Fighting | Inspected Satisfactory | 18FEB2014 |
| Lifesaving | Inspected With Deficiencies Noted | 18FEB2014 |
| Navigation | Inspected Satisfactory | 18FEB2014 |
| Operations/Management | Inspected Satisfactory | 18FEB2014 |

US000184

**ER 332**

| Personnel | Inspected Satisfactory | 18FEB2014 |
| Pollution Prevention/Response | Inspected Satisfactory | 18FEB2014 |
| Stability | Inspected Satisfactory | 18FEB2014 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifejacket/PFD (Type I) | Quantity | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Condemned 31 adult and 02 lifejackets. Until that time, total amount of permitted passengers are limited to the limited jackets on board.

**Resolution:**

Replaced 31 adult and 2 child Type I PFDs

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | 18APR2014 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 18FEB2014 | 18APR2014 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifefloat | Serviceable | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Service / Replace two 25 person L/F located atop pilot house roof.

**Resolution:**

Serviced two 25 person L/F

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 2 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifebuoys | Quantity | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Replace one ring buoy at the pilots port bridge wing.

**Resolution:**

Replaced one ring buoy

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 3 | 23FEB2013 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 07FEB2013 | 22FEB2013 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Lighting (service) | Lighting Branch Circuit | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

US000185

Secure wiring resting on the post link bar.

**Resolution:**

Secured wiring on post link bar

**Narrative:**

18FEB2014:  Attended vessel moored Santa Barbara, CA, for the purpose of conducting 4th Annual inspection. This vessel is a 75 ft, 97 gross ton, plywood hull, built in 1981.  The vessel is currently certificated for the carriage of 103 POB on Oceans route.  Vessel represented by Jerry.

LIFESAVING: 01 def issued.

1. Service / Replace two 25 person L/Fs located atop the pilot house roof.

DRILLS:
Completed satisfactory MOB and main space fire drill.

DRILLS:
Conducted satisfactory U/W emergency drills including man overboard and fire fighting. (00) def noted.

COMMENTS:
Issued (00) requirements, (00) cleared and (00) remain outstanding.  No requirements remain outstanding from previous inspections.  In my opinion, vessel is found fit for route and service as indicated on the COI, at the time of inspection.  Endorsed annual inspection on COI, Inspection complete.

ITEMS RETAINED FOR MSD SANTA BARBARA FILES:
1.  MISLE Activity Narrative

//s//
J. W. Shultz, CWO3, USCG
MSD Santa Barbara

## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Annual Inspection | 18FEB2014 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
| --- | --- |
| Company Name: | |

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
| --- | --- | --- | --- |
| 34°24.9 N | 119°40.2 W | 18FEB2014 09:00Z | SANTA BARBARA HARBOR-SANTA BARBARA HARBOR, CA |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
| --- | --- | --- | --- | --- |
| Licensed Mariner | 1 | 1 | 0 | |

## Radiation Details:

US000186

**ER 334**

**Radiation:**                  No Radiation Detected

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 06FEB2014 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 28FEB2014 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 20MAR2014 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 13NOV2014 | Status Changed to "Closed - Approved Inspection" | Marine Safety Detachment Santa Barbara | Admin, System |
| 20MAR2014 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 13NOV2014 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 13NOV2014 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

Certificates: (None)

US000187

**ER 335**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 5065092 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T), Hull Exam |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry 805-705-1740 |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 04FEB2015 08:00Z |
| Prompt Date: | |
| Team Lead: | Hager, Daniel M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Construction/Loadline | Inspected Satisfactory | 04FEB2015 |
| Deck/Cargo | Inspected Satisfactory | 04FEB2015 |

## Narrative:

US000176

04FEB15: CWO Hager and CWO Shultz attended vessel on blocks at Ventura Boat Yard to conduct hull exam.  Met with vessel rep. Jerry to discuss the scope of the exam.

HULL STRUCTURAL MEMBERS/WATERTIGHT INTEGRITY
Examined hull exterior and interior spaces for signs of damage and unauthorized repairs, all sat.  Noted that keel coolers for dive air system did not have fairlead block to protect non-integral keel cooler.  Issued 01 worklist item to install fairlead block.

RUDDERS, PROPELLERS AND TAILSHAFTS
Examined rudders, steering gear, propellers, tail shafts, and bearings, all sat.

VALVES AND THROUGH-HULL FITTINGS
Examined 09 ball valves, all sat.  Dive air cooling lines have additional 08 ball valves and 06 needle valves, all sat.

COMMENTS:
Inspection continues.  Post drydock check ride required.

//s// CWO Daniel Hager

13FEB15: CWO Shultz attended vessel moored stbd side in Santa Barbara Harbor to conduct post drydock check ride.  Entered all internal spaces underway and noted all spaces dry with no sign of ingress of water.

Inspection completed.  Updated drydock due dates in MISLE and routed amended COI to Sector LA/LB for signature.  In my opinion, the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 04FEB2015 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| Company Name: | |

**PHASE I**
Inspector Comments:
**PHASE II**
Inspector Comments:
**PHASE III**
Inspector Comments:
**PHASE IV**
Inspector Comments:

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°14.4 N | 119°15.6 W | 04FEB2015 08:00Z | Ventura Harbor Boat Yard |

Associated Parties: (None)

### TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

### Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

US000177

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 06FEB2015 | Activity Created.  Status:  "Open - In Progress" | Marine Safety Detachment Santa Barbara | Admin, System |
| 17FEB2015 | Status Changed to "Closed - Approved Inspection" | Sector Los Angeles/Long Beach | Admin, System |
| 17FEB2015 | Status Changed to "Open - Submitted for Review" | Marine Safety Detachment Santa Barbara | Admin, System |
| 17FEB2015 | Status Changed to "Open - Submitted for Review" | Sector Los Angeles/Long Beach | Admin, System |
| 17FEB2015 | Status_DtTm | Marine Safety Detachment Santa Barbara | Admin, System |
| 17FEB2015 | XFerred Ownership and Control to SEC LA/LB for Completion | Marine Safety Detachment Santa Barbara | Admin, System |

Documents: (None)

Certificates: (None)

US000178

**ER 338**



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

MISLE Activity ID:        5023200
Activity Type:            Vessel Inspection
Title/Description:        CONCEPTION (T), COI
Status:                   Closed - Approved Inspection
Point Of Contact:         Jerry (805) 705-1740
Owning Unit:              Marine Safety Detachment Santa Barbara
Originating Unit:         Marine Safety Detachment Santa Barbara
Start Date/Time:          19NOV2014 08:00Z
Prompt Date:
Team Lead:                Shultz, John W.

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 19NOV2014 |
| Communications | Inspected Satisfactory | 19NOV2014 |
| Construction/Loadline | Inspected Satisfactory | 19NOV2014 |
| Deck/Cargo | Inspected Satisfactory | 19NOV2014 |
| Documentation | Inspected Satisfactory | 19NOV2014 |
| Electrical | Inspected Satisfactory | 19NOV2014 |
| Engineering | Inspected Satisfactory | 19NOV2014 |
| Fire Fighting | Inspected Satisfactory | 19NOV2014 |
| Lifesaving | Inspected Satisfactory | 19NOV2014 |
| Navigation | Inspected Satisfactory | 19NOV2014 |
| Operations/Management | Inspected Satisfactory | 19NOV2014 |

US000179

**ER 339**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 5817809 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T), Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 18FEB2016 19:35Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 18FEB2016 |
| Communications | Inspected Satisfactory | 18FEB2016 |
| Construction/Loadline | Inspected Satisfactory | 18FEB2016 |
| Deck/Cargo | Inspected Satisfactory | 18FEB2016 |
| Documentation | Inspected Satisfactory | 18FEB2016 |
| Electrical | Inspected With Deficiencies Noted | 18FEB2016 |
| Engineering | Inspected Satisfactory | 18FEB2016 |
| Fire Fighting | Inspected With Deficiencies Noted | 18FEB2016 |
| Lifesaving | Inspected Satisfactory | 18FEB2016 |
| Navigation | Inspected Satisfactory | 18FEB2016 |
| Operations/Management | Inspected Satisfactory | 18FEB2016 |

US000172

| Personnel | Inspected Satisfactory | 18FEB2016 |
| Pollution Prevention/Response | Inspected Satisfactory | 18FEB2016 |
| Stability | Inspected Satisfactory | 18FEB2016 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| --- | --- | --- | --- |
| 1 | 18FEB2016 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 18FEB2016 | 19FEB2016 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Fire Fighting | Fire Pumps | Power Source | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 701 - Prior to carriage of passengers/cargo | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Prove proper operation of the fire pump.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| --- | --- | --- | --- |
| 2 | 18MAR2016 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 18FEB2016 | 24FEB2016 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Fire Fighting | Fixed Fire Detection System | Heat Detectors | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Prove proper operation of the heat detector in the galley.

**Resolution:**

Heat detector replaced and tested sat.

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
| --- | --- | --- | --- |
| 3 | 18MAR2016 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 18FEB2016 | 19FEB2016 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Electrical Distribution System (service) | Metallic Enclosure/Frame | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Provide suitable cover on motor controller for aft compressor.

**Resolution:**

## Narrative:

US000173

18FEB16: CWO Hager and CWO Young attended vessel moored stbd side in Santa Barbara Harbor to conduct annual inspection. Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

FIREFIGHTING:
Inspected vessel firefighting appliances and O/O could not prove proper operations of the required fire pump; issued no-sail CG-835. Also noted that the heat detector in the galley was not tested or mentioned on the last fire service report in January 2016; issued CG-835 to prove proper operation of the heat detector.

LIFESAVING:
Inspected lifesaving appliances and noted two life floats stowed on top of the bridge need on-going maintenance due to exposure to birds and UV. Life floats are serviceable. Entered special note to verify at each annual that on board maintenance is being completed properly.

ELECTRICAL:
Inspected vessel electrical circuits and noted cover for the motor control for the aft compressor was holed; issued CG-835 to provide suitable cover for the motor controller.

DRILLS:
Completed satisfactory fire and MOB drills.

COMMENTS:
Endorsed COI, inspection continues.

//s// CWO Daniel Hager

19FEB16: CWO Young attended vessel as above for def check; witnessed proper operation of fire pump with 50-ft hose; all sat. Master determined the wrong breaker had been energized during the Annual Exam. Master had also constructed drip shield for aft compressor switch box on aft bulkhead of E/R. Cleared 02 defs; 00 issued, 01 remains.

//s// M.S. Young, CWO4, USCG

24FEB16: CWO Young attended vessel as above for def check; heat detector in the galley was replaced by service tech and MI witnessed proper operation; cleared 01 def; 00 issued, 00 remains. Inspection completed. In my opinion the vessel is fit for route and service as specified on the current COI.

//s// M.S. Young, CWO4, USCG

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 18FEB2016 | Marine Safety Detachment Santa Barbara |
| Inspection Type: | Date: | Unit: |
| Deficiency Check | 19FEB2016 | Marine Safety Detachment Santa Barbara |
| Inspection Type: | Date: | Unit: |
| Deficiency Check | 24FEB2016 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| Company Name: | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.5 N | 119°41.5 W | 18FEB2016 19:35Z | Santa Barbara Harbor |

Associated Parties: (None)

US000174

**ER 342**

**TWIC Details:**

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

**Radiation Details:**

| Radiation: | No Radiation Detected |
|---|---|

**Operational Controls:**

| Category Type: | Reason: | Control Type: |
|---|---|---|
| Safety | Vessel Movement, Other | No-Sail CG-835 |
| **Agency Jurisdiction:** | | **Date Imposed:** | **Date Removed:** |
| US Coast Guard | | 18FEB2016 | 19FEB2016 |

| Restriction: | Description: |
|---|---|
| Vessel Movement Requirement | Vessel required to prove proper operation of the fire pump prior to carrying passengers. |

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 18FEB2016 | Imposed Date: 2/18/2016 9:36:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Involved Personnel Point Of Contact: No | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Involved Personnel Point Of Contact: No | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Start Date: 2/18/2016 7:35:13 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 24FEB2016 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Title: CONCEPTION (T), Annual | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 18FEB2016 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

Certificates: (None)

US000175

**ER 343**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6074077 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) ADMIN / DFU |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 18JAN2017 20:00Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Lifesaving | Inspected With Deficiencies Noted | 18JAN2017 |

US000100

**ER 344**

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 31MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 18JAN2017 | 17APR2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifefloat | Serviceable | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Vessel is restricted to 60 persons until the two lifefloats mounted above the wheelhouse are renewed and inspected.

**Resolution:**

New lifefloats installed and inspected.

**Narrative:**

18JAN17: O/O decided to remove 02 25-man lifefloats that were deteriorated due to exposure above the wheelhouse and replace them with 02 new 22-man lifefloats, still providing 100% capacity for passengers and crew per the current COI. The new lifefloats are on order. Issued 835 restricting the vessel to 60 persons until the new lifefloats are installed and inspected by attending MI.

17APR17: Attended vessel moored stbd side in Santa Barbara Harbor to conduct DFU; 02 22-man lifefloats were properly installed above the wheelhouse; cleared 01 835; none remain outstanding.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Administrative Inspection | 18JAN2017 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 17APR2017 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| **Company Name:** | |

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.5 N | 119°41.5 W | 18JAN2017 20:00Z | Santa Barbara Harbor |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

US000101

**ER 345**

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 17APR2017 | Closed Date: 4/17/2017 8:01:44 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Start Date: 1/18/2017 8:00:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 17APR2017 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Title: CONCEPTION (T) ADMIN | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 17APR2017 | Title: CONCEPTION (T) ADMIN / DFU | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20JAN2017 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

Certificates: (None)

US000102

**ER 346**



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6080655 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION, SPV-T Hull |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan @ 805-705-1740 |
| Owning Unit: | Sector Los Angeles/Long Beach |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 01FEB2017 17:30Z |
| Prompt Date: | |
| Team Lead: | YOUNG, MICHAEL S. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Construction/Loadline | Inspected Satisfactory | 01FEB2017 |
| Deck/Cargo | Inspected Satisfactory | 01FEB2017 |
| Documentation | Inspected With Deficiencies Noted | 01FEB2017 |
| Electrical | Inspected With Deficiencies Noted | 01FEB2017 |
| Engineering | Inspected With Deficiencies Noted | 01FEB2017 |
| Stability | Inspected Satisfactory | 01FEB2017 |

US000096

**ER 347**

**Deficiencies:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 1 | 01MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 01FEB2017 | 09FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Engineering | Feedwater/Condensate Water System | Valve | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Service or repalce (01) ball valve in E/R to ensure full closure.

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 2 | 01MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 01FEB2017 | 09FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Electrical | Electrical Distribution System (service) | Panelboard | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

E/R: label 120V breaker panel and plug 2 holes on each side (4 total).

**Resolution:**

| Item Number: | Due Date: | Extended Due Date: | |
|---|---|---|---|
| 3 | 01MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 01FEB2017 | 09FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Documentation | Certificates/Documents | Certificate of Inspection | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Post all pages of COI

**Resolution:**

**Narrative:**

US000097

01 Feb 2017:
Attended vessel on stands at Ventura Harbor Boatyard to conduct biennial Hull Exam.  Met with vessel Master Jerry Boylan to discuss scope of inspection.

DOCUMENTATION:
Noted that only first page of COI was posted for viewing; issued worklist item requiring all pages of COI be posted for viewing.

ELECTRICAL:
Noted that 120V breaker panel in E/R was not labeled, and there were two openings on each side of panel; issued worklist item requiring proper labeling and that holes be plugged.

ENGINEERING:
Examined (07) ball valves in E/R, (01) in lazarrete, and (01) in berthing bilge; inspected interior of the seawater side of ball, valve interior, and operated the valve. All sat except as noted below.

Noted that one ball valve in E/R would not close completely; issued worklist item requiring servicing/repair or replacement. Issued (03) worklist items.

09 Feb 2017:
Attended vessel as above to conduct def check. Cleared (03) worklist items; none outstanding. Check-ride pending.

10 Feb 2017:
Vessel returned to water at Ventura Harbor.

16 Feb 2017:
Attended vessel at Santa Barbara Harbor to conduct post-D/D check-ride; all sat. Vessel appears fit for service and route iaw its current COI. Recommend two years credit drydock effective 10FEB17.

//s// M. S. YOUNG, CWO4, USCG

## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Hull Examination | 01FEB2017 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 09FEB2017 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 16FEB2017 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| **Vessel Name:** | CONCEPTION |
| --- | --- |
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
| --- | --- | --- | --- |
| 34°15.2 N | 119°15.9 W | 01FEB2017 17:30Z | Ventura Boat Works |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
| --- | --- | --- | --- | --- |
| Licensed Mariner | 0 | 0 | 0 | |

US000098

**ER 349**



**U.S. Department of Homeland Security**

**United States Coast Guard**

## Activity Summary Report

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR Part 15 and 1520. No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. government agencies, public disclosure is governed by 5 U.S.C. 522 and 49 CFR parts 15 and 1520.

| | |
|---|---|
| MISLE Activity ID: | 6086303 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION, SPV-T Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan @ 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 16FEB2017 17:30Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

### Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |

| Classification: | Primary VIN: | Length: |
|---|---|---|
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |

| ITC/Convention (Subpart B): | Regulatory (Subpart C or D): | Year Completed: |
|---|---|---|
| 97 | 97 | 1981 |

| Engine Compartment In An Open Space: | Fuel Compartment In An Open Space: | Vessel Constructed Of All Open Spaces: |
|---|---|---|
| Not Applicable | Not Applicable | Not Applicable |

**Propulsion System Type:**

Diesel Reduction

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |

**Address:**

301 W. Cabrillo Blvd
SANTA BARBARA, CALIFORNIA  93101

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |

**Address:**

301 WEST CABRILLO BLVD
SANTA BARBARA, CALIFORNIA  93101-3886

### Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 16FEB2017 |
| Communications | Inspected With Deficiencies Noted | 16FEB2017 |
| Construction/Loadline | Inspected Satisfactory | 16FEB2017 |
| Deck/Cargo | Inspected Satisfactory | 16FEB2017 |
| Documentation | Inspected With Deficiencies Noted | 16FEB2017 |
| Electrical | Inspected Satisfactory | 16FEB2017 |
| Engineering | Inspected Satisfactory | 16FEB2017 |
| Fire Fighting | Inspected With Deficiencies Noted | 16FEB2017 |
| Lifesaving | Inspected With Deficiencies Noted | 16FEB2017 |

US000092

| | | |
|---|---|---|
| Navigation | Inspected Satisfactory | 16FEB2017 |
| Operations/Management | Inspected Satisfactory | 16FEB2017 |
| Personnel | Inspected Satisfactory | 16FEB2017 |
| Pollution Prevention/Response | Inspected Satisfactory | 16FEB2017 |
| Stability | Inspected Satisfactory | 16FEB2017 |

------BEGIN SSI INFORMATION------

**Deficiencies:**

| **Item Number:** | **Due Date:** | **Extended Due Date:** | |
|---|---|---|---|
| 3 | 16MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☒ Security Violation |
| 16FEB2017 | 27FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Communications | Automatic Identification System (AIS) | Control Unit | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Provide a display for AIS.

**Resolution:**

AIS display provided.

------END SSI INFORMATION------

**Deficiencies:**

| **Item Number:** | **Due Date:** | **Extended Due Date:** | |
|---|---|---|---|
| 1 | 16MAR2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 16FEB2017 | 27FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Fire Fighting | Portable Dry Chemical Fire Extinguisher | Service | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Replace B-I fire extinguisher on the bridge.

**Resolution:**

B-I replaced.

| **Item Number:** | **Due Date:** | **Extended Due Date:** | |
|---|---|---|---|
| 2 | 16FEB2017 | | ☐ Not Available For Inspection |
| **Issued Date:** | **Resolved Date:** | | ☐ Security Violation |
| 16FEB2017 | 16FEB2017 | | ☐ Worklist Item/Do Not Show In PSIX |
| | | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Lifesaving | Lifejacket/PFD (Type I) | Lights | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Renew 40 lifejacket lights, vessel already restricted to 60 persons until new lifefloats are installed above the bridge.

**Resolution:**

Corrected on the spot.

US000093

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 4 | 16FEB2017 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 16FEB2017 | 16FEB2017 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Documentation | Logs/Records | Logbook/Record (unofficial) | ☐ Reported Via PR17 |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ Refer To ACS/RO/TPO |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ ACS/RO/TPO Associated |
| | | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Document safety drills in logbook (fire, MOB, and abandonship).

**Resolution:**

Log updated after satisfactory drills were completed underway.

**Narrative:**

16FEB17: Attended vessel moored stbd side in Santa Barbara Harbor to conduct annual inspection. Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

DOCUMENTATION:
Inspected vessel docs/cert; completed a compliance check of the company's drug testing program; company is a member of ASTS and appears to be in substantial compliance with 46 CFR Part 16. Drill log book was not up to date; issued CG-835 that was corrected on the spot after underway drills were completed satisfactory and logged.

LIFESAVING:
Inspected vessel lifesaving appliances to include 04 15-man lifefloats, all sat. O/O removed 02 25-man lifefloats mounted above the bridge to be replaced; see ADMIN ACT#6074077 for the CG-835 that was issued restricting the vessel to 60 persons until the new lifefloats are installed and inspected by an attending MI. O/O had noted that 40 lifejacket lights had expired in October 2016 and had already placed an order to renew; issued CG-835 to renew 40 lifejacket lights; vessel already restricted to 60 persons for the lifefloats. O/O received 40 new lifejacket lights prior to the end of the inspection; cleared CG-835 on the spot.

FIREFIGHTING:
Inspected vessel firefighting appliances to include 06 fire extinguishers and fixed CO2 system for the E/R which were all serviced by Langkilde's Fire Protection in Feb 2017. Noted B-I fire extinguisher indicator on the bridge was just outside the green; issued CG-835 to replace. O/O brought on board an additional B-II that was not currently serviced but had an indicator in the green as a spare until the B-I was replaced.

NAVIGATION:
Inspected vessel navigation equipment and noted O/O could not display installed AIS information on vessel computer; issued CG-835 to provide a display for the AIS.

DRILLS:
Completed satisfactory MOB and fire drills underway.

COMMENTS:
Endorsed COI, cleared 02 CG-835s on the spot and 02 remain outstanding; inspection continues.

27FEB17: Attended vessel as before for DFU; cleared 02 835s; none remain outstanding. In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 16FEB2017 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 27FEB2017 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| **Vessel Name:** | CONCEPTION |
|---|---|
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |

US000094

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.5 N | 119°41.5 W | 16FEB2017 17:30Z | Sea Landing, Santa Barbara Harbor, CA |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Operational Controls: (None)

## Log:

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 15MAR2017 | Closed Date: 3/15/2017 10:08:15 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 10FEB2017 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 10FEB2017 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 10FEB2017 | Point Of Contact: Jerry Boylan @ 805- | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 16FEB2017 | Point Of Contact: Jerry Boylan @ 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 10FEB2017 | Start Date: 2/16/2017 5:30:00 PM | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 15MAR2017 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 10FEB2017 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 10FEB2017 | Title: CONCEPTION, SPV-T Annual | Marine Safety Detachment Santa Barbara | Young, Michael S |
| 10FEB2017 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Young, Michael S |

Documents: (None)

Certificates: (None)

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR Part 15 and 1520.  No part of this record may be disclosed to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action.  For U.S. government agencies, public disclosure is governed by 5 U.S.C. 522 and 49 CFR parts 15 and 1520.

US000095

**ER 353**



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6345853 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) ANNUAL |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 13FEB2018 22:30Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| Accommodation/Occupational Safety | Inspected Satisfactory | 02MAR2018 |
| Communications | Inspected Satisfactory | 13FEB2018 |
| Construction/Loadline | Inspected Satisfactory | 13FEB2018 |
| Deck/Cargo | Inspected Satisfactory | 13FEB2018 |
| Documentation | Inspected Satisfactory | 13FEB2018 |
| Electrical | Inspected Satisfactory | 13FEB2018 |
| Engineering | Inspected Satisfactory | 13FEB2018 |
| Fire Fighting | Inspected Satisfactory | 13FEB2018 |
| Lifesaving | Inspected Satisfactory | 13FEB2018 |
| Navigation | Inspected Satisfactory | 13FEB2018 |
| Operations/Management | Inspected Satisfactory | 13FEB2018 |

US000088

**ER 354**

| Personnel | Inspected Satisfactory | 13FEB2018 |
| Pollution Prevention/Response | Inspected Satisfactory | 13FEB2018 |
| Stability | Inspected Satisfactory | 13FEB2018 |

## Deficiencies:

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 1 | 15MAR2018 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 13FEB2018 | 02MAR2018 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Accommodation/Occupational Safety | Medical/First Aid | Medicine Chest | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Update expired items in first aid kit.

**Resolution:**

First aid kit updated.

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 2 | 15MAR2018 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 13FEB2018 | 13FEB2018 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Navigation | Piloting/Steering | Coast Guard Light List | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Update light list.

**Resolution:**

Light list updated.

| Item Number: | Due Date: | Extended Due Date: | ☐ Not Available For Inspection |
|---|---|---|---|
| 3 | 15MAR2018 | | ☐ Security Violation |
| **Issued Date:** | **Resolved Date:** | | ☐ Worklist Item/Do Not Show In PSIX |
| 13FEB2018 | 13FEB2018 | | ☐ SMS Related/Objective Evidence For MSO |
| **System:** | **Subsystem:** | **Component:** | ☐ Self Reported |
| Operations/Management | Drug and Alcohol Testing | Employee Coverage | ☐ Reported Via PR17 |
| | | | ☐ Refer To ACS/RO/TPO |
| **Action:** | **Action Code:** | **ACS/RO/TPO Finding Number:** | ☐ ACS/RO/TPO Associated |
| 705 - Other - as specified | c - To the satisfaction of the Coast Guard | | ☐ Accepted As Condition Of ACS/TPO |

**Description:**

Provide 2018 ASTS employee list.

**Resolution:**

List provided.

## Narrative:

US000089

13FEB18:
Attended vessel moored stbd side in Santa Barbara Harbor to conduct annual inspection.  Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

DOCUMENTATION:
Inspected vessel docs/cert; completed a compliance check of the company's drug testing program; company is a member of ASTS and appears to be in substantial compliance with 46 CFR Part 16. Issued (01) CG-835 to provide 2018 ASTS employee list. Corrected on the spot.

LIFESAVING:
Inspected vessel lifesaving appliances to include lifefloats, all sat.

ACCOMANDATION/OCCUPATINAL SAFETY:
First aid kit had expired items in it. Issued (01) CG-835 to update first aid kit.

FIREFIGHTING:
Inspected vessel firefighting appliances were all serviced by Langkilde's Fire Protection in Feb 2018. All sat.

NAVIGATION:
Inspected vessel navigation equipment, Issued (01) CG-835 to update light list. Corrected on the spot.

DRILLS:
Completed satisfactory MOB and fire drills underway.

COMMENTS:
Endorsed COI, Inspection continues.

//s/// CWO Daniel Hager

02MAR18: Attended vessel as before for DFU; cleared 01 835; none remain outstanding.  In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 13FEB2018 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.6 N | 119°41.5 W | 13FEB2018 22:30Z | Sea Landing |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 2 | 2 | 0 | |

## Radiation Details:

US000090

**Radiation:**                    No Radiation Detected

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 02MAR2018 | Closed Date: 3/2/2018 8:11:50 PM | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Involved Personnel Point Of Contact: No | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Involved Personnel Point Of Contact: No | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Start Date: 2/13/2018 10:30:58 PM | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 02MAR2018 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Title: CONCEPTION (T) ANNUAL | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |
| 29JAN2018 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Twiddy, Joseph P |

Documents: (None)

Certificates: (None)

US000091



U.S. Department of
Homeland Security

United States
Coast Guard

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6625487 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 13FEB2019 19:00Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| 01 - Certificates & Documentation | Inspected Satisfactory | 13FEB2019 |
| 02 - Structural Conditions | Inspected Satisfactory | 13FEB2019 |
| 03 - Water/Weathertight Conditions | Inspected Satisfactory | 13FEB2019 |
| 04 - Emergency Systems | Inspected Satisfactory | 13FEB2019 |
| 05 - Radio Communications | Inspected Satisfactory | 13FEB2019 |
| 07 - Fire Safety | Inspected Satisfactory | 13FEB2019 |
| 08 - Alarms | Inspected Satisfactory | 13FEB2019 |
| 09 - Working and Living Conditions | Inspected Satisfactory | 13FEB2019 |
| 10 - Safety of Navigation | Inspected Satisfactory | 13FEB2019 |
| 11 - Life Saving Appliances | Inspected Satisfactory | 13FEB2019 |
| 13 - Propulsion and Auxiliary Machinery | Inspected Satisfactory | 13FEB2019 |

US000067

**ER 358**

14 - Pollution Prevention | Inspected Satisfactory | 13FEB2019

## Narrative:

13FEB19: Attended vessel on blocks in Ventura Boatyard to initiate the annual inspection.  Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

DOCUMENTATION:
Inspected vessel docs/cert; completed a compliance check of the company's drug testing program; company is a member of ASTS and appears to be in substantial compliance with 46 CFR Part 16.

LIFESAVING:
Inspected vessel lifesaving appliances, all sat.

COMMENTS:
Inspection continues once the vessel goes back in the water.

01MAR19: Attended vessel back in the water moored stbd side in Santa Barbara Harbor to complete annual inspection.  Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

FIREFIGHTING:
Inspected vessel firefighting appliances to include 06 portable fire extinguishers and a fixed $CO_2$ system for the E/R which were all serviced by Langkilde's Fire Protection on 28FEB19.

DRILLS:
Completed satisfactory MOB and fire drills.

COMMENTS:
Endorsed COI, inspection completed.  In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 13FEB2019 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| | |
|---|---|
| **Vessel Name:** | CONCEPTION |
| **Company Name:** | |

**PHASE I**
Inspector Comments:
**PHASE II**
Inspector Comments:
**PHASE III**
Inspector Comments:
**PHASE IV**
Inspector Comments:

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.5 N | 119°41.5 W | 13FEB2019 19:00Z | Santa Barbara Harbor |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

US000068

**ER 359**

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 01MAR2019 | Closed Date: 3/1/2019 11:51:22 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Start Date: 2/13/2019 7:00:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 01MAR2019 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Title: CONCEPTION (T) Annual | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

Certificates: (None)

US000069

**ER 360**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6625180 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) Hull Exam |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 13FEB2019 17:30Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Carrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| 02 - Structural Conditions | Inspected Satisfactory | 13FEB2019 |
| 03 - Water/Weathertight Conditions | Inspected Satisfactory | 13FEB2019 |

## Narrative:

US000070

**ER 361**

13FEB19: Attended vessel on blocks at Ventura Boat Yard to conduct hull exam.  Vessel is 75 foot wood vessel.  Met with the vessel rep Jerry Boylan to discuss the scope of the exam.

HULL STRUCTURAL MEMBERS/WATERTIGHT INTEGRITY
Examined hull exterior and interior spaces for signs of damage and unauthorized repairs, all sat.

RUDDERS, PROPELLERS AND TAILSHAFTS
Examined rudders, steering gear, propellers, tail shafts, and bearings, all sat.

VALVES AND THROUGH-HULL FITTINGS
Examined 09 ball valves, all sat.

COMMENTS:
Inspection continues to complete post drydock check ride once the vessel goes back in the water.

01MAR19: Attended vessel moored stbd side in Santa Barbara Harbor.  Complete post drydock check ride; all sat.  Amended drydock dates and routed amended COI for signature.  In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
| --- | --- | --- |
| Hull Examination | 13FEB2019 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 01MAR2019 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
| --- | --- |
| **Company Name:** | |

**PHASE I**

Inspector Comments:

**PHASE II**

Inspector Comments:

**PHASE III**

Inspector Comments:

**PHASE IV**

Inspector Comments:

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
| --- | --- | --- | --- |
| 34°14.4 N | 119°15.6 W | 13FEB2019 17:30Z | Ventura Harbor Boat Yard |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
| --- | --- | --- | --- | --- |
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
| --- | --- |

Operational Controls: (None)

US000071

**ER 362**

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 14MAR2019 | Submitted amended COI to CDR Newberry for his signature. | Sector Los Angeles/Long Beach | McGuigan, Terrence |
| 20MAR2019 | Closed Date: 3/20/2019 9:44:27 PM | Marine Safety Detachment | Hager, Daniel M |
| 14MAR2019 | Involved Personnel Point Of Contact: No | Sector Los Angeles/Long Beach | McGuigan, Terrence |
| 13FEB2019 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 19MAR2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | DeLorme, Gary A |
| 02MAR2019 | Owning Unit: Sector Los Angeles/Long Beach | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Start Date: 2/13/2019 5:30:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20MAR2019 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 02MAR2019 | Status/Subtype: Open/Submitted for Review | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Title: CONCEPTION (T) Hull Exam | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 19MAR2019 | Transfer Reason: Completion | Marine Safety Detachment Santa Barbara | DeLorme, Gary A |
| 02MAR2019 | Transfer Reason: Completion | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
|---|---|---|
| COI - Amended 19Mar2019 | Certificate of Inspection - Amended | |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
|---|---|---|---|
| Sector Los Angeles/Long Beach | EXPIRED | 19NOV2014 | 19NOV2019 |

US000072

**ER 363**

# EXHIBIT 10

Captain Robert C. Compher

Fiedler vs.
United States of America

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                      --o0o--

 4   NANCY FIEDLER, Personal   )
     Representative of the     )
 5   Estate of LISA FIEDLER    )
     (Deceased), et al.,       )
 6                             )
          Plaintiffs,          )
 7                             )
              vs.              ) No. CV-21-7065 PA
 8                             )
     UNITED STATES OF          )
 9   AMERICA,                  )
                               )
10        Defendant.           )
     _____  )

11

12      VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

13             CAPTAIN ROBERT C. COMPHER

14        PMQ FOR THE UNITED STATES OF AMERICA

15        _____

16                 Washington, D.C.

17

18

19   Date:   Friday, June 29, 2023

20   Time:   1:01 p.m. EDT

21   Reporter:  Renee Combs Quinby, RDR, CRR, CSR #11867

22   Job No.: 10122301

23

24

25
```

Page 1

| Captain Robert C. Compher | Fiedler vs. United States of America |
|---|---|

```
 1            MR. KAUFMAN-COHEN:  Eric Kaufman-Cohen,

 2   United States Department of Justice on behalf of the

 3   United States.

 4            MR. PERRYGO:  Scott Perrygo, U.S.

 5   Department of Justice on behalf of the United

 6   States.

 7            THE VIDEOGRAPHER:  Would the court

 8   reporter please swear in the witness.

 9              CAPTAIN ROBERT C. COMPHER,

10   of lawful age, having been first duly sworn to

11   testify to the truth, the whole truth, and nothing

12   but the truth in the case aforesaid, was examined

13   and testified as follows:

14                      --o0o--

15            THE VIDEOGRAPHER:  Please proceed.

16                    EXAMINATION

17   BY MR. HILLSMAN:

18       Q.   Captain Compher, will you please state

19   your name, rank, and current address for our record.

20       A.   Yeah.  Full name, Robert Carlton Compher,

21   C-o-m-p-h-e-r; Captain, United States Coast Guard.

22   Do you want my home address?  Work address?

23            MR. KAUFMAN-COHEN:  No, no, not home

24   address. Just --

25
```

Captain Robert C. Compher

Fiedler vs.
United States of America

1  conversion determination was made and a new -- a new

2  build date is reflected there.

3      Q.   So we'll talk a little bit more about that

4  in a moment, but I gather, then, that OCMIs and

5  bag-carrying inspectors out in the field become

6  aware of that MCON determination through the letter

7  that you just described?

8      A.   That's correct.

9      Q.   Okay.  And absent such a letter, they will

10  automatically assume by default that the old T regs

11  apply to vessels that were built prior to

12  March 11th, 1996?

13      A.   Well, we send a letter stating that if it

14  was a yes or a no, so even if it was not considered

15  a major conversion, we would still send a letter to

16  the OCMI so they would know that, correct, that the

17  existing regulations would still apply.

18      Q.   Got it.

19          All right.  Loyd, would you post clip 5,

20  please.

21          And Captain, this is the section of the

22  46 CFR 177.115 that, at least back at -- in 2005,

23  determined the applicability of the regs.  And I

24  call your attention to paragraph B, (quote as read):

25              Alterations or modifications made

**Captain Robert C. Compher**

Fiedler vs.
United States of America

1                    to the structure or arrangements of

2              an existing vessel that are a major

3              conversion on or after March 11th,

4              1996 must comply with the

5              regulations of this part.

6              Have I read that correctly?

7        A.    Yes.

8        Q.    And that's telling us, then, that the new

9    T regs apply to alterations or modifications made to

10   the structural arrangements of a vessel that

11   comprise a major conversion, if that alteration or

12   modification is performed after March 11th, 1996?

13       A.    That's correct.

14       Q.    Okay.  It goes on to read, (quote as

15   read):

16             Repair or maintenance conducted of

17             an existing vessel resulting in no

18             significant changes to the original

19             structure or arrangement of the

20             vessel must comply with the

21             regulations applicable to the

22             vessel on March 10th, 1996, or as

23             an alternative, with the

24             regulations in this part.

25             Am I reading that correctly?

Page 137

**ER 368**

Captain Robert C. Compher                                      **Fiedler vs.**
                                                    **United States of America**

```
 1        A.    Yes.
 2        Q.    Okay.  Now, the last sentence is the one I
 3   want to focus you on, (quote as read):
 4                    However, when outfit items such as
 5                    furnishings and mattresses are
 6                    renewed, they must comply with the
 7                    regulations in this part.
 8                Have I read that correctly?
 9        A.    Yes.
10        Q.    How do you interpret that?
11        A.    Which part?
12        Q.    The last sentence, (quote as read):
13                    However, when outfit items such as
14                    furnishings and mattresses are
15                    renewed, they must comply with the
16                    regulations in this part, i.e., the
17                    new T regs.
18        A.    Exactly what it says.  Again, there's a
19   list, I believe, further in the -- in the T
20   regulations of outfit items and furnishings and
21   mattresses and things, but when they are renewed if
22   you -- if it is not a major conversion, you can keep
23   them on board until such a time that they are
24   renewed.  New furnishings or mattresses are brought
25   on board, they have to comply with the new T
```

Page 138

**www.aptusCR.com**

Captain Robert C. Compher                                    Fiedler vs.
                                                United States of America

```
 1   regulations.

 2        Q.   Okay.  So put another way, even when the

 3   vessel itself is still subject to the old T regs,

 4   when she takes on a new set of furnishings or new

 5   mattresses, those new furnishings have to be

 6   compliant with the new T regs.  Am I reading that

 7   correctly?

 8        A.   That is the way it reads, yes.

 9        Q.   Okay.  Now, let me find out how we

10   understand, or more importantly, how an OCMI or a

11   marine inspector would determine when a -- what

12   particular part of a vessel's apparel comprises a

13   furnishing within the meaning of that reg.  How do

14   they go about doing that?

15        A.   So furnishings, generally speaking, you

16   know, the items in your accommodation spaces,

17   your -- I don't know, tables, chairs, other things

18   that the passengers use while they're onboard the

19   vessel, the things in the accommodations, if it's an

20   overnight vessel, certainly the mattresses, the bed

21   frames, and the items in the accommodation spaces.

22        Q.   And --

23        A.   And furnishings.

24        Q.   Are those limited to items in the

25   accommodations spaces, furnishings?
```

Page 139

Captain Robert C. Compher                                     Fiedler vs.
                                                    United States of America

```
 1          A.    I'd have to refer to the regs.

 2          Q.    Well, that's why I ask.  I searched the

 3    regs, and perhaps it's me, but I couldn't find any

 4    definition of the term "furnishings."  Are you aware

 5    of one?

 6          A.    Not off the top of my head, no.

 7          Q.    Okay.  In my experience, furnishings are

 8    typically appliances or items that are movable that

 9    are not part of the structure of a house or a

10    vessel.  Is that how you interpret the phrase or the

11    term?

12          A.    Correct, yes, outfitting, yes.

13          Q.    So for example, Loyd, would you post clip

14    20.

15                I'll warrant to you, Captain, that this is

16    a photograph that's been marked as Exhibit 42 in the

17    Los Angeles Superior Court litigation.

18                Eric, I'll make the same offer I made last

19    time.  If you want us to make this an exhibit to

20    these proceedings, I'll be happy to.

21                But I'll represent to you that this is a

22    photograph taken down below in CONCEPTION in her

23    bunk room, and I'll call your attention to the green

24    mattresses on the bunks.  Do you see those?

25          A.    Yes.
```

Page 140

Captain Robert C. Compher                          Fiedler vs.
                                     United States of America

1        Q.    Are those furnishings within the meaning

2    of the reg I just read, 177.115?

3        A.    Furnishings, it specifically calls out

4    mattresses, yes.

5        Q.    Okay.  So if, for example, those

6    mattresses were changed or supplied at any point

7    after March 11th, 1996, they would have to comply

8    with the new T regs?

9        A.    That's correct.

10           MR. HILLSMAN:  All right.  Loyd, would you

11   post clip 15.

12   BY MR. HILLSMAN:

13       Q.    I'll warrant to you that this is a

14   photograph that was taken in the CONCEPTION salon.

15   I'll call your attention to the Grosfillex plastic

16   chairs that you see on the port and starboard of the

17   tables.  Do you see those?

18       A.    I do, yes.

19       Q.    Can we agree that those are furnishings

20   within the meaning of 177.115(b)?

21       A.    Yes, I agree with that.

22       Q.    So if, for example, the evidence shows

23   that those chairs were placed aboard CONCEPTION at

24   some point after March 11th, 1996, even if the

25   vessel itself hadn't undergone an MCON conversion,

Page 141

Captain Robert C. Compher

Fiedler vs.
United States of America

1   those chairs would have to comply with the new T

2   regs?

3       A.   Yeah, that would be up to the OCMI to

4   determine, but yes, yes.

5       Q.   Okay.  But the OCMI conducting an

6   inspection would have to satisfy him or herself that

7   if the chairs were new, i.e., post March 11th, 1996,

8   they complied with the new T regs, yes?

9       A.   That's correct.  Yes.

10          MR. HILLSMAN:  Okay.  Would you please

11  post clip 14.

12  BY MR. HILLSMAN:

13      Q.   Captain, I call your attention to the

14  waste receptacles underneath the ladder-way that

15  leads from CONCEPTION's sun deck to the main deck.

16  I warrant to you this is a photograph taken on the

17  afterdeck or fantail of CONCEPTION.  Do you see the

18  waste containers that are parked underneath the

19  stairway?

20      A.   I do, yes.

21      Q.   Can we agree that those are furnishings

22  within the meaning of 177.115?

23      A.   Yes.

24      Q.   So again, if those -- I'm sorry.  I didn't

25  mean to interrupt.

Page 142

Captain Robert C. Compher                                    Fiedler vs.
                                                   United States of America

1    did he or she have discretion just to ignore them,

2    or was he or she obliged to make sure that those

3    waste containers were compliant with the new T regs?

4        A.   I think the OCMI always has discretion on

5    what they allow and don't allow on T boats.  Yeah, I

6    don't know if an inspector would have known that was

7    a new or an old trash can.

8        Q.   Let me try it again.  I'm posting it as a

9    hypothetical.  We're not asking what inspectors

10   actually in real life knew.  I'm asking you as a

11   hypothetical, if you were a bag-carrying marine

12   inspector who boarded CONCEPTION after March 11th,

13   1996, and assuming that you either knew or should

14   have known that those waste receptacles were new,

15   i.e., post March 11th, 1996 additions to

16   CONCEPTION's furnishings, can we agree that you as

17   an inspector had no discretion just to ignore them.

18   You had to at the very least ensure that those waste

19   containers were compliant with the new T regs

20   concerning waste containers.

21       A.   Yes, if I was an inspector and I knew that

22   that was a new trash can and I had my regs or my 840

23   book with me and it said here's the requirements for

24   new -- for a replacement trash receptacle then, yes,

25   I would have called that out as a deficiency that

Captain Robert C. Compher

Fiedler vs.
United States of America

1    would need to be --

2        Q.    And you'd write that up with a form 835?

3        A.    You could, yes.  Yes.

4        Q.    Okay.  Now, let's turn, at last, to MCONs.

5    The term "major conversion" is defined in the

6    shipping code, am I right, 46 USC 2101?

7        A.    46 USC -- yes, yes.

8            MR. KAUFMAN-COHEN:  And, Loyd, would you

9    post clip 21?

10    BY MR. KAUFMAN-COHEN:

11        Q.    And I'll warrant to you that this is

12    pulled straight out of 46 USC 2101, paragraph 18.

13    Does that look familiar to you?

14        A.    It does, yes.

15        Q.    Okay.  And that language, i.e., (quote as

16    read):

17                A conversion of a vessel that, A,

18                substantially changes the

19                dimensions or carrying capacity of

20                the vessel; B, changes the type of

21                the vessel; C, substantially

22                prolongs the life of the vessel;

23                or, D, otherwise so changes the

24                vessel that it is essentially a new

25                vessel as decided by the Secretary,

Page 145

Captain Robert C. Compher                                          Fiedler vs.
                                                        United States of America

1                    CERTIFICATE OF REPORTER

2

3            I, RENEE COMBS QUINBY, a Certified

4    Shorthand Reporter, hereby certify that the witness

5    in the foregoing deposition was by me duly sworn to

6    tell the truth, the whole truth, and nothing but the

7    truth in the within-entitled cause;

8            That said deposition was taken in

9    shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   the said witness was thereafter reduced to

12   typewriting, by computer, under my direction and

13   supervision;

14           I further certify that I am not of counsel

15   or attorney for either or any of the parties to the

16   said deposition, nor in any way interested in the

17   event of this cause, and that I am not related to

18   any of the parties thereto.

19           DATED: 07/10/2023.

20

21                              _Renee Quinby_

22                    _____

23           RENEE COMBS QUINBY, CRR, RDR, CSR 11867

24

25

EXHIBIT 11

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
 2                        --oOo--


 3


 4    NANCY FIEDLER, Personal        )
      Representative of the Estate   )
 5    of LISA FIEDLER (Deceased), et )
      al.,                           )
 6                                   )
                   Plaintiffs,       )
 7                                   )
             vs.                     ) CV-21-7065 PA
 8                                   )
      UNITED STATES OF AMERICA,      )
 9                                   )
                   Defendant.        )
10    _____)


11


12     REMOTE VIDEO DEPOSITION OF CHIEF WARRANT OFFICER

13                     DANIEL HAGER


14


15                 Thursday, June 8, 2023

16

17

18

19

20

21

22

23

24    REPORTED BY: DENISE A. FORD, CSR 7525

25    JOB NO. 10120765
```

| Chief Warrant Officer Daniel Hager | Fiedler vs. United States of America |
|---|---|

```
 1

 2

 3                        --oOo--

 4         BE IT REMEMBERED that pursuant to Notice and

 5    on Thursday, June 8, 2023, commencing at 10:04 a.m.

 6    thereof, before me, Denise A. Ford, a Certified

 7    Shorthand Reporter, appeared

 8            CHIEF WARRANT OFFICER DANIEL HAGER

 9    called as a witness herein, who, having been first

10    duly sworn, was examined and testified as follows:

11                        --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Chief Warrant Officer Daniel Hager

**Fiedler vs.**
**United States of America**

```
 1    representing plaintiffs in all cases.
 2                    MS. TRAN:  Juliette Tran for Truth
 3    Aquatics and Glen and Dana Fritzler in the state
 4    case.
 5                    MR. STEIN:  Matthew Stein, Langkilde
 6    Fire Protection in the state court case.
 7                    MR. KAUFMAN-COHEN:  Eric
 8    Kaufman-Cohen, United States Department of Justice
 9    on behalf of the United States.
10                    MR. PERRYGO:  Scott Perrygo, US
11    Department of Justice on behalf of the United
12    States.
13                    VIDEO OPERATOR:  The witness now may
14    be sworn in.
15                    (Witness sworn.)
16                EXAMINATION BY MR. MAHONEY
17                    MR. MAHONEY:  Q.  God morning, sir.  Can
18    you state your name once more for the record, please?
19            A.    Daniel Hager.
20            Q.    And, Mr. Hager, you are presently a
21    chief warrant officer in the United States Coast
22    Guard; is that correct, sir?
23            A.    Yes, sir.
24            Q.    And what specifically is your rank?
25            A.    Chief warrant officer 4.
```

Page 7

**www.aptusCR.com**

**ER 380**

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

1    Q.    And did you review any documents in
2  preparation for today's deposition?
3        A.    No, sir.
4        Q.    You didn't look at any documents?
5        A.    No, sir.
6        Q.    When is the last time you looked at
7  the MISLE database for the CONCEPTION?
8        A.    Not since the last inspection I did.
9        Q.    And that last inspection would have
10  occurred in February 2019; is that correct, sir?
11        A.    I believe that is correct.
12        Q.    Do you have a recollection of that
13  inspection?
14        A.    No, sir, not any real details.
15        Q.    Do you have a vague or general
16  recollection of that inspection?
17        A.    I have a vague recollection of what
18  the vessel looked like.
19        Q.    And can you describe -- I am sorry, go
20  ahead, sir.  I didn't mean to interrupt.
21        A.    I don't remember that day in any
22  particular detail.
23        Q.    And can you tell me what you do
24  remember about that day, that last inspection, the
25  annual inspection of CONCEPTION in February of 2019?

Page 12

**Chief Warrant Officer Daniel Hager**                    **Fiedler vs.**
                                                   **United States of America**

1    A.    I believe that February inspection was

2    an annual inspection, if I remember correctly, and

3    so it would have been in the water.

4    **Q.    But you did conduct a whole inspection**

5    **as well; do you remember that?**

6    A.    I don't.  I would have to review the

7    record.

8    **Q.    I don't expect you to be a computer,**

9    **so if you don't have perfect recall, if you don't**

10   **remember something, "I don't recall" is a perfectly**

11   **fine answer, and I will do my best to present you**

12   **with documents that might refresh your recollection.**

13   **All right?**

14   A.    Thank you.

15   **Q.    Sir, let's talk first about your**

16   **background, training and experience.**

17   A.    Okay.

18   **Q.    What is your highest level of**

19   **education?**

20   A.    I have a bachelor's degree.

21   **Q.    And what is that bachelor's in?**

22   A.    Environmental studies.

23   **Q.    And when did -- is that a bachelor of**

24   **science?**

25   A.    Bachelor of arts.

Page 14

**www.aptusCR.com**

**ER 382**

**Chief Warrant Officer Daniel Hager**                    **Fiedler vs. United States of America**

1          Q.    And when did you receive that BA?

2          A.    In 1997.

3          Q.    And from where did you receive that

4    degree?

5          A.    From University of California Santa

6    Barbara.

7          Q.    And when did you join the United

8    States Coast Guard, sir?

9          A.    January of 1998.

10         Q.    After you graduated from UC Santa

11   Barbara?

12         A.    Correct.

13         Q.    And were you commissioned as an

14   officer into the Coast Guard or did you enlist?

15         A.    Enlisted.

16         Q.    And have you been with the United

17   States Coast Guard continuously since you enlisted

18   in 1998?

19         A.    I separated in 2002, was on active

20   reserve, so continued to serve but in the reserves

21   until I think it was October of '04.  So

22   approximately like a year and a half, two years, and

23   then integrated back to active duty and then been on

24   active duty continuously since then.

25         Q.    Can you describe for me generally what

**www.aptusCR.com**

**ER 383**

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
1          Q.     And it would certainly be improper and

2    unauthorized to note that a deficiency was repaired

3    when in fact it was not; is that correct?

4          A.     Yes.

5          Q.     That would be a violation of the

6    inspector's duties under the regulations?

7          A.     Right.

8                 MR. KAUFMAN-COHEN:  I think we have

9    been going about an hour and a half.

10         Can we take like a 15-minute break.

11                MR. MAHONEY:  45 minutes after the

12   hour?

13                VIDEO OPERATOR:  The time is 11:29

14   a.m.

15         We are off the record.

16                (Break taken.)

17                VIDEO OPERATOR:  The time is

18   11:47 a.m.

19         We are now on the record.

20                MR. MAHONEY:  Q.  Sir, I think earlier

21   you were -- in the beginning of the deposition you

22   testified you really don't have a lot of independent

23   recollection of CONCEPTION; is that right?

24         A.     Correct.

25         Q.     And so I am just going to show you
```

www.aptusCR.com

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
 1     what has previously been marked as Exhibit 8, which
 2     is a video of the vessel.
 3             Can you see the video on the screen in front
 4     of you, sir?
 5             A.    Yes.
 6             Q.    Let me just play it for you.
 7                       (Video played.)
 8             Q.    Sir, did that video come through okay
 9     on your end?
10             A.    Yes, it did.
11             Q.    I know it's not a video depiction of
12     the entire vessel, but does looking at that video
13     refresh your recollection generally what the vessel
14     looked like in terms of --
15             A.    Yes.
16             Q.    -- the main deck?
17             A.    Yes.
18             Q.    And if you recall, would you typically
19     inspect the vessel during an annual inspection when
20     the vessel was docked in the water?
21             A.    For an annual inspection, yes.
22             Q.    Would you typically -- when you
23     boarded the vessel -- let me share my screen again.
24             Can you see the video still in front of you?
25             A.    Yes, I can.
```

**www.aptusCR.com**

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
1           Q.    If you recall, do you recall if you
2    would typically board in the same manner as the way
3    this gentleman is doing here?
4           A.    I would assume so.
5           Q.    And on the CONCEPTION when you board,
6    if you board this way, do you enter on the sundeck,
7    right here; is that right, sir?
8           A.    Yes.  It looks like an aft deck area.
9           Q.    And does refresh in your mind's eye
10   the CONCEPTION as you remember it?
11          A.    Yes.
12          Q.    And then you can enter from this
13   section into what has been called the salon area
14   where there are numerous chairs and tables?
15          A.    Yes.
16          Q.    And do you have a recollection now or
17   does this refresh your recollection about what the
18   salon area looked like in the CONCEPTION?
19          A.    Yes.
20          Q.    There is also an emergency escape
21   hatch right here in the center of the salon.
22          Do you see that, sir?
23          A.    Yes, I see that.
24          Q.    And do you have any recollections of
25   that escape hatch in your mind's eye remembering the
```

Page 64

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
 1   assist.  But in general terms it was the two warrant
 2   officers who did the inspections.
 3        The lieutenant was responsible for the
 4   day-to-day operations of the unit, supervising his
 5   crew.  Yes.
 6        Q.    Okay.  But in 2019 then, typically two
 7   warrant officers in Santa Barbara would be
 8   conducting the annual vessel inspections, right, you
 9   and someone else?
10        A.    Yes.  And also in 2019 another warrant
11   arrived early to replace me.  I don't know exactly
12   when that individual arrived, but for a short period
13   of time we did have three.
14        Q.    And would the identities of the
15   inspectors be marked in the MISLE database?
16        A.    Yes.  If you were a part of the
17   inspection, your name would be in the database.
18        Q.    So if your name is the only name --
19   and I am not sure if it is off the top of my head --
20   assuming your name is the only name in the MISLE
21   database for the February '19 annual inspection of
22   CONCEPTION, that means you and you alone did the
23   inspection?
24        A.    Yes. There are two places that names
25   are entered into MISLE.  One is at the end of the
```

**www.aptusCR.com**

| Chief Warrant Officer Daniel Hager | Fiedler vs. United States of America |
|---|---|

```
 1   narrative portion of the activity.  It is basically
 2   you signing the bottom of your narrative, and then
 3   there is another location where names are put in
 4   would be the -- what is that section called -- the
 5   involved personnel I think is what it is called.  It
 6   is another tab in MISLE Where you would put the
 7   names of individuals who were involved with that
 8   inspection.
 9            Q.    Now under the regs we have been
10   talking about, new T and old T, right?
11            A.    Say again.
12            Q.    Under the regulations there is new T
13   and old T, right?
14            A.    Correct.
15            Q.    And pursuant to those regulations, if
16   certain modifications are made to the vessel, new T
17   may begin to govern; is that correct?
18            A.    Yes.
19            Q.    And why don't I just show you that
20   specific portion of the regs.  One second.  I am
21   trying to see what exhibit number we are up to.  47.
22            Sir, I have marked as 47, 46 CFR 117.115.
23            Do you see that on the screen in front of
24   you?
25            A.    Yes, sir.
```

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

1    Q.    And I want to talk about other hazards
2  on a vessel that might be identified during an
3  inspection.  Generally one such hazard would be fire
4  hazards; do you agree?
5         A.    Yes, sir.
6         Q.    In other words, if an inspector
7  observed something that you believed was a fire
8  hazard, in the course of an annual inspection you
9  would be required to identify it as a deficiency?
10        A.    Yes, sir.
11        Q.    And one such item that may be a fire
12 hazard are materials made of what is called
13 polypropylene; do you agree with that?
14        A.    I am not familiar with --
15 polypropylene?
16        Q.    Correct.
17        Have you ever heard of polypropylene?
18        A.    I think I have heard that used when
19 talking about rope or line, polypropylene line.
20        Q.    What about like -- polypropylene
21 plastic is probably a layman's word for it.
22        Chairs, have you ever heard of polypropylene
23 chairs?
24        A.    Plastic chairs, yes.
25        Q.    Are you aware that plastic chairs are

www.aptusCR.com

ER 389

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

1    potentially a fire hazard on vessels?

2          A.    Yes, I think there is a regulation

3    that speaks to -- I think we are talking about what

4    are called furnishings.

5          Q.    And --

6          A.    Sorry.

7          Q.    Go ahead.  I didn't mean to interrupt

8    you.

9          A.    Yes.  Regulations, there is -- I don't

10   know off the top of my head, but it speaks to

11   furnishings.

12         Q.    Well, I guess a polypropylene chair

13   might be an example of a combustible furnishing.

14         Do you agree?

15         A.    I don't know.

16         Q.    Do you know anything about the

17   combustibility of polypropylene?

18         A.    I don't.

19         Q.    And have you ever heard -- withdrawn.

20         Prior to talking about it today, have you

21   ever heard about fire hazards posed by polypropylene

22   materials on passenger vessels?

23         A.    I don't recall.

24         Q.    What about plastic polypropylene

25   garbage cans, have you ever been made aware that

www.aptusCR.com

ER 390

Chief Warrant Officer Daniel Hager                                    Fiedler vs.
                                                                United States of America

1          Sorry, I lost the screen.

2          Q.    You got it?

3          A.    Something jumped in front of it.

4          So the activity summary, you can generate

5    the report and you can view it, like we are now, and

6    you can print it.  It's the same with the vessel

7    critical profile; you can view it in MISLE and you

8    can print it.

9          Q.    All right.  Well, turning in more

10   detail to Exhibit 51, Mr. Jerry Boylan was again the

11   point of contact on this inspection; is that right?

12         A.    Yes, sir.

13         Q.    This was done in 2016, correct?

14         A.    Yes.

15         Q.    And you identified as part of this

16   activity summary report the systems that you

17   inspected.

18         Do you see that?

19         A.    Yes, sir.

20         Q.    And you specifically inspected the

21   electrical system on the vessel?

22         A.    Yes.

23         Q.    And inspecting the electrical system

24   is required to be done by all vessel inspectors

25   conducting on an annual inspection on a T-vessel,

Chief Warrant Officer Daniel Hager | Fiedler vs. United States of America

1  right?

2      A.    Yes.

3      Q.    You noted any deficiencies?

4      A.    Yes.

5      Q.    And those deficiencies are populated

6  on the next page?

7      A.    Yes, sir.

8      Q.    And I think the electrical discrepancy

9  seems to be the lack of a suitable cover on the

10  motor controller for the aft compressor; am I right?

11      A.    Yes, sir.

12      Q.    As you testified earlier, there would

13  be a due date placed on the discrepancy, right?

14      A.    Yes.  So there is an issue date, which

15  is the date it was issued, when it was due by and

16  when it was resolved.

17      Q.    So, again, the Coast Guard is tracking

18  when a deficiency arises and how it is resolved?

19      A.    Yes, sir.

20      Q.    And if a deficiency isn't resolved by

21  the due date, the Coast Guard has to take further

22  action?

23      A.    Yes, sir.

24      Q.    And what that action might be probably

25  depends on the circumstances, but some action must

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
1    minutes?

2            What time is it there?

3                    MR. KAUFMAN-COHEN:  It is ten to

4    2:00.

5                    MR. MAHONEY:  I will be done with

6    this line in about 10 to 15 minutes.

7            Sir, I am going to mark as 67 -- I am

8    sorry -- 55, pages US 67 to 69.

9            (Whereupon Exhibit 55 was marked for

10                    identification.)

11                    MR. MAHONEY:  I will share my

12   screen.

13           Q.    Do you see Exhibit 55 on the screen in

14   front of you?

15           A.    Yes, sir.

16           Q.    And this is activity summary report

17   for the February 13, 2019 annual inspection of

18   CONCEPTION, right?

19           A.    Yes, sir.

20           Q.    And you were the lead inspector on

21   this?

22           A.    Yes, sir.

23           Q.    And this would have been the final

24   annual inspection on the vessel before this

25   September 2, 2019 fire which gives rise to this
```

Page 127

www.aptusCR.com

ER 393

**Chief Warrant Officer Daniel Hager**  |  **Fiedler vs. United States of America**

```
 1   litigation.

 2         Agreed?

 3         A.    Yes, sir.

 4         Q.    And, again, the activity summary

 5   report was generated by MISLE?

 6         A.    Activity summary report, yes.

 7         Q.    And it contains vessel information

 8   like the previous ones?

 9         A.    Yes.

10         Q.    And it also contains the systems that

11   you inspected in that last annual inspection on

12   CONCEPTION, agreed?

13         A.    Yes.

14         Q.    I do not see any reference to the

15   electrical system in this inspection result section

16   of the activity summary report for the final annual

17   on the CONCEPTION.

18         Do you, sir?

19         A.    I am looking.

20         What's on the next page?

21         No, I do not see it.

22         Q.    Okay.  I think as you testified

23   earlier all systems inspected in the course of the

24   inspection would make their way into the inspection

25   results section.
```

Page 128

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

```
 1         Q.    And I guess there are two
 2   possibilities, either, as you said, there is a
 3   clerical error and you didn't enter your inspection
 4   into MISLE, right?
 5         A.    Yes, I didn't correctly document the
 6   inspection in MISLE.
 7         Q.    But another potential based on this
 8   document is that you didn't do an electrical
 9   inspection on CONCEPTION, agree?
10         A.    Which I find highly unlikely.  There
11   is no proof to that fact in the report.
12         Q.    I am reading the list of systems
13   inspected.
14         One could conclude that the electrical
15   system was not inspected on the vessel during the
16   2019 annual inspection, agreed?
17         A.    Correct.
18         Q.    And would that be a deficiency if
19   someone were to review this report to say, hey,
20   there is no electrical system, inspection noted?
21         A.    Yes.
22         Q.    That's because you have to inspect the
23   electrical system during annual inspections of the
24   T-vessel?
25         A.    Yes.
```

**www.aptusCR.com**

**ER 395**

Chief Warrant Officer Daniel Hager

Fiedler vs.
United States of America

1      Q.      And if you don't, you haven't done the
2   inspection properly?
3      A.      Correct.
4      Q.      And I suppose relatedly, you haven't
5   followed the applicable regulations governing annual
6   inspections on T-vessels, agreed, if you haven't
7   done an electrical system inspection?
8      A.      Yes, I didn't document it properly.
9      Q.      But I guess I should say if a marine
10  inspector conducting a T-vessel annual inspection
11  does not review the electrical system of a vessel,
12  that marine inspector is not conducting the
13  inspection in accordance with the applicable T
14  regulations, right?
15     A.      Correct.
16     Q.      And then you wrote in the narrative,
17  in the final statement here, that in your opinion
18  the vessel is fit for routine services specified in
19  the current COI?
20     A.      Yes.
21     Q.      That was your view as the marine
22  inspector on this inspection that as of February --
23  I am sorry, let me get the right date.
24          That as of March 1, 2019 when this
25  inspection was closed -- withdrawn.  I forgot my

www.aptusCR.com

**Chief Warrant Officer Daniel Hager**                    **Fiedler vs.
United States of America**

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, DENISE A. FORD, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell

 6    the truth, the whole truth, and nothing but the

 7    truth in the within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time

10    and place therein stated, and that the testimony of

11    the said witness was thereafter reduced to

12    typewriting, by computer, under my direction and

13    supervision;

14              I further certify that I am not of counsel

15    or attorney for either or any of the parties to the

16    said deposition, nor in any way interested in the

17    event of this cause, and that I am not related to

18    any of the parties thereto.

19

20              DATED:  June 20, 2023.

21

22

23              _____

24              DENISE A. FORD, CSR No. 7525

25
```

**ER 397**

# EXHIBIT 12

1   # National Transportation Safety Board

2

3   ## Office of Marine Safety

4   ### Washington, D.C. 20594

5

6
7
8

9

10   ## Group Chairman's Factual Report

11
12

13

14   1.



Survival Factors Group

15

16

17

18

19   **Conception**

20

21   DCA19MM047

22

23

24

25   **September 4, 2020**

CLAIMANTS' JT ID 001572 – NTSB 001572

**ER 399**

## 1. Accident Information

| | |
|---|---|
| **Vessel:** | *Conception* |
| **Accident Number:** | DCA19MM047 |
| **Date:** | September 2, 2019 |
| **Time:** | 0314 Pacific daylight time (coordinated universal time – 7) |
| **Location:** | Off Channel Islands; 26 nautical miles offshore of Ventura, California. |
| **Accident type:** | Fire/explosion |
| **Fatalities:** | 34 |
| **Injuries:** | 1 serious, 1 minor |

## 2. Survival Factors Group

| | |
|---|---|
| **Chairman:** | Marcel L. Muise, Survival Factors Group Chairman |
| | Office of Marine Safety |
| | National Transportation Safety Board |
| **Member:** | Jim Gillette |
| | Investigations Center of Expertise |
| | US Coast Guard |
| **Member:** | Captain Jay Snodgrass |
| | Santa Barbara County Fire Department |

## 3. Summary

On Monday, September 2, 2019, about 0314 Pacific daylight time, US Coast Guard Sector Los Angeles (LA)/Long Beach received a distress call from the 75-foot small passenger vessel *Conception*. The vessel was anchored in Platts Harbor on the north side of Santa Cruz Island, 21.5 nautical miles south-southwest of Santa Barbara, California, when it caught fire. The *Conception* was carrying 39 persons, 6 of whom were crew.

The wood and fiberglass vessel had three levels: the upper deck, which included the wheelhouse, two crew staterooms, and a sun deck; the main deck, which included a salon with a

CLAIMANTS' JT ID 001573 – NTSB 001573

**ER 400**

1    galley and a large exterior deck; and the lower deck within the hull, which included passenger

2    berthing (bunkroom), a shower room, an engine room, and a lazarette.



4    **Figure 1. Pre-accident photograph of the *Conception* (Source: www.seawayboats.com)**

5       At the time the fire started, 5 crewmembers were asleep in their bunks in the wheelhouse

6    and in the crew staterooms on the upper deck, and 1 crewmember and all 33 passengers were

7    asleep in the bunkroom. A crewmember sleeping in an upper deck stateroom was awakened by a

8    noise and got up to investigate. He saw a fire at the aft end of the sun deck, rising up from the

9    salon compartment below. The crewmember alerted the four other crewmembers sleeping on that

10    deck. As crewmembers awoke, the captain radioed a quick distress message to the Coast Guard

11    before evacuating the smoke-filled wheelhouse.

12       Unable to use the aft ladder, which was on fire, the crewmembers jumped down to the

13    main deck (one crewmember broke his leg when he jumped) and tried to access the salon to

14    reach the passengers below. The salon was fully engulfed by fire at the aft end and by thick

15    smoke in the forward end. Unable to open a window at the forward end of the salon and

16    overwhelmed by smoke from the fire, the crew jumped overboard.

Survival Factors Group Factual Report                            Page 3 of 44

**CLAIMANTS' JT ID 001574 – NTSB 001574**

1    Two crewmembers swam to the stern and re-boarded the vessel. Access to the salon

2    through the aft corridor was blocked by fire, so, along with the captain who had also swum to the

3    stern, they launched a small skiff and picked up the remaining two crewmembers in the water.

4    They transferred to a recreational vessel anchored nearby where the captain continued to radio

5    for help, while two crewmembers returned to the waters around the burning *Conception* to search

6    for possible survivors. No survivors were found.

7    About 78 minutes after the initial distress call, Coast Guard and other first responder

8    boats arrived on scene to extinguish the fire and search for survivors. Helicopters also aided in

9    search efforts. The vessel burned to the waterline and, just after daybreak, sank in about 60 feet

10    of water. Thirty-three passengers and one crewmember died.

11

## 12    4. Details of the Investigation

### 13    4.1. Injuries

14    **Table 1*: Table of injuries.***

| Type of injury[1] | Crew | Passengers | Total |
|---|---|---|---|
| **Fatal** | 1 | 33 | 34 |
| **Serious** | 1 | 0 | 1 |
| **Minor** | 1 | 0 | 1 |
| **None** | 3 | 0 | 3 |
| **Total** | 6 | 33 | 39 |

15

### 16    4.2. Investigation

17    While initially on scene, the Survival Factors Group joined the Operations and Engineering

18    Groups in interviewing the owner and three of the surviving crew of the *Conception*, after which

19    the Coast Guard, Santa Barbara Sheriff's Office and Santa Barbara County Fire Department

---

[1] Title 49 *Code of Federal Regulations* (*CFR*) Section 830.2 defines a fatal injury as any injury that results in death within 30 days of an accident. It defines serious injury as that which requires hospitalization for more than 48 hours, commencing within 7 days from the date the injury was received; results in a fracture of any bone (except simple fractures of fingers, toes, or nose); causes severe hemorrhages, nerve, muscle, or tendon damage; involves any internal organ; or involves second- or third- degree burns, or any burn affecting more than 5 percent of the body surface.

Survival Factors Group Factual Report            Page 4 of 44

**CLAIMANTS' JT ID 001575 – NTSB 001575**

1    representatives recused themselves from further NTSB investigation in order to support the US

2    Attorney's parallel criminal investigation. The Group subsequently interviewed first responders,

3    including a Ventura County Fire Department Captain and two Battalion Chiefs, Coast Guard

4    Station Channel Harbor Islands coxswains and staff, and Channel Islands Harbor Patrol. Although

5    the captain of the *Conception,* voluntarily made himself available for interview on two occasions,

6    the office of the US Attorney prohibited NTSB investigators from interviewing him.

7    *Conception*'s captain had many years of experience on the same vessel and interviews

8    indicated he was intimately familiar with the vessel's history, operations, and maintenance. The

9    owner and surviving crewmembers therefore referred many of investigators' questions to the

10   captain, which remain unanswered due to not being able to interview him. Investigators were also

11   unable to examine smoke and heat detectors, firefighting and lifesaving equipment, which was

12   largely consumed in the fire.

13   The Survival Factors Group later visited two remaining vessels in the Truth Aquatics fleet

14   to inspect construction material, general arrangement, firefighting and lifesaving equipment, and

15   escape and egress arrangements. The wreckage of the *Conception* was examined, once recovered,

16   along with equipment and debris recovered from the sea floor.

17   The Group also joined the Operations and Engineering Groups to interview the Assistant

18   Chief of Inspections, Sector Los Angeles/Long Beach, survivors of the dive boat *Red Sea*

19   *Aggressor 1* fire, and several staff assigned to Coast Guard Headquarters.[2]

20   NTSB investigators later reviewed transcripts of crew interviews completed by law

21   enforcement along with Truth Aquatics documents shared by the FBI.

22   ### 4.3. Background

23   #### 4.3.1. General

24   The *Conception* was a 75-foot, monohull, commercial dive boat built for Truth Aquatics

25   in 1981 by Seaway Boat Company of Long Beach, California. Constructed of fiberglass over

26   plywood, the vessel included three decks. The upper deck included the wheelhouse and berthing

---

[2] The *Red Sea Aggressor 1* was a live-aboard recreational diving passenger vessel that caught fire, burned, and sank in the early morning hours, of November 1, 2019, off the coast of Port Ghalib, Masra Alam, Egypt. Of the 19 passengers and 12 crew on board, 1 United States citizen died and was never found.

CLAIMANTS' JT ID 001576 – NTSB 001576

1    for captain and crew, along with a weather deck where lifesaving equipment was stowed. A single

2    interior space was located on the main deck with a small galley forward and a dining and recreation

3    area aft. The weather deck aft of the salon had toilet and shower facilities, access to the engine

4    room and lazarette below, and a dive platform and skiff storage on the transom. The only access

5    to the upper deck was via stairs from the main deck outside, which descended to the starboard side

6    main deck. A bunkroom and separate shower area were on the lower deck and were accessed from

7    the salon via separate spiral stairs at the forward section of the salon. There was an emergency

8    escape hatch that provided for an egress route from the aft bunkroom to the aft area of the salon.

9    The vessel was inspected by the Coast Guard as an "existing vessel" under 46 *Code of Federal*

10    *Regulations* (*CFR*) Subchapter T.[3]

11       Investigators found that there was one other similar vessel built at the same shipyard, the

12    *Champ*, that was homeported in San Diego and operated in the sport fishing industry. The *Champ*

13    was lost in Mexico in July 2002. Truth Aquatics operated two other vessels, the slightly larger and

14    newer *Vision,* and the smaller *Truth,* that worked the same routes and service as the *Conception.*

15    The *Vision* was designed based on the *Conception*, and was similar in its overall layout and design,

16    but was about 5 feet longer and about a foot wider and had some design differences from the

17    *Conception.*

18       **4.3.2. Vessel particulars**

19   **Table 2: Vessel Particulars**

| Vessel Name | *Conception* |
|---|---|
| Owner/Operator | Fritzler Family Trust DTD 7/27/92 / Truth Aquatics Inc. |
| Port of registry | Santa Barbara, California |
| Flag | United States |
| Official number | 638133 |
| Classification society | None |

---

[3] Existing vessels per 46 *CFR* Subchapter T, were those small passenger vessels that, in general, were built before 1996. The subchapter was substantially revised in 1996. Existing vessels could comply with some parts of the older regulations.

Survival Factors Group Factual Report             Page 6 of 44

**CLAIMANTS' JT ID 001577 – NTSB 001577**

| Draft | 4 feet (1.2 m) |
|---|---|
| Length | 75 feet (22.9 m) |
| Beam | 26 feet (7.9 m) |
| Gross/Net tonnage | 97 / 66 |
| Engine power and type | 2 x 550 hp Detroit Diesel 92 series V-8. 1100 hp (820.3 kW) |
| Service speed | 10 knots |
| Damage cost | $1,400,000 |

### 4.3.3. Agencies having jurisdiction



**Figure 2: The vicinity of the accident site in relation to emergency response assets. The red triangle marks the site of the *Conception* fire. (Background: Google)**

**US Coast Guard:** The Commanding Officer of Coast Guard Sector Los Angeles/Long Beach serves as, inter alia, the Officer in Charge, Marine Inspection (OCMI), and Captain of the

CLAIMANTS' JT ID 001578 - NTSB 001578

**ER 405**

1   Port (COTP) in the sector's respective zones, which include Santa Cruz Island.[4] The Sector
2   Command Center (SCC), located in San Pedro, maintains command, control, and communications
3   for Coast Guard operations in the area.

4          In Santa Barbara and the surrounding area, prevention missions, including marine
5   inspection, were carried out by Marine Safety Detachment (MSD) Santa Barbara. Coast Guard
6   Station Channel Islands Harbor provided search and rescue service to the area, as did helicopters
7   from Air Stations San Diego and San Francisco, and larger cutters assigned to the Sector. In this
8   case, an HH-65 Dolphin forward deployed to Point Mugu, an MH-60 Jayhawk from San Diego,
9   two Station Channel Islands Harbor small boats, and the cutter *Narwhal* initially responded to the
10  distress. Additional Coast Guard assets were available as needed.

11         The Coast Guard has responsibility as Search and Rescue (SAR) Mission Control (SMC)
12  but has no statutory responsibility to fight marine fires. The Sector maintains the Area Contingency
13  Plan, "a comprehensive environmental protection plan to mitigate or prevent a substantial threat
14  of a discharge from a vessel, offshore facility, or onshore facility with a Captain of the Port Zone."[5]
15  Section 8000 of the plan includes firefighting topics. Per this plan and Coast Guard policy,
16  responsibility for advanced firefighting rests with local authorities, and the Coast Guard maintains
17  an assist-as-needed posture.

18         The Coast Guard, jointly with industry, operates the Marine Exchange Vessel Traffic
19  Service (VTS) Los Angeles/Long Beach.[6] The VTS Area extends in a 25-nautical-mile radius from
20  Point Fermin. The accident site was outside of the VTS area but within range of ground-based
21  vessel traffic radar and automatic identification system (AIS) reception.

22         **Ventura County Fire Department (VCFD):** The Channel Islands, including Santa Cruz
23  Island, are a part of Santa Barbara County. Coast Guard Station Channel Island Harbor, however,
24  is in Ventura County. Therefore, Ventura County Fire Department responded to the *Conception*
25  accident. The Coast Guard has memoranda of understanding with several county and municipal
26  agencies, including with the VCFD, most recently renewed in 2015. The Coast Guard Station is

---

[4] 33 *CFR* Parts 3.55-10 define the OCMI and COTP Los Angeles/Long Beach Zones.
[5] US Coast Guard, Los Angeles/Long Beach 2014 Area Contingency Plan, Section 8130.10.
[6] The VTS is a public/private partnership between the Coast Guard and the Marine Exchange of Southern California.

Survival Factors Group Factual Report                                    Page 8 of 44

CLAIMANTS' JT ID 001579 - NTSB 001579

1   located within VCFD Engine 53's first due area, and thus was first to respond to the fire.[7] Engine

2   53 is staffed with at least one paramedic and advanced life support equipment. VCFD staff told

3   investigators that they had familiarization training on the Coast Guard boats and had recently

4   participated in an oil platform fire tabletop exercise together. Engines 54 and 26 were also later

5   dispatched to the fire. VCFD Battalion Chiefs 15 and 22 both responded to the Incident Command

6   Post (ICP), as the assigned engine companies were from different battalions.

7          **Channel Islands Harbor Patrol:** The Channel Islands Harbor Patrol operates several

8   vessels in Channel Island Harbor and one mile either side and offshore of the harbor entrance.

9   They also respond anywhere in Ventura County when VCFD personnel are on board. One of their

10   vessels, *Boat 15*, is a 32-foot fire boat jointly operated by the VCFD.[8] The fire boat is equipped

11   with a 1500-gallon-per-minute fire pump, foam, 3 discharges for handlines, and basic life support

12   equipment.

13          **Other response agencies and organizations:** Santa Barbara Harbor Patrol's *Boat 3*

14   responded from Santa Barbara and was one of two fire boats that actively fought the fire on scene.

15   Ventura City Harbor Patrol's *Boat 1* ferried foam to the scene. TowBoatUS Ventura, which

16   provides commercial assistance to boaters and mariners in the area, operated the *Retriever II,* a 30-

17   foot rigid hull inflatable boat that responded early in the accident. Ventura County Air Squad was

18   unable to respond over water due to only having a single engine aircraft available.

19   ### 4.4. Accident narrative

20          The NTSB Operations Group Chair's Factual Report contains the accident narrative for the

21   time leading up to the abandonment of the vessel.

22   #### 4.4.1. The abandonment

23          The *Conception*'s captain made a distress call on VHF Channel 16 from the wheelhouse

24   of the *Conception* before departing the vessel. While gasping for air in the smoke-filled

25   wheelhouse, he was able to very quickly transmit the vessel's name, the number of persons on

26   board, and the vessel's geographic position before being forced to abandon; he did not state that

---

[7] "First-due response area is a geographical area in proximity to a fire or rescue facility and normally served by the personnel and apparatus from that facility in the event of a fire or other emergency." (44 *CFR* Part 152.2)

[8] Channel Islands Harbor Patrol *Boat 15* was formerly named *Boat 5*. AIS data and some interviews referred to it as *Boat 5*.

CLAIMANTS' JT ID 001580 – NTSB 001580

1  there was a fire, nor did he provide any coordinates. He jumped into the water from the starboard
2  bridge wing when the wheelhouse was engulfed in smoke. The second captain, who was on the
3  main deck, jumped overboard to assist the captain, as it appeared to him that the captain was on
4  fire before landing in the water.[9] After checking on the captain, the second captain then swam for
5  the stern. According to the deckhand, the captain then told the remaining three crew on the bow to
6  jump as well. The deckhand and second galleyhand assisted the first galleyhand (with the fractured
7  tibia) to the port side bow gate and into the water. The second galleyhand followed, then the
8  deckhand. The first galleyhand indicated that he entered the water last, after the second galleyhand
9  who encouraged him to jump.

10     Knowing that he could not reach the fire stations on either side of the salon because of the
11  smoke and fire blocking his way, and unable to access the galley via the windows, the deckhand
12  swam to the stern and boarded the *Conception*. The second captain had also boarded the
13  *Conception* over the stern and found that the vessel still had power, but the salon was fully
14  engulfed, precluding any kind of entry. He found the engine room with the lights on and full of
15  smoke. He then lowered the swim step with the skiff, which required main electrical power to do
16  so.

---

[9] Second captain is the term used by Truth Aquatics and *Conception* crew in lieu of mate. The vessel was required to have a master and a licensed mate although there is no mate's license for vessels of this size. *Conception*'s second captain held a Merchant Mariner Credential as Master, Limited to Vessel less than 100 gross registered tons.

**CLAIMANTS' JT ID 001581 – NTSB 001581**



1
2  **Figure 3: The *Conception*'s skiff cradled on the stern swim step. (Source: Ralph A. Clevenger**
3  **photography and video)**

4    The deckhand used a knife, kept near the stern, to cut the line securing the bow of the skiff.

5  While the captain boarded the skiff and the second captain worked to start the outboard motor, the

6  deckhand returned to the engine room hatch opening in an attempt to start the fire pump. He found

7  the engine room full of white/grey smoke, and realizing the fire stations were inaccessible, he

8  elected not to enter the cramped engine room. The first galleyhand had broken his left tibia in the

9  jump from the upper to the main deck. The second galleyhand suspected he had twisted an ankle

10  in the jump. Since the two galleyhands (without lifejackets), one of which had a serious leg injury,

11  had yet to be rescued from the water, the deckhand joined the others in the skiff as ordered by the

12  captain. The stern line was still attached as the three crewmembers attempted to pull away from

13  the *Conception*, requiring the deckhand to re-board the burning vessel to retrieve the knife. He cut

14  the stern line, which then got wrapped in the outboard motor propeller. The crew paddled the skiff

15  away from the vessel as the deckhand cleared the line, twice, from the propeller.

Survival Factors Group Factual Report                                    Page 11 of 44

CLAIMANTS' JT ID 001582 – NTSB 001582

1    The skiff picked up the two galley hands from the water and proceeded to a nearby
2    anchored recreational vessel, the *Grape Escape*.[10] They banged on the transom and the door until
3    the owners awoke. The *Grape Escape* owners described their first sight of the *Conception* as
4    "completely on fire from one end to the other. It was already completely engulfed. There wasn't a
5    spot on that boat that wasn't on fire." *Grape Escape* owners stabilized the injured galleyhands and
6    informed the Coast Guard by VHF of the situation and their position.

7    ### 4.4.2. Emergency response

8    The SCC received the initial distress call by VHF at 0314:23. In his haste, and while
9    enveloped in smoke, the captain of the *Conception* was only able to communicate the vessel's
10   name, the vessel's general location at "Platts Harbor, north side Santa Cruz," that there were 39
11   people on board, and that he could not breathe. The SCC made repeated call outs, which went
12   unanswered after the crew abandoned the vessel. The *Conception*'s AIS last transmitted the
13   vessel's position of 34° 02.962'N 119° 44.062'W at 0316:34.

14   Using the VHF radio direction finder, the SCC was able to estimate the vessel's position
15   and issue an Urgent Marine Information Broadcast (UMIB) at 0322:54, which was answered by a
16   Good Samaritan vessel and TowBoatUS.[11] The Truth Aquatics vessel *Vision* was en route to
17   Cortez Bank from San Clemente Island, approximately 90 nautical miles south-southeast and
18   stated that they could hear the Coast Guard but no one else.

19   **Table 3: Initial VHF distress communications between the captain of the *Conception* and Coast
20   Guard Sector LA/Long Beach.**

| Time (PDT) | Originator | Message |
|---|---|---|
| **03:14:23** | *Conception* | Mayday, mayday, mayday! *Conception*. Platts Harbor, north side Santa Cruz. Help. |
| **03:14:34** | Coast Guard | Vessel under distress, this is Coast Guard Sector Los Angeles on Channel one six. What is your position and number of persons on board? Over. |

---

[10] The *Grape Escape* was a US-flagged, 60-foot, Hatteras sport fishing vessel, O.N. 1085964.
[11] An Urgent Marine Information Broadcast (UMIB) is a request for assistance from any available mariners. It is broadcasted on VHF Channel 16 and by NAVTEX.

Survival Factors Group Factual Report                                          Page 12 of 44

CLAIMANTS' JT ID 001583 – NTSB 001583

| 03:14:42 | *Conception* | [unintelligible] Thirty nine POB. I can't breathe. Three nine POB. Platts. |
| 03:14:54 | Coast Guard | Vessel in distress, Coast Guard Sector Los Angeles. Roger. You have 29 persons on board and you can't breathe. What is your current GPS position? Over. |
| 03:15:20 | Coast Guard | Vessel in distress, Coast Guard Sector Los Angeles on Channel one six. What is your GPS position? Over |
| 03:16:06 | Coast Guard | Vessel in distress, Coast Guard Sector Los Angeles on Channel one six. |

1

2



3

4   **Figure 4: A screen shot of the accident site from the Coast Guard's Rescue 21 system. Lines**
5   **of position with 2° margins of error from VHF direction finders at Bald Mountain (red) and Honda**

Survival Factors Group Factual Report

Page 13 of 44

**CLAIMANTS' JT ID 001584 – NTSB 001584**

**ER 411**

1   **Ridge (blue). The red X marks the Rescue-21-derived position, and the blue X marks the actual**
2   **position of the *Conception*. (Source: Coast Guard, annotated by NTSB)**

3       The SCC then called Coast Guard Station Channel Islands Harbor by telephone at 0323

4   and requested that they proceed to the scene for a medical emergency.[12] While the crew prepared

5   to get under way, the Station's Officer of the Day (OOD) called the Ventura Fire Department

6   dispatch by radio on VCFD's dispatch frequency and specifically requested Medic Engine 53, the

7   closest to them, to respond to the station and get under way with them. The SCC then called Air

8   Station San Francisco at 0324 and requested a helicopter, which was forward deployed at Point

9   Mugu. The SCC also directed the *Narwhal,* which was five hours away, about 6.5 miles southeast

10  of Long Beach and already underway, to proceed to the accident location.[13]

11      At 0329:30 the captain of the *Grape Escape* radioed the Coast Guard with their position

12  notifying them of the fire and the people believed to be on board. The second captain then got on

13  the radio and reported to the Coast Guard that there were "33" people trapped in the bunkroom

14  that they were not able to evacuate.[14] This was the first notification to the Coast Guard that the

15  nature of the distress was a fire. The *Conception* captain then explained the situation in more detail

16  to the SCC.

17      The *Conception* skiff, with the second captain and deckhand, commenced searching for

18  survivors, not knowing if anyone had escaped the fire. They circled the burning vessel and

19  searched along the shore without sighting or hearing anyone or any alarms. They later made

20  additional searches with better flashlights at the SCC's request, also without success.

21  **Table 4: VHF communications between Coast Guard Sector LA/Long Beach and the Grape**
22  **Escape.**

| Time (PDT) | Originator | Message |
|---|---|---|
| **03:29:30** | *Grape Escape* | Pan-Pan, Pan-Pan, Coast Guard, Coast Guard. |

---

[12] Unless otherwise noted, "Station" in this report refers to Coast Guard Station Channel Islands Harbor.
[13] *USCGC Narwhal* (WPB87335) was an 87-foot patrol boat homeported in Corona Del Mar, California.
[14] The SCC watchstander misheard the *Conception* captain say the passengers were "locked" below deck when they were actually "blocked" by fire. The second captain mistakenly omitted the missing crewmember in his initial report by radio, stating there were "33 souls" still aboard.

Survival Factors Group Factual Report                                    Page 14 of 44

**CLAIMANTS' JT ID 001585 – NTSB 001585**

**ER 412**

| Time (PDT) | Originator | Message |
|---|---|---|
| **03:29:35** | Coast Guard | Vessel *Conception*, Coast Guard Sector Los Angeles on Channel one six. Over. |
| **03:29:39** | *Grape Escape* | This is a -- actually it's a mayday. I have a commercial boat on fire. It's on Santa Cruz Island at ah -- |
| **03:29:57** | Coast Guard | Vessel hailing Coast Guard Sector Los Angeles, come back or say again your last. Couldn't understand it. Over. |
| **03:30:05** | *Grape Escape* | We're at Platts Harbor on Santa Cruz Island. |
| **03:30:12** | Coast Guard | Say again the harbor name. Over. |
| **03:30:17** | *Grape Escape* | Platts Harbor. Platts Harbor. |
| **03:30:20** | Coast Guard | Roger, Captain. What is the, what is the emergency? Over. |
| **03:30:30** | Coast Guard | Vessel *Conception*, Coast Guard Los Angeles. What is the emergency? Over. |
| **03:30:35** | *Grape Escape* | Hang on just a second. |
| **03:30:40** | *Conception* Second Captain on *Grape Escape* | Hello. This is crew of *Conception*. Our boat is on fire. We are on a neighboring vessel. We have 33 souls on board down below trapped in the bunkroom. We cannot evacuate them off the vessel. |
| **03:30:57** | Coast Guard | Vessel reporting a vessel on fire. Roger, Captain. Your vessel is on fire; is that correct? |
| **03:31:07** | *Conception* Second Captain | The vessel's on fire, the vessel's name is *Conception*. |
| **03:31:10** | Coast Guard | Roger. Are you on board the *Conception*? |
| **03:31:13** | *Conception* Second Captain | We're on board a neighboring vessel. We abandoned ship. |
| **03:31:19** | Coast Guard | Roger. And there's 33 people on board the vessel that's on fire; they can't get off? |
| **03:31:24** | *Conception* Second Captain | That is correct. |

Survival Factors Group Factual Report                                          Page 15 of 44

**CLAIMANTS' JT ID 001586 – NTSB 001586**

| Time (PDT) | Originator | Message |
|---|---|---|
| 03:31:27 | Coast Guard | Roger. Are they locked inside the boat? |
| 03:31:32 | *Conception* Second Captain | That's correct, sir. |
| 03:31:37 | Coast Guard | Roger. Can you get back on board and unlock the boat or unlock the doors so they can get off? |
| 03:31:43 | *Conception* Second Captain | Every escape path was on fire. |
| 03:31:48 | Coast Guard | Roger. You don't have any firefighting gear at all? No fire extinguishers or anything? |
| 03:32:05 | Conception Captain | [The captain relieved the second captain on the radio.] Coast Guard Sector LA, we could not get to the bunkroom. The fire absorbed the wheelhouse and -- |
| 03:32:26 | Coast Guard | Roger, that. Is this the captain of the *Conception* |
| 03:32:30 | *Conception* Captain | Yes. My name is Jerry Boylan, B-o-y-l-a-n. I got one mayday out. Smoke, in the wheelhouse there was flames at the back door and the side door. We had to jump from the wheelhouse off the boat. |
| 03:32:59 | Coast Guard | Roger. Was that all the crew that jumped off? |
| 03:33:04 | *Conception* Captain | Five of the crew from the wheelhouse jumped out. One crew is down in the bunkroom. Thirty-four people still on board, okay? |
| 03:33:22 | Coast Guard | Roger. Is the vessel fully engulfed right now? |
| 03:33:26 | *Conception* Captain | To the deck. Fully engulfed to the deck. |

1  The radio conversation continued until 0335 when the SCC broadcast a third UMIB with
2 the updated situation, name, and position. The SCC also requested assistance from Santa Barbara
3 Harbor Patrol at 0339. The Station crew overheard the radio conversation between *Grape Escape*
4 and the SCC and decided to immediately launch the 45-foot Response Boat-Medium (RB-M),
5 *CG 45643*, rather than wait for the VCFD engine crew. The *CG 45643* got underway at 0342.

CLAIMANTS' JT ID 001587 – NTSB 001587

1  Engine 53 arrived at the station at 0346 and, once briefed at the station, joined the second RB-M,
2  *CG 45739*, and both were underway at 0349.[15] The engine company captain updated VCFD and
3  requested an additional engine company respond aboard Channel Island Harbor Patrol *Boat 15*.

4      Channel Islands Harbor Patrol, located in Channel Islands Harbor, had overheard the Coast
5  Guard radio traffic on both VHF and the VCFD frequencies. They anticipated being dispatched,
6  retrieved the *Conception*'s AIS position from an online source, and immediately prepared *Boat 15*
7  to respond once an engine company arrived. *Boat 15* was underway with the crew of Engine 54 at
8  0404. Ventura City Harbor Patrol *Boat 1* later also got underway, with Engine 26, at 0456.

9      The SCC made internal notifications and requested air assets for search and rescue. They
10 directed the *Conception* crew to search the waters for passengers that may have abandoned the
11 vessel, which they complied with. VCFD concurrently dispatched two battalion chiefs, an
12 additional engine company, and requested air assets and mutual aid from Santa Barbara and
13 Ventura City.



**Figure 5:** *Conception* as seen on arrival by *Boat 15*. (Source: VCFD)

Multiple agencies responded to the Coast Guard Channel Islands Station, where an Incident Command Post (ICP) was set up. A VCFD Battalion Chief normally responds to the station when VCFD personnel embark Coast Guard boats. In this case, Battalion Chief 22 joined the Coast Guard Officer in Charge in forming a Unified Command. Communications were established between search and rescue units (SRU), the ICP, the SCC, Good Samaritan vessels, and VCFD dispatch through a mix of Coast Guard, marine, and VCFD frequencies. The owner of the *Conception* also reported to the ICP.

**Accountability:** Prior to arrival on scene, responders were aware of the number of people missing as reported by the *Conception*'s captain. At the ICP, there was brief confusion over

---

[15] Investigators were able to obtain AIS data for the two 45-foot small boats and the *Narwhal*, although during the response their AIS units were in law enforcement mode, and not transmitting to other vessels.

Survival Factors Group Factual Report                                    Page 17 of 44

CLAIMANTS' JT ID 001588 - NTSB 001588

1   passenger names on the vessel's manifest, since the vessel had a late addition before it departed

2   Santa Barbara Harbor on August 31 who was not on the manifest. The owner was able to resolve

3   the discrepancy when he arrived at the ICP.

4        The passenger manifest, although it satisfied regulatory requirements, provided only the

5   names of each passenger. It did not identify each passenger's gender, nationality, and age. No

6   emergency contact information was required to be given by any of the passengers.

7        *CG 45643* was the first SRU to arrive on scene at 0427 and started searching for survivors.

8   They found the *Conception* completely engulfed in flames. *CG 45739*, with Engine 53 embarked,

9   arrived on scene immediately after and assumed the role of On Scene Coordinator (OSC).[16]

10  *CG 45739* transferred two firefighters (a paramedic and an EMT) to the *Grape Escape* to assess

11  the injured *Conception* crewmembers and then began searching the area for any other survivors.

12       The RB-M was equipped with a P-6 portable dewatering pump capable of 250 gallons per

13  minute that could also be used for firefighting, though the Engine 53 captain and RB-M coxswains

14  determined it would not be effective for this response. The RB-M was not equipped with a deck

15  gun or fire monitor. Since *Boat 15* was en route with more pump capacity and the firefighting foam

16  required to fight a conflagration of this size, the RB-Ms searched for survivors in the water,

17  deeming it a higher priority after determining that there were no survivors in the wreck given the

18  mass conflagration.

19       The CG 6540, an HH-65 Dolphin helicopter from Naval Air Station Point Mugu, was the

20  first air asset on scene, arriving about the same time as *CG 45739*.[17] The Engine 53 crew deemed

21  it safer to leave the injured crewmembers on the *Grape Escape* rather than transfer to the helicopter

22  due to the risk of entanglement with the rescue litter and the sport fishing vessel's rigging.

23       The CG 6014, an MH-60 Jayhawk helicopter from Coast Guard Station San Diego, later

24  relieved the HH-65 on scene at 0940. The two RB-Ms, the *Conception* skiff, other small boats,

25  and Coast Guard helicopters searched the area and the shoreline for survivors and found none.

---

[16] The on-scene coordinator (OSC) is the designated vessel or aircraft assigned to coordinate the activities of all participating search units.

[17] Coast Guard Air Station San Francisco had forward deployed air assets at Naval Base Ventura County at Point Mugu.

CLAIMANTS' JT ID 001589 - NTSB 001589

1    *Boat 15,* with Engine Company 54 embarked, arrived on scene, followed by *Boat 3*, and

2    commenced fire suppression efforts, first with fire monitors and then with handlines. The

3    *Retriever II* arrived on scene at 0502 and shortly after began towing the burning wreck away from

4    the shallow water with a grappling hook to a location where the fire boats could better reach it.

5    The fire was first reported extinguished at 0508 but re-flashed several times in the area of the fuel

6    tanks and on the bow. Burned out through-hull penetrations eventually submerged, where the main

7    engine exhausts had been, and the vessel sank stern first in position 34° 02.9' N 119° 44.3' W at

8    0654, approximately 20 yards from shore, in 61 feet of water. First responders were not able to

9    safely board the vessel before it sank. Underwater recovery divers later found the wreckage, lying

10    on the seafloor in an upside-down position.

 

11

12    **Figure 6:** ***Conception*** **as seen from CG 6014 at 0651 (left) and at 0659 after sinking (right). (Source:**

13    **Coast Guard)**

CLAIMANTS' JT ID 001590 – NTSB 001590



1
2  **Figure 7: An extract of Chart 18728 in the vicinity of Platts Harbor showing *Conception*'s last AIS**
3  **position, the position of the anchored *Grape Escape*, and the position of the *Conception* sinking.**
4  **Soundings are in fathoms. (Background source: NOAA; annotated by NTSB)**

5      The *Grape Escape* departed the accident site at 0516 to transport the surviving *Conception*

6  crew to Coast Guard Station Channel Islands, arriving at about 0735. The injured first galleyhand

7  was then transported by VCFD Medic 664 from the station to St. John's Pleasant Valley Hospital

8  in Camarillo. The *Conception* captain stayed on scene aboard *CG 45739* until they returned to the

9  Station. *CG 45643* assumed OSC at 0743, and at 0804, the first human remains were recovered.

10  Four victims were recovered on the surface in shallow water by the *Retriever II* and transported

11  by *CG 45643* to Santa Barbara Harbor, where the remains were transferred to the Santa Barbara

12  County coroner office. The second galleyhand later sought medical treatment for what was

13  diagnosed as a bruised right foot at MedCenter in Santa Barbara.

CLAIMANTS' JT ID 001591 – NTSB 001591

1        *Narwhal* arrived on scene at 0841 and assumed the role of OSC. Air and surface search
2  and rescue efforts continued thereafter for 25 hours until suspended by the Sector Commander at
3  0938 on September 3. No first responder injuries or equipment damage was reported.

4        *Conception* and *Grape Escape* crews and first responders all described the on-scene
5  weather as clear, with light-to-no wind, excellent visibility, and slight swell. There were patches
6  of heavy fog in the Santa Barbara Channel, between Santa Cruz Island and the mainland. The
7  closest weather buoy, 13 miles northwest of the site, recorded an air temperature of 64°F and a 6-
8  knot wind from 210°. The SCC logged air and sea temperatures as 58°F and 68°F, respectively.
9  On arrival, the RB-Ms reported northwest seas 2-feet or less, light west wind, and 10-mile
10  visibility.[18]

11  **Table 5: Summary of resources assigned in the initial response.**

| Name/hull/tail number | Type and affiliation | Role | Time on scene |
|---|---|---|---|
| *CG 45643* | Response Boat-Medium – Coast Guard Station Channel Islands Harbor | First SRU on scene | 0432 |
| CG 6540 | HH-65 helicopter – Coast Guard Air Station San Francisco (forward deployed to NBVC Point Mugu) | SAR, medical response, and first OSC | 0432 |
| *CG 45739* | Response Boat-Medium – Coast Guard Station Channel Islands Harbor VCFD Engine 53 embarked. | SAR, OSC | 0432 |
| *Boat 15* | Fire boat – Channel Islands Harbor Patrol and Ventura County Fire Department. Engine 54 embarked (also called *Boat 5* by some witnesses and in AIS data) | Fire suppression | 0455 |
| *Retriever II* | Commercial towing vessel – TowBoatUS Ventura Harbor | Towing support | 0502 |
| *Boat 3* | Santa Barbara Harbor patrol | Fire suppression | 0518 |

---

[18] The NTSB Meteorology Factual Report dated November 7, 2019, contains additional metocean information.

Survival Factors Group Factual Report                            Page 21 of 44

**CLAIMANTS' JT ID 001592 – NTSB 001592**

| Boat 1 | Patrol boat - Ventura City Harbor with VCFD Engine 26 embarked | Ferried foam to the scene | N/A - mechanical failure |
| --- | --- | --- | --- |
| USCGC Narwhal (WPB 87335) | Coast Guard Patrol Boat homeported in Corona del Mar. | Assumed OSC on arrival | 0841 |
| CG 6014 | MH-60 helicopter - Coast Guard Air Station San Diego | SAR | 0940 |

### 4.4.3. Post-SAR

1  The ICP was moved from Coast Guard Station Channel Islands to VCFD Station 50 about
2  1330 on September 2, once the initial response was completed. Given that the accident occurred
3  in Santa Barbara County, the ICP was again relocated, on September 3, to the Santa Barbara
4  County Fire Department headquarters. Over nine days, divers from several local law enforcement
5  agencies and the Federal Bureau of Investigation (FBI) dove on the wreck, which was overturned
6  on the sea floor. They recovered all but one of the remaining victims, most of whom were found
7  in the berthing area or nearby on the seafloor. The last victim was recovered on the surface on
8  September 11. The ICP was stood down on September 13.

9  Evidence was recovered from the accident site, including equipment and small parts of the
10  hull, and was brought ashore, where it was x-rayed, photographed, and catalogued by the FBI
11  Evidence Recovery Team. The wreckage was recovered on September 12 and transported by barge
12  to the US Naval Base Ventura County in Port Hueneme on September 13. The Coast Guard,
13  Bureau of Alcohol, Tobacco and Firearms (ATF), FBI, and SBFD inspected the wreck over 13
14  days. All debris and personal effects recovered from the seafloor were also brought to the wreckage
15  site for examination.

16  On September 24 and 25, the NTSB was permitted by the FBI, under the direction of the
17  office of the US attorney, to access and examine the wreckage and debris recovered. Investigators
18  found the hull below the gunwale largely intact except for either side of the berthing area, where
19  it burned to the waterline. The interior of the vessel suffered fire damage throughout, with the main
20  deck and above being completely consumed.[19]

---

[19] See NTSB Fire Investigation Factual Report.

Survival Factors Group Factual Report                                          Page 22 of 44

CLAIMANTS' JT ID 001593 - NTSB 001593

1

2    ### 4.5. Additional information



3
4    **Figure 8: Fire, lifesaving appliance and evacuation plan for the *Conception*.**
5

CLAIMANTS' JT ID 001594 – NTSB 001594

### 4.5.1. Lifesaving

**Distress call:** The *Conception* was equipped with an ICOM IC-M506 VHF radio capable of VHF Digital Selective Calling (DSC) if programmed with the vessel's Maritime Mobile Service Identity (MMSI).[20] Additionally, the radio was capable of receiving the position information from an integrated receiver and GPS antenna. It is unknown whether the radio was programmed with the MMSI. In addition to distress



**Figure 9: Conception's VHF radio located overhead in the wheelhouse. The VHF-DSC distress button in the lower left is color-coded red. (Source: B. Priddin)**

communications by voice, by pushing and holding the red distress button on the front panel of the radio for three seconds, a VHF-DSC call would communicate the nature of the distress (default to undesignated distress, if the user did not input this) and the latest position of the vessel, and would have continued to transmit distress messages every 3.5 to 4.5 seconds until the call was acknowledged. Due to the nature of the criminal investigation, investigators were not permitted to interview the captain to determine if he initiated a VHF-DSC distress call. The Coast Guard, however, did not receive a VHF-DSC distress call from the *Conception,* nor did any other vessels contacted by investigators.

The *Conception* had a Category I float-free Emergency Position Indicating Radio Beacon (EPIRB), which was mounted on the upper deck bulwark on the starboard side, near the top of

---

[20] DSC allows mariners to instantly send an automatically formatted distress alert. DSC also allows mariners to initiate or receive distress, urgency, safety, and routine radiotelephone calls to or from any similarly equipped vessel or shore station, allowing you to "direct dial" and "ring" other radios, or allow others to "ring" you. (Coast Guard Navigation Center, April 2020)

Survival Factors Group Factual Report                                                Page 24 of 44

CLAIMANTS' JT ID 001595 – NTSB 001595

1   stairs to the main deck. The surviving crew of the *Conception* did not retrieve or manually activate
2   the EPIRB, and there were no signals received by the Coast Guard.

3      **Primary lifesaving appliances:** Investigators were not able to examine the *Conception*'s
4   lifesaving equipment; only pieces survived the fire. The largest piece recovered was a corner of a
5   lifefloat. According to the owner, the *Conception* was outfitted similarly to *Vision.* All lifesaving
6   appliances were located either on the upper deck or on top of the wheelhouse. Primary lifesaving
7   appliances aboard the *Conception* included 6 various-sized lifefloats, with an aggregate capacity
8   of 104, or 100 percent of the people allowed on board. On small passenger vessels operating in
9   warm water, primary lifesaving may include lifefloats.[21] Nine lifesaving inspection deficiencies
10  were documented by the Coast Guard in the previous ten years, including lifefloat, lifejacket, and
11  life ring issues, all of which were resolved by the owner and captain to the satisfaction of the Coast
12  Guard inspector.

13     Type I offshore lifejackets for 103 adults and 11 children were on board, in addition to
14  Type III work vests stored separately. The vessel was equipped with two different models of
15  lifejackets, and instructions for both were posted in both the salon and each individual bunk. The
16  safety briefing given to passengers did not include a demonstration of putting on the lifejackets.
17  All lifejackets were stowed on the upper deck in boxes with float free covers. According to the
18  station bill on the *Conception*, the second captain was responsible to ensure passengers donned
19  their lifejackets in an emergency.

20     The lifefloats and lifejackets were all stored in plywood boxes on the upper deck, with
21  plywood covers designed to float off. The crew did not have time to retrieve any lifesaving
22  equipment before abandoning ship, and all equipment was consumed in the fire. Investigators
23  recovered only one small piece of a burnt lifefloat.

24     The *Conception* had flares that were reported to be located in the wheelhouse, none of
25  which were used in the accident.

---

[21] 46 *CFR* Part 180 defines warm water as areas where the "monthly mean low temperature of the water is >15 °C (59 °F)."

Survival Factors Group Factual Report                                    Page 25 of 44

CLAIMANTS' JT ID 001596 – NTSB 001596

1    **Table 6: Summary of installed lifesaving equipment.**

| Equipment | Size | Make/Model | USCG Approval No. | Quantity |
|---|---|---|---|---|
| **Lifefloat** | 15 persons 22 persons | Jim Buoy 1215* | 160.027/77/2* | 4 2 |
| **Offshore lifejacket (Type I)** | Adult Child | Kent Sporting Goods* | 160.055/184/0 160.055/180/0 | 103 adult 11 child |
| **Life ring*** | 3 | Jim Buoy 24 inch* | 160.050/106/1 160.050/107 | 3 |
| **EPIRB** | 1 | ACR RLB-38/N2874 | N/A | 1 |

2    *Installed on *Vision*

3

4    **Skiff:** The *Conception*'s skiff was
5    a 16-foot Caribe rigid-hull inflatable
6    equipped with a 40-hp Honda 4-stroke
7    outboard engine and was primarily used
8    to support diving operations, but also for
9    the retrieval of persons overboard. The
10   skiff was also the designated rescue boat
11   per 46 *CFR* Part 180.10-35 (Old T) and
12   180.210 (New T). It was stowed at the
13   stern and was launched via a
14   hydraulically powered launch platform,
15   which required the vessel's main
16   electrical power to lower the platform.



**Figure 10: Postaccident photo of the skiff from the *Conception*. Note the cut line at the bow**

CLAIMANTS' JT ID 001597 – NTSB 001597

1

### 4.5.2.Fire protection

The *Conception* had to meet the fire equipment carriage requirements of 46 *CFR* Part 181. There was no additional fire equipment on board in excess of the requirements. The vessel was inspected annually by Coast Guard marine inspectors and underwent biennial hull (drydock) and internal structural exams. The Coast Guard documented 31 deficiencies over the previous 10 years, 4 of which were fire-protection-related, including the fire pump, galley heat detector, hose, and wheelhouse extinguisher, all of which were rectified to the Coast Guard's satisfaction.

Kangkildes Fire Protection completed a third-party inspection of the engine room fixed fire-fighting system and extinguishers in February and noted no outstanding deficiencies.

**Fire pumps:** An electrical fire pump in the engine room fed fire stations on the main deck on either side, outboard of the salon. The fire pump could be started locally or at the port fire station and could also be used as a bilge pump. The fire pump discharge could also be directed overboard and was routinely tested, according to the deckhand and second captain. On the accident voyage, the sewage holding tank had overflowed into the port bilge, and the deckhand had attempted to use the bilge pump, driven off the starboard engine, to clean up. The impeller failed on the bilge pump, and the deckhand then lined up the fire pump to finish cleaning. He told investigators that he lined up the fire pump, ready for emergency use, before leaving the engine room. The fire hoses were tested annually during Coast Guard inspections.

**Fire Detection:** The bunkroom area contained two independent modular smoke detectors, installed in the overhead, on the port and starboard pathways between the bunks. Investigators were informed by the vessel owner that the smoke detectors in the bunkroom were hardwired into the vessel's electrical system with a 9-volt battery backup. The smoke detectors were not interconnected to other alarms or a centralized system in the wheelhouse. Based on past photos and video, the smoke detectors appeared to be common consumer-type home detectors. The smoke detectors in the bunk room were the only ones installed and required to be on board. Heat detectors were installed in the engine room and galley. The galley detector was not connected to the range

CLAIMANTS' JT ID 001598 - NTSB 001598

1    hood fan or any damper, and there was no galley fixed fire-extinguishing system.[22] In the engine

2    room, the heat detector, if activated, would initiate the carbon dioxide ($CO_2$) system for the engine

3    room, but none of the other detectors were interconnected.

4           The captain of the *Vision*, a similar vessel, stated that he could not hear the berthing area

5    and lazarette detectors from the bridge while underway and that one could faintly hear the lazarette

6    detector with just a generator running. The owner was aware that the berthing area smoke detectors

7    functioned properly less than a month before the accident voyage, when a contractor was soldering

8    on the air conditioning unit, which activated them. The owner told investigators that after the

9    activation, the captain of the *Conception* told him that he "unplugged" the smoke detectors while

10    the soldering was ongoing and when the work was completed, the smoke detectors were plugged

11    back in, "fresh" batteries were added, and they were tested. There were no requirements related

12    to the testing and inspection of smoke detectors. When asked whether if there was any inspection

13    or testing of the smoke detectors on the *Conception*, the owner stated the captain was responsible

14    for any testing and inspection.

15           At the time of the accident, the second galleyhand that awoke the rest of the crew after

16    discovering the fire stated that he did not hear any alarms, nor did he smell smoke from his bunk

17    aft of the wheelhouse. The deckhand, whose bunk was in the wheelhouse, said that he heard a faint

18    alarm when he was awakened. He did not recognize the alarm and described it as "… coming from

19    the dash [in the wheelhouse]… barely a little chirp." He further noted that when he looked, he did

20    not notice anything flashing on the console in the wheelhouse.

21           **Public address and internal communications:** The *Conception* was fitted with a fixed

22    installation Standard Communications Corporation LH10 loudhailer public address (PA) system

23    that could be used as an alarm from the wheelhouse, with speakers on the bow, stern, and in the

24    bunkroom. According to the owner's manual, the system had three modes: hail/listen back,

25    intercom, and automatic signaling. By the push of a button on the control unit in the wheelhouse,

26    regulations required the fixed PA system to be audible during normal operating conditions in

---

[22] One large interior space was located on the Main Deck. "Galley" in this report refers to the food preparation area forward. "Salon" refers to the aft part where tables where installed. Some of the crew refer to the whole space as the Galley.

Survival Factors Group Factual Report                               Page 28 of 44

CLAIMANTS' JT ID 001599 - NTSB 001599

1     passenger accommodation spaces and all other spaces normally manned by crew members.
2     Although there was a speaker for the PA system in the bunkroom, it was reported to have been
3     disconnected so that there would be no interruptions from routine announcements to passengers
4     who were sleeping in the bunkroom. There were no pre-accident records from the Coast Guard
5     showing the PA system on board the *Conception* was checked during inspections or any
6     deficiencies noted.

7     After the accident on the *Conception*, the Coast Guard, in a concentrated inspection
8     campaign, found that the PA speaker on the *Vision* was inoperable, and issued a deficiency to have
9     the speaker repaired or renewed.

10     The *Conception* was not required to have any means of two-way communication between
11     the bunkroom and the wheelhouse control station or crew berthing. Although a crew member
12     occupied a bunk in the bunkroom, she did not have a means to communicate with the crew above,
13     either by intercom, phone, radio, or sound-powered device.

14     **Extinguishers:** In total, there were six fire extinguishers on board the *Conception*.
15     According to the Certificate of Inspection (COI) issued by the Coast Guard, five of them were type
16     B-II (10-pound dry chemical) and one was type B-I (2-pound dry chemical). On the main deck,
17     fire extinguishers were mounted in the galley by the coffee pot and the port aft salon. In the
18     bunkroom, there was a fire extinguisher mounted on a bulkhead across from the main stairs by the
19     changing room. There was one fire extinguisher in the engine room, one in the lazarette, and one
20     in the wheelhouse dash at the console. One of the February 2017 Coast Guard inspection
21     deficiencies was to replace the extinguisher in the wheelhouse. The deficiency was cleared after
22     the vessel owner replaced it.

23     **Fixed system:** 46 *CFR* Part 181 was changed on January 10, 1996 to include more fixed
24     fire-extinguishing requirements for a number of spaces, including most engine rooms. Existing
25     wooden vessel such as *Conception* had until March 1999 to comply with the new regulations.

**CLAIMANTS' JT ID 001600 – NTSB 001600**

1    *Conception*'s engine room was equipped with an approved $CO_2$ system.[23] The $CO_2$ bottles for this

2    system were located in the lazarette.

3        The regulations also require a grease extraction hood and a dry or wet chemical

4    extinguishing system. The *Conception*'s galley had a flat griddle for which regulations prescribed

5    a fixed fire-extinguishing system. The Coast Guard granted a waiver for the system in 2000 due to

6    the short 14-inch ducting that led directly outside. The waiver was contingent on the company

7    providing an additional B-II extinguisher in the galley, installing fire detection, and implementing

8    a maintenance program "to ensure the existing galley and ventilation equipment is kept free from

9    any build-up of grease." The second galleyhand told investigators it was his duty to clean the

10    grease trap. According to the owner, the captains for each vessel in the fleet were responsible for

11    all maintenance on board the vessel and all maintenance records were kept on each vessel.

12    Although the captain of the *Conception* voluntarily made himself available to be interviewed,

13    NTSB investigators were prohibited from interviewing him on scene due to a parallel criminal

14    investigation, thus, the maintenance program for the galley ventilation and ducting on the

15    *Conception* is unknown.

16        **Other firefighting:** A single fire axe, as required by regulations, was stowed on the aft

17    bulkhead of the wheelhouse. The deckhand stated that he was about to ask the captain for it to

18    access the galley through the bow windows when the wheelhouse was engulfed in smoke, but the

19    captain jumped from the wheelhouse into the water before he was able to ask.

20      **4.5.3.Escape and egress from accommodation spaces**

21        Two accommodation spaces were located below the main deck salon: a berthing area,

22    known as the bunkroom, and a shower room (washroom) forward of the berthing area, separated

23    by an athwartship wooden bulkhead.[24] Both spaces were accessed by separate spiral stairways

24    from the main deck salon above. The berthing area aboard was configured in a horseshoe shape,

25    with bunks either side of two fore and aft aisles. On the outer side of each aisle were three sets of

---

[23] The NTSB Engineering Group Chair's Factual Report contains additional information regarding the fixed fire-extinguishing system.

[24] 46 *CFR* 175.400 – Accommodation space (applicable to *Conception*) – means a space used as a (1) public space, (3) dining room or mess room, (4) lounge or café, (6) overnight accommodation space, and (9) washroom or toilet space.

CLAIMANTS' JT ID 001601 - NTSB 001601

1  two-high double bunks. At the inner (centerline) side of each aisle there were two sets of three-
2  high single bunks. Two sets of three-high single bunks were arranged athwartship along the aft
3  bulkhead, with one two-high bunk along the forward bulkhead on the portside (the top being
4  reserved for a crew member) and one double bunk underneath the forward stairway on the
5  starboard side. Each of the bunks had a privacy curtain that could be pulled fully across the aisle-
6  accessible side of the bunks. The privacy curtains were normally closed by passengers when they
7  were occupying the bunks. It was also common to keep them closed by passengers when not
8  occupied.

CLAIMANTS' JT ID 001602 - NTSB 001602



1

2    **Figure 11: *Conception* bunkroom arrangement. (Source: Truth Aquatics)**

3       An escape hatch was installed on the centerline at the aft end of the bunk room that led to

4    the aft end of the salon and was original to the vessel. In all available historic documentation and

5    inspection history of the *Conception*, no discrepancies or modifications were found related to the

6    emergency escape hatch. The hatch was accessible from either aisle by climbing a wooden ladder,

7    located in the corner where the aftermost middle and aft athwartship tiers of bunks were, through

8    a privacy curtain (if not opened) onto the top bunk, crawling to the centerline over bedding and

9    personal effects, and pushing the plywood escape hatch out of the way. The escaping passenger

**CLAIMANTS' JT ID 001603 – NTSB 001603**

**ER 430**

1   would then enter what was essentially a three-sided plywood box without handholds, assisting

2   hardware or lighting and would have to climb out of it before heading aft within the salon. On the

3   similar vessel, the *Vision*, which according to the owner had a similar escape hatch layout and

4   dimensions, the plywood hatch measured about 22 inches by 22 inches and was marked by plastic

5   engraved unlit signage next to the bunks.[25] The escape exited below an island counter with three

6   sides enclosed by plywood and a 6-inch coaming around the escape hatch above the main deck of

7   the salon. About six feet of empty deck space in the salon separated the hatch, which opened

8   underneath a wooden countertop, from the passageway that led to the weather deck. The second

9   captain stated that when he first boarded the vessel at the stern from the water, "he could see the

10  aft escape was fully engulfed in flames."

11      Upon examination of the wreckage, investigators found silhouette evidence markings

12  consistent with the outline of persons or objects of non-uniform shape (e.g. duffel bags) in the

13  bunk room at the bottom of the main stairs leading to the salon, on the port side forward outboard

14  lower double bunk and adjacent vertical and horizontal bunk frames at bunks 17L and 19L. The

15  mattresses and personal effects from 17L and 19L were also mostly unburned. The mattress for

16  19L had an observable silhouette and traces of human tissue on it, as did the air conditioning intake

17  louver at the bottom of the main stairs. Personnel effects, including paper documents, recovered

18  from the crewmember assigned to bunk 17L were almost entirely unburned.

---

[25] Measurements are based on the similar vessel *Vision*, which according to the vessel owner had no design modifications made to the escape hatch from the previous Coast Guard approvals of the escape hatch on the *Conception*.

Survival Factors Group Factual Report                                        Page 33 of 44

CLAIMANTS' JT ID 001604 - NTSB 001604



| | |
|---|---|
| | 1. Bunk 19L |
| | 2. Bunk 15L |
| | 3. Silhouettes |
| | 4. Bunk 17L |
| | 5. Air conditioning intake |
| | 6. Bottom of main stairs to salon |

Figure 12: Postaccident photo of the bunkroom looking from the starboard aisle forward and to port.

Investigators measured the dimensions of the remaining unburnt bunkroom in the wreckage. The area of the bunkroom was about 540 square feet (50 square meters). The bottom step of the spiral stairs survived and measured approximately 36 inches wide. The port aisle, between bunks 19 and 32, was approximately 30 inches. The starboard aisle, between bunks 2 and 15, measured approximately 32 inches.

The *Conception* was an "existing vessel" as defined in Coast Guard regulations. As such, the vessel was required to meet the older standards, commonly referred to as "Old T," for escape routes and emergency egress found in 46 *CFR* Part 177.15. Even as applied to New T regulations, the means of escape met the intent of Subpart E where neither passed through a watertight door and they were at opposite ends of the bunkroom so as to minimize the possibility of one incident blocking both escapes. New T, however, requires the means of escape to be sufficient for rapid evacuation in an emergency for the number of persons served. Investigators were unable to find a quantitative definition of the word "rapid." Although there was no specific minimum dimension guidance in either Old or New T regarding means of escape, New T states the dimensions of the means of escape must be such as to allow for easy movement of persons wearing lifejackets and that there must be no protrusions that could cause injury, ensnare clothing, or damage lifejackets.

CLAIMANTS' JT ID 001605 – NTSB 001605

Old T regulations for means of escape also applied to crew quarters, thus requiring not less than two avenues of escape so that if one is not available, the other may be. For the five crew in the accommodation, all, except the captain who was the last to leave the wheelhouse, exited through the wheelhouse wing doors and lowered themselves to the main deck below. Two of the four crew were injured, with one being serious. The *Conception* was not fitted with any device such as a ladder, net, or ropes for crew to evacuate via the wheelhouse wing exits to the deck below.

All bunks had assigned occupants, except for numbers 7, 9, 24, and 26 (these were the top and bottom bunks of the three-tiers high bunks running athwartships on the aft bulkhead). The deckhand told investigators that passengers on the accident voyage kept to the posted sleeping arrangements. The top bunks nearest the emergency escape hatch were occupied by the two youngest female passengers, aged 16 and 17. According to the deckhand, luggage was stowed below some of the bunks and above them, in a designated area. The deckhand stated, when asked by investigators, that the aisles between the bunks were clear of any luggage all the time. Some passengers did keep personal items and effects with them in their bunk spaces, such as purses and backpacks.



**Figure 13: The *Conception* berthing area escape hatch from above in the salon (left) and from the port side, below deck with the hatch open (middle), and with the hatch closed (right). (Source: Ralph A. Clevenger photography and video*)**

There were three sliding windows on each side of the *Conception* in the main salon. Each of the windows slid open in an aft direction. On the forward bulkhead of the galley were three windows, of which only the center one could be opened from the inside by turning a hand screw and pushing the window outward at the bottom since it was hinged at the top. If closed, none of the windows could be opened from the outer decks. The forwardmost of the three sliding side

CLAIMANTS' JT ID 001606 – NTSB 001606

1  windows in the salon on the port side was labeled as a means of escape. Should passengers exiting
2  the bunkroom via the main stairway not be able to utilize the pathway through the salon through
3  the aft main doors, a person could climb over the seating on that side, slide the window open, if
4  not already open, and exit to the main deck. The starboard side middle window was similarly
5  labelled. None of the windows were designated as emergency escape routes during the
6  construction of the vessel. The owner stated that he had put the emergency escape labels on the
7  windows as an extra measure to help passengers identify additional escape routes. During the fire,
8  the deckhand and second galleyhand attempted to open the forward center window but were
9  unsuccessful, as it was latched from the inside. They stated that at the time of the abandonment,
10  the windows were black with heavy smoke visible through the glass.

11  ### 4.5.4. Operations

12  Safety orientations on small passenger vessels are required by 46 *CFR* Part 185.506. The
13  regulation requires that "before getting under way on a voyage or as soon as practicable thereafter,"
14  passengers should have the opportunity to become acquainted with stowage and location of life
15  preservers, proper methods of donning and adjusting life preservers, the type and location of all
16  lifesaving devices carried on the vessel, and the location and contents of the "emergency checkoff
17  list." The practice on the *Conception* was to complete this orientation on the first morning after
18  getting under way. A laminated checklist was used for the orientation. Law enforcement
19  investigators located several sample typed-up versions of the orientation. All of the versions
20  included donning lifejackets and either diving or hiking safety. On the accident voyage, passengers
21  boarded the vessel the evening/night before the *Conception* got underway on August 30. Once on
22  board and situated, they got in their assigned bunks and went to sleep. The *Conception* got
23  underway from the Sea Landing dock at about 0404. That morning, after the *Conception* anchored
24  at their initial diving site, during breakfast, the first deckhand completed the safety orientation. He
25  stated he briefed passengers on the location of lifejackets, extinguishers, and escape routes. The
26  muster (assembly point) area was located just aft of the salon on the main deck. There was a large
27  sign located immediately aft of the salon doors on the port side aft of the toilet entrance posted on
28  the bulkhead identifying that area as the assembly point. The captain of the *Vision* stated that he
29  did the orientation next to the escape hatch and pointed it out to everyone, and that children would
30  occasionally play, climbing through it. Safety-related material available to passengers prior to the

CLAIMANTS' JT ID 001607 – NTSB 001607

1 *Conception* getting under way were the lifejacket donning instructions, posted in the salon and in

2 each bunk, and a single page "welcome aboard" form that asked passengers to "take a few minutes

3 and read the following" and that the form "will serve as your pre-departure safety briefing." The

4 one-page form included safety orientation related information required by regulation, with the text

5 shown in Figure 13. The remainder of the single page form discussed non-safety-related material

6 such as breakfast, lunch, and dinner times, and bunkroom, shower room, drying room (lazarette),

7 and kayak rack rules and considerations.

8



### Lifesaving Equipment:

All lifesaving equipment, including lifejackets and rafts, is located on the sundeck behind the wheelhouse.  Should the need arise, this is where a crewman will be passing out the equipment.  Please review the placard located in each bunk and table for proper donning of jackets. Life rings are located behind the ladder leading to the sundeck, and in both wing stations on either side of the wheelhouse.

9 **Figure 14: Truth Aquatics "welcome aboard" information specific to pre-departure safety briefing.**

10 *Conception* passengers on previous voyages told investigators that their safety orientation

11 was done after the first night and did not include the location of the emergency escape.

12 Truth Aquatics was in process of finalizing and implementing a vessel and safety

13 orientation video that was intended to be shown on board both the *Vision* and *Conception*, which

14 were similar in layout. The video had been completed by the company tasked with production but

15 was not yet in place on board each vessel. The safety orientation video showed how to don a

16 lifejacket, the locations of the assembly station and of lifesaving appliances, instructions for a man

17 overboard, and the locations of the emergency exit from the bunk room and galley/salon.

18 A roving watch was required by 46 *United States Code* (*USC*) Section 8102 and by 46 *CFR*

19 Part 185.410. The *Conception*'s COI also included a specific endorsement, stating that "A member

20 of the vessel's crew shall be designated by the master as a roving patrol at all times, whether or

21 not the vessel is underway, when the passenger's [sic] bunks are occupied." Notwithstanding these

22 requirements, the practice on the *Conception* was for all hands to sleep at night. One deckhand

23 was assigned a bunk in the berthing area with the passengers. An anchor alarm, built into the GPS,

24 was set in the wheelhouse, where the other deckhand and second captain slept. The deckhand, a

25 *Vision* captain, and a former cook who worked for Truth Aquatics for two years stated that the

26 whole crew always slept at night. When former and current Truth Aquatics crew members were

**CLAIMANTS' JT ID 001608 – NTSB 001608**

1   asked about a roving watch, they either did not recall a roving watch being set at night or they
2   declined to comment.

3   ### 4.5.5. Training and pre-incident planning

4        The owner stated that the crew, including galley staff, conducted regular drills, including
5   fire drills. A former first galleyhand stated that the crew did annual CPR, first aid, and fire
6   extinguishers training, and had to know how to muster the passengers. New crew also drilled with
7   fire hoses. Conflicting information from the second captain, first galleyhand, and second
8   galleyhand indicated that they had not participated in any fire drills and had no training other than
9   being shown where the extinguishers were. These crew members had been on the vessel for several
10  trips and days without these familiarization procedures.

11       The deckhand, who had been with the vessel for 10 months, stated that the captain had
12  shown him all of the fire and lifesaving equipment but had never deployed a fire hose on board.
13  He described the drill for the Coast Guard inspection as an engine room scenario where they broke
14  out extinguishers and closed the ventilation (the engine room had a fixed $CO_2$ system). He had not
15  practiced launching the lifefloats.

16       Regulations require that the owner, master, or managing operator instruct each crew
17  member upon being employed and prior to getting underway for the first time on a particular vessel
18  and at least once every three months, as to the duties that crew member is expected to perform in
19  an emergency including, but not limited to the instructions on the instruction placard and station
20  bill.

21       Regulations further required crew training be logged or otherwise documented for review
22  by the Coast Guard upon request. Truth Aquatics stated the logs for the *Conception* were on board
23  at the time of the fire, and that they had been checked during all Coast Guard annual inspections
24  for compliance. Although not required by regulation, there were no records kept ashore related to
25  crew certificates, training, or licenses.

26  ### 4.5.6 Station Bill

27       As per regulations, the *Conception* had a station bill that outlined instructions to the crew
28  in case of the following emergency situations: man overboard, fire at sea, and rough weather or
29  crossing hazardous bars. Each instruction was based on the recommended emergency

Survival Factors Group Factual Report            Page 38 of 44

**CLAIMANTS' JT ID 001609 – NTSB 001609**

1    instructions format found in 46 *CFR* 185.512. Although the station bill for the *Conception* was

2    not found in the wreckage, it was the same as the two other vessels in the Truth Aquatics fleet,

3    the *Vision* and *Truth*.

4         Specific to onboard fires, the station bill required the second captain to cut off air supply

5    to the fire and close hatches, ports, doors, and ventilation dampers, while the first deckhand was

6    to use portable fire extinguishers to extinguish the fire. The second deckhand was tasked to shut

7    off the fuel supply and ventilation to the engine room and discharge the system for any fire in the

8    machinery space. The captain's task was to minimize the effect of wind on the fire and to

9    immediately notify the Coast Guard and other boats in the vicinity if the fire was unable to be

10   controlled. The second captain was also responsible for moving passengers away from the fire,

11   have them don life preservers, and, if necessary, have them prepare to abandon ship. There were

12   no specific emergency duties assigned to the first or second galleyhands. Additional procedures

13   were discussed in Truth Aquatics Loss Control Program, provided to each employee.

---

### FIRE AT SEA

1. 2nd Captain will cut off air supply to fire, close hatches, ports doors, and ventilators etc.

2. 1st Deck will immediately use portable fire extinguishers at base of flames for flammable liquid or grease fires or water for fires in ordinary combustible materials.

3. 2nd Deck will shut off fuel supply and ventilation and discharge fixed $CO_2$ if installed if fire is in machinery spaces.

4. Master will maneuver vessel to minimize effect of wind on fire and immediately notify Coast Guard and other boats in vicinity if fire is unable to control.

5. 2nd Captain will move passengers away from fire, have them put on life preservers, and if necessary, prepare to abandon ship.

---

14

15   **Figure 14: Fire at sea emergency instructions/station bill from the *Vision*.**

16        None of the crew members on the *Conception* at the time of the accident were aware of

17   any posted station bill, even though it was required to be posted by regulation. The first galley

18   hand was unfamiliar with the concept of a station bill when asked by investigators. The second

Survival Factors Group Factual Report                                    Page 39 of 44

**CLAIMANTS' JT ID 001610 – NTSB 001610**

1  captain understood that his role in a fire emergency was to start the fire pump and/or launch the

2  skiff.

3    Regulations required the master to conduct sufficient drills and give sufficient instructions

4  to make sure all crew members were familiar with their duties during emergencies that necessitate

5  abandoning ship or recovery of persons in the water. The regulations also required the summoning

6  of passengers on a vessel on an overnight voyage to muster stations or embarkation stations and

7  ensuring they understood how the order to abandon ship would be given. Although a safety briefing

8  was given the morning the *Conception* arrived at its first dive location on August 31, this briefing

9  was held in the salon, which was neither a muster station nor embarkation station.

10    The regulations also required the master to conduct sufficient fire drills to make sure each

11  crew member was familiar with his or her duties in case of a fire, and which were required to be

12  logged. Specifics of the date of the drill and training and a general description of the drill scenario

13  and training topics were required to be recorded. There was no requirement to record crew

14  members in attendance for the drill or training.

15    Coast Guard and VCFD staff all stated that they had conducted productive training

16  together, most recently in a tabletop oil platform scenario with more exercises scheduled.[26] The

17  *Conception* owner was not aware of any fire department or emergency management pre-planning

18  specific for passenger vessels, nor had the company participated in any mass casualty exercises.

19  **4.6 Post casualty Coast Guard Actions**

20    Shortly after the fire on the *Conception*, the Coast Guard issued a Marine Safety

21  Information Bulletin (MSIB) addressing passenger vessel compliance and operational readiness

22  for small passenger vessels, MSIB 008-19. The MSIB recommended owners, operators, and

23  masters of passenger vessels complete a review of the overall condition of the passenger

24  accommodation spaces for unsafe practices and other hazardous arrangements.

25    Following a series of concentrated inspections on all passenger vessels operated under the

26  regulations of Subchapter T, the Coast Guard identified issues related to bunks on board in which

---

[26] Santa Barbara Channel was also the site of the Alaska Airlines flight 261 crash on January 31, 2000. See https://www.ntsb.gov/investigations/AccidentReports/Pages/AAR0201.aspx.

1    two people can be assigned. Specific to the *Vision*, on October 2, 2019, the Coast Guard issued a

2    deficiency stating the double bunks on board do not allow for free and unobstructed escape for

3    the inside occupant and that all double bunks may only be occupied by one person; thus the

4    Coast Guard reduced overnight capacity on the *Vision* to 33 persons. Throughout the inspection

5    history of the *Vision* and *Conception* made available to investigators, such a problem had not

6    been identified until after the accident.

7        After the accident on the *Conception*, the Coast Guard initiated a Concentrated Inspection

8    Campaign (CIC) for all Subchapter T inspected passenger vessels with overnight

9    accommodation for passengers. On October 2 and November 1, 2019, the Coast Guard inspected

10    the *Vision*. From the inspection, there were a total of 11 deficiencies related to fire safety, 20

11    electrical, 1 means of escape, 4 lifesaving appliance, 1 navigational, 2 alarm, 1 emergency, and 1

12    machinery: a total of 40 deficiencies. By comparison, during the last annual inspection carried

13    out on April of 2019, there were no deficiencies noted by the attending Coast Guard marine

14    inspector.

15        Among the deficiencies documented aboard *Vision*, which was arranged and outfitted

16    similarly to *Conception*, was a requirement to provide a means of escape from the shower room

17    that leads to an area that does not contain any source of fire, such as a galley stove. The Coast

18    Guard also issued a no-sail deficiency for the grease extraction hood, which was missing a heat

19    detector (removed and taken as evidence by federal law enforcement during a search warrant

20    served at the Truth Aquatics office and the *Truth* and *Vision* on September 8, 9 and 10 2019),

21    had a build-up of grease, and was missing a maintenance plan.

22        After the fire on the *Conception*, Truth Aquatics modified the bunkroom egress on the

23    similar vessel *Vision*. A closet near the port forward end of the space was converted to a

24    passageway and ladders added, leading to watertight hatches, flush with the main deck exterior

25    outside of the galley, both port and starboard.

CLAIMANTS' JT ID 001612 - NTSB 001612



1

**Figure 16: Modifications made to the *Vision*, after the accident on the *Conception*. Left: Ladders at the forward end on each side of the bunkroom lead directly to the weather deck. Right: Flush mounted watertight hatches were installed in the deck, outboard of the galley. (Source: Truth Aquatics)**

6   Because the Coast Guard considered this to be a major modification as per regulations, the

7 emergency escapes fell under New T regulations, even though the *Vision* was considered an

8 existing vessel. New T regulations are more specific regarding emergency exit pathways, and as

9 such the owner of the *Vision* was required to submit the plans to the Coast Guard for approval

10 which, at the time of publication of this report, were still under review and have yet to be approved

11 by the OCMI.

**4.7 Medical and pathological information**

**4.7.1 Medical**

14   Medical equipment, including a first aid kit, oxygen, and an AED, were stowed under the

15 wheelhouse console. None of this equipment was retrieved or used in the accident. The first

16 galleyhand suffered a closed fracture of the left tibia. He was transported by Ventura County Fire

17 Department Medic 664 from Coast Guard Station Channel Islands Harbor to St. John's Pleasant

18 Valley Hospital, in Camarillo. He was treated and released on September 6.

**CLAIMANTS' JT ID 001613 - NTSB 001613**

1    The second galleyhand bruised his right foot when jumping from the top deck, only
2    realizing it when he boarded the *Grape Escape*. He was treated at MedCenter of Santa Barbara on
3    September 2 and released the same day.

4    ### 4.7.1   Pathological

5    Passenger ages ranged from 16 to 62 years, with a median age of 41 years old. There were
6    13 male and 20 female passengers lost (two were female minors under the age of 18 years). The
7    female crewmember who perished was 26 years of age. Four victims were recovered from the
8    surface by the Coast Guard. Federal and local law enforcement divers recovered 29 victims from
9    the wreckage and seafloor. The precise location and water depth for each was not documented.
10    The last remaining victim was recovered on September 11.

11    The Santa Barbara Sheriff's Office (SBSO) Coroner's Bureau conducted an examination
12    of the victims recovered for which a coroner's report was completed for each of the 34 victims.
13    The Sheriff-Coroner conducted external autopsies on each of the decedents but elected not to
14    conduct internal examinations on the decedents. However, the Sheriff-Coroner did conduct trachea
15    examination, searching for soot, on 16 of the decedents. The Santa Barbara Coroner's Bureau
16    stated autopsies were not done due to the totality of the circumstances surrounding the
17    investigation where, the cause of death was easily determined by a body examination and
18    toxicology tests, and the fact that there were witnesses to the event.

19    Investigators reviewed the 34 coroner reports and found that the cause of death in every
20    case was documented as smoke inhalation. Additionally, in two cases carbon monoxide was found
21    to be contributory. The reports documented that tracheal exams were done on 11 victims though
22    the results were only recorded for four of the cases, which included three with soot and one with
23    foam found in the trachea.[27] CO is a product of incomplete combustion and is a central nervous
24    system depressant. CO also binds readily with hemoglobin and displaces oxygen in the blood.
25    Toxicology testing on the *Conception* victims indicated CO saturation levels of between 39 and
26    75 percent with a median 62 percent.[28] According to National Fire Protection Association (NFPA)

---

[27] Foam or froth in the upper airway is an indication of pulmonary edema, itself indicative that the individual was breathing smoke.
[28] The highest levels were reported as greater than 75 percent.

Survival Factors Group Factual Report            Page 43 of 44

**CLAIMANTS' JT ID 001614 - NTSB 001614**

1    guidance, CO levels of 40 percent or higher indicates victims "likely to have died from CO alone
2    or in combination with other factors…or may simply have been incapacitated sufficiently by CO
3    poisoning to be unable the flee the fire."[29]

4         Hydrogen cyanide (HCn) is a product of combustion with plastic fuels and interior finishes.
5    NFPA guidance considers levels between 2.0 and 2.5 µg/ml to be incapacitating and above 3.0 to
6    be lethal.[30] None of the 34 coroner reports found hydrogen cyanide blood toxicology
7    concentrations to be above 2 µg/ml.

8         External examinations conducted by the Sheriff-Coroner, as confirmed by divers' video,
9    documented 27 decedents as being fully or partially clothed. The coroner reports documented that
10   14 people were wearing some sort of footwear and including the female crew member who had
11   sandals on both of her feet. One female passenger was wearing a jacket. Three other cadaver bags
12   included footwear, though not worn at the time of arrival ashore, and one contained a backpack.
13   *Conception*'s bunkroom was outfitted with 13 double bunks, 5 of which were occupied by two
14   people. Of those 10 victims, four had footwear on, or with them, one of which had a hiking boot
15   on one foot and sandal on another. This same victim was holding a mobile phone. A sandal was
16   recovered with the wreckage which had a silhouette impression of a burned foot in it", without
17   further analysis.

18        Of all the victims, not one was found with any type of smart or dive computer watch on
19   them.

20

---

[29] National Fire Protection Association. *NFPA 921 Guide for Fire and Explosion Investigation, 2017.* Quincy, Massachusetts, 2016, page 263.
[30] Ibid, page 264.

Survival Factors Group Factual Report                                    Page 44 of 44

CLAIMANTS' JT ID 001615 - NTSB 001615

# EXHIBIT 14



**U.S. Department of Homeland Security**
**United States Coast Guard**

# Activity Summary Report

Title:                    CONCEPTION: HULL
Activity ID:              4521627
Activity Start Time:      01/24/2013 7:27:00 AM
Originating Unit:         MSD StBarbara
Owner Unit:               MSD StBarbara
Controlling Unit:         MSD StBarbara
Activity Type:            Vessel Inspection/PSC
Team Lead:                Decamp, William .
Status:                   Open - In Progress
Status Date:              01/24/2013
Prompt Date:
Subject POC:              Glenn Fritzler

## Vessel Owner/Operator:

**Owner Name**
GLEN RICHARD FRITZLER

| Address | City | State | Zip | Country | Province |
|---|---|---|---|---|---|
| 301 WEST CABRILLO BLVD | SANTA BARBARA | CA | 93101-3886 | US | |

**Operating Organization Name**
TRUTH AQUATICS, INC

| | - | Corporation | | | |
|---|---|---|---|---|---|
| Address | City | State | Zip | Country | Province |
| 301 W CABRILLO BLVD | SANTA BARBARA | CA | 93101-3886 | | |

## Vessel Information

| Vessel Name: | VIN: | Flag: | Length: | Tonnage(GRT/ITC): |
|---|---|---|---|---|
| CONCEPTION | 638133 | UNITED STATES | 75 | |

| Year Completed: | Vessel Type: | | | Propulsion Type: |
|---|---|---|---|---|
| 1981 | Passenger Ship-Diving Vessel (Recreational)-General (More Than 6, Gross Tonnage < 100) | | | Diesel Reduction |

| Engine Compartment: | Fuel Compartment: | Construction: |
|---|---|---|
| Unknown | Unknown | Unknown |

## Activities Conducted:

| Type | Date | Unit |
|---|---|---|
| Deficiency Check | 02/01/13 | MSD StBarbara |
| Hull Examination | 01/24/13 | MSD StBarbara |

## Inspection Results

| System | Date | Results |
|---|---|---|
| Construction/Loadline | 01/24/13 | Inspected Satisfactory |
| Deck/Cargo | 01/24/13 | Inspected Satisfactory |
| Electrical | 01/24/13 | Inspected Satisfactory |
| Stability | 01/24/13 | Inspected Satisfactory |

## Inspection Results - Deficiencies

| ITEM | COMPLIANCE DATE | DATE ISSUED | DATE RESOLVED |
|---|---|---|---|
| 1 | To the satisfaction of the attending Coast Guard Marine Inspector and/or by 04/01/2012 | 07/20/2011 | 01/24/2013 |

| SYSTEM | SUBSYSTEM | COMPONENT |
|---|---|---|
| Electrical | Electric Supply System (service) | Cable |

—Description—
Remove all welding cable from electrical circuit and replace with approved marine cable.

US003834

**ER 444**

**Inspection Results - Deficiencies**
(Continued)

===================================================================

**Documents and Certificates:**
===================================================================
(none)

**Locations:**

| Latitude | Longitude | Time | Description |
|---|---|---|---|
| 34 14.862 N | 119 16.038 W | 01/24/2013 07:27 | VENTURA HARBOR-VENTURA HARBOR, CA |

**Narrative Summary:**
===================================================================
24Jan13: CWO DeCamp and CPO Udland attended vessel at Ventura B/Y, CA, for the purpose of conducting hull inspection. This vessel is a 75 foot, 97 gross ton, plywood hull dive boat. The vessel is currently certificated for the carriage of 103 POB on Coastwise route.  Vessel represented by Glen Fritzler.

CONSTRUCTION/LOADLINE
Vessel hull appeared in satisfactory with exception of the stainless steel shaft struts and rudder. Even though the entire system was rebuilt 8 years earlier, extensive galvanic corrosion was identified. However, the material use is very heavy duty. Identified area to be gauge and weld. Following worklist items issued for hull credit.

Make repair to shaft strut foundation as indicated.
Complete hull check ride for hull credit.
Repair fresh water leak at the shower.
Treat soft rot port side FWD lax blkh.
Make vapor tight aft E/R blkh.

ENGINEERING- Conducted exam of 8 overboard ball valve, all sat. Clear outstanding def from before to replace all welding cable in the 12V system, all sat.

01Feb13: Attended vessel and conducted DEF ck. Required worklist items completed to satisfaction. Conduced wood boat post DD check ride, all sat. Hull credit DD granted.

COMMENTS:
In my opinion, vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection. Amended COI for hull credit. Inspection complete.
Declaration

//s//
W. DeCamp, CWO4, USCG
MSD Santa Barbara

**Activity Action Log:**

| Eff. Date | Unit | Individual | Description |
|---|---|---|---|
| 01/24/2013 | MSD StBarbara | Decamp, William . | Activity Created.  Status: "Open - In Progress" |

**TWIC Verification Details:**
===================================================================

| Type of Transportation Worker | Checked | Compliant | Non-Compliant | Remarks |
|---|---|---|---|---|
| Administrative Staff | 0 | | | |
| Security | 0 | | | |
| Longshoremen | 0 | | | |
| Dockworker | 0 | | | |
| Truck Driver/Transportation | 0 | | | |
| Licensed Mariner | 1 | 1 | 0 | |
| Unlicensed Mariner | 0 | | | |
| Other | 0 | | | |
| Total | 1 | 1 | 0 | |

US003835

# EXHIBIT 15



**U.S. Department of Homeland Security**
**United States Coast Guard**

### Activity Summary Report

| | |
|---|---|
| Title: | CONCEPTION: HULL |
| Activity ID: | 4521627 |
| Activity Start Time: | 01/24/2013 7:27:00 AM |
| Originating Unit: | MSD StBarbara |
| Owner Unit: | SEC LA/LB |
| Controlling Unit: | SEC LA/LB |
| Activity Type: | Vessel Inspection/PSC |
| Team Lead: | Decamp, William . |
| Status: | Open - Submitted for Review |
| Status Date: | 07/19/2013 |
| Prompt Date: | |
| Subject POC: | Glenn Fritzler |

CR _____ / _____
ACID ____ / 9/23/2013
CID _____ / _____
PREV ____ / 1/24/13
CO _____ / _____
DISP ____ / 5/27/13

## Vessel Owner/Operator:

===============================================================================

| Owner Name | | | | | |
|---|---|---|---|---|---|
| GLEN RICHARD FRITZLER | | | | | |
| Address | City | State | Zip | Country | Province |
| 301 WEST CABRILLO BLVD | SANTA BARBARA | CA | 93101-3886 | US | |
| Operating Organization Name | | | | | |
| TRUTH AQUATICS, INC | - | Corporation | | | |
| Address | City | State | Zip | Country | Province |
| 301 W CABRILLO BLVD | SANTA BARBARA | CA | 93101-3886 | | |

## Vessel Information

===============================================================================

| Vessel Name: | VIN: | Flag: | Length: | Tonnage(GRT/ITC): |
|---|---|---|---|---|
| CONCEPTION | 638133 | UNITED STATES | 75 | |
| Year Completed: | Vessel Type: | | | Propulsion Type: |
| 1981 | Passenger Ship-General-General (More Than 6, Gross Tonnage < 100) | | | Diesel |
| Reduction | | | | |
| Engine Compartment: | Fuel Compartment: | Construction: | | |
| Unknown | Unknown | Unknown | | |

## Activities Conducted:

===============================================================================

| Type | Date | Unit |
|---|---|---|
| Deficiency Check | 02/01/13 | MSD StBarbara |
| Hull Examination | 01/24/13 | MSD StBarbara |

## Inspection Results

===============================================================================

| System | Date | Results |
|---|---|---|
| Stability | 01/24/13 | Inspected Satisfactory |
| Electrical | 01/24/13 | Inspected Satisfactory |
| Deck/Cargo | 01/24/13 | Inspected Satisfactory |
| Construction/Loadline | 01/24/13 | Inspected Satisfactory |

## Inspection Results - Deficiencies

===============================================================================

| ITEM | COMPLIANCE DATE | DATE ISSUED | DATE RESOLVED |
|---|---|---|---|
| 1 | To the satisfaction of the attending Coast Guard Marine Inspector and/or by 04/01/2012 | 07/20/2011 | 01/24/2013 |

| SYSTEM | SUBSYSTEM | COMPONENT |
|---|---|---|
| Electrical | Electric Supply System (service) | Cable |

---Description---

Remove all welding cable from electrical circuit and replace with approved marine cable.

US003832

**ER 447**

**Locations:**

| Latitude | Longitude | Time | Description |
|---|---|---|---|
| 34 14.862 N | 119 16.038 W | 01/24/2013 07:27 | VENTURA HARBOR-VENTURA HARBOR, CA |

**Narrative Summary:**

24Jan13: CWO DeCamp and CPO Udland attended vessel at Ventura B/Y, CA, for the purpose of conducting hull inspection. This vessel is a 75 foot, 97 gross ton, plywood hull dive boat.  The vessel is currently certificated for the carriage of 103 POB on Coastwise route.   Vessel represented by Glen Fritzler.

CONSTRUCTION/LOADLINE:

Make repair to shaft strut foundation as indicated.
Complete hull check ride for hull credit.
Repair fresh water leak at the shower.
Treat soft rot port side FWD lax blkh.
Make vapor tight aft E/R blkh.

ENGINEERING- Conducted exam of 8 overboard ball valve, all sat. Clear outstanding def from before to replace all welding cable in the 12V system, all sat.

01Feb13: Attended vessel and conducted DEF ck. Required worklist items completed to satisfaction. Conduced wood boat post DD check ride, all sat. Hull credit DD granted.

*WHEN DID BOAT SPLASH?*

COMMENTS:
In my opinion, vessel is found fit for route and service as indicated on the Certificate of Inspection, at the time of inspection. Amended COI for hull credit. Inspection complete.
Declaration

//s//
W. DeCamp, CWO4, USCG
MSD Santa Barbara

**TWIC Verification Details:**

| Type of Transportation Worker | Checked | Compliant | Non-Compliant | Remarks |
|---|---|---|---|---|
| Administrative Staff | 0 | | | |
| Security | 0 | | | |
| Longshoremen | 0 | | | |
| Dockworker | 0 | | | |
| Truck Driver/Transportation | 0 | | | |
| Licensed Mariner | 1 | 1 | 0 | |
| Unlicensed Mariner | 0 | | | |
| Other | 0 | | | |
| Total | 1 | 1 | 0 | |

**Radiation Details:**

Was radiation detected? No

US003833

EXHIBIT 17

Joe Price Larson

**Fiedler vs.**
**United States of America**

```
 1           UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA

 3                   --oOo--

 4   NANCY FIEDLER, Personal          )

 5   Representative of the Estate     )

 6   of LISA FIEDLER (Deceased), et   )

 7   al.,                             )

 8                                    )

 9           Plaintiffs,              )

10                                    )

11        vs.                         ) CV-21-7065 PA

12                                    )

13   UNITED STATES OF AMERICA,        )

14                                    )

15           Defendant.               )

16   _____  )

17

18

19

20    REMOTE VIDEO DEPOSITION OF LIEUTENANT COMMANDER

21                 JOE PRICE LARSON

22

23             Thursday, May 25, 2023

24   REPORTED BY: DENISE A. FORD, CSR 7525

25   Job No. 10120128
```

**ER 450**

| Joe Price Larson | Fiedler vs.<br>United States of America |
|---|---|

1

2

3                            --oOo--

4          BE IT REMEMBERED that pursuant to Notice and

5     on Thursday, May 25, 2023, commencing at 1:09 p.m.

6     thereof, before me, Denise A. Ford, a Certified

7     Shorthand Reporter, appeared

8          LIEUTENANT COMMANDER JOE PRICE LARSON

9     called as a witness herein, who, having been first

10    duly sworn, was examined and testified as follows:

11                           --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joe Price Larson                                      **Fiedler vs.**
                                                     **United States of America**

```
 1              MR. WILLIAMS:  Mark Williams,
 2   attorney for Sea Landing Dive Center in the state
 3   court case, attending.
 4              MR. LERNER:  Neil Lerner representing
 5   Ventura Harbor Boatyard in the state court case,
 6   attending.
 7              MR. LESSER:  Rick Lesser, plaintiffs.
 8              MS. TRAN:  Juliette Tran for Truth
 9   Aquatics, Glen and Dana Fritzler in the pending
10   state court.
11              MR. POPPINGA:  Ed Poppinga on behalf
12   of plaintiffs.
13              VIDEO OPERATOR:  The court reporter
14   today is Denise Ford with Aptus.
15         Will you please swear in or affirm the
16   deponents.
17                   (Witness sworn.)
18              EXAMINATION BY MS. NELSON
19              MS. NELSON:  Q.  Good morning, although I
20   suppose it is good afternoon for you since I am on the
21   West Coast and you are on the East Coast.
22         My name is Gretchen Nelson.  As I said
23   earlier, I am here on behalf of the plaintiffs.
24         Am I correct that you are a lieutenant
25   commander?
```

**www.aptusCR.com**

**ER 452**

Joe Price Larson

Fiedler vs.
United States of America

```
 1    inspector.
 2          Q.    If I am understanding your background,
 3    it looks like from high school you went directly to
 4    the U.S. Coast Guard; is that right?
 5          A.    No, ma'am.  I went to college
 6    immediately after high school at the University of
 7    Central Arkansas.  I was in school for about two and
 8    a half years and then dropped out to enlist, and I
 9    enlisted in the Coast Guard in mid-2001.
10          Q.    Got it.
11          And then you went back and finished off your
12    education in 2009, roughly?
13          A.    That's correct, yes, ma'am.
14          Q.    And your degree is in earth sciences?
15          A.    Yes, it is.
16          Q.    But you are on the boats instead of
17    the earth.
18          A.    Geosciences and rocks is my specialty,
19    but, yes, I am on boats.
20          Q.    Got it.
21          Can you basically run me through the
22    assignments that you have had with the Coast Guard
23    since you enlisted back in 2001?
24          A.    Absolutely.  So I began as a junior
25    enlisted member on the shoreside detachment, Paris
```

www.aptusCR.com

ER 453

Case 2:21-cv-07065-PA-MRW    Document 98-15    Filed 07/08/24    Page 6 of 27    Page ID #:1569

Joe Price Larson

Fiedler vs.
United States of America

```
 1    Landing in Tennessee, of all places, on the western

 2    rivers where I was working aids to navigation on one

 3    of the cutters, the ships that was located there.

 4           Then I was accepted to Marine Science

 5    Technician A School, which is what we term our

 6    initial rating school.  I attended that in Yorktown,

 7    Virginia.

 8           And then following that I received

 9    assignment to Galveston, Texas at marine safety unit

10    Galveston.  I was in marine safety unit Galveston

11    for several years, starting in 2003, early 2003, and

12    was -- let's see -- I was there until 2007 when I

13    was accepted to a commissioning program which

14    allowed me to go back to school and finish my

15    degree.  That commissioning program no longer

16    exists, but it was called the pre-commissioning

17    program for enlisted personnel, or PPEP.

18           So I went back to the University of Houston

19    and finished my degree.

20           Following that I reported to officer

21    candidate school in New London, Connecticut at the

22    Coast Guard Academy and graduated in December of

23    2009.

24           Following that I was assigned as an

25    apprentice marine inspector at Coast Guard Sector
```

Page 23

www.aptusCR.com

Joe Price Larson

Fiedler vs.
United States of America

1   Long Island Sound in New Haven, Connecticut.  That's
2   where I initially began learning how to become a
3   marine inspector inspecting small passenger vessels
4   and also doing port state patrol, which is foreign
5   vessel examinations.
6          And then I received assignment back to Texas
7   at the marine safety unit in Texas City where I did
8   what is termed my journeyman marine inspector tour.
9   I was the chief of port state controls, so I ran
10  that division at the unit.  I did that for a year
11  and became the chief of domestic inspections where
12  again I ran that division for over a year, and then
13  was the chief of waterways management but also
14  maintained some of the oversight of domestic
15  inspections as well as some other functions of the
16  department that oversees inspections which is known
17  as prevention during that time, until 2015 when I
18  was assigned to Coast Guard headquarters.
19         At Coast Guard headquarters I was in the
20  regulatory development project management division,
21  also called CG reg, r-e-g, and I was there for three
22  years and was basically a project manager for
23  regulatory development projects.
24         Following those three years I received
25  assignment to marine safety detachment Santa Barbara

www.aptusCR.com

ER 455

Joe Price Larson | Fiedler vs. United States of America

```
 1    in California where I was the supervisor of the
 2    unit, oversaw all of the operations of the marine
 3    safety detachment underneath the command of Sector
 4    Los Angeles/Long Beach.
 5            And then following MSD Santa Barbara in 2021
 6    I was assigned to Coast Guard International Port
 7    Security Program here in Portsmouth, Virginia where
 8    I am a foreign port security assessor, head of
 9    delegation and capacity building instructor.
10            Q.    So if I am understanding the period of
11    time that you were in Santa Barbara, it looks like
12    it was from 2015 to 2021; is that right?
13            A.    Sorry, that was 2018 to '21.
14            Q.    I am sorry, that was my mistake, 2018
15    to 2021.
16            And am I correct in understanding your role
17    as a supervisor in terms of the chain of command in
18    Santa Barbara, you were at the top of the chain; is
19    that right?
20            A.    That's correct, yes.
21            Q.    And how many Coast Guard employees
22    worked underneath you at Santa Barbara?
23            A.    It was -- at my time there it went
24    between 12 and 13, depending on what year it was.
25    We had some people come and go.
```

Page 25

Joe Price Larson

Fiedler vs.
United States of America

```
 1    small passenger vessels am I correct that a

 2    certificate of inspection is required every five

 3    years?

 4           A.    That's correct, yes.

 5           Q.    And in addition to every five years,

 6    there is an annual inspection requirement that once

 7    that annual inspection is conducted, the inspector

 8    will then sign off on the certificate of inspection

 9    that was issued at the five-year interval; is that

10    right?

11           A.    That's correct, yes.

12           Q.    And then am I also correct that there

13    is a requirement that every two years the vessel be

14    inspected in a dry dock setting?

15           A.    Yes.  Actually, again, this is another

16    number that is kind of slipping my mind.  There is

17    some specific terminology for that window, the dry

18    dock window, but roughly, yes, is my recollection.

19           Q.    And to the best of your recollection,

20    what were the differences in the inspections that

21    occurred on the five-year window as compared to the

22    one-year window?

23           A.    So a full COI, is what we would say

24    that five-year inspection is, and COI being

25    certificate of inspection, a full COI is -- saying
```

Page 48

www.aptusCR.com

**ER 457**

Joe Price Larson

Fiedler vs.
United States of America

1    it is more in depth makes it sound like we are

2    skipping things on an annual, which is not the case,

3    but we may be opening lots of panels, every panel,

4    crawling through every space, actually crawling

5    underneath deck plates, checking every single

6    system.

7         Whereas, on an annual we would be more

8    spot-checking those things, opening them up, peering

9    inside, making a check to see if it looks as though

10   anything has changed since the last time we

11   inspected that space, doing a few more in-depth

12   inspections in some certain areas, and also using

13   that if we see anything that piques our interest,

14   makes us think that there might have been a change,

15   then expanding our inspection at that point.  And,

16   again, that's on an annual.

17        However, an annual and a COI very closely

18   resemble each other.  There is not too much

19   difference.  Just that -- again, that COI -- whereas

20   we may be looking at things from 5 feet away on an

21   annual, on a COI we are actually putting our face up

22   against it and checking it very closely at that

23   point.

24        An annual is the "spot check" that the

25   conditions of the COI that were found on the COI

**www.aptusCR.com**

**ER 458**

Case 2:21-cv-07065-PA-MRW   Document 98-15   Filed 07/08/24   Page 11 of 27   Page ID #:1574

Joe Price Larson                                    Fiedler vs.
                                          United States of America

1    inspection are still being maintained onboard the

2    vessel while expanding that if we see evidence that

3    there might have been changes.

4          Q.    And now let me ask in terms of the

5    time that is taken to conduct full COIs, you

6    referred to it, for a small passenger vessel, can

7    you give me on average how long, and I am talking

8    about how many hours, how many days, that inspection

9    takes place for a full COI?

10         A.    Certainly.  So a full COI inspection

11   can take -- depending on the size of the vessel it

12   can vary quite widely, but I would say anywhere

13   between four and eight hours actually on the vessel.

14   This is on top of lots of review of paperwork and

15   records in the office prior to even attending the

16   vessel, as well as creating the case work and

17   reviewing any comments that were made by previous

18   inspectors, the narratives that were created during

19   the last COI and annual inspections to get a picture

20   of the life cycle of the vessel to see where it has

21   been, where it goes to, and what condition can we

22   expect to find there.

23         And then, of course, when we get on scene

24   that is the verification of all of those

25   requirements as well as our suspicions of what we

Page 50

www.aptusCR.com

**ER 459**

Joe Price Larson                                                    Fiedler vs.
                                                         United States of America

1    have read from the records.

2           Q.    And then in terms of the time, is

3    there a record maintained by the Coast Guard of the

4    number of hours or minutes that an inspector spent

5    on a particular vessel?

6           A.    Not that I am immediately aware of.  I

7    could be mistaken.  I know at times we have done

8    things for reviews of manning and are we adequately

9    manned or staffed at our location for the amount of

10   work that we do.  So we try to do estimates at that

11   point of how much we spend on each individual

12   mission, but it is very much a rough estimate.

13   There is not a record of individual missions that I

14   know of as far as what time it takes to conduct the

15   inspections.

16          Q.    And so to just follow up on that and

17   make sure that I have the testimony, when you were

18   in Santa Barbara there would be no record that you

19   are aware of that would show how long a particular

20   inspector spent on a full COI of the CONCEPTION

21   vessel?

22          A.    Not that I recall, no.

23          Q.    Turning to the annual inspection, can

24   you give me roughly on average the amount of time an

25   inspector should spend for the annual inspections?

Joe Price Larson                                          **Fiedler vs. United States of America**

```
 1                    (Break taken.)

 2                    VIDEO OPERATOR:  We are back on the

 3    record at 2:46 p.m.

 4                    MS. NELSON:  Q.  Lieutenant Commander

 5    Price Larson, were you aware of a fire that was on board

 6    the VISION which was one of the sister ships to the

 7    CONCEPTION about a year prior to the CONCEPTION's fire

 8    that was caused by a lithium-ion battery that caught

 9    fire?

10           A.    So I learned about that fire after the

11    CONCEPTION fire.

12           Q.    And how did you learn about it?

13           A.    Actually, I believe it was the NTSB

14    that asked me about it first, and then I asked a few

15    questions on my own at that point.  It was probably

16    a week or so after the CONCEPTION fire that I

17    learned about it.

18           Q.    Let me ask you to take a look at a

19    document that was previously marked as Exhibit 1 to

20    an earlier deposition, which is a 30(b)(6) notice of

21    deposition.  And if you wouldn't mind taking a look

22    at that, what I would like to do is go through and

23    get an understanding of what I understand you were

24    designated to provide testimony on.

25                  And so as it relates to on page 4 of Exhibit
```

Joe Price Larson

Fiedler vs.
United States of America

```
 1    1, the first topic which is, "The history, purpose,

 2    meaning, and day-to-day application of the

 3    provisions in 46 CFR, Subchapter T."

 4            Am I correct that you are here to provide us

 5    with testimony on 1.5 which is, Whether and how the

 6    United States expected inspectors, OCMIs, MSOs and

 7    team leaders of Sector Los Angeles/Long Beach and/or

 8    MSD Santa Barbara to comply with those provisions

 9    when inspecting small passenger vessels like

10    CONCEPTION?

11            A.    Yes, that's my understanding.

12            Q.    Okay.  Is it fair to say that the

13    United States did inspect -- did expect its

14    inspectors to comply with the provisions of

15    Subchapter T when they were inspecting small

16    passenger vessels like CONCEPTION?

17            A.    Yes.

18            Q.    And we talked earlier about old T and

19    new T.  And just so I am clear, my understanding is

20    that the inspectors from MSD Santa Barbara when they

21    went out knew or at least had some understanding of

22    whether they were inspecting under old T or new T

23    based upon something that had been decided by the

24    headquarters -- at the US Coast Guard headquarters

25    in DC; is that right?
```

www.aptusCR.com

Joe Price Larson                                        Fiedler vs.
                                         United States of America

1          What we did -- what we do is -- what matters

2    is the MISLE activity.  That's where it is all

3    recorded.  That's where it is all -- the expiration

4    dates of the fire equipment are recorded in there.

5    And everything can be looked up and everything is

6    referential because these individual documents are

7    for, as you said, Cliff notes for the inspectors to

8    use in the field.

9          There is no requirement for these documents

10   to be passed down.  The information is important,

11   not the document itself.

12         Q.    Fair enough.  But I guess what I am

13   trying to perhaps get at, which maybe I didn't get

14   to very well, it is important, is it not, for your

15   inspectors to maintain a record of the scope of the

16   inspection that they conducted, correct?

17         A.    Certainly.  MISLE is how we do that.

18         Q.    You want to know enough, at least for

19   personnel reasons, you would want to know that your

20   inspector, when they were inspecting a particular

21   vessel, actually did an inspection of, for example,

22   the grounding of the electrical systems for the

23   generators and the motors?

24         A.    Yes.  Absolutely.

25         Q.    And the way to do that, the only way

                                                    **Page 89**

**ER 463**

Joe Price Larson

Fiedler vs.
United States of America

1   you are to know that is if they were to document in

2   some way, correct?

3          A.    Correct.  Yes.

4          Q.    And is it -- is it -- if you were the

5   supervisor required to -- let me strike that and ask

6   it this way:  When you were the supervisor, if you

7   were reviewing an inspection report and you were not

8   convinced that the inspector had in fact conducted

9   an inspection of a particular area on the vessel,

10  what would you do?

11         A.    I would ask them directly.  There is

12  no problem with that.  If I had further questions, I

13  could also call the vessel owner.

14         Q.    And would you also ask the inspector

15  to make certain that it was documented in the MISLE

16  system that that area of the vessel had been

17  inspected?

18         A.    I never had to ask them.  They did

19  that.  That wasn't something that was ever needed to

20  be directed.  It was already being done.

21         Q.    Fair enough.  I am simply saying --

22  this is now going to what I am sure will be a

23  hypothetical question that Mr. Kaufman-Cohen will

24  object to, but in the event that you had some

25  inspector under your supervision who did not

Page 90

Joe Price Larson                                         Fiedler vs.
                                           United States of America

1     document that he or she had in fact conducted an

2     inspection of a particular area, and you asked them

3     and they said, yes, I did, would you then ask them

4     to make certain that that was documented in the

5     MISLE system?

6              A.     It depends.  So in the MISLE

7     narrative, you mentioned things like grounding,

8     bonding, these individual small things that we

9     checked when we are on the vessel.  I am not looking

10    for the certain granularity like I checked this

11    motor on this electrical system and ensured that

12    this wire was connected to the proper ground.

13             What I am looking for is a statement that I

14    inspected the electrical system.  And I know that

15    the inspectors there are qualified and certificate

16    -- sorry, are qualified and have a qualification

17    letter saying that they have been trained and have

18    been tested in these individual systems.  I have

19    been with them on the ships as well to know they

20    have the capability.

21             I know when they say they inspected the

22    engines, they inspected the air intakes, they

23    inspected the flexible fuel hoses, they inspected

24    the piping, the water jacket system, they inspected

25    all of that.  I don't need to see that individual

ER 465

Joe Price Larson

Fiedler vs.
United States of America

1    item written up in the narrative necessarily.

2        Some inspectors do.  They will line out

3    those individual systems to extreme detail, but

4    that's not necessarily in and of itself required.

5        What I am looking for is a qualified

6    inspector says they inspected a system, and unless I

7    have reason otherwise, I trust that that system has

8    been properly inspected.

9        Q.    Did you -- when you were in Santa

10   Barbara and the supervisor of the individuals you

11   referred to, did you ever go out with them on any of

12   their inspections just to confirm in your mind that

13   these inspectors -- not that they weren't qualified,

14   I am not trying to cast aspersions -- but trying to

15   get comfort in your mind that they were qualified to

16   do the work that was necessary?

17       A.    Absolutely, yes, especially when I

18   first reported because I did not know the folks that

19   were working for me.  This isn't just the marine

20   inspectors.  It was the pollution responders, the --

21   across the board.  I done want to go through all of

22   the missions that we did.  We would be here all day.

23       Yes, I went out with them.  I learned who

24   they were, got to know them, learned how they

25   worked, learned their expertise, which were

Page 92

Joe Price Larson                                    Fiedler vs.
                                                    United States of America

1   short list of Exhibit 13, and I can also pull up --

2   we also pull up Exhibit 10 if necessary.

3          I am interested in the issue of cable and

4   wiring on board the vessels that are inspected.

5          There is a reference to UL boat or marine

6   cable.

7          Do you know what that means?

8          A.    I do, yes.  It is cable that is rated

9   for use in marine environments and marine

10  applications.

11         Q.    And is it -- was it a requirement that

12  inspectors make certain that the cabling in a

13  particular small passenger vessel was UL boat or

14  marine cable?

15         A.    Yes.

16         Q.    Did you ever know a Chief Warrant

17  Officer DeCamp?

18         A.    No.  I had heard his name, and several

19  of the people that I worked with spoke very highly

20  of him, but I never worked with him or knew him

21  directly myself.

22         Q.    He was not in Santa Barbara when you

23  were there, I take it?

24         A.    He was not.

25         Q.    Let me ask you something on these

Page 94

ER 467

Joe Price Larson

Fiedler vs.
United States of America

```
 1          A.    Yes, absolutely.

 2          Q.    And you -- that would mean not just

 3   you individually as the supervisor in Santa Barbara

 4   but the Coast Guard overall expected that its

 5   inspectors complied with this, correct?

 6          A.    Yes.

 7          Q.    Am I correct that the manner in which

 8   the inspectors would comply with these provisions

 9   would be to document both in writing when they were

10   on board the vessel deficiencies that may be noted

11   and then also ensure that those deficiencies were

12   input into the MISLE system, and that the vessel

13   owner corrected the deficiencies within a period of

14   time that was determined to be suitable?

15          A.    Yes.  That's correct.

16          Q.    I am going to go to Section 5 -- topic

17   5, paragraph 7.  This has to do with the day-to-day

18   application of the MISLE vessel inspection activity

19   review.

20          First off, why don't you tell us what the

21   vessel inspection activity review in MISLE is?

22          A.    Sorry, I was just trying to find --

23   you are referring back to Exhibit 1?

24          Q.    Yes.  I am so sorry.

25          A.    No problem at all.
```

Page 103

| Joe Price Larson | Fiedler vs. United States of America |
|---|---|

1   detailed look.  The sector was taking more detailed

2   looks at certain things as well, and I think the

3   effort was to see if we were missing anything.

4       Quite honestly, that never proved to be the

5   case, but I was taking a very deep dive into each of

6   our activities after that I think for that reason.

7       **Q.    And can you just briefly, and for the**

8   **record and so that somebody who is as ignorant as me**

9   **who is reading this will understand it, tell us just**

10  **in summary what is the MISLE vessel inspection**

11  **activity review?**

12      A.    So the review is -- you know, you open

13  the activity.  What would happen is after the marine

14  inspectors were finished with their side of the

15  activity, they would send me an e-mail with the

16  activity number within the system.  It would be

17  submitted to me for review.  I would then open up

18  the activity, review the factual information, the

19  vessel, the date, all of that.  Then I would go into

20  and start reviewing the narrative, making sure that

21  the narrative was proper.  As I mentioned, we

22  started to standardize the narratives in our

23  activities so we were ensuring that everything was

24  easier to follow.  Each of them kind of looked the

25  same obviously with the particulars of the vessel

Joe Price Larson                                          Fiedler vs.
                                              United States of America

1    being different, so we would see in a flowing order

2    what actually happened on the vessel, what was

3    looked at, what took place.

4          Then I would open up the individual

5    recommendations or 835s, which we mentioned is

6    deficiencies that were written.  We colloquially

7    call -- just call them an 835 because the 835 form

8    is what we write those on.

9          And so I would review all of the 835 items.

10   I would then look at the issue dates, the expected

11   dates for completion, look at the ones that had

12   been -- that could be reviewed at a later date.

13   Some of them, you know, less time-sensitive items,

14   such as, you know, this area of the vessel we

15   noticed some wood root on the railing, review that

16   in three months to make sure it hasn't spread or

17   make sure the necessary items haven't stopped the

18   rot from spreading, making sure that all of those

19   time frames and particulars are properly notated,

20   properly cleared out if they were corrected and

21   could be cleared.

22         And then at that time if I could, if there

23   weren't any items that still needed to be

24   reviewed -- if there were items that needed to be

25   reviewed, I would kick them back to the marine

www.aptusCR.com

Joe Price Larson

Fiedler vs.
United States of America

1  inspector and ask them questions.  I would also make

2  a notation in the narrative of the activity, that I

3  had reviewed it on such and such a date.  And then

4  if I could, I would either -- I would -- sorry,

5  going through all of these details.  There are a lot

6  of things to click, a lot of things to look at in

7  each of these activities.

8         The final step that I would do, if it was

9  annual, I would go in and endorse the COI within the

10  activities so that it would do -- it would provide

11  that electronic endorsement on the COI within the

12  system, and then I would close out the activity

13  beyond that.

14         If it was a COI inspection and a new COI was

15  being generated, I would then provide the necessary

16  items to sector so that that signature could be

17  provided on the COI document itself to be delivered

18  to the ship.

19         Q.    So in summary, what it sounds like, I

20  am understanding, is that this vessel inspection

21  activity review is exactly that, a review by someone

22  else of the work that an inspector did in any

23  particular inspection once all of the data had been

24  inputted to the MISLE system?

25         A.    That's correct.

Page 107

Joe Price Larson

Fiedler vs.
United States of America

1     Q.     And before the CONCEPTION fire, these

2  reviews were conducted, as I am understanding it, by

3  somebody in Los Angeles/Long Beach?

4     A.     So it was my understanding, and again

5  I am going back a ways in my memory, it has been

6  three years since the CONCEPTION casualty, three and

7  a half years, and two years since I touched a T-boat

8  inspection -- actually more than that since I

9  touched a T-boat inspection, so I am digging from

10  the well of memory for a little bit -- but there

11  were some activities, the minor activities that did

12  not require a sector endorsement were being closed

13  out directly by the marine inspectors after they

14  were completed.  Sometimes with what we would call a

15  gold-pin review where the other marine inspectors

16  look over it, making sure we are not missing

17  anything.

18     But anything that needed to be endorsed or

19  completed was sent up to the sector, and that was a

20  policy that was being managed, a local policy being

21  managed by then the assistant chief of inspections.

22     Q.     And at the time who was that

23  individual, the assistant chief of inspections?

24     A.     It was a civilian who has since

25  retired.  His name was Terry McGuiggin.

Page 108

Joe Price Larson                                    Fiedler vs.
                                          United States of America

1          Q.    And he was located in the Los Angeles

2    area?

3          A.    Yes, he was.

4          Q.    Okay.  And I think we covered that.

5          Let's go down then to -- this won't take

6    very long I don't think.  Don't think that I am

7    going to keep you here forever dragging you through

8    each one of these.

9          Let's go to the -- I think we can cover 6

10   very quickly.  I believe it is SPTV-T checklist that

11   we have talked about.

12         That was the short list that we described

13   earlier; is that right, Exhibit 13?

14         A.    Yes.

15         Q.    The small passenger vessel T that was

16   localized to Santa Barbara, the Cliff note version?

17         A.    That's correct, yes.

18         Q.    And we have talked about that, and you

19   have confirmed that your inspectors were expected to

20   comply with that checklist, correct?

21         A.    In a nutshell, yes.  I expected them

22   to use a guide.  Whether it was that one or the 840

23   book, I expected them to have something with them to

24   be able to assist them, and also, again, there is no

25   expectation, there is no requirement from the Coast

Page 109

ER 473

Joe Price Larson                                                    Fiedler vs.
                                                       United States of America

1   Guard for the inspectors to have those checklists
2   and to use them directly every time.  But any
3   inspector who is experienced knows that they are
4   going to be using one of those.  And so it was
5   expected that that was going to be part of the
6   inspections kit that we carried with us.  I
7   certainly did.  I know Mr. Hager did.  I know Joe
8   Twiddy did.  Andy Schmidt did.
9        At Santa Barbara, yes, that was the norm,
10  but to say it was required is a bit of a
11  misstatement because there was no requirement.
12       Q.    I got it.  I probably misspoke when I
13  asked the question.
14       I think what I was driving at more is that
15  the requirement was the inspection of the vessel and
16  the -- all of the portions of that vessel that the
17  Coast Guard felt or believed critical to ensuring
18  the safety of that vessel for passengers, crew, the
19  environment, et cetera.
20       A.    Yes.
21       Q.    Fair enough.
22       So the inspector job aid is what was
23  previously marked as Exhibit 14, and I just uploaded
24  that.
25       A.    I don't see it quite yet.

**Joe Price Larson**

**Fiedler vs.
United States of America**

```
1                    CERTIFICATE OF REPORTER

2

3           I, DENISE A. FORD, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell

6    the truth, the whole truth, and nothing but the

7    truth in the within-entitled cause;

8           That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   the said witness was thereafter reduced to

12   typewriting, by computer, under my direction and

13   supervision;

14          I further certify that I am not of counsel

15   or attorney for either or any of the parties to the

16   said deposition, nor in any way interested in the

17   event of this cause, and that I am not related to

18   any of the parties thereto.

19

20          DATED:   June 5, 2023.

21

22

23

23

24          DENISE A. FORD, CSR No. 7525

25
```

EXHIBIT 18

# National Transportation Safety Board

Office of Marine Safety

Washington, D.C. 20594

Group Chairman's Factual Report

<div style="background:black;color:white;text-align:center;padding:1em;">

Engineering Group

</div>

*Conception*

DCA19MM047

August 18, 2020

CLAIMANTS' JT ID 000233 - NTSB 000233

## 1.  Accident Information

| | |
|---|---|
| **Vessel:** | *Conception* |
| **Accident Number:** | DCA19MM047 |
| **Date:** | September 2, 2019 |
| **Time:** | 0314 Pacific daylight time (coordinated universal time – 7) |
| **Location:** | Off Channel Islands; 26 nautical miles offshore of Ventura, California. |
| **Accident type:** | Fire/explosion |
| **Fatalities:** | 34 |
| **Injuries:** | 1 serious |

## 2.  Engineering Group

| | |
|---|---|
| **Chairman:** | Barton Barnum, Engineering Group Chairman |
| | Office of Marine Safety |
| | National Transportation Safety Board |

And no others.

## 3.  Summary

On Monday, September 2, 2019, about 0314 Pacific daylight time, US Coast Guard Sector Los Angeles (LA)/Long Beach received a distress call from the 75-foot small passenger vessel Conception. The vessel was anchored in Platts Harbor on the north side of Santa Cruz Island, 21.5 nautical miles south-southwest of Santa Barbara, California, when it caught fire. The Conception was carrying 39 persons, 6 of whom were crew.

The wood and fiberglass vessel had three levels: the upper deck, which included the wheelhouse, two crew staterooms, and a sun deck; the main deck, which included a salon with a galley and a large exterior deck; and the lower deck within the hull, which included passenger berthing (bunkroom), a shower room, an engine room, and a lazarette.

At the time the fire started, 5 crewmembers were asleep in their bunks in the wheelhouse and in the crew staterooms on the upper deck, and 1 crewmember and all 33 passengers were asleep in the bunkroom. A crewmember sleeping in an upper deck stateroom was awakened by a noise and got up to investigate. He saw a fire at the aft end of the sun deck, rising up from the salon compartment below. The crewmember alerted the four other crewmembers sleeping on that deck. As crewmembers awoke, the captain radioed a quick distress message to the Coast Guard before evacuating the smoke-filled wheelhouse.

CLAIMANTS' JT ID 000234 – NTSB 000234

Unable to use the aft ladder, which was on fire, the crewmembers jumped down to the main deck (one crewmember broke his leg when he jumped) and tried to access the salon to reach the passengers below. The salon was fully engulfed by fire at the aft end and by thick smoke in the forward end. Unable to open a window at the forward end of the salon and overwhelmed by smoke from the fire, the crew jumped overboard.

Two crewmembers swam to the stern and re-boarded the vessel. Access to the salon through the aft corridor was blocked by fire, so, along with the captain who had also swum to the stern, they launched a small skiff and picked up the remaining two crewmembers in the water. They transferred to a recreational vessel anchored nearby where the captain continued to radio for help, while two crewmembers returned to the waters around the burning Conception to search for possible survivors. No survivors were found.

About 78 minutes after the initial distress call, Coast Guard and other first responder boats arrived on scene to extinguish the fire and search for survivors. Helicopters also aided in search efforts. The vessel burned to the waterline and, just after daybreak, sank in about 60 feet of water. Thirty-three passengers and one crewmember died.

## 4. Machinery

Apart from deck winches, galley equipment, and an air conditioning unit located below the passenger's berthing area in the bilge, all other machinery on board the *Conception* was located in the engine room and lazarette.

The engine room of the *Conception* was accessed through a single elevated hatch located on the aft main deck. The space contained two main engines, a diesel electric generator, breathing air compressors, pumps, and other auxiliary equipment associated with the propulsion, power generation, and operation of the dive boat. Also, in the engine room was a plywood reinforced, fiberglass sewage holding tank and two steel fuel tanks. The equipment and tanks were distributed throughout the space in order to maintain the boat's stability. In accordance with 46 *Code of Federal Regulations* (*CFR*), part 181, the space was equipped with an approved fixed fire

CLAIMANTS' JT ID 000235 – NTSB 000235

1    extinguishing system. Two 75-pound fixed cylinders charged with carbon dioxide could be
2    activated automatically via heat sensors located above the main engines or remotely at a "pull
3    station" positioned on the port side of the aft main deck. Once activated, the system would flood
4    the engine room with carbon dioxide. The bottles were located on the forward starboard bulkhead
5    in the lazarette. The fire suppression system and ventilation dampers for the engine room were not
6    activated manually on the night of the fire.

7           The lazarette was the aftermost compartment on the vessel and was located directly aft of
8    the engine room. The two spaces were separated by a wooden, watertight bulkhead. The lazarette
9    could be accessed through a single elevated hatch located on the aft main deck behind the hatch for
10   the engine room. Contained in the lazarette was a chest freezer, the hydraulic cylinders and hoses
11   for the steering system, the main engine's wet exhaust pipes, a conventional clothes dryer, the stern
12   winch hydraulic motor/pump and oil reservoir, and a nitrox compressor unit.

CLAIMANTS' JT ID 000236 – NTSB 000236



1

2  **Figure 1. Aft main deck of the *Conception during a previous voyage.* Red arrows indicate access**
3  **hatches to the engine room and lazarette (Source: Profundo no Mundo, YouTube).**

4  ## 5.  Main Engines and Propulsion

5      The *Conception* was propelled by two 550-horsepower (hp) (820 kW total), 2-stroke,

6  Detroit Diesel engines. The turbo-charged, 92 series, V-8 engines scavenged air from the engine

7  room, which was ventilated from ducting leading to the main deck. The engines were bolted to

8  Twin Disc MG-514C Series marine transmissions that acted as both reduction and reversing gears.

9  The transmissions coupled directly to 3-inch stainless steel shafts. The shafts exited the hull of the

10  vessel through bronze compression packing glands and connected to two four-bladed propellers.

11  An electric motor and hydraulic pump in the vessel's engine room powered control valves and

12  actuators attached to the rudder posts. The propellers, along with two stainless steel spaded rudders,

13  allowed the vessel to maneuver. After the vessel was stolen and run aground in 2005, the port and

14  starboard engines were rebuilt with a new components. Both main engines were equipped with

15  emission-controlled, water-injected wet exhaust. Raw water from the discharge of the engine's

Engineering Group Factual Report                                    Page 5 of 18

1  jacket water heat exchanger was injected into the exhaust piping to lower the temperature and
2  dampen noise.

3        At the time of the fire, the *Conception* was at anchor, and neither main engine was
4  operating.



5
6  **Figure 2. The salvaged hull of the *Conception*, looking from aft to forward, with recovered engine room**
7  **and lazarette equipment reinstalled.**

8  ## 6. Electric Generation and Distribution

9        The *Conception* had a single Northern Lights MP55C generator package located in the aft
10 port corner of the engine room. While the vessel was away from the dock, the generator package
11 supplied the vessel with 120/208-volt, alternating current (A/C), three-phase electrical power. The
12 generator package consisted of an 83-hp John Deere diesel engine prime mover, coupled to a
13 Newage 55-kilowatt generator. At the time of the accident, the generator package was running and
14 providing the vessel with electricity.

Engineering Group Factual Report                                Page 6 of 18

CLAIMANTS' JT ID 000238 - NTSB 000238

1       The generator's prime mover had been replaced in September of 2018 due wear.

2   According to the owner, the engine had high running hours, and had work performed in August of

3   2018 to fix a failed oil cooler core and heat exchanger. The vessel's owner ultimately determined to

4   replace the engine with a new model. In the months prior to the accident, the new prime mover

5   reportedly would overheat if put under an elevated load from high electrical demand. Filling scuba

6   tanks with nitrox required the operation of the two breathing air compressors as well as the nitrox

7   compressor.[1] If the flat top stove in the galley was being used at the same time, the generator's

8   prime mover would overheat and eventually shutdown. As a result, a standard procedure was

9   established for the crew to coordinate with the galley so that galley equipment was not operated at

10  the same time that nitrox was being filled.

11      The vessel's grounded, three-phase A/C electrical distribution system consisted of a

12  neutral lead and three conductors. While the vessel was docked, a shore power connection could be

13  utilized in lieu of the generator to provide the vessel with single-phase power. Thermal circuit

14  breakers provided overcurrent protection. Original vessel electrical schematics indicate that the

15  rating for these breakers varied with application. For the larger 3-phase, 208-volt equipment, each

16  phase was protected with either a 60-amp or 30-amp breaker. The smaller 120-volt, single-phase

17  equipment and lighting was protected by 15- and 20-amp breakers. Unlike residential applications,

18  vessels such as the *Conception* were required by 46 *CFR* Subchapter T to utilize stranded or

19  braided conductor core wire. The regulations incorporate by reference material such as electrical

20  standards and codes from organizations, specifications societies, institutes, and classification

21  societies, to ensure vessel electrical systems are constructed and operated safely.[2] In August of

22  2000, Coast Guard inspectors issued a deficiency for the vessel having non-approved wiring in

23  some of its A/C electrical system. The wiring being utilized was flexible "service" wire, commonly

24  referred to in industry as SO, SJO, or STO wiring. It was similar in type to that used in

25  commercially sold extension cords. Both "old" Subchapter T and "new" Subchapter T regulations

---

[1] Nitrox, with respect to underwater diving, is an air mixture composed of nitrogen and an elevated percentage of oxygen (when compared to atmospheric air). It is created by passing compressed air through a semi-permeable membrane, which removes a proportion of nitrogen, thus increasing the amount by volume of oxygen in the resultant air mixture. Typical oxygen percentages used in recreational diving are 32 and 36 percent by volume. Using nitrox-enriched oxygen air while diving is advantageous because the diver is exposed to less nitrogen and its negative effects. Divers aboard the *Conception* paid an extra fee in order to be supplied with nitrox.

[2] Examples of organizations "Incorporated by reference": National Electrical Manufacturers Association (NEMA), National Electric Code (NEC), Institute of Electrical and Electronics Engineers (IEEE), American National Standards Institute (ANSI), Underwriters Laboratories (UL).

**CLAIMANTS' JT ID 000239 – NTSB 000239**

**ER 483**

1   prohibit the use of this wire in the way it was being used aboard the Conception.[3]  This wiring had

2   been installed by the boat builder and approved by Coast Guard inspectors in 1981 during the

3   original construction of the vessel. Truth Aquatics appealed the Coast Guard's decision and

4   requested a waiver to the Coast Guard's requirements, but was denied. In 2002, all non-approved

5   wiring was replaced with approved wiring, and, following a Coast Guard inspection, the vessel was

6   deemed to be in compliance and the deficiency cleared.

7       Throughout the 39-year operation of the *Conception,* many electrical components had

8   been changed with "replacement in kind" alternatives, such as circuit breakers and receptacle

9   outlets. The regulations in 46 *CFR* 176.700 Subpart G, specify that if a repair or alteration is not a

10  replacement in kind, the owner or managing operator must submit to the local Coast Guard unit

11  drawings, sketches, or written specifications describing the details of the proposed alteration. The

12  Coast Guard would then initiate a plan review to determine if the repair or alteration was safe and

13  within regulations. Most reviews are handled locally at the sector or detachment level. If the repair

14  or alteration were deemed "major" by the Officer in Charge,Marine Inspection (OCMI) at the

15  sector, then the plan review was elevated to the Coast Guard's Marine Safety Center (MSC). At the

16  MSC, professional engineers, naval architects and/or subject matter experts conducted the plan

17  review and issued recommendations, interpretations, or guidance to the respective OCMI.

18      Crewmembers reported to investigators that in the weeks prior to the accident, two of the

19  vessel's deckhands changed out the overhead florescent lighting fixtures in the salon with new

20  LED light fixtures. Plans detailing the modification were not submitted to the local Coast Guard

21  Marine Safety Detachment (MSD), and the coast guard was not notified of this change. The

22  *Conception* had last submitted plans for review in 2000 for the installation of a galley hood heat

23  detection sensor, which was required by new Subchapter T regulations. The plans were approved

24  by the OCMI at Coast Guard Sector Los Angeles/Long Beach.

25      Original wiring schematics provided to investigators showed that the *Conception* utilized

26  both 12-volt and 24-volt direct current (DC) voltage systems. The wheelhouse had a 12-volt battery

27  system that was set up to be trickle-charged from the vessel's service 120-volt A/C system. The

28  battery and charger were located under the console in the wheelhouse. The plans indicated that the

---

[3] Refer to Operational Factors report, section 4.4.1 Applicable Regulations for explanation of new T vs. old T.

Engineering Group Factual Report                                    Page 8 of 18

CLAIMANTS' JT ID 000240 – NTSB 000240

1    12-volt system was set up to power navigation lights, radio equipment, and selected lighting in the
2    engine room, lazarette, bunk room, bow compartment, chain locker, and vessel toilet spaces. The
3    propulsion engine's starters and shifting actuators operated on 24-volts, while the propulsion
4    engine's controls and the vessel's diesel generator operated on 12-volts. The batteries utilized for
5    both main engines and generator set were located on the forward workbench in the engine room.
6    Battery chargers were set up for respective voltages and located on the forward bulkhead. Normally
7    an engine's alternator would charge its batteries, although aboard the *Conception*, normal charging
8    of the main engine batteries was accomplished via the ship's service 120-volt system. The main
9    engine's alternators were only used in a stand-by capacity and had their drive belts manually
10   removed. In contrast the generator set's alternator was utilized and charged its batteries while the
11   generator was running.

12        The *Conception* had emergency lighting in the bunk room. It was located at the base of
13   the main stairs going up to the galley/salon, and was designed to automatically activate in the event
14   of the loss of the vessel's service supply power and provide minimal lighting for crew and
15   passengers to maneuver through the space. The emergency lighting was powered from the ship's
16   service 120-volt A/C system, and if this source was lost, batteries internal to the unit would supply
17   power for lighting.



18

19   **Figure 3. Bunkroom emergency lighting on board the similar vessel *Vision*. The lighting was of the**
20   **same make and in a similar location as was on board the *Conception*. Also note the public address**
21   **system speaker to the right of the lights.**

Engineering Group Factual Report                                           Page 9 of 18

CLAIMANTS' JT ID 000241 – NTSB 000241

### 7.  Air Compressors

For the purpose of filling SCUBA air bottles, the *Conception* utilized three breathing air compressors. All three compressors were used solely for filling air bottles. They could be used independently or in conjunction with each other depending on demand and purpose. They were started manually by the crew and operated off 3-phase 208-volt alternating current. The two primary air compressors were in the aft starboard corner of the engine room. These were both Ingersoll-Rand compressors, one was a model 10T2, and other was a larger model 15T4. The third was part of a nitrox generator unit, positioned in the forward starboard corner of the lazarette. According to crew members interviewed, none of the air compressors were in use at the time of the accident.

### 8.  Auxiliary Equipment and Tanks

The fire main and bilge systems were interconnected on board the *Conception*. The fire pump or bilge pump could be used to pump out the vessel's bilges. According to the crew, during normal operations, when bilges were not being actively pumped, the fire main was lined up in a ready state, with the bilge crossover valves shut. Crewmembers on board at the time of the accident also stated that the fire pump was tested daily to ensure performance and maintain the pump's readiness. Located on the port side forward of the engine room, the fire pump was driven by a 208-volt electric motor. The lead deckhand told investigators that the fire pump could be activated from two locations: locally at the motor controller and remotely from the vessel's port fire station. The vessel's two fire stations were located outside on the main deck at the aftermost section of the main structure, with one on the port side and the other on starboard. Each fire station contained 50 feet of 1.5-inch fire hose. The 1.5-inch diameter Jabsco manufactured bilge pump was driven off the starboard main engine. Bilge level sensors were positioned in the engine room, bunkroom, lazarette, shower room and forward of the collision bulkhead. If a high liquid level in a space was reached, the sensor would be activated, and an alarm would sound in the wheelhouse to notify the operator. A series of 1.5-inch piping connected the bilge spaces to the pumps, which were lined up to pump overboard. On September 1, a day before the fire on board the *Conception*, the black water holding tank overflowed into the engine room bilge. A deckhand attempted to clean up the black water and inadvertently burned up the impeller for the engine driven Jabsco bilge pump. The deckhand utilized the fire pump to pump the black water in the bilge overboard, and then he secured the bilge crossover valves and returned the fire pump to its normal, stand-by condition.

CLAIMANTS' JT ID 000242 – NTSB 000242



Figure 4. Fire station number one on the *Conception*. Located at the aft end of the galley/salon, outboard on the port side, photo taken on a previous voyage (Sailor James, Youtube).

Hot, fresh water was utilized on board the *Conception* for galley cleaning, toilet space sinks, and the various stand-up showers. The water was heated via a single, 40-gallon, 220-volt electric hot water heater, similar in type to those used in residential settings. The water heater was located in the engine room forward of the starboard main engine.

The *Conception* had two steel 800-gallon diesel fuel tanks that stored fuel to be consumed by the vessel's two main engines and electric generator. At the time of the fire, the vessel was carrying about 1,400 gallons of fuel. The tanks were located alongside the hull on the port and starboard sides of the forward engine room. Held in place by wooden frames, their shape was contoured to the side of the vessel. Filling and venting of the tanks was accomplished by means of steel pipes running up to the aft main deck. In order to secure fuel from the tanks to the engines in an emergency, two handwheels (located in the port and starboard main deck toilet spaces) were connected to the main supply valves through linkages. Fuel supply to the main engines and

Engineering Group Factual Report                                          Page 11 of 18

CLAIMANTS' JT ID 000243 – NTSB 000243

1   generator was achieved via the consumer's respective engine driven fuel pump and through a
2   network of both copper piping and fuel- rated synthetic hose. Sea Pro filters were used for fuel
3   filtration and water separation.

4       Fresh water on board the *Conception* was stored in four polyethylene tanks located on the
5   forward bulkhead of the lazarette. The total freshwater storage capacity in these four tanks was
6   1,200 gallons. The vessel was not equipped with a reverse osmosis unit or other means of
7   generating fresh water while at sea and thus departed the dock with the volume of fresh water that
8   was needed for the trip. Fresh water on board was used for washing dishes and cooking in the
9   galley, hand washing in the shower room and toilet space sinks, washing down and rinsing dive
10  equipment on deck, and showering. There were 5 showers on board: two were located below deck
11  in an isolated compartment forward of the passenger berthing area, two were located outside on the
12  port-side main deck, aft of the galley, and one was attached to the captain's cabin aft of the
13  wheelhouse on the upper deck. All grey water produced onboard from sinks and showers was
14  discharged directly overboard.

15      All three toilet spaces on board the *Conception* were located directly aft of the
16  galley/salon (two on the starboard side and one port), and they were all accessed from the aft deck.
17  The pressure saltwater toilets drained to a plywood and fiberglass sewage holding tank in the
18  engine room. The tank, which was situated midships along the forward bulkhead, was covered with
19  a workbench. The bench functioned not only as a workspace but also as a platform for the 12-volt
20  and 24-volt marine engine-starting batteries. Once full, the sewage tank could be drained overboard
21  after the vessel was under way and at least 3 miles away from shore.

22      The *Conception* had two winches on board. The bow capstan winch was powered by a
23  208-volt, 5-hp, 3-phase electric motor. It was used to haul the vessel's bow anchors and heave
24  mooring lines as needed. The stern electric hydraulic winch system was powered by a similar 1-hp
25  motor and was primarily used to hoist and lower the vessel's swim platform, which acted as a
26  cradle for the vessel's rigid hull inflatable skiff. Neither of these winches were wired to the vessel's
27  emergency power, nor were they in use at the time of the accident.

28      Additionally, the vessel had several auxiliary freshwater and saltwater pumps, located in
29  the engine room and lazarette. These pumps were used for washing down the deck, cleaning scuba

CLAIMANTS' JT ID 000244 – NTSB 000244

1  dive equipment, and other shipboard tasks.

## 9. HVAC (heating ventilation and air conditioning)

3        The HVAC system on board the *Conception* was similar to those on board other overnight
4  dive excursion vessels in the area. The system consisted of a combination of supply and exhaust
5  fans, natural ventilation, and an air conditioner in the bunk room.

6        According to a former crewmember the only heater onboard was a small plug-in space
7  heater located in the wheelhouse. The crewmember stated that this heater was used occasionally
8  during the winter months but usually was not used during the summer season.

9        The engine room utilized both natural ventilation and two forced draft fans to supply air
10  for cooling and engine consumption. Outside supply air was ducted into the engine room from
11  openings on the aft main deck. In the event of fire, these ducts could be secured manually by means
12  of closing dampers, with the shutoffs located on the main deck port and starboard side across from
13  the engine room hatch. On the night of the fire, the ducting in the engine room was not secured by
14  the crew. Also, in the engine room was a fan positioned in the bulkhead that connected the engine
15  room to the lazarette. The fan could be run to supply additional cooling air to the engine room or in
16  reverse to supply warm engine room air to the lazarette, where scuba dive suits were hung to dry.
17  Investigators were unable to determine in which direction the fan was operated in the night of the
18  accident. According to the owner, it was normal procedure when at anchor at night to have the fan
19  in reverse operation, pulling air through the engine room and exhausting to the lazarette.

20        The galley and salon utilized natural ventilation in the form of three sliding windows on
21  each side of the salon and an outward-opening window at the forward galley area. The aft doors
22  were manually opened or closed depending on need. The galley flat top and twin burner stove had a
23  mechanical extraction fan directly above the stove, which was utilized while cooking to expel
24  fumes via a duct directly outside to the port forward main deck. Crewmembers stated that, at the
25  time of the accident, the aft port and starboard sliding windows in the salon were open several
26  inches for ventilation and the forward outward-opening galley window was closed. The aft salon
27  doors were also open for ventilation, as they always were while the boat was at sea with passengers
28  on board. These doors were only closed when the boat was docked, not being used, and with no
29  one on board.

CLAIMANTS' JT ID 000245 – NTSB 000245

1    The wheelhouse and crew staterooms on the upper deck of the *Conception* did not have
2    air conditioning and relied on natural ventilation through windows, the bridge wing doors, and the
3    door to the aft upper deck. At the time of the accident, it was reported by the crew, that the aft
4    upper deck door was open, the port and starboard bridge wing doors were shut, and the positions of
5    the stateroom windows were unknown.



**Figure 5. The starboard-side main deck of *Conception*, looking aft from forward of the galley. The red arrows indicate the location of the bunkroom ventilation intake and exhaust ducts. Also note the sliding windows. (Source: R. White).**

The bunkroom regularly utilized a combination of circulation fans, as well as an air conditioning unit. The supply fan, located at the forward end of the space, drew air through ducting that originated 12 inches above the main deck. The ducting attached to air plenum boxes that were about 6–10 inches off the main deck. These boxes were located on both the port and starboard sides, just below the forwardmost side galley windows. Two exhaust fans, one located on each side of the aft area of the bunkroom, expelled air from the space to the main deck. The ducting for these fans, led to identical plenum boxes, which were located aft of the intake plenum boxes.

The primary means of cooling and ventilation for the bunkroom was an air conditioning unit. The unit was located under the bunkroom deck boards just port of midship and underneath bunks 30U, 31M, and 32L (see the survival factors report for a layout of the bunkroom) in the vessel's bilge area. The direct expansion package unit

30    consisted of an evaporator coil, blower fan, compressor, and sea water cooled condenser. The

CLAIMANTS' JT ID 000246 - NTSB 000246

**ER 490**

1    system was designed to pull air from
2    the space through a diffuser and filter
3    element, located at the forward end of
4    the space, directly at the bottom of the
5    stairs. The blower fan would draw
6    ambient air across the evaporator coil
7    and discharge the cool conditioned air
8    through a network of flexible
9    insulated distribution ductwork
10   located in the bilge. This ductwork
11   connected to permanent ducts and
12   passageways built into the framework
13   of the bunkroom. Each bunk was
14   fitted with a grill/diffuser that could be
15   opened or closed dependent on need.
16   Similar grill/diffusers and ductwork
17   were positioned on the overhead
18   between the rows of bunks on both the
19   port and starboard sides. The air
20   conditioning unit was sized for the
21   space and was estimated to be 4–5



**Figure 6. Port side of the *Conception*'s bunk room looking aft, with inset of grill/diffuser (Source: Ryan, Inset: Landis).**

22   tons. A month prior to the accident, a technician had been called to the vessel to repair a leak on the
23   condenser tubing, which required some soldering to fix. According to the vessel's owner, who had
24   spoken to the vessel's Captain, the smoke produced from the soldering activated a smoke detector
25   in the bunkroom. Since the repair, the unit had been operating as expected. It was standard practice
26   for the vessel's crew to only operate the air-conditioner through the night when the passengers
27   were sleeping. A crewmember would turn the unit on and off by means of a circuit breaker located
28   in the circuit breaker panel at the top of the stairs leading down to the shower room. At the time of
29   the accident, the air conditioning system was in operation; a crewmember stated that he turned on
30   the breaker before going to bed.

31        The air conditioning unit was recovered still in place in the wreckage and was examined

CLAIMANTS' JT ID 000247 – NTSB 000247

1  by investigators. There were no signs of
2  mechanical failure to the components of the
3  unit. The air conditioning system was not
4  connected to the vessel's emergency power.
5  None of the surviving crewmembers turned off
6  the air conditioning system at the time the fire
7  was discovered. The unit would have operated
8  until the *Conception*'s main power was lost
9  (although there was no means to confirm that
10 this occurred).



**Figure 7. Post-accident photo of bunk room air conditioning unit located in vessel's bilge area.**

### 10. Maintenance

12        Most of the maintenance on board was
13 conducted by the crew under the direction of
14 the captain. As required by the Coast Guard, the
15 *Conception* was on a 24-month drydock
16 inspection schedule. The last Coast Guard
17 drydock (haul out) inspection took place on
18 February 13, 2019. The hull exterior and
19 interior spaces were inspected for damage and
20 unauthorized repairs. Rudders, steering gear,
21 propellers, tail shafts, and bearings were also
22 inspected. In addition, all nine of the vessel's
23 through-hull penetrations were inspected. All areas were recorded as being satisfactory by the
24 Coast Guard. In addition, the vessel's bottom was hydro-blasted and painted.
25        Crewmembers told investigators that some equipment on board the vessel, such as the
26 main engines, generator, and air compressors, were maintained regularly under the direction of the
27 captain. Crewmembers also said that equipment maintenance was recorded, and running logs were
28 kept for equipment, and rounds made. All records and logs were kept on board and were lost in the
29 fire. Documents obtained from the *Vision*, a Truth Aquatics vessel similar in size and type to the
30 *Conception*, show general maintenance instructions for much of the vessel's engine room
31 equipment. The *Vision*'s round sheets showed routine daily engine room checks, and the vessel's

Engineering Group Factual Report                                         Page 16 of 18

CLAIMANTS' JT ID 000248 – NTSB 000248

1    logs documented equipment maintenance history, which reflected the maintenance instructions.

2    Maintenance completed by *Vision*'s crew consisted of oil changes, coolant flushing, filter changes,

3    zinc renewal, pump rebuild, and belt replacement. The maintenance and the engine room rounds

4    documented in the *Vision*'s logs were similar to the work the crewmembers on board the

5    *Conception* said was completed onboard their vessel. The owner of the *Conception* said if the

6    captain deemed that the maintenance was outside the capability of the vessel's crew, the captain

7    would schedule an outside contractor to come on board and carry out the work and/or repair.

**Engine Room Check Log**
**CHECK GENERATOR SEA STRAINERS BEFORE EACH TRIP**

| Date | Init ials | Port Main | | | Stbd Main | | | Port Genset | | Stbd Genset | | Port Comp | Stbd Comp | Nitrox Comp | Water % | Fuel Gal | Fire Pump | Flush Heater | Reverse Fan | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Engine | Trans | Water | Engine | Trans | Water | Oil | Water | Oil | Water | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |

**Figure 8. Engine Room Check Log utilized on the Truth Aquatics vessel *Vision* (Source: Truth Aquatics).**

## 11. Galley

The galley kitchen area consisted of a two-burner cooktop, flattop griddle, double oven, microwave, coffee pot, and refrigerator. Midships in the salon aft of the galley was a fountain soda dispenser, ice maker, and a large refrigerated cooler. On the stern deck, aft of the main salon doors, there was a barbeque grill. All equipment was electric. As a precaution, at night, the flattop griddle and two-burner cooktop were secured via the breaker panel located at the top of the stairs leading to the shower room. On the night of the accident, the second galley crewmember stated that he turned off this equipment by opening their respective circuit breakers. The surviving deckhand stated that the only galley equipment running, at the time of the accident, were the "fridges." Above the flattop griddle was a fixed-temperature heat detector, set to alarm at 135°F. The siren alarm would sound locally in the galley, when activated.

## 12. Engine room and lazarette at the time of the fire

On the night of the accident, the *Conception's* main engines were secured while the vessel was anchored. After the five surviving crewmembers abandoned the vessel, two of them re-boarded via the stern. Both crewmembers separately opened the engine room hatch, but neither entered the space. One of the crewmembers inspected for flames while the other attempted to access the vessel's fire pump and start it locally. Neither crewmember saw flames coming from the space or heard any alarms, but both described the space as being filled with smoke. One crewmember said

CLAIMANTS' JT ID 000249 - NTSB 000249

1  that he "didn't really feel any heat," and the other crewmember didn't "remember it being

2  particularly hot." One crewmember described the smoke as being "gray-ish white-ish," while the

3  other described the smoke as being "black." The two crewmembers told investigators that the

4  generator was still running even when the fire had fully engulfed the galley/salon. Lights were

5  observed to be on in the engine room and the lazarette. Also, the electric/hydraulic stern winch was

6  energized and used by the surviving crew, to lower the swim platform and launch the skiff to

7  escape.

Engineering Group Factual Report                                                      Page 18 of 18

CLAIMANTS' JT ID 000250 - NTSB 000250

EXHIBIT 21



**United States of America**
**Department of Homeland Security**
**United States Coast Guard**

| | |
|---|---|
| Certification Date: | 19 Nov 2014 |
| Expiration Date: | 19 Nov 2019 |

# *Certificate of Inspection*

For ships on international voyages this certificate fulfills the requirements of SOLAS 74 as amended, regulation V/14, for a SAFE MANNING DOCUMENT.

| Vessel Name | Official Number | IMO Number | Call Sign | Service |
|---|---|---|---|---|
| CONCEPTION | 638133 | | WYR8548 | Passenger (Inspected) |

| Hailing Port | Hull Material | Horsepower | Propulsion |
|---|---|---|---|
| SANTA BARBARA, CA

UNITED STATES | Wood | 1000 | Diesel Reduction |

| Place Built | Delivery Date | Keel Laid Date | Gross Tons | Net Tons | DWT | Length |
|---|---|---|---|---|---|---|
| LONG BEACH, California

UNITED STATES | 01Jul1981 | | R-97
I- | R-66
I- | | R-75.0
I-0 |

| Owner | Operator |
|---|---|
| GLEN RICHARD FRITZLER
301 WEST CABRILLO BLVD
SANTA BARBARA, CA 93101-3886
UNITED STATES | TRUTH AQUATICS, INC
301 W CABRILLO BLVD
SANTA BARBARA, CA 93101-3886
UNITED STATES |

This vessel must be manned with the following licensed and unlicensed Personnel.  Included in which there must be 0 Certified Lifeboatmen, 0 Certified Tankermen, 0 HSC Type Rating, and 0 GMDSS Operators.

| | | | |
|---|---|---|---|
| 1 Masters | 1 Licensed Mates | 0 Chief Engineers | 0 Qual. Member Eng. Depts |
| 0 Chief Mates | 0 First Class Pilots | 0 First Assistant Engineers | 0 Oilers |
| 0 Second Mates | 0 Radio Officers | 0 Second Assistant Engineers | 0 Crew Members |
| 0 Third Mates | 0 Able Seamen | 0 Third Assistant Engineers | |
| 0 Master First Class Pilot | 0 Ordinary Seamen | 0 Licensed Engineers | |
| 0 Mate First Class Pilots | 2 Deckhands | 0 Non Licensed Engineer Dept | |

In addition, this vessel may carry 99 Passengers, 0 Other Persons in crew, 0 Persons in addition to crew, and no Others. Total Persons allowed: 103

Route Permitted And Conditions Of Operation:

## ---Oceans---

PACIFIC OCEAN, NOT ON AN INTERNATIONAL VOYAGE, BETWEEN THE SAN LUIS OBISPO / MONTEREY COUNTY LINE: 35°-47.5' NORTH LATITUDE, AND 31°-45' NORTH LATITUDE, NOT MORE THAN 100 MILES FROM THE MAINLAND SHORE.

IF THE VESSEL IS AWAY FROM THE DOCK OR PASSENGERS ARE ON BOARD OR HAVE ACCESS TO THE VESSEL FOR LESS THAN 12 HOURS IN ANY 24 HOUR PERIOD, THE CREW MAY BE REDUCED TO 1 MASTER AND 2 DECKHANDS.  THE NUMBER OF PASSENGERS MAY BE ADJUSTED ACCORDINGLY SO THAT THE TOTAL PERSONS ALLOWED DOES NOT EXCEED 103.

A MEMBER OF THE VESSEL'S CREW SHALL BE DESIGNATED BY THE MASTER AS A ROVING PATROL AT ALL TIMES, WHETHER OR NOT THE VESSEL IS UNDERWAY, WHEN THE PASSENGER'S BUNKS ARE OCCUPIED.

### ***SEE NEXT PAGE FOR ADDITIONAL CERTIFICATE INFORMATION***

With this Inspection for Certification having been completed at Santa Barbara California UNITED STATES, the Officer in Charge, Marine Inspection, Los Angeles - Long Beach certified the vessel, in all respects, is in conformity with the applicable vessel inspection laws and the rules and regulations prescribed thereunder.

| Annual/Periodic/Re-Inspection | | | | This Amended certificate issued by: |
|---|---|---|---|---|
| Date | Zone | A/P/R | Signature | T.J. GRANT, CDR, U.S. Coast Guard, By Direction |
| 18Feb2016 | MSD StBarbara | A | HAGER DANIEL | |
| | | | | Officer in Charge, Marine Inspection |
| | | | | Los Angeles - Long Beach |
| | | | | Inspection Zone |

Dept. of Home Sec., USCG, CG-841 (Rev 4-2000)(v2)

OMB No. 2115-0512

TA-0003

**ER 496**

| | Certification Date: | 19 Nov 2014 |
|---|---|---|
| | Expiration Date: | 19 Nov 2019 |

**United States of America**
**Department of Homeland Security**
**United States Coast Guard**

# Certificate of Inspection

Vessel Name: CONCEPTION

\*
A CHILD–SIZED LIFE JACKET SHALL BE PROVIDED FOR EACH PERSON WEIGHING LESS THAN 90 POUNDS.

Overnight accommodations for 46 passengers.

## ---Hull Exams---

| Exam Type | Next Exam | Last Exam | Prior Exam |
|---|---|---|---|
| DryDock | 28Feb2021 | 13Feb2019 | 10Feb2017 |

## ---Stability---

| Type | Issued Date | Office |
|---|---|---|
| Letter | 10Jul1981 | LA-LB |

## ---Lifesaving Equipment---

Total Equipment for 103 Persons

| Primary Lifesaving Equipment | Quantity | Capacity | | Required |
|---|---|---|---|---|
| Lifeboats (Total) | 0 | 0 | Life Preservers (Adult) | 103 |
| Lifeboats (Port) | 0 | 0 | Life Preservers (Child) | 11 |
| Lifeboats (Starboard) | 0 | 0 | Ring Buoys (Total) | 3 |
| Motor Lifeboats | 0 | 0 | With Lights | 1 |
| Lifeboats With Radio | 0 | 0 | With Line Attached | 1 |
| Rescue Boats/Platforms | 1 | 0 | Other | 1 |
| Inflatable Rafts | 0 | 0 | Immersion Suits | 0 |
| Life Floats/Buoyant App | 6 | 104 | Portable Lifeboat Radios | 0 |
| Inflatable Buoyant Apparatus (IBA) | 0 | 0 | Equipped With EPIRB? | YES |

## --- Fire Fighting Equipment ---

Number of Fire Pumps - 1

**\*Hose Information\***

| Location | Quantity | Diameter | Length |
|---|---|---|---|
| MAIN DECK | 2 | 1.5 | 50 |

**\*Fixed Extinguishing Systems\***

| Location | Type | Capacity | |
|---|---|---|---|
| ENGINEROOM | Carbon Dioxide | 200 | Pound |

**\*Fire Extinguishers - Hand portable and semi-portable\***

| Quantity | Class Type |
|---|---|
| 1 | B-I |
| 5 | B-II |

## ---Certificate Amendments---

| Unit Amending | Amendment Date | Amendment Remark |
|---|---|---|
| Sector Los Angeles/Long Beach | 10Feb2017 | Conducted hull exam for credit drydock; amended due dates. |
| Sector Los Angeles/Long Beach | 13Feb2019 | Conducted hull exam for credit drydock; amended due dates. |

**\*\*\*END\*\*\***

Dept. of Home Sec., USCG, CG-841 (Rev 4-2000)(v2)

OMB No. 2115-0517

TA-0004

# EXHIBIT 22









# EXHIBIT 23

# National Transportation Safety Board

Office of Marine Safety

Washington, D.C. 20594

Group Chairman's Factual Report

<div style="background:black; color:white; padding:1em; text-align:center;">Fire and Explosions Group</div>

## Conception

DCA19MM047

**May 7, 2020**

CLAIMANTS' JT ID 001460 – NTSB 001460

**ER 502**

DCA19MM047

Report No. 20-020
Page No. 16



Figure 4. Port side of the *Conception*'s salon looking aft. (Source: M. Ryan)



Figure 5. Starboard side of the Conception's salon looking aft. (Source: M. Ryan)

CLAIMANTS' JT ID 001475 – NTSB 001475



1
E. MARTIN ESTRADA
United States Attorney
2
DAVID M. HARRIS
Assistant United States Attorney
3
Chief, Civil Division
4
5
BRIAN BOYNTON
Principal Deputy Assistant Attorney General
6
ERIC KAUFMAN-COHEN, Cal. SBN 171064
eric.kaufman-cohen@usdoj.gov
7
Attorney in Charge, West Coast Office
FRANK J. ANDERS, Cal. SBN 227208
8
Franklin.j.anders@usdoj.gov
SCOTT PERRYGO, Cal. SBN 341834
9
Scott.perrygo@usdoj.gov
KYLE FRALICK, Maryland SBN 081230008
10
Kyle.fralick@usdoj.gov
Trial Attorneys
11
Torts Branch, Civil Division
U.S. Department of Justice
12
450 Golden Gate Avenue, Room 7-5395
San Francisco, California 94102-3463
13
Telephone: (415) 436-6648/(415) 436-6644/
14
            (415) 436-6645/(415) 436-6647
Facsimile: (415) 436-6632
15
16
17
Attorneys for United States of America

18
UNITED STATES DISTRICT COURT

19
CENTRAL DISTRICT OF CALIFORNIA

20
| | |
|---|---|
| NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal Representative of the Estate of VAIDEHI | Case No.: 2:21-cv-07065-PA-MRW<br><br>In Admiralty<br><br>**UNITED STATES' NOTICE OF ERRATA RE EXHIBIT H TO THE DECLARATION OF SCOTT PERRYGO FILED IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS**<br><br>**[ECF 88-10]** |

21
22
23
24
25
26
27
28

UNITED STATES' NOTICE OF ERRATA                    Case No.: 2:21-cv-07065-PA-MRW

DEVI CAMPBELL WILLIAMS )
(Deceased); CHRISTINE )
ALEXANDRA DIGNAM, Personal )
Representative of the Estate of JUSTIN )
DIGNAM (Deceased); JASMINE )
LORD, Personal Representative of the )
Estate of CHARLES McILVAIN )
(Deceased); VICTORIA E. MOORE, )
Personal Representative of the Estates of )
RAYMOND SCOTT CHAN (Deceased) )
and KENDRA CHAN (Deceased); )
YUKA OHASHI MERRITT, Personal )
Representative of the Estate of YUKO )
HATANO (Deceased); VIKRAM )
SINGH, Personal Representative of the )
Estate of SUNIL SINGH SANDHU )
(Deceased); NINA HUTTEGGER, )
Personal Representative of the Estate of )
JUHA-PEKKA AHOPELTO )
(Deceased); YADIRA ALVAREZ, )
Personal Representative of the Estate of )
BERENICE FELIPE (Deceased); SEJAY )
TAN, Personal Representative of the )
Estate of WEI TAN (Deceased); ERIC )
BALTZ, Personal Representative of the )
Estate of NEAL BALTZ (Deceased); )
ANTHONY BEITZINGER, Personal )
Representative of the Estate of )
PATRICIA BEITZINGER (Deceased); )
SHRUTI DEOPUJARI, Personal )
Representative of the Estate of )
SANJEERI DEOPUJARI (Deceased); )
ATLEE FRITZ, Personal )
Representative of the Estate of )
ANDREW FRITZ (Deceased); SEEMA )
SHARMA, Personal )
Representative of the Estate of )
KAUSTUBH NIRMAL (Deceased); )
MARGARET STROM, Personal )
representative of the Estate of TED )
STROM (Deceased); RICHARD X. LIU, )
Personal Representative of the Estate of )
XIANG LIN; SUSANA SOLANO )
ROSAS, Personal Representative of the )
Estates of EVANMICHEL SOLANO )
QUITASOL (Deceased), ANGELA )
ROSE SOLANO QUITASOL )
(Deceased), and NICOLE SOLANO )
QUITASOL (Deceased); ARIEL )
TAKVAM, Personal Representative of )
the Estate of KRISTIAN TAKVAM )
(Deceased); DOMINIC MICAEL )
SELGA, Personal Representative of the )

UNITED STATES' NOTICE OF ERRATA                    Case No.: 2:21-cv-07065-PA-MRW

Estate of FERNISA JUNE SISON  )
(Deceased); ROBERT KURTZ and  )
CHERIE MCDONOUGH, Personal  )
Representatives of the Estate of  )
ALEXANDRA HALEY KURTZ; JEAN  )
ANNE ALLEN as Executor of the Estate  )
of STEVEN JOHN SALIKA, Executor  )
of the Estate OF CAROL DIANA  )
ADAMIC and Administrator of the  )
Estate of TIA NICOLE ADAMIC  )
SALIKA; JAMES ADAMIC,  )
individually and as beneficiary of the  )
Estate of CAROL DIANA ADAMIC  )
(Deceased); ANGELIKA ADAMIC,  )
individually and as beneficiary of the  )
Estate of CAROL DIANA ADAMIC  )
(Deceased); MARK ADAMIC,  )
individually and as beneficiary of the  )
Estate of CAROL DIANA ADAMIC  )
(Deceased); SHIRLEY SALIKA,  )
individually, and as beneficiary of the  )
Estate of STEVEN JOHN SALIKA  )
(Deceased) and TIA NICOLE SALIKA  )
(Deceased); DANIEL POH-HOCK  )
CHUA, Personal Representative of the  )
Estate of KRISTINA OLINE FINSTAD  )
(Deceased), and RYAN SIMS,  )
individually,  )
                                                        )
                    Plaintiffs,                         )
                                                        )
        vs.                                             )
                                                        )
UNITED STATES OF AMERICA,                               )
                                                        )
                    Defendant.                          )
                                                        )

UNITED STATES' NOTICE OF ERRATA                    Case No.: 2:21-cv-07065-PA-MRW

This notice of errata is being filed to correct Exhibit H to the Declaration of Scott Perrygo in support of the United States' Motion to Dismiss Plaintiffs' Amended Complaint for lack of jurisdiction.  The original Exhibit H [ECF 88-10] inadvertently left out the actual exhibit and only included the cover page.

Attached hereto is the entire Exhibit H.

Date: May 15, 2024                    Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
ERIC KAUFMAN-COHEN
Attorney in Charge, West Coast Filed Office

 s/Scott Perrygo
SCOTT PERRYGO
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice

Attorneys for United States of America

UNITED STATES' NOTICE OF ERRATA            1            Case No.: 2:21-cv-07065-PA-MRW

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2024, a copy of the foregoing UNITED STATES' NOTICE OF ERRATA RE EXHIBIT H TO THE DECLARATION OF SCOTT PERRYGO FILED IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.

　　　 s/Scott Perrygo
　　　SCOTT PERRYGO

UNITED STATES' NOTICE OF ERRATA            2            Case No.: 2:21-cv-07065-PA-MRW

Exhibit H



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6625487 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) Annual |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 13FEB2019 19:00Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA  93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA  93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| 01 - Certificates & Documentation | Inspected Satisfactory | 13FEB2019 |
| 02 - Structural Conditions | Inspected Satisfactory | 13FEB2019 |
| 03 - Water/Weathertight Conditions | Inspected Satisfactory | 13FEB2019 |
| 04 - Emergency Systems | Inspected Satisfactory | 13FEB2019 |
| 05 - Radio Communications | Inspected Satisfactory | 13FEB2019 |
| 07 - Fire Safety | Inspected Satisfactory | 13FEB2019 |
| 08 - Alarms | Inspected Satisfactory | 13FEB2019 |
| 09 - Working and Living Conditions | Inspected Satisfactory | 13FEB2019 |
| 10 - Safety of Navigation | Inspected Satisfactory | 13FEB2019 |
| 11 - Life Saving Appliances | Inspected Satisfactory | 13FEB2019 |
| 13 - Propulsion and Auxiliary Machinery | Inspected Satisfactory | 13FEB2019 |

Declaration of Scott Perrygo, Exhibit H, Page 1 of 6

US000067

14 - Pollution Prevention                  Inspected Satisfactory                  13FEB2019

## Narrative:

13FEB19: Attended vessel on blocks in Ventura Boatyard to initiate the annual inspection. Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

DOCUMENTATION:
Inspected vessel docs/cert; completed a compliance check of the company's drug testing program; company is a member of ASTS and appears to be in substantial compliance with 46 CFR Part 16.

LIFESAVING:
Inspected vessel lifesaving appliances, all sat.

COMMENTS:
Inspection continues once the vessel goes back in the water.

01MAR19: Attended vessel back in the water moored stbd side in Santa Barbara Harbor to complete annual inspection. Met with vessel rep Jerry Boylan to discuss the scope of the inspection.

FIREFIGHTING:
Inspected vessel firefighting appliances to include 06 portable fire extinguishers and a fixed CO2 system for the E/R which were all serviced by Langkilde's Fire Protection on 28FEB19.

DRILLS:
Completed satisfactory MOB and fire drills.

COMMENTS:
Endorsed COI, inspection completed. In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Annual Inspection | 13FEB2019 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| Vessel Name: | CONCEPTION |
|---|---|
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

## Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°24.5 N | 119°41.5 W | 13FEB2019 19:00Z | Santa Barbara Harbor |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| Radiation: | No Radiation Detected |
|---|---|

Declaration of Scott Perrygo, Exhibit H, Page 2 of 6        US000068

Operational Controls: (None)

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
|---|---|---|---|
| 01MAR2019 | Closed Date: 3/1/2019 11:51:22 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Start Date: 2/13/2019 7:00:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 01MAR2019 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Title: CONCEPTION (T) Annual | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

Certificates: (None)

Declaration of Scott Perrygo, Exhibit H, Page 3 of 6      US000069

**ER 513**



**U.S. Department of Homeland Security**

**United States Coast Guard**

# Activity Summary Report

| | |
|---|---|
| MISLE Activity ID: | 6625180 |
| Activity Type: | Vessel Inspection |
| Title/Description: | CONCEPTION (T) Hull Exam |
| Status: | Closed - Approved Inspection |
| Point Of Contact: | Jerry Boylan 805-705-1740 |
| Owning Unit: | Marine Safety Detachment Santa Barbara |
| Originating Unit: | Marine Safety Detachment Santa Barbara |
| Start Date/Time: | 13FEB2019 17:30Z |
| Prompt Date: | |
| Team Lead: | HAGER, DANIEL M. |

## Vessel Information:

| Vessel Name: | Call Sign: | Current Flag / Flag At Time Of Activity: |
|---|---|---|
| CONCEPTION | WYR8548 | UNITED STATES / UNITED STATES |
| **Classification:** | **Primary VIN:** | **Length:** |
| Passenger Ship - Diving Vessel (Recreational) - General (More Than 6, Gross Tonnage < 100) | 638133 | 75.0 |
| **ITC/Convention (Subpart B):** | **Regulatory (Subpart C or D):** | **Year Completed:** |
| | 97 | 1981 |
| **Engine Compartment In An Open Space:** | **Fuel Compartment In An Open Space:** | **Vessel Constructed Of All Open Spaces:** |
| Not Applicable | Not Applicable | Not Applicable |
| **Propulsion System Type:** | | |
| Diesel Reduction | | |

### Vessel Associated Parties:

| Name: | Type: | Role: |
|---|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92 | Organization | Managing Owner |
| **Address:** | | |
| 301 W. Cabrillo Blvd SANTA BARBARA, CALIFORNIA 93101 | | |
| **Name:** | **Type:** | **Role:** |
| FRITZLER TRUSTEE, GLEN RICHARD | Individual | Operator (managing) |
| **Address:** | | |
| 301 WEST CABRILLO BLVD SANTA BARBARA, CALIFORNIA 93101-3886 | | |

## Inspection Results:

| System: | Inspection Results: | Date: |
|---|---|---|
| 02 - Structural Conditions | Inspected Satisfactory | 13FEB2019 |
| 03 - Water/Weathertight Conditions | Inspected Satisfactory | 13FEB2019 |

## Narrative:

Declaration of Scott Perrygo, Exhibit H, Page 4 of 6

US000070

13FEB19: Attended vessel on blocks at Ventura Boat Yard to conduct hull exam.  Vessel is 75 foot wood vessel.  Met with the vessel rep Jerry Boylan to discuss the scope of the exam.

**HULL STRUCTURAL MEMBERS/WATERTIGHT INTEGRITY**
Examined hull exterior and interior spaces for signs of damage and unauthorized repairs, all sat.

**RUDDERS, PROPELLERS AND TAILSHAFTS**
Examined rudders, steering gear, propellers, tail shafts, and bearings, all sat.

**VALVES AND THROUGH-HULL FITTINGS**
Examined 09 ball valves, all sat.

**COMMENTS:**
Inspection continues to complete post drydock check ride once the vessel goes back in the water.

01MAR19: Attended vessel moored stbd side in Santa Barbara Harbor.  Complete post drydock check ride; all sat.  Amended drydock dates and routed amended COI for signature.  In my opinion the vessel is fit for route and service as specified on the current COI.

//s// CWO Daniel Hager

## Inspection Details

| Inspection Type: | Date: | Unit: |
|---|---|---|
| Hull Examination | 13FEB2019 | Marine Safety Detachment Santa Barbara |
| **Inspection Type:** | **Date:** | **Unit:** |
| Deficiency Check | 01MAR2019 | Marine Safety Detachment Santa Barbara |

## Streamlined Inspection Program (SIP) Summary:

| | |
|---|---|
| **Vessel Name:** | CONCEPTION |
| **Company Name:** | |
| **PHASE I** | |
| Inspector Comments: | |
| **PHASE II** | |
| Inspector Comments: | |
| **PHASE III** | |
| Inspector Comments: | |
| **PHASE IV** | |
| Inspector Comments: | |

### Location(s):

| Latitude: | Longitude: | Recorded Date/Time: | Description: |
|---|---|---|---|
| 34°14.4 N | 119°15.6 W | 13FEB2019 17:30Z | Ventura Harbor Boat Yard |

Associated Parties: (None)

## TWIC Details:

| Worker Type: | Checked: | Compliant: | Noncompliant: | Remarks: |
|---|---|---|---|---|
| Licensed Mariner | 0 | 0 | 0 | |

## Radiation Details:

| | |
|---|---|
| **Radiation:** | No Radiation Detected |

Operational Controls: (None)

Declaration of Scott Perrygo, Exhibit H, Page 5 of 6        US000071

**ER 515**

**Log:**

| Effective Date: | Description/New Value: | Logged By Unit: | Logged By: |
| --- | --- | --- | --- |
| 14MAR2019 | Submitted amended COI to CDR Newberry for his signature. | Sector Los Angeles/Long Beach | McGuigan, Terrence |
| 20MAR2019 | Closed Date: 3/20/2019 9:44:27 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 14MAR2019 | Involved Personnel Point Of Contact: No | Sector Los Angeles/Long Beach | McGuigan, Terrence |
| 13FEB2019 | Involved Personnel Point Of Contact: Yes | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 19MAR2019 | Owning Unit: Marine Safety Detachment Santa Barbara | Marine Safety Detachment Santa Barbara | DeLorme, Gary A |
| 02MAR2019 | Owning Unit: Sector Los Angeles/Long Beach | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Point Of Contact: Jerry Boylan 805-705-1740 | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Start Date: 2/13/2019 5:30:00 PM | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 20MAR2019 | Status/Subtype: Closed/Approved Inspection | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 13FEB2019 | Status/Subtype: Open/In Progress | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 02MAR2019 | Status/Subtype: Open/Submitted for Review | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Title: CONCEPTION (T) Hull Exam | Marine Safety Detachment Santa Barbara | Hager, Daniel M |
| 19MAR2019 | Transfer Reason: Completion | Marine Safety Detachment Santa Barbara | DeLorme, Gary A |
| 02MAR2019 | Transfer Reason: Completion | Sector Los Angeles/Long Beach | Hager, Daniel M |
| 13FEB2019 | Vessel: CONCEPTION | Marine Safety Detachment Santa Barbara | Hager, Daniel M |

Documents: (None)

**Certificates:**

| Name: | Type: | Description: |
| --- | --- | --- |
| COI - Amended 19Mar2019 | Certificate of Inspection - Amended | |

| Owning Unit: | Status: | Issued Date: | Expired Date: |
| --- | --- | --- | --- |
| Sector Los Angeles/Long Beach | EXPIRED | 19NOV2014 | 19NOV2019 |

Declaration of Scott Perrygo, Exhibit H, Page 6 of 6

US000072

1   E. MARTIN ESTRADA
    United States Attorney
2   DAVID M. HARRIS
    Assistant United States Attorney
3   Chief, Civil Division

4   BRIAN M. BOYNTON
5   Principal Deputy Assistant Attorney General
    ERIC KAUFMAN-COHEN, Cal. SBN 171064
6   Eric.Kaufman-Cohen@usdoj.gov
    Attorney in Charge, West Coast Office
7   SCOTT PERRYGO, Cal. SBN 341834
    Scott.Perrygo@usdoj.gov
8   Trial Attorney
    Torts Branch, Civil Division
9   U.S. Department of Justice
    450 Golden Gate Avenue, Room 7-5395
10  San Francisco, California 94102-3463
    Telephone:  (415) 436-6648/(415) 436-6645
11  Facsimile:   (415) 436-6632

12

13  Attorneys for United States of America

14                    UNITED STATES DISTRICT COURT

15
                      CENTRAL DISTRICT OF CALIFORNIA
16

17  NANCY FIEDLER, Personal            )  Case No.: 2:21-cv-07065-PA-MRW
    Representative of the Estate of LISA )
18  FIEDLER (Deceased); MATTHEW        )  In Admiralty
    GUINEY, Personal Representative of the )
19  Estate of MARYBETH GUINEY          )
    (Deceased); OLGA FAYNSHTEYN,       )  **MEMORANDUM OF POINTS**
20  Personal Representative of the Estate of )  **AND AUTHORITIES IN**
    YULIYA KRASHENNAYA                 )  **SUPPORT OF THE UNITED**
21  (Deceased); KATIE OSBORNE,         )  **STATES' MOTION TO DISMISS**
    Personal Representative of the Estate of )  **PLAINTIFFS' FIRST AMENDED**
22  DANIEL GARCIA (Deceased);          )  **COMPLAINT FOR LACK OF**
    CHRISTINA QUITASOL, Personal       )  **SUBJECT MATTER**
23  Representative of the Estate of     )  **JURISDICTION**
    MICHAEL QUITASOL (Deceased);       )
24  SARMA WILLIAMS, Personal           )  **[Fed. R. Civ. P. 12(b)(1)]**
    Representative of the Estate of VAIDEHI )
25  DEVI CAMPBELL WILLIAMS             )
    (Deceased); CHRISTINE              )  Date: August 12, 2024
26  ALEXANDRA DIGNAM, Personal         )  Time: 1:30 p.m.
    Representative of the Estate of JUSTIN )  Courtroom: 9A
27  DIGNAM (Deceased); JASMINE         )
    LORD, Personal Representative of the )
28

---

**ER 517**

| | | |
|---|---|---|
| 1 | Estate of CHARLES McILVAIN (Deceased); VICTORIA E. MOORE, Personal Representative of the Estates of RAYMOND SCOTT CHAN (Deceased) and KENDRA CHAN (Deceased); YUKA OHASHI MERRITT, Personal Representative of the Estate of YUKO HATANO (Deceased); VIKRAM SINGH, Personal Representative of the Estate of SUNIL SINGH SANDHU (Deceased); NINA HUTTEGGER, Personal Representative of the Estate of JUHA-PEKKA AHOPELTO (Deceased); YADIRA ALVAREZ, Personal Representative of the Estate of BERENICE FELIPE (Deceased); SEJAY TAN, Personal Representative of the Estate of WEI TAN (Deceased); ERIC BALTZ, Personal Representative of the Estate of NEAL BALTZ (Deceased); ANTHONY BEITZINGER, Personal Representative of the Estate of PATRICIA BEITZINGER (Deceased); SHRUTI DEOPUJARI, Personal Representative of the Estate of SANJEERI DEOPUJARI (Deceased); ATLEE FRITZ, Personal Representative of the Estate of ANDREW FRITZ (Deceased); SEEMA SHARMA, Personal Representative of the Estate of KAUSTUBH NIRMAL (Deceased); MARGARET STROM, Personal representative of the Estate of TED STROM (Deceased); RICHARD X. LIU, Personal Representative of the Estate of XIANG LIN; SUSANA SOLANO ROSAS, Personal Representative of the Estates of EVANMICHEL SOLANO QUITASOL (Deceased), ANGELA ROSE SOLANO QUITASOL (Deceased), and NICOLE SOLANO QUITASOL (Deceased); ARIEL TAKVAM, Personal Representative of the Estate of KRISTIAN TAKVAM (Deceased); DOMINIC MICAEL SELGA, Personal Representative of the Estate of FERNISA JUNE SISON (Deceased); ROBERT KURTZ and CHERIE MCDONOUGH, Personal Representatives of the Estate of ALEXANDRA HALEY KURTZ; JEAN ANNE ALLEN as Executor of the Estate | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Hon. Percy Anderson<br><br>Supporting documents:<br><br>1) Declaration of Scott Perrygo<br><br>2) Proposed Order |

MEM. IN SUPPORT OF MOT. TO DISMISS                    Case No.: 2:21-cv-07065-PA-MRW

**ER 518**

1    of STEVEN JOHN SALIKA, Executor )
   of the Estate OF CAROL DIANA )

2    ADAMIC and Administrator of the )
   Estate of TIA NICOLE ADAMIC )

3    SALIKA; JAMES ADAMIC, )
   individually and as beneficiary of the )

4    Estate of CAROL DIANA ADAMIC )
   (Deceased); ANGELIKA ADAMIC, )

5    individually and as beneficiary of the )
   Estate of CAROL DIANA ADAMIC )

6    (Deceased); MARK ADAMIC, )
   individually and as beneficiary of the )

7    Estate of CAROL DIANA ADAMIC )
   (Deceased); SHIRLEY SALIKA, )

8    individually, and as beneficiary of the )
   Estate of STEVEN JOHN SALIKA )

9    (Deceased) and TIA NICOLE SALIKA )
   (Deceased); DANIEL POH-HOCK )

10   CHUA, Personal Representative of the )
   Estate of KRISTINA OLINE FINSTAD )

11   (Deceased), and RYAN SIMS, )
   individually, )

12                  )

13            Plaintiffs, )

14       vs. )

15   UNITED STATES OF AMERICA, )

16           Defendant. )

17

18

19

20

21

22

23

24

25

26

27

28

MEM. IN SUPPORT OF MOT. TO DISMISS           Case No.: 2:21-cv-07065-PA-MRW

**TABLE OF CONTENTS**

INTRODUCTION ……………………..…………………………………1

BACKGROUND ……………………………………………………………3

    I.     Fire and Sinking of Conception ………………………………...…3

    II.    Procedural History ……………………………………………   3

    III.   Statutory and Regulatory Background ……………………………  4

         A.    Coast Guard Statutes and Shipping Statutes …………...……..4

         B.    Small Passenger Vessel Regulations ………...…………..……5

         C.    Marine Safety Manual, Other Guides, and Local
             Practice …………………………………………………......7

    IV.   Conception Certification and Inspections ………………….……11

DISCUSSION …………………………………………………...…..13

    I.     Legal Standard …………………………………………….…13

    II.    The Court Lacks Subject Matter Jurisdiction Because
          The United States Has Not Waived Sovereign Immunity
          For Discretionary Functions ……………………………...….13

         A.    The Challenged Conduct is the Coast Guard's Inspection
             And Certification Policies in their Totality ……………...…16

         B.    Prong One: The Controlling Statutes, Regulations, and
             Policies Vest the Coast Guard with Discretion …………......18

             1.    The Statutes, Regulations, and Policies Demonstrate
                  The Coast Guard's Discretion in Conducting
                  Inspections ……………………..……………………19

2.   To the Extent Individual Subchapter T Standards are Relevant, None Require the Coast Guard to Conduct its Vessel Inspection and Certification in a Particular Manner ……………….…………………………………24

C.   Prong Two: The Coast Guard's Establishment and Implementation of a Maritime Safety Program Is Susceptible to Political, Social, and Economic Policy Analysis ………………..…....…………………..28

CONCLUSION ………………………………………………………..34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Americopters, LLC v. FAA*,

   441 F.3d 726 (9th Cir. 2006) ................................................................13

*Autery v. United States*,

   992 F.2d 1523 (11th Cir. 1993) ...................................................... 17, 18

*Berkovitz v. United States*,

   486 U.S. 531 (1988) ................................................................ 15, 18, 19

*Cassens v. St. Louis River Cruise Lines, Inc.*,

   44 F.3d 508 (7th Cir. 1995) .......................................................... passim

*Chadd v. United States*,

   794 F.3d (9th Cir. 2015) ....................................................................28

*Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*,

   532 F. Supp. 2d 369 (D.P.R. 2008)....................................................33

*Dalehite v. United States*,

   346 U.S. 15 (1953)...................................................................... 14, 29

*Earles v. United States*,

   935 F.2d 1028 (9th Cir. 1991) ..........................................................14

*Foster Logging, Inc. v. United States*,

   973 F.3d 1152 (11th Cir. 2020) ........................................................16

*GATX/Airlog Co. v. United States,*

  286 F.3d 1168 (9th Cir. 2002) ........................................................15

*Gonzalez v. United States,*

  814 F.3d 1022 (9th Cir. 2016) ......................................................15

*Gonzalez v. United* States,

  851 F.3d 538 (5th Cir. 2017) ........................................................27

*In re Ocean Ranger Sinking Off Newfoundland on Feb. 15, 1982,*

  632 F. Supp. 72 (E.D. La. 1985)...................................................21

*Indemnity Ins. Co. of N. Am. v. United States,*

  569 F.3d 175 (4th Cir. 2009) .............................................. 29, 30, 32

*Irving v. United States,*

  162 F.3d 154 (1st Cir. 1998).................................................. 28, 29

*Johnson v. United States,*

  547 F.2d 688 (D.C. Cir. 1976) ......................................................16

*Kohl v. United States,*

  699 F.3d 935 (6th Cir. 2012) ........................................................16

*Kokkonen v. Guardian Life Ins. Co. of Am.,*

  511 U.S. 375 (1994)......................................................................13

*Lam v. United States,*

  979 F.3d 665 (9th Cir. 2020) ............................................... passim

*Myers v. United States,*

    17 F.3d 890 (6th Cir. 1994) ................................................................23

*Nurse v. United States,*

    226 F.3d 996 (9th Cir. 2000) ..............................................................15

*Safe Air for Everyone v. Meyer,*

    373 F.3d 1035 (9th Cir. 2004) ...........................................................13

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union,*

    65 F.4th 1012 (9th Cir. 2023) ............................................................13

*Smith v. U.S. Coast Guard,*

    220 F. Supp. 2d 275 (S.D.N.Y. 2002) ........................... 20, 22, 23, 32

*Tew v. United States,*

    86 F.3d 1003 (10th Cir. 1996) ...........................................................33

*United States v. Gaubert,*

    499 U.S. 315 (1991) .............................................................. passim

*United States v. Mitchell,*

    445 U.S. 535 (1980) ...........................................................................13

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*

    467 U.S. 797 (1984) .............................................................. passim

Statutes

6 U.S.C. § 468 ...................................................................................4, 33

14 U.S.C. § 102(3) ...............................................................................................4, 30

14 U.S.C. § 501 ..........................................................................................................5

14 U.S.C. § 503 .....................................................................................................5, 33

14 U.S.C. § 504(c) .....................................................................................................5

18 U.S.C. § 1115 ......................................................................................................12

28 U.S.C. § 2680(a) .................................................................................................14

46 U.S.C. 3305(1) ....................................................................................................21

46 U.S.C. 3305(a) ...............................................................................................20, 22

46 U.S.C. § 2101(31) .................................................................................................6

46 U.S.C. § 3301(8) ...................................................................................................5

46 U.S.C. § 3305(d)(1) .........................................................................................5, 30

46 U.S.C. § 3307(1) .................................................................................................21

46 U.S.C. § 3315(a) .................................................................................................20

46 U.S.C. § 30903 ....................................................................................................13

46 U.S.C.A. § 30901 ..................................................................................................3

46 U.S.C § 3307(2) ....................................................................................................6

Rules

Fed. R. Civ. P. 12(b)(1)..........................................................................................1, 13

Fed. R. Civ. P. 12(h)(3)...............................................................................................1

Regulations

45 C.F.R. § 183.115(a) ............................................................................7

46 C.F.R. 175.115 ..................................................................................25

46 C.F.R. 182.115(b) ...............................................................................7

46 C.F.R. 183.115(a) ..............................................................................26

46 C.F.R. Part 176 ...................................................................................6

46 C.F.R. §176.400(a) ...................................................................... 20, 22

46 C.F.R. §176.500(b)(1)(ii) ..................................................................21

46 C.F.R. § 71.25-15 ..............................................................................28

46 C.F.R. § 175.110(a) .............................................................................5

46 C.F.R. § 175.112 .................................................................................7

46 C.F.R. § 175.400 ................................................................................26

46 C.F.R. § 176.100 .......................................................................... 20, 22

46 C.F.R. § 176.100(a) .............................................................................6

46 C.F.R. § 176.110 ................................................................................31

46 C.F.R. § 176.402(b) ...........................................................................21

46 C.F.R. § 176.402(c) ................................................................ 6, 16, 19, 21

46 C.F.R. § 176.404 .................................................................................6

46 C.F.R. § 176.404(a) ...........................................................................21

46 C.F.R. § 176.600(c) .............................................................................6

**ER 526**

46 C.F.R. § 176.800 (b) ............................................................ 23, 31, 32

46 C.F.R. § 176.800(a) ........................................................................ 6

46 C.F.R. § 177.115(a) ......................................................................... 7

46 C.F.R. § 177.30-7(d), (a) ................................................................ 26

46 C.F.R. § 177.405(f) ................................................................. 25, 26

46 C.F.R. § 185.410 ................................................................... 11, 12

46 C.F.R. §§ 175.01-1–185.30-30 (1995)............................................ 7

46 C.F.R. §§ 175.100 to 185.910 ......................................................... 5

46 C.F.R. §§ 176.400-176.402 ............................................................. 6

46 C.F.R. §§ 176.800-176.840 ....................................................... 6, 22

46 C.F.R. §§ 176.830(a) .................................................................... 25

46 C.F.R § 176.500(b) .......................................................................... 6


Other Authorities

*H.R. Rep. No. 338,*

   98th Cong., 1st Sess. 113 (1983), reprinted in 1983 U.S.C.C.A.N. 924 ................ 5

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| Exhibit A | Excerpts of the U.S. Coast Guard Marine Safety Manual Volume 2. |
| Exhibit B | Excerpts from the deposition transcript of Commander Stephanie Hodgdon, U.S. Coast Guard. |
| Exhibit C | Excerpts of the U.S. Coast Guard Marine Safety Manual Volume 1 ("MSM Vol. 1"). |
| Exhibit D | Excerpts of form CG-840 TI. |
| Exhibit E | Excerpts from the deposition transcript of Lieutenant Commander Joe Price Larson, U.S. Coast Guard. |
| Exhibit F | Conception's Certificate of Inspection ("COI") issued November 19, 2014. |
| Exhibit G | Excerpts from the deposition transcript of Captain Ronald Caputo, U.S. Coast Guard. |
| Exhibit H | Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports 6625487 and 6625180, for the inspection of Conception dated Feb. 13, 2019. |
| Exhibit I | Excerpts of the U.S. Coast Guard Maritime Commerce Strategic Outlook, October 2018. |
| Exhibit J | Excerpts of the U.S. Coast Guard Strategic Plan 2018-2022. |

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant United States of America moves to dismiss the Complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), 12(h)(3); Order granting leave to file motion to dismiss, ECF 82.

## INTRODUCTION

This case arises from a fire aboard the dive boat *Conception*, which was a 75-foot, wood-and-fiberglass passenger vessel that docked in Santa Barbara Harbor. During the early morning hours of September 2, 2019, a fire broke out while the boat was anchored off Santa Cruz Island. The fire, which engulfed the boat and led to its sinking, tragically resulted in the deaths of 34 people sleeping below deck. Only the captain and four other crewmembers survived.

Much litigation followed. The United States brought criminal charges against the captain of the vessel, Jerry Boylan. Following a ten-day trial, the jury found him guilty of "seaman's manslaughter," and the court sentenced him to four years in prison. Plaintiffs, the personal representatives of the decedents, filed a lawsuit in state court, suing 72 named defendants, including the vessel's owners, vessel repair entities, and numerous manufacturers of cell phones, cameras, lights, dive gear, and other battery-powered devices brought onto the vessel by passengers. In that state-court case, Plaintiffs allege that the *Conception* burned because of "a lithium-fueled fire that was sparked and/or critically accelerated by" these devices.[1] The vessel owner also filed a lawsuit seeking to limit its liability, but that action in this Court is stayed while the state court claims proceed against the other entities.[2]

In the present lawsuit, the United States is the sole defendant. No federal employee was present on *Conception* at the time of the fire or was otherwise

---

[1] *See* Second Amended Master Complaint, ¶ 48, *Nancy Fiedler, et al. v. Truth Aquatics, et al.,* Case No. 21STCV08121, (Cal. Super. Ct. Aug. 31, 2022).

[2] *See* Order, ECF 179, at ¶ 2, *Matter of Truth Aquatics, Inc.*, Case No. 2:19-CV-07693 PA (MRWx) (C.D. Cal. Jan. 28, 2021).

1   involved in the voyage. Rather, the allegations are directed exclusively at the

2   regulatory oversight activities of the U.S. Coast Guard. In this oversight role, the

3   Coast Guard promotes safety in the maritime industry in numerous ways, such as by

4   promulgating vessel safety standards, conducting vessel inspections, investigating

5   accidents, engaging in education efforts, and more.

6       This case specifically challenges the way in which the Coast Guard inspects

7   and certificates certain small passenger vessels. Plaintiffs challenge discretionary,

8   policy-based actions of the Coast Guard in administering maritime regulations over

9   this private maritime industry component. In essence, Plaintiffs allege that the vessel

10  owner violated safety regulations and the Coast Guard failed to catch this violation.

11  The discretionary function exception to the United States' waiver of sovereign

12  immunity bars this challenge to the Coast Guard's oversight role because Congress

13  did not intend to impose liability on the United States for the type of regulatory

14  enforcement activities at issue in this case. *See United States v. S.A. Empresa de*

15  *Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 821 (1984)

16  (discretionary function exception precluded suit against Federal Aviation

17  Administration for its alleged failure to catch a regulatory violation for a non-

18  complying waste receptacle where a fire started on the aircraft). The exception

19  precludes a suit challenging discretionary regulatory actions "even if the employee

20  abused that discretion." *Lam v. United States*, 979 F.3d 665, 675 (9th Cir. 2020). As

21  the Supreme Court stated in this seminal *Varig Airlines* decision, a regulatory agency

22  has a duty "to promote safety . . . not to insure it." 467 U.S. at 821.

23      Here, it was always the responsibility of *Conception*'s owners and operators

24  to comply with the required safety standards and to conduct safe maritime

25  operations. The Coast Guard's only role in this case relates to its function of

26  administering maritime safety laws, which is replete with discretionary, policy-

27  based judgments. The Coast Guard's regulatory oversight role does not make it

28  liable for a private party's violation of the regulatory scheme. Because the United

MEM. IN SUPPORT OF MOT. TO DISMISS        2        Case No.: 2:21-cv-07065-PA-MRW

States has not waived its sovereign immunity, the Court lacks subject matter jurisdiction.

## BACKGROUND

### I.  Fire and Sinking of Conception

These facts are taken from the First Amended Complaint. *See* ECF 49, ¶¶ 126-29. In the early morning hours of September 2, 2019, the *Conception*, a dive boat owned and operated by Truth Aquatics, Inc., sailed out of Santa Barbara on an overnight dive trip with thirty-three passengers and six crewmembers onboard. After a day of diving, the vessel anchored for the night off the Channel Islands. That night, a fire broke out somewhere on the vessel. By the time the crew, asleep in their bunks on the upper deck, were awakened, the fire was raging across the main deck. The captain abandoned ship, jumping overboard to safety, and directed his crew to follow suit. Thirty-four people—all thirty-three passengers and one crewmember—were trapped in the bunk room directly below the fire. The vessel burned to the waterline before the remaining hull sank. All thirty-four persons aboard perished.

### II.  Procedural History

Plaintiffs filed an Amended Complaint against the United States for wrongful death and survival damages under the Suits in Admiralty Act, 46 U.S.C.A. § 30901, arising out of this marine casualty. In essence, Plaintiffs allege that the Coast Guard was negligent in "[i]gnoring, disregarding, and failing to abide by" applicable "procedures, protocols, and checklists" and "supplemental publications" when inspecting the *Conception.* Am. Compl. ¶ 132. In turn, they allege that this negligence allowed the *Conception* to operate "even though her electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs" violated the applicable "procedures, protocols, and checklists." *Id.* Plaintiffs focused in discovery on Coast Guard regulations regarding trash can receptacles and appear to be pursuing the theory that the fire started in a trash can onboard the vessel.

MEM. IN SUPPORT OF MOT. TO DISMISS            3            Case No.: 2:21-cv-07065-PA-MRW

The Court stayed this case, but it allowed limited discovery regarding the discretionary function exception and for this dispositive motion to be filed before proceeding, if necessary, on the merits of this case. *See, e.g.*, ECF Nos. 70, 73, 82. During discovery, the United States propounded interrogatories to Plaintiffs requesting that they identify all mandatory duties they contend the Coast Guard violated and that they state with specificity the facts upon which they based their allegation that the Coast Guard acted negligently in certifying and authorizing Conception to operate. The United States served these interrogatories on Plaintiffs on February 9, 2023, and discovery closed on May 26, 2023, without a response from Plaintiffs.

Just recently, nearly a year after discovery closed, Plaintiffs responded to the government's discovery by identifying thousands of pages of documents, the majority of which are documents produced in their state court action to which the United States is not privy, including deposition transcripts taken of witnesses in that action. Plaintiffs also identified transcripts of trial testimony given in Captain Boylan's criminal trial. Should Plaintiffs attempt to rely on their discovery responses in their opposition to this motion, the United States reserves its right to move to exclude any such evidence, or seek other relief.

### III.   Statutory and Regulatory Background

#### A.   Coast Guard Statutes and Shipping Statutes

Congress tasks the Coast Guard with eleven missions in areas of defense, homeland security, law enforcement, environmental protection, and marine safety. 6 U.S.C. § 468. The Coast Guard's grant of authority is found in Title 14 of the U.S. Code. Congress charges the Coast Guard with promoting maritime safety, directing it to "promulgate and enforce regulations for the promotion of safety of life and property" at sea. 14 U.S.C. § 102(3). Congress granted the Secretary of the Coast Guard general powers to "do any and all things necessary to carry out the purposes

1  of this title," 14 U.S.C. § 501, and specific powers to "promulgate such regulations
2  and orders as he deems appropriate to carry out the provisions of this title or any
3  other law applicable to the Coast Guard." 14 U.S.C. § 503. Some of the ways in
4  which the Coast Guard works to promote marine safety include promulgating vessel
5  safety standards, 14 U.S.C. § 503, as well as inspecting vessels, investigating marine
6  accidents, licensing and certificating merchant mariners, documenting and
7  numbering vessels, creating and executing boating safety programs, administering
8  navigation rules, administering aids to navigation, and more. 14 U.S.C. § 504(c).

9
10  Shipping is a heavily regulated industry. Over a 200-year period, Congress
11  has enacted many laws applicable to the shipping industry, now gathered at Title 46
12  of the U.S. Code. Two of Congress's purposes in enacting Title 46 were to "make
13  maritime safety and seaman protection law easier for the Coast Guard to administer,
14  [and] to make it less cumbersome for the maritime community to use." H.R. Rep.
15  No. 338, 98th Cong., 1st Sess. 113 (1983), reprinted in 1983 U.S.C.C.A.N. 924, 925.
16  The Coast Guard "administers" these shipping laws, while the maritime industry "is
17  governed by them." *Id.*

18  In executing its regulatory authority, the Coast Guard balances competing
19  policy goals, as Congress further instructed the Coast Guard to "interpret regulations
20  and standards under this subtitle . . . to avoid disruption and undue expense to the
21  industry." 46 U.S.C. § 3305(d)(1).

22  **B.    Small Passenger Vessel Regulations**

23  Under the statutory authority discussed above, the Coast Guard promulgates
24  vessel regulations in different statutory categories, such as tank vessels, towing
25  vessels, cargo vessels, and the like. *See* 46 U.S.C. § 3301(8). The Coast Guard's
26  regulations for small passenger vessels are found at 46 C.F.R. Subchapter T, 46
27  C.F.R. §§ 175.100 to 185.910. Subchapter T defines small passenger vessels as those
28  below specified tonnage and passenger thresholds. 46 C.F.R. § 175.110(a) (Jan. 10,

1   1996); *see also* 46 U.S.C. § 2101(31), (47) (distinguishing "small passenger vessel"
2   from other types of "passenger vessel"). Such vessels are often called "T-boats."

3       Subchapter T is directed at vessel owners and operators and places the duty
4   on the operators to comply with these regulations and make their vessels ready for
5   Coast Guard inspection. *E.g.*, 46 C.F.R. § 176.402(c); § 176.810(a) (Jan. 10, 1996).
6   To carry passengers for hire, a T-boat must have a Coast Guard Certificate of
7   Inspection ("COI"). 46 C.F.R. § 176.100(a) (Jan. 10, 1996). To receive a COI, a
8   vessel must undergo an initial inspection by the Coast Guard. 46 C.F.R. §§ 176.400-
9   176.402 (Jan. 10, 1996). After five years, a vessel must be reinspected to renew its
10  COI, via what is called a "five-year" or "COI" inspection. 46 C.F.R. § 176.404 (Jan.
11  10, 1996). These inspections are required by statute. 46 U.S.C § 3307(2). Further,
12  by regulation, the Coast Guard requires T-boats to undergo an annual spot-check
13  inspection. 46 C.F.R § 176.500(b) (Jan. 10, 1996). Separately, a T-boat must also
14  have its hull inspected periodically. 46 C.F.R. § 176.600(c) (Jan. 10, 1996).

15      Vessel owners are advised that the Coast Guard inspects a vessel to determine
16  its "compliance with the standards required by" the regulations in Subchapter T. 46
17  C.F.R. § 176.800(a) (Jan. 10, 1996). 46 C.F.R. Part 176 Subpart H identifies the
18  areas and systems that may be inspected, including the vessel's construction and
19  arrangement, operation, and various equipment and systems. *See* 46 C.F.R. §§
20  176.800-176.840. The regulations place the duty to comply with these standards on
21  vessel owners and operators. 46 C.F.R. §§ 176.402(c), 176.404 (Jan. 10, 1996). The
22  remaining Parts, 177 to 185, are the substantive standards for these categories and
23  systems, *i.e.*, the standards for which the Coast Guard inspects to check for
24  compliance. 46 C.F.R. Parts 177-85.

25      However, these substantive standards do not apply equally to all T-boats. In
26  1996, the Coast Guard revised Subchapter T, adopting "New T" regulations that took
27  effect March 11, 1996. Vessels that existed before 1996 are known as "Old T"
28  vessels and are generally allowed to follow the previous requirements. The New T

MEM. IN SUPPORT OF MOT. TO DISMISS        6        Case No.: 2:21-cv-07065-PA-MRW

requirements apply to "new vessel[s]" but not "existing vessel[s]"; rather, "an existing [Old T] vessel must comply with the construction and arrangement regulations that were applicable to the vessel on March 10, 1996 . . . ." 46 C.F.R. § 177.115(a) (Jan. 10, 1996); *see id.* § 175.400 (defining "existing vessel" as built before that date). "[A]s an alternative," however, "existing [Old T] vessel[s] may comply with the regulations in this part [New T]." *See, e.g.*, § 177.115(a). Because of this "grandfathering" allowance, the substantive requirements that apply to Old T vessels are in the version of Subchapter T that was current just before the 1996 adoption of New T.[3] *See* 46 C.F.R. §§ 175.01-1–185.30-30 (1995). This version of Subchapter T is no longer codified in the current C.F.R., but its provisions remain the applicable requirements for Old T vessels. As discussed more fully below, the *Conception* is an Old T vessel.

### C.    Marine Safety Manual, Other Guides, and Local Practice

Subchapter T sets the standards for T-boat construction, operation, and equipment; these are the "requirements," with which a vessel must comply in order to carry passengers for hire. Coast Guard inspectors reference the regulations when checking a vessel, however, it is the vessel's responsibility to follow requirements, regardless of whether an inspector spots a violation. In other words, the regulations impose mandates on vessels, not on the Coast Guard inspectors to flag each and every violation.

Internal guidance for Coast Guard inspectors is found in the Marine Safety Manual (the "Manual"), which provides "information and guidance" on the

---

[3] Every substantive Part in Subchapter T makes an allowance for "existing vessel[s]," with only limited exceptions where grandfathering is not allowed. *See* 46 C.F.R. § 175.112; *see, e.g.* 45 C.F.R. § 183.115(a) (specifying two exceptions to grandfathering for electrical standards). Each Part also allows that The New T regulations also allow Old T vessels to repair or replace existing equipment without losing their grandfathered status. *See*, *e.g.*, 46 C.F.R. 182.115(b).

MEM. IN SUPPORT OF MOT. TO DISMISS          7          Case No.: 2:21-cv-07065-PA-MRW

1  inspection regulations for inspectors. Ex. A, Marine Safety Manual Vol. 2 at A1-13.
2  While the Manual outlines general parameters for inspectors and inspections, it does
3  not prescribe any mandatory, step-by-step procedures inspectors must follow on
4  every inspection. Ex. B, Hodgdon Dep. 103:7:105:7 (the Manual "is used as
5  guidance" and allows inspectors to make "reasonable, discretionary decisions on
6  case-by-case situations"), 226:21-229:16 (inspectors have discretion in how they
7  determine compliance with particular requirements). The Manual provides policy
8  and guidance on how to conduct vessel inspections, not specific mandates, which
9  leaves inspectors with discretion in conducting vessel inspections. The Manual states
10 that it "should be used as a guide" "without undue hampering of independent action
11 and judgment by marine safety personnel." Ex. C, Manual Vol. 1 at 1-2. The Manual
12 calls for inspectors to use their own judgment, stating that its guidance is "no
13 substitute for experience and sound judgment to ensure that good marine practice is
14 being followed." Ex. A, Manual Vol. 2 at A1-13.

15   The Coast Guard also provides inspectors with additional guidance, including
16 the T-Boat Inspection Book, known as the CG-840-TI or the 840 book. Ex. D, CG-
17 840. This book and other job aids are collections of Subchapter T regulations that
18 inspectors may use, but do not mandate a specific course of conduct. The 840 book
19 notes that the "[r]eferences given are only general guides" and that "[n]ot all items
20 in this book are applicable to all vessels." Ex. D, CG-840 at 4. Like the Manual itself,
21 these checklists and job aids are just that: guides; there are no policies requiring that
22 inspectors use any of these guides, nor if they do, any requirement that they check
23 all the boxes or otherwise follow them line-by-line. *See* Ex. B, Hodgdon Dep.
24 111:23-112:9, 115:7-14, 116:8-19, 166:17-167:2, 177:16-21, 179:18-22. According
25 to the Manual, an inspection is intended to reflect a vessel's "reasonable, probable
26 compliance" with the minimum safety standards. Ex. A, Manual Vol. 2 at A1-14.
27 The Manual states that the inspector must be "reasonably satisfied" that the vessel's
28 "degree of compliance with statutes, regulations, and the terms of its [COI] warrants

1   continued possession of the COI." *Id*. at B2-1. The Manual emphasizes inspectors'
2   broad discretion. In inspecting vessels, "[t]he inspector should vary the degree of
3   attention to individual items as circumstances require." *Id*. at B2-1. "The inspector
4   has great latitude in the scope of these inspections, which is based on his or her
5   evaluation of the vessel's overall condition." *Id*.

6      One reason for this level of discretion in vessel inspection is the wide variation
7   in vessels and their operational needs. Inspectors evaluate each vessel individually,
8   in order to realistically assess its safety given its individual circumstances. "[I]n
9   determining inspection requirements and procedures," "[t]he overall safety of a
10  vessel and its operating conditions, such as route, hours of operation, and type of
11  operation, should be considered in determining inspection requirements." Ex. A,
12  Manual Vol. 2 at A1-14–A1-15. In cautioning inspectors to avoid "unreasonable
13  requirements," the Manual allows for "requirements [to] vary for similar vessels
14  because of different proposed routes or service and other circumstances." Ex. C,
15  Manual Vol. 1 at 3-13. "The steps required in such cases will naturally vary in each
16  case." *Id*. at 3-24.

17     The Coast Guard's intent to treat each vessel individually applies to the wide
18  variety of T-boats it inspects. T-boat inspections "require a realistic appraisal of the
19  operational needs of this industry." Ex. A, Manual Vol. 2 at B4-1. Subchapter T
20  covers a wide variety of vessel types and operations, ranging from small launches
21  and water taxis making short trips within a single harbor to larger vessels on multi-
22  day voyages in the open ocean and ferries carrying up to 150 passengers. For this
23  reason, inspectors should be aware of "regulations that seem applicable [but] are
24  actually inappropriate for the situation or not in the best interest of overall safety."
25  *Id.* at A2-6. Inspectors must "take care to ensure that each regulation being applied
26  is relevant to the vessel and situation." *Id*. The Manual also permits "local practices"
27  that are "safe and appropriate for local conditions, even if they do not conform
28  specifically to regulations." *Id.* at A2-15. Discretion to individualize inspections in

1  this way—instead of mandating a single, uniform inspection procedure on all
2  vessels—enables the Coast Guard to better promote vessel safety.

3        The Manual also reflects a second reason for this discretion: the competing
4  goals of promoting safety and facilitating commercial operations. Ex. A, Manual
5  Vol. 2 at A1-15. For example, the Officer in Charge, Marine Inspection (OCMI) is
6  the senior field officer with final authority to certificate a vessel. The Manual
7  instructs OCMIs to "avoid unreasonable requirements and arbitrary or unreasonable
8  decisions in the discharge of the marine safety programs." Ex. C, Manual Vol. 1 at
9  3-13. This is because "[i]t is not the Coast Guard's intent to place unnecessary
10 economic and operational burdens upon the maritime industry." Ex. A, Manual Vol.
11 2 at A1-14–A1-15. Given that OCMIs should consider that "requirements may vary
12 for similar vessels because of different proposed routes or service and other
13 circumstances," they should "act to promote a reasonable level of safety and to
14 minimize unnecessary expenses on the part of vessel and facility owners and
15 operators." Ex. C, Manual Vol. 1 at 3-13. For this reason, inspectors should use
16 "[s]ound judgment and understanding . . . so that appropriate safety standards are
17 maintained without imposing unnecessary or unreasonable standards on vessel and
18 facility owners, operators, and crews." *Id.* at 3-24. Inspectors should be "capable of
19 balanced decisions with consideration of how they affect commerce, public safety,
20 and environmental risk." Ex. A, Manual Vol. 2 at A7-4.

21       Turning to local practice, COIs are issued by a Coast Guard unit with OCMI
22 authority. Inspectors from Coast Guard Marine Safety Detachment Santa Barbara
23 inspect vessels in Santa Barbara, including *Conception*. Santa Barbara is a
24 subordinate unit of Coast Guard Sector Los Angeles/Long Beach, and reports to the
25 OCMI in Los Angeles. Santa Barbara inspectors inspect the vessels, and the OCMI
26 at Los Angeles approves the COIs. For annual spot-checks, inspectors from Santa
27 Barbara have authority to endorse the existing COI, allowing the vessel to continue
28

operating. Ex. B, Hodgdon Dep. 90:17-20, 174:19-23; *see also* Ex. E. Price Larson Dep. 107:8-18.

During an inspection of a vessel, an inspector creates an Activity Summary Report in the electronic database system, which serves as the Coast Guard's official record of the inspection. Ex. E, Price Larson Dep. 89:1-17. In documenting an inspection, however, an inspector is not required to "check the[] boxes" on the report, nor include details of all items inspected. *Id.* 88:2-93:3. Rather, the report merely reflects when and where a vessel was inspected and generally what systems were inspected, relying on inspectors' training, experience, and judgment for how to inspect those systems. *Id.* 91:6-92:8. If an inspector finds a deficiency, greater detail is added to document that deficiency.

**IV.    Conception Certification and Inspections**

*Conception* was an Old T vessel. As it was built in 1981, its operator could choose to comply with either Old T or New T regulations. Ex. F, COI; Ex. B, Hodgdon Dep. 84:13-17; Ex. G, Caputo Dep. 92:9-22. The Coast Guard most recently issued a COI to *Conception* on November 14, 2014. Ex. F, COI. On the face of *Conception*'s COI is a "condition of operation" requiring Conception to have a member of the vessel's crew designated as a "roving patrol" at all times when the passengers' bunks are occupied, like they were on the night of the casualty. This requirement is also imposed on all T-boat operators in Subchapter T. 46 C.F.R. § 185.410 (Jan. 10, 1996).

In February 2019, about seven months before the fire, *Conception* underwent an annual (spot check) inspection and hull exam. Ex. H, Activity Summary Reports. Coast Guard Chief Warrant Officer Daniel Hager, an experienced T-boat inspector, performed these inspections. *Id.* The first day of the inspection was on February 13, 2019, while the vessel was in dry dock. *Id.* at 2, 5. Mr. Hager met with Captain Jerry Boylan that day to discuss the scope of the inspection. *Id.* The second day of the

1  inspection was on March 1, 2019, when Mr. Hager visited the vessel while moored
2  in Santa Barbara Harbor when he completed the post-drydock check ride. *Id.*

3       Following the inspection, Mr. Hager endorsed the COI allowing *Conception*
4  to continue operating, having determined the vessel to be reasonably safe and that,
5  "[i]n [his] opinion, the vessel is fit for route and service as specified on the current
6  COI." *Id.*

7       On the night of the casualty, however, Captain Boylan, the master of the
8  vessel, failed to comply with the vessel's condition of operation that he designate a
9  crewmember as a roving patrol when the passenger bunks were occupied. He was
10  convicted of violating 18 U.S.C. § 1115 ("seaman's manslaughter"). *United States*
11  *v. Jerry Boylan*, Case No. 2:22-cr-004820-GW (C.D. Cal.); *see also id.* Indictment
12  (Oct. 18, 2022) (failure to maintain a night watch or roving patrol, despite his duty
13  to do so set forth in the Certificate of Inspection posted onboard the *P/V Conception*
14  and 46 C.F.R. § 185.410).

15  //
16  //
17  //

18
19
20
21
22
23
24
25
26
27
28

MEM. IN SUPPORT OF MOT. TO DISMISS           12                Case No.: 2:21-cv-07065-PA-MRW

**ER 540**

**DISCUSSION**

## I.  Legal Standard

The United States moves to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), 12(h)(3). Federal courts are courts of limited subject matter jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and a Rule 12(b)(1) challenge to the Court's subject matter jurisdiction "may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, as the United States brings here, the court may go beyond the complaint and "may consider facts and need not assume the truthfulness of the complaint." *Americopters, LLC v. FAA*, 441 F.3d 726, 732 n.4 (9th Cir. 2006). "The plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject matter jurisdiction has been met." *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028-29 (9th Cir. 2023). Furthermore, "the existence of disputed material facts will not preclude" dismissal; rather, "the trial court evaluat[es] for itself the merits of the jurisdictional claims," and may "resolv[e] factual disputes if necessary." *Id*. As such, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air,* 373 F.3d at 1039. [4]

## II.  The Court Lacks Subject Matter Jurisdiction Because The United States Has Not Waived Sovereign Immunity For Discretionary Functions.

The United States is immune from suit unless it expressly waives its sovereign immunity. Absent an unequivocal waiver, federal courts lack subject matter

---

[4] The United States notes that this case can be resolved on a facial attack alone: Plaintiffs' complaint (Am. Compl. ¶ 132a) alleges that the United States had discretion in the acts or omissions alleged; by definition, there is no cause of action for "abus[ing]" discretionary actions protected by the discretionary function exception. *See Lam v. United States,* 979 F.3d 665, 673 (9th Cir. 2020).

1    jurisdiction. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Plaintiffs claim that

2    the applicable waiver of sovereign immunity here is the Suits in Admiralty Act, 46

3    U.S.C. § 30903, however, this waiver does not extend to claims based on

4    discretionary, policy-based conduct of a federal agency or employee. *United States*

5    *v. Gaubert*, 499 U.S. 315 (1991). The exception, explicitly stated in the Federal Tort

6    Claims Act, 28 U.S.C. § 2680(a), is implied in the Suits in Admiralty Act. *Earles v.*

7    *United States*, 935 F.2d 1028, 1032 (9th Cir. 1991). Under the discretionary function

8    exception, courts lack subject matter jurisdiction over tort claims challenging the

9    performance of discretionary functions by an employee of the United States. The

10   exception is intended to protect discretionary decisions that, if exposed to tort

11   liability, could "seriously handicap efficient government operations." *Varig Airlines*,

12   467 U.S. at 814. It reflects Congress's intent "to prevent judicial second guessing of

13   legislative and administrative decisions grounded in social, economic, and political

14   policy . . . ." *Gaubert*, 499 U.S. at 323 (citing *Varig Airlines*, 467 U.S. at 813). The

15   core purpose of the exception is to protect precisely the kind of regulatory oversight

16   conduct at issue here. *Varig Airlines*, 467 U.S. at 809. The United States has the

17   burden to prove this defense. *Lam v. United States*, 979 F.3d 665, 673 (9th Cir. 2020)

18       Negligence is not considered in a discretionary function analysis. The

19   exception applies "whether or not the discretion involved be abused." *Lam*, 979 F.3d

20   at 672 (quoting 28 U.S.C. § 2680(a)). As the Ninth Circuit further explained, "even

21   if the employee's discretionary act is negligent, the district court should dismiss

22   plaintiff's case." *Id.* "[T]he Supreme Court repeatedly states that negligence is not

23   an issue" in the discretionary function analysis because the "degree of care used" in

24   discretionary conduct is "irrelevant to the application of that doctrine." *Id.* (quoting

25   *Dalehite v. United States*, 346 U.S. 15, 45-46 (1953)). The only inquiry is "whether

26   the employee's acts were discretionary"; the Court need only "examine the

27   applicable government policies to see if they authorize or imply discretion or if they

28   mandate specific duties," not how the employee carried out those policies. *Id.*

To decide a question of discretionary function, the Court must first define the challenged conduct. *Gaubert*, 499 U.S. at 322. Next, the Court applies a two-step analysis, determining: (1) whether the challenged act involved an element of judgment or choice, and (2) whether the act is susceptible to policy considerations – *i.e.*, was the conduct the type that the exception was designed to shield. *Lam*, 979 F.3d at 674 (quoting *Berkovitz v. United States*, 486 U.S. 531 (1988)).

The first prong is met unless "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. Even if a statute, regulation, or policy contains a mandate to do something, if the implementation of that mandate involves judgment or choice, the discretion element is satisfied. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174-75 (9th Cir. 2002). With respect to the second prong, the focus of the court's inquiry is on the "nature of the actions taken." *Gonzalez v. United States*, 814 F.3d 1022, 1027 (9th Cir. 2016). "[T]o be protected from suit, the challenged decision need not *actually* be grounded in policy considerations, so long as it is, by its nature susceptible to policy analysis." *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (citation omitted).

Many courts have ruled that the United States has not waived its immunity for suits arising from its regulatory oversight of a transportation industry. *See, e.g.*, *Varig Airlines*, 467 U.S. at 820 (FAA's regulatory regime "accommodates the goal of air transportation safety and the reality of finite agency resources" such that courts should not second-guess its "political, social, and economic judgments"). In that case, the Supreme Court ruled that allegations that government inspectors negligently certified an airliner by failing to inspect a trash can that did not comply with safety regulations and that later caught fire fell "squarely within the discretionary function exception." *Varig Airlines*, 467 U.S. at 820. The Court reasoned that the FAA's regulatory oversight role did not make the FAA an insurer of safe flight: "the duty to ensure that an aircraft conforms to FAA safety regulations

lies with the manufacturer and operator." *Id.* at 816. The agency's role of "spot check[ing]" operators' compliance remained discretionary and therefore outside the United States' waiver of sovereign immunity. *Id.* at 816-17.

Like the regulatory regime at issue in *Varig Airlines,* the Coast Guard's oversight of small passenger vessels places the duty to comply with safety standards squarely on owners and operators. *See* 46 C.F.R. § 176.402(c). As such, courts have barred actions arising from similar allegations that the Coast Guard negligently conducted vessel inspections by failing to identify safety hazards. *See, e.g.*, *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 514, 515 (7th Cir. 1995) (Coast Guard's inspection process involves judgments that balance "considerations of safety and economics with reference to the needs and uses of the particular vessel being inspected"). The reasoning of these cases, as applied to the present facts, shows the discretionary function exception bars this lawsuit.

### A. The Challenged Conduct is the Coast Guard's Inspection and Certification Policies in their Totality.

The threshold inquiry in the discretionary function analysis is defining exactly what conduct is at issue. *Gaubert*, 499 U.S. at 322. This is the "crucial first step." *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012). The Court may look to the complaint, but it need not simply accept the plaintiff's characterizations. *See Johnson v. United States*, 547 F.2d 688, 691-92 (D.C. Cir. 1976) ("[A] litigant cannot circumvent the Act by the simple expedient of drafting in terms of negligence a complaint that in reality is a claim as to which the United States remains immunized.").

The challenged action is not to be so narrowly defined as to focus only on the allegedly negligent act, as this approach would collapse the discretionary function analysis into "a question of whether the government was negligent," rendering the exception meaningless. *Foster Logging, Inc. v. United States*, 973 F.3d 1152, 1166 (11th Cir. 2020). For example, in a case in the Eleventh Circuit, the plaintiffs sued

1  the United States after a tree fell on their car in a national park. *Autery v. United*
2  *States*, 992 F.2d 1523, 1527 (11th Cir. 1993). The plaintiffs alleged that an agency's
3  site management policy imposed a mandatory requirement to "identify and eliminate
4  known hazardous trees." *Id.* at 1527. The district court found the United States
5  negligent and awarded damages to the plaintiffs; however, the circuit court reversed,
6  holding that the court lacked subject matter jurisdiction under the discretionary
7  function exception. The court first considered "exactly what conduct is at issue" and
8  ruled that the inquiry was not whether the Park Service was required to remove
9  hazardous trees, but whether park personnel had discretion in executing the tree
10  inspection and removal plan. *Id.*

11      In *Lam*, plaintiffs also challenged an agency's management of hazards in a
12  park after they were injured by a falling tree. 979 F.3d at 676. The Ninth Circuit held
13  that the proper scope of the inquiry was not the isolated act regarding the tree in
14  question, but rather to "look at all the relevant policies in their totality and how they
15  fit together to determine if they are discretionary or mandatory." *Id.* Thus, one
16  specific policy requiring park employees to inspect and remove hazardous trees did
17  not defeat the exception because the policy, as a whole, allowed discretion in
18  managing hazards, including how to inspect and identify such trees in the first place.
19  *Id.* at 678-68.

20      The Seventh Circuit in *Cassens v. St. Louis River Cruise Lines, Inc.*, defined
21  the scope of the challenged conduct in a case involving Coast Guard vessel
22  inspections, like this one. 44 F.3d 508, 515 (7th Cir. 1995). There, the court
23  considered a claim that the Coast Guard was negligent in inspecting and certificating
24  a passenger vessel, even though it allegedly lacked a handrail required by
25  regulations. *Id.* The court rejected the plaintiffs' framing of the issue as one of
26  whether the inspector had discretion to ignore or fail to notice the missing handrail.
27  Rather, the court held that the issue was whether the Coast Guard "was required by
28  statute or regulation to follow a specific course of action when inspecting the ship

1   as a whole," or whether it had "the discretion to formulate and conduct a specific
2   inspection procedure." *Id*.; *see also Gaubert*, 499 U.S. at 324-25, 329, 331-32
3   (purpose of controlling statute defines challenged conduct).

4       In the present case, Plaintiffs challenge the Coast Guard's policies for
5   certificating and inspecting passenger vessels in furtherance of the marine safety
6   program. Plaintiffs allege that the Coast Guard negligently inspected *Conception*,
7   negligently certificated it, and negligently authorized it to operate as a small
8   passenger vessel, even though the vessel's systems allegedly violated safety
9   regulations. ECF 49, Am. Compl. ¶ 132. Implicit in this allegation is that Plaintiffs
10  are framing the challenged conduct as Mr. Hager's alleged failure to spot a
11  regulatory violation in his inspection of the vessel six months before the fire—just
12  as the plaintiffs in *Autery* alleged that park personnel failed to spot a hazardous tree
13  or the plaintiffs in *Cassens* alleged that the Coast Guard inspector failed to spot a
14  missing handrail. However, as in those cases, Plaintiffs cannot define the relevant
15  conduct so narrowly, for purposes of the discretionary function analysis. Rather, the
16  question here is whether the statutes, regulations, and policies that establish the
17  maritime safety program allowed Coast Guard inspectors discretion to determine the
18  scope of their inspections and whether to issue *Conception* a Certificate of
19  Inspection. As we demonstrate below, they do.

20   **B.    Prong One: The Controlling Statutes, Regulations, and Policies**
21       **Vest the Coast Guard with Discretion.**

22       At the first prong, the Court examines whether the challenged conduct
23  "involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. This prong
24  focuses only on the statutes, regulations, or official agency policies governing the
25  general conduct at issue, not how individual employees carried out those acts. All
26  that matters at this prong is "that there was, in fact, discretion." *Lam*, 979 F.3d at
27  672 n.3. The Court considers "all the relevant policies in their totality and how they
28

fit together to determine if they are discretionary or mandatory." *Lam*, 979 F.3d at 676; *see also Berkowitz*, 486 U.S. at 539.

### 1. The Statutes, Regulations, and Policies Demonstrate the Coast Guard's Discretion in Conducting Inspections.

The relevant statutes establish that Congress intended to vest discretion in the Coast Guard to establish and implement a program for inspecting and certificating small passenger vessels in furtherance of its maritime safety program. Both Title 14 and Title 46 of the U.S. Code establish that Congress granted broad authority to the Coast Guard to create a maritime safety program that also satisfies competing policy interests. Neither the regulations nor Coast Guard guidance divest Coast Guard inspectors of their discretion to determine the scope of their inspections and whether to issue Certificates of Inspection.

Plaintiffs fail to identify a specific mandate requiring the Coast Guard to conduct its vessel inspections in a particular way.[5] Rather, Plaintiffs simply allege the vessel was in violation of various safety regulations and the Coast Guard failed to catch it. Yet the regulations impose a duty of compliance on the *vessels*, not on the Coast Guard. "The owner or managing operator of a vessel shall ensure that the vessel complies with the laws and regulations applicable to the vessel and that the vessel is otherwise satisfactory for the intended service." 46 C.F.R. § 176.402(c) (Jan. 10, 1996). Pursuant to this duty, the Coast Guard relies on "the trust [it] place[s] in a licensed master" to follow the regulations, as well as "the responsibility of the master to report whether or not they can in fact comply with those requirements." Ex. G, Caputo Dep. 114:1-11; *see also* Ex. E, Price Larson Dep. 95:16-97:11 (Coast Guard has to "trust that the licensed mariner is going to operate the vessel within the

---

[5] Plaintiffs implicitly acknowledge the Coast Guard's discretion in the Amended Complaint, alleging that Coast Guard employees "[a]bused their discretion." ECF 49, Am. Compl. ¶ 132. The discretionary function exception applies even if the discretion was "abused." *Lam*, 979 F.3d at 672.

1    confines of" the regulations and "the bounds of their license"). The vessel inspection

2    statute expressly requires a vessel's master and other licensed mariners to assist

3    Coast Guard inspections by "point[ing] out defects and imperfections known to the

4    individual in matters subject to regulation and inspection." 46 U.S.C. § 3315(a).

5          Both the statute and the regulations are "devoid of specific directives," and

6    neither delineate the "specific steps for inspectors to follow in conducting their

7    inspection." *Cassens*, 44 F.3d at 513-14. The circuit court in *Cassens* found it

8    irrelevant that regulations prescribe hundreds of highly specific requirements with

9    which vessels must comply: "the existence of regulatory requirements, however

10    detailed, is of no import if the means of determining compliance—*i.e.*, the inspection

11    procedure itself—involves the type of judgment protected by the discretionary

12    function exception." 44 F.3d at 513.

13          Similarly, in *Smith v. U.S. Coast Guard*, 220 F. Supp. 2d 275 (S.D.N.Y. 2002),

14    the plaintiffs were injured when a water taxi carrying twenty-seven persons capsized.

15    The plaintiffs sued the United States, alleging the Coast Guard negligently

16    certificated and inspected the vessel because the vessel failed to comply with certain

17    Subchapter T regulations. The district court granted the United States' motion to

18    dismiss for lack of subject matter jurisdiction under the discretionary function

19    exception. The court found that although Subchapter T imposes "highly detailed"

20    requirements for vessels, they "do not specify the means by which the Coast Guard

21    inspector is to determine compliance" with those regulations. *Id*. at 281.  While the

22    regulations and enabling statute require the Coast Guard to do some inspection

23    before issuing a COI, neither the statute nor the regulations "require the Coast Guard

24    to conduct specific tests or inspections prior to issuing a COI." *Id.* at 280-81 (citing

25    46 C.F.R. § 176.100 (Jan. 10, 1996), 46 C.F.R. §176.400(a) (Jan. 10, 1996), and 46

26    U.S.C. 3305(a)). Instead, they leave it "to the discretion of the Coast Guard inspector

27    to determine which inspections to conduct." *Id.* at 281 n.8. For this reason, the court

28    rejected the argument that Subchapter T "required" an inspector "to determine

MEM. IN SUPPORT OF MOT. TO DISMISS    20    Case No.: 2:21-cv-07065-PA-MRW

compliance with each of these regulations before issuing a COI," and thus the discretionary function exception barred the plaintiffs' claim that the Coast Guard was negligent for certificating a vessel that failed to comply with the regulations. *Id. Accord In re Ocean Ranger Sinking Off Newfoundland on Feb. 15, 1982*, 632 F. Supp. 72, 75-76 (E.D. La. 1985) (ruling that claims of Coast Guard negligence in inspection and certification of vessel fell within the discretionary function exception as defined by *Varig Airlines*).

The vessel inspection statutes describe the scope and standards of inspections in general terms only. 46 U.S.C. § 3307(1), (2). Inspections are intended to determine that a vessel is of a structure suitable for the service in which it is to be employed, is equipped with proper appliances for lifesaving, fire prevention, and firefighting, is in a condition to be operated with safety to life and property, and complies with applicable marine safety laws and regulations. 46 U.S.C. 3305(1). This statutory scheme leaves implementation to the Coast Guard's discretion.

The Coast Guard's regulations, in turn, vest discretion in individual inspectors. For example, "all parts of the vessel and its machinery and equipment *may be checked* to determine if the vessel is satisfactory in all respects for the service intended." 46 C.F.R. § 176.402(b) (emphasis added). "The initial inspection *may include* an inspection of" a number of specified systems and equipment. *Id.* § 176.402(c) (emphasis added). A five-year inspection "*normally includes* inspection and testing of the structure, machinery, equipment, and on a sailing vessel, rigging and sails." 46 C.F.R. § 176.404(a) (Jan. 10, 1996) (emphasis added).

The regulations add an annual inspection requirement on top of the five-year statutory requirement; these are "the same as the inspection for certification but in less detail," unless the inspector "finds deficiencies" or "a major change," in which case she "will conduct an inspection more detailed in scope." 46 C.F.R. § 176.500(b)(1)(ii) (Feb. 9, 2000). The regulation does not define how much "less detail" is permitted on an annual inspection, nor how much "more detail" it will

cover if problems are noted. *See generally Smith,* 220 F. Supp. 2d at 280-81 (citing 46 C.F.R. § 176.100 (Jan. 10, 1996), 46 C.F.R. §176.400(a) (Jan. 10, 1996), and 46 U.S.C. 3305(a)); *see also* Ex. B, Hodgdon Dep. 166:17-168:16; Ex. E, Price Larson Dep. 49:7-50:3. These regulations neither mandate any specific inspection procedures nor require inspectors to examine any or all of the many hundreds of standards Subchapter T imposes on vessels. The remainder of Subchapter T are those substantive standards for the vessels—those standards with which vessel owners must comply and which the Coast Guard may inspect.[6]

Additionally, as the *Smith* court found, the Subchapter T regulations and Coast Guard policies expressly allow Coast Guard inspectors to determine which of these substantive regulations they will impose and inspect on any given vessel. The Court's discretionary function analysis focuses on the Coast Guard's discretion to determine the scope of its inspections and whether to issue *Conception* a Certificate of Inspection, not whether *Conception* violated any particular regulatory standard. The purpose of vessel inspections is "not necessarily . . . to determine if there are deficiencies" as to every regulation, but "to determine the safety of the vessels overall." Ex. E, Price Larson Dep. 36:21-25. The Coast Guard has no duty to inspect each and every regulatory requirement before issuing a COI, but may decide which regulations to impose on any given vessel, including exercising discretion not to impose any given regulation. *Smith,* 220 F. Supp. 2d at 282 (citing 46 C.F.R. § 176.800 (b)); *see also* Ex. A, Manual Vol. 2 at A1-14, B2-1. A COI is neither a warranty nor guarantee that a vessel complies with every federal regulation – it merely attests to the "reasonable probability" that a vessel is in compliance with minimum safety standards at the time of the inspection. *Id.* A1-14.

---

[6] Part 176 Subpart H identifies the areas and systems that may be inspected, including the vessel's construction and arrangement, operation, and various equipment and systems. *See* 46 C.F.R. §§ 176.800-176.840. The remaining Parts, 177 to 185, are the substantive standards for these categories and systems, *i.e.*, the standards for which the Coast Guard inspects to check for compliance. *See* 46 C.F.R. Parts 177-85.

1      Coast Guard inspections are expressly premised on inspectors' discretion to
2  examine each vessel according to its individual circumstances. Part 176 allows that
3  "[i]n the application of inspection standards, due consideration must be given to the
4  hazards involved in the operation permitted by a vessel's Certificate of Inspection."
5  46 C.F.R. § 176.800 (b) (Jan. 10, 1996). The requirements the Coast Guard places
6  on a vessel "may vary in accordance with the vessel's area of operation or any other
7  operational restrictions or limitations." *Id*. Citing this section, the *Smith* court
8  dismissed an allegation suggesting that if a T-boat failed to comply with any
9  regulation, the Coast Guard was therefore negligent in certifying that vessel.
10  Simply put, Coast Guard "inspectors are given discretion to vary the application of
11  inspection standards." 220 F. Supp. 2d at 282 (citing 46 C.F.R § 176.800(b)). Rather
12  than mandating that inspectors examine each and every Subchapter T regulation, the
13  Manual gives inspectors "great latitude," empowering them to "vary the degree of
14  attention they give to individual items as circumstances require . . . based on his or
15  her evaluation on the vessel's overall condition." Ex. A, Manual Vol. 2 at B2-1; *see*
16  *also Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994) (The United States is
17  not "an insurer for every private party's violation of a federal regulatory scheme[.]").
18      This situation is thus similar to the facts in *Varig Airlines*, where an airliner
19  crashed following a fire that began in a trash receptacle. *Varig Airlines*, 467 U.S. at
20  814. The plaintiff argued that the FAA negligently certified the aircraft for
21  commercial use because the aircraft was in violation of a safety regulation requiring
22  that trash receptacles be made of fire-resistant materials and incorporate features for
23  containing possible fires. *Id.* at 801. The Supreme Court found the FAA's inspection
24  program—which involved a "spot check" of certain parts but not conducting a
25  comprehensive compliance review, *id.* at 818-19, to be discretionary even though
26  the record lacked evidence that the inspector actually checked the trash receptacle.
27  *See id.* at 814 ("From the records in these cases there is no indication that either the
28  Boeing 707 trash receptacle or the DeHavilland Dove cabin heater was actually

inspected or reviewed by an FAA inspector or representative."). The Court concluded that "the FAA's alleged negligence in failing to check certain specific items in the course of certificating a particular aircraft falls squarely within the discretionary function exception." *Id.* at 820.

That reasoning applies with equal force to Coast Guard vessel inspections. Though plaintiffs have focused on the safety regulations requiring vessels to use non-combustible materials for trash receptacles, nothing in Title 14, Title 49, Subchapter T, or any formal Coast Guard policy requires inspectors to focus specifically on those regulations, out of the many hundreds that the vessel also had to comply with. Rather, as with the FAA's "spot check" system at issue in *Varig Airlines*, inspectors have discretion to determine which specific regulations to focus on and what items to inspect.

> 2. To the Extent Individual Subchapter T Standards are Relevant, None Require the Coast Guard to Conduct its Vessel Inspection and Certification in a Particular Manner.

The Coast Guard's inspection policies and regulations in their totality allow ample discretion for inspectors to determine the scope and focus of their inspections. To the extent any individual Subchapter T regulation is relevant to the discretionary function question, none of those regulations defeat the exception here.

In their Complaint, Plaintiffs alleged the United States was liable because the Coast Guard negligently inspected and certificated the *Conception* even though the vessel's "electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs" allegedly violated the applicable "procedures, protocols, and checklists." Am. Compl. ¶ 132. In discovery on this issue, however, including in depositions of all six Coast Guard witnesses, Plaintiffs pursued a theory that the fire started in a trash

1   receptacle onboard the vessel[7] and so they focused on two regulations regarding fire
2   hazards and trash receptacles, 46 C.F.R. §§ 176.830(a) and 177.405(f). The former
3   directs vessel owners generally that "[a]t each inspection for certification and every
4   other vessel inspection, all unsafe practices, fire hazards, and other hazardous
5   situations must be corrected and all required guards and protective devices must be
6   in satisfactory condition." 46 C.F.R. § 176.830(a) (Jan. 10, 1996) The latter requires
7   that "[u]nless other means are provided to ensure that a potential waste receptacle
8   fire would be limited to the receptacle, waste receptacles must be constructed of
9   noncombustible materials with no openings in the sides or bottom." 46 C.F.R. §
10  177.405(f) (Jan. 10, 1996). Plaintiffs may point to mandatory-sounding language in
11  these regulations to suggest that they place a mandate on Coast Guard inspectors.
12  But these regulations (which an Old T vessel like the *Conception* was not obliged to
13  comply with) establish no mandatory course of conduct for an inspector. Neither
14  Congress, nor the Coast Guard, require that on any given inspection, let alone an
15  annual spot check, an inspector examine the vessel to ensure compliance with those
16  particular regulations out of the many hundreds that may apply to T-boats.

17      Not every plastic trash can—on an Old T vessel like *Conception*—is
18  necessarily a fire hazard within the meaning of § 176.830(a).[8] The Old T regulations
19
20  _____

21      [7] At other times, Plaintiffs have suggested a number of other theories of liability.
    In both this action and their state court product liability suit, Plaintiffs allege that the fire
22  was caused by lithium-ion batteries or other electrical equipment plugged in to the ship's
    outlets. *See* ECF 49, Pls.' First Am. Compl. ¶ 128; *see also* n.1, *supra*. This theory and
23  others various suggested by Plaintiffs in discovery all rely on the same faulty premise:
    that if a vessel failed to comply with any specific Subchapter T standard, the Coast Guard
24  must have been negligent in inspecting and certificating the vessel.
25
26      [8] To the extent Plaintiffs cite New T regulations, the New T standards were not
    mandatory for *Conception.* Neither § 177.405, nor § 176.830, are listed in Subchapter T
27  among the exceptions to the general allowance for grandfathering, which are expressly
    stated in each part. *See* 46 C.F.R. 175.112 (setting specific exceptions for existing Old-T
28

MEM. IN SUPPORT OF MOT. TO DISMISS        25        Case No.: 2:21-cv-07065-PA-MRW

that governed *Conception* regulate trash cans in certain locations, only. They require the vessel to provide "covered metal trash containers," in "areas located below the main deck." 46 C.F.R. § 177.30-7(d), (a) (Sep. 6, 1963). Old T regulations place no requirements on trash cans anywhere else; they do not prohibit the plastic trash cans Plaintiffs have suggested that *Conception* carried on her main deck and that they theorize may have been the source of the fire.

Further, under the grandfathering allowance, *Conception* could have chosen to comply with the New T trash can standard, § 177.405(f). This regulation similarly does not prohibit non-steel trash cans. It requires only that they be made of "noncombustible materials" *unless* "other means are provided" to limit a potential fire. 46 C.F.R. § 177.405(f) (Jan. 10, 1996). This is discretionary language: neither this section nor any other regulation specifies what may constitute acceptable "other means," leaving it up to the inspector's discretion whether a given trash can is a fire hazard in violation of the requirement.[9] For this reason, Coast Guard Commander Stephanie Hodgdon, the Division Chief of the Domestic Vessel Compliance Division at Coast Guard Headquarters, testified that the mere existence of a plastic trash can would not be an "obvious violation" of the New T regulation, because "the first part of the regulation says 'unless other means are provided.'" Ex. B, Hodgdon Dep. 232:7-233:8; *see also* Ex. G, Caputo Dep. 104:4-12.

For these reasons, there is no mandatory duty for an inspector to identify all plastic trash cans on a T-boat, nor to determine them to necessarily be fire hazards and require corrective action. Rather, an inspector would have discretion to observe a plastic trash can and not deem it a fire hazard or to simply not focus on trash cans

---

vessels in each part); *cf.* 46 C.F.R. 183.115(a), (b) (specifying two regulations under Part 183 that may not be grandfathered).

[9] "Noncombustible material" includes, *inter alia*, "any other standard specified by the Commandant," again leaving it to the discretion of the Coast Guard what is permissible in any given circumstance. 46 C.F.R. § 175.400 (Jan. 10, 1996).

1     in his inspection. Only if the inspector (1) specifically inspected a trash can, and (2)

2     determined it to be, in his discretion, a fire hazard, could he arguably have a

3     nondiscretionary duty under § 176.830(a) to require corrective action.[10]

4          The *Cassens* court discussed this very hypothetical, where an inspector

5     identifies an out-of-compliance hazard, but the inspector fails to require the vessel

6     to correct it; the court distinguished this from situations where, as apparently

7     happened here, the inspector simply does not inspect a particular requirement, or

8     where he inspects something, but fails to identify a potential violation. *Cassens*, 44

9     F.3d at 515; *see also Gonzalez v. United* States, 851 F.3d 538, 546-47 (5th Cir. 2017)

10    (where policy required agency to conduct inspections but did not mandate

11    specifically how to carry them out, it was irrelevant to the discretionary function

12    exception analysis that the employee could not recall whether he inspected a specific

13    requirement under the policy, because the policy as a whole allowed "room for

14    choice" in deciding what to inspect). Moreover, even if the record contains no

15    evidence indicating that Mr. Hager specifically inspected trash cans for compliance

16    with § 177.405 in his 2019 annual inspection of *Conception*, again, as in *Varig*

17    *Airlines*, that is of no moment to the discretionary function analysis.

18          The United States is not arguing that every aspect of a vessel inspection is a

19    discretionary function. In the present case, however, no specific mandate required

20    the inspector to "catch" any particular alleged violation. By contrast, certain Coast

21

22         [10] Commander Hodgdon testified that the regulations leave discretion to inspectors

23    about what to inspect and how to inspect these requirements. For example, she testified

      that pursuant to § 176.830(a), "a non-steel trash can" *could* be a fire hazard.  Ex. B,

24    Hodgdon Dep. 229:24-230:24. If an inspector observed such a trash can *and* deemed it to

      be a fire hazard, he would be required to at least note it as a deficiency and require

25    corrective action. *Id.* 231:4-8. Implicit in these questions—and apparent on the face of

      these regulations—is that this requirement applies only if a fire hazard is "observed." *See*

26    Ex. B, Hodgdon Dep. 230:11-16 ("Q . . . all *observed* fire hazards must be corrected? A.

      Yes.") (emphasis added), 231:4-8 ("Q . . . w[h]ere [sic] such a fire hazard, a non-steel trash

27    can is *observed* . . . the inspector should take action . . . ") (emphasis added).

28

1   Guard regulations do prescribe specific, mandatory procedures. The Seventh Circuit

2   in *Cassens* recognized that "when Coast Guard inspectors are required to follow

3   specific inspection procedures, the regulations carefully specify those procedures."

4   44 F.3d at 514. The *Cassens* court cited a regulation in 46 C.F.R. Subchapter H, a

5   more rigorous set of regulations governing larger passenger vessels, requiring that

6   "[a]t each annual inspection, *the inspector shall conduct* the following tests"

7   followed by "detailed provisions" and step-by-step procedures for testing specified

8   lifeboat launching equipment. *Id.* (emphasis added) (quoting 46 C.F.R. § 71.25-15).

9   "The obvious implication is that where such specific directives are absent, it is within

10  the individual inspector's discretion how to conduct the inspection." *Id.* Just like in

11  *Cassens*, Plaintiffs here cannot identify any step-by-step inspection procedure

12  mandated by Subchapter T that the inspector violated.

13      **C.    Prong Two: The Coast Guard's Establishment and**
14          **Implementation of a Maritime Safety Program Is Susceptible to**
15          **Political, Social, and Economic Policy Analysis.**

16          In the second prong of the discretionary function exception analysis, the Court

17  considers whether the discretion is the kind the exception "was designed to shield,"

18  *i.e.*, those decisions that involve economic, social, or political concerns. *Lam*, 979

19  F.3d at 673-74. This is an objective, not subjective, analysis. The challenged conduct

20  itself "need not be actually grounded in policy considerations" but must merely

21  involve a decision of a "nature [that is] susceptible to policy analysis." *Chadd v.*

22  *United States*, 794 F.3d at 1104, 1109 (9th Cir. 2015). "The focus of the inquiry is

23  not on the agent's subjective intent . . . but on the nature of the actions taken and on

24  whether they are *susceptible* to policy analysis." *Lam*, 979 F.3d at 674 (quoting

25  *Gaubert*, 499 U.S. at 325)). The discretionary function exception shields a

26  discretionary act from judicial review, regardless of whether the employee actually

27  considered any underlying policy judgments in carrying out the act. *Irving v. United*

28  *States*, 162 F.3d 154, 168 (1st Cir. 1998); *see also Cassens*, 44 F.3d at 515 (exception

MEM. IN SUPPORT OF MOT. TO DISMISS        28        Case No.: 2:21-cv-07065-PA-MRW

1  applied even if Coast Guard inspector was not making a "policy judgment" but
2  merely "negligently failed to look at the stairway and notice that there was no
3  handrail").

4      Where the first prong is satisfied, the United States is entitled to a "strong
5  presumption" that the second prong is also satisfied. *Gaubert*, 499 U.S. at 324; *see*
6  *also Lam*, 979 F.3d at 676 ("[I]t must be *presumed* that the agent's acts are grounded
7  in policy when exercising that discretion[.]"). At the second prong, the United States
8  "has no burden of production" and "may rest . . . on the *Gaubert* presumption."
9  *Irving*, 162 F.3d 168.

10     The Supreme Court has ruled that safety inspections of this nature are
11  susceptible to policy analysis. In *Varig Airlines*, the Court concluded that the FAA's
12  inspection program and the acts of its inspectors fell under the discretionary function
13  exception because an agency's "decisions as to the manner of enforcing regulations
14  directly . . . require the agency to establish priorities for the accomplishment of its
15  policy objectives by balancing the objectives sought to be obtained against such
16  practical considerations as staffing and funding." *Varig Airlines*, 467 U.S. at 819-
17  20. The Court ruled that the exception "plainly was intended to encompass the
18  discretionary acts of the Government acting in its role as a regulator of the conduct
19  of private individuals." *Id.* at 813-14. The Court recognized that "[w]hen an agency
20  determines the extent to which it will supervise the safety procedures of private
21  individuals, it is exercising discretionary regulatory authority of the most basic
22  kind." *Id.* at 819-20; *see also Dalehite v. United States*, 346 U.S. 15, 42-43 (1953)
23  (discretionary function exception applied to allegations that Coast Guard negligently
24  inspected the loading of a cargo ship leading vessel to catch fire and explode because
25  the Coast Guard's actions were in furtherance of a statutory scheme that gave it
26  discretion to regulate vessel loading).

27     Specific to the Coast Guard's vessel inspections program, the *Cassens* court
28  held that the discretionary function exception "shields the entire [Coast Guard]

MEM. IN SUPPORT OF MOT. TO DISMISS          29          Case No.: 2:21-cv-07065-PA-MRW

1    inspections process including alleged negligent omissions." *Cassens*, 44 F.3d at 515.
2    *See also Indemnity Ins. Co. of N. Am. v. United States,* 569 F.3d 175, 181, 182 (4th
3    Cir. 2009) (ruling that Coast Guard inspection and certification of small passenger
4    vessels under Subchapter T are protected by the discretionary function exception).

5         The Coast Guard's marine safety programs, including the inspection and
6    certification decisions at issue here, balance competing policy interests in at least
7    three different ways: (1) the Coast Guard is required by statute to balance vessel
8    safety with the goal of facilitating maritime commerce, given the reality that going
9    to sea inevitably involves inherent danger; (2) vessel inspections must balance the
10   goal of uniformity with the express goal of inspecting and evaluating the safety of
11   each vessel on an individual basis; and (3) the Coast must operate with a finite budget
12   and resources to balance between eleven different statutory missions, only one of
13   which is vessel inspections. 14 U.S.C. §§ 102(3); 46 U.S.C. § 3305(d)(1).

14        First, Congress has ordered the Coast Guard "to avoid disruption and undue
15   expense to industry" in its marine safety programs. 46 U.S.C. § 3305(d)(1). The
16   maritime industry is critical to commerce and national security. Ex. I, U.S. Coast
17   Guard Maritime Commerce Strategic Outlook, October 2018. Risk is inherent in the
18   industry; the only way commercial vessels would be absolutely safe is if they never
19   went to sea. A maritime industry that did not operate would be of little value to the
20   United States. Congress thus granted the Coast Guard broad authority and flexibility
21   to develop a certification and inspection program with goals of both reducing
22   casualties and promoting shipping. The Coast Guard seeks "a balance between risks
23   and costs to support the efficient flow of commerce." Ex. I, Strategic Outlook at 18.
24   As the Coast Guard explains in its Strategic Plan, it works to create a "domestic
25   regulatory approach that strikes the right balance between facilitating and
26   safeguarding commerce." Ex. J, U.S. Coast Guard Strategic Plan 2018-2022 at 18.
27   As applied to vessel inspections, these competing policies require that "[a] balance
28   must be maintained between the requirements of safety and practical operation." Ex.

MEM. IN SUPPORT OF MOT. TO DISMISS          30          Case No.: 2:21-cv-07065-PA-MRW

A, Manual Vol. 2 at A1-15. The court in *Cassens* quoted this same language from the Manual, holding that it directs Coast Guard inspectors "to make choices and exercise judgment in conducting their inspections." *Cassens*, 44 F.3d at 514. Since these choices "require balancing considerations of safety and economics" and "are 'based on considerations of public policy,' they meet the second requirement for the application of the discretionary function exception." *Id*. at 514-15 (quoting *Gaubert*, 499 U.S. at 323).

The second kind of policy balancing involved in the Coast Guard's vessel inspection program is the need to evaluate each vessel's unique characteristics and circumstances, balanced against the goal of promoting a uniform level of safety across the industry. Coast Guard inspectors are not expected to follow a rote, identical procedure on every vessel. Rather, inspectors treat each vessel individually and are granted the discretion to do so, varying the attention they give to different requirements as a vessel's individual circumstances require. Ex. A, Manual Vol. 2 at B2-1.  The requirements applied to a vessel "may vary in accordance with the vessel's area of operation or any other operations restrictions or limitations." 46 C.F.R. § 176.800(b) (Jan. 10, 1996). The Coast Guard's policies allow an inspector to consider the various hazards involved in a vessel's actual operations, including the routes operated, the capabilities of the vessel, and other operational limits. *Id*.; *see also* 46 C.F.R. § 176.110 (May 7, 1996); *Id.* § 175.550 (Jan. 10, 1996) (allowing "departures" from requirements when "circumstances or arrangements warrant such departures and an equivalent level of safety is provided").

The reason for this discretion is to enable inspectors to realistically evaluate each vessel's condition, thus more effectively promoting vessel safety. Subchapter T encompasses a wide variety of vessels operating in widely different environments, ranging from tiny launches or tenders carrying only a handful of people, to ferries and larger vessels on multi-day voyages. Tailoring inspections to individual vessels enables the Coast Guard to better evaluate each vessel's unique circumstance. To

1   best promote vessel safety in each case, inspectors must consider "situations in
2   which regulations that seem applicable are actually inappropriate for the situation or
3   not in the best interest of overall safety." Ex. A, Manual Vol 2, at A2-6. For this
4   reason, inspectors must "take care to ensure that each regulation being applied is
5   relevant to the vessel and situation." *Id*. This discretion allows inspectors to focus
6   on systems and requirements that, in their judgment, present more hazard or require
7   more attention on a given vessel. Without discretion to tailor inspections to each
8   vessel, inspectors would be required to follow the same uniform procedure on every
9   vessel. That would not be the regime that Congress authorized. Such a program,
10  were it to be established and implemented, would mandate a cookie-cutter inspection
11  protocol, directly impairing the Coast Guard's ability to realistically evaluate and
12  promote vessel safety.

13          The courts in both *Smith* and *Cassens* recognized the wisdom in the Coast
14  Guard's policy. In *Smith*, the vessel was limited to operating within one mile of
15  shore, and its COI was "dependent on its use in this restricted area." Coast Guard
16  inspectors relied on these circumstances in deciding what requirements were
17  relevant to that vessel's safety. 220 F. Supp. 2d at 282. The court found this
18  discretion to modify inspection standards based on a vessel's intended use to meet
19  the policy prong of the discretionary function test. *Id.* (citing 46 C.F.R. §
20  176.800(b)). Similarly, the Seventh Circuit in *Cassens* held that inspectors "are
21  required to make choices and exercise judgment in conducting their inspections,"
22  which includes "balancing considerations of safety and economics with reference to
23  the needs and the uses of the particular vessel being inspected." 44 F.3d at 514. The
24  Coast Guard's discretion to flexibly examine a vessel based on its particular
25  circumstance is "based on considerations of public policy." *Id.* at 514-15; *see also*
26  *Indemnity Ins. Co.*, 569 F.3d at 181 (policy permitting inspectors to use "judgment
27  concerning the application of inspection standards based on the intended use of the
28  vessel" meets the second prong of the discretionary function analysis).

MEM. IN SUPPORT OF MOT. TO DISMISS          32          Case No.: 2:21-cv-07065-PA-MRW

1    Finally, the Coast Guard must balance its resources between the eleven
2    missions assigned by statute, including defense, homeland security, law
3    enforcement, search and rescue, and environmental protection, in addition to marine
4    safety. *See* 6 U.S.C. § 468 (a), (c). The Coast Guard makes policy-based decisions
5    how to commit its financial, personnel, equipment, and training resources among
6    these missions to best serve national priorities. *See* Ex. J, U.S. Coast Guard Strategic
7    Plan 2018-2022 at 8, 22. Such considerations – whether it would be "economically
8    or operationally feasible" to commit Coast Guard resources to a particular mission
9    – "are a proper basis for the exercise of discretion." *Tew v. United States*, 86 F.3d
10   1003, 1006 (10th Cir. 1996) (citing *Gaubert*, 499 U.S. at 323); *see also Lam*, 979
11   F.3d at 681 ("competing policy considerations, such as safety, budget, staffing . . .
12   are all the type of policy decisions that are protected under the [discretionary
13   function exception]"); *Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*,
14   532 F. Supp. 2d 369, 382 (D.P.R. 2008) (Coast Guard decisions that balance "the
15   needs of society and maritime commerce" with "the expenditure of federal funds"
16   are inherently "grounded in social and economic policy").

17   Congress did not order the Coast Guard to conduct a rote and exhaustive
18   inspection of every regulatory requirement on every vessel. *E.g.*, 14 U.S.C §§ 503,
19   504. Instead, the system relies on owners and operators to comply with the
20   regulatory standards and their COIs, while the Coast Guard spot checks for
21   compliance. Increasing the level of certification and inspection would require the
22   Coast Guard to alter its funding priorities or require additional appropriations from
23   Congress. This is exactly the type of policy balancing that is exempt from review in
24   a tort action.

25   Because the Coast Guard's establishment and implementation of the marine
26   safety program is susceptible to policy analysis, the discretionary function exception
27   applies here, and the United States has not waived its immunity for this action.
28   //

MEM. IN SUPPORT OF MOT. TO DISMISS          33          Case No.: 2:21-cv-07065-PA-MRW

# CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Complaint be dismissed with prejudice for lack of subject matter jurisdiction.

Date: May 15, 2024           Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
ERIC KAUFMAN-COHEN
Attorney in Charge, West Coast Office

 *s/ Scott Perrygo*
SCOTT PERRYGO
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice

Attorneys for United States of America

MEM. IN SUPPORT OF MOT. TO DISMISS          34          Case No.: 2:21-cv-07065-PA-MRW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2024, a copy of the foregoing UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.

  s/Scott Perrygo   
SCOTT PERRYGO

MEM. IN SUPPORT OF MOT. TO DISMISS          35          Case No.: 2:21-cv-07065-PA-MRW