No. 24-5064

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NANCY FIEDLER, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California

## APPELLANTS' EXCERPTS OF RECORD

### VOLUME 4 of 5

Gretchen M. Nelson (112566)
NELSON & FRAENKEL LLP
601 So. Figueroa, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469
Telecopier: (213)-622-6019
gnelson@nflawfirm.com

John R. Hillsman (71220)
McGUINN HILLSMAN & PALEFSKY
220 Jackson Street, Suite 350
San Francisco, CA 94111
Telephone: (415) 421-9292
Telecopier: (415) 403-0202
jrhillsman@mhpsf.com

*Counsel for Plaintiffs-Appellants – Add'tl Counsel on Signature Page*

Case 2:21-cv-07065-PA-MRW    Document 88-2    Filed 05/15/24    Page 1 of 5    Page ID
#:680

1   TRACY WILKISON
    United States Attorney
2   JOANNE OSINOFF
    Assistant United States Attorney
3   Chief, Civil Division

4   BRIAN BOYNTON
5   Principal Deputy Assistant Attorney General
    ERIC KAUFMAN-COHEN, Cal. SBN 171064
6   eric.kaufman-cohen@usdoj.gov
7   Attorney in Charge, West Coast Office
    SCOTT PERRYGO, Cal. SBN 341834
8   Scott.perrygo@usdoj.gov

9   Trial Attorneys
10  Torts Branch, Civil Division
    U.S. Department of Justice
11  450 Golden Gate Avenue, Room 7-5395
12  San Francisco, California 94102-3463
    Telephone: (415) 436-6648/(415) 436-6645
13  Facsimile: (415) 436-6632
14  Attorneys for United States of America

15              UNITED STATES DISTRICT COURT

16           CENTRAL DISTRICT OF CALIFORNIA

17  NANCY FIEDLER, Personal              ) Case No.: 2:21-cv-07065-PA-MRW
    Representative of the Estate of LISA )
18  FIEDLER (Deceased); MATTHEW          ) In Admiralty
    GUINEY, Personal Representative of the )
19  Estate of MARYBETH GUINEY            )
    (Deceased); OLGA FAYNSHTEYN,         ) **DECLARATION OF SCOTT**
20  Personal Representative of the Estate of ) **PERRYGO IN SUPPORT OF THE**
    YULIYA KRASHENNAYA                   ) **UNITED STATES' MOTION TO**
21  (Deceased); KATIE OSBORNE,           ) **DISMISS**
    Personal Representative of the Estate of )
22  DANIEL GARCIA (Deceased);            ) [L.R. 7-7]
    CHRISTINA QUITASOL, Personal         )
23  Representative of the Estate of       )
    MICHAEL QUITASOL (Deceased);         ) Date: August 12, 2024
24  SARMA WILLIAMS, Personal             ) Time: 1:30 p.m.
    Representative of the Estate of VAIDEHI ) Courtroom: 9A
25  DEVI CAMPBELL WILLIAMS               )
    (Deceased); CHRISTINE                ) Hon. Percy Anderson
26  ALEXANDRA DIGNAM, Personal           )
27  Representative of the Estate of JUSTIN )
    DIGNAM (Deceased); JASMINE           )
28

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' MOTION TO DISMISS                    Case No.: 2:21-cv-07065-PA-MRW

**ER 565**

LORD, Personal Representative of the )
Estate of CHARLES McILVAIN )
(Deceased); VICTORIA E. MOORE, )
Personal Representative of the Estates of )
RAYMOND SCOTT CHAN (Deceased) )
and KENDRA CHAN (Deceased); )
YUKA OHASHI MERRITT, Personal )
Representative of the Estate of YUKO )
HATANO (Deceased); VIKRAM )
SINGH, Personal Representative of the )
Estate of SUNIL SINGH SANDHU )
(Deceased); NINA HUTTEGGER, )
Personal Representative of the Estate of )
JUHA-PEKKA AHOPELTO )
(Deceased); YADIRA ALVAREZ, )
Personal Representative of the Estate of )
BERENICE FELIPE (Deceased); SEJAY )
TAN, Personal Representative of the )
Estate of WEI TAN (Deceased); ERIC )
BALTZ, Personal Representative of the )
Estate of NEAL BALTZ (Deceased); )
ANTHONY BEITZINGER, Personal )
Representative of the Estate of )
PATRICIA BEITZINGER (Deceased); )
SHRUTI DEOPUJARI, Personal )
Representative of the Estate of )
SANJEERI DEOPUJARI (Deceased); )
ATLEE FRITZ, Personal )
Representative of the Estate of )
ANDREW FRITZ (Deceased); SEEMA )
SHARMA, Personal )
Representative of the Estate of )
KAUSTUBH NIRMAL (Deceased); )
MARGARET STROM, Personal )
representative of the Estate of TED )
STROM (Deceased); RICHARD X. LIU, )
Personal Representative of the Estate of )
XIANG LIN; SUSANA SOLANO )
ROSAS, Personal Representative of the )
Estates of EVANMICHEL SOLANO )
QUITASOL (Deceased), ANGELA )
ROSE SOLANO QUITASOL )
(Deceased), and NICOLE SOLANO )
QUITASOL (Deceased); ARIEL )
TAKVAM, Personal Representative of )
the Estate of KRISTIAN TAKVAM )
(Deceased); DOMINIC MICAEL )
SELGA, Personal Representative of the )
Estate of FERNISA JUNE SISON )
(Deceased); ROBERT KURTZ and )
CHERIE MCDONOUGH, Personal )
Representatives of the Estate of )
ALEXANDRA HALEY KURTZ; JEAN )

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' MOTION TO DISMISS                    Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 88-2    Filed 05/15/24    Page 3 of 5    Page ID #:682

1   ANNE ALLEN as Executor of the Estate )
    of STEVEN JOHN SALIKA, Executor )
2   of the Estate OF CAROL DIANA )
    ADAMIC and Administrator of the )
3   Estate of TIA NICOLE ADAMIC )
    SALIKA; JAMES ADAMIC, )
4   individually and as beneficiary of the )
    Estate of CAROL DIANA ADAMIC )
5   (Deceased); ANGELIKA ADAMIC, )
    individually and as beneficiary of the )
6   Estate of CAROL DIANA ADAMIC )
    (Deceased); MARK ADAMIC, )
7   individually and as beneficiary of the )
    Estate of CAROL DIANA ADAMIC )
8   (Deceased); SHIRLEY SALIKA, )
    individually, and as beneficiary of the )
9   Estate of STEVEN JOHN SALIKA )
    (Deceased) and TIA NICOLE SALIKA )
10  (Deceased); DANIEL POH-HOCK )
    CHUA, Personal Representative of the )
11  Estate of KRISTINA OLINE FINSTAD )
    (Deceased), and RYAN SIMS, )
12  individually, )

13              Plaintiffs,

14          vs.

15  UNITED STATES OF AMERICA,

16              Defendant.

17  _____

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' MOTION TO DISMISS                Case No.: 2:21-cv-07065-PA-MRW

I, Scott Perrygo hereby declare as follows:

1.     I am a Trial Attorney of the United States Department of Justice, Civil Division, Aviation Space & Admiralty West Coast Field Office and one of the attorneys for defendant United States of America in this action. I have personal knowledge of the matters stated herein.

2.     Exhibit "A" is a true and correct copy of excerpts of the U.S. Coast Guard Marine Safety Manual Volume 2.

3.     Exhibit "B" is a true and correct copy of excerpts from the deposition transcript of Commander Stephanie Hodgdon, U.S. Coast Guard.

4.     Exhibit "C" is a true and correct copy of excerpts of the U.S. Coast Guard Marine Safety Manual Volume 1 ("MSM Vol. 1").

5.     Exhibit "D" is a true and correct copy of excerpts of form CG-840 TI.

6.     Exhibit "E" is a true and correct copy of excerpts from the deposition transcript of Lieutenant Commander Joe Price Larson, U.S. Coast Guard.

7.     Exhibit "F" is a true and correct copy of *Conception*'s Certificate of Inspection ("COI") issued November 19, 2014.

8.     Exhibit "G" is a true and correct copy of excerpts from the deposition transcript of Captain Ronald Caputo, U.S. Coast Guard.

9.     Exhibit "H" is a true and correct copy of Marine Information for Safety and Law Enforcement ("MISLE") Activity Summary Reports 6625487 and 6625180, for the inspection of *Conception* dated Feb. 13, 2019.

10.    Exhibit "I" is a true and correct copy of excerpts of the U.S. Coast Guard Maritime Commerce Strategic Outlook, October 2018.

11.    Exhibit "J" is a true and correct copy of excerpts of the U.S. Coast Guard Strategic Plan 2018-2022.

\\
DECLARATION OF SCOTT
PERRYGO IN SUPPORT OF UNITED
STATES' MOTION TO DISMISS                    1                    Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 88-2    Filed 05/15/24    Page 5 of 5    Page ID
#:684

1    I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746,

2    that the foregoing is true and correct.

3        Executed this 15th day of May, 2024

4

5                        s/Scott Perrygo
                         SCOTT PERRYGO
6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE OF SERVICE

20        I hereby certify that on May 15, 2024, a copy of the foregoing

21   DECLARATION OF SCOTT PERRYGO IN SUPPORT OF THE UNITED

22   STATES' MOTION TO DISMISS was filed electronically with the Clerk of the

23   Court by operation of the Court's electronic filing system, which will serve an

24   electronic copy of all counsel of record.

25

26                      s/Scott Perrygo
                        SCOTT PERRYGO
27

28
     DECLARATION OF SCOTT
     PERRYGO IN SUPPORT OF UNITED
     STATES' MOTION TO DISMISS            2          Case No.: 2:21-cv-07065-PA-MRW

# Exhibit A

Case 2:21-cv-07065-PA-MRW    Document 88-3    Filed 05/15/24    Page 2 of 12   Page ID
#:686



The United States Coast Guard
# Marine Safety Manual
## Volume II: Materiel Inspection



# COMDTINST 16000.7B Change 2

Declaration of Scott Perrygo, Exhibit A, Page 1 of 11

US000883

**ER 571**

## USCG Marine Safety Manual, Vol. II: Materiel Inspection
## TABLE OF CONTENTS

**A.  Marine Inspection Administration**                                                           **A1-1**
   1.  Authority and Provisions for Merchant Vessel Inspections.                    A1-1
   2.  Administration of Merchant Vessel Inspections                               A2-1
   3.  Documentation of Vessel Inspections                                         A3-1
   4.  Approval of Plans and Specifications                                        A4-1
   5.  Vessel Construction, Conversions, Alterations, and Repairs                  A5-1
   6.  Miscellaneous Vessel Inspection Activities                                  A6-1
   7.  **Commercial Vessel Compliance Personnel Proficiency**                      **A7-1**

**B.  Domestic Inspection Programs**                                                               **B1-1**
   1.  Inspection of Vessels for Certification                                     B1-1
   2.  Vessel Reinspections, Annual Inspections, and Periodic Inspections         B2-2
   3.  Hull Examinations                                                           B3-1
   4.  Inspection Procedures Applicable to Vessel Types, Classes, and Categories  B4-1
   5.  Inspection of Public Vessels                                                B5-1
   6.  Pollution Prevention                                                        B6-1
   7.  Marine Facilities and Structure                                             B7-1
   8.  (Chapter held for future update)                                           B8-1
   9.  Alternate Compliance Program                                                B9-1
  10.  The Streamlines Inspection Program (SIP)                                      B10-1

**C.  Inspection of Engineering Systems, Equipment, and Materials**                                **C1-1**
   1.  Marine Equipment and Materials                                              C1-1
   2.  Inspections of Vessel Equipment and Materials                               C2-1
   3.  Factory and Shop Inspections of Equipment and Materials                     C3-1
   4.  Inspection of Steering Systems                                              C4-1
   5.  Inspection of Inert Gas Systems                                             C5-1

**D.  Port State Control**                                                                         **D1-1**
   1.  General Aspects of Port State Control Examinations                          D1-1
   2.  Procedures Applicable to Exercising Control Over Foreign Vessels Under U.S.
       Jurisdiction                                                          D2-1
   3.  Procedures to Ensure Accountability for Port State Control Examinations and
       Detentions                                                            D3-1
   4.  Targeting of Foreign Vessels                                                D4-1
   5.  Procedures Applicable to Foreign Freight Vessels                            D5-1
   6.  Procedures Applicable to Foreign Tank Vessels                               D6-1
   7.  Procedures Applicable to Foreign Passenger Vessels                          D7-1

**E.  International Conventions, Treaties, Standards, and Regulations**                             **E1-1**
   1.  MARPOL 73/78 Vessel Requirements                                            E1-1
   2.  Inspections Relative to SOLAS Requirements                                  E2-1
   3.  Safety Management Systems (SMS)                                             E3-1
   4.  International Convention on Load Lines, 66/88                               E4-1

Declaration of Scott Perrygo, Exhibit A, Page 2 of 11

US000899

(10 of 274), Page 10 of 274 Case: 24-5064, 01/21/2025, DktEntry: 27.5, Page 10 of 274

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

SECTION A: MARINE INSPECTION ADMINISTRATION

## CHAPTER 1: AUTHORITY AND PROVISIONS FOR MERCHANT VESSEL INSPECTIONS

### A.  AUTHORITY FOR THE INSPECTION OF VESSELS

#### 1.  General

The Coast Guard administers navigation and vessel inspection laws and regulations governing marine safety. It is the Coast Guard's responsibility to inspect the vessels regulated by those laws. Each marine safety unit must maintain current copies of Titles 33 and 46 of the Code of Federal Regulations (CFR). A statute's applicability to a particular vessel is based on many factors, including the vessel's trade, route, length, tonnage, and/or number of passengers. To avoid misunderstandings, the applicability of each statute should be determined with a particular vessel, type of vessel, or operation in mind. Most statutes establish general requirements for inspection and authorize the Coast Guard to prescribe specific standards by regulation. However, certain statutes contain specific requirements for vessel standards and procedures.

#### 2.  Authority

46 U.S.C. 3305, 3307, and 3714 provide the legal basis for Coast Guard inspection of vessels that are subject to inspection under 46 U.S.C. 3301.  43 U.S.C. 1356 provides the legal basis for Coast Guard regulations pertaining to vessels engaged in Outer Continental Shelf activities.  46 U.S.C. 3306 and 3703 direct the Secretary of the Department of Homeland Security (DHS) to prescribe regulations to carry out these requirements.

#### 3.  Delegation of Authority from SECDHS

DHS has delegated authority to the Commandant of the U.S. Coast Guard to administer certain navigation and inspection laws. The Commandant accomplishes this by prescribing regulations published in Titles 33, 46 and 49 of the CFR. These regulations incorporate international laws to which the United States is signatory (see Part D of this Chapter), as well as various classification society and industry technical standards. Specific authorities and the process by which regulations are adopted, changed, and deleted are described in 33 CFR 1.05 and in the Marine Safety Manual (MSM) Volume I, Administration and Management, COMDTINST M16000.6 (series), Chapter 2.

A1 - 1

US000901

**ER 573**

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

**SECTION A: MARINE INSPECTION ADMINISTRATION**

## CHAPTER 1: AUTHORITY AND PROVISIONS FOR MERCHANT VESSEL INSPECTIONS

entered into force on 15 June 1989. ILO 147 serves as an umbrella convention for 15
other ILO conventions concerning a variety of maritime related health, welfare and
workplace safety issues. ILO 147 concerns three basic areas: safety standards, including
standards of competency, hours of work and manning; appropriate social security
matters; and shipboard conditions of employment and shipboard living arrangements. A
guidebook, Inspection of Labour Conditions on Board Ship: Guidelines for Procedure
(ISBN 92-2-107096-4), may be obtained from ILO Publications, The International
Labour Office, CH-1211, Geneva 22, Switzerland.See MSM Volume II, Materiel
Inspection, COMDTINST M16000.7B (series), Chapter D2, for guidance on exercising
control under ILO 147 Article 4 and COMDTINST 16711.12.

**E.   PURPOSE OF MARINE SAFETY MANUAL, VOLUME II, MATERIEL INSPECTION,
COMDTINST M16000.7B (SERIES)**

### 1.   Responsibility of the Marine Inspector

It is neither necessary nor possible to memorize the multitude of laws and regulations that
the Coast Guard must enforce. However, it is incumbent upon, and the responsibility of,
the marine inspector to have a working knowledge of both U.S. and international laws
and regulations so that he/she can recognize a deficiency when one occurs and can
quickly locate the statutory citation related to a particular requirement.

### 2.   Content

The following chapters contain information and guidance intended to promote consistent
interpretation and application of U.S. and international laws and regulations related to
merchant vessel inspections. The regulations and the guidance contained in this volume
are not intended to cover all contingencies that may be encountered during vessel
inspections. This manual generally does not restate requirements that are specifically and
clearly covered in the law, Federal regulations, or international conventions. There is no
substitute for experience and sound judgment to ensure that good marine practice is being
followed. In addition, any information in this volume may be supplemented, altered, or
waived in specific cases by the Commandant, district commander, or OCMI. To that end,
it is imperative that the OCMI maintain a current and complete library containing the
applicable laws and regulations.

Declaration of Scott Perrygo, Exhibit A, Page 4 of 11

   US000913

**ER 574**

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Material Inspection

SECTION A: MARINE INSPECTION ADMINISTRATION

### CHAPTER 1: AUTHORITY AND PROVISIONS FOR MERCHANT VESSEL INSPECTIONS

### 3.   Other Guidance

This volume must be used in conjunction with other applicable instructions, notices, and publications such as Commandant Instructions, Law Bulletins, and Navigation and Vessel Inspection Circulars (NVICs). For easy reference, a list of recommended resources is included at the end of this chapter.

### F.   VESSEL INSPECTION POLICY

### 1.   Inspections

The goal of vessel inspection policy is to protect individuals, their private property, and the marine environment from the consequences of incidents involving materially unsafe vessels. Generally, vessels are inspected while they are not engaged in navigation. However, at times it is more conducive to vessel owners and operators to schedule an in-water inspection, such as an inspection for certification or midperiod inspection, during a leg of a vessel's voyage. OCMIs should take advantage of underway inspections, as they allow the inspector to observe crew performance and witness the operation of a vessel's machinery and other equipment. The inspection of a vessel is intended to determine its reasonable, probable compliance with published minimum safety standards over a projected period of time. The issuance of a Certificate of Inspection (COI) attests to that reasonable probability.

### 2.   Coast Guard Concerns

The Coast Guard's objective is to administer vessel inspection laws and regulations and promote safe, well-equipped vessels that are suitable for their intended service. It is not the Coast Guard's intent to place unnecessary economic and operational burdens upon the maritime industry. When determining inspection requirements and procedures, inspection personnel must recognize and give due consideration to the following factors:

a.   That the burden for proposing acceptable repairs rests upon the vessel's owner, not upon the repair facility or the inspector.

b.   That delays to vessels, which can be costly, need to be balanced against the risks imposed by continued operation of the vessel, with safety of life, property, and the environment always the predominant factors rather than economics.

Declaration of Scott Perrygo, Exhibit A, Page 5 of 11

US000914

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

SECTION A: MARINE INSPECTION ADMINISTRATION

**CHAPTER 1: AUTHORITY AND PROVISIONS FOR
MERCHANT VESSEL INSPECTIONS**

c.   That certain types of construction, equipment, and/or repairs are more
economically advantageous to the vessel operator and can provide the same
measure of safety.

d.   That some repairs can be safely delayed and can be more economically
accomplished at a different place and time.

e.   That the overall safety of a vessel and its operating conditions, such as route,
hours of operations, and type of operation, should be considered in determining
inspection requirements.

f.   That vessels are sometimes subject to the operational requirements of
organizations and agencies other than the Coast Guard.

g.   That a balance must be maintained between the requirements of safety and
practical operation. Arbitrary decisions or actions that contribute little to the
vessel's safety must be avoided.

---

**3.   Appeals and Waivers**

Decisions made by the OCMI; the District Commander; the Marine Safety Center; a
recognized classification society when acting on behalf of the Coast Guard; the National
Maritime Center; Director, Great Lakes Pilotage; and vessel documentation matters may
be appealed by the affected party as described in 46 CFR 1.03. Pursuant to the 2010
Coast Guard Authorization Act, Pub. L. 111-281, which amended Section 102 of Chapter
5 of Title 14, United States Code, the following section details the requirements for
individuals involved in appeals and waivers:

Except for the Commandant of the Coast Guard, any individual adjudicating an appeal or
waiver of a decision regarding marine safety, including inspection or manning and threats
to the environment, shall—

(1) be a qualified specialist with the training, experience, and qualifications in marine
safety to effectively judge the facts and circumstances involved in the appeal and make a
judgment regarding the merits of the appeal; or

(2) have a senior staff member who—

   (a) meets the requirements of paragraph (1);
   (b) actively advises the individual adjudicating the appeal; and
   (c) concurs in writing on the decision on appeal.

Declaration of Scott Perrygo, Exhibit A, Page 6 of 11

US000915

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

SECTION A: MARINE INSPECTION ADMINISTRATION

## CHAPTER 2: ADMINISTRATION OF MERCHANT VESSEL INSPECTIONS

a.  Computation for services. 46 U.S.C. 2111 is to be used for computing overtime
    compensation for services performed after hours, on Sundays, and on holidays.
    Saturdays are considered normal work days. Overtime, other than that specifically
    provided for in Title 46, is computed according to 5 U.S.C. 5542.

b.  Reimbursements from industry. Reimbursements from industry for overtime
    services by civilian inspectors are not to be viewed as an offset to the district's
    civilian overtime ceiling. 46 U.S.C. 2111 requires that overtime is paid to the
    employee out of annual appropriations and that reimbursements from industry are
    deposited in the U.S. Treasury. Rather than sidestepping the district's civilian
    overtime ceiling, the provisions of the statute will actually cause the overtime
    account to be drawn down more rapidly as payments to civilian documentation
    officers and inspectors are considerably more generous than those paid to other
    employees.

c.  Availability of district funding. Presently, there are no means by which the Coast
    Guard may recover the deposits of overtime reimbursements from the Treasury.
    This may create a problem when overtime funding is no longer available at the
    district level. Until a means is established to recover the reimbursements
    deposited in the Treasury to supplement the overtime ceilings, Commandant
    (G-MOC) should be contacted regarding the possibility of providing program
    funds to cover overtime expenses for the purpose of preventing any disruption in
    our services.

d.  Assignment of civilian inspectors. When assigning civilian inspectors, OCMIs
    should exercise care to ensure that the same companies are not repeatedly
    burdened with the extra cost while others escape the added expense altogether.
    This will avoid the appearance of unfairly treating any particular party. Also, a
    written acknowledgement must first be obtained from the vessel operators that
    they will reimburse the Government for overtime costs.

## B.  Regulations

The marine inspector is bound to encounter situations in which regulations that seem
applicable are actually inappropriate for the situation or not in the best interest of overall
safety. During the inspection of a vessel, an inspector must take care to ensure that each
regulation being applied is relevant to the vessel and situation. Inspectors should be alert
to such situations. Before requiring changes based on such a judgment call, an inspector
should seek advice from the Chief, Inspection Division (CID), the Chief, Prevention
Department (PDH) or the OCMI. When in doubt, the OCMI should request advice from
the District Commander (or the Commandant, via the chain of command).

Declaration of Scott Perrygo, Exhibit A, Page 7 of 11

US000931

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Material Inspection

SECTION A: MARINE INSPECTION ADMINISTRATION

## CHAPTER 2: ADMINISTRATION OF MERCHANT VESSEL INSPECTIONS

    (2)  Unless the situation is extremely hazardous, additional requirements should not be imposed before the matter is resolved. When an OCMI finds it necessary to change or impose additional requirements because of hazardous conditions, he or she should notify the first OCMI, the district commander(s) and Commandant (CG-CVC) by phone or email.

  c.  Transfer of records. When previous inspection records will help resolve questions concerning a vessel inspected in another zone, the OCMI should obtain a copy of such records.

### D.   SPECIAL CONSIDERATIONS

### 1.   Introduction

The vessel inspection regulations include provisions for special actions and considerations for certain circumstances. In many cases, the Commandant or district commander holds the discretion to give special consideration. In some cases, the OCMI is given this authority and may further delegate the authority to inspectors. Other regulations authorize the inspector to make discretionary rulings on matters within the limits of unit policy. Provisions for special consideration should be used to provide practical application of the regulations and avoid unreasonable requirements, actions, or decisions unnecessary to maintaining an adequate degree of safety. This policy applies only to those regulations that expressly authorize these special provisions, i.e., 46 CFR 30.15, 70.15, 90.15, 108.105, 175.15, and 188.15.

### 2.   OCMI's Role

Certain sections of the small passenger vessel regulations in 46 CFR Subchapters T and K authorize the OCMI to permit departures from specific requirements when warranted by special circumstances or arrangements. OCMIs must recognize that local practices have often proved safe and appropriate for local conditions, even if they do not conform specifically to regulations.

Declaration of Scott Perrygo, Exhibit A, Page 8 of 11

US000940

COMDTINST M16000.7B

| USCG Marine Safety Manual, Vol. II: Materiel Inspection |
| :---: |
| **Section A:  Marine Inspection Administration** |
| **CHAPTER 7:  COMMERCIAL VESSEL COMPLIANCE PERSONNEL PROFICIENCY** |

Inspector definition is an ideal that begins to formulate what is suitable proficiency. The term was used in the 2012 Marine Inspector Strategic Needs Assessment and is integral to the Human Performance Technology cycle.

b. Definition of Marine Inspector.  Marine Safety Manual, Volume 1, Administration and Management, COMDINST M16000.6 (series), Chapter 3 defines a Marine Inspector as:

*The marine inspector is an officer or civilian assigned to the inspection department of a field unit to perform the field duties of the Commercial Vessel Safety (CVS) Program. The inspector must understand and apply federal statutes and regulations, Coast Guard policy, and accepted industrial standards in the inspection of construction, alterations and repairs, equipment, and operating procedures for various types of vessels. To this end, the inspector shall be thoroughly familiar with applicable references (including this manual), and shall take advantage of available technical training.*

c. Traits of Optimal Marine Inspector.  The Optimal Marine Inspector is a confident and competent member of the maritime community who:

- has an in-depth technical knowledge of the maritime transportation system including vessel components, policy and regulations,

- demonstrates thorough understanding and correct application of regulations, policies, and technical information,

- is capable of balanced decisions with consideration of how they affect commerce, public safety and environmental risk,

- is committed to the Coast Guard marine safety mission,

- promotes self and others in continued professional and inspector development, and

- is recognized as a leader in the marine safety community.

d. Relationship to Vessel Examiners.  The traits of the Optimal Marine Inspector were developed as part of a Strategic Needs Assessment focused on Marine Inspectors. Vessel Examiners should also work towards acquiring and displaying these traits within their scope of responsibilities.

---

## 3.    Related Policy

a. Marine Safety Manual Volume I.  Marine Safety Manual, Volume I, Administration and Management, COMDINST M16000.6 (series), provides policy and guidance on a

Declaration of Scott Perrygo, Exhibit A, Page 9 of 11

                                    US001023

CH-2

COMDTINST 16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

**SECTION B: DOMESTIC INSPECTION PROGRAMS**

**CHAPTER 2: VESSEL REINSPECTIONS, ANNUAL INSPECTIONS, AND PERIODIC INSPECTIONS**

## A.   INTRODUCTION

Vessel reinspections, annual inspections, and periodic inspections occur between those inspections required by vessel inspection laws. These focus more on the vessel's equipment and operating practices, while inspections required by vessel inspection laws focus on basic hull and machinery conditions. The scope of reinspections, annual inspections, and periodic inspections varies according to the vessel's condition, its record of maintenance, and, at times, the marine inspector's time constraints. Such inspections should verify that all parts of the vessel and its equipment are being maintained in a safe condition. They should not be perfunctory; the vessel's operator should not be able to predict their scope.

### 1.  Scope of Reinspections, Annual Inspections, Periodic Inspections

During reinspections, annual inspections, and periodic inspections, inspectors must give special attention to lifesaving and firefighting equipment and watertight closures. The inspector should vary the degree of attention they give to individual items as circumstances require. During each reinspection, annual inspection, and periodic inspection, the inspector should inspect accessible parts of the hull and machinery that are prone to neglect and rapid deterioration. The inspector has great latitude in the scope of these inspections, which is based on his or her evaluation of the vessel's overall condition. At a minimum, the guidelines for International Convention for the Safety of Life at Sea (SOLAS) annual inspections must be used for all vessel reinspections, annual inspections, and periodic inspections (see E of this Chapter).

### 2.  Inspector's Obligations

The inspector must be reasonably satisfied as to the condition of the vessel and its equipment, and must ascertain that the vessel's degree of compliance with statutes, regulations, and the terms of its Certificate of Inspection (COI) warrant continued possession of the COI. As conditions warrant, the inspector may conduct an inspection similar in scope to that of an inspection for certification. In any case, the scope of inspection must be consistent with the requirements found in B2 of this Chapter.

**B2 - 1**

US001209

COMDTINST M16000.7B

USCG Marine Safety Manual, Vol. II: Materiel Inspection

**SECTION B: DOMESTIC INSPECTION PROGRAMS**

**CHAPTER 4: INSPECTION PROCEDURES APPLICABLE TO VESSEL TYPES, CLASSES, AND CATEGORIES**

### A.    SMALL PASSENGER VESSELS ("T-BOATS")

### 1.    INTRODUCTION

The statutes relating to the inspection and certification of small passenger vessels are found in 46 U.S.C. 3301, et seq. The implementing regulations, in Title 46 CFR, require a realistic appraisal of the operational needs of this industry. Because there are many types of vessels and operations to consider, it is impractical to try to develop regulations that cover all situations. Under 46 CFR Subchapter T, Officers-in-Charge, Marine Inspection (OCMI) are authorized to accept alternates or equivalents and to grant departures from the regulations when circumstances so warrant. In the development of the T-boat regulations, the primary considerations were--

   a.  Ignorance or misunderstanding of the hazards of the sea by most passengers;

   b.  Overloading, fires, explosions, and marginal seaworthiness (these had caused several serious casualties on uninspected passenger-carrying vessels); and

   c.  The need for a means of ready escape and survival in case of casualty.

---

**SPECIAL CONSIDERATION:**

Inspection personnel involved in the T-boat inspection program should never assume that vessel owners or operators are familiar with Coast Guard regulations and procedures. Inspection personnel must communicate with these owners and operators on a continuing, personal basis to explain requirements in detail. Experience has shown that after a vessel is inspected and requirements are explained, most of an owner's apprehension subsides and cooperation is enhanced.

Reports of inspection for certification and reinspection should note all items that have required interpretations of regulations by the OCMI, the district commander, or the Commandant. Such items include equivalents, substitutions, non-approved equipment, nonstandard fuel tanks, variations from subdivision standards, etc. These notes will form the basis for comparison of installed items with regulatory requirements at subsequent inspections.

---

# Exhibit B

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 2 of 21   Page ID

**Commander Stefanie Hodgdon**     #:698            **Fiedler vs.**
                                                                **United States of America**

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3  NANCY FIEDLER, Personal       )
    Representative of the         )
 4  Estate of LISA FIEDLER        )
    (Deceased), et al.,           )
 5                                )
    [Abbreviated caption]         )
 6                                )
    Plaintiffs,                   )
 7                                )
         vs.                      ) Case No. CV-21-7065 PA
 8                                )
    UNITED STATES OF AMERICA,     )
 9                                )
    Defendant.                    )
10                                )
11
12
         VIDEOTAPED DEPOSITION OF
13
       COMMANDER STEFANIE HODGDON
14
              30(b)(6)
15
       UNITED STATES COAST GUARD
16
17
_____
       Wednesday, April 12, 2023
18
19
20
21
22
23
24  REPORTED BY:
    ANGELA KOTT, CSR 7811
25  JOB NO: 10117560
```

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA
 3  NANCY FIEDLER, Personal       )
    Representative of the Estate of )
 4  LISA FIEDLER (Deceased); MATTHEW )
    GUINEY, Personal Representative of )
 5  the Estate of MARYBETH QUINEY   )
    (Deceased); OLGA FAVShTEYN,     )
 6  Personal Representative of the  )
    Estate of YULIYA KRASHENNAYA    )
 7  (Deceased); KATIK OSBORNE, Personal )
    Representative of the Estate of ) Case No.
 8  DANIEL GARCIA (Deceased); CHRISTINA ) CV-21-7065 PA
    QUITASOL, Personal Representative )
 9  of the Estate of MICHAEL QUITASOL )
    (Deceased); SARMA WILLIAMS,     )
10  Personal Representative of the  )
    Estate of VAIDEHI DEVI CAMPBELL )
11  WILLIAMS (Deceased); CHRISTINE  )
    ALEXANDRA DIGNAM, Personal      )
12  Representative of the Estate of )
    JUSTIN DIGNAM (Deceased); JASMINE )
13  LORD, Personal Representative of )
    the Estate of CHARLES McILVAIN  )
14  (Deceased); VICTORIA K. MOORE,  )
    Personal Representative of the  )
15  Estate of RAYMOND SCOTT CHAN    )
    (Deceased) and KENDRA CHAN      )
16  (Deceased); YUKA OHASHI MERRITT, )
    Personal Representative of the  )
17  Estate of YUKO HATANO (Deceased); )
    VIKRAM SINGH, Personal          )
18  Representative of the Estate of )
    SUNIL SINGH SANGHU (Deceased); NINA )
19  HUTTKOGER, Personal Representative )
    of the Estate of SURABHEKA AKOPHITO )
20  (Deceased); YADIRA ALVAREZ,     )
    Personal Representative of the  )
21  Estate of BERENICE FELIPE       )
    (Deceased); SEJAY TAN, Personal )
22  Representative of the Estate of WEY )
    TAN (Deceased); ERIC BALTZ,     )
23  Personal Representative          )
    Of the Estate of NEAL BALTZ     )
24  (Deceased); ANTHONY BEITZINGER, )
    Personal Representative of the  )
25  Estate of PATRICIA BEITZINGER   )
```

**Page 3**

```
 1  [Full caption continued]
 2  (Deceased); SHRUTI DEODHWARI,
    Personal Representative of the
 3  Estate of SANJEEKT DEODWARI
    (Deceased); ATLEE FRITZ, Personal
 4  Representative of the Estate of
    ANDREW FRITZ (Deceased); SEEMA
 5  SHARMA, Personal Representative of
    the Estate of KAUSTUBH NIRMAL
 6  (Deceased); MARGARET STROM,
    Personal representative of the
 7  Estate of TED STROM (Deceased);
    RICHARD X. LIU, Personal
 8  Representative of the Estate of
    XIANG LIN; SUSANA SOLANO ROSAS,
 9  Personal Representative of the
    Estates of EVAN MICHEL SOLANO
10  QUITASOL (Deceased), ANGELA ROSE
    SOLANO QUITASOL (Deceased), and
11  NICOLE SOLANO QUITASOL (Deceased);
    ARIEL TAKVAM, Personal
12  Representative of the Estate of
    KRISTIAN TAKVAM (Deceased);
13  DOMINIC MICHAEL BELCA, Personal
    Representative of the Estate of
14  PERNISA JUNE SISON (Deceased);
    ROBERT KURTZ and CHERIE MCDONOUGH,
15  Personal Representatives of the
    Estate of ALEXANDRA HALEY KURTZ;
16  JEAN ANNE ALLEN as Executor of the
    Estate of STEVEN JOHN SALIKA,
17  Executor of the Estate OF CAROL
    DIANA ADAMIC and Administrator of
18  The Estate of TIA NICOLE ADAMIC
    SALIKA; JAMES ADAMIC, Individually
19  and as beneficiary of the Estate of
    CAROL DIANA ADAMIC (Deceased);
20  ANGELIKA ADAMIC, individually and
    as beneficiary of the Estate of
21  CAROL DIANA ADAMIC (Deceased); MARK
    ADAMIC, individually and as
22  beneficiary of the Estate of CAROL
    DIANA ADAMIC (Deceased); SHIRLEY
23  SALIKA, individually, and as
    beneficiary of the Estate of STEVEN
24  JOHN SALIKA (Deceased) and TIA
    NICOLE SALIKA (Deceased); DANIEL
25  POH-HOCK CHUA, Personal
```

**Page 4**

```
 1  [Full caption continued]
 2  Representative of the Estate of
 3  KRISTINA OLINE FINSTAD (Deceased),
 4  and RYAN SIMS, individually
 5            Plaintiffs,
 6            vs.
 7  UNITED STATES OF AMERICA,
 8            Defendants.
 9
10      BE IT REMEMBERED THAT, pursuant to Notice
11  of Taking Deposition, and on Wednesday,
12  April 12, 2023, commencing at the hour of 1:13 p.m.,
13  Eastern time, thereof, at the offices of Regus
14  Washington, DC, 1015 15th Street, 6th Floor,
15  Washington, DC, before me, ANGELA KOTT (Appeared via
16  videoconference), a Certified Shorthand Reporter,
17  there personally appeared
18          COMMANDER STEFANIE HODGDON,
19  called as a witness by the Plaintiffs, who, being by
20  me first duly sworn, was thereupon examined and
21  interrogated as is hereinafter set forth.
22
23               --oOo--
24
25
```

Declaration of Scott Perrygo, Exhibit B, Page 1 of 20 **Page 1..4**
www.aptusCR.com

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 3 of 21   Page ID
#:699

Fiedler vs.
Commander Stefanie Hodgdon                                    United States of America

**Page 5**

```
 1            A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3    Counsel for Victoria Ellen Moore, Christine Dignam,
      Jasmine Lord, Yuka Hatsuki Merritt, and Vikkram
 4    Singh:
 5    MCGUINN HILLSMAN AND PALEFSKY
        BY:  JOHN R. HILLSMAN, Attorney at Law
 6             BRAM HILLSMAN, Attorney at Law
               (Appeared via videoconference)
 7      535 Pacific Avenue Suite 100
        San Francisco, CA 94133
 8      415.421.9292
        Jrhillsman@mhpf.com
 9
10      LESSER & ASSOCIATES
          BY:  RICHARD LESSER, Attorney at Law
11               (Appeared via videoconference)
          1444 Aviation Blvd., Suite 101
12        Redondo Beach, California 90278
          310.374.4800
13        Lesser@divelaw.com
14
      Counsel for Susana Solano Rosas:
15
      SCHUERING ZIMMERMAN AND DOYLE LLP
16        BY:  THEODORE DERK POPPINGA, Attorney at Law
               (Appeared via videoconference)
17        400 University Avenue
          Sacramento, California 95825
18        916.567.0400
          Tdp@szs.com
19
20    Counsel for The Fritzlers and Trustees of the
      Fritzler Family Trust:
21
      LARSON LLP
22        BY:  HILARY POTASHNER, Attorney at Law
               (Appeared via videoconference)
23        555 South Flower Street, Suite 4400
          Los Angeles, California 90071
24        213.436.4888
          Hpotashner@larsonllp.com
25  //
```

**Page 6**

```
 1  APPEARANCES CONTINUED:
 2  FOR THE DEFENDANT:
 3    U.S. DEPARTMENT OF JUSTICE
        BY:  ERIC KAUFMAN-COHEN, Attorney in Charge,
 4    West Coast Filed Office
        SCOTT PERRYGO, Attorney at Law
 5    Aviation, Space & Admiralty Litigation
      Torts Branch, Civil Division
 6    450 Golden Gate Ave, Suite 7-5395
      San Francisco, California 94102
 7    Eric.kaufman-cohen@usdoj.gov
      Scott.perrygo@usdoj.gov
 8
 9  Counsel for Daniel Bader dba Sea Landing Dive
    Center:
10
      MARK M. WILLIAMS, Attorney at Law
11        (Appeared via videoconference)
      P.O. Box 90193
12    Pasadena, California 91109
      213.483.2720
13    Markmwilliams@sbcglobal.net
14
    Counsel for Langklide Fire Protection Services:
15
      BREMER WHYTE BROWN & O'MEARA
16        BY:  ETHAN MURRAY, Attorney at Law
               (Appeared via videoconference)
17        20320 South West Birch Street, Second Floor
          Newport Beach, California 92660
18        949.221.1000
          Emurray@bremerwhyte.com
19
20  Counsel for Ventura Harbor Boatyard:
21    COX WOOTTON LERNER GRIFFIN & HANSEN, LLP
        BY:  CHRISTOPHER S. KILDGHGEN, Attorney at
22    Law
          (Appeared via videoconference)
23    900 Front Street, Suite 350
      San Francisco, California 94111
24    415.438.4600
      Ckiplinger@cwl-firm.com
25  //
```

**Page 7**

```
 1  APPEARANCES CONTINUED:
 2  ALSO PRESENT:
 3        KEVIN FRANK, Aptus Video Operator
 4        LLOYD SHERWOOD, McGuinn Hillsman &
          Palefsky
 5        (Appeared via videoconference)
 6        JULIE HARRISON, McGuinn Hillsman &
          Palefsky
 7        (Appeared via videoconference)
 8                 ---oOo---
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1                 I N D E X
 2           INDEX OF EXAMINATIONS
 3  EXAMINATION BY MR. HILLSMAN...................  11
 4
 5      EXHIBITS MARKED FOR IDENTIFICATION
 6  Exhibit No.     Description               Page
 7  Exhibit 1     Plaintiffs' Renotice Duces   19
 8               Tecum of the "PMQ" Deposition
             of Defendant United States of
 9           America Pursuant to
             Fed.R.Civ.P. 30(b)(6), 40
10           pages
11  Exhibit 2     Letter dated February 23,    20
             2023, from Eric Kaufman-Cohen
12           to John R. Hillsman, Re:
             Fiedler, et al., v. United
13           States, 3 pages
     Exhibit 3     Photograph of Conception, 1  109
14           page
15  Exhibit 4     Layout of Conception, 1 page 109
16  Exhibit 5     Certificate of Inspection for 110
             Conception, dated November
17           19, 2014, 2 pages
18  Exhibit 6     Photograph of Conception     110
             ashore, 1 page
19
     Exhibit 7     VHBY Repair Contract for     110
20           Conception with Truth
             Aquatics (2005), Bates
21           VHBY00001075 - VHBY00001076
22  Exhibit 8     Video of Conception          110
23  Exhibit 9     Video of Conception          110
24  Exhibit 10    T-Book Inspection Book, Bates 110
             US002840 - US002881
25
```

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 4 of 21   Page ID
#:700

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

**Page 9**

| 1 | EXHIBITS CONTINUED: | | |
|---|---|---|---|
| 2 | Exhibit 11 | USCG Office of Commercial Vessel Compliance (CG-CVC) | 110 |
| 3 | | Mission Management System (MMS) Procedure (PR), Bates US002300 - US002307 | |
| 4 | | | |
| 5 | Exhibit 12 | USCG Office of Commercial Vessel Compliance (CG CVC) | 110 |
| 6 | | Mission Management System (MMS) Work Instruction (WI), Bates US002300 - US002312 | |
| 7 | | | |
| 8 | Exhibit 13 | Small Passenger Vessel (T), MSO Santa Barbara, Checklist, | 110 |
| 9 | | Bates US002325 - US002326 | |
| 10 | Exhibit 14 | Small Passenger Vessel (T) Inspector Job Aid, Bates | 110 |
| 11 | | US002882 - US002895 | |
| 12 | Exhibit 15 | Small Passenger Vessel | 110 |
| 13 | | 1989 to 1997, Bates US003236 | |
| 14 | Exhibit 16 | CG-CVC Policy Letter 20-03, dated October 29, 2020, Bates | 110 |
| 15 | | US002896 - US002899 | |
| 16 | Exhibit 17 | CG-ENG-Policy Letter, No. 02-19, dated October 2, 2019, | 111 |
| 17 | | Bates US003228 - US003232 | |
| 18 | Exhibit 18 | United States Coast Guard, Marine Safety Alert, No. | 111 |
| 19 | | 03-13b, dated April 30, 2013, Bates US003233 - US003234 | |
| 20 | | | |
| | Exhibit 19 | United States Coast Guard Marine Safety Alert, No. | 111 |
| 21 | | 15-16, dated October 14, 2016, Bates US003235 | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

**Page 10**

| 1 | INSTRUCTIONS NOT TO ANSWER | |
|---|---|---|
| 2 | PAGE | LINE |
| 3 | 49 | 10 |
| 4 | 56 | 13 |
| 5 | 86 | 13 |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 11**

1   PROCEEDINGS

2

3       APTUS VIDEO TECHNICIAN: Good afternoon.

4   We are now on the record. Today's date is

5   April 12th, 2023, and the time is approximately

6   1:13 p.m. Eastern time.

7       This is the videotaped deposition of

8   Commander Stefanie Hodgdon in the matter of Nancy

9   Fiedler verse United States of America. All counsel

10   and parties present will be noted on the

11   stenographic record.

12       Will the court reporter who is appearing

13   remotely place swear in the witness.

14

15       COMMANDER STEFANIE HODGDON,

16       having been first duly sworn,

17   was examined and testified as follows:

18

19       THE REPORTER: Thank you. Please begin.

20       EXAMINATION

21   BY MR. HILLSMAN:

22       **Q.** Commander Hodgdon, would you be good enough

23   to state your full name and current residence

24   address for our record.

25       MR. KAUFMAN-COHEN: Just give your name,

**Page 12**

1   not the residence address. That's Privacy Act

2   stuff.

3   BY MR. HILLSMAN:

4       **Q. Fair enough. How about business or office**

5   **address?**

6       A. Sure. My name is Stefanie Hodgdon. I'm a

7   commander in the US Coast Guard. And my work

8   address is 2703 Martin Luther King, Junior, Avenue

9   Southeast, Washington, DC.

10       MR. HILLSMAN: Let me note for the record,

11   Eric, that we've agreed that while the court

12   reporter and the witness are in different states,

13   that the court reporter has been empowered by

14   stipulation to administer the oath as if she were

15   present in the room back with you guys on the East

16   Coast. True?

17       MR. KAUFMAN-COHEN: So stipulated, yes.

18   BY MR. HILLSMAN:

19       **Q. Okay. First of all, Commander, thank you**

20   **for your service and for the time you're lending us**

21   **this morning. I want to assure you that my clients**

22   **and I appreciate both.**

23       My name is John Hillsman. I represent six

24   of the families who lost loved ones in the

25   Conception fire, and I'll be asking questions on

Declaration of Scott Perrygo, Exhibit B, Page 3 of 20

**Page 9..12**

www.aptusCR.com

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 5 of 21   Page ID #:701

Commander Stefanie Hodgdon                                    Fiedler vs.
                                                     United States of America

Page 37

1   A. I'm aware a fire occurred on the
2 Conception.
3       Q. And where were you billeted at the time of
4 that fire back in the fall of 2019?
5   A. I was at Coast Guard headquarters.
6       Q. From now on, if I refer to that
7 September 2nd, 2019, fire as the Conception fire,
8 will you know what I'm talking about?
9   A. Yes, sir.
10      Q. Do you recall how you first learned about
11 the Conception fire?
12  A. Yes, sir. I was -- I believe it was over
13 Labor Day weekend and I was at home. And my
14 father-in-law who was visiting at the time asked me
15 if I had heard about this. He had heard about it
16 through media sources.
17      Q. Before being designated as the defendant's
18 PMQ for the purpose of this deposition, have you had
19 any involvement with the Conception fire in the line
20 of duty?
21  A. I don't understand your question.
22      Q. Well, the Coast Guard has -- we'll talk
23 about investigations in a moment -- but for example,
24 I know that Subchapter T was in the wake of this
25 fire amended.

Page 38

1       Did you have any involvement in the
2 amendments to Subchapter T following the Conception
3 fire?
4   A. The Subchapter T regulations have not been
5 amended.
6       Q. As you understand it, when was the last
7 amendments to Subchapter T?
8   A. On or about -- the current Subchapter T
9 regulations are applicable to vessels that were
10 built on or around March 11th, 1996.
11      Q. Okay. And those were the regs that were in
12 place at the time of the Conception fire?
13  A. Yes, sir.
14      Q. And those are the same regs that are still
15 in place today?
16  A. Yes, sir.
17      Q. You worked as a marine safety officer and
18 as a marine investigator. True?
19  A. Yes, sir.
20      Q. And you're generally familiar with the
21 Coast Guard's authority to investigate marine
22 casualties?
23  A. Yes, sir.
24      Q. Can we agree that Chapter 63 of the US
25 Shipping Code -- that's 46 USC Section 6301 --

Page 39

1 empowers the Coast Guard to investigate marine
2 casualties like the Conception fire?
3   A. Yes, sir.
4       Q. As a Coast Guard officer, are you generally
5 familiar with the 46 CFR Chapter 1, Subchapter A,
6 Part 4, the regs concerning marine casualty
7 investigations?
8   A. Yes, sir.
9       Q. Have you been called upon to implement
10 those regulations yourself? That is to say, to use
11 them while investigating marine casualties.
12  A. Yes, sir.
13      Q. Can we agree that those regulations
14 empowered either the commandant or the district
15 commander to initiate investigations into the causes
16 of marine casualties like the Conception fire?
17  A. Yes, sir.
18      Q. Who was the commandant at the time of the
19 Conception fire?
20      Do you recall?
21  A. Admiral Karl Schultz.
22      Q. Do you know whether the commandant ever
23 initiated an investigation into the cause of the
24 Conception fire?
25  A. I do not.

Page 40

1       Q. Do you know whether District 11 ever
2 initiated a marine investigation into the causes of
3 the Conception fire?
4   A. I do not.
5       Q. Are you familiar with the Marine Safety
6 Detachment Santa Barbara, MSD Santa Barbara?
7   A. Yes, sir.
8       Q. Do you know whether MSD Santa Barbara ever
9 initiated an investigation into the causes of the
10 Conception fire?
11  A. I do not.
12      Q. Do you know whether anybody in the Coast
13 Guard has ever initiated an investigation into the
14 marine -- into the casualties involved in the
15 Conception fire?
16  A. I'm sorry. I take it back.
17      Yes, the Office of Marine Investigations &
18 Analysis has initiated a Coast Guard marine
19 investigation.
20      Q. And --
21  A. I misunderstood the question.
22      Q. No problem. And feel free to speak up like
23 that and correct answers like that any time the need
24 arises.
25      Would you please repeat the title of the

Commander Stefanie Hodgdon                                      Fiedler vs.
                                                     United States of America

Page 69

1 the marine inspectors who inspected Conception
2 during the years leading up to the fire had received
3 such a waiver, how would I go about doing that?
4 What records should I request?
5      A. I don't know.
6      Q. All right. If you wanted to find that out,
7 how would you go about doing it?
8      A. I -- I kept a file of all my qualification
9 letters and any waiver I ever was granted
10 personally.
11     Q. And when one completes the marine
12 inspection course or the marine inspectors course
13 you described at Yorktown, does one receive a
14 certificate or an insignia or something indicating
15 that you've completed the course successfully?
16     A. At the time I completed the course, a
17 certificate was given and a notation was made in my
18 personnel file.
19     Q. Got it. Now, you indicated that after --
20 assuming that you don't receive a waiver, after you
21 completed the course, I gather you use -- and by
22 "you" I mean marine inspectors -- undergo OTJ or
23 on-the-job training?
24     A. Yes.
25     Q. And are there certain standards or minimums

Page 70

1 that describe how much OTJ you have to complete in
2 order to qualify as a journey marine inspector?
3      A. Sorry. Repeat the question.
4      Q. Let me put it this way: How would I go
5 about determining whether the marine inspectors who
6 conducted the inspections aboard Conception during
7 the years running up to the fire had completed
8 sufficient OTJ in order to qualify as journeymen
9 marine inspectors?
10     A. They would have a designation in their
11 personnel file.
12     Q. And what would that designation be?
13     A. Journeyman marine inspector.
14     Q. Now, I gather that a marine inspector has
15 to complete a probationary period in order to become
16 a journeyman marine inspector?
17     A. You have to meet the requirements outlined
18 in that policy letter. I don't recall the number,
19 but there's specific guidance on time and how many
20 qualifications you need.
21        And I do know that Subchapter T is not a
22 requirement to be a journey marine inspector. So
23 you can be a journey marine inspector without
24 holding this T-Boat qualification.
25     Q. Okay. But whether you hold the T-Boat

Page 71

1 qualification or not, there are certain minimum
2 requirements that one must satisfy in order to
3 become a journeyman marine inspector?
4      A. Yes, sir.
5      Q. All right. And as you understand it, do
6 MSD commanders, like the commander at MSD Santa
7 Barbara, have the jurisdiction to waive those
8 requirements, or are those requirements mandatory?
9      A. I'm not understanding the question.
10     Q. Whenever I hear the phrase or the term
11 "requirements," I think of them as being mandatory.
12        You indicated to me that there are certain
13 requirements that must be met before one qualifies
14 as a journeyman marine inspector.
15        My question is, does a commander of a
16 marine safety unit like MSD Santa Barbara have the
17 discretion to waive those requirements, or are they
18 mandatory, as you understand them?
19     A. Those requirements -- the requirement for
20 each billet is not determined by the commanding
21 officer. That is determined by the program office.
22     Q. Okay. And the commanding officer is
23 obligated to follow the requirements set by the
24 program office in making his or her assignments.
25 True?

Page 72

1      A. It depends.
2      Q. It depends on what?
3      A. I am not in the office that determines
4 billets and who goes into those billets. The billet
5 is the number that's associated with how many need
6 to go to the -- I'm not in that office, so I do not
7 know how that process works.
8      Q. Does an apprentice marine inspector have
9 the ability under the policy letter governing these
10 things to conduct marine inspections on his or her
11 own?
12     A. Yes, sir.
13     Q. So even when you're an apprentice, you can
14 make a solo inspection of a vessel like Conception
15 without violating any Coast Guard policies or
16 mandates?
17     A. Yes, sir.
18     Q. You're generally familiar with the history
19 of Subchapter T?
20     A. Yes, sir.
21     Q. And it's my understanding -- once again,
22 just so we have our terminology correct -- that the
23 post-1996 regs are referred to as New T or new
24 Subchapter T by the Coast Guard?
25     A. Yes, sir.

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 7 of 21    Page ID
#:703

Commander Stefanie Hodgdon                                      Fiedler vs.
                                                    United States of America

Page 73

1  Q. And the old pre-'96 regs are referred to as
2  old Subchapter T or Old T?
3     A. Yes, sir.
4     Q. It's also my understanding that when it
5  came to matters relating to fire protection or
6  electrical equipment, vessels constructed before
7  1996 were required to comply with those portions of
8  Subchapter T that were in force at the time the
9  vessel was built.
10     Is that your understanding as well?
11     A. I would have to confer with the regs.
12     Q. With the regs?
13     A. With the regulations.
14     Q. Okay.
15     A. The regulations will -- in the
16  applicability section in each part of Subchapter T
17  will direct you on whether that part is applicable
18  to vessels that were built on or before 1996.
19     Q. Understood. But it's my understanding that
20  even though Conception was built back in 1981, she
21  still had to comply with the New T regulations
22  concerning inspections and certifications.
23     Is that how you understand the regs as
24  well?
25     A. There's an applicability section under

Page 74

1  inspections and certifications. And it will direct
2  you into what -- whether it's Old T or New T and
3  what you need to comply with.
4     Q. All right. Lloyd, would you post Clip 11,
5  please. This is provision 46 CFR Section 177.115.
6     And you'll see that according to 177.115
7  (b), "Alterations or modifications made to the
8  structure or arrangements of an existing vessel,
9  that are a major conversion, on or after March 11,
10  1996, must comply with the regulations of this
11  part," New T.
12     "Repairs or maintenance conducted on an
13  existing vessel, resulting in no significant changes
14  to the original structure or to the arrangement of
15  the vessel, must comply with the regulations
16  applicable to the vessel on March 10, 1996, or, as
17  an alternative, with the regulations in this part.
18  However, when outfit items such as furnishings and
19  mattresses are renewed, they must comply with the
20  regulations in this part," period.
21     Have I read that correctly?
22     A. Yes, sir.
23     Q. How do marine inspectors know whether a
24  vessel that they are inspecting has undergone such a
25  conversion of, quote, major conversion?

Page 75

1     A. Major conversions are determined by the
2  program office at headquarters.
3     Q. And which program office is that?
4     A. I believe -- it is my understanding that it
5  is a joint decision between the Marine Safety Center
6  and the Office of Commercial Vessel Compliance.
7     Q. During your work with the Office of
8  Commercial Vessel Compliance, have you ever been
9  called upon to determine whether or not an
10  outfitting or repair work aboard a vessel comprises
11  a major conversion within the meaning of
12  Section 175.400?
13     A. No, sir.
14     Q. Who at the office typically does that?
15     A. It depends.
16     Q. Depends on what?
17     A. Who is assigned the project.
18     Q. And who typically assigns projects at CVC?
19     A. So we are structured -- well, what time are
20  we talking about? Are we talking about today?
21     Are we talking about -- when are we -- what
22  timeframe are we talking about?
23     Q. Well, right now I don't need names. I'm
24  just trying to figure out what the policy is with
25  respect to the determination of when a vessel has

Page 76

1  undergone a major construction.
2     Let me try it this way: Lloyd, would you
3  please post Clip Number 12.
4     Commander, the evidence is going to show
5  that in 2005 a vagrant by the name of Donald Kelly
6  hijacked Conception from Santa Barbara Harbor and
7  drove her onto the rocks near Vandenberg Air Force
8  Base up near Point Conception, as it happened.
9     Were you aware of that incident?
10     A. No, sir.
11     Q. Okay. Is this the first you've heard about
12  it?
13     A. Yes, sir.
14     Q. The evidence is also going to show that
15  following that grounding, Conception was refloated
16  and taken to the Ventura Harbor Boatyard in Ventura,
17  California, for repairs and construction.
18     Were you aware of that fact before today?
19     A. No, sir.
20     Q. Would you please post Clip 13, Lloyd.
21     Commander, this is a copy of the final
22  billing summary for Truth Aquatics' contract with
23  the Ventura Harbor Boatyard for that overhaul, the
24  overhaul in 2005 following the vessel's grounding up
25  near Vandenberg Air Force Base.

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 8 of 21   Page ID
#:704

Commander Stefanie Hodgdon                                                    Fiedler vs.
                                                              United States of America

Page 81

1 As you recall, we requested you to produce
2 all of the MISLE files back to the year 2000,
3 precisely because we wanted to see the records for
4 the 2005 overhaul.
5 We haven't seen those records, and I'm very
6 concerned that those records will confirm that
7 Conception was governed by the New T regs at the
8 time of the fire rather than the Old T regs. This
9 is, I think we'll agree, a critical issue for both
10 of us.
11 So my question stands. If you're
12 instructing her not to answer, that's your call. I
13 will say that if we don't have the information we
14 feel we need in order to oppose your motion, we'll
15 oppose that motion under 57(b) on grounds that it's
16 premature.
17 Your call.
18 MR. KAUFMAN-COHEN: My call is we produced
19 all the MISLEs going back to 2000, as far as I
20 understand. I'll go back and confirm after the
21 deposition whether that's not the case.
22 If there's more, we'll get those to you
23 more. But I'm instructing her not to answer today.
24 MR. HILLSMAN: That's fine. Now, are we in
25 a position to deal with this by stipulation?

Page 82

1 Are you in a position to stipulate that the
2 conversion we're talking about here was a major
3 conversion within the meaning of Section 46 175.400?
4 Because it obviously determines which regs
5 apply, New T or Old T.
6 MR. KAUFMAN-COHEN: No, I will not so
7 stipulate.
8 MR. HILLSMAN: Understood.
9 BY MR. HILLSMAN:
10 Q. Commander, if you wanted to find out
11 whether the $761,000 overhaul that Conception
12 underwent in 2005 comprised a major conversion that
13 would have brought her under the New T regs, how
14 would you go about doing that?
15 A. I would confer with the MISLE file.
16 Q. It's your impression that if that indeed
17 were the case, there should be a notation in the
18 MISLE file suggesting that the vessel was now
19 subject to the New T regs?
20 A. Yes, sir.
21 Q. Okay. You have reviewed the MISLE file
22 materials that were produced, did -- you and
23 Lieutenant Commander Bizzaro identified and produced
24 those files. Is there such a notation?
25 Are you able to tell me one way or the

Page 83

1 other, as you sit here today as the PMQ on this
2 topic, as to whether or not Conception was governed
3 by the Old T or the New T regs?
4 A. We -- Lieutenant Commander Bizzaro and
5 myself did not produce any MISLE activities or
6 anything associated with MISLE. We produced program
7 policy and guidance that was applicable at the time
8 of Conception's casualty.
9 Q. Okay. So I gather that was a negative
10 answer to my question?
11 You're not in a position, as you sit here
12 today, to tell me one way or the other whether
13 Conception was subject to the New T or Old T regs as
14 to the date of the fire?
15 A. The Conception -- the motor vessel
16 Conception had a Certificate of Inspection that was
17 endorsed and annually endorsed by the cognizant
18 OCMI. It is my understanding they met all
19 applicable regs and policy and guidance.
20 Q. I understand. We're now trying to figure
21 out which regs and policies and guidance were
22 applicable. Was it the New T or the Old T?
23 Are you able to tell me?
24 A. It is my understanding that the OCMI and
25 the marine inspectors knew what regs were applicable

Page 84

1 at the time of the inspection and ensured that it
2 met the requirements.
3 Q. I don't doubt that. That wasn't my
4 question.
5 My question is, do you know one way or the
6 other whether the COI was governed by the New T or
7 the Old T regs at the time of the fire?
8 A. Can I please see the COI?
9 Q. Sure. Lloyd, would you put the COI back
10 up.
11 A. Can you please scroll down to the second
12 page. Can you please go to the first page.
13 It is my opinion that based on the
14 Certificate of Inspection with the keel laid date of
15 1 July, 1981 and the servicing of an inspected
16 passenger vessel, the vessel would have been
17 inspected under Old T.
18 Q. And the fact that she underwent a $761,000
19 overhaul following a grounding at Vandenberg Air
20 Force Base doesn't alter or influence that opinion
21 in any way?
22 MR. KAUFMAN-COHEN: Objection. Again, goes
23 beyond the scope. Goes beyond the Judge's order.
24 You can say it as passionately as you want,
25 but I still object to the question.

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 9 of 21    Page ID
Commander Stefanie Hodgdon                    #:705                              Fiedler vs.
                                                                                United States of America

Page 89

1  problem, Eric. But let's move on.
2       Would you please post Clip, let's see --
3  hang on.
4  BY MR. HILLSMAN:
5       Q. Let me ask you this: Generally speaking,
6  Commander, how long do COIs last?
7       A. The COI is valid for five years, sir.
8       Q. All right. And would you post Clip 10
9  again, Lloyd. That's the COI. And could you go
10 down to the issue date on the bottom.
11      Commander, I'm sorry, we've gone past it.
12 Where do we need to go to determine the issue date
13 on this COI?
14      A. It's at the top, sir.
15      Q. All right. The top of the first page?
16      A. It's on every top page, sir.
17      Q. Okay. And this COI was issued on
18 November 19, 2014, and its expiration date would
19 have therefore been November 19, 2019?
20      A. Yes, sir.
21      Q. So the COI we're looking at is the COI that
22 was in effect on the date of the fire,
23 September 2nd, 2019. Agreed?
24      A. Yes, sir.
25      Q. Okay. In order to maintain that COI, the

Page 90

1  inspection -- I beg your pardon -- the Conception
2  has to be inspected annually?
3       Do I have that correct?
4       A. Yes, sir.
5       Q. In addition to annual inspections, she also
6  has to undergo five-year inspections?
7       A. Yes, sir.
8       Q. Are there any inspections other than the
9  five-year and the annual inspection that a vessel, a
10 saltwater vessel like Conception, has to undergo?
11      A. They would have a dry dock and an internal
12 service exam.
13      Q. And those take place every two years?
14      A. Yes, sir. Whatever the regs say.
15      Q. Okay. And as I understand it, if a vessel
16 passes those inspections, the annual, the two-year,
17 the five-year, the inspector endorses the COI and
18 the vessel is good to go until the next inspection.
19      Do I have that right?
20      A. Yes, sir.
21      Q. Now, what happens if a vessel does not pass
22 an inspection? What happens if the inspector
23 determines that there's a deficiency?
24      A. They would write a CG-835, which is the
25 Coast Guard form for issuing deficiencies. And they

Page 91

1  would make a notation in the MISLE file.
2       Q. And the CG-835 places operational controls
3  on the vessel?
4       A. It depends.
5       Q. Depends on the nature of the deficiency?
6       A. Yes, sir.
7       Q. The CG-835 remains in place until the
8  deficiency has been rectified?
9       A. Yes, sir.
10      Q. How does the Coast Guard go about
11 determining whether or when a deficiency noted in
12 the CG-835 is rectified?
13      A. I'm sorry. Restate the question.
14      Q. Sure. How does the Coast Guard go about
15 determining whether a deficiency noted in a CG-835
16 is rectified?
17      A. The owner and operator notifies the marine
18 inspector. They attend the vessel or they get
19 objective evidence that supports that the deficiency
20 has been resolved.
21      Q. And must the resolution of the deficiency
22 be noted in the MISLE file?
23      A. Yes, sir.
24      Q. Okay. And how is that notation typically
25 made?

Page 92

1  A. It depends.
2  Q. It depends on what?
3       A. They may write it in the MISLE narrative or
4  they would -- under the tab that says
5  "Deficiencies," they would mark that it's been
6  resolved.
7       Q. Now, does the Coast Guard issue marine
8  inspectors forms to fill out during the inspection
9  process?
10      A. What timeframe are we talking about?
11      Q. Let's say the timeframe between 2014 and
12 2019.
13      A. We were in a transition at that time.
14      Q. Hm-hmm.
15      A. So they may have had an actual carbon copy
16 form or they may have -- we've transferred to
17 electronic where they could just print it out.
18      Q. Do you know whether the e-file
19 transformation was completed by September of 2019?
20      A. I don't recall.
21      Q. And you haven't reviewed the MISLE file, so
22 you don't know -- you can't tell from what was in
23 there which forms, carbon copy or e-forms, were used
24 by the inspectors who conducted inspections on
25 Conception during the period between 2014 and 2019?

Page 101

1   A. Yes, sir. That is true.
2       Q. Here is the first page of the document that
3   you guys produced. And by "you guys," I mean the
4   government produced at our request.
5           And it is apparently the MSM that was last
6   amended as of August 7th, 2017.
7       MR. HILLSMAN: Whether the Commander
8   answers this question or Eric, Eric, can we agree
9   that what you guys produced is an authentic copy of
10  the Marine Safety Manual that was in effect as of
11  the time of Conception's loss?
12      MR. KAUFMAN-COHEN: Yes.
13      MR. HILLSMAN: And we can also agree that
14  that obviously is a public record within the hearsay
15  exception?
16      MR. KAUFMAN-COHEN: Yes.
17      MR. HILLSMAN: Okay.
18  BY MR. HILLSMAN:
19      Q. Then let's jump past question number one.
20          And question number two, this manual is
21  subject to periodic revision. Who is responsible
22  for approving the revisions, as you understand it,
23  Commander?
24      A. It is my understanding that it is the
25  commandant of prevention policy, the assistant

Page 102

1   commandant of prevention policy.
2       Q. Okay. Do you happen to know who that was
3   back in August of 2017?
4       A. It was either Admiral Thomas or Admiral
5   Timme.
6       Q. Okay. And could you spell Timme for us?
7       A. T-i-m-m-e.
8       Q. Now, am I correct in assuming that the MSM,
9   the Marine Safety Manual, is basically the Coast
10  Guard's safety bible?
11      A. Yes, sir.
12      Q. And its provisions are binding on all Coast
13  Guard unit commanders, commanding officers,
14  officers-in-charge, deputy/assistant commandants,
15  and chiefs of headquarters staff elements; is that
16  correct?
17      A. That's who it applies to, yes, sir.
18      Q. And those -- all of those folks must comply
19  with the provisions. True?
20      A. Can you be more specific about "must
21  comply"?
22      Q. Well, I'm reading the language here. "All
23  Coast Guard unit commanders, commanding officers,
24  officers-in-charge, deputy/assistant commandants,
25  and chiefs of headquarters staff elements must

Page 103

1   comply with the provisions of this Manual."
2           What does that mean to you?
3       A. So there is also verbiage in the Marine
4   Safety Manual that says if there is a disconnect or
5   a conflict of language, that the marine inspector
6   should default to Coast Guard CFRs or regulations.
7       Q. Okay. Along with the CFRs, the MSM is
8   binding on all Coast Guard personnel. True?
9       A. The Marine Safety Manual is guidance to
10  assist marine inspectors in making decisions to
11  ensure the safety of the vessel.
12      Q. To whom is the manual circulated? Does
13  every commissioned officer in the Coast Guard
14  receive a copy of the Marine Safety Manual?
15      A. It is not a document or a book that is
16  issued to us. It is publicly available. Through
17  our training and through the qualification process,
18  we are made aware of its location and you have
19  access to it.
20      Q. After the Coast Guard went online to
21  e-filing was -- were copies of the manual available
22  through a portal to all Coast Guard personnel who
23  had occasion to review it?
24      A. Yes, sir.
25      Q. And do you know whether that was already

Page 104

1   the case back in 2017 when this particular edition
2   of the manual was adopted?
3       A. Yes, sir. It was available on a portal
4   site.
5       Q. Okay. So it would have been available, for
6   example, to the personnel at MSD Santa Barbara on a
7   portal site?
8       A. Yes, sir.
9       Q. Do you know enough about the procedures out
10  there to know whether there would have also been a
11  paper copy available at MSD Santa Barbara?
12      A. I do not know, sir.
13      Q. All right. In all events, can we agree
14  that the marine inspectors at MSD Santa Barbara were
15  required to comply with the requirements of the
16  manual when conducting their inspections of vessels
17  like Conception?
18      A. The Marine Safety Manual are not
19  requirements. They are guidance.
20      Q. Guidance. All right. Are any of those
21  guidance mandatory dictates or are they simply
22  advisory?
23      A. They are advisory.
24      Q. So the entire manual is advisory?
25          In other words, Coast Guard inspectors, for

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 11 of 21   Page
ID #:707

Commander Stefanie Hodgdon                                      Fiedler vs.
                                                    United States of America

Page 105

1 example, have discretion to disregard the guidance
2 in the manual?
3      Am I hearing that correctly?
4      A. The Marine Safety Manual is used as
5 guidance so that marine inspectors and OCMIs can
6 make reasonable, discretionary decisions on
7 case-by-case situations on each inspection.
8      Q. Okay. We'll get back into that in a
9 moment.
10     Lloyd, would you put up Clip 51. And this
11 is Topic 3.
12     The history, purpose, meaning and
13 day-to-day application of the provisions of the
14 T-Boat inspection handbook that were in force and
15 effect during the period between January 1st, 2000,
16 and September 2nd, 2019.
17     You are the designated PMQ on this topic.
18 What is it about your background and experience in
19 the Coast Guard that qualifies you to be a PMQ with
20 respect to the T-Boat inspection handbook?
21     A. The -- other than from personal experience,
22 and we are the program office that generated that
23 handbook.
24     Q. And have you read the handbook yourself?
25     A. Yes, sir. I have.

Page 106

1      Q. From beginning to end?
2      A. Yes, sir.
3      Q. And do you use it regularly in your work
4 with CVC?
5      A. So this particular handbook is not in
6 effect today.
7      Q. All right. And this particular handbook --
8 and we'll talk about this in a second, the one that
9 was in effect back at the time of the Conception's
10 loss -- has since been updated?
11     A. So there are two documents -- and this
12 T-Boat inspection handbook is not called a T-Boat
13 inspection handbook. It's the CG-840 book.
14     Q. Hm-hmm.
15     A. I'm sorry. Can you scroll down, because
16 there's two.
17     There's another 840 book, and one was
18 published in 2011 and another one was published in
19 2015.
20     Q. Tell you what, let me try it this way:
21 Lloyd, would you post Clip 18, which is the title
22 page of the document that you guys produced at our
23 request.
24     And let's see, that is Exhibit 10.
25     Can you tell by the -- beg your pardon.

Page 107

1 You'll see in the lower right-hand corner there next
2 to US Bates stamp page 002840, it says CGI-840 TI
3 Rev April 2011.
4      Am I correct in assuming that that is the
5 CG 840 book that was last amended or revised in
6 April of 2011?
7      A. Yes, sir.
8      Q. And is this the handbook that was in place
9 at the time of the Conception's loss?
10     A. No, sir.
11     Q. Okay. This is the one that we have. I
12 haven't seen any others.
13     MR. HILLSMAN: Have you guys produced
14 another handbook, Eric?
15     MR. KAUFMAN-COHEN: The 2015?
16     THE WITNESS: The 2015 version, yeah.
17     MR. KAUFMAN-COHEN: Yes, we have produced
18 the 2015 one.
19     MR. HILLSMAN: Do you have the Bates stamp
20 page numbers on that, Eric?
21     And I'll tell you, for some reason, the
22 handbook pages were scrambled. I'm sure it's
23 completely inadvertent.
24     But I'm not altogether sure which T-Boat
25 handbooks we have. So if you produced two CG-840s,

Page 108

1 if you'd give me the Bates stamped pages, that would
2 be great.
3      MR. KAUFMAN-COHEN: You've already
4 identified it in your Topic, what is it, 7.
5      It says history, purpose and any day-to-day
6 applications, small passenger vessel, T US Bates
7 stamp 0002882 through 002895.
8      So that's one -- yeah, it's under your
9 Topic 7.
10     And while you're scrambling to find that,
11 could we maybe take a break since we're kind of a
12 little hungry out here. It's almost past 3:30 our
13 time.
14     MR. HILLSMAN: Sure. No problem at all.
15     And what you just reminded me is that we
16 have got this, a whole different topic. So that's
17 fine. We'll talk about this one and deal with the
18 later topic later.
19     So yeah. You want to take a break. You
20 tell me for how long. I'd be happy to do it.
21     MR. KAUFMAN-COHEN: Do you want a full
22 hour? 45 minutes? What you need?
23     I mean, I'm getting a little hungry. So I
24 need -- I get cranky when I'm hungry. You don't
25 want to see my cranky. I'm not cranky yet.

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 12 of 21    Page Fiedler vs.
ID #:708                                                          United States of America

Commander Stefanie Hodgdon

Page 109

1    MR. HILLSMAN: You must have been starving
2 all morning, eh?
3    APTUS VIDEO TECHNICIAN: Off the record at
4 3:39 p.m. We're going off the record.
5    (Recess taken)
6    APTUS VIDEO TECHNICIAN: We are now going
7 back on the record. The time is 4:37 p.m.
8    MR. HILLSMAN: Okay. Before we proceed,
9 let me note on a housekeeping point that we have
10 marked 19 exhibits for use at this deposition.
11    They will be by no means the only documents
12 we refer to. As I've explained to Eric before we
13 started, we will show the witness via screen sharing
14 documents that are not necessarily marked. But when
15 I do that, we'll refer to the Bates stamp page
16 numbers.
17    However, to make the record clear, the 19
18 exhibits have been sent to the court reporter and to
19 Eric.
20    And Angela, I would ask that those exhibits
21 be attached to the transcript when we're through
22 here. And they've all been premarked.
23    (Whereupon, Exhibit 3 was marked for
24    identification)
25    (Whereupon, Exhibit 4 was marked for

Page 110

1    identification)
2    (Whereupon, Exhibit 5 was marked for
3    identification)
4    (Whereupon, Exhibit 6 was marked for
5    identification)
6    (Whereupon, Exhibit 7 was marked for
7    identification)
8    (Whereupon, Exhibit 8 was marked for
9    identification)
10    (Whereupon, Exhibit 9 was marked for
11    identification)
12    (Whereupon, Exhibit 10 was marked for
13    identification)
14    (Whereupon, Exhibit 11 was marked for
15    identification)
16    (Whereupon, Exhibit 12 was marked for
17    identification)
18    (Whereupon, Exhibit 13 was marked for
19    identification)
20    (Whereupon, Exhibit 14 was marked for
21    identification)
22    (Whereupon, Exhibit 15 was marked for
23    identification)
24    (Whereupon, Exhibit 16 was marked for
25    identification)

Page 111

1    (Whereupon, Exhibit 17 was marked for
2    identification)
3    (Whereupon, Exhibit 18 was marked for
4    identification)
5    (Whereupon, Exhibit 19 was marked for
6    identification)
7 BY MR. HILLSMAN:
8    Q. Commander, while we were off the record on
9 a break, did you have a chance to confer with
10 counsel?
11    A. Yes, sir.
12    Q. And do you want to amend or change any
13 answers you've given so far?
14    A. No, sir.
15    Q. Okay. Before the break, we were talking
16 about the Topic 3 from the PMQ notice, and
17 specifically the T-Boat inspection handbook that has
18 been produced as Bates stamped pages 2840 through
19 2883.
20    And that, Lloyd, if you could post, let's
21 see, Number 18 again. That is the CG-840 that was
22 revised last in April of 2011.
23    Now, the phrase "CG-840 TI," what does that
24 mean?
25    A. The CG-840 is a form number that has been

Page 112

1 used to designate this Job Aid to marine inspectors.
2    Q. Okay. You say "Job Aid to marine
3 inspectors," could you tell us what you mean by
4 that.
5    A. Certainly. So each platform or vessel type
6 has a book very similar to this, and it is a quick,
7 easy -- excuse me, quick, easy guide that outlines
8 requirements and CFR sites that would be applicable
9 to each platform.
10    Q. Okay. And as you sit here today, can you
11 think of anyone who is more qualified to address
12 this particular CG-840, the one that was last
13 revised on April 2011, than yourself?
14    A. No, sir.
15    MR. HILLSMAN: And Eric, can we agree that
16 this is the T-Boat inspection handbook -- beg your
17 pardon, the T-Boat inspection book that was in place
18 at the time of Conception's loss?
19    MR. KAUFMAN-COHEN: No. I guess the other
20 one is your Topic 7. The one you identified,
21 Topic 7 was the one in effect.
22    MR. HILLSMAN: Okay. So this was an
23 earlier version that was revised?
24    MR. KAUFMAN-COHEN: Yeah. You have it. If
25 you look at your Topic 7 --

Page 113

1    MR. HILLSMAN: No, no. I'm not accusing
2 you of anything. I just want to make sure that I
3 understand what I'm looking at.
4        So this is a document that was produced but
5 has been superseded?
6        Do I have that right?
7        MR. KAUFMAN-COHEN: It's been produced
8 but -- and there's another one that was produced as
9 well that was in effect at the time.
10       MR. HILLSMAN: Okay. But my question is
11 was this one, the one we're looking at now, the one
12 that begins with Bates stamped page 2840, also in
13 effect at the time?
14       MR. KAUFMAN-COHEN: I can't even -- ask the
15 witness. I can't testify as to that.
16       MR. HILLSMAN: All right. I thought that's
17 what the verification indicated. But let me ask
18 you.
19 BY MR. HILLSMAN:
20    Q.   Commander, the title page of the CG-840
21 inspection guide, the T-Boat inspection book that
22 we're looking at, was it still in effect back in
23 2017, 2018, and 2019?
24    A.   No, sir.
25    Q.   It had been superseded by another document?

Page 114

1    A.   Yes, sir.
2    Q.   Okay. We'll chat about that document in a
3 moment, then.
4        Let me ask you, you'll be testifying about
5 this document entirely from your own personal
6 knowledge or did you do anything to educate yourself
7 beyond that knowledge?
8    A.   I'll be testifying on my personal
9 knowledge, and the program office that is in charge
10 of ensuring the accuracy and the applicability of
11 the actual document.
12    Q.   All right. Now, when was this document
13 initially published, do you know?
14    A.   2011.
15    Q.   And who at the Coast Guard approved the
16 publication of this document? That is to say, which
17 office or program?
18    A.   Office of Commercial Vessel Compliance.
19    Q.   And the CVC office approved its publication
20 back in 2011?
21    A.   Yes, sir.
22    Q.   And how long did this particular inspection
23 handbook remain in force and effect?
24    A.   Until the subsequent document, 2015, came
25 into force.

Page 115

1    Q.   Okay. So it was up and running from 2011
2 through 2015?
3    A.   Yes, sir.
4    Q.   Okay. And can you just tell me briefly why
5 the handbook was initially adopted, what was its
6 function and purpose?
7    A.   The function and purpose of the 840 book is
8 a collection of regulations and requirements that
9 are applicable to each platform with the
10 accompanying CFR site.
11       It is used as a quick, easy guide for
12 marine inspectors to refer to as needed to identify
13 either deficiencies or to ensure compliance with the
14 requirements.
15    Q.   And when you use the term "platforms,"
16 you're referring in this instance to small passenger
17 vessels subject to Subchapter T, like Conception?
18    A.   Yes, sir.
19    Q.   All right. Just by way of example, Lloyd,
20 would you post Clip 19.
21       Let me call your attention to Bate stamped
22 page 2865 of this particular handbook, Task 11. And
23 if you have it -- well, we'll put it on the screen.
24       Task 11 has to do with electrical
25 inspections. During the period between 2011 and

Page 116

1 2015 when an inspector from MSD Santa Barbara
2 inspected a vessel like Conception, was he or she
3 expected to follow the task guidelines set forth on
4 page 2865?
5        Go ahead.
6    A.   I'm sorry. Can you repeat the first part
7 of the question?
8    Q.   Sure. When a marine inspector from MSD
9 Santa Barbara was inspecting a small passenger
10 vessel like Conception during the period between
11 2011 and 2015 when this handbook was in effect, was
12 he or she expected to follow the guidelines spelled
13 out in Task 11?
14    A.   No, sir.
15    Q.   Explain what you mean by that.
16    A.   This is a regurgitation of the regs. These
17 are requirements. Whether they went line by line or
18 whether they just looked at it and then verified
19 compliance is completely up to the marine inspector.
20    Q.   Okay. But the requirements, I gather, are
21 the ones spelled out in the Subchapter T regulations
22 that are reprinted in the margin under "reference"?
23    A.   Those would be applicable -- well, based on
24 the CFR site, to New T.
25    Q.   Okay. Got it. Was there a similar book

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

Page 165

1 the purpose of this checklist?
2      A. It's just a guide for --
3      Q. What does that mean?
4      A. -- reference during the marine inspection.
5      Q. Okay. Well, the term "checklist" to me
6 means a list that you check off. And I'm looking at
7 this particular one and it looks like there's a box
8 after each specific task, which a layperson like me
9 thinks that you naturally check when you're doing a
10 search or doing an inspection.
11      Am I wrong about that?
12      A. You can assume that that is the function of
13 the box.
14      Q. Well, I'm going to assume it. Am I correct
15 in making that assumption?
16      A. You can make that assumption that is the --
17 to check it off that you've completed that task,
18 yes.
19      Q. Do you know one way or the other, speaking
20 as the Coast Guard's PMQ on this issue, whether
21 marine inspectors at MSD Santa Barbara
22 were bound to use this checklist on each and every
23 inspection that they conducted?
24      A. I do not.
25      Q. Okay. Do you know one way or the other

Page 166

1 whether the unit commander at MSD Santa Barbara
2 intended this checklist to be a directive to the
3 marine inspectors operating in that command?
4      A. I do not.
5      Q. Do you know one way or the other whether
6 marine inspectors operating out of MSD Santa Barbara
7 had the discretion to ignore this checklist?
8      A. I do not.
9      Q. Okay. But we do know for a fact, checklist
10 aside, that the marine inspectors working out of MSD
11 Santa Barbara, and indeed anyplace else, had
12 obligations when it came to conducting an electrical
13 inspection to ensure that the vessel was in
14 compliance with the CFR sections listed on the right
15 hand of the list that we're looking at here with
16 electrical. True?
17      A. I would say it would depend based on the
18 scope.
19      So again, those are just guidelines. So if
20 you are -- for instance, an example, if you're doing
21 an annual, you may choose from that list. You may
22 choose all from that list. You may choose one item
23 from that list.
24      It would depend on the marine inspector,
25 the exam -- or the inspection that they are

Page 167

1 conducting and their experience and comfort level
2 for that particular system.
3      Q. And I want to make sure I understand what
4 you're telling me.
5      I'm a marine inspector. It's February of
6 2019. I'm walking down to Conception to perform her
7 last annual inspection before this accident. And I
8 can look at this electrical list and say to myself,
9 gee, I don't have the timing -- I don't have the
10 time it takes to do a grounding inspection today or
11 to look at generators or motors. Maybe I'll just
12 look at distribution panels.
13      Are you telling me that the marine
14 inspector has that kind of discretion?
15      A. They have the discretion to adjust the exam
16 based on the exam -- on the inspection and what is
17 going on with the inspection or to make -- if they
18 don't have any reason to go further, then they have
19 the discretion not to.
20      Q. Let me make sure you're answering the
21 question I put to you.
22      I'm looking at the electrical tasks here
23 and there are nine separate boxes. You're telling
24 me that the person who conducted the marine
25 inspection in February of 2019 had the discretion to

Page 168

1 just perform, for example, an inspection of the
2 lighting and ignore the other eight categories?
3      A. They did.
4      Q. Okay. And upon what do you base that
5 opinion?
6      A. On --
7      Q. I mean, is there anything about the list
8 that says pick and choose which ones you're going to
9 use today?
10      A. On the regulatory cite that says the marine
11 inspector has the discretion, I'm paraphrasing, to
12 adjust the scope of the annual exam.
13      Q. Okay. And which regulatory cite are you
14 referring to -- I beg your pardon. Which regulatory
15 cite are you referring us to?
16      A. 46 CFR 176.500, what is that, (b)(1)(ii).
17      Q. Okay. Now, notwithstanding that, if a
18 marine inspector in the course of his or her
19 inspection actually spots a deficiency that perhaps
20 wasn't on his or her checklist at the outset, can we
21 agree that that marine inspector has a duty to write
22 up that deficiency and to log it in the MISLE
23 database?
24      A. Yes.
25      Q. And once again, once that's done, that

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

**Page 173**

1 make sure they are doing that.
2    Q. Okay. Well, that's I think what I asked
3 you.
4       Do you guys do anything to make sure that a
5 vessel permitted like Conception to operate within a
6 specific geographic area is indeed operating within
7 that specific geographic area?
8       Do you do anything at all?
9    A. Yes.
10    Q. What do you do?
11    A. I just don't know what any -- you could --
12 there's lots of things you could do.
13    Q. Okay. That's a question I should direct to
14 the unit commander, MSD Santa Barbara?
15    A. Yes.
16    Q. Okay. The permit -- the conditions of
17 operation for Conception also indicated that when
18 the vessel is away from the dock and passengers are
19 on board, the crew may be reduced to one master and
20 two deckhands.
21       Do you guys do anything to confirm -- and
22 by "you guys," forgive me.
23       Does the Coast Guard, as far as you know,
24 do anything to confirm that Conception remained
25 within that envelope of her operational conditions?

**Page 174**

1    A. Yes.
2    Q. And what did you guys do in that
3 connection?
4    A. Again, it would be up to the marine
5 inspector of how they ensure compliance, but there's
6 no guidelines of how to ensure that their routes and
7 conditions are being met.
8    Q. All right. And we've already discussed the
9 issue of compliance with the Coast Guard reg on
10 watch keeping.
11       Apart from that, can you tell me whether
12 MSD Santa Barbara or Sector Long Beach/LA, or any
13 other office or program in the Coast Guard, did
14 anything to ensure that, quote, a member of
15 Conception's crew was designated by the master as a
16 roving patrol at all times, whether or not the
17 vessel is underway, when the passengers' bunks are
18 occupied?
19    A. So the -- the marine inspector has endorsed
20 the COI here at the bottom of the document that
21 we're at currently, which is an indicator that they
22 are satisfied that the vessel has met all the
23 conditions of the Certificate of Inspection. And
24 how they did it is entirely up to them, but from a
25 program's perspective, they were in compliance with

**Page 175**

1 the requirements.
2    Q. But from a program's perspective, they had
3 to do something to determine whether the vessel was
4 operating in compliance with that condition. True?
5    A. Yes.
6    Q. Okay. All right. Let's turn to Topic
7 number 7. And Eric, this is, I gather, the Job Aid
8 we were discussing before, and I apologize for
9 creating any confusion about that.
10       Lloyd, would you post Clip 32.
11       Topic Number 7 concerns, quote, "The
12 history, purpose, meaning, and day-to-day
13 application of Small Passenger Vessel (T) Inspector
14 Job Aid (2015)," Bates stamped pages 2882 to 2895.
15       What is it about your experience and
16 background with the Coast Guard that qualifies you
17 to be the defendant's PMQ on this topic?
18    A. Using the document -- using the actual
19 document from personal experience and being the
20 program office that is responsible for the
21 publication of this document.
22    Q. As you sit here today, can you think of
23 anybody in the program office who is more qualified
24 to address this topic on the defendant's behalf than
25 you?

**Page 176**

1    A. No.
2    Q. And will you be testifying entirely from
3 your own personal experience or have you done
4 anything to educate yourself about this particular
5 beyond that experience?
6    A. Personal experience.
7    Q. Okay. Lloyd let's publish Clip 33.
8       This is the Small Passenger Vessel (T) Job
9 Aid in question. We've marked it as Exhibit 14.
10       This is the title page of that document.
11 I've produced the whole document itself in an e-mail
12 last night to Eric.
13       Can you confirm that this is indeed the
14 title page of the Job Aid that was described in
15 Topic Number 7?
16    A. Yes, I can.
17    Q. And this was indeed the Small Passenger
18 Vessel (T) Inspector Job Aid that was in place at
19 the time of Conception's loss?
20    A. Yes, it was.
21    Q. Now, is this a CG-840 document like the
22 T-Boat inspector's -- beg your pardon, like the
23 T-Boat inspector's handbook or is this something
24 else?
25    A. It is the same type of document. We -- in

**ER 596**

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 16 of 21    Page vs.
Commander Stefanie Hodgdon                    ID #:712                           United States of America

Page 177

1 2015 we just renamed it --
2    Q. Okay.
3    A. -- a Job Aid. We renamed all of our 840
4 books that was a legacy reference to now Job Aides.
5    Q. I see. And when this Job Aid was adopted
6 in 2015, did it supersede or supplant the handbook
7 that we looked at earlier?
8    A. Yes, it did.
9    Q. Okay.
10    A. Can I just add one thing?
11    Q. Sure.
12    A. So this was the program's document. It was
13 in effect, but we don't -- we did not officially
14 cancel previous versions because the regulations
15 hadn't changed. It's more of a format that changed.
16    Q. Okay. So MSD Santa Barbara could have used
17 both the Job Aid and the handbook if it so chose?
18    A. Yes. That is correct.
19    Q. There were no directives to Santa Barbara
20 to apply one and ignore the other?
21    A. That is correct.
22    Q. Got it. Can you tell me the reasons why
23 that Job Aid was adopted and published?
24    A. Yes. So if you look at the 2011 version
25 and previous versions they are quite long and

Page 178

1 lengthy.
2    Q. Hm-hmm.
3    A. And the part of Commercial Vessel
4 Compliance's program goals is to modernize and, you
5 know --
6    Q. Streamline?
7    A. Streamline, thank you. Streamline and make
8 it easier for the marine inspector to conduct
9 inspections. And from feedback we were -- we were
10 told that the previous versions were quite lengthy.
11    So if you look at them side-by-side, they
12 are identical in the sense that the regs are the
13 same, associated with the same topics, but the 2011
14 version gives you more steps which is just verbatim
15 from the regs.
16    Q. Hm-hmm.
17    A. And the 2015 version will give the general
18 idea. And if you need to reference additional steps
19 to ensure compliance, then you can refer back to the
20 2011 version or you can actually just go into the
21 regs and get more specifics.
22    But it reduced the paper from 42 pages down
23 to 11.
24    Q. So to draw an analogy, which will label me
25 as a boomer, this is basically the CliffNote version

Page 179

1 of the handbook?
2    A. It's the CliffNote version of the
3 regulations.
4    Q. Okay. Would you please post Clip 35 for
5 me.
6    Calling your attention to the highlighted
7 language, it says, "The tasks contained within this
8 Job Aid are not intended to limit the scope or depth
9 of inspection. A checked box should be a running
10 record of what has been inspected and does not imply
11 that the entire system has been inspected or that
12 any -- or that all or any items are in full
13 compliance. This Job Aid does not constitute part
14 of the official inspection record."
15    Have I read that correctly?
16    A. You have.
17    Q. What does it mean?
18    A. It's just a tool that an inspector can use
19 to reference while they were conducting the exam.
20    Q. And do you expect inspectors to take this
21 tool with them during inspections?
22    A. We do not.
23    Q. Okay. I'm sorry. I didn't mean to
24 interrupt.
25    A. The program in the Coast Guard does not

Page 180

1 expect inspectors to take this. It's a choice.
2    Q. Got it. So as was the case with the
3 handbook, the requirements, the safety directives,
4 the mandates, if you will, themselves are set forth
5 in the regulations, correct?
6    A. That's correct.
7    Q. And those regulations are referenced in the
8 guide and in the handbook. Am I reading that
9 correctly?
10    A. Yes.
11    Q. Okay. Would you post Clip 34.
12    What are we looking at here?
13    A. A bunch of boxes.
14    Q. Well, there are a bunch of boxes which are
15 labeled, "Deficiency Summary Worksheet."
16    What is that?
17    A. It's a page out of the Job Aid where a
18 marine inspector can take notes or write
19 deficiencies that they find during the inspection.
20    Q. Okay. And it also has a column to indicate
21 the date where the deficiency was cleared?
22    A. Yes.
23    Q. Now, "Req't. Issued," what does that mean?
24    A. Requirement issued.
25    Q. And can you explain that to us in lay

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 17 of 21   Page
ID #:713

Commander Stefanie Hodgdon                                    Hedler vs.
                                                      United States of America

Page 221

1 to determine whether or not cables that provide
2 power or lighting are UL marine cable?
3      A. I don't know if that's the first thing.
4 That depends on the person.
5      Q. Let me rephrase it, then.
6      Is that one of the things an inspector is
7 looking to determine, whether cable is UL marine
8 cable aboard a small passenger vessel like
9 Conception?
10     A. If it is to be seen without disturbing the
11 area and you can see it, yes.
12     Q. Okay. Would you please post Clip 53.
13      According to 46 CFR 183.340 (b), all cable
14 and wire must: (1) Have stranded copper conductors
15 with sufficient current carrying capacity for the
16 circuit in which they are used." True?
17     A. Yes.
18     Q. "Be installed in a manner to avoid or
19 reduce interference with radio reception and compass
20 indication." True?
21     A. Yes.
22     Q. "Be protected from the weather."
23      Those are among the things you're looking
24 for when examining cable. True?
25     A. Yes.

Page 222

1      Q. And those, once again, are not guides, they
2 are not suggestions, they are directives as to which
3 the marine inspector has no discretion. You've got
4 to look for that stuff.
5      A. Well, it says you have to ensure that they
6 comply with those regs.
7      Q. Okay.
8      A. You have to comply with that list. How
9 they do that is up to the marine inspector, but as
10 long they meet those requirements, then yes.
11     Q. Understood. And if they do not then you
12 have to write it up as a deficiency?
13     A. You have to identify that as a deficiency,
14 yes.
15     Q. You have to log the deficiency in the
16 database?
17     A. Yes.
18     Q. And you have to conduct a deficiency review
19 to make sure that the deficiency has been rectified?
20     A. Well, I would have to counter and say what
21 kind of -- what are we talking about? Are we
22 talking about inspection? Are we talking about when
23 the vessel is in dry dock?
24     Q. I'm talking about annual inspection.
25     A. For an official annual inspection, yes, if

Page 223

1 you identify that the vessel does not meet one of
2 those things, the policy is that you notate it and
3 put it into MISLE, yes.
4      Q. Okay. And then let's take a look at --
5 yeah, you've got it, Lloyd. This is Clip Number 54.
6 And this is the same reg (d) (2), "The cable and
7 wire for power and lighting circuits must: Be
8 listed by Underwriters Laboratories (UL), as UL Boat
9 or UL Marine cable."
10      Have I read that correctly?
11     A. You have.
12     Q. What is that? What is UL boat or UL marine
13 cable?
14     A. I'm not understanding the question.
15     Q. What is it that confuses you?
16      I'm asking you as a marine -- as a former
17 marine inspector yourself to tell us what is UL boat
18 or UL marine cable? What's the reg talking about?
19     A. That the reg is speaking to does that wiring
20 is -- meets the standard.
21     Q. Okay. And how do you as a marine inspector
22 tell whether or not a particular wiring or cable in
23 a vessel meets the standard of 183.340 (d)(2)?
24     A. From the inspections that I've personally
25 done, it's notated on the actual wire. It will

Page 224

1 say --
2      Q. Now -- I didn't mean to interrupt.
3 Continue, please.
4      THE REPORTER: Sorry, I didn't catch that.
5 It will say --
6      THE WITNESS: It will have a UL and it will
7 say that it's -- it's the UL marine -- actually, I
8 don't remember if it's UL marine or if there's an
9 actual, like, number that's associated with it.
10      But it will say it right there on the
11 outside of the coating of the wire -- maybe,
12 assuming that it hasn't been worn one time. Like
13 on brand-new wire it will have an indicator.
14     Q. And can we agree that if a marine inspector
15 discovers non-marine grade cable aboard a vessel
16 like Conception, he or she must record a deficiency
17 in the MISLE database?
18     A. Yes.
19     Q. Can we agree that if he or she records such
20 a deficiency, that marine inspector should conduct
21 an inspection more detailed in scope to ensure that
22 the vessel is in satisfactory condition?
23     A. Yes.
24     Q. Okay. And can we likewise agree that the
25 MSM further directs marine inspectors to determine

Case 2:21-cv-07065-PA-MRW    Document 88-4    Filed 05/15/24    Page 18 of 21    Page Hedler vs.
**Commander Stefanie Hodgdon**    ID #:714    **United States of America**

Page 225

1 the condition of the cables by insulation resistance
2 readings and visual observation?
3     A. I would have to refer to the Marine Safety
4 Manual.
5     Q. Can you post Clip 55, please.
6         This is from the MSM manual. Lloyd, can
7 you show us the Bates stamped page.
8         It's Bates stamped page 1136. And reads,
9 f. "Electrical cables. The inspector must determine
10 condition of cables by insulation resistance
11 readings and by visual observations."
12         Again, that's not disjunctive, it's
13 conjunctive, "The inspector must determine condition
14 of cables by insulation resistance readings and by
15 visual observations."
16         That's a directive, is it not?
17     A. This is guidance.
18     Q. "Must determine"?
19     A. This is --
20     Q. You don't read that language at mandatory?
21     A. The whole manual as a whole is guidance.
22 It's right there in the front.
23     Q. So when the manual gives me a -- strike
24 that.
25         When the manual issues a marine directive

Page 226

1 as a marine inspector saying that I must determine
2 the condition of cables by insulation resistance
3 readings and visual observations, you're telling
4 me that I have discretion to ignore that?
5     A. I'm saying you have discretion on how you
6 determine that it's in good condition. There's
7 other ways.
8     Q. Well, here it says "The inspector must
9 determine condition of cables by insulation
10 resistance readings and by visual observations."
11         I don't know about you, but in law we're
12 taught that language like "shall" and "must" are
13 mandatory.
14         Can we agree that this directive in the MSM
15 is mandatory and not discretionary?
16     A. No, it's not mandatory.
17     Q. "Must" is not mandatory. Okay.
18     A. No. And I can give you an example of why.
19         If you -- if they are -- say like it's, for
20 example, even more egregious and they are going to
21 have the vessel completely rewired, and they rewire
22 it, and then you have a professional person that
23 does it, you wouldn't need to go and determine the
24 condition of the cable by insulation and resistance
25 because you've been provided evidence that says that

Page 227

1 it's brand-new from a qualified person who conducted
2 the repair.
3     Q. You're talking about a deficiency review.
4 I'm now talking about the initial inspection.
5         During an initial inspection when the
6 inspector is examining cable, at least according to
7 the MSM, it says that the inspector must determine
8 condition of cables by insulation resistance
9 readings and by visual observations.
10         In that instance, during the initial
11 inspection, can we agree that this directive is
12 mandatory?
13     A. No, we cannot. Because --
14     Q. All right. I think you've stated your
15 position on it remarkably clearly, if not
16 persuasively. But let me ask you this:
17         What is the MSM talking there when it talks
18 about resistance readings, how does one obtain
19 resistance readings from electrical cable?
20     A. I'm sorry. It's very late here. I'm
21 losing -- there's -- I can't remember what it's
22 called, but there's a piece of equipment that you
23 can hook up to determine that it's providing the
24 right voltage, amperage, something like that.
25     Q. All right. And are marine inspectors

Page 228

1 physically equipped with that particular device when
2 inspecting small passenger vessels like Conception?
3     A. I would -- it is available -- it is
4 available at units -- it was available at my units
5 that I've been. I can't speak for all units.
6         It's not a standard that every unit gets
7 issued this, but I can say personally speaking that
8 we had them at all the units that I was at.
9     Q. All right. Now, I'll tell you, Commander,
10 that as I read this passage, it suggests to me, at
11 least, as an attorney who reads and applies
12 regulations, that an inspector inspecting a small
13 passenger vessel like Conception, when examining and
14 inspecting its electrical cables must determine the
15 condition of that cable by using that device to test
16 its insulation resistance.
17         Do you read this in some other way?
18     A. Again, it depends.
19     Q. On what? Where in this language is the
20 variation on which the use of that particular device
21 depends? "The inspector must determine condition of
22 cables by insulation or resistance readings," where
23 is the caveat?
24     A. Again, if there was other circumstances
25 where I can ensure that the cable was in good

Commander Stefanie Hodgdon                                    Fiedler vs.
United States of America

Page 229

1 condition, i.e., they replaced the whole thing and a
2 qualified electrician has provided me objective
3 evidence, I would say that it is in good condition.
4      Q. Let me return you to my question. This is
5 not a deficiency follow-up.
6      A. It doesn't matter.
7      Q. My -- let me just finish. My hypothetical
8 poses a question where the inspector in the first
9 instance is inspecting cable. And in the first
10 instance, at least as I read this directive, it
11 indicates to me that the inspector must, among other
12 things, determine the condition of that cable by
13 insulation resistance readings using the device that
14 you just identified.
15      Do you disagree?
16      A. I do. This is all guidance.
17      Q. Okay. Let's turn your attention to
18 something else.
19      Apart from electrical inspections, did
20 marine inspectors who examined Conception also have
21 an obligation to write up all observed fire hazards?
22      A. Can you be more specific?
23      Q. Sure. Lloyd, would you post Clip 59.
24      46 CFR 176.830 (a), "At each inspection for
25 certification and at every other vessel inspection

Page 230

1 all observed unsafe practices, fire hazards, and
2 other hazardous situations must be corrected and all
3 required guards and protective devices must be in
4 satisfactory condition."
5      Have I read that accurately?
6      A. You have.
7      Q. Can we agree that this is a directive?
8      A. Yes.
9      Q. It's a mandate?
10      A. Yes.
11      Q. And to restate that mandate in terms of
12 material to the instant question, can we agree that
13 at each inspection for certification and at every
14 other vessel inspection, all observed fire hazards
15 must be corrected?
16      A. Yes.
17      Q. Okay. Now, just generally speaking, and
18 drawing on your own personal experience, what are we
19 talking about when we use the phrase "fire hazards"?
20      A. There is a broad range of what fire hazards
21 could be.
22      Q. That's why I'm asking you to describe it.
23      A. So the easiest one would be a non-steel
24 trash can.
25      Q. Okay.

Page 231

1      A. Obviously if you have a trash can and
2 there's paper in it and somebody throws a cigarette
3 in it, it could potentially have a fire hazard.
4      Q. And were such a fire hazard, a non-steel
5 trash can is observed, at least according 176.830,
6 the inspector should take action to correct it.
7 True?
8      A. Yes.
9      Q. Okay. Now, would you please post Clip 60,
10 which is 46 CFR 177.405.
11      And let me call your attention to subpart
12 (f) Waste receptacles. "Unless other means are
13 provided to ensure that a potential waste receptacle
14 fire would be limited to the receptacle. Waste
15 receptacle must be constructed of noncombustible
16 materials with no openings in the sides or bottom.
17      Have I read that correctly?
18      A. Yes.
19      Q. Speaking as a marine inspector yourself, as
20 a member of the CVC program, as the PMQ on this
21 topic, can you tell me what we're talking about
22 there?
23      What are -- how can we tell when a waste
24 receptacle has been constructed of combustible
25 materials as opposed to noncombustible materials?

Page 232

1      A. You'd just have to look at it.
2      Q. Have you ever heard of polypropylene?
3      A. Yes.
4      Q. Can we agree that polypropylene is a
5 combustible material?
6      A. Yes.
7      Q. Can we agree that a waste receptacle
8 manufactured of polypropylene aboard a vessel is an
9 obvious violation of 46 CRF 177.40(f)?
10      A. Give me a second.
11      Q. No problem.
12      A. Well, you have to read the first part of
13 the regulation. So it says, "unless other means are
14 provided."
15      So if they do provide other means to ensure
16 that it would be limited, then you could make the
17 argument that it doesn't have to be constructed of
18 noncombustible materials.
19      Q. And when you refer to that other means by
20 which it would be limited, could you tell us what
21 you're talking about?
22      A. The owner and operator would have to prove
23 that it -- it is another means that it would be
24 limited to that receptacle.
25      Q. In other words, what you're telling us is

Commander Stefanie Hodgdon

Page 233

1 that if a polypropylene waste can is found aboard a
2 vessel and the owner can satisfy the Inspector that
3 a fire that began in that receptacle would not
4 spread to other portions of the vessel, that would
5 not be an observed fire hazard.
6       Am I reading your -- am I understanding
7 your testimony correctly?
8       A. Yes.
9       Q. Okay. Lloyd, would you play Clip 17,
10 please.
11         (Video shown)
12         I already managed to miss two
13 receptacles -- let's go back. First of all, back up
14 the stairs.
15         And progress it just a little bit further.
16 A couple more. Go back, I'm sorry.
17         And forgive me, Commander. This is the
18 only photograph we have of this waste receptacle
19 because it was consumed in the fire. There we go.
20         Directly underneath the stairs there is a
21 polypropylene waste receptacle on the afterdeck of
22 Conception.
23         The evidence will show that the
24 polypropylene waste receptacle was not only there on
25 the night of September 2nd, 2019, but had been there

Page 234

1 for years.
2       Can we agree that that polypropylene waste
3 receptacle, given its location directly beneath
4 wooden stairs and shelves, is an obvious fire
5 hazard?
6       A. No.
7       Q. No? Could you explain your answer, please?
8       A. Yeah. They would have -- the owner -- if I
9 saw -- if I personally saw that, I would have -- I
10 would ensure that there was no other means that it
11 would be contained.
12         They would have --
13       Q. All right.
14       A. They would have -- so just by looking at a
15 picture, no. I will say no.
16       Q. You don't believe that that polypropylene
17 flammable waste receptacle is a fire hazard given
18 its location directly behind a wooden bulkhead and
19 directly beneath wooden shelves and stairs, you
20 don't recognize that as a deficiency?
21       A. I don't know that that is a polypropylene
22 receptacle. To me --
23       Q. You could assume from my hypothetical that
24 that is indeed a polypropylene receptacle. As I
25 understand it, you haven't read the ATF report, but

Page 235

1 that is indeed a polypropylene receptacle,
2 combustible material. You can also assume that it's
3 directly beneath wooden stairs.
4       My question to you as a marine Inspector
5 and as the PMQ is, do you at the very least
6 recognize this as a deficiency within the meaning of
7 the Coast Guard regs that we just looked at?
8       A. So how do we know that vessel -- that -- as
9 a marine inspector how do I know that that wasn't
10 removed before the vessel got underway?
11       Q. Well, we know because it was aboard the
12 vessel the night the fire took place.
13       But for the purposes of my hypothetical
14 right now, I'm asking you to assume that you boarded
15 Conception, that you saw that polypropylene
16 receptacle on the afterdeck, that you saw it
17 situated directly beneath a wooden stairway and
18 wooden shelves directly aft of a wooden bulkhead in
19 the position that's depicted in this video still.
20       My question to you is, would you -- do you
21 recognize that as an obvious fire hazard within the
22 meaning of the regs?
23       A. Yes.
24       Q. Okay. Now, given that hypothetical, can we
25 agree that a marine inspector had a mandatory duty

Page 236

1 to list that deficiency, to log it, and to ensure
2 that it had been rectified?
3       A. Per policy, yes.
4       Q. Let me turn your attention back to Clip 60,
5 46 CFR 177.405.
6       Take a look at paragraph (c) "Separation of
7 machinery and fuel tank spaces from accommodation
8 spaces. Machinery and fuel tank spaces must be
9 separated from accommodation spaces by boundaries
10 that prevent the passage of vapors."
11       Have I read that correctly?
12       A. I'm just checking to see if this is
13 applicable to Old T.
14       Q. Understood.
15       We may be violating the 15-second pitch
16 rule here.
17       A. So that requirement is not outlined in Old
18 T.
19       Q. And you're assuming, of course, that Old T
20 applies, notwithstanding the major conversion that
21 the vessel underwent in 2005?
22       A. Yes. I've seen no evidence that this
23 vessel would be applicable to New T.
24       Q. Okay. Do you remember what the question
25 was?

Case 2:21-cv-07065-PA-MRW   Document 88-4   Filed 05/15/24   Page 21 of 21   Page
ID #:717

Commander Stefanie Hodgdon

Fiedler vs.
United States of America

Page 245

1  we go off the record for five minutes.
2        APTUS VIDEO TECHNICIAN:  Off the record
3  8:50 p.m.
4        (Recess taken)
5        APTUS VIDEO TECHNICIAN:  We're now back on
6  the record the time is 8:56 p.m.
7        MR. HILLSMAN:  Commander Hodgdon, you've
8  been very patient.  That's all I have for now.
9        Let me just note for the record, Eric, that
10  I have limited myself to the 12 topics that you've
11  produced this witness on.
12        I do not agree with your dismissal of the
13  other topics.  We don't have to argue about that
14  now.  You and I can discuss it.  But with that
15  observation, I've got no further questions.
16        MR. KAUFMAN-COHEN:  Does that mean the
17  plaintiffs are done?
18        MR. HILLSMAN:  I believe it does.
19        MR. KAUFMAN-COHEN:  On the record saying
20  we'll get you the people in sector about the
21  circulars you were talking about.
22        MR. HILLSMAN:  That would be great.  Okay.
23  Good.  And then we can also discuss my thoughts on
24  some of the other topics, but we needn't do that
25  now.

Page 246

1        MR. KAUFMAN-COHEN:  I want to make sure the
2  court reporter understands, we don't want the video.
3  With that, we're done.
4        APTUS VIDEO TECHNICIAN:  Okay.  We're going
5  off the record.  The time is 8:57 p.m.
6
7        (Whereupon, the deposition was
8        adjourned at 8:57 p.m., Eastern)
9
10
11        --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 247

1              CERTIFICATE OF REPORTER
2        I, ANGELA T. KOTT, Certified Shorthand
3  Reporter, hereby certify that the witness in the
4  forgoing deposition was duly sworn to tell the
5  truth, the whole truth and nothing but the truth in
6  the within-entitled cause,
7        That said deposition was taken down in
8  shorthand by me, a disinterested person, at the time
9  and place therein stated, and that the testimony of
10  the said witness was thereafter reduced to
11  typewriting, by computer, under my direction and
12  supervision;
13        That before completion of the deposition,
14  review of the transcript [ X ] was [  ] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18        I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23        Dated: April 17, 2023.
24
25              ANGELA T. KOTT, CSR 7811

Page 248

1          DECLARATION UNDER PENALTY OF PERJURY
2  Case Name: Fiedler vs. United States of America
3  Date of Deposition: 04/12/2023
4  Job No.: 10117560
5
6        I, COMMANDER STEFANIE HODGDON, hereby certify
7  under penalty of perjury under the laws of the State of
8  _____ that the foregoing is true and correct.
9        Executed this _____ day of
10  _____, 2023, at _____.
11
12
13  _____
14              COMMANDER STEFANIE HODGDON
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20___,
21  by_____,  proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25

# Exhibit C

MARINE SAFETY MANUAL

VOLUME I

TABLE OF CONTENTS

CHAPTER 1.    MARINE SAFETY PROGRAM
    Section    1.A    Philosophy Of The Marine Safety Program
    Section    1.B    Marine Safety Manual (MSM)
    Section    1.C    Commercial Vessel Safety (CVS) Program
    Section    1.D    Port And Environmental Safety (PES) Program
    Section    1.E    Marine Environmental Response (MER) Program
    Section    1.F    Coast Guard In-House Compliance With
                      Environmental Law
    Section    1.G    Marine Pollution Financial Responsibility And
                      Compensation Program
    Section    1.H    Waterways Management (WWM) Program
    Section    1.I    Navigation Safety Program
    Section    1.J    Coast Guard Recreational Boating Safety(RBS)
                      Program
    Section    1.K    Civil Penalty Hearing Officer Program

CHAPTER 2.    AUTHORITY AND PERFORMANCE STANDARDS FOR MARINE SAFETY
              ACTIVITIES
    Section    2.A    Sources Of Authority
    Section    2.B    Enabling Authorities For The Captain Of The
                      Port (COTP), Officer In Charge, Marine
                      Inspection (OCMI), And On-Scene
                      Coordinator (OSC)
    Section    2.C    Specific Authorities For Requiring Coast
                      Guard Inspection And Licensed Or
                      Certificated Personnel On Vessels
    Section    2.D    Major Legislative Authorities For The Marine
                      Environmental Protection (MEP) Program
    Section    2.E    Specific Authority For The Port Safety And
                      Security (PSS) Program
    Section    2.F    Specific Authority For The Bridge
                      Administration (BA) Program
    Section    2.G    Specific Authority For The Recreational
                      Boating Safety (RBS) Program
    Section    2.H    Grants Of Authority
    Section    2.I    Lines Of Authority
    Section    2.J    Port Safety And Security (PSS) And Marine
                      Environmental Protection (MEP) Mission
                      Performance Standards (BEING DEVELOPED)
    Section    2.K    Authority For Commercial Vessel Safety (CVS)
                      Performance Standards (BEING DEVELOPED)
    Section    2.L    Authority For Maritime Defense Zone (MDZ)
    Section    2.M    Authority For Exemptions And Waivers

CONTENTS I

Declaration of Scott Perrygo, Exhibit C, Page 1 of 9

US000430

MARINE SAFETY MANUAL

VOLUME I

TABLE OF CONTENTS

    Section   2.N   Appeals
    Section   2.O   MSIS (BEING DEVELOPED)

CHAPTER 3.   MARINE SAFETY ORGANIZATION
    Section   3.A   Headquarters
    Section   3.B   Field
    Section   3.C   Program Billets And Positions

CHAPTER 4.   LAW ENFORCEMENT
    Section   4.A   Enforcement Perspective And Scope
    Section   4.B   Enforcement Objectives And Principles
    Section   4.C   Definitions
    Section   4.D   Enforcement Policy
    Section   4.E   Intragovernmental And International
                    Enforcement Coordination

CHAPTER 5.   CIVIL PENALTY VIOLATIONS AND CRIMINAL OFFENSES
    Section   5.A   General Violation Case Procedures
    Section   5.B   Penalty Assessment Under The FWPCA
    Section   5.C   Publication Of Marine Safety Civil Penalty
                    And Other Enforcement Actions

CHAPTER 6.   PERSONNEL MANAGEMENT
    Section   6.A   Basic Management Concerns
    Section   6.B   Assignment And Employment Of Personnel
    Section   6.C   Marine Safety Apparel
    Section   6.D   Use Of CG Reserve Resources
    Section   6.E   Off-Duty Employment Of Marine Safety
                    Personnel
    Section   6.F   Temporary Additional Duty For Overseas
                    Inspectors

CHAPTER 7.   PROFESSIONAL TRAINING AND QUALIFICATION
    Section   7.A   General Requirements For
                    Marine Safety Professional Training And Qualification
    Section   7.B   Management Of The Marine Safety Training And
                    Qualification Program
    Section   7.C   Career Development Paths And Patterns
    Section   7.D   Qualification In Marine Safety Programs
    Section   7.E   On-The-Job Training (OJT)
    Section   7.F   Professional Resident Courses

Declaration of Scott Perrygo, Exhibit C, Page 2 of 9

US000431

**ER 605**

MARINE SAFETY MANUAL

VOLUME I

TABLE OF CONTENTS

Section 7.G    Nonresident Training Administered by Marine Safety Commands
Section 7.H    Training with the Marine Industry
Section 7.I    Postgraduate Training
Section 7.J    Reserve Training
Section 7.K    Procedures for Maintaining Professional Credentials

CHAPTER 8.    MATERIAL MANAGEMENT

Section 8.A    Material Administration
Section 8.B    Unit Logistics
Section 8.C    Safety Equipment and Protective Clothing
Section 8.D    Vehicles and Small Boats
Section 8.E    Firefighting Equipment
Section 8.F    Pollution Control Equipment
Section 8.G    Coast Guard Employment of Civilian Aircraft

CHAPTER 9.    MISCELLANEOUS ADMINISTRATIVE CONCERNS

Section 9.A    Policy
Section 9.B    Coast Guard Adoption of Codes and Standards
Section 9.C    Public Access to Information
Section 9.D    Public Affairs Management

CHAPTER 10.    OCCUPATIONAL HEALTH AND SAFETY PROGRAMS

Section 10.A    Policy
Section 10.B    Unit Safety and Environmental Health Program
Section 10.C    Marine Safety Anticipated Hazards
Section 10.D    Controlling Hazards
Section 10.E    Safety Training Program
Section 10.F    Occupational Medical Surveillance and Evaluation Program
Section 10.G    Marine Safety and Environmental Protection Confined Space
               Entry Policy Aboard Merchant Vessels
Section 10.H    Designation of Coast Guard Competent Persons
Section 10.I    References

Declaration of Scott Perrygo, Exhibit C, Page 3 of 9
Contents III  CH-14

US000432

MARINE SAFETY MANUAL

VOLUME I

TABLE OF CONTENTS

CHAPTER 11.    EXTERNAL RELATIONS

    Section 11.A  Interagency Relations
    Section 11.B  International Activities
    Section 11.C  Great Lakes Pilotage
    Section 11.D  Joint Marine Pollution Contingency Plans
    Section 11.E  Relationships with the Marine Safety Industry
    Section 11.F  Federal/State Boating Safety Regulations

CHAPTER 12.    INFORMATION AND DATA SYSTEMS

    Section 12.A  Purpose and Responsibilities
    Section 12.B  Major G-M Information Systems
    Section 12.C  Pollution and Chemical Hazards Response Information Systems
    Section 12.D  Other Coast Guard Information Systems
    Section 12.E  Headquarters and Field Units
    Section 12.F  MISLE Data Entry Procedures
    Section 12.G  MISLE Sections
    Section 12.H  MISLE Data Entry and Activities Action Standards
    Section 12.I  Relevant Laws, Regulations, and Policies

CHAPTER 13.    REPORTS AND CORRESPONDENCE

    Section 13.A  Administrative Standards
    Section 13.B  Reports
    Section 13.C  Forms
    Section 13.D  Marine Safety Records
    Section 13.E  Vessel Case/Project Standard Subject Heading Notice

Declaration of Scott Perrygo, Exhibit C, Page 4 of 9
US000433

**ER 607**

MARINE SAFETY MANUAL

CHAPTER 1.   MARINE SAFETY PROGRAM

A.   Philosophy Of The Marine Safety Program.

   1.   Historical Objectives.

      a.   Origin Of The Program.   In the early 1800's, Congress was
reluctant to address "marine safety" issues with regard to
the steamboat industry.   Only after a long series of marine
incidents, involving heavy losses of life and property, did
Congress enact legislation and create a federal
organization, the Steamboat Inspection Service, to preserve
and protect the public from preventable marine incidents.
The preservation of life in the aftermath of a marine
incident was carried out by federal search and rescue
forces; the protection aspect (before-the-fact) was
handled by federal agencies involved with maritime law
enforcement and aids to navigation.   The Coast Guard's
current marine safety programs still retain the overall
philosophical objectives of the historical preservation and
protection programs.   As a result of myriad statues and
regulations affecting the marine environment and the marine
industry, several distinct programs concerned with marine
safety and related issues have evolved:   Commercial Vessel
Safety (CVS), Port and Environmental Safety (PES), Marine
Environmental Response (MER), Waterways Management (WWM),
Recreational Boating Safety (RBS), and Bridge Administration
(BA).

      b.   Origin Of The Marine Safety Office (MSO).   In 1972, the
Commandant decided to consolidate CVS, PES/MER/WWM, BA, and
RBS investigative activities in the field under the MSO
structure.   The previous segregation of review and response
activities result in well meant, but fragmented, "marine
safety" policies tending to focus on symptoms rather than
causes of marine casualties and incidents.   Under
consolidation, attention is better focused on preventing
marine casualties and incidents through appropriate
legislation and regulations, coordinated field efforts to
implement requirements, and education of the maritime
public.   In 1982, the policy concerning the investigation of
recreational boating fatalities was changed to reflect that
only those accidents which were inadequately investigated by
the state, as determined by the Commandant or the district
commander, would be investigated by investigations
departments of MSO's/marine inspection offices (MIO's).
States are considered the primary investigative authority
for all boating accidents as provided by 33 CFR 174.103.

   2.   Operational Intent.   While Congress provided the Coast Guard
with certain specific powers and constraints to enforce marine
related laws and regulations, different approaches to
enforcement have evolved as a result of the variances between
various statues.   For example, CVS Program objectives can be met
by withholding a Certificate of Inspection (COI) from a vessel
that does not comply with the safety standards prescribed by
laws and regulations, or by withholding a license or merchant
mariner's document (MMD) from any person who does not comply
with the requirements of appropriate federal laws and
regulations.   The PES Program, on the

1-1   Declaration of Scott Perrygo, Exhibit C, Page 5 of 9

US000437

MARINE SAFETY MANUAL

1.A.2.  (cont'd) other hand, has no issuance of licenses or documents, nor "before-the-fact" inspection and certification of potential pollution sources, except for certain vessels and liquid bulk facilities.  Originally, the enforcement concept for PES was one of "crime and punishment."  Since the program's inception, emphasis has shifted from punishment to prevention because, ultimately, the only true protection from pollution incidents comes from preventing them.  The PES Program focuses upon port facilities and merchant shipping.

    3.  Personnel Intent  Today, all personnel assigned to CVS, PES/MER/WWM Program funded billets can be referred to as "marine safety" personnel.  It is the Commandant's goal that such personnel eventually be well trained in all aspects of marine safety.  This is not the goal during the first MSO tour, an assignment where an individual should develop expertise in one program before expanding.  It is recognized that not all personnel will have the same level of experience in all aspects of "marine safety," regardless of rank or grade, because the term encompasses not only marine safety functions (e.g., marine inspection, pollution investigation), but others that are of an operational nature.  The Commandant has determined that the public will be served best by consolidated administration of marine safety activities and a positive approach to training and diversification of unit personnel.  An "us" and "them" attitude or the notion that an MSO has a "captain of the port (COTP) side" distinct in importance from a "marine inspection office (MIO) side" is counterproductive and should be discouraged by unit managers.

B.  Marine Safety Manual (MSM).  The MSM is the primary policy and procedural statement for the marine safety programs of the Coast Guard.  Published for the use of all Coast Guard marine safety and industry personnel, it prescribes the essential functions which must be performed to attain the overall objectives of the CVS and PES/MER/WWM Programs and certain investigative functions of the RBS Program.  The MSM should be used as a guide for consistent and uniform administration of marine safety activities, without undue hampering of independent action and judgment by marine safety personnel.

    1.  Effective Use Of The MSM.  District commanders and unit commanding officers (CO's) shall ensure that they and their personnel are familiar with the provisions of this manual.  This is particularly important in view of the large amount of new and revised policy contained in this manual.  The MSM must be used in concert with appropriate marine safety laws and regulations.  In any case of apparent conflict between provisions of this manual and any statue or regulation, the legal requirements shall be observed.  Commandant (G-MP) should be informed of the conflict so that the matter can be resolved.  In case of conflict between provisions of this manual and conventional practice, the appropriate Headquarters staff element should also be contacted for resolution of any doubt.

    2.  Publications And Directives Affected.  The MSM has superseded the following publications:

        a.  Merchant marine safety Manual (CG-203);

1-2  Declaration of Scott Perrygo, Exhibit C, Page 6 of 9

US000438

**ER 609**

MARINE SAFETY MANUAL

3.C.2.a.    (2)  Authority.  The OCMI is vested with the authority to
perform such activities, and to delegate them to
subordinates, by the Code of Federal Regulations (CFR).
The OCMI, though designated and assigned by the
Commandant, is directly answerable to the district
commander.  The OCMI's decisions may be appealed to the
district commander and ultimately to the Commandant,
whose decision is final (see chapter 2 of this volume).
The OCMI serves as the CO of an MSO or MIO, in
accordance with the provisions of Coast Guard
Regulations, COMDTINST M5000.3, and applicable
Commandant and district directives.  The OCMI is
responsible for the supervision and training of all
unit personnel, so that they are qualified to perform
the duties of the marine safety programs.  Sound
judgment in the discharge of these duties shall be
emphasized, so that requirements and standards are
reasonably applied.

(3)  Responsibility.  The OCMI and those under the OCMI's
authority shall adhere to the procedure established by
statutes and regulations, international treaties,
agreements, COMDTINST's and Commandant Notices
(COMDTNOTE's), Navigation and Vessel Inspection
Circulars (NVIC's), and the provisions of this manual
to ensure uniform application of requirements and
standards to vessels, facilities, and personnel.  The
OCMI shall strive to avoid unreasonable requirements
and arbitrary or unreasonable decisions in the
discharge of the marine safety programs.  In some
cases, requirements may vary for similar vessels
because of different proposed routes or service and
other circumstances.  In the event that inspection of a
vessel type is not covered by regulations or other
standards, the OCMI shall make recommendations to the
Commandant, via the district commander.  In the interim,
the OCMI shall act to promote a reasonable level of
safety and to minimize unnecessary expenses on the part
of vessel and facility owners and operators.

(4)  Professional Concerns And Liaison.  For the most
effective execution of responsibilities, the OCMI must
consider the many elements affecting the safety and
activity levels within the marine inspection zone.
These include:

(a)  Geographic arrangements of principal and secondary
waterways;

(b)  Shipping companies and their personnel;

(c)  Equipment factories and their personnel;

(d)  Shipyards and repair facilities;

(e)  Maritime unions and their officers;
(f)  Other Coast Guard units operating within the
zone; and

(g)  The American Bureau of Shipping (ABS).
3-13    Declaration of Scott Perrygo, Exhibit C, Page 7 of 9

US000522

MARINE SAFETY MANUAL

3.C.2.j. (4)  (k)  Managing and coordinating aerial surveillance activities for pollution response.

(l)  Supervising the unit communications system.

(m)  Promoting the AMVER System and the AMVER educational program to merchant mariners.

(n)  General enforcement of the navigation and vessel inspection laws and regulations.

(o)  Issuance of port security cards, as warranted.

(p)  Developing emergency response plans and exercises.

(q)  Developing and maintaining various contingency plans.

(5)  Supervisor, Marine Inspection Detachment (MIDET). The MIDET is a subunit of an MIO (see paragraph 3.B.8 above). The MIDET Supervisor is designated by the Commandant, but acts under the direction of the OCMI.

(6)  Supervisor, Port Safety Detachment (PSD). The PSD is a subunit of the PSSTA or COTP (see paragraph 3.B.9.b above). The PSD Supervisor is designated by the Commandant, but acts under the direction of the COTP.

(7)  Supervisor, Marine Safety Detachment (MSD). The MSD is a subunit of an MSO (see paragraph 3.B.4 above). The MSD Supervisor is designated by the Commandant, but acts under the direction of the OCMI/COTP.

k.  Field Positions.

(1)  Marine Inspector. The marine inspector is an officer or civilian assigned to the inspection department of an MSO or MIO to perform the field duties of the CVS Program. The inspector must understand and apply federal statues and regulations, Coast Guard policy, and accepted industrial standards in the inspection of construction, alterations and repairs, equipment, and operating procedures for various types of vessels. To this end, the inspector shall be thoroughly familiar with applicable references (including this manual), and shall take advantage of available technical training and references. [NOTE: Qualified petty officers are termed "assistant marine inspectors."]

(a)  Records Of Inspections. The inspector shall submit reports, logs, and other work records and, as warranted, report verbally to the Chief, Inspection Department on the conditions and status of vessels inspected. The inspector shall bring all situations requiring greater experience, or a "command decision," to the attention of the Chief, Inspection Department as soon as practicable.

3-23 Declaration of Scott Perrygo, Exhibit C, Page 8 of 9

US000532

MARINE SAFETY MANUAL

3.C.2.k.(1)   (b)   Requirements For Judgment.   The marine inspector
must be alert generally to possible violations of
the navigation and vessel inspection laws.   When
such practices or conditions are observed,
immediate action shall be taken to have the
practice stopped or the condition corrected.   The
steps required in such cases will naturally vary
in each case, often, calling the matter to the
attention of the vessel's master or officers will
be sufficient.   At other times, it may be
necessary to issue a Notice of Merchant Marine
Inspection Requirements, Form CG-835, and to
report the conditions to the Chief, Inspection
Department.   Serious cases, or those in which
there is disagreement over how to resolve the
conditions, shall be brought to the OCMI's
attention immediately for resolution.   Refusal of
the vessel's master to comply with the inspector's
requirements may lead to revocation of the
vessel's Certificate of Inspection (COI) or S&R
proceedings concerning the MMD's of the master or
officers aboard the vessel.

(c)   Interface With Industry.   The marine inspector's
duties affect one of the largest industries in the
U.S.   The ultimate objective of the CVS Program is
the protection of life and property in the
maritime environment.   The professional attitude
and deportment of the inspector is vital to the
achievement of that objective.   It must be
remembered that the merchant mariner or commercial
operator is in business to make a profit.   Sound
judgment and understanding is required of the
marine inspector, so that appropriate safety
standards are maintained without imposing
unnecessary or unreasonable standards on vessel
and facility owners, operators, and crews.
However, safety is not to be compromised due to
financial hardship.

(d)   Resident Marine Inspector.   This officer is a
marine inspector assigned to work at a specific
location, such as a shipyard or factory, away from
the MSO\MIO for a prolonged period.   In such
assignments, the resident inspector operates under
the supervision of the Chief, Inspection
Department.

(e)   Hull, Boiler, And Electrical Inspectors.   The
"H" designator is assigned to marine inspectors
who are qualified to inspect vessel structures and
deck equipment for compliance with requirements.
The "B" designator is assigned to marine
inspectors who are qualified to inspect the
machinery and propulsion systems of vessels for
compliance with requirements.   The "E" designator
is assigned to marine inspectors who are qualified
to inspect electrical installations and equipment
on board vessels for compliance with requirements
and standards.

3-24   Declaration of Scott Perrygo, Exhibit C, Page 9 of 9

US000533

**United States Coast Guard**

**T-BOAT INSPECTION BOOK**

| Name of Vessel |  |
|---|---|

| Official Number |  |
|---|---|

| Date Completed | Location |
|---|---|

**SOLAS Certificates Issued**
☐ Yes  ☐ No

**Route**
☐ Oceans  ☐ Limited Coastwise  ☐ Lakes / Bays / Sounds
☐ Coastwise  ☐ Great Lakes  ☐ Rivers

**Inspection Type**
☐ Inspection for Certification (COI)  ☐ Annual Inspection
☐ Drydock Inspection

**Inspectors**
1. _____  2. _____

CG-840 TI
Rev. Apr 2011

US002840

ER 613

*Table of Contents:*

| Section | Page |
|---|---|
| Pre-inspection and administrative items | 6 |
| Certificate and documents review | 9 |
| Crew Requirements | 11 |
| Logs and manuals | 12 |
| Navigation safety systems | 14 |
| Structural integrity | 18 |
| General health and safety | 20 |
| Lifesaving equipment | 22 |
| Fire protection | 31 |
| Machinery and auxiliary machinery | 37 |
| Electrical | 54 |
| Pollution prevention systems | 59 |
| MTSA/ISPS | 60 |
| Fire drill | 66 |
| Abandon ship drill | 67 |
| Man overboard drill | 69 |
| Plan Review | 70 |
| Drydock and ground tackle | 72 |
| Post-inspection items | 75 |
| Deficiency Summary Worksheet | 77 |
| Notes | 78 |
| Conversions | 79 |

2

Declaration of Scott Perrygo, Exhibit D, Page 1 of 2

US002841

**IMO Applicability Dates:**

| Reference | Date |
|---|---|
| SOLAS 1960 | 26 MAY 65 |
| SOLAS 1974 | 25 MAY 80 |
| 1978 Protocol to SOLAS 1974 | 01 MAY 81 |
| 1981 Amendments (II-1 & II-2) | 01 SEP 84 |
| 1983 Amendments (III) | 01 JUL 86 |
| *Various additional amendments to SOLAS* | |
| MARPOL 73/78 Annex I | 02 OCT 83 |
| MARPOL 73/78 Annex V | 31 DEC 88 |
| MARPOL 73/78 Annex VI | 19 MAY 05 |
| COLREGS 1972 | 15 JUL 77 |
| *Various additional amendments to COLREGS* | |
| Load Line 1966 | 21 JUL 68 |
| STCW 1978 | 28 APR 84 |
| 1991 Amendments | 01 DEC 92 |
| 1994 Amendments | 01 JAN 96 |
| 1995 Amendments | 01 FEB 97 |

This document does not establish or change Federal laws or regulations. References given are only general guides. Refer to IMO publications, CFR's, NVIC's or any locally produced cite guides for specific regulatory references. Not all items in this book are applicable to all vessels. Due to recent regulatory revisions, OLD SUBCHAPTER T cites (applicable to existing vessels on or before March 10, 1996) are provided in addition to new Subchapter T cites. Example *(46 CFR 184.10-1)*

**NOTE:** *Guidance on how to conduct inspections on U.S. flagged SPV can be found in Marine Safety Manual (MSM) Volume II, Chapter B1, Inspection of Vessels for Certification. All MSM cites listed in this book refer to MSM Volume II, unless otherwise indicated.*

4

**Conversions:**

| | | ALUMINUM PLATE | |
|---|---|---|---|
| Decimal | MM Standard Plate | Wastage MM @ 25 | Aluminum Wastage Allowances, Conventional Vessels Under 90 M (295 Feet) built to ABS Class |
| .1969 | 5mm | 3.75mm | Main Deck Plating 15% |
| .2362 | 6mm | 4.50mm | Bottom Plating 15% |
| .2756 | 7mm | 5.25mm | Keel Plating 15% |
| .3150 | 8mm | 6.00mm | Sheer Strake 15% |
| .3543 | 9mm | 6.75mm | Bilge Strake 15% |
| .3937 | 10mm | 7.50mm | Side Shell Plating 20% |
| .4331 | 11mm | 8.25mm | Forecastle 20% |
| .4724 | 12mm | 9.00mm | Internals and Bulkheads 20% |
| .5118 | 13mm | 9.75mm | |
| .5519 | 14mm | 10.50mm | |

81

Declaration of Scott Perrygo, Exhibit D, Page 2 of 2

US002843

# Exhibit E

Case 2:21-cv-07065-PA-MRW   Document 88-7   Filed 05/15/24   Page 2 of 10   Page ID #:732

Joe Price Larson

Fiedler vs.
United States of America

---

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                    --oOo--
 4   NANCY FIEDLER, Personal        )
 5   Representative of the Estate   )
 6   of LISA FIEDLER (Deceased), et )
 7   al.,                           )
 8                                  )
 9            Plaintiffs,           )
10                                  )
11        vs.                       )  CV-21-7065 PA
12                                  )
13   UNITED STATES OF AMERICA,      )
14                                  )
15            Defendant.            )
16                                  )
17   _____)
18
19
20   REMOTE VIDEO DEPOSITION OF LIEUTENANT COMMANDER
21               JOE PRICE LARSON
22
23           Thursday, May 25, 2023
24   REPORTED BY: DENISE A. FORD, CSR 7525
25   Job No. 10120128
```

Page 3

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:  NELSON & FRAENKEL, 601 South
 4   Figueroa Street, Suite 2050, Los Angeles, CA 90017,
 5   GRETCHEN NELSON, ESQ.
 6
 7   FOR THE PLAINTIFFS:  LESSER & ASSOCIATES, 1444
 8   Aviation Blvd, Suite 103, Redondo Beach, CA 90278,
 9   RICK LESSER, ESQ.
10
11   FOR THE PLAINTIFFS: SCHUERING ZIMMERMAN & DOYLE,
12   400 University Ave, Sacramento, CA 95825, THEODORE
13   POPPINGA, ESQ.
14
15   FOR THE FRITZLERS and TRUSTEES OF THE FRITZLER
16   FAMILY TRUST: LARSON LLP, 555 South Flower Street,
17   Suite 4400, Los Angeles, CA 90071, JULIETTE TRAN,
18   ESQ.
19
20   FOR THE UNITED STATES OF AMERICA: U.S. Department
21   of Justice, 450 Golden Gate Ave, Room 7-5395, San
22   Francisco, CA 94102, ERIC KAUFMAN-COHEN, ESQ.
23
24
25
```

---

Page 2

```
 1             I N D E X
 2        INDEX OF EXAMINATIONS
 3                          Page
 4   EXAMINATION BY MS. NELSON        7
 5
 6
 7
 8
 9        NO EXHIBITS MARKED
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   FOR VENTURA HARBOR BOATYARD:  COX WOOTTON LERNER
 2   GRIFFIN & HANSEN, 900 Front Street, Suite 350, San
 3   Francisco, CA 94111, NEIL LERNER, ESQ.
 4
 5   FOR LANGKILDE FIRE PROTECTION SERVICES:  BREMER
 6   WHYTE BROWN & O'MEARA, 20320 South West Birch
 7   Street, Second Floor, Newport Beach, CA 92660,
 8   MATTHEW STEIN, ESQ.
 9
10   FOR SEA LANDING DIVE CENTER: MARK M. WILLIAMS,
11   ESQ., P.O. Box 90193, Pasadena, CA 91109.
12
13        ALSO PRESENT:
14   TIM KOEHL, video operator.
15
16
17            --oOo--
18
19
20
21
22
23
24
25
```

---

Declaration of Scott Perrygo, Exhibit E, Page 1 of 9
www.aptusCR.com

Page 1..4

Case 2:21-cv-07065-PA-MRW    Document 88-7    Filed 05/15/24    Page 3 of 10    Page ID
#:733

Joe Price Larson

Fiedler vs.
United States of America

Page 5

1
2
3    --oOo--
4    BE IT REMEMBERED that pursuant to Notice and
5    on Thursday, May 25, 2023, commencing at 1:09 p.m.
6    thereof, before me, Denise A. Ford, a Certified
7    Shorthand Reporter, appeared
8    LIEUTENANT COMMANDER JOE PRICE LARSON
9    called as a witness herein, who, having been first
10   duly sworn, was examined and testified as follows:
11   --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    VIDEO OPERATOR: We are now on the
2    record.
3    Today's date is May 25, 2023, and the time
4    is 1:09 p.m.
5    This is the video deposition of Joe Price
6    Larson being taken in the matter of Nancy Fiedler,
7    Personal Representative of the Estate of Lisa
8    Fiedler, deceased, et al. v. United States of
9    America, taken on behalf of the plaintiffs pending
10   in the circuit court of the United States District
11   Court, Central District of California, Case No.
12   CV-21-7065 PA.
13   We are at the Renaissance Portsmouth Norfolk
14   Waterfront Hotel, 425 Water Street, Portsmouth,
15   Virginia 23704.
16   My name is Tim Koehl of Aptus court
17   Reporting located at 401 West A street, Suite 1680,
18   San Diego, California 92101.
19   Will counsel please identify yourselves and
20   state whom you represent.
21   MS. NELSON: This is Gretchen Nelson
22   on behalf of the plaintiffs.
23   MR. KAUFMAN-COHEN: Eric
24   Kaufman-Cohen, Department of Justice, on behalf of
25   the Defendant United States.

Page 7

1    MR. WILLIAMS: Mark Williams,
2    attorney for Sea Landing Dive Center in the state
3    court case, attending.
4    MR. LERNER: Neil Lerner representing
5    Ventura Harbor Boatyard in the state court case,
6    attending.
7    MR. LESSER: Rick Lesser, plaintiffs.
8    MS. TRAN: Juliette Tran for Truth
9    Aquatics, Glen and Dana Fritzler in the pending
10   state court.
11   MR. POPPINGA: Ed Poppinga on behalf
12   of plaintiffs.
13   VIDEO OPERATOR: The court reporter
14   today is Denise Ford with Aptus.
15   Will you please swear in or affirm the
16   deponents.
17   (Witness sworn.)
18   EXAMINATION BY MS. NELSON
19   MS. NELSON: Q. Good morning, although I
20   suppose it is good afternoon for you since I am on the
21   West Coast and you are on the East Coast.
22   My name is Gretchen Nelson. As I said
23   earlier, I am here on behalf of the plaintiffs.
24   Am I correct that you are a lieutenant
25   commander?

Page 8

1    A.  Yes.
2    Q.  I will endeavor to refer to you as
3    Lieutenant Commander Price Larson. It is a bit of a
4    mouthful, so if I forget, please forgive me.
5    A.  Feel free to refer to me as Joe.
6    That's no problem.
7    Q.  Okay. That's a little too informal
8    for Federal Court and me, but I will do my best.
9    So if you wouldn't mind, please, just for
10   the record state your full name and rank and also
11   your current employment address.
12   A.  Certainly. I am Lieutenant Commander
13   Joe Wesley Price Larson, lieutenant commander with
14   the United States Coast Guard currently stationed at
15   Coast Guard's International Port Security Program at
16   the Atlantic Area Command in Portsmouth, Virginia at
17   431 Crawford street in Portsmouth.
18   Q.  Have you ever been deposed before?
19   A.  I have not.
20   Q.  I am sure you have had an opportunity
21   to talk to Mr. Kaufman-Cohen before, but just so we
22   have it on the record, I will go through a few of
23   what we call the rules of the road.
24   I will be asking you questions,
25   Mr. Kaufman-Cohen on occasion may object. Most of

Case 2:21-cv-07065-PA-MRW   Document 88-7   Filed 05/15/24   Page 4 of 10   Page ID
#:734

Joe Price Larson                                                    Fiedler vs.
                                                    United States of America

Page 33

1 investigating officer and CGINV for visibility.
2 We -- I believe we returned to Truth
3 Aquatics one more time with a few more questions,
4 and though I don't recall -- I say "we." It was
5 myself and one other enlisted member of the
6 detachment.
7       And then we returned to the MSD, and at that
8 point there was so much media and such a large crowd
9 around Truth Aquatics that we did not return, and we
10 continued to run things as best we could from the
11 detachment in Santa Barbara.
12       I received a call from the captain of the
13 port out of Sector Los Angeles/Long Beach, and she
14 requested that I stay in Santa Barbara rather than
15 go to Station Channel Islands so that I could be
16 available for any media or any other inquiries that
17 may come directly to Santa Barbara Harbor. So I
18 remained there for the rest of the day.
19       Q.   Was that Commanding Officer Monica
20 Rochester?
21       A.   Yes, it was.
22       Q.   Let me ask you, did you prepare
23 reports on all of what you had conducted?
24       MR. KAUFMAN-COHEN: I will object.
25       He is not here as the deponent as to

Page 34

1 inspections. He is here as to a 30(b)(6) notice of
2 inspection, not the Coast Guard's notice of
3 inspection of this incident.
4       I am giving him a lot of leeway here, but
5 kind of bring it back to the 30(b)(6) deposition
6 notice of the Coast Guard's T-boat inspections in
7 Santa Barbara district, I would greatly appreciate
8 it.
9       MS. NELSON: I appreciate what you
10 are saying. I am just a little confused. I thought
11 this witness was being produced as being the
12 supervising officer at -- in Santa Barbara, not
13 under a 30(b)(6) notice. The notice I have is just
14 his name.
15       MR. KAUFMAN-COHEN: The notice we
16 have, and you should have had, was for the 30(b)(6)
17 notice of depositions, which he is being presented
18 as the person most qualified to talk about the
19 sector's inspections of the T-boats in Santa Barbara
20 and the CONCEPTION. That's the notice that was
21 originally propounded, and he was also identified as
22 the one who would -- the person most qualified to
23 talk about circulars that were issued by the Coast
24 Guard concerning batteries and cell phones.
25       MS. NELSON: Apologies. That's my

Page 35

1 mistake. I was not aware of that. John Hiitsman
2 sent me a notice of deposition simply identifying
3 him as a witness, and I am assuming that's where it
4 came from.
5       Let me go on to a couple of things, but
6 just -- I realize there was a question pending when
7 the objection came in. It is a simple question.
8       Q.   I am assuming you prepared reports and
9 those reports were updated somehow or other in your
10 MISLE system; is that right?
11       A.   No, I did not because just shortly
12 after that I was rolled into the NTSB investigation
13 team, Coast Guard INV and our senior investigating
14 officer out of Los Angeles/Long Beach handled the
15 MISLE data entry. And that's M-I-S-L-E for the
16 spelling of MISLE.
17       Q.   Right.
18       A.   I am sorry, I was saying that for the
19 court reporter for the benefit of that.
20       So that -- and that was handled by the SIO,
21 as I mentioned, because Santa Barbara was quite
22 chaotic. There was a lot going on. And so it was
23 beneficial for us to be able to handle things on the
24 scene and let them handle the data entry.
25       Q.   Fair enough. You were aware, were you

Page 36

1 not, that the CONCEPTION boat had been inspected by
2 officers out of Santa Barbara, correct?
3       A.   Yes, I was aware of that.
4       Q.   Did you have any concerns after the
5 CONCEPTION fire that there had been inadequate
6 inspections of that vessel?
7       A.   No, I did not.
8       Q.   Did you have any meetings after the
9 fire with any of the individuals who had previously
10 inspected the CONCEPTION vessel regarding those
11 inspections?
12       A.   No, I did not.
13       Q.   It sounds as if -- it is fair to say
14 that you are very familiar with the rules and
15 standards regarding inspections, correct?
16       A.   Yes, ma'am.
17       Q.   And you would agree with me that the
18 purpose of the Coast Guard's vessel inspections is
19 to determine whether there were any deficiencies
20 that would make a vessel unsafe, correct?
21       A.   Well, the purpose of the Coast Guard
22 Inspections program is to ensure the safety of
23 vessels, yes. So we are not necessarily there to
24 determine if there are deficiencies. We are there
25 to determine the safety of the vessels overall, yes.

Joe Price Larson

Fiedler vs.
United States of America

Page 49

1  it is more in depth makes it sound like we are
2  skipping things on an annual, which is not the case,
3  but we may be opening lots of panels, every panel,
4  crawling through every space, actually crawling
5  underneath deck plates, checking every single
6  system.
7       Whereas, on an annual we would be more
8  spot-checking those things, opening them up, peering
9  inside, making a check to see if it looks as though
10 anything has changed since the last time we
11 inspected that space, doing a few more in-depth
12 inspections in some certain areas, and also using
13 that if we see anything that piques your interest,
14 makes us think that there might have been a change,
15 then expanding our inspection at that point. And,
16 again, that's on an annual.
17      However, an annual and a COI very closely
18 resemble each other. There is not too much
19 difference. Just that -- again, that COI -- whereas
20 we may be looking at things from 5 feet away on an
21 annual, on a COI we are actually putting our face up
22 against it and checking it very closely at that
23 point.
24      An annual is the "spot check" that the
25 conditions of the COI that were found on the COI

Page 50

1  inspection are still being maintained onboard that
2  vessel while expanding that if we see evidence that
3  there might have been changes.
4       Q.  And now let me ask in terms of the
5  time that is taken to conduct full COIs, you
6  referred to it, for a small passenger vessel, can
7  you give me on average how long, and I am talking
8  about how many hours, how many days, that inspection
9  takes place for a full COI?
10      A.  Certainly.  So a full COI inspection
11 can take -- depending on the size of the vessel it
12 can vary quite widely, but I would say anywhere
13 between four and eight hours actually on the vessel.
14 This is on top of lots of review of paperwork and
15 records in the office prior to even attending the
16 vessel, as well as creating the case work and
17 reviewing any comments that were made by previous
18 inspectors, the narratives that were created during
19 the last COI and annual inspections to get a picture
20 of the life cycle of the vessel to see where it has
21 been, where it goes to, and what condition can we
22 expect to find there.
23      And then, of course, when we get on scene
24 that is the verification of all of those
25 requirements as well as our suspicions of what we

Page 51

1  have read from the records.
2       Q.  And then in terms of the time, is
3  there a record maintained by the Coast Guard of the
4  number of hours or minutes that an inspector spent
5  on a particular vessel?
6       A.  Not that I am immediately aware of.  I
7  could be mistaken.  I know at times we have done
8  things for reviews of manning and are we adequately
9  manned or staffed at our location for the amount of
10 work that we do.  So we try to do estimates at that
11 point of how much we spend on each individual
12 mission, but it is very much a rough estimate.
13 There is not a record of individual missions that I
14 know of as far as what time it takes to conduct the
15 inspections.
16      Q.  And so to just follow up on that and
17 make sure that I have the testimony, when you were
18 in Santa Barbara there would be no record that you
19 are aware of that would show how long a particular
20 inspector spent on a full COI of the CONCEPTION
21 vessel?
22      A.  Not that I recall, no.
23      Q.  Turning to the annual inspection, can
24 you give me roughly on average the amount of time an
25 inspector should spend for the annual inspections?

Page 52

1       A.  Saying an inspector should spend an
2  amount of time on a vessel is difficult because I
3  can't say there is an amount of time they should
4  spend, but I would expect any annual that I go on,
5  depending again on the size of the vessel, the
6  arrangement and service of the vessel could make
7  things quite different.  But anywhere between three
8  and six hours possibly for an annual.  It could also
9  go quite longer than that.
10      Q.  Okay.  And then in terms of your
11 statement that it could depend on the differences of
12 the vessels and what they are being used for, let's
13 take the CONCEPTION or the TRUTH -- or the VISION
14 rather, which is another one of Truth Aquatics'
15 vessels, are the hours that you just provided for
16 the annual, roughly four to eight -- excuse me --
17 for the annual of roughly three to six and the full
18 of four to eight, would those apply to the
19 CONCEPTION and VISION?
20      A.  Possibly.  I would say it is very hard
21 to sit here and estimate how long it would take to
22 conduct those inspections on board those vessels.
23 The VISION in particular, since the fire on the
24 CONCEPTION I spent quite a bit of time on the
25 VISION.  It is a rather large vessel.  It has quite

Case 2:21-cv-07065-PA-MRW    Document 88-7    Filed 05/15/24    Page 6 of 10    Page ID #:736

Joe Price Larson                                                            Fiedler vs.
                                                            United States of America

Page 85

1   Q.  This basically is just two pages and
2   in summary version took the sections identified in
3   Exhibit 10 and synthesized them down into a simpler
4   portion; is that correct?
5       A.  That's correct, yes.
6       Q.  And was this Small Passenger Vessel-T
7   MSD Santa Barbara, Exhibit 13, in use the whole time
8   you were in Santa Barbara?
9       A.  Yes, it was.
10      Q.  Were you at all involved in the
11  creation of this document?
12      A.  No.  That was created before my time.
13      Q.  So your inspectors in Santa Barbara
14  would take with them when they went on the
15  inspection this -- I think someone referred to it in
16  a prior deposition as the Cliff note version of the
17  T book as well as the full T book, correct?
18      A.  That's correct.
19      Q.  And now in terms of this, obviously,
20  the individual who is conducting the inspection
21  would fill in the information of whether this -- at
22  the top whether this was an annual inspection, a dry
23  dock or a COI inspection, correct?
24      A.  Yes.
25      Q.  And then they would put in the

Page 86

1   information as to the vessel's name, the date.
2       What is the MISLE activity?
3       A.  So that's any time we create an
4   activity for an inspection in MISLE, that's -- it
5   creates a seven-, eight-, nine-digit -- I don't know
6   what we are up to now -- number that is the
7   reference activity number that you can pull up the
8   activity from in MISLE.
9       Q.  And then all -- the balance of this
10  information is filled in.
11      Now going down to the -- probably what I
12  would call the second portion of this document,
13  Exhibit 13, there are areas:  Administration,
14  Lifesaving, Navigation/Radios, Emergency
15  Preparedness, and there are boxes that are ticked --
16  or boxes that appear after each one of the call-outs
17  underneath these different sections.
18      Do you see that?
19      A.  Yes.
20      Q.  Am I correct that on this page when
21  the inspector inspected a vehicle, they would mark
22  on this page that in fact -- and I will use by
23  example under Administration, they would mark off
24  that the application for inspection was reviewed?
25      Is that a yes?

Page 87

1       A.  Yes.  Yes, it is, sorry.
2       Q.  Sorry, that was one thing I forget to
3   say unfortunately.  On video shaking your head
4   works.  It doesn't help --
5       A.  I thought maybe you had more to your
6   question.
7       That is correct, we would check off -- this
8   sheet was very useful for writing dates, scribbling
9   notes next to the individual items.  They usually
10  had a lot of notes on them when they came back.
11      Q.  And then we will go down to
12  firefighting on the second page.
13      Again, where there were portable
14  extinguishers, the inspector would mark in that box
15  to the right of the word "portable extinguishers"
16  that he had examined those.
17      He would fill in that they were serviced on
18  a particular date, I am assuming, is that right?
19      A.  Yes.  That's correct.
20      Q.  And then if there was a fire pump he
21  would mark that there was a fire pump by putting an
22  X in the box or filling in that box to the right of
23  whatever the call-out item is, correct?
24      A.  That's correct.
25      Q.  And then the same thing for

Page 88

1   electrical, correct?
2       A.  Yes.  We are talking a lot about
3   almost as though we are saying this is a requirement
4   for these inspectors to check these boxes.  It's
5   not.  This is a reference aid.  The requirement is
6   for the inspectors to inspect the vessel against
7   Subchapter T.
8       We are not just using this saying they have
9   fire extinguishers, check and move on box.  They are
10  also looking at, as you mentioned, fire equipment
11  servicing certificates from the servicing company.
12      We -- because Santa Barbara is kind of a
13  small area, we usually knew the fire servicing
14  companies and technicians, so we would know who did
15  it and when.  The -- but there is not a Coast Guard
16  policy document that says you shall check these
17  boxes.
18      I wanted to make that clear, we are talking
19  about the inspector will do this, the inspector will
20  do this.  There is no requirement for them to check
21  those boxes, and I didn't check these sheets when
22  they came back, nor did anyone else at any other
23  Coast Guard unit check the 840 books or the sheets
24  to make sure that they had checked these individual
25  boxes.

Joe Price Larson            Fiedler vs.
United States of America

Page 89

1   What we did -- what we do is -- what matters
2 is the MISLE activity. That's where it is all
3 recorded. That's where it is all -- the expiration
4 dates of the fire equipment are recorded in there.
5 And everything can be looked up and everything is
6 referential because these individual documents are
7 for, as you said, Cliff notes for the inspectors to
8 use in the field.
9   There is no requirement for these documents
10 to be passed down. The information is important,
11 not the document itself.
12   Q. Fair enough. But I guess what I am
13 trying to perhaps get at, which maybe I didn't get
14 to very well, it is important, is it not, for your
15 inspectors to maintain a record of the scope of the
16 inspection that they conducted, correct?
17   A. Certainly. MISLE is how we do that.
18   Q. You want to know enough, at least for
19 personnel reasons, you would want to know that your
20 inspector, when they were inspecting a particular
21 vessel, actually did an inspection of, for example,
22 the grounding of the electrical systems for the
23 generators and the motors?
24   A. Yes. Absolutely.
25   Q. And the way to do that, the only way

Page 90

1 you are to know that is if they were to document in
2 some way, correct?
3   A. Correct. Yes.
4   Q. And is it -- is it -- if you were the
5 supervisor required to -- let me strike that and ask
6 it this way: When you were the supervisor, if you
7 were reviewing an inspection report and you were not
8 convinced that the inspector had in fact conducted
9 an inspection of a particular area on the vessel,
10 what would you do?
11   A. I would ask them directly. There is
12 no problem with that. If I had further questions, I
13 could also call the vessel owner.
14   Q. And would you also ask the inspector
15 to make certain that it was documented in the MISLE
16 system that that area of the vessel had been
17 inspected?
18   A. I never had to ask them. They did
19 that. That wasn't something that was ever needed to
20 be directed. It was already being done.
21   Q. Fair enough. I am simply saying --
22 this is now going to what I am sure will be a
23 hypothetical question that Mr. Kaufman-Cohen will
24 object to, but in the event that you had some
25 inspector under your supervision who did not

Page 91

1 document that he or she had in fact conducted an
2 inspection of a particular area, and you asked them
3 and they said, yes, I did, would you then ask them
4 to make certain that that was documented in the
5 MISLE system?
6   A. It depends. So in the MISLE
7 narrative, you mentioned things like grounding,
8 bonding, these individual small things that we
9 checked when we are on the vessel. I am not looking
10 for the certain granularity like I checked this
11 motor on this electrical system and ensured that
12 this wire was connected to the proper ground.
13   What I am looking for is a statement that I
14 inspected the electrical system. And I know that
15 the inspectors there are qualified and certificate
16 -- sorry, are qualified and have a qualification
17 letter saying that they have been trained and have
18 been tested in these individual systems. I have
19 been with them on the ships as well to know they
20 have the capability.
21   I know when they say they inspected the
22 engines, they inspected the air intakes, they
23 inspected the flexible fuel hoses, they inspected
24 the piping, the water jacket system, they inspected
25 all of that. I don't need to see that individual

Page 92

1 item written up in the narrative necessarily.
2   Some inspectors do. They will line out
3 those individual systems to extreme detail, but
4 that's not necessarily in and of itself required.
5   What I am looking for is a qualified
6 inspector says they inspected a system, and unless I
7 have reason otherwise, I trust that that system has
8 been properly inspected.
9   Q. Did you -- when you were in Santa
10 Barbara and the supervisor of the individuals you
11 referred to, did you ever go out with them on any of
12 their inspections just to confirm in your mind that
13 these inspectors -- not that they weren't qualified,
14 I am not trying to cast aspersions -- but trying to
15 get comfort in your mind that they were qualified to
16 do the work that was necessary?
17   A. Absolutely, yes, especially when I
18 first reported because I did not know the folks that
19 were working for me. This isn't just the marine
20 inspectors. It was the pollution responders, the --
21 across the board. I done want to go through all of
22 the missions that we did. We would be here all day.
23   Yes, I went out with them. I learned who
24 they were, got to know them, learned how they
25 worked, learned their expertise, which were

Page 93

1   extensive, and very, very quickly became very
2   comfortable with the knowledge of the people that
3   were working for me and with me.
4        Q.   You mentioned earlier about the
5   location, the proximity of the Truth Aquatics office
6   to the Coast Guard office in Santa Barbara.
7        Did you on occasion ever socialize with the
8   Fritzlers who owned Truth Aquatics?
9        A.   No. In fact, I never -- I actually
10  did not meet Mr. Fritzler until after the casualty.
11       Q.   And similarly, did you ever have any
12  occasion to have lunch or coffee or breakfast with
13  Jerry Boylan, the captain?
14       A.   No.
15       Q.   How about Ms. Courtois, who was I
16  think the manager, office manager, at Truth
17  Aquatics?
18       A.   No. The only times -- I know who you
19  are referring to. No. The only times I ever -- was
20  in their presence was when I was there on official
21  duties.
22       Q.   By the way, do you have a diving
23  credential or license?
24       A.   No, I do not.
25       Q.   Let's go back, if I can, on both the

Page 94

1   short list of Exhibit 13, and I can also pull up --
2   we also pull up Exhibit 10 if necessary.
3        I am interested in the issue of cable and
4   wiring on board the vessels that are inspected.
5        There is a reference to UL boat or marine
6   cable.
7        Do you know what that means?
8        A.   I do, yes. It is cable that is rated
9   for use in marine environments and marine
10  applications.
11       Q.   And is it -- was it a requirement that
12  inspectors make certain that the cabling in a
13  particular small passenger vessel was UL boat or
14  marine cable?
15       A.   Yes.
16       Q.   Did you ever know a Chief Warrant
17  Officer DeCamp?
18       A.   No. I had heard his name, and several
19  of the people that I worked with spoke very highly
20  of him, but I never worked with him or knew him
21  directly myself.
22       Q.   He was not in Santa Barbara when you
23  were there, I take it?
24       A.   He was not.
25       Q.   Let me ask you something on these

Page 95

1   forms: One thing I am sort of curious about, if we
2   go to the COI form, which is Exhibit 5, there is --
3   there are requirements on certain vessels for the
4   number of personnel as well as number of passengers.
5        A.   Yes.
6        Q.   How does the Coast Guard monitor to
7   make certain that the vessel owner is in fact
8   complying with that fact, for example, with the
9   CONCEPTION it could carry 99 passengers in total,
10  although there was a limitation when it was
11  overnight?
12       What do you do -- how can you get your hands
13  around that information to make certain that this
14  particular vessel owner and the master were
15  complying with those requirements?
16       A.   So that's one of the difficulties that
17  we have in marine inspections is that the boat that
18  we see on inspection day is the boat that we see
19  that day. There is always the possibility that the
20  operators can operate outside of the certificate of
21  inspection, add more people, take away crew, that
22  sort of thing.
23       We usually -- these situations occasionally
24  get caught on vessels sometimes from whistleblowers,
25  sometimes just from being in proximity to the

Page 96

1   vessels we can see that there appears to be too many
2   people on board, so we will board the vessel when
3   they come back to the dock or will work with our
4   partner units around the area to have a small boat
5   or a cutter do a boarding of them at sea.
6        So we have options for that. That's, of
7   course, again, if we have a suspicion that something
8   is going on, we wouldn't just send the small boats
9   after them if we don't have that suspicion typically
10  unless the small boats are trying to get their
11  boarding numbers up.
12       But all of that aside, how do we check it,
13  good old-fashioned investigative work if we need to.
14  But for the most part, there is a measure of trust
15  on the licensed mariner that is running the vessel
16  that they are running in the confines of the routes
17  and conditions, the manning, the passenger counts
18  that are listed on the certificate of inspection.
19       Those things are not negotiable. They
20  understand that. That's not secret. This document
21  is not a secret to the operators and owners. So it
22  is -- it is something that we discuss with them
23  during the inspections, what the routes and
24  conditions are. In fact we pull it down, you have
25  mentioned yourself this is something that gets

Page 97

1  endorsed by the inspector when the inspection is
2  done for the annual, and of course during a COI
3  inspection they get a new copy of this. And we
4  review all of the information on the COI with the
5  operator, sometimes with the owner as well, but
6  sometimes the owner is the operator.
7       But all of that aside, we have to trust that
8  the licensed mariner is going to operate the vessel
9  within the confines of the restrictions on that
10 vessel and within the bounds of their license. And
11 we occasionally find that that is not the case.
12      Q.  Are the requirements by the Coast
13 Guard the vessel owners maintain certain logs, and
14 if so, are those logs then examined by the inspector
15 when he is on board?
16      A.  So logs for small passenger vessels
17 are somewhat limited. I don't want to say off the
18 top of my head what all logs are required. They are
19 not required to keep things like watch-keeping logs
20 and things like that, but we do see a fair number of
21 records being kept on the vessels, and we review
22 those.
23      Again, as I mentioned, it has been awhile
24 since I have done an inspection. I don't want to
25 say off the top of my head exactly what all of those

Page 98

1  logs are, but we will see a vessel logbook when we
2  are on board and we will review them when we are
3  there.
4       Q.  Were there logbooks required to be
5  kept for fire drills and for, you know, getting all
6  the boat quickly, I guess, similar to what an
7  airline does?
8       A.  Right. I am trying to remember again
9  what all logs are required on small passenger
10 vessels. Again, it has been awhile. And unless I
11 had my cheat sheets in front of me, I guess I can
12 look, you can look as well, the documents we are
13 looking at here, again it has been awhile since I
14 did a T-boat small passenger vessel. I don't want
15 to say off the top of my head because I will most
16 likely get that wrong.
17      Q.  But if there are logs and the --
18 Exhibit 10, the T-boat inspection list or Exhibit 13
19 required by CFRs that the inspectors check those
20 logs, that would be a requirement that you
21 understood your inspectors would conduct, correct?
22      A.  Yes. Of course.
23      Q.  On the COI, I had a couple of quick
24 questions, just to make sure I am clear on the
25 record of what occurs.

Page 99

1       We talked about the five-year inspection,
2  and this COI, Exhibit 5, is in fact the certificate
3  that is issued following that extensive inspection
4  that you referred to earlier that can last as long
5  as eight hours.
6       A.  It can last more than that, just so we
7  are clear on that.
8       Q.  Fair enough. I shouldn't cabin you
9  in, no pun intended on that. But it can be for many
10 hours.
11      Am I correct that down at the bottom of the
12 first page of Exhibit 5 where it says "Annual
13 periodic reinspection," that is what are the annual
14 inspections that occurred after this original COI
15 was issued on November 19 of 2014?
16      A.  Yes. That's correct.
17      Q.  And the -- maybe -- so the certificate
18 that was issued has the name of Commander Newberry?
19      A.  Yes.
20      Q.  He was in your position in Santa
21 Barbara, correct?
22      A.  No, he was not. He was the prevention
23 department head in Los Angeles/Long Beach at the
24 sector.
25      Q.  So -- I am sorry, go ahead.

Page 100

1       A.  He was my supervisor, my boss.
2       Q.  I see.
3       So tell me this, how do you know on this
4  certificate who was the inspector for this
5  particular COI when it was initially issued?
6       A.  I would have to go back and look at
7  the MISLE activity. For the initial issuance of a
8  new COI, I would have to go back and look at the
9  MISLE activity.
10      So, obviously, we can see the signatures for
11 the annuals when it is endorsed during an annual
12 inspection. But during a -- during the initial
13 issuance, the only signature on there is the officer
14 in charge of marine inspections or a -- as you see
15 by signature, by the prevention department head.
16      Q.  I see. Okay. So this -- am I correct
17 then -- maybe -- sorry. That was a lot of
18 information and I may not have processed it fully.
19      This particular COI, Exhibit 5, was signed
20 by Commander Newberry who was in Los Angeles/Long
21 Beach?
22      A.  Yes.
23      Q.  The COIs would normally have been
24 issued by you in your position as the supervisor in
25 Santa Barbara?

Case 2:21-cv-07065-PA-MRW   Document 88-7   Filed 05/15/24   Page 10 of 10   Page
ID #:740

Joe Price Larson

Fiedler vs.
United States of America

Page 133

1 investigator, do you have any expertise in the area
2 of the speed at which various fires will spread?
3     A.   No.
4     Q.   And do you have any expertise on
5 basically arson investigations, how fires start and
6 spread?
7     A.   No, I do not.
8     Q.   And you weren't asked to do any
9 investigation by the government before you came to
10 this deposition on any of those issues, such as
11 combustibility, origins of fire, the speed at which
12 a fire of different sources will spread, or the
13 timing of this particular fire, correct?
14     A.   That's correct.
15          MS. NELSON: I don't think I have
16 anything further to ask you. I want to thank you
17 very much for being here. I know this was very hard
18 on you. You can now say that you have been deposed
19 once before.
20          THE WITNESS: I don't know if that's
21 a good thing or not, but, yes, thank you.
22          VIDEO OPERATOR: I was going to end
23 the deposition.
24          MS. NELSON: I don't know if anybody
25 else does.

Page 134

1          Eric, do you have any questions?
2          MR. KAUFMAN-COHEN: No questions, no.
3          MS. NELSON: I don't think anybody
4 else does because I don't think anybody else has
5 standing to.
6          Eric, what is the situation on the court
7 reporter and --
8          MR. KAUFMAN-COHEN: We will go by the
9 code, Central District of California.
10          So you will provide I guess a copy to us to
11 read and sign, and we will get it read and the
12 signature provided and any changes given with 30
13 days of receiving the transcript.
14          MS. NELSON: That sounds fine to me.
15          Do -- who is going to keep the original I
16 guess is the question?
17          MR. KAUFMAN-COHEN: You as the
18 noticing party will keep the original, and we get a
19 copy, and that's how that works.
20          Should the original not be available at the
21 time of trial, a copy will do.
22          MS. NELSON: I love you, Eric. I
23 think you came from my generation. Those are all
24 the words I am used to hearing.
25          MR. KAUFMAN-COHEN: I don't know if

Page 135

1 you can see it but I got my pen and legal pad.
2          MS. NELSON: That's what I had.
3          VIDEO OPERATOR: We are off the
4 record at 4:48 p.m.
5               (Whereupon, the deposition was
6               adjourned at 4:48 p.m.)
7               --oOo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1                    CERTIFICATE OF REPORTER

2

3          I, DENISE A. FORD, a Certified Shorthand
4 Reporter, hereby certify that the witness in the
5 foregoing deposition was by me duly sworn to tell
6 the truth, the whole truth, and nothing but the
7 truth in the within-entitled cause;
8          That said deposition was taken down in
9 shorthand by me, a disinterested person, at the time
10 and place therein stated, and that the testimony of
11 the said witness was thereafter reduced to
12 typewriting, by computer, under my direction and
13 supervision;
14          I further certify that I am not of counsel
15 or attorney for either or any of the parties to the
16 said deposition, nor in any way interested in the
17 event of this cause, and that I am not related to
18 any of the parties thereto.
19
20          DATED:  June 5, 2023.
21
22
23
23
24                    DENISE A. FORD, CSR No. 7525
25

# Exhibit F

Case 2:21-cv-07065-PA-MRW    Document 88-8    Filed 05/15/24    Page 2 of 3    Page ID #:742



**United States of America**
**Department of Homeland Security**
**United States Coast Guard**

| Certification Date: | 19 Nov 2014 |
|---|---|
| Expiration Date: | 19 Nov 2019 |

# *Certificate of Inspection*

For ships on international voyages this certificate fulfills the requirements of SOLAS 74 as amended regulation VI/4 for a SAFE MANNING DOCUMENT

| Vessel Name | Official Number | IMO Number | Call Sign | Service |
|---|---|---|---|---|
| CONCEPTION | 638133 | | WYR8548 | Passenger (Inspected) |

| Hailing Port | Hull Material | Horsepower | Propulsion | | |
|---|---|---|---|---|---|
| SANTA BARBARA, CA | Wood | 1000 | Diesel Reduction | | |
| UNITED STATES | | | | | |

| Place Built | Delivery Date | Keel Laid Date | Gross Tons | Net Tons | DWT | Length |
|---|---|---|---|---|---|---|
| LONG BEACH, CA | 01Jul1981 | | R-97 | R-66 | | R-75.0 |
| UNITED STATES | | | I- | I- | | I-0 |

| Owner | Operator |
|---|---|
| FRITZLER FAMILY TRUST DTD 7/27/92<br>301 W. Cabrillo Blvd<br>Santa Barbara, CA 93101<br>UNITED STATES | TRUTH AQUATICS, INC<br>301 W CABRILLO BLVD<br>SANTA BARBARA, CA 93101-3886<br>UNITED STATES |

This vessel must be manned with the following licensed and unlicensed Personnel. Included in which there must be 0 Certified Lifeboatmen, 0 Certified Tankermen, 0 HSC Type Rating, and 0 GMDSS Operators.

| 1 Masters | 1 Licensed Mates | 0 Chief Engineers | 0 Oilers |
|---|---|---|---|
| 0 Chief Mates | 0 First Class Pilots | 0 First Assistant Engineers | |
| 0 Second Mates | 0 Radio Officers | 0 Second Assistant Engineers | |
| 0 Third Mates | 0 Able Seamen | 0 Third Assistant Engineers | |
| 0 Master First Class Pilot | 0 Ordinary Seamen | 0 Licensed Engineers | |
| 0 Mate First Class Pilots | 2 Deckhands | 0 Qualified Member Engineer | |

In addition, this vessel may carry 99 Passengers, 0 Other Persons in crew, 0 Persons in addition to crew, and no Others. Total Persons allowed: 103

Route Permitted And Conditions Of Operation:

**---Oceans---**

PACIFIC OCEAN, NOT ON AN INTERNATIONAL VOYAGE, BETWEEN THE SAN LUIS OBISPO / MONTEREY COUNTY LINE: 35° 41.5' NORTH LATITUDE, AND 31°-45' NORTH LATITUDE, NOT MORE THAN 100 MILES FROM THE MAINLAND SHORE.

IF THE VESSEL IS AWAY FROM THE DOCK OR PASSENGERS ARE ON BOARD OR HAVE ACCESS TO THE VESSEL FOR LESS THAN 12 HOURS IN ANY 24 HOUR PERIOD, THE CREW MAY BE REDUCED TO 1 MASTER AND 2 DECKHANDS. THE NUMBER OF PASSENGERS MAY BE ADJUSTED ACCORDINGLY SO THAT THE TOTAL PERSONS ALLOWED DOES NOT EXCEED 103.

A MEMBER OF THE VESSEL'S CREW SHALL BE DESIGNATED BY THE MASTER AS A ROVING PATROL AT ALL TIMES, WHETHER OR NOT THE VESSEL IS UNDERWAY, WHEN THE PASSENGER'S BUNKS ARE OCCUPIED.

**\*\*\*SEE NEXT PAGE FOR ADDITIONAL CERTIFICATE INFORMATION\*\*\***

With this Inspection for Certification having been completed at Santa Barbara, CA, UNITED STATES, the Officer in Charge, Marine Inspection, Los Angeles - Long Beach certified the vessel, in all respects, is in conformity with the applicable vessel inspection laws and the rules and regulations prescribed thereunder.

| Annual/Periodic/Re-Inspection | | | | This Amended certificate issued by: |
|---|---|---|---|---|
| Date | Zone | A/P/R | Signature | M.E. NEWBERRY, CDR, U.S.Coast Guard, By Direction |
| 18Feb2016 | MSD StBarbara | A | HAGER DANIEL | Officer in Charge Marine Inspection |
| 16Feb2017 | MSD StBarbara | A | HAGER DANIEL | Los Angeles - Long Beach |
| 13Feb2018 | MSD StBarbara | A | HAGER DANIEL | |
| | | | | Inspection Zone |

Dept. of Home Sec USCG CG-841 (Rev.4-2000)(v.1)

Declaration of Scott Perrygo, Exhibit F, Page 1 of 2

US002228

OMB No 2115-0517

**ER 627**

| | | Certification Date: | 19 Nov 2014 |
| | | Expiration Date: | 19 Nov 2019 |



**United States of America**
**Department of Homeland Security**
**United States Coast Guard**

# *Certificate of Inspection*

Vessel Name CONCEPTION

A CHILD-SIZED LIFE JACKET SHALL BE PROVIDED FOR EACH PERSON WEIGHING LESS THAN 90 POUNDS.

overnight accommodations for 46 passengers.

## ---Hull Exams---

| Exam Type | Next Exam | Last Exam | Prior Exam |
|---|---|---|---|
| DryDock | 28Feb2021 | 13Feb2019 | 10Feb2017 |

## ---Stability---

| Type | Issued Date | Office |
|---|---|---|
| Letter | 10Jul1981 | LA-LB |

## ---Lifesaving Equipment---

Total Equipment for 103 Persons

| Primary Lifesaving Equipment | Quantity | Capacity | | Required |
|---|---|---|---|---|
| Lifeboats (Total) | 0 | 0 | Life Preservers (Adult) | 103 |
| Lifeboats (Port) | 0 | 0 | Life Preservers (Child) | 11 |
| Lifeboats (Starboard) | 0 | 0 | Ring Buoys (Total) | 3 |
| Motor Lifeboats | 0 | 0 | With Lights | 1 |
| Lifeboats With Radio | 0 | 0 | With Line Attached | 1 |
| Rescue Boats/Platforms | 1 | 0 | Other | 1 |
| Inflatable Rafts | 0 | 0 | Immersion Suits | 0 |
| Life Floats/Buoyant App | 8 | 104 | Portable Lifeboat Radios | 0 |
| Inflatable Buoyant Apparatus (IBA) | 0 | 0 | Equipped With EPIRB? | YES |

## --- Fire Fighting Equipment ---

Number of Fire Pumps - 1

**\*Hose Information\***

| Location | Quantity | Diameter | Length |
|---|---|---|---|
| MAIN DECK | 2 | 1.5 | 50 |

**\*Fixed Extinguishing Systems\***

| Location | Type | Capacity | |
|---|---|---|---|
| ENGINEROOM | Carbon Dioxide | 200 | Pound |

**\*Fire Extinguishers - Hand portable and semi-portable\***

| Quantity | Class Type |
|---|---|
| 1 | B-I |
| 5 | B-II |

## ---Certificate Amendments---

| Unit Amending | Amendment Date | Amendment Remark |
|---|---|---|
| Sector Los Angeles/Long Beach | 10Feb2017 | Conducted hull exam for credit drydock; amended due dates. |
| Sector Los Angeles/Long Beach | 13Feb2019 | Conducted hull exam for credit drydock; amended due dates. |

\*\*\*END\*\*\*

Dept of Home Spc  USCG. CG-841 (Rev. 4-2000)(2)    Page 2 of 2    OMB No 2115-0517
Declaration of Scott Perrygo, Exhibit F, Page 2 of 2
US002229

**ER 628**

# Exhibit G

Case 2:21-cv-07065-PA-MRW    Document 88-9    Filed 05/15/24    Page 2 of 7    Page ID #:745

Captain Ronald Caputo                    Confidential                    Fiedler vs.
                                                                 United States of America

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
 2                  --oOo--
        NANCY FIEDLER, Personal      )
 3      Representative of the Estate  )
        of LISA FIEDLER (Deceased), et )
 4      al.,                          )
                                      )
 5          Plaintiffs,               )
                                      )
 6          vs.              ) CV-21-7065 PA
                                      )
 7      UNITED STATES OF AMERICA,     )
                                      )
 8          Defendant.                )
                                      )
 9      _____)
10
11
12      REMOTE VIDEO DEPOSITION OF
13
14      CAPTAIN RONALD CAPUTO - PMQ
15
16      Wednesday, June 21, 2023
17
18          CONFIDENTIAL
19
20
21
22      REPORTED BY: DENISE A. FORD, CSR 7526
23      JOB NO: 10122900
24
25
```

**Page 2**

```
 1              I N D E X
 2          INDEX OF EXAMINATIONS
 3                              Page
 4      EXAMINATION BY MR. HILLSMAN        7
 5
 6
 7      (Exhibits 59-63 marked CONFIDENTIAL)
 8
 9          EXHIBITS MARKED        Page
10      Exhibit 57  Stipulated Protective Order   6
11      Exhibit 58  Plaintiff's Notice of Second  6
12              "PMQ" Deposition
13      Exhibit 59  Major Conversion Determination   6
14      Exhibit 60  Memorandum            6
15      Exhibit 61  Memorandum            6
16      Exhibit 62  Memorandum            6
17      Exhibit 63  Review of Major Conversion     6
18              Determination Policies and Procedures
19      Exhibit 64  Sea Trials "I"" Boat New Construction 6
20              and Conversion
21
22
23
24
25
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3      FOR THE PLAINTIFFS:  KREINDLER & KREINDLER, 750
 4      Third Avenue, New York, NY 10017, KEVIN MAHONEY,
 5      ESQ.
 6
 7      FOR THE PLAINTIFFS:  McGUINN, HILLSMAN & PALEFSKY,
 8      535 Pacific Avenue, San Francisco, CA 94133, JOHN
 9      HILLSMAN, ESQ.
10
11      FOR THE PLAINTIFFS:  SALTZ MONGELUZZI & BENDESKY,
12      1650 Market Street, Philadelphia, PA 19103, DOUGLAS
13      DiSANDRO, JR., ESQ.
14
15      FOR THE PLAINTIFFS:  LAW OFFICES OF W. RUSSELL
16      FIELDS, 1792 Tribute Road, Suite 400, Sacramento, CA
17      95815, A. EDWARD FIELDS, ESQ.
18
19      FOR THE PLAINTIFFS:  SCHUERING ZIMMERMAN & DOYLE,
20      400 University Avenue, Sacramento CA 95825, THEODORE
21      POPPINGA, ESQ.
22
23      FOR THE PLAINTIFFS:  LESSER & ASSOCIATES, 1444
24      Aviation Blvd, Suite 103, Redondo Beach, CA 90278,
25      RICK LESSER, ESQ.
```

**Page 4**

```
 1      FOR THE UNITED STATES OF AMERICA:  U.S. Department
 2      of Justice, 450 Golden Gate Ave, Room 7-5395, San
 3      Francisco, CA 94102, ERIC KAUFMAN-COHEN, ESQ. and
 4      SCOTT PERRYGO, ESQ.
 5
 6          ALSO PRESENT:
 7      Lorenzo Ferdandez-Kopec, video operator.
 8      Loyd Sherwood and Julie Harrison, McGuinn, Hillsman
 9      & Palofsky.
10
11
12              --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 2:21-cv-07065-PA-MRW  Document 88-9  Filed 05/15/24  Page 3 of 7  Page ID #:746

**Captain Ronald Caputo**        Confidential        **Fiedler vs. United States of America**

Page 5

1
2
3 --oOo--
4 BE IT REMEMBERED that pursuant to Notice and
5 on Wednesday, June 21, 2023, commencing at 10:08
6 a.m. thereof, before me, Denise A. Ford, a Certified
7 Shorthand Reporter, appeared
8       CAPTAIN RONALD CAPUTO
9 called as a witness herein, who, having been first
10 duly sworn, was examined and testified as follows:
11 --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1 the United States.
2       MR. PERRYGO:  Scott Perrygo on behalf
3 of the United States.
4       MR. POPPINGA:  Ted Poppinga on behalf
5 of plaintiff Susana Solano Rosas.
6       MR. DiSANDRO:  Doug DiSandro on
7 behalf of a number of the plaintiffs in this case.
8       MR. MAHONEY:  Kevin Mahoney on behalf
9 of Nina Hutteger, plaintiff.
10       MR. HILLSMAN:  I think that's our
11 quorum.
12       MR. LESSER:  Richard Lesser on behalf
13 of plaintiffs.
14       VIDEO OPERATOR:  Will the court
15 reporter please swear in the witness.
16       (Witness sworn.)
17       EXAMINATION BY MR. HILLSMAN
18       MR. HILLSMAN:  Q.  Captain Caputo, would
19 you please be good enough to state your full name for
20 the record?
21       A.  Sure.  Ronald J. Caputo, Captain U.S.
22 Coast Guard.
23       Q.  And where are you currently stationed,
24 Captain, that is to say, what is your current office
25 address?

Page 6

1 (Whereupon Exhibits 57-64 were marked for
2 identification.)
3       VIDEO OPERATOR:  This begins the
4 videotaped deposition of the PMQ of the United
5 States of America filed in the case Nancy Fiedler v.
6 United States of America, Case No. CV07065-PA-MRW.
7       This deposition is being held at 1300 Clay
8 Street, Suite 600 in Oakland, California on
9 Wednesday, June 21, 2023.
10       My name is Lorenzo Fernandez-Kopec.  I am
11 the videographer.  The court reporter is Denise
12 Ford.  We are both here helping Aptus Court
13 Reporting located at 235 Pine Street, Suite 1100 in
14 San Francisco, California.
15       Please note that audio and video recording
16 will take place unless all parties agree to go off
17 the record.
18       The time is 10:07 a.m.  We are on the record
19 now.
20       Counsel, will you please state your
21 appearance and affiliation.
22       MR. HILLSMAN:  This is John Hillsman.
23 I represent five of the named plaintiffs herein.
24       MR. KAUFMAN-COHEN:  Eric
25 Kaufman-Cohen, US Department of Justice on behalf of

Page 8

1       A.  It is the 11th District in Coast Guard
2 Island in Alameda, California.
3       Q.  Is that where you are located now?
4       A.  At this present moment?
5       Q.  Yes, sir.
6       A.  No.
7       Q.  Where are you located now?
8       A.  At the Aptus offices at 1300 Clay
9 Street in Oakland, California.
10       Q.  And is anybody present with you?
11       A.  Yes, the Department of Justice
12 attorneys Mr. Kaufman and Mr. Perrygo.
13       Q.  Do you have any devices with you other
14 than the computer laptop over which you are speaking
15 that are capable of connecting with the internet?
16       A.  My cell phone is in my bag here.
17       Q.  Here's why I mention that, because we
18 are proceeding remotely and because the questions I
19 ask of you are for you and you alone, you can't call
20 a friend.  You can't communicate with anybody other
21 than counsel, and I would ask that you don't
22 communicate with counsel while a question is
23 pending.
24       Do you understand that?
25       A.  Yes.

Case 2:21-cv-07065-PA-MRW    Document 88-9    Filed 05/15/24    Page 4 of 7    Page ID
#:747

Captain Ronald Caputo                                                   Fiedler vs.
United States of America

Page 89

1 that are a major conversion, on or after March 11,
2 1996, must comply with the regulations of this
3 part."
4     Have I read that correctly?
5     A.   Yes, you read that right.
6     Q.   And speaking as the Coast Guard's PMQ
7 on this topic, as you understand it, what is that
8 sentence telling us?
9     A.   That if a major conversion
10 determination is made after -- on or after March 11,
11 1996, then the vessel must comply with the
12 regulations of Subchapter T that are in place after
13 March 11, 1996.
14     Q.   Just to frame it in terms of our case,
15 if indeed CONCEPTION underwent a major conversion at
16 the Ventura Harbor Boatyard back in 2005, as of
17 September of 2019 she would have been governed by
18 the new T regs rather than the old ones; do I have
19 that right?
20     A.   If a determination was made that it
21 was a conversion, then, yes, it would have to comply
22 with the new T regulations.
23     Q.   Now, you have read the MISLE file,
24 correct?
25     A.   Yes.

Page 90

1     Q.   And we will talk about this more in a
2 moment, but I am assuming that if an MCON
3 determination had been made there would be a
4 notation of that in the vessel's MISLE file?
5     A.   There should be, yes.
6     Q.   So far as you can tell from the MISLE
7 file, was such a determination ever made for
8 CONCEPTION?
9     A.   No, not that I have read or seen.
10     Q.   So far as you can tell from the
11 MISLE file, did anybody ever request that such a
12 determination be considered for CONCEPTION?
13     A.   I don't know that that information
14 would be in the MISLE file.
15     Q.   Where would you expect to find that
16 information?
17     A.   That could be done informally via
18 conversation or via e-mail at the time.
19     Q.   In your capacity as the duly-appointed
20 PMQ for this deposition, did you make any attempt to
21 determine whether anyone in the Coast Guard had ever
22 requested an MCON determination for CONCEPTION
23 following her time in the yard at the Ventura Harbor
24 Boatyard in 2005?
25     A.   No, I didn't make any inquiry into

Page 91

1 that.
2     Q.   And to wrap this up, do you know one
3 way or the other as you sit here today whether
4 anybody in the Coast Guard ever requested that such
5 a determination be made following CONCEPTION's stay
6 in the Ventura Harbor Boatyard back in 2005?
7     A.   I don't know if anyone made any of
8 those inquiries, no.
9     Q.   If you give me just a moment. Let me
10 get my ducks in a row before we proceed.
11     Loyd, would you post clip 5 one more time.
12     The next sentence after the one I just read,
13 "Repairs or maintenance conducted of an existing
14 vessel resulting in no significant changes to the
15 original structure or arrangement of the vessel must
16 comply with the regulations applicable to the vessel
17 on March 10, 1996, or as an alternative with the
18 regulations in this part."
19     Have I read that correctly?
20     A.   Yes.
21     Q.   Speaking as the Coast Guard's PMQ and
22 as the former chief of prevention down in San Diego,
23 can you tell us what that sentence means?
24     Tell us in lay terms what you understand
25 that regulatory requirement to be.

Page 92

1     A.   If there are any repairs or
2 maintenance, said repairs or maintenance must comply
3 with old T regulations, or as an alternative the
4 owner can decide to comply with new regulations.
5     Q.   But it is not required to do so absent
6 an MCON determination?
7     A.   That's correct, it is not required.
8 It is an alternative.
9     Q.   Now, how would Coast Guard marine
10 inspectors know which regs CONCEPTION had to comply
11 with?
12     Is there typically a notation in the MISLE
13 file?
14     A.   It's based on the construction and
15 keel lain date.
16     Q.   So barring some kind of specific
17 indication that the vessel has undergone an MCON
18 determination, the fact that CONCEPTION has been in
19 service since 1981 would suggest to anybody who
20 inspected the vessel back in 2019 that it was
21 subject to the old T regs; do have I that right?
22     A.   Yes, I would agree with that.
23     Q.   The next sentence goes on to read,
24 "However, when outfit items such as furnishings and
25 mattresses are renewed, they must comply with the

Case 2:21-cv-07065-PA-MRW  Document 88-9  Filed 05/15/24  Page 5 of 7  Page ID #:748

Captain Ronald Caputo                                    Fiedler vs.
                                               United States of America

Page 101

1 presented with an issue as chief of prevention down in
2 San Diego as to whether or not a fuel pipe cap, a
3 movable cap was either -- was a furnishing, whom would
4 you put that question to?
5    A.  Either the Marine Safety Center or the
6 Office of Design Engineering and Standards.
7    Q.  Okay. And did you serve in that
8 office yourself for a time?
9    A.  I did, yes.
10    Q.  But notwithstanding that service, you
11 are not sure whether fuel pipe caps or fill pipe
12 caps comprise furnishings within the meaning of the
13 reg?
14    A.  I didn't serve in the office that made
15 -- the division within that office that made that
16 determination.
17    Q.  What division within that office made
18 such determinations?
19    A.  They have restructured since I was
20 last there, so it would be hard for me to make that
21 determination. Possibly ENG 4 as they are known.
22    Q.  Be that as it may, I will warrant to
23 you that these are the fill pipe caps aboard
24 CONCEPTION. I will warrant to you that these are --
25 they are depicted here in this photograph. I will

Page 102

1 further warrant to you they are made of PVC.
2    Do you know what PVC is?
3    A.  Yes, it is a plastic vinyl pipe or
4 material.
5    Q.  Is it flammable?
6    A.  I believe part of it can be or certain
7 types of it can be, yes.
8    Q.  If you had been a marine inspector
9 conducting an annual two-year or five-year
10 inspection aboard CONCEPTION and you saw PVC fill
11 pipe caps, would you have noted that as a
12 deficiency?
13    A.  So you are asking if I was on an
14 inspection 18 years ago if I would have noticed
15 and/or called the attention to those?
16    Q.  Doesn't have to be 18 years ago.
17    If you were conducting an inspection today
18 and you found a Subchapter T passenger vessel
19 equipped with PVC fuel pipe caps, would you have
20 called that out as a deficiency?
21    A.  I possibly could have looked into it
22 if I knew that there were -- if they were in fact
23 fuel piping.
24    Q.  And why would you have done that?
25    A.  As it doesn't seem -- it seems like

Page 103

1 something to note.
2    Q.  Why does it seem like something to
3 note?
4    Is that an observed fire hazard?
5    A.  Fire hazard or not, I would just want
6 to call out and find out if it is in accordance with
7 the CFRs.
8    MR. HILLSMAN:  Loyd, would you please
9 post clip 14.
10    Q.  Captain Caputo, I will warrant to you
11 that this is a photograph that we pulled from the
12 NTSB report. It shows the afterdeck of CONCEPTION
13 and the after bulkhead of her main deckhouse.
14    You will see under the ladder there between
15 the main deck and what has been called the sundeck
16 aboard CONCEPTION a series of polyurethane
17 receptacles, a trash can and a food container.
18    Do you see those?
19    Loyd, do you want to cursor those for us?
20    A.  Underneath the ladder, yes.
21    Q.  Are those -- can you tell us one way
22 or the other whether those are furnishings within
23 the meaning of 177.115(b7)?
24    A.  I wouldn't be able to tell that, no.
25    Q.  Again, is that something that you

Page 104

1 would seek the advice of the folks back at
2 standards?
3    A.  Yes.
4    Q.  I will note -- I will warrant to you,
5 sir, that the trash cans we are looking at are also
6 made of polyurethane.
7    If you had been an inspector and you saw
8 those trash cans aboard CONCEPTION situated in that
9 place underneath that wooden ladder, would you have
10 had any concerns at all?
11    A.  Not necessarily as they are on the
12 exposed open deck.
13    Q.  All right. Captain, during your years
14 as a marine inspection, did you ever have occasion
15 to try to determine whether a small passenger vessel
16 is governed by the old T or new T regs?
17    I am not talking about making an MCON
18 determination. I am simply talking about going
19 aboard a vessel and deciding on site which set of
20 regs you are supposed to apply to that vessel.
21    A.  Yes, I believe I recall that.
22    Q.  Okay. And I gather that you did that
23 simply by looking in the MISLE file to determine,
24 one, when she was built or launched, and, two,
25 whether there had been an MCON determination?

Case 2:21-cv-07065-PA-MRW    Document 88-9    Filed 05/15/24    Page 6 of 7    Page ID
#:749    Confidential

Captain Ronald Caputo                                    Fiedler vs.
                                                 United States of America

Page 113

1  inspection conducted after March of 1996?
2      Would you automatically assume it was the
3  new T regs that applied or would you think that a
4  vessel that was built prior to March 11, 1996 would
5  somehow be grandfathered into the old watch-keeping
6  requirements?
7      A.  Once again, I would have to go through
8  the regulation and marine safety manual to find out
9  about manning requirements and watch-keeping
10 requirements.  Roving patrols are specific called
11 out within the CFRs which is part of the
12 watch-keeping piece as well as having a master on
13 board the vessel.
14     Q.  Right.  Let's talk about roving
15 patrols then.
16     Is satisfying yourself that a Subchapter
17 T-boat, an overnight boat, was maintaining roving
18 patrols while passengers are aboard one of the
19 things that you did as a marine inspector?
20     A.  I don't necessarily think I can verify
21 for roving patrols there while I was a marine
22 inspector since we are not there while overnight
23 passengers were on board.
24     Q.  That's what I was asking about.
25     Would you do anything to try to satisfy

Page 114

1  yourself -- would you do anything at all as a marine
2  inspector to try to determine whether or not an
3  overnight T-boat was indeed maintaining roving
4  patrols in accordance with the chapter's
5  requirements?
6      A.  So that's the trust we place in a
7  licensed master as we discussed those watch
8  procedures and manning for the vessel, and that's
9  the responsibility of the master to report whether
10 or not they can in fact comply with those
11 requirements.
12     Q.  Do most T-boats in your experience
13 maintain vessel logs?
14     A.  In some form they do.
15     Q.  And indeed do you expect them to
16 maintain vessels logs of their operations?
17     A.  If they had them, yes, we would review
18 them.  There are certain things that are required to
19 be reported, and we would look for those parts.
20     Q.  Training is required?
21     A.  Training.
22     Q.  Drills are required?
23     A.  Yes.
24     Q.  How about watch keeping, as you
25 understand it, was watch keeping something that had

Page 115

1  to be posted in the logs?
2      A.  No, not that I was aware.
3      Q.  So at least back when you were
4  actually conducting reinspections, there was really
5  no way of determining whether a roving watch was
6  maintained aboard an overnight T-boat except from
7  the master's reports?
8      A.  Either from the master report or if
9  there was a boarding of some kind done on -- in a
10 separate mission conducted by the Coast Guard.
11     Q.  Understood.
12     And just so I understand, we are talking
13 about if there is a random boarding while the vessel
14 is out on an overnight trip, for example?
15     A.  Correct.
16     Q.  Did you do any of those as the --
17 strike that.  I don't know whether you actually did
18 them yourself.
19     Did you authorize boardings like that during
20 your tenure as the chief of prevention in San Diego?
21     A.  Post CONCEPTION we developed a
22 practice, an operation, which we do underway
23 verification of operational requirements on board
24 Subchapter T vessels.
25     Q.  But nothing pre-CONCEPTION, I gather?

Page 116

1      A.  Nothing pre-CONCEPTION.
2      Q.  That's one of the lessons we all
3  learned about CONCEPTION?
4      A.  Yes.
5      Q.  Got it.  All right.  Let's get to the
6  topics.  I think we'll run through these fairly
7  quickly.
8      Topic no. 1 is, Who, besides the commandant
9  had authority to make an MCON determination during
10 the period between March 1, 2005 and February 28,
11 2019.
12     Eric, as I understand it, Captain Caputo is
13 the PMQ the government has designated to testify
14 about that topic from the district level?
15         MR. KAUFMAN-COHEN:  Yes.
16         MR. HILLSMAN:  Q.  Captain Caputo, can
17 you think of anybody who is more qualified to address
18 this topic from the district level on the defendant's
19 behalf than you?
20     A.  Not at the district level, no.
21     Q.  And as you sit here today and having
22 in mind the duties and preparation that we discussed
23 earlier, do you feel you are fully prepared to
24 testify as the government's duly-designated PMQ on
25 topic no. 1?

Case 2:21-cv-07065-PA-MRW   Document 88-9   Filed 05/15/24   Page 7 of 7   Page ID
#:750

Captain Ronald Caputo                                                    Fiedler vs.
                                                              United States of America

Page 169

1    Captain, I will warrant to you that this is
2    a document we received in our discovery in the Los
3    Angeles case from CONCEPTION's owner Truth Aquatics.
4    It is entitled Sea Trials, T Boat New Construction
5    and Conversion.
6        The first paragraph reads, "The purpose of
7    the sea trial is to determine the vessel's
8    characteristics under operating conditions. Sea
9    trials shall be conducted on all sub T vessels prior
10   to issuance of a certificate of inspection.
11   Currently certificated or previously certificated
12   vessel that have undergone extensive structural or
13   machinery modification or anything that may affect
14   the safe navigation of a vessel must undergo sea
15   trials. It is the policy of this port to take the
16   vessel beyond the breakwater to a safe area and
17   perform and observe at least the following." And
18   there is a list of 12 different factors.
19       First of all, have I read that paragraph
20   correctly?
21   A.   Yes. Yes, you have.
22   Q.   Have you ever seen this document
23   before today?
24   A.   Not before, no.
25   Q.   The sentence, "It is the policy of

Page 170

1    this port to take the vessel beyond the breakwater"
2    suggested to me at least that this was either a
3    Coast Guard document or one that was prepared by MSD
4    Santa Barbara.
5        Can you lend me any insight on that?
6        We don't know where this thing came from.
7    A.   I can't. I don't know where this came
8    from.
9        I don't know -- the term "the port" could be
10   interpreted to mean anything.
11   Q.   Okay. Did the district have any
12   policies or protocols back when you were prevention
13   chief at Sector San Diego concerning the requirement
14   for sea trials following major repair projects?
15   A.   No.
16       MR. HILLSMAN: I think that's all I
17   have got.
18       Why don't we, if we can, take a break for
19   about ten minutes so I can confer with my superiors,
20   and we can decide whether or not we are through.
21       VIDEO OPERATOR: The time is 2:01.
22   We are going off the record.
23       (Break taken.)
24       VIDEO OPERATOR: The time is 2:09.
25       We are back on the record.

Page 171

1        MR. HILLSMAN: Captain Caputo, thank
2    you very much for your time and cooperation today.
3        I have no further questions. I have
4    conferred with my colleagues, and I don't believe
5    they do either.
6        VIDEO OPERATOR: That concludes the
7    deposition for today. The time is 2:10.
8        We are off the record.
9               (Whereupon, the deposition was
10                adjourned at 2:10 p.m.)
11               --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

1              CERTIFICATE OF REPORTER
2
3        I, DENISE A. FORD, a Certified Shorthand
4    Reporter, hereby certify that the witness in the
5    foregoing deposition was by me duly sworn to tell
6    the truth, the whole truth, and nothing but the
7    truth in the within-entitled cause;
8        That said deposition was taken down in
9    shorthand by me, a disinterested person, at the time
10   and place therein stated, and that the testimony of
11   the said witness was thereafter reduced to
12   typewriting, by computer, under my direction and
13   supervision;
14       I further certify that I am not of counsel
15   or attorney for either or any of the parties to the
16   said deposition, nor in any way interested in the
17   event of this cause, and that I am not related to
18   any of the parties thereto.
19
20       DATED: June 30, 2023.
21
22
23
24       _____
         DENISE A. FORD, CSR No. 7525
25

Declaration of Scott Perrygo, Exhibit G, Page 6 of 6   **Page 169..172**
www.aptusCR.com

**ER 635**

# Exhibit I



UNITED STATES COAST GUARD

✶ ✶ ✶ ✶

MARITIME COMMERCE
STRATEGIC OUTLOOK

OCTOBER 2018
WASHINGTON, D.C.

ER 637



THE UNITED STATES
COAST GUARD'S

# VISION

FOR ENABLING
MARITIME COMMERCE

# Table of Contents

I.      Introduction.............................................................................................................4

II.     Executive Summary..................................................................................................6

III.    Today's Realities ......................................................................................................9

IV.     Background: U.S. Coast Guard's Enduring Role in Facilitating Commerce.........................15

V.      Line of Effort 1: Facilitating Lawful Trade and Travel on Secure Waterways.......................18

VI.     Line of Effort 2: Modernizing Aids to Navigation and Mariner Information Systems...........24

VII.    Line of Effort 3: Transforming Workforce Capacity and Partnerships ...............................30

VIII.   Ensuring Long-Term Success..................................................................................33

IX.     Conclusion .............................................................................................................34

X.      Appendix................................................................................................................36

Declaration of Scott Perrygo, Exhibit I, Page 3 of 9

USCG MARITIME COMMERCE STRATEGIC OUTLOOK   i

# THE COMMANDANT
## OF THE UNITED STATES COAST GUARD



America is a maritime Nation. It is a Nation shaped by seafarers who recognized the tremendous economic potential derived from unrestricted access to the oceans, internal waterways, deepwater ports and protected straits and bays. This geostrategic advantage favorably shapes our Nation's security, economic prosperity, and global standing.

American prosperity remains inextricably linked to the fate of the maritime environment. In an era of increasing technological and political change, we continue to be a maritime Nation that has come to expect free access to, and movement within, the maritime environment. Access to outdoor recreation, fisheries and mineral resources, global commodities, and markets for manufactured goods define the American experience. Our waterways, a wealth of natural resources and marine transportation networks, remain critical to our prosperity, our security, and our identity as a Nation.

I am pleased to present the U.S. Coast Guard's Maritime Commerce Strategic Outlook to guide our Service efforts in securing this strategically critical maritime environment while enabling its impact on our Nation's economic prosperity. This document establishes three lines of effort that are critical to the success of the Coast Guard: 1) facilitating lawful trade and travel on secure waterways; 2) modernizing aids to navigation and mariner information systems; and 3) transforming our workforce capacity and partnerships to meet the increasingly complex operating environment.

The Coast Guard must anticipate transformative changes in technology and maritime governance in order to retain our leadership role providing for the safety, security, and stewardship of our Nation's precious ocean, bay, and river resources. Through collaborative leadership and strategic vision, the Coast Guard will maintain and grow our strategic advantage in the maritime domain, forever fostering a prosperous and secure America.

*Semper Paratus.*

**Admiral Karl L. Schultz**
Commandant

Declaration of Scott Perrygo, Exhibit 1, Page 4 of 9

2 USCG MARITIME COMMERCE STRATEGIC OUTLOOK

# II.

# Executive Summary

The Coast Guard's enduring responsibility to safeguard the MTS and enable the uninterrupted flow of maritime commerce is becoming more challenging. Emerging technologies, including the increased complexity in vessel designs, propulsion systems and operations; automation, interconnectivity, robotics and networked systems; and new methods for offshore natural resource exploration, production and transportation pose challenges and can be risk aggravators for the Service. These factors produce a system highly susceptible to disruption. Any man-made or natural disruption, even of brief duration, has the potential for lasting damaging effect on the Nation's economy and national security.



Declaration of Scott Perrygo, Exhibit 1, Page 5 of 9

6 USCG MARITIME COMMERCE STRATEGIC OUTLOOK

The Coast Guard's long term outlook for maritime commerce emphasizes three lines of effort: *Facilitating Lawful Trade and Travel on Secure Waterways, Modernizing Aids to Navigation and Mariner Information Systems,* and *Transforming Workforce Capacity and Partnerships.* This outlook emphasizes the critical need to build a Ready, Relevant, and Responsive Coast Guard that maximizes America's economic prosperity across the maritime domain. To ensure the Service's enduring roles of safety, security, and stewardship, the Coast Guard must look to the future and anticipate rapid innovation in the maritime industry and the resulting complexity in the marine environment. To that end, the Coast Guard will pursue three lines of effort:

**Facilitating Lawful Trade and Travel on Secure Waterways.** The ease of moving people and cargo on America's waterways is a competitive advantage and wellspring for economic prosperity and national security. The Coast Guard's enduring role of enabling the uninterrupted flow of maritime commerce requires a multi-faceted approach that includes managing risks to critical infrastructure, ensuring the efficient delivery of Coast Guard services, supporting uniform/consistent vessel and facility standards, and promoting resiliency and unity of effort among all MTS stakeholders.

**Modernizing Aids to Navigation and Mariner Information Systems.** The Nation must invest in the waterways of the future to sustain global economic competitive advantage. The Coast Guard must build the information, digital, and physical infrastructure to manage emerging sources of risk within America's waterways brought about by the introduction of new technologies and operating constructs. Leveraging technological advancements such as artificial intelligence, mobile and cloud-based computing, and data analytics will help keep the Service in step with emerging trends in the maritime industry. This includes modernizing information technology (IT) networks and applications that enable the Coast Guard to assess, monitor, and manage risk. Given the competing uses and growing demands for commerce, energy, food, resources, and recreation in U.S. waters, the Coast Guard must optimize maritime planning. The Service must also balance sustaining traditional navigation systems while building next generation waterway management systems, modernizing Inland and Coastal Aids to Navigation cutters, and applying emerging technologies. Regulatory frameworks, applications, and standards will be adapted to accurately incorporate the implementation of emerging technologies that will transform maritime operations such as autonomous systems and new logistics platforms.

**Transforming Workforce Capacity and Partnerships.** Given the increased demand on America's waterways, the Coast Guard must have a transforming workforce capacity and strengthen linkages/partnerships to facilitate, safeguard, and advance maritime commerce. The Service must develop an adaptive force that is proficient operating in a highly complex environment amid rapid evolution of technology. It needs to strengthen its nimble workforce with the digital competencies to respond to changes in commercial markets and the maritime industry. With an ever expanding MTS, the Coast Guard will leverage robust auditing capabilities of Third Party Organizations (TPOs) to improve vessel plans, surveys, and certain required certificates, while strengthening an extensive audit regime that ensures the highest standards of compliance oversight are being maintained. It is imperative to transform the workforce and roles of other enabling organizations to have the capability, experience, and expertise to address the broad spectrum of threats to our national interests.

Declaration of Scott Perrygo, Exhibit I, Page 6 of 9



This document also outlines a number of enabling concepts that will ensure the Service's long-term success. These include:

- **Unity of Effort:** The Coast Guard will leverage established partnerships and look for opportunities to build new partnerships within Federal, State, local, and tribal governments and private industry to bring a balanced approach to improving America's maritime economic competitiveness.

- **Adaptive-Focused Service:** The Coast Guard will anticipate change, become more agile, apply lessons-learned, and embrace the fast pace of technology. Service members must be comfortable operating in a dynamic, complex, and ambiguous environment.

- **Marine Transportation as a National Priority:** The MTS is vital to America's prosperity. The Coast Guard will advocate the importance of America's waterways and articulate how economic and national security is inextricably linked to the MTS.

- **Investment in the Future:** The Coast Guard must invest in data and information infrastructure that enables big data analytics and operations research in an environment of increasing complexity of systems, accelerated pace of innovation, and rapid incorporation of new technologies.

- **Situational Awareness:** The Coast Guard will provide decision makers real-time, accurate, and actionable information and intelligence for maritime operations. The Coast Guard must understand industry trends, patterns, and threats to the MTS in order to position the Service to address them. The Service must take advantage of emerging technologies to improve situational awareness.

- **International Engagement:** The Coast Guard will assertively seek opportunities to be a leader at international maritime regulatory bodies and maximize international relationships with key trading partners to reduce risks to America's MTS.

Declaration of Scott Perrygo, Exhibit I, Page 7 of 9

# IV.

# Background: U.S. Coast Guard's Enduring Role in Facilitating Commerce

America's enduring maritime interests—its reliance on the seas for commerce, sustenance, and defense—has changed little since colonial days. The Coast Guard protects these national interests, thereby enabling unrestricted and unimpeded trade and travel on America's waterways. For more than 228 years the Coast Guard has facilitated maritime security to promote and safeguard American commerce.

The Nation's first Treasury Secretary, Alexander Hamilton, founded the Revenue Marine (later named the Revenue Cutter Service) to enforce Federal tariff and trade laws and prevent smuggling from the sea. The authorities and missions of today's Coast Guard are derived from these foundational decisions for the Revenue Marine cutters to conduct maritime law enforcement, monitor commerce, and assess and improve the operations of the Nation's major ports. At the same time, the Lighthouse Service took over control of the Nation's existing lighthouses and buoys from the States and went on to establish more aids to navigation that greatly assisted mariners in avoiding danger. During the early evolution of steam propulsion, thousands of lives were lost due to boiler explosions and fires. Congress began enacting laws in 1838 that required the inspection of steam vessels and the Steamboat Inspection Service was formed and issued licenses to steamship officers. The U.S. Lifesaving Service was formed in 1848 to help save shipwrecked mariners and passengers. In 1884, Congress established the Bureau of Navigation to support the Nation's growing merchant fleet of officers and crew. The Steamboat Inspection Service and the Bureau of Navigation merged in 1932 to form the Bureau of Navigation and Steamboat Inspection, which became the Bureau of Marine Inspection and Navigation in 1936.

With the merging of the Revenue Cutter Service and Life-Saving Service in 1915, the modern day Coast Guard was formed. In 1946, the Coast Guard incorporated the Lighthouse Service and the Bureau of Marine Inspection and Navigation, consolidating Federal authority for maritime safety, security, and environmental stewardship into a single Federal agency. Today the Coast Guard has broad statutory authorities, unique capabilities, and partnerships as a military, law enforcement, regulatory, emergency response, and humanitarian service, all to advance American prosperity through the facilitation of a safe, secure, and environmentally sustainable system of maritime commerce.

The Coast Guard is the lead Federal agency responsible for the maritime mode of the Transportation Systems Sector under the National Infrastructure Protection Plan, which directs the Coast Guard to protect and promote the MTS.[16] In accordance with the Maritime Transportation Security Act of 2002, the Coast Guard is charged with preventing transportation security incidents, which are

Declaration of Scott Perrygo, Exhibit I, Page 8 of 9



# V.

# Facilitating Lawful Trade and Travel on Secure Waterways

As the lead Federal agency protecting our Nation's MTS and the primary regulator of the maritime shipping industry, the Coast Guard advances American prosperity through securing ports and waterways that enable commerce and ensuring vessels are subject to uniform, consistent standards. The Coast Guard must seek a balance between risks and costs to support the efficient flow of commerce while reducing the risk of disruption to the MTS.

18  USCG MARITIME COMMERCE STRATEGIC OUTLOOK

Case 2:21-cv-07065-PA-MRW    Document 88-12    Filed 05/15/24    Page 1 of 8    Page ID
#:762

# Exhibit J



U.S. Coast Guard

COAST GUARD STRATEGIC PLAN
2018 – 2022



THE COMMANDANT OF THE UNITED STATES COAST GUARD

The Coast Guard is on the front lines of our Nation's effort to protect the American people, our homeland, and our way of life. We are a unique instrument of national power with specialized and adaptive capacity across the full spectrum of maritime activities. As challenges to our national security and global influence grow more complex, the need for a Ready, Relevant, and Responsive Coast Guard has never been greater.

I am proud to deliver the Coast Guard Strategic Plan 2018-2022, which represents our Senior Leaders' shared vision to advance the Service over the next four years. This Strategic Plan supports the Department of Homeland Security (DHS) and the National Security Strategy (NSS) to ensure a safe, secure, and prosperous homeland. The lines of effort in this plan emphasize our need to invest in Service readiness while fine-tuning mission execution and operational support to meet the needs of the Nation.

***Maximizing Readiness Today and Tomorrow*** is my top priority. Service readiness begins with our people — our greatest strength — including our dedication to maintaining an inclusive workplace and striving to mirror the great diversity of the American public we serve. Supporting our mission-ready total workforce requires capable assets, modern systems, resilient infrastructure, and sufficient Operations and Support (OSS) appropriations to operate and sustain them.

Our unique position within DHS and our enduring role with the Department of Defense (DOD) allows our Service to effectively ***Address the Nation's Complex Maritime Challenges***. We will employ our leadership within the maritime domain to foster domestic and international cooperation, build stakeholder capacity, and exert influence at home and abroad. As Commandant, I intend to leverage the Coast Guard's broad authorities, capabilities, and partnerships to safeguard the American people, promote economic prosperity, and advance national interests.

Upholding our legacy of operational excellence across our broad missions, we will ***Deliver Mission Excellence Anytime, Anywhere***. This begins with orienting all of our Service's initiatives to promote organizational efficiency, agility, and effectiveness and extends to the daily work of Coast Guard women and men during steady state or in times of crisis.

While it is impossible to predict what the next four years will bring, I can assure you we will face complex challenges around the world that will require our very best – the best people, best tools, and our best performance. Collectively, we will ensure that the Coast Guard remains Always Ready to meet the needs of our great Nation.

Semper Paratus,

Karl L. Schultz

Admiral Karl L. Schultz
Commandant

Declaration of Scott Perrygo, Exhibit J, Page 2 of 7























# STRENGTHEN

## MARITIME GOVERNANCE

**Objective 2.1.** | Our ability to address challenges in the maritime domain spans the full range of activity from education and partnerships to regulation and enforcement to high-end, specialized operations. Full spectrum maritime governance provides the foundation for an adaptive and stabilizing framework that is essential to resilience. Nefarious activities destabilize and threaten vulnerable regions. To address these sources of maritime disorder, we will employ our singular capabilities, authorities, and established partnerships to maintain law and order and uphold accepted behaviors.

### 2.1.1. Enhance Situational Awareness to Secure our Maritime Borders

As the Nation's premier maritime agency, the Coast Guard must integrate information, intelligence, and operations to create actionable knowledge that informs decisionmaking. To protect our [illegible] and maritime borders, we will:

- Acquire and integrate a networked system of platforms, sensors, mission integration systems, communications equipment, and analytical tools across the Service;
- Leverage [illegible] intelligence, surveillance, and reconnaissance capabilities from military, law enforcement, and commercial sources to improve the processing, exploitation, and dissemination of critical and actionable intelligence; and
- Employ data-driven methodologies to optimize planning for the deployment of Coast Guard resources.

### 2.1.2. Promote Acceptable Behavior in the Maritime Domain

The Coast Guard is a recognized leader in maritime communities, from local ports to international regulatory bodies. Our position enables us to influence maritime operations around the world. To shape safe, secure, and environmentally-responsible maritime activities, we will:

- Preserve maritime norms and influence acceptable behavior to facilitate the unimpeded flow of lawful maritime commerce;
- Create opportunities and build avenues for regional information sharing;
- Ensure a comprehensive domestic regulatory approach that strikes the right balance between facilitating and safeguarding commerce; and
- Lead America in international maritime affairs and promote a free and open maritime order in support of the National Security Strategy.

### 2.1.3. Employ Effective Presence to Deter and Disrupt Maritime Threats to the Nation

Driven by intelligence, our operational assets must be in the right place at the right time. To maximize operational impact, we will:

- Incorporate strategically relevant technologies to harness real-time data and effectively direct assets for endgame interdiction;
- Treat every operational asset as a sensor to collect and disseminate information and intelligence; and
- Harness the ideas and innovation of our workforce to challenge [illegible] operational approaches, apply new technology, and increase effectiveness in countering maritime threats.

Declaration of Scott Perrygo, Exhibit J, Page 5 of 7

# ENHANCE

UNIFIED EFFORT

**Objective 2.2** | The Coast Guard partners at every level, from individual mariners to local police departments, to the world's top navies and coast guards. We act in coordination with our government partners, private stakeholders, and international allies to safeguard our national interests and protect against threats to the homeland. Our aim is to integrate whenever possible and deliver output greater than the sum of its parts. Only with commitment to "all-in" collaboration can we produce the "all-out" effort necessary to achieve our collective goals.

### 2.2.1. Strengthen Integration with DHS

The Coast Guard employs both distinct and complementary capabilities to help DHS and its components meet their strategic objectives. To maximize our value to the Department, we will:

- Enhance integration with DHS at the strategic, operational, and tactical levels;
- Implement DHS best practices across the Service including, but not limited to, requirements management, acquisition processes, research and development, and IT solutions; and
- Connect our capabilities with other DHS components to further DHS strategic priorities.

### 2.2.2. Leverage Joint Capabilities and Authorities to Complement DOD

Our unique authorities, specialized capabilities, and established relationships will complement DOD to provide an agile response to contingencies, address sources of maritime disorder, and deter threats to our national interests. To better integrate capabilities for national defense, we will:

- Employ our authorities to support National Defense Strategy (NDS) objectives;
- Synchronize engagement, operations, and capacity-building efforts to strengthen maritime governance around the world;
- Leverage DOD to field interoperable equipment and reduce redundancies in the acquisition of new capabilities; and
- Target interoperability with the U.S. Navy and other maritime services to include the National Oceanic and Atmospheric Administration (NOAA) and the U.S. Maritime Administration (MARAD).

### 2.2.3. Enhance Partnerships with Maritime Stakeholders

The MTS is critical to our economic prosperity and national security. By cultivating relationships across the maritime community, we bolster our credibility, recognize industry trends, and understand emerging technologies. To safeguard the MTS, we will:

- Foster productive relationships with the maritime industry to build our own expertise and enable effective oversight;
- Continue to lead a community of Federal, State, and local partners to ensure all elements of the MTS are efficient, effective, and responsive; and
- Share universal best practices to strengthen maritime [illegible] preparedness, response, and recovery.

### 2.2.4. Align International Engagement with National and Departmental Priorities

Our strong international standing and proven track record in partnership and capacity building is directly linked to our national and economic security. To further our international impact, we will:

- Use our position within the international maritime community to shape and promote universal standards and regimes;
- Strategically orient time and resources toward international activities to maximize return on investment for national and Coast Guard priorities; and
- Foster international capacity building efforts in regions that are both critical to U.S. interests and in alignment with DOD and U.S. Department of State (DOS) [illegible]

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 1 of 9    Page ID
#:568

1  E. MARTIN ESTRADA
2  United States Attorney
3  JOANNE OSINOFF
   Assistant United States Attorney
4  Chief, Civil Division

5
   BRIAN BOYNTON
6  Principal Deputy Assistant Attorney General
7  ERIC KAUFMAN-COHEN, Cal. SBN 171064
   eric.kaufman-cohen@usdoj.gov
8  Attorney in Charge, West Coast Office
9  FRANK J. ANDERS, Cal. SBN 227208
   Franklin.j.anders@usdoj.gov
10 SCOTT PERRYGO, Cal. SBN 341834
11 Scott.perrygo@usdoj.gov
12 KYLE FRALICK, Maryland SBN 081230008
   Kyle.fralick@usdoj.gov
13 Trial Attorneys
14 Torts Branch, Civil Division
   U.S. Department of Justice
15 450 Golden Gate Avenue, Room 7-5395
16 San Francisco, California 94102-3463
17 Telephone: (415) 436-6648
          (415) 436-6644/(415) 436-6645/(415) 436-6647
18 Facsimile: (415) 436-6632

19
20 Attorneys for United States of America

21                UNITED STATES DISTRICT COURT

22             CENTRAL DISTRICT OF CALIFORNIA

23 NANCY FIEDLER, Personal              ) Case No.: 2:21-cv-07065-PA-MRW
   Representative of the Estate of LISA  )
24 FIEDLER (Deceased); MATTHEW          ) In Admiralty
   GUINEY, Personal Representative of the )
25 Estate of MARYBETH GUINEY           ) STIPULATION IN SUPPORT OF
   (Deceased); OLGA FAYNSHTEYN,        ) JOINT ADMINISTRATIVE
26 Personal Representative of the Estate of ) MOTION FOR AN ORDER
   YULIYA KRASHENNAYA                   ) GRANTING THE UNITED
27 (Deceased); KATIE OSBORNE,           ) STATES LEAVE TO FILE A
   Personal Representative of the Estate of ) MOTION TO DISMISS
28

STIPULATION IN SUPPORT JOINT MOTION
FOR AN ORDER ALLOWING USA TO FILE MOTION
TO DISMISS AND CONTINUE FILING DATE              Case No.: 2:21-cv-07065-PA-MRW

ER 654

Case 2:21-cv-07065-PA-MRW   Document 80-2   Filed 09/29/23   Page 2 of 9   Page ID #:569

| | |
|---|---|
| 1    DANIEL GARCIA (Deceased);<br>CHRISTINA QUITASOL, Personal<br>2    Representative of the Estate of<br>MICHAEL QUITASOL (Deceased);<br>3    SARMA WILLIAMS, Personal<br>Representative of the Estate of VAIDEHI<br>4    DEVI CAMPBELL WILLIAMS<br>(Deceased); CHRISTINE<br>5    ALEXANDRA DIGNAM, Personal<br>Representative of the Estate of JUSTIN<br>6    DIGNAM (Deceased); JASMINE<br>LORD, Personal Representative of the<br>7    Estate of CHARLES McILVAIN<br>(Deceased); VICTORIA E. MOORE,<br>8    Personal Representative of the Estates of<br>RAYMOND SCOTT CHAN (Deceased)<br>9    and KENDRA CHAN (Deceased);<br>YUKA OHASHI MERRITT, Personal<br>10    Representative of the Estate of YUKO<br>HATANO (Deceased); VIKRAM<br>11    SINGH, Personal Representative of the<br>Estate of SUNIL SINGH SANDHU<br>12    (Deceased); NINA HUTTEGGER,<br>Personal Representative of the Estate of<br>13    JUHA-PEKKA AHOPELTO<br>(Deceased); YADIRA ALVAREZ,<br>14    Personal Representative of the Estate of<br>BERENICE FELIPE (Deceased); SEJAY<br>15    TAN, Personal Representative of the<br>Estate of WEI TAN (Deceased); ERIC<br>16    BALTZ, Personal Representative of the<br>Estate of NEAL BALTZ (Deceased);<br>17    ANTHONY BEITZINGER, Personal<br>Representative of the Estate of<br>18    PATRICIA BEITZINGER (Deceased);<br>SHRUTI DEOPUJARI, Personal<br>19    Representative of the Estate of<br>SANJEERI DEOPUJARI (Deceased);<br>20    ATLEE FRITZ, Personal<br>Representative of the Estate of<br>21    ANDREW FRITZ (Deceased); SEEMA<br>SHARMA, Personal<br>22    Representative of the Estate of<br>KAUSTUBH NIRMAL (Deceased);<br>23    MARGARET STROM, Personal<br>representative of the Estate of TED<br>24    STROM (Deceased); RICHARD X. LIU,<br>Personal Representative of the Estate of<br>25    XIANG LIN; SUSANA SOLANO<br>ROSAS, Personal Representative of the<br>26    Estates of EVANMICHEL SOLANO<br>QUITASOL (Deceased), ANGELA<br>27    ROSE SOLANO QUITASOL<br>28 | **PLAINTIFFS' FIRST AMENDED<br>COMPLAINT FOR LACK OF<br>SUBJECT MATTER<br>JURISDICTION PURSUANT TO<br>FED.R.CIV.P. 12(b)(1) AND<br>ORDER CONTINUING THE<br>FILING DATE OF MOTION** |

STIPULATION IN SUPPORT JOINT MOTION
FOR AN ORDER ALLOWING USA TO FILE MOTION
TO DISMISS AND CONTINUE FILING DATE          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 80-2   Filed 09/29/23   Page 3 of 9   Page ID #:570

(Deceased), and NICOLE SOLANO
QUITASOL (Deceased); ARIEL
TAKVAM, Personal Representative of
the Estate of KRISTIAN TAKVAM
(Deceased); DOMINIC MICAEL
SELGA, Personal Representative of the
Estate of FERNISA JUNE SISON
(Deceased); ROBERT KURTZ and
CHERIE MCDONOUGH, Personal
Representatives of the Estate of
ALEXANDRA HALEY KURTZ; JEAN
ANNE ALLEN as Executor of the Estate
of STEVEN JOHN SALIKA, Executor
of the Estate OF CAROL DIANA
ADAMIC and Administrator of the
Estate of TIA NICOLE ADAMIC
SALIKA; JAMES ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); ANGELIKA ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); MARK ADAMIC,
individually and as beneficiary of the
Estate of CAROL DIANA ADAMIC
(Deceased); SHIRLEY SALIKA,
individually, and as beneficiary of the
Estate of STEVEN JOHN SALIKA
(Deceased) and TIA NICOLE SALIKA
(Deceased); DANIEL POH-HOCK
CHUA, Personal Representative of the
Estate of KRISTINA OLINE FINSTAD
(Deceased), and RYAN SIMS,
individually,

        Plaintiffs,

    vs.

UNITED STATES OF AMERICA,

        Defendant.

STIPULATION IN SUPPORT JOINT MOTION
FOR AN ORDER ALLOWING USA TO FILE MOTION
TO DISMISS AND CONTINUE FILING DATE

Case No.: 2:21-cv-07065-PA-MRW

ER 656

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 4 of 9    Page ID #:571

1    WHEREAS on October 14, 2022, the Court issued an Order permitting the
2  United States to file a motion for summary judgment to determine whether the
3  Discretionary Function Exception to the Waiver of Sovereign Immunity (DFE)
4  shields the United States from liability. (ECF No. 70.).

5    WHEREAS the United States believes that the proper motion to raise the
6  DFE defense is a motion to dismiss for lack of subject matter jurisdiction pursuant
7  to Fed. R. Civ. P. 12(b)(1).

8    WHEREAS the Court originally set April 24, 2023 as the deadline for the
9  United States to file its motion and set a discover cutoff date of March 13, 2023.
10
   (ECF No. 73.)
11

12   WHEREAS the Court granted Plaintiffs' *ex parte* application for an order
13  continuing the discovery cutoff to May 26 and enlarging the time for the United
14  States to file its motion from April 24 to July 28 (ECF No. 75.)

15   WHEREAS on February 25, 2023, the parties filed a joint administrative
16  motion for an order enlarging time to conduct discovery and continuing the
17  deadline for the United States to file its DFE motion for summary judgment. (ECF
18  No. 74.)

19   WHEREAS the Court granted the motion on February 28, 2023 and issued
20  an Order continuing the discovery cut off to May 26, 2023, and further continued
21  the deadline for the United States to file its motion for summary judgment to July
22  28, 2023. (ECF 78.)

23   WHEREAS the Court previously continued the deadline for the United
24  States to file its motion from July 28, 2023 to October 30, 2023 based upon, *inter*
25  *alia,* the fact that the criminal trial of the Captain of the *Conception* was set to
26  begin on September 28, 2023.
27

28  STIPULATION IN SUPPORT OF
    JOINT MOTION TO CONTINUE FILING
    DATE OF UNITED STATES' MOTION
    FOR SUMMARY JUDGMENT                 1              Case No.: 2:21-cv-07065-PA-MRW

**ER 657**

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 5 of 9    Page ID
#:572

WHEREAS Both Plaintiffs herein and the United States continue to believe that the outcome of the Captain's criminal trial will have significant impact on this case.

WHEREAS during the interim period from the Court's original order allowing the United States to file a motion based upon DF and the parties' request herein, the parties have conducted extensive discovery, both written and by depositions and defendants continue to review the vast number of documents produced by the United States.

WHEREAS the criminal trial against the Captain of the *Conception* has since been continued from September 28, 2023 to October 24, 2023.

WHEREAS another issue facing the United States is the very real possibility of a government shutdown commencing October 1. Absent an appropriation, Department of Justice attorneys and employees of the federal government will be prohibited from working, even on a voluntary basis, except in very limited circumstances, including "emergencies involving the safety of human life or the protection of property." 31 U.S.C. § 1342. This prohibition will impact counsel for the United States ability to draft and file the motion by October 30, 2023.

AND WHEREAS co-lead counsel for the Plaintiffs, John Hillsman, who will have the primary responsibility for opposing the Government's motion, is scheduled to start trial on December 12, 2023, in *Ehart v. Lahaina Divers, Inc. et al,* U.S.D.C. Haw., Civil No. CV 21-00475 SOM-KJM, will not complete that trial until mid-January, 2024, and will be engaged in preparing and submitting all of the pre-trial pleadings and papers required for that trial during the last weeks of November, 2023.

STIPULATION IN SUPPORT OF
JOINT MOTION TO CONTINUE FILING
DATE OF UNITED STATES' MOTION
FOR SUMMARY JUDGMENT              2              Case No.: 2:21-cv-07065-PA-MRW

**ER 658**

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 6 of 9    Page ID #:573

1    NOW, THEREFORE, THE PARTIES STIPULATE AS FOLLOWS:

2    That good cause exists to allow the United States to file a motion to dismiss

3    Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction

4    pursuant to Fed. R. Civ. P. 12(b)(1) instead of a motion for summary judgment

5    pursuant to Fed. R. Civ. P. 56, and that good cause exists to extend the United

6    States' time to file its motion to January 15, 2024.

7    IT IS SO STIPULATED.

8

9    Date: September 29, 2023          Respectfully submitted,

10
                                       E. MARTIN ESTRADA
11                                     United States Attorney
12                                     JOANNE OSINOFF
                                       Assistant United States Attorney
13                                     Chief, Civil Division

14
                                       BRIAN BOYNTON
15                                     Principal Deputy Assistant Attorney General

16

17                                     s/Eric Kaufman-Cohen
                                       ERIC KAUFMAN-COHEN
18                                     Attorney in Charge, West Coast Filed Office
19                                     FRANK J. ANDERS
                                       SCOTT PERRYGO
20                                     KYLE FRALICK
21                                     Trial Attorneys
                                       Torts Branch, Civil Division
22                                     450 Golden Gate Avenue, Room 7-5395
23                                     San Francisco, California 94102-3463
24                                     415-436-6648
                                       Email: eric.kaufman-cohen@usdoj.gov
25                                     U.S. Department of Justice
26                                     Attorneys for United States of America

27

28   STIPULATION IN SUPPORT OF
     JOINT MOTION TO CONTINUE FILING
     DATE OF UNITED STATES' MOTION
     FOR SUMMARY JUDGMENT          3          Case No.: 2:21-cv-07065-PA-MRW

**ER 659**

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 7 of 9    Page ID #:574

Dated: September 29, 2023          MCGUINN HILLSMAN AND PALEFSKY

                                   s/John R. Hillsman
                                   JOHN R. HILLSMAN
                                   535 Pacific Avenue Suite 100
                                   San Francisco, CA 94133
                                   415-421-9292
                                   Email: jrhillsman@mhpsf.com
                                   On behalf of all Plaintiffs

STIPULATION IN SUPPORT OF
JOINT MOTION TO CONTINUE FILING
DATE OF UNITED STATES' MOTION
FOR SUMMARY JUDGMENT                 4              Case No.: 2:21-cv-07065-PA-MRW

**ER 660**

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 8 of 9   Page ID
#:575

## CERTIFICATION OF SIGNATURES

I attest that the content of the document is acceptable to all persons required

to sign the document.

s/ Eric Kaufman-Cohen
ERIC KAUFMAN-COHEN

STIPULATION IN SUPPORT OF
JOINT MOTION TO CONTINUE FILING
DATE OF UNITED STATES' MOTION
FOR SUMMARY JUDGMENT                    5            Case No.: 2:21-cv-07065-PA-MRW

**ER 661**

Case 2:21-cv-07065-PA-MRW    Document 80-2    Filed 09/29/23    Page 9 of 9    Page ID #:576

1                  CERTIFICATE OF SERVICE

2         I hereby certify that on September 29, 2023, a copy of the foregoing

3    STIPULATION IN SUPPORT OF JOINT ADMINISTRATIVE MOTION FOR

4    AN ORDER GRANTING THE UNITED STATES LEAVE TO FILE A

5    MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR

6    LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO

7    FED.R.CIV.P. 12(b)(1) AND ORDER CONTINUING THE FILING DATE OF

8    MOTION was filed electronically with the Clerk of the Court by operation of the

9    Court's electronic filing system, which will serve an electronic copy of all counsel

10   of record.

11

12                    s/Eric Kaufman-Cohen

13                    ERIC KAUFMAN-COHEN

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   STIPULATION IN SUPPORT OF
     JOINT MOTION TO CONTINUE FILING
     DATE OF UNITED STATES' MOTION
     FOR SUMMARY JUDGMENT            6            Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 73   Filed 12/01/22   Page 1 of 1   Page ID
#:465

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 21-7065 PA (MRWx) | Date | December 1, 2022 |
| --- | --- | --- | --- |

| Title | Nancy Fiedler, et al. v. United States of America. |
| --- | --- |

Present: The Honorable   PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Not Reported |
| --- | --- |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:**      **IN CHAMBERS — COURT ORDER**

On October 14, 2022, the Court issued an Order permitting defendant United States of America ("Defendant") to file a motion for summary judgment to determine whether the discretionary function exception ("DFE") to the Federal Tort Claims Act ("FTCA") shields Defendant from liability. (Docket No. 70.) The Court stayed the remainder of this action and ordered the parties to file proposals on the scope of discovery necessary for a determination of whether Plaintiffs' claims are barred by the DFE. (Id.) In issuing the October 14, 2022 Order, the Court reminded the parties to carefully consider the two-part DFE test articulated by the Ninth Circuit in Lam v. United States, 979 F.3d 665, 678 (9th Cir. 2020).

Having reviewed the parties' proposals (Docket Nos. 71-72), the Court finds that in light of the two-part DFE test specified in Lam, the discovery proposed by Plaintiffs goes beyond the scope of what is necessary to determine whether the DFE bars Plaintiffs' claims. The discovery Defendant proposes, on the other hand, is appropriately tailored to a resolution of the issue. Therefore, the Court limits the scope of discovery to that which Defendant proposed. (See Docket No. 71.)

The discovery cutoff date is March 13, 2023. Defendant shall file its motion for summary judgment on or before April 24, 2023. Plaintiff's opposition shall be filed by May 8, 2023, and Defendant's reply, if any, is due on or before May 15, 2023. The Court will hear Defendant's motion for summary judgment on May 29, 2023, at 1:30 p.m. The dates set by the Court are firm dates. Absent extraordinary circumstances, which must satisfy the requirements of Federal Rule 16 and be brought to the Court's attention in a timely manner, the Court will not modify these dates.

IT IS SO ORDERED.

**ER 663**

1  Gretchen M. Nelson (State Bar No.112566)
2  Carlos F. Llinás Negret (State Bar No. 284746)
   **NELSON & FRAENKEL LLP**
3  601 South Figueroa St., Suite 3600
4  Los Angeles, CA 90017
   Tel.: 213-943-6089
5  Fax: 213-622-6019
6  Email: gnelson@nflawfirm.com
   Email: cllinas@nflawfirm.com
7  *Attorneys for Plaintiffs Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay*
   *Tan, Yadira Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto, C.A.*
8  *(a minor), Jean Anne Allen, Estate of Carol Diana Adamic, Estate of Steven John*
9  *Salika, Estate of Tia Nicole Adamic Salika, Shirley Salika, James Adamic*
   *See Signature Page for List of Additional Attorneys*

10

11                      **UNITED STATES DISTRICT COURT**
                        **CENTRAL DISTRICT OF CALIFORNIA**
12                            **WESTERN DIVISION**

13   NANCY FIEDLER, et al.,                CASE NO.: 2:21-CV-7065 PA

14                                         (MRWx)
                  Plaintiffs              Honorable Percy Anderson
15

16        vs.
                                           **PLAINTIFFS' RESPONSE TO**
17   UNITED STATES OF AMERICA,            **DEFENDANT UNITED STATES**
                                           **OF AMERICA's PROPOSAL RE:**
18             Defendant.                  **DISCOVERY RELATING TO**
                                           **DEFENDANT'S CLAIM THAT**
19                                         **PLAINTIFFS' CLAIMS ARE**
                                           **BARRED BY THE**
20                                         **DISCRETIONARY FUNCTION**
                                           **EXCEPTION**
21

22

23

24

25

26

27

28
   Case 2:21-cv-07065 PA (MRWx)
   PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE
   DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE
   BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION

1      In accordance with Court's Order dated October 14, 2022 (Dkt. 70), Plaintiffs
2 respectfully submit the following response to the Proposal of the Defendant, United
3 States of America, Re: Discovery (Dkt. 71), relating to the issue of Defendant's claim
4 that Plaintiffs' Complaint is barred by the Discretionary Function Exception (the
5 "DFE").

6 <div align="center">**OVERVIEW**</div>

7      Plaintiffs have complied with the Court's directions and have reviewed *Lam v.*
8 *United States*, 979 F.3d 665, 672 (9th Cir. 2020). See ECF No. 70. As noted by the
9 U.S. Supreme Court, the DFE "marks the boundary between Congress' willingness to
10 impose tort liability upon the United States and its desire to protect certain
11 governmental activities from exposure to suit by private individuals." *United States*
12 *v. Varig Airlines*, 467 U.S. 797, 808 (1984). As such, the DFE is intended to
13 "prevent judicial 'second-guessing' of legislative and administrative decisions
14 grounded in social, economic, and political policy through the medium of an action in
15 tort." *Lam,* 979 F.3d at 673 (citing *Varig Airlines*, 467 U.S. at 814). "[B]ecause the
16 discretionary or non-discretionary nature of the acts are the focus of the DFE, 'it is
17 the nature of the conduct, rather than the status of the actor, that governs whether the
18 discretionary function exception applies in a given case.'" *Id.* (quoting *Varig*
19 *Airlines*, 467 U.S. at 813). The *Lam* court thus held that "if the policies allow an
20 employee to make independent policy judgments, then the DFE defeats plaintiff's
21 claim." *Id.* (citing *Berkovitz v. United States*, 486 U.S. 531, 536, 546 (1988).

22      But as the *Lam* decision likewise confirms, "if the 'policy leaves no room for
23 an official to exercise policy judgment in performing a given act, or if the act simply
24 does not involve the exercise of such judgment, the discretionary function exemption
25 does not bar a claim that the act was negligent or wrongful.'" *Id.* (quoting *Berkowitz,*
26 486 U.S. at 546-547) (emphasis added). As the Supreme Court admonished in
27 *Berkowitz*: "The discretionary function exception applies only to conduct that

28

<div align="center">1</div>

Case 2:21-cv-07065 PA (MRWx)
**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE
DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE
BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION**

<div align="center">**ER 665**</div>

1 | involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 539,
2 | 108 S. Ct. at 1960. That exception thus has at least two clear-cut carveouts that are
3 | pertinent here.

4 | First, where, as in the present case, "a suit charges an agency with failing to act
5 | in accord with a specific mandatory directive, the discretionary function exception
6 | does not apply." *Berkovitz*, 486 U.S. at 544. Thus in deciding whether the DFE
7 | applies in any case, the court must consider whether the challenged actions were truly
8 | discretionary -- or whether they were instead controlled not just by mandatory
9 | statutes, regulations, or publicized policy statements but by internal manuals,
10 | management plans, directives, protocols, check lists, or specifications that the
11 | Government imposed on itself. See *United States v. Gaubert*, 499 U.S. 315, 328
12 | (1991). "The requirement of judgment or choice is not satisfied if a 'federal statute,
13 | regulation, or policy specifically prescribes a course of action for an employee to
14 | follow,' because 'the employee has no rightful option but to adhere to the directive.'"
15 | *Id.* at 322 (quoting *Berkovitz*, 486 U.S., at 536); see also *Tracor/MBA, Inc. v. United*
16 | *States*, 933 F.2d 663, 666 (8th Cir. 1991). That is exactly what Plaintiffs allege
17 | happened in this case. (Dkt. 44, ¶132 (a) and (b).)

18 | Second, even when the Government's conduct involves some element of
19 | choice, the DFE applies only if it was the type of decision that Congress wanted to
20 | protect. Not all decisions fall into that category. To take a pertinent example,
21 | although the decision to adopt a particular safety policy is a discretionary function,
22 | the day-to-day implementation of that policy is not, and a "failure to effectuate policy
23 | choices already made will not be protected under the discretionary function
24 | exception." *Maryls Bear Medicine v. United States*, 241 F.3d 1208, 1215 (9th Cir.
25 | 2000); see also *Terbush v. United States*, 516 F.3d 1125, 1130-1132 (9th Cir. 2008);
26 | *Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987); *Garcia v. United States*,
27 |
28 | 2

Case 2:21-cv-07065 PA (MRWx)
**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION**

1 | 602 Fed. Appx. 656, 657 (9th Cir. 2015). Plaintiffs' Complaint invokes that carveout
2 | also. (Dkt. 44, ¶ 132 (c).)

### PLAINTIFFS' NECESSARY DISCOVERY

4 | To properly and fully prepare for the Defendant's summary assertion of the
5 | DFE, Plaintiffs will thus need the opportunity to research and compile the statutes
6 | and regulations governing the United States Coast Guard's inspection and
7 | certification of small passenger vessels like *Conception* and to pour through all the
8 | Marine Information for Safety and Law Enforcement ("MISLE") files related to
9 | *Conception* and her sisters *Vision* and *Truth*. They will also require the following
10 | discovery in the form of document production and depositions:

11 |     (1)    All manuals, policy statements, protocols, management plans, directives,
12 | check lists, or specifications that the U.S. Coast Guard Commandant, District
13 | Command, and Local Sector Command have imposed on the personnel who
14 | performed such inspections and certifications;

15 |     (2)    Discovery as to the avowed purposes of those policy statements,
16 | protocols, management plans, directives, check lists, or specifications;

17 |     (3)    The identities and depositions of the U.S. Coast Guard personnel who
18 | drafted, enforced, and implemented those policy statements, protocols,
19 | management plans, directives, or specifications; and

20 |     (4)    The identities and depositions of the U. S. Coast Guard personnel who
21 | inspected and certified Conception and her sisters and/or interfaced with the
22 | owners of those vessels.

23 | Plaintiffs acknowledge the Government's avowed readiness to "produce the
24 | relevant policies and procedures[,]" "make available, within reason, those individuals
25 | who were responsible for drafting those policies and procedures as well as those
26 | individuals who actually carried out those policies and procedures[,]" and "produce

27 |

28 | 

3

Case 2:21-cv-07065 PA (MRWx)
**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION**

1 | all documentation available related to the Coast Guard's T-Boat inspections of the
2 | CONCEPATION [sic] covering a reasonable time frame." (Dkt. 71, p. 1.)

3 |     Plaintiffs' counsel know and respect opposing counsel, have worked with them
4 | before, and are hopeful that any logistical issues regarding the required discovery can
5 | be resolved informally. However, if Plaintiffs are to oppose Defendant's motion on
6 | grounds other than Fed.R.Civ.P. 56(d), Plaintiffs are equally certain that their
7 | discovery will need to reach all the way back to Conception's original inspection and
8 | certification to the time immediately prior to the tragic accident that led to this
9 | lawsuit and may also include discovery as to the inspections conducted by
10 | governmental agencies and reports issued by such agencies following the fire .

11 |     For all of the foregoing reasons, Plaintiffs respectfully submit that they be
12 | permitted a period of seven (7) months to conduct the necessary discovery to oppose
13 | Defendant's anticipated motion.

14 | Dated: November 11, 2022            Respectfully submitted,

15 |                               NELSON & FRAENKEL, LLP

16 |                               WALKUP, MELODIA, KELLY &
17 |                               SCHOENBERGER

18 |                               PANISH SHEA BOYLE & RAVIPUDI LLP

19 |                               SALTZ MONGELUZZI & BENDESKY P.C.

20 |                               MCGUINN, HILLSMAN & PALESFSKY

21 |                               FIORE ACHERMAN, A Law Corp.

22 |                               SCHUERING ZIMMERMAN & DOYLE,LLP

23 |                               KREINDLER & KREINDLER LLP

24 |                               LAW OFFICE OF W. RUSSELL FIELDS

25 |                               GALINE FRYE FITTING AND FRANGOS

26 |                               ARNOLD AND ITKIN LLP

27 |

28 |                                   4

Case 2:21-cv-07065 PA (MRWx)
**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION**

TODD M. ABBOTT

By: /s/Gretchen M. Nelson

By: s/Matthew D. Davis

By: s/Robert S. Glassman

By: s/E. Douglas Disandro, Jr.

By: s// John R. Hillsman

By:s/Jeniffer Fiore

By: s/Theodore Poppinga

By: s/Kevin Mahoney

By:s/A. Edward Fields

By: /s/Ilya Demetrios Frangos

By. /s/Cory Itkin

By: /s/ Todd M. Abbott

ATTORNEYS FOR PLAINTIFFS

5

Case 2:21-cv-07065 PA (MRWx)
PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE
DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE
BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION

ER 669

1  **Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

2  Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories

3  listed and on whose behalf the filing is submitted, concur in the content of the filing

4  and have authorized the filing.

5  Dated: November 11, 2022

6  By ___/s/ Gretchen M. Nelson___

7  Gretchen M. Nelson
   Attorneys for Plaintiffs *Cheng Leng Tan,*

8  *Estate of Wei Tan, Chik Ping Yap, Sejay Tan,*

9  *Yadira Alvarez, Estate of Berenice Felipe,*
   *Nina Huttegger, Julia Ahopelto, C.A. (a*

10 *minor), Jean Anne Allen, Estate of Carol*

11 *Diana Adamic, Estate of Steven John Salika,*
   *Estate of Tia Nicole Adamic Salika, Shirley*

12 *Salika, James Adamic*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                             6

Case 2:21-cv-07065 PA (MRWx)
PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES OF AMERICA's PROPOSAL RE
DISCOVERY RELATING TO ISSUE OF DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE
BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION

ER 670

Case 2:21-cv-07065-PA-MRW    Document 71    Filed 10/28/22    Page 1 of 6    Page ID
#:452

TRACY WILKISON
United States Attorney
JOANNE OSINOFF
Assistant United States Attorney
Chief, Civil Division

BRIAN BOYNTON
Principal Deputy Assistant Attorney General
ERIC KAUFMAN-COHEN
Attorney in Charge, West Coast Office
FRANK J. ANDERS
SCOTT PERRYGO
KYLE FRALICK
Trial Attorneys
Aviation, Space & Admiralty Litigation
Torts Branch, Civil Division, U.S. Department of Justice
P.O. Box 36028
450 Golden Gate Avenue, Room 7-5395
San Francisco, California 94102-3463
Telephone: (415) 436-6648 (415) 436-6644
          (415) 436-6645 (415) 436-6647
E-mail: eric.kaufman-cohen@usdoj.gov
       Franklin.j.anders@usdoj.gov
       Scott.perrygo@usdoj.gov
       Kyle.fralick@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of | Case No.: 2:21-cv-07065-PA-MRW<br><br>In Admiralty<br><br>UNITED STATES' PROPOSAL RE: DISCOVERY |

UNITED STATES PROPOSAL RE:
DISCOVERY                                              Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW     Document 71     Filed 10/28/22     Page 2 of 6     Page ID #:453

1  DANIEL GARCIA (Deceased);
   CHRISTINA QUITASOL, Personal
2  Representative of the Estate of
   MICHAEL QUITASOL (Deceased);
3  SARMA WILLIAMS, Personal
   Representative of the Estate of VAIDEHI
4  DEVI CAMPBELL WILLIAMS
   (Deceased); CHRISTINE
5  ALEXANDRA DIGNAM, Personal
   Representative of the Estate of JUSTIN
6  DIGNAM (Deceased); JASMINE
   LORD, Personal Representative of the
7  Estate of CHARLES McILVAIN
   (Deceased); VICTORIA E. MOORE,
8  Personal Representative of the Estates of
   RAYMOND SCOTT CHAN (Deceased)
9  and KENDRA CHAN (Deceased);
   YUKA OHASHI MERRITT, Personal
10 Representative of the Estate of YUKO
   HATANO (Deceased); VIKRAM
11 SINGH, Personal Representative of the
   Estate of SUNIL SINGH SANDHU
12 (Deceased); NINA HUTTEGGER,
   Personal Representative of the Estate of
13 JUHA-PEKKA AHOPELTO
   (Deceased); YADIRA ALVAREZ,
14 Personal Representative of the Estate of
   BERENICE FELIPE (Deceased); SEJAY
15 TAN, Personal Representative of the
   Estate of WEI TAN (Deceased); ERIC
16 BALTZ, Personal Representative of the
   Estate of NEAL BALTZ (Deceased);
17 ANTHONY BEITZINGER, Personal
   Representative of the Estate of
18 PATRICIA BEITZINGER (Deceased);
   SHRUTI DEOPUJARI, Personal
19 Representative of the Estate of
   SANJEERI DEOPUJARI (Deceased);
20 ATLEE FRITZ, Personal
   Representative of the Estate of
21 ANDREW FRITZ (Deceased); SEEMA
   SHARMA, Personal
22 Representative of the Estate of
   KAUSTUBH NIRMAL (Deceased);
23 MARGARET STROM, Personal
   representative of the Estate of TED
24 STROM (Deceased); RICHARD X. LIU,
   Personal Representative of the Estate of
25 XIANG LIN; SUSANA SOLANO
   ROSAS, Personal Representative of the
26 Estates of EVANMICHEL SOLANO
   QUITASOL (Deceased), ANGELA
27 ROSE SOLANO QUITASOL
28

UNITED STATES PROPOSAL RE:
DISCOVERY                                    Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 71    Filed 10/28/22    Page 3 of 6    Page ID
                                  #:454

1   (Deceased), and NICOLE SOLANO
    QUITASOL (Deceased); ARIEL                           )
2   TAKVAM, Personal Representative of                   )
    the Estate of KRISTIAN TAKVAM                        )
3   (Deceased); DOMINIC MICAEL                           )
    SELGA, Personal Representative of the                )
4   Estate of FERNISA JUNE SISON                         )
    (Deceased); ROBERT KURTZ and                         )
5   CHERIE MCDONOUGH, Personal                           )
    Representatives of the Estate of                     )
6   ALEXANDRA HALEY KURTZ; JEAN                          )
    ANNE ALLEN as Executor of the Estate                 )
7   of STEVEN JOHN SALIKA, Executor                      )
    of the Estate OF CAROL DIANA                         )
8   ADAMIC and Administrator of the                      )
    Estate of TIA NICOLE ADAMIC                          )
9   SALIKA; JAMES ADAMIC,                                )
    individually and as beneficiary of the              )
10  Estate of CAROL DIANA ADAMIC                         )
    (Deceased); ANGELIKA ADAMIC,                         )
11  individually and as beneficiary of the              )
    Estate of CAROL DIANA ADAMIC                         )
12  (Deceased); MARK ADAMIC,                             )
    individually and as beneficiary of the              )
13  Estate of CAROL DIANA ADAMIC                         )
    (Deceased); SHIRLEY SALIKA,                          )
14  individually, and as beneficiary of the             )
    Estate of STEVEN JOHN SALIKA                         )
15  (Deceased) and TIA NICOLE SALIKA                     )
    (Deceased); DANIEL POH-HOCK                          )
16  CHUA, Personal Representative of the                 )
    Estate of KRISTINA OLINE FINSTAD                     )
17  (Deceased), and RYAN SIMS,                           )
    individually,                                        )
18                                                       )
19          Plaintiffs,                                  )
                                                         )
20      vs.                                              )
                                                         )
21  UNITED STATES OF AMERICA,                            )
                                                         )
22          Defendant.                                   )

23  _____

24

25

26

27

28

    UNITED STATES PROPOSAL RE:
    DISCOVERY                                Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 71    Filed 10/28/22    Page 4 of 6    Page ID
#:455

Pursuant to the Court's Civil Minute Order dated October 14, 2022 (ECF No. 70) the United States hereby submits its proposal for discovery.

As the United States' motion for summary judgment on Plaintiffs' Complaint will be based upon the discretionary function exception to the waiver of sovereign immunity (DFE) the United States, at this time, does not foresee a need to conduct discovery. In support of its motion the United States will rely on the Coast Guard's discretion concerning its policies and procedures in implementing and carrying out its responsibilities under 46 CFR Ch. I, Subch. T, *et seq.* ("T-Boat inspection.")

The United States understands that Plaintiffs will seek discovery into these policies and procedures and the United States will produce the relevant policies and procedures. The United States will also make available, within reason, those individuals who were responsible for drafting those policies and procedures as well as those individuals who actually carried out those policies and procedures and actually conducted the T-Boat inspections of the dive boat CONCEPTION covering a reasonable time frame. The United States will also produce all documentation available related to the Coast Guard's T-Boat inspections of the CONCEPATION covering a reasonable time frame.

The United States does not anticipate any issues arising concerning the limited discovery the Court has recognized Plaintiffs may need in order to respond to the United States DFE motion.

UNITED STATES PROPOSAL RE:
DISCOVERY                                    1              Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 71   Filed 10/28/22   Page 5 of 6   Page ID #:456

Date: October 28, 2022                    Respectfully submitted,

                                          TRACY WILKISON
                                          United States Attorney
                                          JOANNE OSINOFF
                                          Assistant United States Attorney
                                          Chief, Civil Division

                                          BRIAN BOYNTON
                                          Principal Deputy Assistant Attorney General

                                          s/Eric Kaufman-Cohen
                                          ERIC KAUFMAN-COHEN
                                          Attorney in Charge, West Coast Filed Office
                                          FRANK J. ANDERS
                                          SCOTT PERRYGO
                                          KYLE FRALICK
                                          Trial Attorneys
                                          Aviation, Space & Admiralty Litigation
                                          Torts Branch, Civil Division
                                          U.S. Department of Justice

                                          Attorneys for United States of America

UNITED STATES PROPOSAL RE:
DISCOVERY                          2              Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 71    Filed 10/28/22    Page 6 of 6    Page ID
#:457

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that on October 28, 2022, a copy of the foregoing UNITED

4    STATES' PROPOSAL RE: DISCOVERY was filed electronically with the Clerk of

5

6    the Court by operation of the Court's electronic filing system, which will serve an

7    electronic copy of all counsel of record.

8

9

10

11    _____s/Eric Kaufman-Cohen_____
         ERIC KAUFMAN-COHEN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES PROPOSAL RE:
DISCOVERY                          3            Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 70   Filed 10/14/22   Page 1 of 1   Page ID
#:451

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 21-7065 PA (MRWx) | Date | October 14, 2022 |
|---|---|---|---|

| Title | Nancy Fiedler, et al. v. United States of America. | | |
|---|---|---|---|

Present: The Honorable   PERCY ANDERSON, UNITED STATES DISTRICT JUDGE

| Kamilla Sali-Suleyman | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:**       **IN CHAMBERS — COURT ORDER**

Having reviewed the parties' Supplemental Joint Report, the Court has determined that the United States will be permitted to file a motion for summary judgment to determine whether the discretionary function exception to the Federal Tort Claims Act shields the United States from liability. See Lam v. United States, 979 F.3d 665, 672 (9th Cir. 2020) (explaining that "where the DFE applies, the United States has not waived its sovereign immunity, and the district court lacks subject matter jurisdiction over a plaintiff's claim"). Accordingly, the Court will stay the rest of the action pending a further order of the Court.

To expedite resolution of the DFE issue, the Court will impose limitations on the scope of discovery. The Court orders the Government to submit within fourteen days of the date of this order its proposal, not to exceed 5 pages, on the scope of discovery necessary for a determination of whether Plaintiffs' claims are barred by the DFE. Plaintiffs shall then have fourteen days, from the date the Government files its report, to file its response not to exceed 5 pages.

The Court reminds the parties to carefully consider the relevant two-part test articulated by the Supreme Court, for determining whether the DFE applies, when presenting their views on the discovery needed for the Court to properly apply the two-part analysis. See Lam, 979 F.3d at 678 (outlining and applying the Supreme Court precedent for the two-part test and its Ninth Circuit progeny). Following receipt of the parties' reports, the Court will issue a briefing schedule and an order outlining the permissible scope of discovery limited to the DFE issue.

IT IS SO ORDERED.

**ER 677**



1 | MATTHEW D. DAVIS
2 | mdavis@walkuplawoffice.com
SPENCER J. PAHLKE
3 | spahlke@walkuplawoffice.com
4 | WALKUP, MELODIA, KELLY & SCHOENBERGER
650 California Street, 26th Floor
5 | San Francisco, CA 94108

6 | *Attorneys for Plaintiffs*

7

8 | [All counsel listed in the signature block]

9 | **UNITED STATES DISTRICT COURT**
10 | **CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
11

12 | NANCY FIEDLER, et al.,

13 |               Plaintiffs

14 | vs.

15 |

16 | UNITED STATES OF AMERICA,

17 |               Defendants.

18

19

20

21

22

23

24

25

26

27

28

IN ADMIRALTY

CASE NO. 2:21-cv-07065-PA-MRW

[HON. PERCY ANDERSON]

**SUPPLMENTAL JOINT RULE 26(f) REPORT**

Answer Filed: July 13, 2022

Date: September 26, 2022
Time: 11:00 a.m.
Place: First Street Courthouse,
Courtroom 9A

1

1    Pursuant to the Court's Order of September 9, 2022 (*ECF No. 62*), Plaintiffs
2 Nancy Fielder, *et. al.* and United States of America (collectively "the Parties"), by
3 and through undersigned counsel, hereby provide the Court with their Supplemental
4 Fed. R. Civ. P. 26(f) Report.[1]

5    The Court has directed the parties to meet and confer and prepare a
6 Supplemental Report explaining why discovery and potential resolution of the
7 discretionary function issue should be stayed pending resolution of the criminal
8 action against Captain Jerry Boylan, Master of the dive boat *CONCEPTION* ("the
9 Criminal Action against Capt. Boylan"). The Criminal Action against Capt. Boylan
10 has been dismissed without prejudice.[2]  Rather than file a second, superseding
11 indictment, the U.S. Attorney's office has appealed that dismissal to the Ninth
12 Circuit.

13                          **The Position of the United States**

14    The United States no longer believes a stay in this action is warranted and is
15 prepared to move forward with its contemplated motion for summary judgment. In
16 that regard, the United States is amenable to allowing Plaintiffs to conduct limited
17 discovery into the issue of whether the United States is immune from suit herein
18 pursuant to the discretionary function exception to its waiver of sovereign immunity
19
20

---

21 [1] The United States notes that the continued hearing date of September 26, 2022, falls
22 on the Jewish Holiday of Rosh Hashanah, the Jewish New Year.  The Parties
23 respectfully request that should the Court find that a hearing is necessary, it be
    rescheduled for a different date.

24 [2] Should the U.S. Attorney's Office file a second superseding indictment, or
25 otherwise appeal the Court's Order dismissing the Criminal case, the United States
26 does not believe that the filing of a motion for summary judgment in this case based
    upon the discretionary function exception to the waiver of sovereign immunity would
27 jeopardize any further criminal proceedings or effect this case, and therefore a stay
28 would not be warranted.

29                                              2

Case 2:21-cv-07065-PA-MRW   Document 63   Filed 09/19/22   Page 3 of 13   Page ID
#:425

1 courts have recognized applies to the Suits in Admiralty Act, 46 U.S.C.A. §§ 30901,
2 *et seq.* (See *McMellon v. United States,* 387 F.3d 329, 340 (4th Cir. 2004).

3      Plaintiffs take the position that they need to conduct discovery in order to
4 establish that the Coast Guard abused its discretion under 46 C.F.R, Subchapter T,
5 Parts 175 to 187, in inspecting the CONCEPTION. However, an "abuse of
6 discretion" analysis plays no role in determining whether the discretionary function
7 exception to the waiver of sovereign immunity precludes Plaintiffs' action against
8 the United States herein. Indeed, even if the actions of the Coast Guard were deemed
9 negligent, the United States would still be immune from suit as long as the Coast
10 Guard was given, and is given, discretion in carrying out its inspection duties under
11 46 C.F.R., Subchapeter T. *Irrigation Dist. v. United States,* 880 F.2d 1018, 1029 (9th
12 Cir. 1989) (recognizing that if negligence defeated the discretionary function
13 exception, the exception would be useless.)

14      The United States still takes the position that at this point the case need not be
15 stayed pending the outcome of Plaintiffs' civil action pending in the Complex
16 Litigation Department of the Los Angeles Superior Court, Case No. 21STCV8121
17 ("Superior Court Action"). Should the Court deny the United States motion for
18 summary judgement, then it would be appropriate to stay this action pending the
19 conclusion of Plaintiffs' Superior Court action.

20                    **The Position of the Plaintiffs**

21      Plaintiffs respectfully urge this Court to stay the instant Action altogether
22 pending disposition of the Superior Court Action -- just as this Court has already
23 stayed the Action *CONCEPTION's* owners filed under the Vessel Owner's
24 Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq.* ("the LOLA Action"). See
25 Case 2:19-cv-07693-PA-MRW, *ECF No. 179.* Alternatively, Plaintiffs ask that this
26 Action be stayed pending the disposition of the Criminal Action against Capt.
27 Boylan.

28

29                                    3

1    District courts have a broad discretion to stay or abate proceedings before

2 them pending the disposition of related proceedings. *Rhines v. Weber*, 544 U.S. 269,

3 276 (2005).

> [T]he power to stay proceedings is incidental to the power inherent in
> every court to control the disposition of the causes on its docket with
> economy of time and effort for itself, for counsel, and for litigants. How
> this can best be done calls for the exercise of judgment, which must
> weigh competing interests and maintain an even balance.

8 *Landis v. N. Am. Co.*, 299 U.S. 248, 254-255 (1936) (compiling cases). On balance,

9 those competing interests support Plaintiffs' requests for a stay of the instant Action.

10

11    This Action, the Criminal Action against Capt. Boylan, the Superior Court

12 Action, and the LOLA Action all arise from the September 2, 2019, fire that killed 34

13 people aboard the dive boat *CONCEPTION*. Until the Criminal Action against Capt.

14

15 Boylan has been concluded, his Fifth Amendment rights and those of

16 *CONCEPTION's* four surviving crew members and the vessel's owner, Glenn

17 Fritzler,[3] will prevent Plaintiffs from gathering evidence that is material, if not critical

18

19 to their allegation that the Coast Guard not only abused its discretion under 46 C.F.R,

20 Subchapter T, Parts 175 to 187, but also violated, indeed ignored the procedures,

21 protocols, and checklists it set forth in the CG-840-T1 when it certified

22

23 *CONCEPTION* to operate as "a small passenger vessel" under 46 C.F.R. § 175.110(a)

24 year after year notwithstanding glaring defects in her design, construction, wiring,

25

26

27

28 [3] See e.g. see e.g. *United States v. Nobles*, 422 U.S. 225 (1975); *Bellis v. United*

29 *States*, 417 U.S. 85 (1974).

4

1  fire-detection and fire-suppression equipment, and shipboard operating procedures.
2  See *ECF No. 49* at Par. 132.
3
4  Capt. Boylan and his fellow crew members are the *only* surviving eyewitnesses
5  to events aboard *CONCEPTION* on the night of the fire, and Glenn Fritzler had a
6  close and longstanding relationship with the Coast Guard personnel who inspected
7
8  and certified *CONCEPTION.*   Plaintiffs are informed and believe that Fritzler
9  likewise facilitated that vessel's annual inspections and attended several himself.
10  What is more, despite repeated FOIA and *Touhy* requests from the civil litigants, the
11
12  U.S. Attorneys prosecuting Capt. Boylan have sequestered great swaths of material
13  evidence -- including *all* the lithium-ion-battery husks and electronic equipment
14  salvaged from the wreck – and refuse to release that evidence until the Criminal
15
16  Action against Capt. Boylan has been completed.  We do not see how we can fully
17  and fairly oppose the Government's contemplated motion for summary judgment on
18  the discretionary-function issue much less prosecute our claims against the Coast
19
20  Guard until we have inspected all that sequestered evidence and taken the unfettered
21  depositions of *CONCEPTION's* owner, master, and surviving crew members.  Indeed,
22  if the Government insists on proceeding with a motion for summary judgment, we are
23
24  prepared to aver under Fed.R.Civ.P. 56(d) that we "cannot present facts essential to
25  justify its opposition" by reason of the Criminal Action against Capt. Boylan.  See
26  e.g. *United States v. Kitsap Physicians Servs.*, 314 F.3d 995, 1000 (9th Cir. 2002);
27
28
29  _____5_____

*Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades etc.*, 817 F.2d 1391, 1395 (9th Cir. 1987)).

Plaintiffs further respectfully submit that this Court should stay the instant Action pending disposition of the Superior Court Action. Since the instant Action and the Superior Court Action lie against entirely different parties, since *CONCEPTION* owners are not only egregiously underinsured but have also petitioned for limitation under LOLA, and since Plaintiffs cannot attempt a piecemeal settlement with *any* single party (including the Coast Guard) without eliminating the joint and several liability that is the families' only hope for just compensation, see *McDermott, Inc. v. Amclyde*, 511 U.S. 202, 218-220 (1994), *both* the Superior Court Action and the instant Action will have to proceed to judgment absent a global settlement. Setting the considerations of judicial economy and the danger of inconsistent results to one side, allowing the instant Action to proceed to trial before the Superior Court action will deprive Plaintiffs of their saved, Constitutional right to trial by jury.

Both this Action and the Superior Court Action sound in admiralty and satisfy the requirements for admiralty tort jurisdiction. See *In re Truth Aquatics*, 2020 U.S. Dist. LEXIS 81040, *12-*13 (C.D.Cal. 2020).[4] The "savings-to-suitors clause" in 28

---

[4] "[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved, to determine whether the

6

Case 2:21-cv-07065-PA-MRW    Document 63    Filed 09/19/22    Page 7 of 13    Page ID
#:429

1 U.S.C. § 1333(1) nonetheless entitles Plaintiffs to invoke their common-law remedies
2 and sue all the Defendants they deem responsible for the *CONCEPTION* disaster –
3
4 *except* the Coast Guard – at law, in state court. See gen. 1 Schoenbaum, *Admiralty*
5 *and Maritime Law* (4th ed.) § 4-4, p. 173-174. Trial by jury is the most important
6 example of the common-law remedies saved to Plaintiffs by that clause. *Lewis v.*
7
8 *Lewis & Clark Marine, Inc.*, 531 U.S. 438, 454-455 (2001). This Court has already
9 stayed the LOLA Action in deference to that saved right. Plaintiffs respectfully urge
10 Your Honor to do the same thing here.
11
12     If this Court does not stay the instant Action pending the disposition of the
13 Superior Court action, it could effectively prevent the Plaintiffs from having critical
14 issues concerning the amount and apportionment of their damages determined by a
15
16 jury. If, on the other hand, this Court defers trial in this Action until after the bell
17 weather trial in the Superior Court Action, the jury's verdict in that bell weather trial
18 might well eliminate the need for the instant Action altogether.
19
20 . . .
21 . . .
22 . . .
23 . . .
24 . . .
25
26 incident has a potentially disruptive impact on maritime commerce. Second, a court
27 must determine whether the general character of the activity giving rise to the incident
   shows a substantial relationship to traditional maritime activity." *Grubart v. Greaat*
28 *Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1994) (internal quotation marks and
29 citations omitted).

7



Case 2:21-cv-07065-PA-MRW    Document 63    Filed 09/19/22    Page 8 of 13    Page ID
#:430

1 | Dated:        September 19, 2022

2 | **Respectfully submitted,**

3

4 | TRACY WILKISON
    United States Attorney
5 | JOANNE OSINOFF
6 | Assistant United States Attorney
    Chief, Civil Division
7 | BRIAN BOYNTON
8 | Principal Deputy Assistant Attorney General

9 | s/Eric Kaufman-Cohen
10 | ERIC KAUFMAN-COHEN
    Attorney in Charge, West Coast Filed Office
11 | Aviation, Space & Admiralty Litigation
12 | Torts Branch, Civil Division
    U.S. Department of Justice
13

14 | Attorneys for United States of America

15

16

17 | NELSON & FRAENKEL, LLP

18 | */s/Carlos F. Llinás Negret*
19 | Gretchen M. Nelson
20 | Carlos F. Llinás Negret
    601 South Figueroa Street, Suite 2050
21 | Los Angeles, CA 90017

22 | cllinas@nflawfirm.com
23

24 | Counsel for: Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay Tan,
    Yadira Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto, C.A. (a
25 | minor), Jean Anne Allen, Estate of Carol Diana Adamic, Estate of Steven John
26 | Salika, Estate of Tia Nicole Adamic Salika, Shirley Salika, James Adamic.

27

28

29 | <u>8</u>
                                                    JOINT RULE 26(F) REPORT
                                                    CASE NO.:2:21-cv-07065-PA-MRW

**ER 685**



1 | MCGUINN HILLSMAN AND PALEFSKY

2
3 | */s/John R. Hillsman*
  | JOHN R. HILLSMAN
4 | 535 Pacific Avenue Suite 100
  | San Francisco, CA 94133
5
6 | Email: jrhillsman@mhpsf.com

7 | Counsel for: Victoria Ellen Moore, Christine Dignam, Jasmine Lord, Yuka Hatashi
8 | Merritt, and Viikram Singh.

9
10 | SALTZ MONGELUZZI AND BENDESKY PC

11 | */s/ Jeffrey P. Goodman*
12 | Jeffrey P Goodman (Pro Hac Vice To Be Submitted)
  | Ernest D. DiSandro, Jr. (Pro Hac Vice To Be Submitted
13 | 1650 Market Street 52nd Floor
14 | Philadelphia, PA 19103

15 | jgoodman@smbb.com
16
17
18 | PANISH SHEA AND BOYLE LLP
19
20 | */s/Robert Samuel Glassman*
  | Robert Samuel Glassman
21 | 11111 Santa Monica Boulevard Suite 700
22 | Los Angeles, CA 90025

23 | glassman@psblaw.com
24
25 | Counsel for: Mathew Guiney, Shruti Deopuraji, Robert Kurtz, Cherie McDonough,
  | Kaustubh Nirmal, Gregory Krashenny, Seema Sharma, Cherie McDonough, Anthony
26 | Beitzinger, Henry Garcia, Margaret Strom, Eric Baltz, Atlee Fritz.
27
28
29 | 9



1 | GALINE FRYE FITTING AND FRANGOS

2

3 | */s/Ilya Demetrios Frangos*
ILYA DEMETRIOS FRANGOS

4 | 411 Borel Avenue Suite 500
San Mateo, CA 94402

5

6 | ifrangos@gff-law.com

7 | Counsel for: Richard X. Liu, Estate of Xiang Lin.

8

9

10 | SCHUERING ZIMMERMAN AND DOYLE LLP

11 | */s/Theodore Derk Poppinga*

12 | Theodore Derk Poppinga
Robert Harry Zimmerman

13 | 400 University Avenue

14 | Sacramento, CA 95825

15 | tdp@szs.com

16 | Counsel for: Susana Solano Rosas.

17

18

19

20 | FIORE ACHERMANN ALC

21 | */s/Jennifer L Fiore*

22 | Jennifer L Fiore
Sophia M Acherman

23 | 340 Pine Street Suite 503

24 | San Francisco, CA 94104

25 | jennifer@thefafirm.com

26 | Counsel for: Ariel Takvam, Kenneth Takvam, Mary R. Takvam, Mark Adamic,

27 | Angelika Adamic.

28

29 | 10



Case 2:21-cv-07065-PA-MRW    Document 63    Filed 09/19/22    Page 11 of 13    Page ID
#:433

1  WALKUP MELODIA KELLY WECHT AND SCHOENBERGER
2  */s/Matthew D Davis*
   Matthew D Davis
3  650 California Street, 26th Floor
4  San Francisco, CA 94108

5  dsaeltzer@walkuplawoffice.com

6  Counsel for: Christina Quitasol, Katie Osborne, Olga Faynshteyn, Sarma Williams,
7  Nancy Fiedler, Mathew Guiney.

8

9

10
   LAW OFFICE OF W RUSSELL FIELDS
11 */s/Aurelio Edward Fields*
12 Aurelio Edward Fields
   1792 Tribute Road Suite 400
13 Sacramento, CA 95815

14
   ed@russfieldslaw.com
15

16 Counsel for: Dominic Micael Selga, Estate of Fernisa June Sison, Nisa Shinagawa.

17

18

19

20 ARNOLD AND ITKIN LLP
   */s/Cory Itkin*
21 Cory Itkin
22 Roland T Christensen
   6009 Memorial Drive
23 Houston, TX 77007

24
   citkin@arnolditkin.com
25

26 Counsel for: Ryan Sims.

27

28

29                                    11
                                              JOINT RULE 26(F) REPORT
                                              CASE NO.:2:21-cv-07065-PA-MRW



1  Todd M. Abbott, Esquire
2  */s/ Todd M. Abbott*

3  2127 Olympic Parkway, Suite 1006, Number 348
4  Chula Vista, California 91915

5  tmabbottlaw@gmail.com
6  Counsel for: Daniel Poh-Hock Chua; Estate of Kristen Findstad.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

12

Case 2:21-cv-07065-PA-MRW    Document 63    Filed 09/19/22    Page 13 of 13   Page ID
                                          #:435

## FILER'S ATTESTATION

The filing attorney attests that the filing attorney has obtained permission regarding the filing of this document from the signatories of this document. Further, the filing attorney hereby certifies that the content of this stipulation is acceptable to all parties required to sign this stipulation. All parties authorize the filing attorney to affix their CM/ECF electronic signatures to this stipulation.

Dated: September 19, 2022        McGUINN, HILLSMAN & PALEFSKY

                                 By: /s/  JOHN R. HILLSMAN
                                         JOHN R. HILLSMAN

                                 *Attorneys for Plaintiffs*

13

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 1 of 16    Page ID
#:383

1  MATTHEW D. DAVIS (State Bar #141986)
2  mdavis@walkuplawoffice.com
   SPENCER J. PAHLKE (State Bar #250914)
3  spahlke@walkuplawoffice.com
4  WALKUP, MELODIA, KELLY & SCHOENBERGER
   650 California Street, 26th Floor
5  San Francisco, CA 94108

6  *Attorneys for Plaintiffs*

7
8  [All counsel listed in the signature block]

9                    **UNITED STATES DISTRICT COURT**
10                  **CENTRAL DISTRICT OF CALIFORNIA**
                            **WESTERN DIVISION**
11

12                                              IN ADMIRALTY
   NANCY FIEDLER, et al.,
13                                              CASE NO.:2:21-cv-07065-PA-MRW
             Plaintiffs
14
15        vs.                                   [HON. PERCY ANDERSON]

16  UNITED STATES OF AMERICA,                   **JOINT RULE 26(f) REPORT**

17           Defendants.                        Answer Filed: July 13, 2022
18
19                                              Date: September 12, 2022
                                                Time: 10:30 a.m.
20                                              Place: First Street Courthouse,
21                                              Courtroom 9A

22

23
24        COME NOW, Plaintiffs Nancy Fielder, et. al. and United States of America
25  (collectively "the Parties"), by and through undersigned counsel, and pursuant to Fed.
26  R. Civ. P. 26(f), and this Court's July 14, 2022, Order re. Scheduling Conference
27  [ECF No. 57], the Parties file their Joint Rule 26(f) Report. In support thereof, the
28  Parties state as follows:

                                        1
                                                         JOINT RULE 26(F) REPORT
                                                         CASE NO.:2:21-cv-07065-PA-MRW

## I. Synopsis of Principal Issues in the Case.

This matter consists of a Complaint for Wrongful Death and Survival Damages under the Suits in Admiralty Act, 46 U.S.C. §30903 (hereinafter "SIAA"). The SIAA waives sovereign immunity for the United States in cases in which a private person, in like circumstances, could be sued in admiralty.

The action grows out of the catastrophic fire that killed thirty-four people aboard the dive vessel *CONCEPTION* during the early morning hours of September 2, 2019. Plaintiffs' claims center on the role and actions of the United States Coast Guard ("USCG") in inspecting, certifying and approving the vessel prior to the fire. Plaintiffs' complaint alleges, among other things, that USCG violated and ignored its own written inspection standards and protocols over an extended period of years when it repeatedly certified the M/V *CONCEPTION* to continue operating in coastwise, overnight service as a small passenger vessel despite glaring deficiencies in its design, wiring, construction, and shipboard procedures.

Plaintiffs allege "[o]n the night of Tuesday, September 1, 2019, while *CONCEPTION* was anchored at Platt's Harbor just a few hundred yards off Santa Cruz Island, some of her passengers made a night dive that concluded some time before 2400. After that, the vessel buttoned down for the night. At 0235 hours, the last person awake, *CONCEPTION's* Second Cook Michael Kohls, finished cleaning the salon, galley, and heads, and went up to his bunk on the sun deck. There was no indication at that time of any fire or disturbance in the bunk room, on the fantail, in the salon, in the galley, or anywhere else aboard the vessel. By the time Kohls nodded off in his berth, everyone aboard *CONCEPTION*, including all six of her crew members, was sound asleep." (ECF No. 44, ¶127.)

Plaintiffs further allege, "sometime around 0300, Kohls and his fellow crew member, First Cook Ryan Sims, were awakened by loud noises and the cry of someone in distress. Earlier that evening, Sims had seen sparks when he plugged his cell phone into one of the charging stations in the salon. Kohls got up to investigate,

2

JOINT RULE 26(F) REPORT                                          CASE NO.:2:21-cv-07065-PA-MRW

**ER 692**

1  but when he reached the top of the stairway from the sun deck down to the main
2  deck, he saw flames licking at the stairs from the after, starboard corner of the
3  passenger accommodation. What Kohls saw was a lithium-fueled fire that had been
4  sparked and/or critically accelerated by defective equipment which was plugged into
5  an overburdened shipboard electrical system." (ECF No. 44, ¶128.)

6      Plaintiffs allege, among other things, that this overburdened shipboard
7  electrical system had been designed, developed, built, installed, and refurbished
8  without adequate fire detection, without adequate fire protection and/or without
9  adequate electrical systems and wiring by the *CONCEPTION's* owners and others.
10  Plaintiffs allege the Coast Guard failed to perform adequate inspections, allowing the
11  *CONCEPTION* to sail with these hazardous and ultimately deadly conditions. (ECF
12  No. 44, ¶128.)

13      Defendant the United States, filed its Answer and Affirmative Defenses on
14  July 13, 2022 (ECF No. 53.) Defendant denies the Plaintiffs' allegations. As its
15  Fourth Affirmative Defense, Defendant United States alleges "the Court lacks
16  subject matter jurisdiction over Plaintiffs' First Amended Complaint and action since
17  said Complaint and action solely raise matters of discretionary functions and acts for
18  which the United States of America has not waived sovereign immunity and
19  consented to be sued." (*Id.,* ¶187.)

20      The Parties met and conferred during their Fed. R. Civ. P. 16(c) conference.
21  At that time, the United States informed Plaintiffs that it intends to file a dispositive
22  motion in support of its "discretionary function" defense.

23      During their Rule 16 Conference, the Parties discussed that in order for the
24  Court to properly assess and adjudicate the United States' discretionary function
25  defense, discovery is necessary. As discussed in greater detail below, such discovery
26  would consist of the exchange of written discovery (Requests for Production,
27  Interrogatories, Requests for Admissions) and depositions.

28

29

3

JOINT RULE 26(F) REPORT                                     CASE NO.:2:21-cv-07065-PA-MRW

1   At this time, however, Plaintiffs' ability to conduct discovery will be severely
2   restricted, due to the contemporaneous and pending criminal prosecution of the
3   *CONCEPTION's* Captain Jerry Boylan.

4   Accordingly, all Parties believe this matter should be stayed (along with any
5   adjudication of the United States' 'discretionary function' defense). The Parties
6   disagree on the extent of the stay.

7   The United States agrees this matter should be stayed until the conclusion of
8   the pending criminal matter. (See description below, re. *United States v. Boylan*, CR
9   2:20-cr-00600-GW).

10   The Plaintiffs believe, however, in the interests of justice and judicial
11   economy, the matter should also be stayed until a final judgement on the merits of
12   the State Court Action against CONCEPTION's owner and others (See description
13   below, re. *Fiedler, et al. v. Truth Aquatics, et al.* Los Angeles Superior Court Case
14   No. 21STCV8121).

15   The United States believes that the issue of whether the Court has subject matter
16   jurisdiction over this action and whether the United States has waived its sovereign
17   immunity and consented to be sued herein is of paramount importance and should be
18   decided as expeditiously as possible. Therefore, the United States requests that it be
19   allowed to file its motion for summary judgment pursuant to Fed.R.Civ.P.56 on its
20   Fourth Affirmative Defense once the criminal case is resolved and at the conclusion
21   of any discovery Plaintiffs may need to conduct to oppose the motion. Such discovery
22   being limited solely to the jurisdictional issue, *i.e.*, whether the United States is
23   immune from suit herein under the discretionary function exception to its waiver of
24   sovereign immunity. If the Court grants the motion, the issue will be resolved. If the
25   Court denies the motion, the United States will consent to a stay of this action
26   pending resolution of Plaintiffs' State Court action.

27   **II.    Related Actions.**

28   Criminal Case: *United States v. Boylan, CR 2:20-cr-00600-GW*

29

4

**ER 694**

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 5 of 16   Page ID
#:387

1     Captain Jerry Nehl Boylan was indicated on December 1, 2020. The criminal
2  matter is pending before the Hon. George Wu. According to the Grand Jury
3  indictment [CR ECF No. 1], the United States is seeking conviction of Captain
4  Boylan pursuant to the Seaman's Manslaughter Statute, 18 U.S.C. § 1115. A First
5  Superseding Indictment was filed on July 19, 2022. The criminal matter remains
6  pending. The current trial date is October 5, 2022. That date has been previously
7  continued.

8     Limitation of Liability Action: *In Re Conception, 2:19-cv-07693-PA-MRW*

9     On September 5, 2019, the owners of *CONCEPTION*, Truth Aquatics, Inc.,
10 Glen Richard Fritzler, and Dana Jeanne Fritzler (the "LOLA Petitioners"), filed an
11 action seeking relief under the Vessel Owners Limitation of Liability Act ("LOLA"),
12 46 U.S.C. §§ 30501–11. Families of thirty-two (32) deceased passengers, one
13 crewmember who died, and one crewmember who sustained personal injuries filed
14 claims opposing the owners' LOLA Petition.

15    After Claimants answered the LOLA Petitioners' pleadings and the parties
16 exchanged initial disclosures, the parties reached a stipulation that stayed the LOLA
17 action and permitted Claimants to file state court actions under the "savings to
18 suitors" clause of the Federal Judiciary Act of 1789, 28 U.S.C. § 1333(1). (See 2:19-
19 cv-07693, ECF No. 179.) Upon granting the stipulation, this Court administratively
20 closed the case and ordered semi-annual status reports to be filed, beginning on
21 August 1, 2021. (See id. ¶ 5.) The most recent status report was filed on August 1,
22 2022. (*Id.*, ECF No. 183.)

23    State Court Action: *Fiedler, et al. v. Truth Aquatics, et al.* Los Angeles Superior
24 Court Case No. 21STCV8121

25    After the LOLA federal matter was administratively closed, Claimants filed
26 their complaints in the Superior Court of California, County of Los Angeles (the
27 "Superior Court"), asserting claims against Truth Aquatics, Inc., Glen Richard
28 Fritzler, and Dana Jeanne Fritzler, and other parties.

29

5

JOINT RULE 26(F) REPORT                                    CASE NO.:2:21-cv-07065-PA-MRW

**ER 695**

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 6 of 16    Page ID
#:388

1    On March 11, 2021, the Superior Court designated as the lead case, *Fiedler, et*
2    *al. v. Truth Aquatics, et al.,* Case No. 21STCV08121. Eleven other complaints were
3    ordered related to the *Fiedler* case. All of the related cases have been assigned to the
4    Hon. Carolyn B. Kuhl in Department 12 of the Complex Courts Division. At present,
5    pre-trial proceedings and discovery continue in the State Court Action.

6    **III.    Proposed Schedule of Written Discovery, Depositions and a**
7    **Proposed Discovery Cut-Off Date.**

8    If the Court grants the United States leave to file a dispositive motion under
9    Fed.R.Civ.P.56 seeking a resolution of its "discretionary function" defense, at the
10   conclusion of the pending criminal case, and before staying the case pending the
11   resolution of the Plaintiffs' Superior Court action, the Parties agree Plaintiffs are
12   entitled to conduct discovery prior to briefing any meaningful opposition to a
13   discretionary function motion. Accordingly, and solely to the extent the Court allows
14   the United States to file its dispositive motion at the conclusion of the criminal case,
15   the Parties propose the following preliminary "discretionary function" defense
16   discovery schedule:

17   Deadline for Parties to Propound Written Discovery: October 21, 2022.

18   Deadline for Parties to Complete Depositions: April 14, 2023.

19   Deadline to Disclose Experts: May 12, 2023.

20   Deadline to Disclose Rebuttal Experts: June 16, 2023.

21   Expert Discovery Cut-Off: October 18, 2023.

22   **IV.    Proposed Schedule of Law and Motion Matters, and Proposed**
23   **Dispositive Motion Cut-Off Date.**

24   The only dispositive motion contemplated at this time is Defendant's motion
25   based on the discretionary function defense. The Parties propose that the cut-off for
26   filing such a motion be no later than 30 days after the Expert Discovery Cut-Off.

27

28

29
                                          6
     JOINT RULE 26(F) REPORT                          CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 7 of 16    Page ID
#:389

**V.    A statement of what efforts have been made to settle or resolve the case to date and what settlement procedure is recommended pursuant to Local Rule 16-14-4.**

Settlement is premature at this juncture. In particular due to the aforementioned pending actions against other Defendants (see State Court Action), if Plaintiffs were to settle with any individual Defendant, they would be deprived of Joint and Several Liability rights under the General Maritime Law of the United States. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994).

Accordingly, all settlement discussions and negotiations must include all parties in all related matters, including the State Court Action.

Once these matters are ripe for meaningful mediation, the Parties anticipate using the services of a private mediator.

**VI.    An Estimated Length of Trial and Proposed Date for the Pretrial Conference and For Trial.**

The Parties estimate trial will take 15 days. Should the Court deny the United States Motion for summary judgment, and to the extent the Court is not inclined to stay this matter pending resolution of Plaintiffs' Superior Court action as contemplated by the parties, the Parties propose the following dates:

Pretrial Conference: July 1, 2024.

Trial: August 2, 2024.

**VII.    A Discussion of Other Parties Likely to be Added.**

The Parties do not anticipate adding other parties to this SIAA litigation.

**VIII.    Whether Trial will be by Jury or to the Court.**

As a matter of law and procedure, SIAA matters are admiralty proceedings under Fed. R. Civ. P. 9(h), adjudicated by the Court.

**IX.    A Statement of Whether Pleadings are Likely to be Amended.**

The Parties do not anticipate any further amendments to the pleadings at this time.

7

JOINT RULE 26(F) REPORT                                          CASE NO.:2:21-cv-07065-PA-MRW

**ER 697**

**X.    A Statement as to Issues Which Any Party Believes May be Determined by Motion.**

As noted above, Defendant intends to file a motion for summary judgment based on its discretionary function defense.

**XI.    Any Other Issues Which any Party Believes May be Determined By Motion.**

During their Rule 16 Conference, the parties met and conferred concerning Defendant's possession of evidence critical to this matter and the State Court Action.

The Plaintiffs believe Defendant should disclose, as part of its Rule 26 Disclosures, the following material items in the exclusive custody, possession and control of Defendant and its agencies, including the Federal Bureau of Investigation ("FBI") and the Bureau of Alcohol, Tobacco and Firearms ("ATF"):

- All battery husks and electronic equipment recovered from the *CONCEPTION*;

- An inventory of all the rechargeable equipment recovered from the *CONCEPTION*, including identifying manufacturer information and serial numbers;

- An inventory of all electronic equipment, however powered, salvaged from the vessel;

- An inventory of all the cell phones recovered from the *CONCEPTION*, including identifying manufacturer information and serial numbers;

- A description of all testing conducted on electronic equipment recovered from the *CONCEPTION*;

- All data, images, video recordings, audio recordings and other information downloaded from victim's and crew members' phones and other electronic equipment collected or recovered from the *CONCEPTION*.

- A description of all data, images, video recordings, audio recordings and other information downloaded from victim's and crew members' phones

8

1    and other electronic equipment collected or recovered from the
2    *CONCEPTION.*

3    Plaintiffs further believe that the Coast Guard should provide a complete list
4 of the names, contact information, contemporary assignment, and current posting of
5 any and all past or present Coast-Guard personnel charged or involved in any way
6 with the inspection or certification of *M/V CONCEPTION* since 2008. The United
7 States agrees that Plaintiffs are entitled to this information in this action, and counsel
8 for the United States is currently working with the Coast Guard in compiling a list of
9 all Coast Guard personnel who conducted inspections of the vessel since 2008. Once
10 completed, the United States will disclose the list of individuals to Plaintiffs as
11 required by Fed.R.Civ.P.26.

12    As for the other items Plaintiffs are demanding from the United States, the
13 United States submits that Plaintiffs' First Amended Complaint pleads two causes of
14 action against the United States, Wrongful Death and a Survival Action. In support
15 of these two causes of action Plaintiffs allege that the Coast Guard acted "negligently
16 and recklessly" by:

17    a. Abusing their discretion pursuant to Title 46 of the Code of Federal
18        Regulations, Subchapter T, Parts 175 to 187 – governing the inspection and
19        operation of small passenger vessels (less than 100 gross tons) carrying
20        between 6 and 150 passengers overnight;

21    b. Ignoring, disregarding, and failing to abide by the procedures, protocols,
22        and checklists set forth in the CG-840-T1, and the supplemental
23        publications issued by the MSD; and

24    c. Certificating, and authorizing CONCEPTION to operate as a "small
25        passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times
26        material hereto, and to carry up to forty-five passengers on overnight
27        voyages along the Southern California coast, even though her electrical
28        wiring and systems, her fire detection and suppression systems, her

29
                                    9

1    passenger-accommodation escape hatch, her watch logs and training logs
2    were in open and obvious violations of those procedures, protocols and
3    checklists. (FAC ¶ 132, ECF No. 44.)

4    The United States position is that none of the electronics and other items listed
5    above by Plaintiffs will aid them in carrying their burden of proof in establishing
6    negligence on the part of the United States in this action, nor will the production of
7    these items, even assuming counsel for the United States in this action has the ability
8    to produce these items, lead to the discovery of admissible evidence in this case.[1]

9    As for Plaintiffs' belief that the United States should disclose the above listed
10   items as part of Fed.R.Civ.P. 26 disclosures, the United States submits that its defense
11   of this action is based upon the discretionary function exception to the waiver of
12   sovereign immunity applicable to cases, such as this, arising under the Suits in
13   Admiralty Act. Under Fed.R.Civ.P. 26 disclosures, a party is required to disclose all
14   documents electronically stored information and tangible things that the disclosing
15   party may use to support its defenses. The United States will not be relying on any
16   of the items listed above by Plaintiffs to support this defense. As such, the United
17   States will not be, nor should it be required to, disclose the items sought by Plaintiffs
18   under the guise of Fed.R.Civ.P.26. Simply put, the items sought by Plaintiffs are
19   entirely irrelevant to this case, both as to Plaintiffs' theory of the case against the
20   United States, as well as the United States' defenses thereto.

21   On its part, the United States respectfully submits that Plaintiffs openly admit
22   that they are using this case, and using this Court, in order to obtain discovery in its
23   State Court action. Such tactics are not in the interests of justice and judicial
24   economy.

25

26

27   [1]  Counsel for the United States understands, that the items listed by Plaintiffs were collected by the FBI and
28   ATF as part of their ongoing criminal investigations. It would be unethical for the attorneys in the Department
     of Justice's Civil Division to involve themselves in the criminal investigation being undertaken by another
29   branch of the Department of Justice.

10

JOINT RULE 26(F) REPORT                                                      CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 11 of 16    Page ID
#:393

1    The Plaintiffs disagree with Defendant's characterization for three reasons.
2 First, Plaintiffs believe the information they seek is reasonably calculated to the
3 discovery of admissible evidence (and proportional to the needs of) their case against
4 the Coast Guard (Fed. R. Civ. P. 26(b)(1).) Second, their production is in the interests
5 of justice and the United States because all Defendants potentially liable to the
6 Plaintiffs (*e.g.*, the owners of the CONCEPTION, manufacturers/designers of
7 hazardous electrical equipment on the vessel, and the Coast Guard), are subject to
8 the longstanding rules of joint and several liability under the General Maritime Law
9 of the United States. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994). Third,
10 their production is in the interest of judicial economy, because outside of this action,
11 Plaintiffs only remedy to obtain the materials would be to file an independent *fourth*
12 *action* under *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

13

14                              **Respectfully submitted,**

15

16    Dated:        August 29, 2022

17 TRACY WILKINSON
18 United States Attorney
   JOANNE OSINOFF
19 Assistant United States Attorney
20 Chief, Civil Division
   BRIAN BOYTON
21 Principal Deputy Assistant Attorney General

22
   */s/ Eric Kaufman-Cohen*
23 ERIC KAUFMAN-COHEN
24 Attorney in Charge, West Coast Field Office
   Aviation, Space & Admiralty Litigation
25 Torts Branch, Civil Division

26
   Attorneys for the United States of America
27

28

29
                                                        11
   JOINT RULE 26(F) REPORT                               CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 58   Filed 08/29/22   Page 12 of 16   Page ID
#:394

1  NELSON & FRAENKEL, LLP

2  */s/Carlos F. Llinás Negret*
3  Gretchen M. Nelson
4  Carlos F. Llinás Negret
   601 South Figueroa Street, Suite 2050
5  Los Angeles, CA 90017
6  844-622-6469
   cllinas@nflawfirm.com
7
8  Counsel for: Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay Tan, Yadira
   Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto, C.A. (a minor),
9  Jean Anne Allen, Estate of Carol Diana Adamic, Estate of Steven John Salika, Estate
10 of Tia Nicole Adamic Salika, Shirley Salika, James Adamic.

11
12 MCGUINN HILLSMAN AND PALEFSKY

13 */s/John R. Hillsman*
14 JOHN R. HILLSMAN
   535 Pacific Avenue Suite 100
15 San Francisco, CA 94133
16 415-421-9292
   Email: jrhillsman@mhpsf.com
17
18 Counsel for: Victoria Ellen Moore, Christine Dignam, Jasmine Lord, Yuka Hatashi
   Merritt, and Viikram Singh.
19
20 SALTZ MONGELUZZI AND BENDESKY PC

21 */s/ Jeffrey P. Goodman*
22 Jeffrey P Goodman (Pro Hac Vice To Be Submitted)
   Ernest D. DiSandro, Jr. (Pro Hac Vice To Be Submitted
23 1650 Market Street 52nd Floor
24 Philadelphia, PA 19103
   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
25 jgoodman@smbb.com
26
27
28
29
                              12
   JOINT RULE 26(F) REPORT                    CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 58   Filed 08/29/22   Page 13 of 16   Page ID #:395

1  PANISH SHEA AND BOYLE LLP

2  */s/Robert Samuel Glassman*
3  Robert Samuel Glassman
4  11111 Santa Monica Boulevard Suite 700
   Los Angeles, CA 90025
5  310-477-1700
6  glassman@psblaw.com

7  Counsel for: Mathew Guiney, Shruti Deopuraji, Robert Kurtz, Cherie McDonough,
8  Kaustubh Nirmal, Gregory Krashenny, Seema Sharma, Cherie McDonough, Anthony
   Beitzinger, Henry Garcia, Margaret Strom, Eric Baltz, Atlee Fritz.
9

10  GALINE FRYE FITTING AND FRANGOS

11  */s/Ilya Demetrios Frangos*
12  ILYA DEMETRIOS FRANGOS
    411 Borel Avenue Suite 500
13  San Mateo, CA 94402
14  650-345-8484
    ifrangos@gff-law.com
15

16  Counsel for: Richard X. Liu, Estate of Xiang Lin.

17  SCHUERING ZIMMERMAN AND DOYLE LLP

18  */s/Theodore Derk Poppinga*
19  Theodore Derk Poppinga
20  Robert Harry Zimmerman
    400 University Avenue
21  Sacramento, CA 95825
22  916-567-0400
    tdp@szs.com
23

24  Counsel for: Susana Solano Rosas.

25

26

27

28

29
                                                    13
JOINT RULE 26(F) REPORT                                      CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 58   Filed 08/29/22   Page 14 of 16   Page ID
#:396

1 │ FIORE ACHERMANN ALC

2
  │ */s/Jennifer L Fiore*
3 │ Jennifer L Fiore
4 │ Sophia M Acherman
  │ 340 Pine Street Suite 503
5 │ San Francisco, CA 94104
6 │ 415-550-0650
  │ jennifer@thefafirm.com
7

8 │ Counsel for: Ariel Takvam, Kenneth Takvam, Mary R. Takvam, Mark Adamic,
  │ Angelika Adamic.
9

10 │ WALKUP MELODIA KELLY WECHT AND SCHOENBERGER
   │ */s/Matthew D Davis*
11 │ Matthew D Davis
12 │ 650 California Street, 26th Floor
   │ San Francisco, CA 94108
13 │ 415-981-7210
14 │ dsaeltzer@walkuplawoffice.com

15 │ Counsel for: Christina Quitasol, Katie Osborne, Olga Faynshteyn, Sarma Williams,
16 │ Nancy Fiedler, Mathew Guiney.

17 │ LAW OFFICE OF W RUSSELL FIELDS
18 │ */s/Aurelio Edward Fields*
   │ Aurelio Edward Fields
19 │ 1792 Tribute Road Suite 400
20 │ Sacramento, CA 95815
   │ 916-646-6100
21 │ ed@russfieldslaw.com

22
   │ Counsel for: Dominic Micael Selga, Estate of Fernisa June Sison, Nisa Shinagawa.
23

24 │ ARNOLD AND ITKIN LLP
   │ */s/Cory Itkin*
25 │ Cory Itkin
26 │ Roland T Christensen
   │ 6009 Memorial Drive
27 │ Houston, TX 77007
28 │ 713-222-3800
   │ citkin@arnolditkin.com
29

14

JOINT RULE 26(F) REPORT                    CASE NO.:2:21-cv-07065-PA-MRW



1    Counsel for: Ryan Sims.

2    */s/ Todd M. Abbott*
3    Todd M. Abbott, Esquire
4    2127 Olympic Parkway, Suite 1006, Number 348
     Chula Vista, California 91915
5    tmabbottlaw@gmail.com

6    Counsel for: Daniel Poh-Hock Chua; Estate of Kristen Findstad.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

15

JOINT RULE 26(F) REPORT                                    CASE NO.:2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 58    Filed 08/29/22    Page 16 of 16   Page ID
#:398

## FILER'S ATTESTATION

The filing attorney attests that the filing attorney has obtained permission regarding the filing of this document from the signatories of this document. Further, the filing attorney hereby certifies that the content of this stipulation is acceptable to all parties required to sign this stipulation. All parties authorize the filing attorney to affix their CM/ECF electronic signatures to this stipulation.

Dated:        August 29, 2022            NELSON & FRAENKEL, LLP

By: */s/Carlos F. Llinás*
Gretchen M. Nelson
Carlos F. Llinás Negret

*Attorneys for Plaintiffs*

16

JOINT RULE 26(F) REPORT                              CASE NO.:2:21-cv-07065-PA-MRW

**ER 706**

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 1 of 28    Page ID
#:331

1  TRACY WILKISON
2  United States Attorney
   JOANNE OSINOFF
3  Assistant United States Attorney
4  Chief, Civil Division

5
   BRIAN BOYNTON
6  Principal Deputy Assistant Attorney General
7  ERIC KAUFMAN-COHEN, Cal. SBN 171064
   eric.kaufman-cohen@usdoj.gov
8  Attorney in Charge, West Coast Office
9  FRANK J. ANDERS, Cal. SBN 227208
   Franklin.j.anders@usdoj.gov
10 SCOTT PERRYGO, Cal. SBN 341834
11 Scott.perrygo@usdoj.gov
12 KYLE FRALICK, Maryland SBN 081230008
   Kyle.fralick@usdoj.gov
13 Trial Attorneys
14 Aviation, Space & Admiralty Litigation
15 Torts Branch, Civil Division, U.S. Department of Justice
   P.O. Box 36028
16 450 Golden Gate Avenue, Room 7-5395
17 San Francisco, California 94102-3463
   Telephone: (415) 436-6648
18          (415) 436-6644/(415) 436-6645/(415) 436-6647
19 Facsimile: (415) 436-6632

20 Attorneys for United States of America

21              UNITED STATES DISTRICT COURT

22            CENTRAL DISTRICT OF CALIFORNIA

23

| NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of | Case No.: 2:21-cv-07065-PA-MRW<br><br>In Admiralty<br><br>ANSWER OF THE UNITED STATES TO THE FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES UNDER THE SUITS IN ADMIRALTY ACT |
|---|---|

24

25

26

27

28

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          1          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 53   Filed 07/13/22   Page 2 of 28   Page ID #:332

1   DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of
2   MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal
3   Representative of the Estate of VAIDEHI DEVI CAMPBELL WILLIAMS
4   (Deceased); CHRISTINE ALEXANDRA DIGNAM, Personal
5   Representative of the Estate of JUSTIN
6   DIGNAM (Deceased); JASMINE LORD, Personal Representative of the
7   Estate of CHARLES McILVAIN (Deceased); VICTORIA E. MOORE,
8   Personal Representative of the Estates of RAYMOND SCOTT CHAN (Deceased)
9   and KENDRA CHAN (Deceased); YUKA OHASHI MERRITT, Personal
10   Representative of the Estate of YUKO HATANO (Deceased); VIKRAM
11   SINGH, Personal Representative of the Estate of SUNIL SINGH SANDHU
12   (Deceased); NINA HUTTEGGER, Personal Representative of the Estate of
13   JUHA-PEKKA AHOPELTO (Deceased); YADIRA ALVAREZ,
14   Personal Representative of the Estate of BERENICE FELIPE (Deceased); SEJAY
15   TAN, Personal Representative of the Estate of WEI TAN (Deceased); ERIC
16   BALTZ, Personal Representative of the Estate of NEAL BALTZ (Deceased);
17   ANTHONY BEITZINGER, Personal Representative of the Estate of
18   PATRICIA BEITZINGER (Deceased); SHRUTI DEOPUJARI, Personal
19   Representative of the Estate of SANJEERI DEOPUJARI (Deceased);
20   ATLEE FRITZ, Personal Representative of the Estate of
21   ANDREW FRITZ (Deceased); SEEMA SHARMA, Personal
22   Representative of the Estate of KAUSTUBH NIRMAL (Deceased);
23   MARGARET STROM, Personal representative of the Estate of TED
24   STROM (Deceased); RICHARD X. LIU, Personal Representative of the Estate of
25   XIANG LIN; SUSANA SOLANO ROSAS, Personal Representative of the
26   Estates of EVANMICHEL SOLANO QUITASOL (Deceased), ANGELA
27   ROSE SOLANO QUITASOL
28

ANSWER OF UNITED STATES TO PLAINTIFFS' FIRST AMENDED COMPLAINT          2          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 3 of 28    Page ID
#:333

1  (Deceased), and NICOLE SOLANO )
   QUITASOL (Deceased); ARIEL )
2  TAKVAM, Personal Representative of )
   the Estate of KRISTIAN TAKVAM )
3  (Deceased); DOMINIC MICAEL )
   SELGA, Personal Representative of the )
4  Estate of FERNISA JUNE SISON )
   (Deceased); ROBERT KURTZ and )
5  CHERIE MCDONOUGH, Personal )
   Representatives of the Estate of )
6  ALEXANDRA HALEY KURTZ; JEAN )
   ANNE ALLEN as Executor of the Estate )
7  of STEVEN JOHN SALIKA, Executor )
   of the Estate OF CAROL DIANA )
8  ADAMIC and Administrator of the )
   Estate of TIA NICOLE ADAMIC )
9  SALIKA; JAMES ADAMIC, )
   individually and as beneficiary of the )
10 Estate of CAROL DIANA ADAMIC )
   (Deceased); ANGELIKA ADAMIC, )
11 individually and as beneficiary of the )
   Estate of CAROL DIANA ADAMIC )
12 (Deceased); MARK ADAMIC, )
   individually and as beneficiary of the )
13 Estate of CAROL DIANA ADAMIC )
   (Deceased); SHIRLEY SALIKA, )
14 individually, and as beneficiary of the )
   Estate of STEVEN JOHN SALIKA )
15 (Deceased) and TIA NICOLE SALIKA )
   (Deceased); DANIEL POH-HOCK )
16 CHUA, Personal Representative of the )
   Estate of KRISTINA OLINE FINSTAD )
17 (Deceased), and RYAN SIMS, )
   individually, )
18                                         )
19            Plaintiffs,                  )
                                           )
20     vs.                                 )
                                           )
21 UNITED STATES OF AMERICA,               )
                                           )
22            Defendant.                   )
                                           )
23 ────────────────────────────────────────
24
25
26
27
28

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        3            Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 4 of 28    Page ID
#:334

The Answer of the United States of America to the First Amended Complaint filed by Plaintiffs herein, admits, denies, and alleges on information and belief as follows:

1. Paragraph 1 of Plaintiffs' First Amended Complaint alleges matters of law to which no response is required. To the extent a response would be required, the United States of America admits and alleges that this is a case alleging admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and that the United States of America has waived its sovereign immunity from suit and consents to be sued herein, if at all, only pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901, *et seq.*

2. The United States admits the allegations pled in ¶ 2 of Plaintiffs' First Amended Complaint.

3. The United States admits the allegations pled in ¶ 3 of Plaintiffs' First Amended Complaint.

## (Parties, Personal Jurisdiction and Venue)

### Plaintiffs and Their Beneficiaries

4. The United States denies the allegations pled in ¶ 4 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

5. The United States denies the allegations pled in ¶ 5 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT            4            Case No.: 2:21-cv-07065-PA-MRW

6.     The United States denies the allegations pled in ¶ 6 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

7.     The United States denies the allegations pled in ¶ 7 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

8.     The United States denies the allegations pled in ¶ 8 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

9.     The United States denies the allegations pled in ¶ 9 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

10.     The United States denies the allegations pled in ¶ 10 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

11.     The United States denies the allegations pled in ¶ 11 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

12.     The United States denies the allegations pled in ¶ 12 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

13.     The United States denies the allegations pled in ¶ 13 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

14.     The United States denies the allegations pled in ¶ 14 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

15.     The United States denies the allegations pled in ¶ 15 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          5          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW     Document 53     Filed 07/13/22     Page 6 of 28     Page ID
#:336

16.     The United States denies the allegations pled in ¶ 16 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

17.     The United States denies the allegations pled in ¶ 17 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

18.     The United States denies the allegations pled in ¶ 18 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

19.     The United States denies the allegations pled in ¶ 19 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

20.     The United States denies the allegations pled in ¶ 20 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

21.     The United States denies the allegations pled in ¶ 21 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

22.     The United States denies the allegations pled in ¶ 22 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

23.     The United States denies the allegations pled in ¶ 23 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

24.     The United States denies the allegations pled in ¶ 24 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

25.     The United States denies the allegations pled in ¶ 25 of Plaintiffs' First
Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          6          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 7 of 28    Page ID
#:337

26. The United States denies the allegations pled in ¶ 26 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

27. The United States denies the allegations pled in ¶ 27 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

28. The United States denies the allegations pled in ¶ 28 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

29. The United States denies the allegations pled in ¶ 29 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

30. The United States denies the allegations pled in ¶ 30 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

31. The United States denies the allegations pled in ¶ 31 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

32. The United States denies the allegations pled in ¶ 32 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

33. The United States denies the allegations pled in ¶ 33 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

34. The United States denies the allegations pled in ¶ 34 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

35. The United States denies the allegations pled in ¶ 35 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          7          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 8 of 28    Page ID
#:338

36.     The United States denies the allegations pled in ¶ 36 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

37.     The United States denies the allegations pled in ¶ 37 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

38.     The United States denies the allegations pled in ¶ 38 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

39.     The United States denies the allegations pled in ¶ 39 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

40.     The United States denies the allegations pled in ¶ 40 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

41.     The United States denies the allegations pled in ¶ 41 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

42.     The United States denies the allegations pled in ¶ 42 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

43.     The United States denies the allegations pled in ¶ 43 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

44.     The United States denies the allegations pled in ¶ 44 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

45.     The United States denies the allegations pled in ¶ 45 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

46.    The United States denies the allegations pled in ¶ 46 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

47.    The United States denies the allegations pled in ¶ 47 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

48.    The United States denies the allegations pled in ¶ 48 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

49.    The United States denies the allegations pled in ¶ 49 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

50.    The United States denies the allegations pled in ¶ 50 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

51.    The United States denies the allegations pled in ¶ 51 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

52.    The United States denies the allegations pled in ¶ 52 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

53.    The United States denies the allegations pled in ¶ 53 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

54.    The United States denies the allegations pled in ¶ 54 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

55.    The United States denies the allegations pled in ¶ 55 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          9          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 10 of 28    Page ID #:340

56.     The United States denies the allegations pled in ¶ 56 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

57.     The United States denies the allegations pled in ¶ 57 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

58.     The United States denies the allegations pled in ¶ 58 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

59.     The United States denies the allegations pled in ¶ 59 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

60.     The United States denies the allegations pled in ¶ 60 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

61.     The United States denies the allegations pled in ¶ 61 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

62.     The United States denies the allegations pled in ¶ 62 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

63.     The United States denies the allegations pled in ¶ 63 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

64.     The United States denies the allegations pled in ¶ 64 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

65.     The United States denies the allegations pled in ¶ 65 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        10        Case No.: 2:21-cv-07065-PA-MRW

66. The United States denies the allegations pled in ¶ 66 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

67. The United States denies the allegations pled in ¶ 67 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

68. The United States denies the allegations pled in ¶ 68 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

69. The United States denies the allegations pled in ¶ 69 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

70. The United States denies the allegations pled in ¶ 70 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

71. The United States denies the allegations pled in ¶ 71 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

72. The United States denies the allegations pled in ¶ 72 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

73. The United States denies the allegations pled in ¶ 73 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

74. The United States denies the allegations pled in ¶ 74 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

75. The United States denies the allegations pled in ¶ 75 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          11          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 12 of 28    Page ID #:342

76.    The United States denies the allegations pled in ¶ 76 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

77.    The United States denies the allegations pled in ¶ 77 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

78.    The United States denies the allegations pled in ¶ 78 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

79.    The United States denies the allegations pled in ¶ 79 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

80.    The United States denies the allegations pled in ¶ 80 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

81.    The United States denies the allegations pled in ¶ 81 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

82.    The United States denies the allegations pled in ¶ 82 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

83.    The United States denies the allegations pled in ¶ 83 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

84.    The United States denies the allegations pled in ¶ 84 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

85.    The United States denies the allegations pled in ¶ 85 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        12        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 13 of 28    Page ID #:343

86.    The United States denies the allegations pled in ¶ 86 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

87.    The United States denies the allegations pled in ¶ 87 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

88.    The United States denies the allegations pled in ¶ 88 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

89.    The United States denies the allegations pled in ¶ 89 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

90.    The United States denies the allegations pled in ¶ 90 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

91.    The United States denies the allegations pled in ¶ 91 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

92.    The United States denies the allegations pled in ¶ 92 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

93.    The United States denies the allegations pled in ¶ 93 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

94.    The United States denies the allegations pled in ¶ 94 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

95.    The United States denies the allegations pled in ¶ 95 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        13        Case No.: 2:21-cv-07065-PA-MRW

96.    The United States denies the allegations pled in ¶ 96 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

97.    The United States denies the allegations pled in ¶ 97 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

98.    The United States denies the allegations pled in ¶ 98 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

99.    The United States denies the allegations pled in ¶ 99 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

100.    The United States denies the allegations pled in ¶ 100 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

## The Defendant

101.    The United States admits the allegations pled in ¶ 101 of Plaintiffs' First

Amended Complaint.

102.    The United States admits that venue is proper in this Court. Except as

so admitted, the United States denies the remainder of the allegations pled in ¶ 102

of Plaintiffs' First Amended Complaint.

## OPERATIVE FACTS

## (The Small Passenger Vessel CONCEPTION)

103.    The United States denies the allegations pled in ¶ 103 of Plaintiffs' First

Amended Complaint for lack of knowledge and information.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        14        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 15 of 28    Page ID
#:345

104.    The United States denies the allegations pled in ¶ 104 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

105.    The United States denies the allegations pled in ¶ 105 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

106.    The United States denies the allegations pled in ¶ 106 of Plaintiffs' First Amended Complaint for lack of knowledge and information.

107.    In answering ¶ 107 of Plaintiffs' First Amended Complaint, the United States admits that the best evidence of what is contained in the T-Boat Inspection Book ("CG-840 TI") is the CG-840 itself.

108.    The allegations pled in ¶ 108 of Plaintiffs' First Amended Complaint do not call for a response from the United States.

109.    In answering ¶ 109 of Plaintiffs' First Amended Complaint, the United States admits that the best evidence of what is contained in the T-Boat Inspection Book ("CG-840 TI") and "checklist" attached as Exhibit "A" to Plaintiffs' First Amended Complaint are the CG-840 and the "checklist" themselves.  Except as so admitted, the United States denies the remaining allegations pled in ¶ 109 of Plaintiffs' First Amended Complaint.

110.    The United States denies the allegations pled in ¶ 110 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        15        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 16 of 28    Page ID #:346

1    111.    The United States denies the allegations pled in ¶ 111 of Plaintiffs' First

2  Amended Complaint for lack of knowledge and information.

3

4    112.    The United States denies the allegations pled in ¶ 112 of Plaintiffs' First

5  Amended Complaint.

6

7    113.    United States denies knowledge and information sufficient to form a

8  belief as to the allegations in ¶ 113 of Plaintiffs' First Amended Complaint.

9    114.    United States denies knowledge and information sufficient to form a

10

11  belief as to the allegations in ¶ 114 of Plaintiffs' First Amended Complaint.

12    115.    United States denies knowledge and information sufficient to form a

13

14  belief as to the allegations in ¶ 115 of Plaintiffs' First Amended Complaint.

15    116.    United States denies knowledge and information sufficient to form a

16  belief as to the allegations in ¶ 116 of Plaintiffs' First Amended Complaint.

17

18    117.    United States denies knowledge and information sufficient to form a

19  belief as to the allegations in ¶ 117 of Plaintiffs' First Amended Complaint.

20    118.    United States denies knowledge and information sufficient to form a

21

22  belief as to the allegations in ¶ 118 of Plaintiffs' First Amended Complaint.

23    119.    United States denies knowledge and information sufficient to form a

24

25  belief as to the allegations in ¶ 119 of Plaintiffs' First Amended Complaint.

26    120.    The United States denies the allegations pled in ¶ 120 of Plaintiffs' First

27

28  Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        16        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 17 of 28    Page ID #:347

121.   United States denies knowledge and information sufficient to form a belief as to the allegations in ¶ 121 of Plaintiffs' First Amended Complaint.

122.   The United States denies the allegations pled in ¶ 122 of Plaintiffs' First Amended Complaint.

123.   The United States denies the allegations pled in ¶ 123 of Plaintiffs' First Amended Complaint.

124.   United States denies knowledge and information sufficient to form a belief as to the allegations in ¶ 124 of Plaintiffs' First Amended Complaint.

125.   United States denies knowledge and information sufficient to form a belief as to the allegations in ¶ 125 of Plaintiffs' First Amended Complaint.

126.   The United States admits the allegations pled in ¶ 126 of Plaintiffs' First Amended Complaint.

127.   United States denies knowledge and information sufficient to form a belief as to the allegations in ¶ 127 of Plaintiffs' First Amended Complaint.

128.   The United States denies the allegations pled in ¶ 128 of Plaintiffs' First Amended Complaint.

129.   United States denies knowledge and information sufficient to form a belief as to the allegations in ¶ 129 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          17          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 18 of 28    Page ID
#:348

## FIRST CAUSE OF ACTION

### (Wrongful Death against Defendant UNITED STATES OF AMERICA)

130. The United States incorporates by reference its responses to ¶¶ 1 through 129 above as if fully set forth herein.

131. The United States of America admits that Plaintiffs' alleged wrongful death cause of action arises under the General Maritime Law of the United States and that the United States of America has waived its sovereign immunity from suit and consents to be sued herein, if at all, only pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 30901, *et seq.*

132. The United States denies the allegations pled in pled in ¶ 132 of Plaintiffs' First Amended Complaint and each and every subparagraph pled therein.

133. The United States denies the allegations pled in pled in ¶ 133 of Plaintiffs' First Amended Complaint.

134. The United States denies the allegations pled in pled in ¶ 134 of Plaintiffs' First Amended Complaint.

135. The United States denies the allegations pled in pled in ¶ 135 of Plaintiffs' First Amended Complaint.

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 19 of 28    Page ID
#:349

## SECOND CAUSE OF ACTION

### (Survival Action)

136. The United States incorporates by reference its responses to ¶¶ 1 through 135 above as if fully set forth herein.

137. The United States denies the allegations pled in pled in ¶ 137 of Plaintiffs' First Amended Complaint.

138. The United States denies the allegations pled in pled in ¶ 138 of Plaintiffs' First Amended Complaint.

139. The United States denies the allegations pled in pled in ¶ 139 of Plaintiffs' First Amended Complaint.

140. The United States denies the allegations pled in pled in ¶ 140 of Plaintiffs' First Amended Complaint.

141. The United States denies the allegations pled in pled in ¶ 141 of Plaintiffs' First Amended Complaint.

142. The United States denies the allegations pled in pled in ¶ 142 of Plaintiffs' First Amended Complaint.

143. The United States denies the allegations pled in pled in ¶ 143 of Plaintiffs' First Amended Complaint.

144. The United States denies the allegations pled in pled in ¶ 144 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        19        Case No.: 2:21-cv-07065-PA-MRW

145. The United States denies the allegations pled in pled in ¶ 145 of Plaintiffs' First Amended Complaint.

146. The United States denies the allegations pled in pled in ¶ 146 of Plaintiffs' First Amended Complaint.

147. The United States denies the allegations pled in pled in ¶ 147 of Plaintiffs' First Amended Complaint.

148. The United States denies the allegations pled in pled in ¶ 148 of Plaintiffs' First Amended Complaint.

149. The United States denies the allegations pled in pled in ¶ 149 of Plaintiffs' First Amended Complaint.

150. The United States denies the allegations pled in pled in ¶ 150 of Plaintiffs' First Amended Complaint.

151. The United States denies the allegations pled in pled in ¶ 151 of Plaintiffs' First Amended Complaint.

152. The United States denies the allegations pled in pled in ¶ 152 of Plaintiffs' First Amended Complaint.

153. The United States denies the allegations pled in pled in ¶ 153 of Plaintiffs' First Amended Complaint.

154. The United States denies the allegations pled in pled in ¶ 154 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        20        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 53   Filed 07/13/22   Page 21 of 28   Page ID #:351

155. The United States denies the allegations pled in pled in ¶ 155 of Plaintiffs' First Amended Complaint.

156. The United States denies the allegations pled in pled in ¶ 156 of Plaintiffs' First Amended Complaint.

157. The United States denies the allegations pled in pled in ¶ 157 of Plaintiffs' First Amended Complaint.

158. The United States denies the allegations pled in pled in ¶ 158 of Plaintiffs' First Amended Complaint.

159. The United States denies the allegations pled in pled in ¶ 159 of Plaintiffs' First Amended Complaint.

160. The United States denies the allegations pled in pled in ¶ 160 of Plaintiffs' First Amended Complaint.

161. The United States denies the allegations pled in pled in ¶ 161 of Plaintiffs' First Amended Complaint.

162. The United States denies the allegations pled in pled in ¶ 162 of Plaintiffs' First Amended Complaint.

163. The United States denies the allegations pled in pled in ¶ 163 of Plaintiffs' First Amended Complaint.

164. The United States denies the allegations pled in pled in ¶ 164 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT      21      Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 53   Filed 07/13/22   Page 22 of 28   Page ID #:352

165.   The United States denies the allegations pled in pled in ¶ 165 of Plaintiffs' First Amended Complaint.

166.   The United States denies the allegations pled in pled in ¶ 166 of Plaintiffs' First Amended Complaint.

167.   The United States denies the allegations pled in pled in ¶ 167 of Plaintiffs' First Amended Complaint.

168.   The United States denies the allegations pled in pled in ¶ 168 of Plaintiffs' First Amended Complaint.

169.   The United States denies the allegations pled in pled in ¶ 169 of Plaintiffs' First Amended Complaint.

170.   The United States denies the allegations pled in pled in ¶ 170 of Plaintiffs' First Amended Complaint.

171.   The United States denies the allegations pled in pled in ¶ 171 of Plaintiffs' First Amended Complaint.

172.   The United States denies the allegations pled in pled in ¶ 172 of Plaintiffs' First Amended Complaint.

173.   The United States denies the allegations pled in pled in ¶ 173 of Plaintiffs' First Amended Complaint.

174.   The United States denies the allegations pled in pled in ¶ 174 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        22        Case No.: 2:21-cv-07065-PA-MRW

175. The United States denies the allegations pled in pled in ¶ 175 of Plaintiffs' First Amended Complaint.

176. The United States denies the allegations pled in pled in ¶ 176 of Plaintiffs' First Amended Complaint.

177. The United States denies the allegations pled in pled in ¶ 177 of Plaintiffs' First Amended Complaint.

178. The United States denies the allegations pled in pled in ¶ 178 of Plaintiffs' First Amended Complaint.

179. The United States denies the allegations pled in pled in ¶ 179 of Plaintiffs' First Amended Complaint.

180. The United States denies the allegations pled in pled in ¶ 180 of Plaintiffs' First Amended Complaint.

### THIRD CAUSE OF ACTION

### (For Personal Injuries for Plaintiff SIMS)

181. The United States incorporates by reference its responses to ¶¶ 1 through 180 above as if fully set forth herein.

182. The United States denies the allegations pled in pled in ¶ 182 of Plaintiffs' First Amended Complaint.

183. The United States denies the allegations pled in pled in ¶ 183 of Plaintiffs' First Amended Complaint.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          23          Case No.: 2:21-cv-07065-PA-MRW

## AS AND FOR A FIRST AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

184.   Plaintiffs' First Amended Complaint and action fail to state claims upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

185.   If Plaintiffs sustained injuries and damages by reason of the matters alleged in the First Amended Complaint, which is denied, then said damages were caused in whole or in part by the acts, whether criminal or negligent, of third parties and were not caused or contributed to in any manner by any actions or fault of the United States of America, its officers, agents, vessels, crew, servants, employees or others for whom it was responsible.

## AS AND FOR A THIRD AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

186.   The Court lacks subject matter jurisdiction over Plaintiffs' First Amended Complaint and action.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT         24         Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 25 of 28    Page ID #:355

## AS AND FOR A FOURTH AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

187. The Court lacks subject matter jurisdiction over Plaintiffs' First Amended Complaint and action since said Complaint and action solely allege matters of discretionary functions and acts for which the United States of America has not waived sovereign immunity and consented to be sued.

## AS AND FOR A FIFTH AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

188. The Court lacks subject matter jurisdiction over Plaintiffs' First Amended Complaint and action since said Complaint and action solely allege matters which are subject to the Constitutional doctrine of separation of powers for which the United States of America has not waived sovereign immunity and consented to be sued.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        25        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 26 of 28    Page ID #:356

## AS AND FOR A SIXTH AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

189.    Plaintiffs failed to mitigate their damages, which claims of damages and claims of liability upon which they are based are fully denied by the United States.

## AS AND FOR A SEVENTH AFFIRMATIVE AND

## COMPLETE DEFENSE, THE UNITED STATES

## ALLEGES ON INFORMATION AND BELIEF AS FOLLOWS

An award of prejudgment interest, if any, is subject to the Suits in Admiralty Act, which provides that an award of interest on a money judgment is solely within the discretion of the court and may not exceed 4 percent per year until satisfied. 46 U.S.C.A. § 30911.

WHEREFORE, the United States of America prays as follows:

1.    That Plaintiffs' First Amended Complaint and action be dismissed with prejudice and with costs;

2.    The United States of America expressly reserves the right to amend this Answer and its affirmative defenses as may be necessary; and

3.    For such other relief as the Court deems just and proper.

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          26          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 27 of 28    Page ID
#:357

Date: July 13, 2022                          Respectfully submitted,

                                             TRACY WILKISON
                                             United States Attorney
                                             JOANNE OSINOFF
                                             Assistant United States Attorney
                                             Chief, Civil Division

                                             BRIAN BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             s/Eric Kaufman-Cohen
                                             ERIC KAUFMAN-COHEN
                                             Attorney in Charge, West Coast Filed Office
                                             FRANK J. ANDERS
                                             SCOTT PERRYGO
                                             KYLE FRALICK
                                             Trial Attorneys
                                             Aviation, Space & Admiralty Litigation
                                             Torts Branch, Civil Division
                                             U.S. Department of Justice

                                             Attorneys for United States of America

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT          27          Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW    Document 53    Filed 07/13/22    Page 28 of 28    Page ID #:358

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2022, a copy of the foregoing ANSWER OF THE UNITED STATES TO THE FIRST AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVAL DAMAGES UNDER THE SUITS IN ADMIRALTY ACT was filed electronically with the Clerk of the Court by operation of the Court's electronic filing system, which will serve an electronic copy of all counsel of record.


                    s/Eric Kaufman-Cohen
                    ERIC KAUFMAN-COHEN

ANSWER OF UNITED STATES TO
PLAINTIFFS' FIRST AMENDED COMPLAINT        28        Case No.: 2:21-cv-07065-PA-MRW

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 1 of 48   Page ID #:271

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3   NANCY FIEDLER, Personal                    CASE NO. 2:21-cv-07065-PA-
    Representative of the Estate of LISA
4   FIEDLER (Deceased); MATTHEW
5   GUINEY, Personal Representative of     **AMENDED COMPLAINT FOR**
    the Estate of MARYBETH GUINEY          **WRONGFUL DEATH AND**
6   (Deceased); OLGA FAYNSHTEYN,           **SURVIVAL DAMAGES UNDER**
                                           **THE SUITS IN ADMIRALTY ACT**
7   Personal Representative of the Estate of
    YULIYA KRASHENNAYA
8   (Deceased); KATIE OSBORNE,
9   Personal Representative of the Estate of
    DANIEL GARCIA (Deceased);
10  CHRISTINA QUITASOL, Personal
    Representative of the Estate of
11  MICHAEL QUITASOL (Deceased);
12  SARMA WILLIAMS, Personal
    Representative of the Estate of
13  VAIDEHI DEVI CAMPBELL
    WILLIAMS (Deceased); CHRISTINE
14  ALEXANDRA DIGNAM, Personal
15  Representative of the Estate of JUSTIN
    DIGNAM (Deceased); JASMINE
16  LORD, Personal Representative of the
17  Estate of CHARLES McILVAIN
    (Deceased); VICTORIA E. MOORE,
18  Personal Representative of the Estates
19  of RAYMOND SCOTT CHAN
    (Deceased) and KENDRA CHAN
20  (Deceased); YUKA OHASHI
    MERRITT, Personal Representative of
21  the Estate of YUKO HATANO
22  (Deceased); VIKRAM SINGH,
    Personal Representative of the Estate of
23  SUNIL SINGH SANDHU (Deceased);
    NINA HUTTEGGER, Personal
24  Representative of the Estate of JUHA-
25  PEKKA AHOPELTO (Deceased);
    YADIRA ALVAREZ, Personal
26  Representative of the Estate of
27  BERENICE FELIPE (Deceased);
    SEJAY TAN, Personal Representative
28  of the Estate of WEI TAN (Deceased);

1

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 2 of 48   Page ID
#:272

1   ERIC BALTZ, Personal Representative
    of the Estate of NEAL BALTZ
2   (Deceased); ANTHONY
3   BEITZINGER, Personal Representative
    of the Estate of PATRICIA
4   BEITZINGER (Deceased); SHRUTI
5   DEOPUJARI, Personal Representative
    of the Estate of SANJEERI
6   DEOPUJARI (Deceased); ATLEE
7   FRITZ, Personal
    Representative of the Estate of
8   ANDREW FRITZ (Deceased); SEEMA
    SHARMA, Personal
9   Representative of the Estate of
10  KAUSTUBH NIRMAL (Deceased);
    MARGARET STROM, Personal
11  representative of the Estate of TED
12  STROM (Deceased); RICHARD X.
    LIU, Personal Representative of the
13  Estate of XIANG LIN; SUSANA
    SOLANO ROSAS, Personal
14  Representative of the Estates of
15  EVANMICHEL SOLANO QUITASOL
    (Deceased), ANGELA ROSE SOLANO
16  QUITASOL (Deceased), and NICOLE
17  SOLANO QUITASOL (Deceased);
    ARIEL TAKVAM, Personal
18  Representative of the Estate of
    KRISTIAN TAKVAM (Deceased);
19  DOMINIC MICAEL SELGA, Personal
20  Representative of the Estate of
    FERNISA JUNE SISON (Deceased);
21  ROBERT KURTZ and CHERIE
22  MCDONOUGH, Personal
    Representatives of the Estate of
23  ALEXANDRA HALEY KURTZ;
    JEAN ANNE ALLEN as Executor of
24  the Estate of STEVEN JOHN SALIKA,
25  Executor of the Estate OF CAROL
    DIANA ADAMIC and Administrator of
26  the Estate of TIA NICOLE ADAMIC
27  SALIKA; JAMES ADAMIC,
    individually and as beneficiary of the
28  Estate of CAROL DIANA ADAMIC

2
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

ER 736

1  (Deceased); ANGELIKA ADAMIC,
   individually and as beneficiary of the
2  Estate of CAROL DIANA ADAMIC
3  (Deceased); MARK ADAMIC,
   individually and as beneficiary of the
4  Estate of CAROL DIANA ADAMIC
5  (Deceased); SHIRLEY SALIKA,
   individually, and as beneficiary of the
6  Estate of STEVEN JOHN SALIKA
7  (Deceased) and TIA NICOLE SALIKA
   (Deceased); DANIEL POH-HOCK
8  CHUA, Personal Representative of the
   Estate of KRISTINA OLINE FINSTAD
9  (Deceased), and RYAN SIMS,
10 individually.

11                    Plaintiffs,
          v.
12
   UNITED STATES OF AMERICA,
13
                      Defendant.
14  ------------------------------------------------------

15       Plaintiffs  NANCY  FIEDLER,  MATTHEW  REID  GUINEY,  OLGA
16  FAYNSHTEYN,  KATIE  OSBORNE,  CHRISTINA  QUITASOL,  SARMA
17  WILLIAMS,  CHRISTINE  ALEXANDRA  DIGNAM,  JASMINE  LORD,
18  VICTORIA ELLEN MOORE, YUKA OHASHI MERRITT, VIKRAM SINGH,
19  NINA HUTTEGGER, YADIRA ALVAREZ, SEJAY TAN, NEAL BALTZ,
20  ANTHONY BEITZINGER, SHRUTI DEOPUJARI, ATLEE FRITZ, SEEMA
21  SHARMA, MARGARET STROM, RICHARD LIU, SUSANA SOLANO
22  ROSAS, ARIEL TAKVAM, DOMINIC SELGA, ROBERT KURTZ, CHERIE
23  McDONOUGH, JEAN ALLEN, DANIEL POH-HOCK CHUA acting as the
24  Personal Representatives of the Estates of their respective Decedents, and RYAN
25  SIMS, acting individually, who herewith complain of Defendant UNITED STATES
26  OF AMERICA, and allege as follows:
27
28
                            3
                SIAA First Amended Complaint of Plaintiffs
                 for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 4 of 48    Page ID
#:274

## **PRELIMINARY ALLEGATIONS**

*(Maritime jurisdiction under SIAA)*

1.      Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1333, Fed.R.Civ.P. 9(h), and the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, as hereinafter more fully appears.

2.      As is hereinafter more fully set forth, this action grows out of the catastrophic fire that killed thirty-four people aboard the dive vessel *CONCEPTION* (O.V.N. 638133) during the early morning hours of September 2, 2019.

3.      The incident which gave rise to this lawsuit is subject to admiralty tort jurisdiction in that: It occurred upon the navigable waters of the Pacific Ocean within the territorial waters of the State of California less than one marine league from the shores of Santa Cruz Island; It had an actual and potential impact on maritime commerce, and; It involved a traditional maritime activity.

*(Parties, Personal Jurisdiction and Venue)*

### **Plaintiffs and Their Beneficiaries**

4.      At all times material hereto, Plaintiff NANCY FIEDLER ("Plaintiff FIEDLER") was and still is an adult resident of the State of California. Plaintiff FIEDLER is the mother of LISA FIELDER, Deceased ("DECEDENT FIEDLER"), and a "parent" as that term is used in 46 U.S.C. § 30302. Plaintiff FIEDLER is also the duly appointed Personal Representative of DECEDENT FIEDLER's Estate.

5.      DECEDENT FIEDLER was born in 1967. At all times material hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel during the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards from shore and within the territorial limits of the State of

4
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 5 of 48    Page ID #:275

1 || California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
2 || Code, § 170, 171).

3       6.    MARVIN FIEDLER is DECEDENT FIEDLER's father and a "parent" as
4 || that term is used in 46 U.S.C. § 30302.

5       7.    At all times material hereto, Plaintiff ROBERT KURTZ ("Plaintiff
6 || KURTZ") was and is the father of ALEXANDRA HALEY KURTZ, Deceased
7 || ("DECEDENT KURTZ"), and a "parent" as that term is used in 46 U.S.C. § 30302.
8 || Plaintiff KURTZ is also the Personal Representative of DECEDENT KURTZ's
9 || Estate.

10      8.    At all times material hereto, Plaintiff CHERIE MCDONOUGH ("Plaintiff
11 || MCDONOUGH") was and is the mother of ALEXANDRA HALEY KURTZ,
12 || Deceased ("DECEDENT KURTZ"), and a "parent" as that term is used in 46 U.S.C.
13 || § 30302. Plaintiff MCDONOUGH is also the Personal Representative of
14 || DECEDENT KURTZ's Estate.

15      9.    DECEDENT KURTZ was born in 1993. At all times material hereto, she
16 || was a Jones Act seafarer, who was killed in the course of employment aboard the dive
17 || vessel *CONCEPTION*. As hereinafter more fully appears, she died aboard that vessel
18 || during the early morning hours of September 2, 2019, when *CONCEPTION* caught
19 || fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
20 || than one-hundred yards from shore and within the territorial limits of the State of
21 || California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
22 || Code, § 170, 171).

23      10. At all times material hereto, Plaintiff DANIEL POH-HOCK CHUA
24 || ("Plaintiff CHUA") was and still is an adult resident of the State of California.
25 || Plaintiff CHUA is also the duly appointed Executor of the Estate of KRISTINA
26 || OLINE FINSTAD ("DECEDENT FINSTAD").

27      11. DECEDENT Finstad was born in 1978. At all times material hereto, she
28 || was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is

5
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 6 of 48    Page ID
#:276

1  used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
2  U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel
3  during the early morning hours of September 2, 2019, when CONCEPTION caught
4  fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
5  than one-hundred yards from shore and within the territorial limits of the State of
6  California. See Tidewater,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
7  Code, § 170, 171).

8      12. At all times material hereto, Plaintiff JEAN ANNE ALLEN ("Plaintiff
9  ALLEN") was and still is an adult resident of the State of California. Plaintiff ALLEN
10 is also the duly appointed Executor of the Estate STEVEN JOHN SALIKA, Deceased
11 ("DECEDENT SALIKA"), Executor of the Estate of CAROL DIANA ADAMIC,
12 Deceased ("DECEDENT ADAMIC"), and Administrator of the Estate of TIA
13 NICOLE ADAMIC SALIKA, Deceased ("DECEDENT ADAMIC SALIKA").

14     13. DECEDENT SALIKA was born in 1964. At all times material hereto, he
15 was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is
16 used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
17 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel
18 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
19 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
20 than one-hundred yards from shore and within the territorial limits of the State of
21 California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
22 Code, § 170, 171).

23     14. DECEDENT ADAMIC was born in 1959. At all times material hereto,
24 she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase
25 is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
26 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel
27 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
28 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less

6
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1  than one-hundred yards from shore and within the territorial limits of the State of
2  California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
3  Code, § 170, 171).

4      15. DECEDENT ADAMIC SALIKA was born in 2002. At all times material
5  hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that
6  phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of
7  *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard
8  that vessel during the early morning hours of September 2, 2019, when
9  *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off
10 Santa Cruz Island, less than one-hundred yards from shore and within the territorial
11 limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const.,
12 art. III, § 2; Gov. Code, § 170, 171).

13     16. At all times material SHIRLEY SALIKA was an adult resident of the State
14 of California. SHIRLEY SALIKA is DECEDENT SALIKA's mother and a "parent"
15 as that term is used in 46 U.S.C. § 30302.

16     17. At all times material SHIRLEY SALIKA was an adult resident of the State
17 of California. SHIRLEY SALIKA is DECEDENT ADAMIC SALIKA's
18 grandmother, heir and successor-in-interest.

19     18. At all times material hereto, JAMES ADAMIC was an adult resident of
20 the State of California. He was the adult brother of DECEDENT ADAMIC and a
21 "sibling" as that term is used in 46 U.S.C. § 30302. JAMES ADAMIC is DECEDENT
22 ADAMIC's heir and successor-in-interest.

23     19. At all times material hereto, MARK ADAMIC was an adult resident of
24 the State of California. He was the adult brother of DECEDENT ADAMIC and a
25 "sibling" as that term is used in 46 U.S.C. § 30302. MARK ADAMIC is DECEDENT
26 ADAMIC's heir and successor-in-interest.

27     20. At all times material hereto, ANGELIKA ADAMIC was an adult resident
28 of the State of Colorado. She was the adult sister of DECEDENT ADAMIC and a

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 8 of 48   Page ID
#:278

1  "sibling" as that term is used in 46 U.S.C. § 30302. ANGELIKA ADAMIC is
2  DECEDENT ADAMIC's heir and successor-in-interest.

3      21. At all times material hereto, Plaintiff MATTHEW REID GUINEY
4  ("Plaintiff GUINEY") was and is the brother of MARYBETH GUINEY, Deceased
5  ("DECEDENT GUINEY") and the duly appointed Personal Representative of
6  DECEDENT GUINEY's Estate.

7      22. DECEDENT GUINEY was born in 1968. At all times material hereto, she
8  was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is
9  used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
10 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel
11 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
12 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
13 than one-hundred yards from shore and within the territorial limits of the State of
14 California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
15 Code, § 170, 171).

16     23. MARY ELIZABETH GUINEY is DECEDENT GUINEY's mother and a
17 "parent" as that term is used in 46 U.S.C. § 30302.

18     24. At all times material hereto, Plaintiff OLGA FAYNSHTEYN ("Plaintiff
19 FAYNSHTEYN") was and is the mother of YULIYA KRASHENNAYA, Deceased
20 ("DECEDENT KRASHENNAYA") and a "parent" as that term is used in 46 U.S.C.
21 § 30302. Plaintiff FAYNSHTEYN is also the duly appointed Personal Representative
22 of DECEDENT KRASHENNAYA's Estate.

23     25. DECEDENT KRASHENNAYA was born in 1979. At all times material
24 hereto, she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that
25 phrase is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of
26 *Yamaha*, 516 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard
27 that vessel during the early morning hours of September 2, 2019, when
28 *CONCEPTION* caught fire and sank upon the navigable waters of Platt's Harbor off

8
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 9 of 48    Page ID
#:279

1 Santa Cruz Island, less than one-hundred yards from shore and within the territorial
2 limits of the State of California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const.,
3 art. III, § 2; Gov. Code, § 170, 171).

4    26.  GREGORY KRASHENNY is DECEDENT KRASHENNAYA's father
5 and a "parent" as that term is used in 46 U.S.C. § 30302.

6    27.  At all times material hereto, Plaintiff KATIE OSBORNE ("Plaintiff
7 OSBORNE") was and is the sister of DANIEL GARCIA, Deceased ("DECEDENT
8 GARCIA") and is the duly appointed Personal Representative of DECEDENT
9 GARCIA's Estate.

10    28.  DECEDENT GARCIA was born in 1973. At all times material hereto, he
11 was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is
12 used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
13 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel
14 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
15 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
16 than one-hundred yards from shore and within the territorial limits of the State of
17 California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
18 Code, § 170, 171).

19    29.  HENRY GARCIA is DECEDENT GARCIA's father and a "parent" as
20 that term is used in 46 U.S.C. § 30302.

21    30.  ELLEN GEHRINGER is DECEDENT GARCIA's mother and a "parent"
22 as that term is used in 46 U.S.C. § 30302

23    31.  At all times material hereto, Plaintiff CHRISTINA QUITASOL ("Plaintiff
24 QUITASOL") was and still is an adult resident of the State of California. Plaintiff
25 QUITASOL is the daughter of MICHAEL QUITASOL, Deceased ("DECEDENT
26 MICHAEL QUITASOL"). She is also the duly appointed Personal Representative of
27 DECEDENT QUITASOL's Estate.

28    32.  DECEDENT QUITASOL was born in 1956. At all times material hereto,

9
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 743**

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 10 of 48   Page ID
#:280

1 he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is
2 used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
3 U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel
4 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
5 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
6 than one-hundred yards from shore and within the territorial limits of the State of
7 California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
8 Code, § 170, 171).

9        33. At all times material hereto, Plaintiff SARMA WILLIAMS ("Plaintiff
10 WILLIAMS") was and still is an adult resident of the State of California. Plaintiff
11 WILLIAMS is the husband of VAIDEHI DEVI CAMPBELL WILLIAMS, Deceased
12 ("DECEDENT WILLIAMS") and is a "spouse" as that term is used in 46 U.S.C. §
13 30302. He is also the duly appointed Personal Representative of DECEDENT
14 WILLIAMS's Estate.

15        34. DECEDENT WILLIAMS was born in 1977. At all times material hereto,
16 she was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase
17 is used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
18 U.S. 199, 215 (1996). As hereinafter more fully appears, she died aboard that vessel
19 during the early morning hours of September 2, 2019, when *CONCEPTION* caught
20 fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
21 than one-hundred yards from shore and within the territorial limits of the State of
22 California. See *Tidewater*,14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
23 Code, § 170, 171).

24        35. MAKANI WILLIAMS is DECEDENT WILLIAMS's daughter and a
25 "child" as that term is used in 46 U.S.C. § 30302. She was born in 2008.

26        36. DAELEN WILLIAMS is DECEDENT WILLIAMS's son and a "child"
27 as that term is used in 46 U.S.C. § 30302. She was born in 2011.

28        37. At all times material hereto, Plaintiff CHRISTINE ALEXANDRA

10
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 11 of 48   Page ID
#:281

1  DIGNAM ("Plaintiff DIGNAM") was and still is an adult resident of the State of
2  California.   She was the wife of JUSTIN CARROLL DIGNAM, Deceased
3  ("DECEDENT DIGNAM") and a "spouse" as that term is used in 46 U.S.C. § 30302.
4  She is also the duly appointed, Personal Representative of DECEDENT's Estate and
5  the mother of his two children.

6      38. DECEDENT DIGNAM was born in 1960. At all times material hereto,
7  he was a "passenger for hire" aboard the dive vessel *CONCEPTION* as that phrase is
8  used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516
9  U.S. 199, 215 (1996). As hereinafter more fully appears, he died aboard that vessel
10  during the early morning hours of September 2, 2019, when *CONCEPTION* caught
11  fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz, Island, less
12  than a few-hundred yards from shore, within the territorial limits of the State of
13  California. See *Tidewater Marine Western, Inc. v. Bradshaw* (1996)14 Cal.4th 557,
14  564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

15      39. TAYLOR ALEXANDRA DIGNAM is DECEDENT DIGNAM's
16  daughter and a "child" as that term is used in 46 U.S.C. § 30302. She was born in
17  1994.

18      40. CHANDLER JOHN DIGNAM is DECEDENT DIGNAM's son and a
19  "child" as that term is used in 46 U.S.C. § 30302. He was born in 1996.

20      41. At all times material hereto, Plaintiff JASMINE LORD ("Plaintiff
21  LORD") was and still is an adult resident of the State of California. She was the wife
22  of CHARLES SPENCER McILVAIN, Deceased ("DECEDENT McILVAIN"), and
23  is a "spouse" as that term is used in 46 U.S.C. § 30302. She is also the duly appointed,
24  Personal Representative of his Estate.

25      42. DECEDENT McILVAIN was born in 1975. At all times material hereto,
26  he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase
27  is used in 33 CFR § 101.105, and a "non-seafarer" within the meaning of *Yamaha*,
28  516 U.S. at 215. As hereinafter more fully appears, he too died aboard that vessel

11
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 12 of 48    Page ID #:282

1  during the early morning hours of September 2, 2019, when *CONCEPTION* caught
2  fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less
3  than a few-hundred yards from shore, within the territorial limits of the State of
4  California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
5  Code, § 170, 171).

6      43. CLARK McILVAIN is DECEDENT McILVAIN's father and a "parent"
7  as that term is used in 46 U.S.C. § 30302.

8      44. SUZANNE ADAMS is DECEDENT McILVAIN's mother and a "parent"
9  as that term is used in 46 U.S.C. § 30302.

10     45. At all times material hereto, Plaintiff VICTORIA ELLEN MOORE
11  ("Plaintiff MOORE") was and still is an adult resident of the State of California. She
12  was the wife of RAYMOND SCOTT CHAN, Deceased ("DECEDENT CHAN"),
13  and is a "spouse" as those terms are used in 46 U.S.C. § 30302. She is also the mother
14  of his two children and the duly appointed, Personal Representative of the Estates of
15  DECEDENT SCOTT CHAN and KENDRA MOORE CHAN, Deceased
16  ("DECEDENT MOORE CHAN").

17     46. DECEDENT SCOTT CHAN was born in 1960. At all times material
18  hereto, he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as
19  that phrase is used in 33 CFR § 101.105, and a "non-seafarer" within the meaning of
20  *Yamaha*, 516 U.S. at 215. As hereinafter more fully appears, he too died aboard that
21  vessel during the early morning hours of September 2, 2019, when *CONCEPTION*
22  caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island,
23  less than a few-hundred yards from shore, within the territorial limits of the State of
24  California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.
25  Code, § 170, 171).

26     47. DECEDENT MOORE CHAN was born in 1993. She was the daughter of
27  Plaintiff MOORE and DECEDENT CHAN. At all times material hereto, she too was
28  a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is used in

12
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 13 of 48   Page ID
#:283

1  33 CFR § 101.105, and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at
2  215. As hereinafter more fully appears, she too died aboard that vessel during the
3  early morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank
4  upon the navigable waters of Platt's Harbor off Santa Cruz, Island, less than a few-
5  hundred yards from shore, within the territorial limits of the State of California. See
6  *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

7       48. KEVIN WILLIAMS CHAN is DECEDENT CHAN's son and a "child"
8  and DECEDENT MOORE CHAN's brother and a "sibling" as those terms are used
9  in 46 U.S.C. § 30302.

10      49. At all times material hereto, Plaintiff YUKA OHASHI MERITT
11 ("OHASHI MERITT") was and still is an adult resident of the State of California and
12 is the duly appointed Personal Representative of the Estate of YUKO HATANO,
13 Deceased ("DECEDENT HATANO").

14      50. DECEDENT HATANO was born in 1979. At all times material hereto,
15 she too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that
16 phrase is used in 33 CFR § 101.105, and a "non-seafarer" within the meaning of
17 *Yamaha*, 516 U.S. at 215. As hereinafter more fully appears, she too died aboard that
18 vessel during the early morning hours of September 2, 2019, when *CONCEPTION*
19 caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz
20 Island, less than a few-hundred yards from shore, within the territorial limits of the
21 State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2;
22 Gov. Code, § 170, 171).

23      51. MACHIKO HATANO is DECEDENT HATANO's mother and a
24 "parent" as that term is used in 46 U.S.C. § 30302.

25      52. At all times material hereto, Plaintiff VIKRAM SINGH ("SINGH") was
26 and still is an adult resident of the State of California and is the duly appointed,
27 Personal Representative of the Estate of SUNIL SINGH SANDHU, Deceased
28 ("DECEDENT SINGH SANDHU").

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 14 of 48    Page ID
#:284

1      53. DECEDENT SINGH SANDHU was born in 1973. At all times material

2 hereto, he too was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as

3 that phrase is used in 33 CFR § 101.105, and a "non-seafarer" within the meaning of

4 *Yamaha*, 516 U.S. at 215. As hereinafter more fully appears, he too died aboard that

5 vessel during the early morning hours of September 2, 2019, when *CONCEPTION*

6 caught fire and sank upon the navigable waters of Platt's Harbor off Santa Cruz Island,

7 less than a few-hundred yards from shore, within the territorial limits of the State of

8 California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov.

9 Code, § 170, 171).

10      54. SOJIT SINGH s/o UDHAM SINGH is DECEDENT SINGH

11 SANDHU's father and a "parent" as that term is used in 46 U.S.C. § 30302.

12      55. JASBIR KAUR d/o BIKREM SINGH is DECEDENT SINGH

13 SANDHU's mother and a "parent" as that term is used in 46 U.S.C. § 30302.

14      56. SUNITA KAUR SANDHU is DECEDENT SINGH SANDHU's sister

15 and a "sibling" as that term is used in 46 U.S.C. § 3032.

16      57. Plaintiff NINA HUTTEGGER ("Plaintiff HUTTEGGER") was at all

17 times relevant to this Complaint an adult resident of the State of California. Plaintiff

18 HUTTEGGER is the surviving wife of decedent, JUHA-PEKKA AHOPELTO

19 ("DECEDENT AHOPELTO") and the biological mother of Decedent AHOPELTO's

20 minor son C.A., and DECEDENT AHOLPELTO's adult daughter, JULIA

21 AHOPELTO. Plaintiff HUTTEGGER is the Personal Representative of Decedent

22 AHOLPELTO's Estate.

23      58. Decedent AHOPELTO was born in 1969. At all times material hereto, he

24 was a "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is

25 used in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516

26 U.S. at 215. As hereinafter more fully appears, he died aboard that vessel during the

27 early morning hours of September 2, 2019, when CONCEPTION caught fire and sank

28 upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-

14
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

ER 748

1 hundred yards from shore, within the territorial limits of the State of California. See

2 *Tidewater,* 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

3     59. At all times material hereto, Plaintiff JULIA AHOPELTO was at all times

4 relevant to this Complaint an adult resident of the State of California. Plaintiff JULIA

5 AHOPELTO is the surviving daughter of Decedent AHOPELTO.

6     60. At all times material hereto, Plaintiff C.A. is the surviving minor son of

7 DECEDENT AHOPELTO.

8     61. At all times material hereto, Plaintiff YADIRA ALVAREZ ("Plaintiff

9 ALVAREZ") was and still is an adult resident of the State of California. She was the

10 natural mother of BERENICE FELIPE, Deceased ("DECEDENT FELIPE"). She is

11 also the duly appointed, Personal Representative of DECEDENT FELIPE's Estate.

12     62. DECEDENT FELIPE was born in 2002. At all times material hereto, she

13 was "passenger for hire" aboard the dive vessel CONCEPTION as that phrase is used

14 in 33 CFR § 101.105 and a "non-seafarer" within the meaning of *Yamaha Motor*

15 *Corp., U.S.A. v. Calhoun* ["*Yamaha*"] (1996) 516 U.S. 199, 215. As hereinafter more

16 fully appears, she died aboard that vessel during the early morning hours of September

17 2, 2019, when CONCEPTION caught fire and sank upon the navigable waters of

18 Platt's Harbor off Santa Cruz Island, less than one hundred yards from shore, within

19 the territorial limits of the State of California. See *Tidewater Marine Western, Inc. v.*

20 *Bradshaw* (1996)14 Cal.4th 557,564 (citing Cal. Const., art. III,§ 2; Gov. Code,§ 170,

21 171).

22     63. At all times material hereto, Plaintiff SEJAY TAN ("Plaintiff TAN") was

23 and still is an adult resident of the State of Michigan. He is the brother of WEI TAN,

24 deceased ("DECEDENT TAN") and the duly appointed, Personal Representative of

25 DECEDEDENT TAN's Estate.

26     64. DECEDENT TAN was born in 1993. At all times material hereto, she too

27 was a "passenger for hire" aboard the dive vessel *CONCEPTION*, as that phrase is

28 used in 33 CPR§ 01.105, and a "non-seafarer" within the meaning of *Yamaha*, 516

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 16 of 48   Page ID #:286

1  U.S. at 215. As hereinafter more fully appears, she too died aboard that vessel during
2  the early morning hours of September 2, 2019, when *CONCEPTION* caught fire and
3  sank upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-
4  hundred yards from shore, within the territorial limits of the State of California. See
5  *Tidewater*, 14 Cal.4th at 564 ( citing Cal. Const., art. III, § 2; Gov. Code, §170,171).

6      65.  CHENG LENG TAN is DECEDENT TAN's natural father and a "parent"
7  as that term is used in 46 U.S.C. § 30302.

8      66.  CHIK PING YAP is DECEDENT TAN's natural mother and a "parent"
9  as that term is used in 46 U.S.C. § 30302.

10     67.  At all times material hereto, Plaintiff ERIC BALTZ ("Plaintiff BALTZ")
11 was and still is an adult resident of the State of Missouri. He was the brother and a
12 "sibling" of NEAL BALTZ, Deceased ("DECEDENT BALTZ") as that term is used
13 in 46 U.S.C. § 30302. He is the duly appointed Personal Representative of
14 DECEDENT BALTZ's Estate.

15     68.  At all times material hereto, DECEDENT BALTZ was a "passenger for
16 hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR §
17 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215
18 (1996). As hereinafter more fully appears, he died aboard that vessel during the early
19 morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon
20 the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred
21 yards from shore, within the territorial limits of the State of California. See
22 *Tidewater*.14 Cal.4th 557, 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170,
23 171).

24     69.  CANDACE BALTZ is DECEDENT BALTZ's mother and a "parent" as
25 that term is used in 46 U.S.C. § 30302.

26     70.  At all times material hereto, Plaintiff ANTHONY BEITZINGER
27 ("Plaintiff BEITZINGER") was and still is an adult resident of the State of Ohio. He
28 was the brother and a "sibling" of PATRICIA BEITZINGER, Deceased

SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 750**

1   ("DECEDENT BEITZINGER") as that term is used in 46 U.S.C. § 30302. He is the
2   duly appointed Personal Representative of DECEDENT BEITZINGER's Estate.

3       71. At all times material hereto, DECEDENT BEITZINGER was a "passenger
4   for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR §
5   101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215
6   (1996). As hereinafter more fully appears, she died aboard that vessel during the early
7   morning hours of September 2, 2019, when CONCEPTION caught fire and sank upon
8   the navigable waters of Platt's Harbor off Santa Cruz Island, less than one hundred
9   yards from shore, within the territorial limits of the State of California. See *Tidewater*,
10  14 Cal.4th 557, 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

11      72. ELIZABETH BEITZINGER is DECEDENT BEITZINGER's mother and
12  a "parent" as that term is used in 46 U.S.C. § 30302.

13      73. At all times material hereto, Plaintiff SHRUTI DEOPUJARI ("Plaintiff
14  DEOPUJARI") was and still is an adult resident of the State of Virginia. She is the
15  duly appointed Personal Representative of the Estate of SANJEERI DEOPUJARI
16  ("DECEDENT DEOPUJARI").

17      74. At all times material hereto, DECEDENT DEOPUJARI was a "passenger
18  for hire" aboard the dive vessel CONCEPTION as that phrase is used in 33 CFR §
19  101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215
20  (1996). As hereinafter more fully appears, she died aboard that vessel during the early
21  morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon
22  the navigable waters of Platt's Harbor off Santa Cruz Island, less than one hundred
23  yards from shore, within the territorial limits of the State of California. See *Tidewater*,
24  14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

25      75. SATISH DEOPUJARI is DECEDENT DEOPUJARI's father and a
26  "parent" as that term is used in 46 U.S.C. § 30302.

27      76. SANDHYA DEOPUJARI is DECEDENT DEOPUJARI's mother and a
28  parent" as that term is used in 46 U.S.C. § 30302.

1       77. At all times material hereto, Plaintiff ATLEE FRITZ ("Plaintiff FRITZ")
2  was and still is an adult resident of the State of Texas. He was the father and "parent"
3  of ANDREW FRITZ, Deceased ("DECEDENT FRITZ") as those terms are used in
4  46 U.S.C. § 30302. He is the duly appointed Personal Representative of DECEDENT
5  FRITZ's Estate.

6       78. At all times material hereto, DECEDENT FRITZ was a "passenger for
7  hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR §
8  101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215. As
9  hereinafter more fully appears, he died aboard that vessel during the early morning
10  hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the
11  navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards
12  from shore, within the territorial limits of the State of California. See *Tidewater*,
13  Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

14       79. LINDA FRITZ is DECEDENT FRITZ's mother and a "parent" as that
15  term is used in 46 U.S.C. § 30302.

16       80. At all times material hereto, Plaintiff SEEMA SHARMA ("Plaintiff
17  SHARMA") was and still is an adult resident of the State of Ohio. She is the duly
18  appointed Personal Representative of the Estate of KAUSTUBH NIRMAL
19  ("DECEDENT NIRMAL").

20       81. At all times material hereto, DECEDENT NIRMAL was a "passenger for
21  hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR §
22  101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215
23  (1996). As hereinafter more fully appears, he died aboard that vessel during the early
24  morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank
25  upon the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-
26  hundred yards from shore, within the territorial limits of the State of California. See
27  *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).
28       82. PATANJALI SHARMA is DECEDENT NIRMAL's father and a "parent"

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 19 of 48   Page ID
#:289

1 | as that term is used in 46 U.S.C. § 30302.

2 |     83. LAKSHMI SHARMA is DECEDENT NIRMAL's mother and a "parent"
3 | as that term is used in 46 U.S.C. § 30302.

4 |     84. At all times material hereto, Plaintiff MARGARET STROM ("Plaintiff
5 | STROM") was and still is an adult resident of the State of Tennessee. She was the
6 | wife and "spouse" of TED STROM, Deceased ("DECEDENT STROM") as those
7 | terms are used in 46 U.S.C. § 30302. She is also the mother of his two children and
8 | the duly appointed Personal Representative of DECEDENT STROM's Estate.

9 |     85. At all times material hereto, DECEDENT STROM was a "passenger for
10 | hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR §
11 | 101.105 and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. 199, 215
12 | (1996). As hereinafter more fully appears, he died aboard that vessel during the early
13 | morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon
14 | the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred
15 | yards from shore, within the territorial limits of the State of California. See *Tidewater*,
16 | 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

17 |     86. KESTREL STROM is DECEDENT STROM's son and a "child" as that
18 | term is used in 46 U.S.C. § 30302.

19 |     87. PFEIFFER STROM is DECEDENT STROM's son and a "child" as that
20 | term is used in 46 U.S.C. § 30302.

21 |     88. At all times material hereto, Plaintiff RICHARD X. LIU ("Plaintiff LIU")
22 | was and still is an adult resident of the State of California. He is the duly appointed
23 | Personal representative of the Estate of XIANG LIN, (Deceased).

24 |     89. Decedent XIANG LIN (hereinafter "DECEDENT LIN") was born in 1973.
25 | At all times material hereto, she was a "passenger for hire" aboard the dive vessel
26 | *CONCEPTION* as that phrase is used in 33 CFR § 101.105 and a "non-seafarer" within
27 | the meaning of *Yamaha*, 516 U.S. at 215. As hereinafter more fully appears, she died
28 | aboard that vessel during the early morning hours of September 2, 2019, when

19
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 753**

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 20 of 48    Page ID
#:290

1    *CONCEPTION* caught fire and sank upon the navigable waters of Platts Harbor off
2    Santa Cruz Island, less than one-hundred yards from shore, within the territorial limits
3    of the State of California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III,
4    § 2; Gov. Code, § 170, 171).

5       90. YIN LIN and ANZHI CHEN are residents of the People's Republic of
6    China and are "parent[s]" of DECEDENT, as the term is used in 46 U.S.C. § 30302.

7       91. At all times material hereto, Plaintiff SUSANA SOLANO ROSAS was and
8    is an adult resident of the State of California and is the natural mother of DECEDENT
9    EVANMICHEL SOLANO QUITASOL ("DECEDENT EVANMICHAEL
10    QUITASOL"), ANGELA ROSE SOLANO QUITASOL ("DECEDENT ANGELA
11    SOLANO QUITASOL"), and NICOLE STORM SOLANO QUITASOL
12    ("DECEDENT NICOLE QUITASOL"). The Decedents were the adult daughters of
13    Plaintiff SUSANA SOLANO ROSAS. Plaintiff SUSANA SOLANO ROSAS is the
14    duly appointed personal representative of the Decedents' respective estates, and is a
15    "parent" as that term is used in 46 U.S.C. § 30302.

16       92. DECEDENT EVANMICHAEL QUITASOL was born July 31, 1982.
17    DECEDENT ANGELA SOLANO QUITASOL was born July 26, 1991. DECEDENT
18    NICOLE QUITASOL was born January 4, 1998. At all times material hereto, each of
19    those DECEDENTS was a "passenger for hire," as that phrase is used in 33 CFR
20    §101.105, aboard the dive vessel *CONCEPTION.* Those DECEDENTS were "non-
21    seafarers" within the meaning of *Yamaha*, 516 U.S. at 215 (1996). As hereinafter more
22    fully appears, those DECEDENTS perished aboard that vessel during the early
23    morning hours of September 2, 2019, when it caught fire and sank in Platt's Harbor off
24    Santa Cruz Island, upon navigable waters within the territorial limits of the State of
25    California. See *Tidewater*, 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code,
26    § 170, 171).

27       93. At all times material hereto, Plaintiff ARIEL TAKVAM was an adult
28    resident of the State of California. She was the spouse of KRISTIAN TAKVAM,

1 Deceased ("DECEDENT TAKVAM") and is a "spouse" as that term is used in 46
2 U.S.C. § 30302. She is also the duly appointed, Personal Representative of
3 DECEDENT TAKVAM's Estate.

4     94. At all times material hereto, Plaintiff KENNETH TAKVAM was an adult
5 resident of the State of Texas. KENNETH TAKVAM was the natural father of
6 DECEDENT TAKVAM and is a "parent" as that term is used in 46 U.S.C. § 30302.

7     95. At all times material hereto, Plaintiff MARY R. TAKVAM was an adult
8 resident of the State of Texas. She was the natural mother of DECEDENT
9 TAKVAM, is a "parent" as that term is used in 46 U.S.C. § 30302, and is the duly
10 appointed Personal Representative of DECEDENT TAKVAM's Estate.

11     96. At all times material hereto, DECEDENT TAKVAM was a "passenger for
12 hire" aboard the dive vessel *CONCEPTION* as that phrase is used in 33 CFR §
13 101.105 and a "non-seafarer" within the meaning of *Yamaha,* 516 U.S. at 215. As
14 hereinafter more fully appears, he died aboard that vessel during the early morning
15 hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon the
16 navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred yards
17 from shore, within the territorial limits of the State of California. See *Tidewater*,14
18 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

19     97. Plaintiff, DOMINIC MICAEL SELGA was and still is an adult resident of
20 the State of California. He is the natural son of FERNISA JUNE SISON (Deceased)
21 ("DECEDENT SISON), a "child" as that term is used in 46 U.S.C. § 30302, and the
22 duly appointed Personal Representative of said DECEDENT's Estate.

23     98. At all times material hereto, DECEDENT SISON was a "passenger for
24 hire" aboard the dive vessel *CONCEPTION,* as that phrase is used in 33 CFR §
25 101.105, and a "non-seafarer" within the meaning of *Yamaha*, 516 U.S. at 215. As
26 hereinafter more fully appears, she too died aboard that vessel during the early
27 morning hours of September 2, 2019, when *CONCEPTION* caught fire and sank upon
28 the navigable waters of Platt's Harbor off Santa Cruz Island, less than one-hundred

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 22 of 48    Page ID
#:292

1 yards from shore, within the territorial limits of the State of California. See *Tidewater*,

2 14 Cal.4th at 564 (citing Cal. Const., art. III, § 2; Gov. Code, § 170, 171).

3     99. NISA SHINAGAWA is the natural daughter of DECEDENT SISON and

4 a "child" at that term is used in 46 U.S.C. § 30302.

5     100. At all times material hereto, Plaintiff RYAN SIMS ("Plaintiff SIMS") was

6 and still is an adult resident of the State of California.  Plaintiff SIMS was a member

7 of *CONCEPTION's* crew when she caught fire and sank upon the navigable waters of

8 Platts Harbor off Santa Cruz, Island.

9 <div align="center">**The Defendant**</div>

10     101. At all times material hereto, the UNITED STATES COAST GUARD

11 (hereinafter "COAST GUARD") was and still is a military, multi-mission, maritime

12 service within the Department of Homeland Security, one of the five armed services

13 of Defendant the UNITED STATES OF AMERICA, and an "agent of the UNITED

14 STATES" within the meaning of 46 U.S.C. § 30904. As such the UNITED STATES

15 OF AMERICA is designated Defendant herein ("UNITED STATES").

16     102. Venue is properly laid in this Court under 28 U.S.C. § 1391(b)(2) in that

17 Defendant's acts and omissions complained of herein occurred within the federal

18 judicial district of this Honorable Court.

19 <div align="center">**OPERATIVE FACTS**</div>

20 <div align="center">*(The Small Passenger Vessel CONCEPTION)*</div>

21     103. At all times material hereto, Truth Aquatics, a California-organized

22 business, owned by Richard Glen Fritzler and Dana Jeanne Fritzler ("Truth Aquatics"

23 and "the Fritzlers") built, owned, operated, maintained, manned, equipped, controlled,

24 and operated three "small passenger vessels" within the meaning of 46 C.F.R.,

25 Subchapter T – *CONCEPTION, VISION*, and *TRUTH*. Although *VISION* was five

26 feet longer and one foot wider than *CONCEPTION,* they were sisterships in the sense

27 that the layout and general arrangement of their decks, deck houses, and below deck

28 compartments were very similar.

<div align="center">22
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages</div>

<div align="center">**ER 756**</div>

1    104. *CONCEPTION* was designed, built, furnished, equipped, inspected, and
2  launched in Long Beach, California in 1981 by the Fritzlers and others, and was
3  redesigned, rebuilt, refurbished, reequipped, relaunched by the Fritzlers and others, in
4  2005 and/or subsequent years. When *CONCEPTION* was launched in 1981, she was
5  subject to Coast Guard inspection and certification under 46 C.F.R. § 175.100(a) and
6  was indeed inspected and certificated by the Coast Guard acting for Defendant
7  UNITED STATES by and through a duly authorized Officer in Charge of Marine
8  Inspection ("OCMI").

9    105. *CONCEPTION* was likewise subject to Coast Guard inspection and
10  certification at the time of her redesign and reconstruction in 2005 and was indeed
11  reinspected and recertificated at that time by the Coast Guard acting for Defendant
12  UNITED STATES by and through a duly authorized OCMI.

13    106. From the time *CONCEPTION* first entered service in 1981 until the date
14  of the catastrophic fire which is the subject of this action, said vessel was further
15  subject to annual inspection and certification under 46 C.F.R. §§ 175.100(a), and
16  185.726, *inter alia,* and was indeed inspected and certificated annually by the Coast
17  Guard acting for Defendant UNITED STATES by and through a duly authorized
18  OCMI.  In addition to said annual inspections, Defendant UNITED STATES also
19  conducted 5-year COI renewal inspections and biannual hull and structural
20  examinations aboard *CONCEPTION* pursuant to 46 C.F.R. § 176.600 *inter alia.* The
21  OCMI's who inspected and certificated *CONCEPTION* pursuant to those regulations
22  during the years immediately preceding the catastrophe that is the subject of this
23  incident, were members of the Marine Safety Detachment ("MSD") in Santa Barbara,
24  a sub-unit of the MSD for Coast Guard Sector LA/Long Beach.

25    107. The Coast Guard developed, adopted, promulgated, published, and
26  updated a T-Boat Inspection Book ("CG-840 TI") which not only prescribes the
27  procedures and protocols for all those inspections, examinations, and certifications
28  but also provides OCMI's with written procedures, protocols, and checklists for such

1  inspections, examinations, and certifications.  The CG-840-T1 and its procedures,
2  protocols, and checklists were last updated in 2011.  In addition to the procedures,
3  protocols, and checklists set forth in the CG-840-TI, the MSD in Santa Barbara
4  prepared, published, adopted, issued, and updated its own supplemental procedures,
5  protocols, and checklists for small-passenger-vessel inspections and examinations
6  like the ones described hereinabove.  The supplemental procedures, protocols, and
7  checklists published by the Santa Barbara MSD were last updated in 2014.

8        108.  A copy of the Supplemental Procedures Check List referenced herein is
9  attached to the Complaint as Exhibit "A."

10       109. Among other things, the procedures, protocols, and checklists described
11  in Paragraphs 107 and 108 hereinabove required the OCMI's to inspect and certificate
12  *CONCEPTION's* wiring and electrical systems to ensure that they complied with the
13  standards set forth in 46 C.F.R. § 183.340.  They also called upon the OCMI's to
14  ensure that small passenger vessels like *CONCEPTION* were equipped with proper
15  fire detection and suppression systems and suitable passenger evacuation hatches and
16  passages.  Having developed, adopted, promulgated, published, and issued those
17  procedures, protocols, and checklists, the MSD's for Coast Guard Sector LA/Long
18  Beach and sub-unit Santa Barbara and their OMCI's had a manifest duty to comply
19  with said procedures, protocols, and checklists and had no discretion to violate or
20  disregard them.

21       110. The Coast Guard, acting by and through its aforesaid MSD's and duly
22  designated OCMI's documented each of the inspections, examinations, and
23  certifications described hereinabove with a dated Certificate of Inspection ("COI").
24  The MSD in Santa Barbara issued *CONCEPTION* her last COI on or about November
25  19, 2014, and conducted an annual inspection in 2019, prior to *CONCEPTION*
26  burning to the waterline in the catastrophe that is the subject of this action.  As
27  hereinafter more fully appears, that COI authorized *CONCEPTION* to operate as "a
28  small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times

24

SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1 material hereto, and to carry up to forty-five passengers on overnight voyages along
2 the Southern California coast, even though her electrical wiring and systems, her fire
3 detection and suppression systems, and her passenger-accommodation escape hatch
4 were in open and obvious violation of the procedures, protocols, and checklists
5 described in Paragraph 107 and 108 hereinabove.

6      111. Beginning in 2013, the Coast Guard started publishing Navigation and
7 Vessel Inspection Circulars ("NVIC's") and safety alerts about dangers of circuit
8 overloads and shipboard fires caused by the use of power strips and rechargeable
9 devices aboard small passenger vessels.

10     112. After the catastrophe that is the subject of this action, the Coast Guard
11 inspected *CONCEPTION's* sistership *VISION*, applying the same procedures,
12 protocols, and checklists the OCMI's of MSD Santa Barbara should have applied to
13 *CONCEPTION*, and discovered numerous glaring deficiencies in *VISION's* wiring
14 and electrical systems, fire detection and suppression systems, and passenger-
15 accommodation escape hatch.

16     113. *CONCEPTION*, which is depicted below, was constructed of wood and
17 fiberglass. She had a registered tonnage of 66 net tons and as of September 2, 2019,
18 was licensed by the Coast Guard to carry up to six crew members and one hundred
19 passengers for hire and to conduct overnight, near-coastal voyages upon the territorial,
20 near coastal waters of the Santa Barbara Channel

21
22
23
24
25
26
27
28



25
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 759**

1    114. As designed, built, equipped, redesigned, rebuilt, and refurbished,
2  *CONCEPTION* had three decks. The pilothouse and sleeping quarters for five of her
3  crew members were located on the vessel's uppermost, or "sun deck," atop the main-
4  deck house, and were accessed from the main deck by a single set of open stairs
5  situated at the after end of the deck house. Exterior walkways ran along the main
6  deck on either side of the house and provided access to the bow. The dive station was
7  situated on the main deck's open "fantail" area aft of the house. The stern of the
8  vessel was equipped with a dive platform that could be raised and lowered and when


*Galley with forward windows*

9                  raised, also functioned as a
10                 "skid"   or   cradle   for
11                 *CONCEPTION's*   fifteen-foot
12                 inflatable skiff.

13                   115. The      passenger
14                 accommodations        were
15                 distributed between the main-
16                 deck and below-deck areas. The
17                 interior of the main-deck house

18  comprised an open area that was divided into two zones or
19  spaces by low counters and fixed furniture.   The
20  forward one-third of that space housed "the
21  galley" and its electrically powered food-
22              storage    and    food-preparation
23              equipment. The after two-thirds of
24              the  space  comprised  "the
25              salon" where passengers

26  **MAIN DECK**              socialized and ate their
27              meals.   A set of fixed
28              counters  equipped  with  food-

26
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1   service platforms, built-in coolers, and an ice maker ran down the centerline of the
2   salon. Banquette-style seating and a row of padded sofas were built into the port and
3   starboard walls of the salon. Wooden tables and plastic chairs sat inboard of the
4   banquettes and sofas. The salon and all of its furnishings were flammable, including
5   the carpeting on the deck and the acoustic tile on the overhead.

6       116. The galley/salon space was accessed from the main deck by a doorway at
7   the after end of the deck house which led to and from the dive station and the open
8   fantail. That entry/exit was equipped with a set of double doors which were always
9   kept open while the vessel lay at anchor.

10      117. The main-deck house also embraced three separately enclosed "heads" or
11   toilets. Two of those heads were accessed via flanking doorways on the port and
12   starboard sides of the main deck entry. The third head was located on the starboard
13   side of the deck house and was accessed from an exterior doorway situated at the
14   bottom of the stairway up to the sun deck.



*Salon looking forward towards galley area*



**SLEEPING QUARTERS**



*The bunk room below deck*

118. All the passenger accommodations were located below the main deck, within the hull itself, and comprised a bunk room and a shower room separated by a watertight, thwartship bulkhead. The cramped bunk room was located aft of the shower room and designed to accommodate forty-five passengers and one crew member in a space that was approximately twenty-one feet long and twenty-five feet wide. Thirteen of the bunks in that compartment were designed for double occupancy and twenty for single occupancy.

119. Twelve of the double-occupancy bunks were divided into two flights, one above the other, and arranged along each side of the bunk room, six to a side. Twelve single-occupancy bunks were arranged longitudinally, in the middle of the room, in a block that ran two bunks wide, two bunks long, and three bunks high. A thwartship block of single-occupancy bunks running three high and two long sat against the after

28

1 bulkhead. Viewed from above, the layout resembled a three-pronged fork, where the
2 outside tangs were double bunks, the center tang was the longitudinal set of double
3 bunks, and the base of the fork was the smaller, thwartship block of singles. The
4 thirteenth double bunk was tucked under the access companionway at the forward end
5 of the bunk room, and the last two single-occupancy bunks were stacked atop one
6 another against the port side of the forward bulkhead. All the bunks were framed in
7 wood and equipped with reading lights, plastic-covered foam mattresses, pillows, and
8 blankets. Privacy was provided by thin wooden partitions and cloth curtains. During
9 the accident voyage, all thirteen of the double bunks and sixteen of the twenty singles
10 were assigned to couples or individuals. The unassigned bunks all lay in the
11 thwartship block that sat against the after bulkhead. The bunk room had no windows,
12 portholes, or skylights. Ventilation was provided by a forced-air system with intakes
13 on the main deck and an air-conditioning system that cooled and recirculated interior
14 air.

15     120. Over the years, undocumented and ill-designed modifications were added
16 to the forced-air ducting and compartment overhead. Lighting in the aisles was
17 fluorescent. There were two, residence-grade smoke alarms and one emergency light
18 in the bunk room. Each alarm operated independently of the other, and neither sent a
19 signal to the pilothouse. There was a single, ten-pound, Class ABC fire extinguisher
20 housed at the forward end of the bunk room but no other fire-fighting systems or
21 equipment in that compartment. There were only two means of access to and egress
22 from the bunk room, and neither opened directly onto a weather deck. There was a
23 narrow, curved companionway equipped with stairs that spiraled down to the forward
24 end of the bunk room from the starboard side of the galley. There was also a closed
25 and unmarked, twenty-two-inch-by-twenty-two-inch emergency-escape hatch tucked
26 into the overhead above the aftermost berths in the longitudinal block of single bunks
27 which opened onto a cramped space beneath the aftermost counter in the salon. By
28 virtue of its repeated inspection of *CONCEPTION*, the Coast Guard was aware of

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 30 of 48   Page ID
#:300

1 these conditions.

2      121. The open fantail area at the after end of *CONCEPTION's* main deck was
3 equipped with center-line storage banks for dive equipment such as fins, masks, and
4 SCUBA bottles. The below-deck space immediately beneath the fantail was divided
5 into two compartments. The forward compartment housed the "engine room" and
6 abutted the after end of and was separated from the bunk room by a ½-inch thick
7 plywood bulkhead. That compartment contained the two diesel engines that turned
8 the vessel's twin propellors, two fuel tanks, air compressors for filling the SCUBA
9 bottles, and an auxiliary diesel generator that powered the vessel's electrical system.
10 The after compartment or "lazarette" lay between the engine room and the vessel's
11 transom. The lazarette housed a nitrox system for producing oxygen-enriched dive
12 air and a storage area for drying wet suits. Access to and from the engine room and
13 the lazarette was provided through two separate hatches located on the fantail.

14      122. As designed, built, equipped, launched, inspected, certificated, redesigned,
15 rebuilt, refurbished, reequipped, reinspected, and recertificated by, *CONCEPTION*
16 was equipped with an onboard electrical system that was powered by diesel
17 generators. That electrical system did not fully and/or adequately comply with the
18 standards set forth under 46 CFR 183.340. For example, some electrical items in the
19 bunkroom were not composed of UL Boat or Marine cable called for by such
20 standards, but rather of cheap, everyday Romex wire of the kind one would buy at
21 Home Depot.

22      123. The vessel's inadequate electrical system was already stressed by the
23 addition of the nitrox generation system to the point where the galley stove and the
24 nitrox system could not be operated at the same time. Based on the information the
25 OCMI's gathered in the inspections, examinations, and certifications described
26 hereinabove, the Coast Guard knew, or in the exercise of ordinary care should have
27 known, that Truth Aquatics and the Fritzlers not only added undocumented and ill-
28 designed electricalutlets throughout the vessel for the purpose of battery charging but

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 31 of 48    Page ID
#:301

1   also permitted and even encouraged passengers and crew members like
2   DECEDENTS to use *CONCEPTIONS's* electrical system to charge digital cameras,
3   video-cameras, smartphones, cell phones, strobe lights, Go Pros, lap top tablets,
4   underwater-scooter power packs, CPAP machines, and other lithium battery-powered
5   electronic equipment

6               *(The Events Leading Up to the Incident)*



18       124. The risk of fire caused or accelerated by the presence of lithium-based
19   batteries is well documented by official studies and mainstream media. Many types
20   of lithium-battery-powered equipment have long been banned from commercial
21   airliners. Between 2006 and 2021, the Federal Aviation Administration, an agency
22   of Defendant UNITED STATES, alone recorded 310 air or airport fire incidents
23   involving lithium batteries. The Consumer Product Safety Commission, also an
24   agency of Defendant UNITED STATES, recorded numerous incidents of lithium
25   battery fires during the same period. More pertinently, on the late afternoon of March
26   9, 2013, over six years before the fatal fire that is the subject of this action, the
27   *CONDOR EXPRESS*, another "small passenger vessel" within the meaning of 46
28   C.F.R.§ 175.110(a), caught fire while berthed in Santa Barbara Harbor when the

31
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1 | battery charging station for that vessel's portable maritime radio burst into flames
2 | inside her wheelhouse.

3      125. During the pre-dawn hours of October 8, 2018, eleven months before the
4 | fatal fire that is the subject of this action, Ken Dehler, an off-duty fireman and a
5 | passenger aboard *CONCEPTION*'s sistership *VISION*, heard a "hissing" noise and
6 | then a loud "bang" inside that vessel's main deckhouse and discovered sparks, flames,
7 | and smoke emanating from two lithium-based batteries that were nested in a charging
8 | station plugged into a power strip sitting among paperback books atop a shelf on the
9 | starboard side of the *VISION's* salon. After Dehler and another passenger who just
10 | happened to be awake smothered the fire with a dry chemical extinguisher from the
11 | galley, they unplugged the charger and threw it into a rinse bin located out on the
12 | main deck. Dehler and the other passenger promptly reported the fire to the *VISION's*
13 | master who reported it in turn to his employers.

14      126. On Monday, August 31, 2019, DECEDENTS, and each of them, departed
15 | Santa Barbara Harbor aboard *CONCEPTION*, along with Plaintiff SIMS and five
16 | other crew members, for a three-day voyage through the Channel Islands ("accident
17 | voyage"). That voyage would take *CONCEPTION* "between ports in the United
18 | States" as that phrase is used in 46 U.S.C. § 30509(a)(1).

19      127. On the night of Tuesday, September 1, 2019, while *CONCEPTION* was
20 | anchored in Platt's Harbor just a few hundred yards off Santa Cruz Island, some of
21 | her passengers made a night dive that concluded some time before 2400. After that,
22 | the vessel buttoned down for the night. At 0235 hours, the last person awake,
23 | *CONCEPTION's* Second Cook Michael Kohls, finished cleaning the salon, galley,
24 | and heads and went up to his bunk on the sun deck. There was no indication at that
25 | time of any fire or disturbance in the bunk room, on the fantail, in the salon, in the
26 | galley, or anywhere else aboard the vessel. By the time Kohls nodded off in his berth,
27 | everyone aboard *CONCEPTION*, including all six of her crew members, was sound
28 | asleep.

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 33 of 48    Page ID
#:303

1    128. Sometime around 0300, Kohls and his fellow crew member, First Cook
2  Ryan Sims, were awakened by loud noises and the cry of someone in distress. Earlier
3  that evening, Sims had seen sparks when he plugged his cell phone into one of the
4  charging stations in the salon. Kohls got up to investigate, but when he reached the
5  top of the stairway from the sun deck down to the main deck, he saw flames licking
6  at the stairs from the after, starboard corner of the passenger accommodation. What
7  Kohls saw was a lithium-fueled fire that had been sparked and/or critically accelerated
8  by defective equipment which was plugged into an overburdened shipboard electrical
9  system. This overburdened shipboard electrical system had been designed, developed,
10  built, installed, and refurbished without adequate fire detection, without adequate fire
11  protection and/or without adequate electrical systems and wiring by the Fritzlers,
12  Truth Aquatics, and others, and inspected and approved by the Coast Guard and
13  Defendant the UNITED STATES. Nevertheless, at all times material, the Coast
14  Guard failed to perform adequate inspections, allowing CONCEPTION to sail with
15  these hazardous and ultimately deadly conditions.

16    129. Lithium-fueled fires are subject to the well-known phenomenon of
17  "thermal runaway" and can quickly generate temperatures in excess of 1000 degrees
18  Fahrenheit. As soon as Kohls saw the fire licking at the bottom of the after stairway,
19  he ran forward along the sun deck and alerted Capt. Jerry Boylan and the rest of the
20  crew.     After Boylan made a MAYDAY call at 0314 from *CONCEPTION's*
21  pilothouse, he, Kohls, Sims, First Mate Cullen Molitor, and Deck Hand Milton French
22  realized that the fire had accelerated beyond their control and abandoned ship, taking
23  *CONCEPTION's* fifteen-foot inflatable skiff with them.    Apart from passenger
24  Berenice Felipe -- whom Kohls had apparently heard cry out as she pushed open the
25  escape directly above her bunk and fled overboard through the fire – everyone else
26  aboard *CONCEPTION* was trapped down below in the bunk room where they died
27  from the combined effects of fire and asphyxiation after trying to fight the blaze with
28  the fire extinguisher in the cabin.



### FIRST CAUSE OF ACTION

*(Wrongful Death against Defendant UNITED STATES OF AMERICA)*

130. Plaintiffs hereby refer to, and incorporate as though fully set forth herein, each and every allegation set forth in each paragraph hereinabove.

131. This cause of action arises under the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918, and the General Maritime Law of the United States as handed down in *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970), *Sea-Land Services v. Gaudet*, 414 U.S. 573 (1974), *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811 (2001), and *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199 (1996),*inter alia*.

132. Defendant UNITED STATES would, if a private person, be liable to the Plaintiffs and DECEDENTS' heirs-at-law in that the Coast Guard and its duly designated OMCI's acted negligently and carelessly at all times material hereto by:

> a.    Abusing their discretion pursuant to Title 46 of the Code of Federal Regulations, Subchapter T, Parts 175 to 187 - governing the inspection and operation of small passenger vessels (less than 100 gross tons) carrying between 6 and 150 passengers overnight;

34
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 35 of 48    Page ID
                                    #:305

        b.     Ignoring, disregarding, and failing to abide by the procedures, protocols, and checklists set forth in the CG-840-T1 and the supplemental publications issued by the MSD; and

        c.     Certificating and authorizing *CONCEPTION* to operate as "a small passenger vessel" within the meaning of 46 C.F.R. § 175.110(a) at all times material hereto, and to carry up to forty-five passengers on overnight voyages along the Southern California coast, even though her electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs were in open and obvious violation of those procedures, protocols, and checklists.

133. As a direct, proximate, and legal result of the hereinabove delicts of Defendant, and each of them, DECEDENTS and each of them died as a consequence of the fire, due to a combination of burns, smoke inhalation, and asphyxiation.

134. As a direct, proximate, and legal result of the death of DECEDENTS, and each of them, Plaintiffs, the respective Estates they represent, and DECEDENTS heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENTS' services, support, nurture, counsel, and example all to their pecuniary damage in an amount to be proven at the time of trial.

135. As a direct, proximate, and legal result of the death of DECEDENTS, and each of them, Plaintiffs, the respective Estates they represent, and DECEDENTS heirs and beneficiaries, have suffered and will continue to suffer the permanent loss of said DECEDENTS' love, society, affection, care, comfort and consortium, all to their non-pecuniary damage in an amount to be proven at the time of trial.

WHEREFORE, Plaintiffs pray judgment against Defendant UNITED STATES as is hereinafter set forth.

///

35
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 36 of 48    Page ID #:306

## SECOND CAUSE OF ACTION
### (Survival Action)

136. Plaintiffs herewith refers to and by that reference incorporates, as though fully set forth herein, each and every allegation set forth hereinabove.

137. On or about September 2, 2019, before the foregoing cause of action arose in DECEDENTS' favor, DECEDENTS, who would have been plaintiffs in this action had they lived, died of smoke inhalation, burns, and asphyxiation secondary to the fire.

138. As a direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENTS' Estates incurred expenses for funeral and cremation, all to their Estates' pecuniary damage in an amount to be determined at the time of trial.

139. As a further direct, proximate, and legal result of the hereinabove alleged delicts of the Defendant, DECEDENTS and each of them were placed in great fear for their own lives and own physical well-being and consciously suffered extreme, severe, and relentless mental and emotional anguish, terror, and physical pain, and continued to suffer such terror, pain, and anguish for a substantial period of time until they died by fire and asphyxiation while trapped in CONCEPTION's chaotic and over-crowded bunk room, all to their Estates' nonpecuniary damage in an amount to be proven at the time of trial herein.

140. As a further direct, proximate, and legal result of the hereinabove alleged delicts of Defendant, DECEDENT CHAN consciously suffered extreme, severe, and relentless fear for his own life and physical well-being, and for the life and physical well-being of his daughter and fellow passenger KENDRA MOORE CHAN and continued to suffer such fear for a substantial period of time until he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial.

141. As a further direct, proximate, and legal result of the hereinabove alleged delicts of the Defendant, DECEDENT MOORE CHAN consciously suffered

36
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1 extreme, severe, and relentless fear for her own life and physical well-being, and for
2 the life and physical well-being of her father and fellow passenger RAYMOND
3 SCOTT CHAN and continued to suffer such fear for a substantial period of time until
4 she died by fire and asphyxiation, all to her Estate's nonpecuniary damage in an
5 amount to be proven at the time of trial.

6      142. As a further direct, proximate, and legal result of the hereinabove alleged
7 delicts of Defendant, DECEDENT DEOPUJARI consciously suffered extreme,
8 severe, and relentless fear for her own life and physical well-being, and for the life
9 and physical well-being of her husband and fellow passenger DECEDENT NIRMAL
10 and continued to suffer such fear for a substantial period of time until she died by fire
11 and asphyxiation, all to her Estate's nonpecuniary damage in an amount to be proven
12 at the time of trial

13      143. As a further direct, proximate, and legal result of the hereinabove alleged
14 delicts of Defendant, DECEDENT FELIPE consciously suffered extreme, severe, and
15 relentless fear for her own life and physical well-being, and for the life and physical
16 well-being of her travel companions and close friend TIA NICOLE ADAMIC
17 SALIKA, and her parents STEVEN SALIKA and CAROL DIANA ADAMIC. The
18 DECEDENT continued to suffer such fear for a substantial period of time until he
19 died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount
20 to be proven at the time of trial

21      144. As a further, direct, proximate, and legal result of the hereinabove alleged
22 delicts of Defendant, DECEDENTS ADAMIC, SALIKA and ADAMIC SALIKA
23 consciously suffered extreme, severe, and relentless fear for their own lives and
24 physical well-being, the lives and physical well-being of each other, and their travel
25 companion and close friend DECEDENT FELIPE. The DECEDENTS continued to
26 suffer such fear for a substantial period of time until he died by fire and asphyxiation,
27 all to his Estate's nonpecuniary damage in an amount to be proven at the time of trial

28      145. As a further direct, proximate, and legal result of the hereinabove alleged

1   delicts of Defendant, DECEDENT FRITZ consciously suffered extreme, severe, and
2   relentless fear for his own life and physical well-being, and for the life and physical
3   well-being of his wife and fellow passenger ADRIAN DAHOOD-FRITZ and
4   continued to suffer such fear for a substantial period of time until he died by fire and
5   asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at
6   the time of trial.

7       146. As a further direct, proximate, and legal result of the hereinabove alleged
8   delicts of Defendant, DECEDENT NIRMAL consciously suffered extreme, severe,
9   and relentless fear for his own life and physical well-being, and for the life and
10   physical well-being of his wife and fellow passenger DECEDENT DEOPUJARI and
11   continued to suffer such fear for a substantial period of time until he died by fire and
12   asphyxiation, all to his Estate's nonpecuniary damage in an amount to be proven at
13   the time of trial.

14       147. As a further direct, proximate, and legal result of the hereinabove alleged
15   delicts of Defendant, DECEDENTS EVANMICHAEL QUITASOL, ANGELA
16   QUITASOL, and NICOLE QUITASOL, and each of them, consciously suffered
17   extreme, severe, and relentless fear for one another's lives and physical well-being.
18   Additionally,   DECEDENTS   EVANMICHAEL   QUITASOL,   ANGELA
19   QUITASOL, and NICOLE QUITASOL, and each of them, consciously suffered
20   extreme, severe, and relentless fear for the loss of life of their biological father,
21   MICHAEL QUITASOL, who also perished in the fire. The DECEDENTS continued
22   to suffer such fear for a substantial period of time until they each died by fire and
23   asphyxiation, all to their Estate's nonpecuniary damage in an amount to be proven at
24   the time of trial.

25       148. As a further direct, proximate, and legal result of the hereinabove alleged
26   delicts of Defendant, DECEDENT MICHAEL QUITASOL, consciously suffered
27   extreme, severe, and relentless fear for his own life and physical well-being.
28   Additionally, DECEDENT MICHAEL QUITASOL consciously suffered extreme,

SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW     Document 49     Filed 02/25/22     Page 39 of 48     Page ID
#:309

1 severe, and relentless fear for the loss of life of his wife, DECEDENT FERNISA
2 SISON, and his three adult daughters (DECEDENTS EVANMICHAEL QUITASOL,
3 ANGELA QUITASOL, and NICOLE QUITASOL), who also perished in the fire.
4 The DECEDENT continued to suffer such fear for a substantial period of time until
5 he died by fire and asphyxiation, all to his Estate's nonpecuniary damage in an amount
6 to be proven at the time of trial.

7      149. As a further direct, proximate, and legal result of the hereinabove alleged
8 delicts of Defendant, DECEDENT FERNISA SISON, consciously suffered extreme,
9 severe, and relentless fear for her own life and physical well-being. Additionally,
10 DECEDENT FERNISA SISON consciously suffered extreme, severe, and relentless
11 fear for the loss of life of her husband and fellow passenger, DECEDENT MICHAEL
12 QUITASOL, who also perished in the fire. The DECEDENT continued to suffer such
13 fear for a substantial period of time until she died by fire and asphyxiation, all to her
14 Estate's nonpecuniary damage in an amount to be proven at the time of trial.

15      150. DECEDENT FERNISA SISON had a statistical life expectancy of another
16 30 years at the time of her death.

17      151. DECEDENT MOORE CHAN was not married, had no children, and had
18 a statistical life expectancy of another fifty-four years at the time of her death. As a
19 further direct and proximate result of the hereinabove alleged delicts of the Defendant,
20 DECEDENT MOORE CHAN has incurred and will continue to incur a loss of future
21 earnings and income, all to her Estate's pecuniary damage in an amount to be
22 determined at the time of trial.

23      152. DECEDENT SCOTT CHAN had a statistical life expectancy of another
24 44 years at the time of his death.

25      153. DECEDENT HATANO was not married, had no children, and had a
26 statistical life expectancy of another forty-three years at the time of her death. As a
27 further direct and proximate result of the hereinabove alleged delicts of the Defendant,
28 DECEDENT HATANO has incurred and will continue to incur a loss of future

Case 2:21-cv-07065-PA-MRW  Document 49  Filed 02/25/22  Page 40 of 48  Page ID
#:310

1 earnings and income, all to her Estate's pecuniary damage in an amount to be
2 determined at the time of trial.

3     154. DECEDENT SINGH SANDHU was not married, had no children, and
4 had a statistical life expectancy of another thirty-eight years at the time of his death.
5 As a further direct and proximate result of the hereinabove alleged delicts of the
6 Defendant, DECEDENT SINGH SANDHU has incurred and will continue to incur a
7 loss of future earnings and income, all to her Estate's pecuniary damage in an amount
8 to be determined at the time of trial.

9     155. DECEDENT AHOPELTO had a statistical life expectancy of another
10 thirty-four years at the time of his death.

11     156. DECEDENT FELIPE was not married, had no children, and had a
12 statistical life expectancy of another sixty-five years at the time of her death. As a
13 further direct and proximate result of the hereinabove alleged delicts of the Defendant,
14 DECEDENT FELIPE has incurred and will continue to incur a loss of future earnings
15 and income, all to her Estate's pecuniary damage in an amount to be determined at the
16 time of trial.

17     157. DECEDENT TAN was not married, had no children, and had a statistical
18 life expectancy of another fifty-five years at the time of her death. As a further direct
19 and proximate result of the hereinabove alleged delicts of the Defendant,
20 DECEDENT TAN has incurred and will continue to incur a loss of future earnings
21 and income, all to her Estate's pecuniary damage in an amount to be determined at the
22 time of trial.

23     158. DECEDENT TIA ADAMIC SALIKA was not married, had no children,
24 and had a statistical life expectancy of another fifty-five years at the time of her death.
25 As a further direct and proximate result of the hereinabove alleged delicts of the
26 Defendant, DECEDENT ADAMIC SALIKA has incurred and will continue to incur
27 a loss of future earnings and income, all to her Estate's pecuniary damage in an amount
28 to be determined at the time of trial.

1      159. DECEDENT MICHAEL QUITASOL had a statistical life expectancy of
2    25 years.

3      160. DECEDENT STEVEN JOHN SALIKA's spouse and only child died in
4    the fire. He had a statistical life expectancy of 33 years. As a further direct and
5    proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT
6    SALIKA has incurred and will continue to incur a loss of future earnings and income,
7    all to his Estate's pecuniary damage in an amount to be determined at the time of trial.

8      161.  DECEDENT CAROL DIANA ADAMIC's spouse and only child died in
9    the fire. She had a statistical life expectancy of 28 years. As a further direct and
10   proximate result of the hereinabove alleged delicts of the Defendant, DECEDENT
11   CAROL DIANA ADAMIC has incurred and will continue to incur a loss of future
12   earnings and income, all to his Estate's pecuniary damage in an amount to be
13   determined at the time of trial.

14     162. DECEDENT LIN had a statistical life expectancy of another forty-six
15   years at the time of her death.

16     163. DECEDENT DIGNAM had a statistical life expectancy of another
17   twenty-eight years at the time of his death.

18     164. DECEDENT MCILVAIN had a statistical life expectancy of another 44
19   years at the time of his death.

20     165. DECEDENT GUINEY had a had a statistical life expectancy of another
21   37 years at the time of her death.

22     166. DECEDENT EVANMICHAEL SOLANO QUITASOL was not married,
23   had no children, and had a statistical life expectancy of another 46 years at the time
24   of her death. As a further direct and proximate result of the hereinabove alleged delicts
25   of the Defendant, DECEDENT has incurred and will continue to incur a loss of future
26   earnings and income, all to her Estate's pecuniary damage in an amount to be
27   determined at the time of trial.

28     167. DECEDENT ANGELA ROSE SOLANO QUITASOL was not married,

41
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 775**

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 42 of 48   Page ID #:312

1  had no children, and had a statistical life expectancy of another 54.5 years at the time
2  of her death. As a further direct and proximate result of the hereinabove alleged delicts
3  of the Defendant, DECEDENT has incurred and will continue to incur a loss of future
4  earnings and income, all to her Estate's pecuniary damage in an amount to be
5  determined at the time of trial.

6      168. DECEDENT NICOLE SOLANO QUITASOL was not married, had no
7  children, and had a statistical life expectancy of another 51.6 years at the time of her
8  death. As a further direct and proximate result of the hereinabove alleged delicts of
9  the Defendant, DECEDENT has incurred and will continue to incur a loss of future
10  earnings and income, all to her Estate's pecuniary damage in an amount to be
11  determined at the time of trial.

12      169. DECEDENT KURTZ was not married, had no children, and had a
13  statistical life expectancy of another 62 years at the time of her death.

14      170.  DECEDENT TAKVAM had a statistical life expectancy of another 44.1
15  years at the time of his death.

16      171. DECEDENT GARCIA was not married, had no children and had a
17  statistical life expectancy of another 42 years at the time of his death. As a further
18  direct and proximate result of the hereinabove alleged delicts of the Defendant,
19  DECEDENT GARCIA has incurred and will continue to incur a loss of future
20  earnings and income, all to his Estate's pecuniary damage in an amount to be
21  determined at the time of trial.

22      172. DECEDENT KRASHENNAYA was unmarried, had no children, and had
23  a statistical life expectancy of another 48 years at the time of her death. As a further
24  direct and proximate result of the hereinabove alleged delicts of the Defendant,
25  DECEDENT KRASHENNAYA has incurred and will continue to incur a loss of
26  future earnings and income, all to her Estate's pecuniary damage in an amount to be
27  determined at the time of trial.

28      173. DECEDENT DEOPUJARI's spouse died in the fire, he had no children,

42
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

**ER 776**

1  and had a statistical life expectancy of another 49 years at the time of his death. As a
2  further direct and proximate result of the hereinabove alleged delicts of the Defendant
3  DECEDENT DEOPUKARI has incurred and will continue to incur a loss of future
4  earnings and income, all to his Estate' pecuniary damage in an amount to be
5  determined at the time of trial.

6      174. DECEDENT WILLIAMS had a statistical life expectancy of another 46
7  years at the time of her death.

8      175. DECEDENT FIEDLER had a statistical life expectancy of another 36
9  years at the time of her death.

10      176. DECEDENT BALTZ was not married, had no children, and had a
11  statistical life expectancy of another 38 years at the time of his death. As a further
12  direct and proximate result of the hereinabove alleged delicts of the Defendant,
13  DECEDENT has incurred and will continue to incur a loss of future earnings and
14  income, all to his Estate's pecuniary damage in an amount to be determined at the time
15  of trial.

16      177. DECEDENT BEITZINGER was not married, had no children, and had a
17  statistical life expectancy of another 32 years at the time of her death. As a further
18  direct and proximate result of the hereinabove alleged delicts of the Defendant,
19  DECEDENT has incurred and will continue to incur a loss of future earnings and
20  income, all to her Estate's pecuniary damage in an amount to be determined at the
21  time of trial.

22      178. DECEDENT FRITZ did not leave a surviving spouse, had no children,
23  and had a statistical life expectancy of another 40 years at the time of his death. As a
24  further direct and proximate result of the hereinabove alleged delicts of the Defendant,
25  DECEDENT has incurred and will continue to incur a loss of future earnings and
26  income, all to his Estate's pecuniary damage in an amount to be determined at the time
27  of trial.

28      179. DECEDENT NIRMAL did not leave a surviving spouse, had no children,

1  and had a statistical life expectancy of another 47 years at the time of his death. As a
2  further direct and proximate result of the hereinabove alleged delicts of the
3  Defendant, DECEDENT has incurred and will continue to incur a loss of future
4  earnings and income, all to his Estate's pecuniary damage in an amount to be
5  determined at the time of trial.

6
7                          **THIRD CAUSE OF ACTION**
8                      (For Personal Injuries for Plaintiff SIMS)

9      180. Plaintiff SIMS herewith refers to and by that reference incorporates
10 paragraphs 1 - 129, as though fully set forth herein, each and every allegation set forth
11 in Paragraphs through hereinabove.

12     181. As a direct and proximate result of the hereinabove alleged delicts of
13 Defendant, Plaintiff SIMS incurred and shall continue to incur medical expenses, all
14 to his special damage in an amount to be determined at the time of trial herein.

15     182. As a further direct and proximate result of the hereinabove alleged delicts
16 of Defendant, Plaintiff SIMS has suffered and will continue to suffer a loss of wages,
17 benefits, and earning capacity, all to his further special damage in an amount to be
18 determined at the time of trial herein.

19     183. As a further direct and proximate result of the hereinabove alleged delicts
20 of Defendant, Plaintiff SIMS injured various parts of his body, including but not
21 limited to a broken leg, and has experience and will continue to experience severe and
22 permanent mental, physical, nervous, and emotional pain, suffering, and distress all
23 to his general damage in an amount to be determined at the time of trial.

24     184. WHEREFORE Plaintiffs pray judgment against Defendant the UNITED
25 STATES OF AMERICA as follows:

26     185. Funeral expenses in accordance with the allegations set forth above;

27     186. Pecuniary and nonpecuniary survival damages, including DECEDENTS'
28 pre-death pain and suffering, in accordance with the allegations set forth above;

44
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW   Document 49   Filed 02/25/22   Page 45 of 48   Page ID #:315

1     187. Pecuniary and nonpecuniary wrongful death damages, in accordance with

2     the allegations set forth above;

3     188. For Plaintiff SIMS' general and special personal injury damages;

4     189. For prejudgment interest;

5     190. For the costs of suit herein; and,

6     191. For such other and further relief as the Court may deem just and proper.

7

8     DATED: February 25, 2022.

9     MCGUINN HILLSMAN AND PALEFSKY

10
      */s/John R. Hillsman*
11    JOHN R. HILLSMAN
      535 Pacific Avenue Suite 100
12    San Francisco, CA 94133
13    415-421-9292
      Email: jrhillsman@mhpsf.com
14

15    Counsel for: Victoria Ellen Moore, Christine Dignam, Jasmine Lord, Yuka
      Hatashi Merritt, and Viikram Singh.
16

17    NELSON & FRAENKEL, LLP

18
      */s/Carlos F. Llinás Negret*
19    Gretchen M. Nelson
      Carlos F. Llinás Negret
20    601 South Figueroa Street, Suite 2050
21    Los Angeles, CA 90017
      844-622-6469
22    cllinas@nflawfirm.com

23

24    Counsel for: Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay Tan,
      Yadira Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto,
25    C.A. (a minor), Jean Anne Allen, Estate of Carol Diana Adamic, Estate of
26    Steven John Salika, Estate of Tia Nicole Adamic Salika, Shirley Salika, James
      Adamic.

27

28    SALTZ MONGELUZZI AND BENDESKY PC

                                      45
                    SIAA First Amended Complaint of Plaintiffs
                     for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 46 of 48    Page ID
#:316

1

2    */s/ Jeffrey P. Goodman*
     Jeffrey P Goodman (Pro Hac Vice To Be Submitted)
3    Ernest D. DiSandro, Jr. (Pro Hac Vice To Be Submitted
     1650 Market Street 52nd Floor
4    Philadelphia, PA 19103
5    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
     jgoodman@smbb.com
6

7    PANISH SHEA AND BOYLE LLP

8
     */s/Robert Samuel Glassman*
9    Robert Samuel Glassman
10   11111 Santa Monica Boulevard Suite 700
     Los Angeles, CA 90025
11   310-477-1700
12   glassman@psblaw.com

13   Counsel for: Mathew Guiney, Shruti Deopuraji, Robert Kurtz, Cherie
14   McDonough, Kaustubh Nirmal, Gregory Krashenny, Seema Sharma, Cherie
     McDonough, Anthony Beitzinger, Henry Garcia, Margaret Strom, Eric Baltz,
15   Atlee Fritz.

16
     GALINE FRYE FITTING AND FRANGOS
17

18   */s/Ilya Demetrios Frangos*
     ILYA DEMETRIOS FRANGOS
19   411 Borel Avenue Suite 500
20   San Mateo, CA 94402
     650-345-8484
21   ifrangos@gff-law.com

22
     Counsel for: Richard X. Liu, Estate of Xiang Lin.
23

24   SCHUERING ZIMMERMAN AND DOYLE LLP

25   */s/Theodore Derk Poppinga*
26   Theodore Derk Poppinga
     Robert Harry Zimmerman
27   400 University Avenue
28   Sacramento, CA 95825

                              46
             SIAA First Amended Complaint of Plaintiffs
             for Wrongful Death and Survival Damages

Case 2:21-cv-07065-PA-MRW    Document 49    Filed 02/25/22    Page 47 of 48    Page ID
#:317

1   916-567-0400
2   tdp@szs.com

3   Counsel for: Susana Solano Rosas.

4   FIORE ACHERMANN ALC
5

6   */s/Jennifer L Fiore*
    Jennifer L Fiore
7   Sophia M Acherman
8   340 Pine Street Suite 503
    San Francisco, CA 94104
9   415-550-0650
10  jennifer@thefafirm.com

11  Counsel for: Ariel Takvam, Kenneth Takvam, Mary R. Takvam, Mark Adamic,
12  Angelika Adamic.

13  WALKUP MELODIA KELLY WECHT AND SCHOENBERGER
14  */s/Matthew D Davis*
    Matthew D Davis
15  650 California Street, 26th Floor
16  San Francisco, CA 94108
    415-981-7210
17  dsaeltzer@walkuplawoffice.com

18  Counsel for: Christina Quitasol, Katie Osborne, Olga Faynshteyn, Sarma
19  Williams, Nancy Fiedler, Mathew Guiney.

20  LAW OFFICE OF W RUSSELL FIELDS
21  */s/Aurelio Edward Fields*
    Aurelio Edward Fields
22  1792 Tribute Road Suite 400
23  Sacramento, CA 95815
    916-646-6100
24  ed@russfieldslaw.com
25

26  Counsel for: Dominic Micael Selga, Estate of Fernisa June Sison, Nisa
    Shinagawa.
27

28  ARNOLD AND ITKIN LLP

47
SIAA First Amended Complaint of Plaintiffs
for Wrongful Death and Survival Damages

1

*/s/Cory Itkin*

2

Cory Itkin
Roland T Christensen

3

6009 Memorial Drive

4

Houston, TX 77007
713-222-3800

5

citkin@arnolditkin.com

6

Counsel for: Ryan Sims.

7

8

*/s/ Todd M. Abbott*

Todd M. Abbott, Esquire

9

2127 Olympic Parkway, Suite 1006, Number 348

10

Chula Vista, California 91915
tmabbottlaw@gmail.com

11

12

Counsel for: Daniel Poh-Hock Chua; Estate of Kristen Findstad.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:21-cv-07065-PA-MRW    Document 1-1    Filed 09/01/21    Page 1 of 4    Page ID
#:49

## M/V TRUTH

### SMALL PASSENGER VESSEL - T
MSD Santa Barbara

☐ Annual    ☐ Drydock    ☐ COI

Vessel Name: _____ ON: _____ MISLE Activity: _____

Date: _____    Location: _____    Inspector : _____

Vessel Rep: _____    ☐ Owner ☐ Operator TWIC___ Phone: _____
E-mail _____    MMSI: _____
Build Date: _____ Max PAX: _____    O/N Accom: ☐Yes ☐No    HULL: ☐FRP ☐Wood ☐Alum ☐Steel
Route: ☐ O=Oceans    ☐ C=Coastwise    ☐LC= Limited Coastwise    ☐ LBS= Lakes, Bays, Sounds

*Note: All sites are "46 CFR" unless otherwise noted.*

### Administration:
| | |
|---|---|
| Application for Inspection (CG-3752) | ☐ 176.105/176.400 |
| Certificate of Documentation | ☐ 67.7/67.9c |
| ☐ Permanent O.N. on interior member (67.121) | |
| State Registration | ☐ 33/173.15 |
| Operator's License/Tonnage/Route/Date | ☐ 185.402/15.805 |
| Stability Ltr. #pax _____ Route ☐E ☐PP ☐P | ☐ 176.306 |
| *(posted near Operating station)* | |
| COI Posted *(all pgs)* | ☐ 176.302 |
| Oil Discharge / MARPOL Placards (>26ft) | ☐ 33/155.450/151.59 |
| Waste Management Plan (>40ft) | ☐ 33/151.57 |
| Drug Testing Program: _____ | ☐ 16.260 |
| *Policy available for review* ☐ Yes ☐ No | |
| FCC Stn. License / Sfty. Cert. / Op Permit | ☐ 47/Part 13 |
| *(Verify Call sign on stn. lic. vs. Safety Cert.)* Safety Cert Exp. Date: ____ | |
| Drills Logged (EPIRB test/MOB/FF) | ☐ 185.728/.520/.524 |
| Emergency Instruction List *(read specific Vessel)* | ☐ 185.510 |
| First Aid Training / CPR Cards *(recommended)* | ☐ NVIC 1-91 |
| SPV Decal Posted *(Vis. to PAX @ embark.)* | ☐ 176.310 |
| Deckhand Qualifications | ☐ NVIC 1-91 |
| Discussed Marine Casualty reporting reqs. | ☐ 4.05 |
| * *(CG-2692)* | |

### Navigation / Radios:
| | |
|---|---|
| Mag. Compass w/ light *(O/C/LC)*: | ☐ 184.402 |
| Radar *(O/C/LC, > 49 pax)* | ☐ 184.404 |
| Electronic Position Fixing Device (O) | ☐ 184.410 |
| Navigation Lights (>65' UL1104) | ☐ 183.420 |
| Pubs & Charts | ☐ 184.420 |
| VHF Radio ( >1000' from shore < 20 NM) | ☐ 47 CFR 80.905 |
| Single Side Band | ☐ 47 CFR 80 |
| NAVTEX (> 100 NM) | |
| Emergency Broadcast Placard | ☐ 184.506 |

### Steering:
| | |
|---|---|
| Main Steering (Linkage/packing) | ☐ 182.610 |
| Auxiliary Steering / Tiller | ☐ 182.620 |
| Steering Test / Tiller | ☐ 176.814 |
| *If not multiple screw or duplicate system* | |

### Comments / Deficiencies explained:

### Lifesaving:
| | |
|---|---|
| Primary I./S: ☐ L/R ☐B/A ☐IBA ☐E./R | ☐ 180.200 |
| Number & Capacity: _____ | ☐ 180.200 to .208 |
| Stowage & Markings | ☐ 180.130/185.604 |
| Inflatable survival craft placard | ☐ 185.518 |
| Life Preservers: | |
| # _____ Adults # _____ Child | ☐ 180.71 |
| Lights (O/C) | ☐ 180.75 |
| Stowage & Markings | ☐ 180.78 |
| Lifejacket Donning Placard | ☐ 185.516 |
| *Ensure Placard matches LJ onboard.* | |
| Ring Buoys: | |
| # _____ w/light(s) # _____ w/ line(s) | ☐ 180.70 |
| Lanyard w/ detachable clip | ☐ 180.70-d.3 |
| Retro-reflective Tape | ☐ 185.604 |
| Distress Signals *(bright W/T container / marked)* | ☐ 185.614 |
| First Aid Kit *(contents per 160.041/LQ spec)* | ☐ 184.710/160.041 |
| Sound device: Horn/Bell (>39.4) | ☐ COLREG/33/86 |
| EPIRB 406 ☐ Battery ☐ Hydro ☐NOAA Reg. | ☐ 180.64/185.728/.740 |
| EPIRB test: ☐ | |
| ID#: _____ Date: _____ | |
| Rescue Boat (>65 feet) | ☐ 180.210 |

### Emergency Preparedness:
| | |
|---|---|
| Drills Witnessed by MI: ☐ FF ☐MOB ☐Steering | |
| Voyage Plan (O/C or overnight / where filed?) | ☐ 185.503 |
| Passenger Count (if plan not req. / Available?) | ☐ 185.504 |
| Passenger Safety Orientation | ☐ 185.506 |
| Station Bill (> 4 crew, 65 feet) | ☐ 185.514 |

### Accommodations:
| | |
|---|---|
| Berthing | ☐ 177.810 |
| Seating | ☐ 177.820 |
| Public Address System | ☐ 184.610 |
| Heating & Cooking | ☐ 184.200 |
| Means of Escape (Marked & Clear) | ☐ 177.500 |
| Upper Deck Pax Limit marking *(per Stab. ltr.)* | ☐ 185.602-g |
| Windows / Glass | ☐ 177.1010/.1020 |
| General Alarm (Overnight accommodations only) | ☐ 183.550 |
| Cooking / Heating (B-15 boundary installed) | ☐ 177.410.c.1 |

_____
_____
_____

CLAIMANTS' JT ID 000127 - NTSB 000127

ER 783

1B015-INSPECTION PAPERWORK-000059

Case 2:21-cv-07065-PA-MRW   Document 1-1   Filed 09/01/21   Page 2 of 4   Page ID #:50

## Firefighting:

| | |
|---|---|
| Portable Extinguishers | ☐ 181.500 |
| Service _____ Hydro¹ sat / unsat | ☐ NFPA 10 |
| Fixed Gas Fire System | ☐ 181.410/ 420 |
| Auto power ventilation / Engine Shutdown | ☐ 181.410/ 420 |
| Audible / Visual Alarm | ☐ 181.410/ 420 |
| Remote & Manual Activation | ☐ 181.410/ 420 |
| Instructions at controls & In Space | ☐ 185.612 |
| Service _____ Hydro¹ sat / unsat | ☐ 176.810,147.65 |
| Fire Pump (> 49 Pass, > 65 feet, ferry) | ☐ 181.300 |
| Fire Hose | ☐ 181.320 |
| Fire Axe (> 65 feet @ Operating Station) | ☐ 181.600 |
| Fire Bucket (< 65 feet 3) | ☐ 181.610 |
| 5 Years  Halon   12 Years   DC   12 Years | |

## Electrical:

| | |
|---|---|
| Grounding | ☐ 183.370 |
| Batteries (trays, connections, ventilation) | ☐ 183.350 |
| Lighting Emergency / Portable | ☐ 183.430/32 |
| Generators & Motors | ☐ 183.320 |
| Radio(s) fused at Main Panel | ☐ 183.392 |
| Cable & Wiring | ☐ 183.340 |
| Power / Lighting 14+ AWG | |
| Control Indicator 22+ AWG | |
| UL Boat or Marine Cable | |
| Equipment in Hazardous Areas | ☐ 183.530 |
| (Gasoline engines, tanks / Point Leakers) | |
| Distribution Panels / Switchboard | ☐ 183.330 |
| Equipment / Circuits marked | ☐ 183.220 |

## Machinery:

| | |
|---|---|
| Propulsion Engines | ☐ 182.200 |
| Dual Controls: MDE Speed, Direction, Shutdown | |
| Gauges (At Helm: RPM, Temp, Oil Press) | ☐ 182.410(b) |
| Cooling System | ☐ 182.420 |
| Fuel System | ☐ 182.435 |
| Remote Shutoff Valves | ☐ 182.455(b)(4) |
| Valve Markings | ☐ 185.608 |
| Flexible hose IAW SAE J-1942 | ☐ 182.720 |
| Strainer, Drip Pans, Screens | ☐ 182.455(b)(6) |
| Fuel Vents / Tank Bonding | ☐ 182.440(b)(4) |
| Exhaust System | ☐ 182.425 /430 |
| Fire Dampers | ☐ 182.465(h) |
| Marine Sanitation Device | ☐ 184.704 |
| Oil Pollution Prevention | ☐ 33CFR151/155 |
| Pressure Vessels (Every 5 Years >5 cubic feet) | ☐ 176.812/61.10 |
| P/V Relief Valve: | |
| Set: _____ psi _____ psi _____ psi | ☐ 54.15, 56.50-20 |
| Set: _____ psi _____ psi _____ psi | |

## Deck:

| | |
|---|---|
| Ground Tackle / Mooring | ☐ 184.300 |
| Deck Railing | ☐ 177.900 |
| Watertight Integrity | ☐ 179.360 |
| Structural Integrity | ☐ 177.300 |
| Hull Marking | |
| Draft / Loading Marks | ☐ 185.602 |
| Name / Hailing Port | ☐ 67.120-123 |
| Scuppers / Freeing Ports | ☐ 176.610 |

## Drydock / ISE :

| | |
|---|---|
| Hull Material: FRP | Steel | Alum | Wood | Wood w/ Overlay | |
| External Structural Integrity | ☐ 176.610 |
| Hull Markings | ☐ 185.602 |
| Name of Vessel / Hailing Port | ☐ 67.123 |
| Draft Marks / Loading Mark (> 65'/SOLAS) | ☐ 185.602(c) |
| (Vessel > 65' or > one deck above Main Deck) | |
| Propeller(s) # _____ | ☐ 176.610 |
| Shaft(s) (Drawn: Yes / No) | ☐ 176.670 |
| Rudder(s) (Drawn: Yes / No) | ☐ 176.610 |
| Bearing(s) (Replaced: Yes / No) <50% wear | ☐ 176.610 |
| Hull Penetrations below waterline (valves) | ☐ 179.350(c) |

| | | | |
|---|---|---|---|
| ☐ P-ME _____ | | ☐ S-ME _____ | |
| ☐ M-ME _____ | | ☐ MSD _____ | |
| ☐ Fire pump _____ | | ☐ Bilge pump _____ | |
| ☐ Bait Tank _____ | | ☐ Bait pump _____ | |
| ☐ P-GENSET _____ | | ☐ S-GENSET _____ | |
| ☐ MISC. _____ | | ☐ MISC. _____ | |

| | |
|---|---|
| Hull Penetrations, 6" above waterline | ☐ 179.350 |
| Internal Structural Integrity | ☐ 176.610(b) |
| ☐ Frames          ☐ Floors | |
| ☐ Shelves, brackets, clamps   ☐ Tank tops | |
| Collision Bulkhead (> 65', >49 Pax) | ☐ 179.310 |
| Watertight Bulkhead(s) (> 65', >49 Pax) | ☐ 179.320 |
| Bilge Piping system / pumps | ☐ 182.510/520 |
| Bilge High Level Alarms (26') | ☐ 182.530 |
| House Structural Integrity | ☐ 177.300 |
| Deck Rail | ☐ 177.900 |
| Scuppers / Freeing Ports | ☐ 176.610 |

Wood Hull

| | |
|---|---|
| Keel Bolts | ☐ NVIC 7-95 |
| Fasteners Pulled | ☐ NVIC 7-95 |

| Port / Locations | STBD / Location |
|---|---|
| 1. | 1. |
| 2. | 2. |
| 3. | 3. |
| 4. | 4. |
| 5. | 5. |
| 6. | 6. |
| 7. | 7. |
| 8. | 8. |

*Dry dock References: NVICs 7-53 Steel, 7-95 Wood, 11-80 Aluminum, 8-87 FRP*

Notes:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Updated 7/10/14                    Small Passenger Vessel-T Checklist                    Page 2 of 2

CLAIMANTS' JT ID 000128 - NTSB 000128

1B015-INSPECTION PAPERWORK-000060

FOR JD VISION

Special Pullout Feature

# United States Coast Guard
# Checklist for T-boat Inspection

I. Provide the following documents, certificates, and equipment for inspection:
   a. Certificate of Documentation or state certificate of registration (46 CFR 67-01.5)
      1. This Certificate of Documentation should have a current stamp issued by a Coast Guard documentation office. A vessel with state numbers must have a valid state certificate of registration, with numbers properly affixed to the hull.
      2. Owner's address should match address on the Certificate of Inspection.
   b. Certificate of Inspection and any amendments (46 CFR 176.01)
   c. Operator's license (46 CFR 185.10)
   d. FCC Certificate, if required (46 CFR 184.25)
   e. U.S. Coast Guard Stability Letter, if issued (46 CFR 185.12)
   f. Current rules of the road and charts for vessel's operating area (46 CFR 185.20-35)
   g. 46 CFR Subchapter T (Parts 175-187) is recommended
   h. Emergency check-off list (46 CFR 185.25-1)
II. Open all interior spaces, including forward of collision bulkhead and ventilate all spaces (46 CFR 176.25-5).
III. Have all bilges clean and dry (46 CFR 176.05-10).
IV. Pre-inspect the following equipment:
   a. Lifejackets (46 CFR 180.25-1)
      1. Squeeze kapok bags to determine if kapok has become waterlogged. Plastic bags around kapok do not have to be airtight, but airtight bags will reduce the chances of the kapok becoming water logged.
      2. Name of vessel marked on jacket (46 CFR 180.25-15)
      3. Reflective tape on both sides of jackets (46 CFR 180.25-25)
      4. Check all straps and buckles to ensure their good condition
      5. Coast Guard-approved water light must have batteries marked with date of manufacture and expiration date (46 CFR 180.25-20)
      6. Check number of lifejackets required on COI (46 CFR 180.25.5)
      7. Stack lifejackets for easy inspection
   b. Distress Signals
      1. Flares — 6 red and 6 orange, or 12 combination are required, stowed in a portable watertight container (46 CFR 180.35)
   2. Signal whistle and bell for vessels greater than 39.4 feet (Navigation rules — rule 33)
   3. Efficient sound device for vessels less than 39.4 feet (Navigation rules — rule 33)
   4. Day shapes for anchoring (Navigation rules — rule 30)
   c. Navigation lights — conduct operational test
   d. Steering — shift rudder for all operating stations, including emergency steering (46 CFR 182.30-5 and 185.20-10)
   e. Fuel shut-off valves — mark with 1-inch letters, indicating purpose of valve and arrow showing direction of operation (46 CFR 185.30-20)
   f. Magnetic compass (46 CFR 184.20)
   g. Anchor and associated gear (46 CFR 184.20)
   h. Markings—Name on stern and homeport/hailing port (46 CFR 67.13, 676.15 and 185.30-1)
   i. Ring Buoy — not less than 24 inches, watertight and 60 feet of line (46 CFR 180.30). Vessels less than 26 feet in length may use a ring buoy not less than 20 inches in diameter.
   j. Life float/buoyant apparatus, watertight and float free link (46 CFR 180.10 and 180.20)
   k. Class C EPIRB required on vessels with Great Lakes route — battery must be current (46 CFR 185.30.30 and 180.40)
   l. Nonmetallic flexible fuel hoses — acceptable by Coast Guard for intended service (46 CFR 182.20-40)
   m. Fire extinguishers (46 CFR 181.30-1(a))
      1. $CO_2$ — check hydrostatic test date on neck of bottle (good for 12 years), along with hoses and seals to ensure their good condition.
      2. Dry Chemical — check gauge and hose. Turn extinguisher upside down to ensure powder inside is free and not packed hard. Extinguishers with stainless steel shells require a hydrostatic testing every 12 years.
      3. Halon — must be inspected and approved by local OCMI for fixed system.
      4. Extinguishers to be weighed and/or serviced within the last 12 months.
   n. Both fixed and hand fire pump (46 CFR 181.10/181.10-5)
      1. Insure controls and valves to fixed pump operate properly
      2. Test fire station, inspect hose, and insure nozzle is in place

*T-BOAT INSPECTION CHECKLIST, page 10*

CLAIMANTS' JT ID 000129 - NTSB 000129

1B015-INSPECTION PAPERWORK-000061



*T-BOAT INSPECTION CHECKLIST, from page 9*

    3. Ensure hand fire pump is equipped with suction and discharge hose suitable for use in fire fighting

  o. Watertight/weathertight hatches (46 CFR 171.124)

    1. Each hatch or opening penetrating the main deck must be watertight unless it has a 12-inch coaming.

    2. Check watertightness of hatch, using a garden hose with 30 psi minimum pressure. Hatch is watertight if only minor seepage occurs.

    3. Ensure all hatches are fitted with securing devices in addition to the captive chain or wire; i.e., toggles on hatches.

V. Conduct operational checks of the following equipment:
  a. Radios
  b. Radar, fathometer, LORAN
  c. Propulsion engines
  d. Generators (46 CFR 182.25)
  e. Bilge pumps
  f. Pressure vessel (air receiver) relief valves

VI. Pressure vessels must be opened for examination or hydroed to 1-1/4 times their MAWP triennially.

VII. Rails and guards should be checked to ensure they are properly secured and are of height for primary service of vessel (46 CFR 177.36-1).

VIII. At the beginning of the inspection, notify the inspector of any of the following:
  a. Changes in machinery
  b. Changes in navigation equipment (plus new make, model, and serial number)
  c. Repairs to vessel
  d. Changes in owner/operator
  e. Problems or known deficiencies of vessel

IX. Drydock inspection: If the vessel operates solely in fresh water, drydocking is required after 60 months (5 years). If the vessel is operated fewer than 6 months in each 12-month period, the vessel must be drydocked after 36 months. Extensions to scheduled drydock inspections may be granted on a case-by-case basis. All requests must be submitted in writing at least 30 days in advance.

X. If a drydock inspection will be conducted (46 CFR 176.15)
  a. Ensure hull (exterior) is clean, but not freshly painted.
  b. Open all interior spaces and ventilate.
  c. Ensure bilges are clean and dry
  d. All skin valves shall be open for inspection, including check valves.
  e. Remove all screens/strainers from exterior of hull
  f. Wooden vessels over ten years old should be prepared to pull fastenings, as directed by the inspector. Keep in mind that the vessel operator is responsible for ensuring that a vessel is in compliance with the regulations at all times, not just prior to or during a scheduled Coast Guard inspection.

*This checklist was prepared by personnel from the Coast Guard Marine Safety Office, Buffalo, New York, as part of the MSO Newsletter of 25 December 1990. To comment or to be placed on the mailing list for future copies of the MSO mailing list, write to: U.S. Coast Guard, Marine Safety Office, Federal Building, Room 1111, 111 West Huron Street, Buffalo, NY 14202-2395.*

## Insurance News from Marsh & McLennan

*Editor's Note: At the board of directors meeting held in January, 1990, Marsh & McLennan, Inc., and The St. Paul Companies, Inc., received the continued endorsement as NAPVO's insurance broker and provider, respectively. Marsh & McLennan, Inc., plans to contribute regular articles to the Foghorn, beginning with this issue.*

To: NAPVO Members

From: Smith McGehee, Senior Vice President, Marsh & McLennan, Inc.

Subject: News From NAPVO Insurance Center

Marsh & McLennan, Inc., (MMI) and The St. Paul Companies, Inc., are excited to have received continued endorsement by the NAPVO insurance program committee. There are many changes planned for the insurance program, and they are all designed to give further benefits to the Association and its members. A few of the changes currently in process are:
- revised policy form
- continued competitive pricing of products
- dedicated claims service operation
- dedicated loss control service
- increased participation in regional activities
- continued profit sharing agreement
- royalty agreement with the Association
- timely turn-around on policy issuance, invoicing, certificates, claim handling, and other day-to-day servicing
- The St. Paul Companies, Inc. — Corporate Systems — MMI will develop a network for claims tracking
- newsworthy articles in every issue of *Foghorn*
- increase in NAPVO membership by coordinated effort to identify qualified passenger vessel owners.

To fulfill its commitments, MMI will employ highly-skilled professionals in the NAPVO Insurance Center, who will, over the next four to six months, make personal contact with NAPVO members — and when possible, attempt to visit them personally — to discuss the benefits of these new program features. ∎

CLAIMANTS' JT ID 000130 - NTSB 000130
1B015-INSPECTION PAPERWORK-000062

1  [PLAINTIFFS' COUNSEL ARE LISTED ON THE SIGNATURE BLOCK]

2

3  # UNITED STATES DISTRICT COURT

4  ## CENTRAL DISTRICT OF CALIFORNIA

5

6  NANCY FIEDLER, Personal Representative of the Estate of LISA FIEDLER (Deceased); MATTHEW GUINEY, Personal Representative of the Estate of MARYBETH GUINEY (Deceased); OLGA FAYNSHTEYN, Personal Representative of the Estate of YULIYA KRASHENNAYA (Deceased); KATIE OSBORNE, Personal Representative of the Estate of DANIEL GARCIA (Deceased); CHRISTINA QUITASOL, Personal Representative of the Estate of MICHAEL QUITASOL (Deceased); SARMA WILLIAMS, Personal Representative of the Estate of VAIDEHI DEVI CAMPBELL WILLIAMS (Deceased); CHRISTINE ALEXANDRA DIGNAM, Personal Representative of the Estate of JUSTIN DIGNAM (Deceased); JASMINE LORD, Personal Representative of the Estate of CHARLES McILVAIN (Deceased); VICTORIA E. MOORE, Personal Representative of the Estates of RAYMOND SCOTT CHAN (Deceased) and KENDRA CHAN (Deceased); YUKA OHASHI MERRITT, Personal Representative of the Estate of YUKO HATANO (Deceased); VIKRAM SINGH, Personal Representative of the Estate of SUNIL SINGH SANDHU (Deceased); NINA HUTTEGGER, Personal Representative of the Estate of JUHA-PEKKA AHOPELTO (Deceased);

Case No. CV-21-7065 PA

**NOTICE OF APPEAL**
FRAP 4

---

NOTICE OF APPEAL                    CV-21-7065 PA          1

1  YADIRA ALVAREZ, Personal
2  Representative of the Estate of
   BERENICE FELIPE (Deceased);
3  SEJAY TAN, Personal Representative
   of the Estate of WEI TAN (Deceased);
4  ERIC BALTZ, Personal Representative
5  of the Estate of NEAL BALTZ
   (Deceased); ANTHONY
6  BEITZINGER, Personal Representative
7  of the Estate of PATRICIA
   BEITZINGER (Deceased); SHRUTI
8  DEOPUJARI, Personal Representative
   of the Estate of SANJEERI
9  DEOPUJARI (Deceased); ATLEE
10 FRITZ, Personal
   Representative of the Estate of
11 ANDREW FRITZ (Deceased); SEEMA
12 SHARMA, Personal
   Representative of the Estate of
13 KAUSTUBH NIRMAL (Deceased);
14 MARGARET STROM, Personal
   representative of the Estate of TED
15 STROM (Deceased); RICHARD X.
   LIU, Personal Representative of the
16 Estate of XIANG LIN; SUSANA
17 SOLANO ROSAS, Personal
   Representative of the Estates of
18 EVANMICHEL SOLANO QUITASOL
   (Deceased), ANGELA ROSE SOLANO
19 QUITASOL (Deceased), and NICOLE
20 SOLANO QUITASOL (Deceased);
   ARIEL TAKVAM, Personal
21 Representative of the Estate of
22 KRISTIAN TAKVAM (Deceased);
   DOMINIC MICAEL SELGA, Personal
23 Representative of the Estate of
   FERNISA JUNE SISON (Deceased);
24 ROBERT KURTZ and CHERIE
25 MCDONOUGH, Personal
   Representatives of the Estate of
26 ALEXANDRA HALEY KURTZ;
27 JEAN ANNE ALLEN as Executor of
   the Estate of STEVEN JOHN SALIKA,
28 Executor of the Estate OF CAROL

NOTICE OF APPEAL                    CV-21-7065 PA          2

Case 2:21-cv-07065-PA-MRW   Document 112   Filed 08/14/24   Page 3 of 9   Page ID
#:1977

1  DIANA ADAMIC and Administrator of
   the Estate of TIA NICOLE ADAMIC
2  SALIKA; JAMES ADAMIC,
3  individually and as beneficiary of the
   Estate of CAROL DIANA ADAMIC
4  (Deceased); ANGELIKA ADAMIC,
   individually and as beneficiary of the
5  Estate of CAROL DIANA ADAMIC
6  (Deceased); MARK ADAMIC,
   individually and as beneficiary of the
7  Estate of CAROL DIANA ADAMIC
8  (Deceased); SHIRLEY SALIKA,
   individually, and as beneficiary of the
9  Estate of STEVEN JOHN SALIKA
10 (Deceased) and TIA NICOLE SALIKA
   (Deceased); DANIEL POH-HOCK
11 CHUA, Personal Representative of the
   Estate of KRISTINA OLINE FINSTAD
12 (Deceased), and RYAN SIMS,
13 individually.

14                           Plaintiffs,
                 v.
15
   UNITED STATES OF AMERICA,
16
                             Defendant.
17

18

19

20
       **NOTICE IS HEREBY GIVEN** that Plaintiffs listed in the above caption
21

22 hereby appeal to the United States Court of Appeals for the Ninth Circuit from the

23 Order entered in this action on August 1, 2024 (*ECF No. 110*) and the Court's

24
   Judgment of Dismissal entered in this action on August 1, 2024 (*ECF No. 111*) by
25

26 which this Court granted Defendant UNITED STATES OF AMERICA'S Motion to

27 Dismiss (*ECF No. 88*).

28

   NOTICE OF APPEAL                                    CV-21-7065 PA          3

Case 2:21-cv-07065-PA-MRW    Document 112    Filed 08/14/24    Page 4 of 9    Page ID
#:1978

1

2    Dated: August 14, 2025

3

4    **MCGUINN HILLSMAN AND PALEFSKY**

5    */s/John R. Hillsman*
6    JOHN R. HILLSMAN
     535 Pacific Avenue Suite 100
7    San Francisco, CA 94133
8    415-421-9292
     Email: jrhillsman@mhpsf.com
9

10   Counsel for: Victoria Ellen Moore, Estates of Raymond Scott Chan and Kendra
     Chan; Christine Dignam, Estate of Justin Dignam; Jasmine Lord, Estate of
11   Charles McIllvain; Yuka Hatashi Merritt, Estate of Yuko Hatano; and Viikram
12   Singh, Estate of Sunil Singh Sandhu.

13

14   **NELSON & FRAENKEL, LLP**

15   */s/Carlos F. Llinás Negret*
16   Gretchen M. Nelson
     Carlos F. Llinás Negret
17   601 South Figueroa Street, Suite 2050
18   Los Angeles, CA 90017
     844-622-6469
19   cllinas@nflawfirm.com

20   Counsel for: Cheng Leng Tan, Estate of Wei Tan, Chik Ping Yap, Sejay Tan,
21   Yadira Alvarez, Estate of Berenice Felipe, Nina Huttegger, Julia Ahopelto,
22   C.A. (a minor), Jean Anne Allen, Estate of Carol Diana Adamic, Estate of
     Steven John Salika, Estate of Tia Nicole Adamic Salika, Shirley Salika, James
23   Adamic.

24
                    -and co-counsel for Nina Huttegger and Julia Ahopelto-
25

26

27

28

NOTICE OF APPEAL                                    CV-21-7065 PA          4

Case 2:21-cv-07065-PA-MRW    Document 112    Filed 08/14/24    Page 5 of 9    Page ID
#:1979

**GREENE, BROILLET & WHEELER**

*/s/ Daniel O. Rose*
Daniel O. Rose
222 North Pacific Coast Highway, Suite 2100
El Segundo, CA 90245
310- 576-1200
Avamge;der@gbw.law

**SALTZ MONGELUZZI AND BENDESKY PC**

*/s/ Jeffrey P. Goodman*
Jeffrey P Goodman (Pro Hac Vice)
Ernest D. DiSandro, Jr. (Pro Hac Vice)
1650 Market Street 52nd Floor
Philadelphia, PA 19103
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
jgoodman@smbb.com

**PANISH SHEA AND BOYLE LLP**

*/s/Robert Samuel Glassman*
Robert Samuel Glassman
11111 Santa Monica Boulevard Suite 700
Los Angeles, CA 90025
310-477-1700
glassman@psblaw.com

Counsel for: Mathew Guiney, Shruti Deopuraji, Robert Kurtz, Cherie
McDonough, Kaustubh Nirmal, Gregory Krashenny, Seema Sharma, Cherie
McDonough, Anthony Beitzinger, Henry Garcia, Margaret Strom, Eric Baltz,
Atlee Fritz.

NOTICE OF APPEAL                                    CV-21-7065 PA          5

**ER 791**

1
2

**GALINE FRYE FITTING AND FRANGOS**

3
4

*/s/Ilya Demetrios Frangos*
ILYA DEMETRIOS FRANGOS
411 Borel Avenue Suite 500

5

San Mateo, CA 94402

6

650-345-8484
ifrangos@gff-law.com

7
8

Counsel for: Richard X. Liu, Estate of Xiang Lin.

9

10

**SCHUERING ZIMMERMAN AND DOYLE LLP**

11
12

*/s/Theodore Derk Poppinga*
Theodore Derk Poppinga

13

Robert Harry Zimmerman

14

400 University Avenue
Sacramento, CA 95825

15

916-567-0400
tdp@szs.com

16
17

Counsel for: Susana Solano Rosas.

18

19

**FIORE ACHERMANN ALC**

20
21

*/s/Jennifer L Fiore*
Jennifer L Fiore

22

Sophia M Acherman
340 Pine Street Suite 503

23

San Francisco, CA 94104

24

415-550-0650
jennifer@thefafirm.com

25
26

Counsel for: Ariel Takvam, Kenneth Takvam, Mary R. Takvam, Mark Adamic,
Angelika Adamic.

27
28

NOTICE OF APPEAL                                      CV-21-7065 PA          6

Case 2:21-cv-07065-PA-MRW    Document 112    Filed 08/14/24    Page 7 of 9    Page ID
#:1981

1

2    **WALKUP MELODIA KELLY WECHT AND SCHOENBERGER**

3    */s/Matthew D Davis*
     Matthew D Davis
4    650 California Street, 26th Floor
5    San Francisco, CA 94108
     415-981-7210
6    dsaeltzer@walkuplawoffice.com
7
8    Counsel for: Christina Quitasol, Katie Osborne, Olga Faynshteyn, Sarma
     Williams, Nancy Fiedler, Mathew Guiney.
9

10   **LAW OFFICE OF W RUSSELL FIELDS**
11
12   */s/Aurelio Edward Fields*
     Aurelio Edward Fields
13   1792 Tribute Road Suite 400
14   Sacramento, CA 95815
     916-646-6100
15   ed@russfieldslaw.com
16
     Counsel for: Dominic Micael Selga, Estate of Fernisa June Sison, Nisa
17   Shinagawa.
18

19   **ARNOLD AND ITKIN LLP**
20
     */s/Cory Itkin*
21   Cory Itkin
     Roland T Christensen
22   6009 Memorial Drive
23   Houston, TX 77007
     713-222-3800
24   citkin@arnolditkin.com
25                                    -    and co-counsel-
26
27
28

NOTICE OF APPEAL                              CV-21-7065 PA        7

**GREENE, BROILLET & WHEELER, LLP**
*/s/ Alan Van Gelder*
Alan Van Gelder
222 North Pacific Coast Highway, Suite 2100
El Segundo, CA 90245
310-576-1200
avangelder@gbw.law

Counsel for: Ryan Sims.

**LAW OFFICES OF TODD M. ABOTT**

*/s/ Todd M. Abbott*
Todd M. Abbott, Esquire
2127 Olympic Parkway, Suite 1006, Number 348
Chula Vista, California 91915
tmabbottlaw@gmail.com

Counsel for: Daniel Poh-Hock Chua; Estate of Kristen Findstad.

**Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other

signatories listed and on whose behalf the filing is submitted, concur in the content

of the filing and have authorized the filing.

Dated: August 14, 2024

McGUINN, HILLSMAN & PALEFSKY

By: _____
JOHN R. HILLSMAN

Attorneys for Plaintiffs

NOTICE OF APPEAL                                    CV-21-7065 PA          8

Case 2:21-cv-07065-PA-MRW    Document 112    Filed 08/14/24    Page 9 of 9    Page ID #:1983

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing document was duly served upon the following counsel via electronic service on the date indicated below:

      ERIC KAUFMAN-COHEN
      Attorney in Charge, West Coast Filed Office
      Aviation, Space & Admiralty Litigation
      Torts Branch, Civil Division
      U.S. Department of Justice

      via e-mail: eric.kaufman-cohen@usdoj.gov

Dated: August 15, 2024

                   McGUINN, HILLSMAN & PALEFSKY

                   By:

                          JOHN R. HILLSMAN

                   Attorneys for Plaintiffs

NOTICE OF APPEAL                              CV-21-7065 PA            9

**ER 795**

CM/ECF - California Central District

ACCO,(MRWx),APPEAL, CONSOLTR,DISCOVERY,LEADTR,MANADR,PROTORD,RELATED-G,STAYED

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:21-cv-07065-PA-MRW

Nancy Fiedler et al v. United States of America
Assigned to: Judge Percy Anderson
Referred to: Magistrate Judge Michael R. Wilner
Related Case: 2:19-cv-07693-PA-MRW
Case in other court: 9th CCA, 24-05064
Cause: 28:1333 Admiralty

Date Filed: 09/01/2021
Date Terminated: 08/01/2024
Jury Demand: None
Nature of Suit: 340 Marine
Jurisdiction: U.S. Government Defendant

### Plaintiff

**Nancy Fiedler**
*Personal Representative of the Estate of*
*Lisa Fiedler (Deceased)*

represented by **Daniel O. Rose**
Kreindler and Kreindler LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
212-973-3414
Fax: 212-972-9432
Email: drose@kreindler.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
Kreindler and Kreindler LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
212-973-3490
Fax: 212-972-9432
Email: kmahoney@kreindler.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
Walkup Melodia Kelly and Schoenberger
650 California Street 26th Floor
San Francisco, CA 94108
415-981-7210
Fax: 415-391-6965
Email: mdavis@walkuplawoffice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
Nelson and Fraenkel LLP
601 South Figueroa Street, Suite 2050
Los Angeles, CA 90017
213-943-6089

**ER 796**

CM/ECF - California Central District

Fax: 213-622-6019
Email: gnelson@nflawfirm.com
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
McGuinn Hillsman and Palefsky
535 Pacific Avenue Suite 100
San Francisco, CA 94133
415-421-9292
Fax: 415-403-0202
Email: jrhillsman@mhpsf.com
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
Nelson and Fraenkel LLP
601 South Figueroa Street Suite 2050
Los Angeles, CA 90017
844-622-6469
Fax: 213-622-6019
Email: cllinas@nflawfirm.com
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Matthew Guiney**
*Personal Representative of the Estate of*
*Marybeth Guiney (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

## Plaintiff

**ER 797**

**Olga Faynshteyn**
*Personal Representative of the Estate of*
*Yuliya Krashennaya (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Katie Osborne**
*Personal Representative of the Estate of*
*Daniel Garcia (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christina Quitasol**
*Personal Representative of the Estate of*
*Michael Quitasol (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sarma Williams**
*Personal Representative of the Estate of*
*Vaidehi Devi Campbell Williams (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew D Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**

(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Christine Alexandra Dignam**
*Personal Representative of the Estate of*
*Justin Dignam (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Jasmine Lord**
*Personal Representative of the Estate of*
*Charles McIlvain (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Victoria E. Moore**
*Personal Representative of the Estates of*
*Raymond Scott Chan (Deceased) and*
*Kendra Chan (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Yuka Ohashi Merritt**
*Personal Representative of the Estate of*
*Yuko Hatano (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Vikram Singh**
*Personal Representative of the Estate of*
*Sunil Singh Sandhu (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Nina Huttegger**
*Personal Representative of the Estate of*
*Juha-Pekka Ahopelto (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Carlos Felipe Llinas Negret**
Nelson and Fraenkel LLP
601 South Figueroa Street Suite 2050
Los Angeles, CA 90017
844-622-6469
Fax: 213-622-6019
Email: cllinas@nflawfirm.com
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Yadira Alvarez**
*Personal Representative of the Estate of*
*Berenice Felipe (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Sejay Tan**
*Personal Representative of the Estate of Wei*
*Tan (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ER 803**

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Eric Baltz**
*Personal Representative of the Estate of*
*Neal Baltz (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
Panish Shea and Boyle LLP
11111 Santa Monica Boulevard Suite 700
Los Angeles, CA 90025
310-477-1700
Fax: 310-477-1699
Email: rglassman@psbr.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
Saltz Mongeluzzi and Bendesky PC
1 Liberty Place
1650 Market Street 52nd Floor
Philadelphia, PA 19103
215-496-8282
Fax: 215-496-0999
Email: ddisandro@smbb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
Saltz Mongeluzzi and Bendesky PC
1 Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
215-496-8282
Fax: 215-496-0999
Email: jgoodman@smbb.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Beitzinger**
*Personal Representative of the Estate of*
*Patricia Beitzinger (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shruti Deopujari**
*Personal Representative of the Estate of*

represented by **Daniel O. Rose**
(See above for address)

*Sanjeeri Deopujari (Deceased)*

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Atlee Fritz**
*Personal Representative of the Estate of*
*Andrew Fritz (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Ernest D. DiSandro , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Seema Sharma**
*Personal Representative of the Estate of*
*Kaustubh Nirmal (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ER 807**

CM/ECF - California Central District

          **John Ralph Hillsman**
          (See above for address)
          *ATTORNEY TO BE NOTICED*

          **Carlos Felipe Llinas Negret**
          (See above for address)
          *ATTORNEY TO BE NOTICED*

### Plaintiff

**Margaret Strom**
*Personal Representative of the Estate of Ted Strom (Deceased)*

represented by **Daniel O. Rose**
          (See above for address)
          *LEAD ATTORNEY*
          *PRO HAC VICE*
          *ATTORNEY TO BE NOTICED*

          **Kevin John Mahoney**
          (See above for address)
          *LEAD ATTORNEY*
          *PRO HAC VICE*
          *ATTORNEY TO BE NOTICED*

          **Robert Samuel Glassman**
          (See above for address)
          *LEAD ATTORNEY*
          *ATTORNEY TO BE NOTICED*

          **Ernest D. DiSandro , Jr.**
          (See above for address)
          *PRO HAC VICE*
          *ATTORNEY TO BE NOTICED*

          **Gretchen M. Nelson**
          (See above for address)
          *ATTORNEY TO BE NOTICED*

          **Jeffrey P. Goodman**
          (See above for address)
          *PRO HAC VICE*
          *ATTORNEY TO BE NOTICED*

          **John Ralph Hillsman**
          (See above for address)
          *ATTORNEY TO BE NOTICED*

          **Carlos Felipe Llinas Negret**
          (See above for address)
          *ATTORNEY TO BE NOTICED*

### Plaintiff

**Richard X. Liu**
*Personal Representative of the Estate of Xiang Lin (Deceased)*

represented by **Daniel O. Rose**
          (See above for address)
          *LEAD ATTORNEY*
          *PRO HAC VICE*

**ER 808**

CM/ECF - California Central District

*ATTORNEY TO BE NOTICED*

**Ilya Demetrios Frangos**
Galine Frye Fitting and Frangos
411 Borel Avenue Suite 500
San Mateo, CA 94402
650-345-8484
Email: ifrangos@gff-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Susana Solano Rosas**
*Personal Representative of the Estates of
Evanmichel Solano Quitasol (Deceased),
Angela Rose Solano Quitasol (Deceased),
and Nicole Solano Quitasol (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore Derk Poppinga**
Schuering Zimmerman and Doyle LLP
400 University Avenue
Sacramento, CA 95825
916-567-0400
Fax: 916-568-0400
Email: tdp@szs.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)

*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Harry Zimmerman**
Schuering Zimmerman and Doyle
400 University Avenue
Sacramento, CA 95825
916-567-0400
Fax: 916-568-0400
Email: ksb@zimmlaw.net
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ariel Takvam**
*Personal Representative of the Estate of*
*Kristian Takvam (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L Fiore**
Fiore Achermann
605 Market Street Suite 1103
San Francisco, CA 94105
415-550-0650
Email: jennifer@thefafirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ER 810**

CM/ECF - California Central District

**Dominic Micael Selga**
*Personal Representative of the Estate of*
*Fernisa June Sison (Deceased)*

represented by **Aurelio Edward Fields**
Law Office of W Russell Fields
1792 Tribute Road Suite 400
Sacramento, CA 95815
916-646-6100
Fax: 916-646-8769
Email: ed@russfieldslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Kurtz**
*Personal Representative of the Estate of*
*Alexandra Haley Kurtz (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
(See above for address)

**ER 811**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cherie McDonough**
*Personal Representative of the Estate of*
*Alexandra Haley Kurtz (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Samuel Glassman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ernest D. DiSandro , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. Goodman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**Jean Anne Allen**
*as Executor of the Estate of Steven John Salika, Executor of the Estate of Carol Diana Adamic and Administrator of the Estate of Tia Nicole Adamic Salika*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

#### Plaintiff

**James Adamic**
*individually and as beneficiary of the Estate of Carol Diana Adamic (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

CM/ECF - California Central District

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Angelika Adamic**
*individually and as beneficiary of the Estate*
*of Carol Diana Adamic (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L Fiore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Mark Adamic**
*individually and as beneficiary of the Estate*
*of Carol Diana Adamic (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer L Fiore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)

**ER 814**

*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Shirley Salika**
*individually and as beneficiary of the Estate
of Steven John Salika (Deceased) and Tia
Nicole Salika (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Daniel Poh-Hock Chua**
*Personal Representative of the Estate of
Kristina Oline Finstad (Deceased)*

represented by **Daniel O. Rose**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd M Abbott**
Abbott and Abbott Law
2127 Olympic Parkway
Suite 1006 - 348
Chula Vista, CA 91915

ER 815

CM/ECF - California Central District

760-494-1400
Email: tmabbottlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ryan Sims**                          represented by **Daniel O. Rose**
*individually*                                         (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

**Kevin John Mahoney**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roland T. Christensen**
Arnold and Itkin LLP
6009 Memorial Drive
Houston, TX 77007
713-222-3800
Fax: 713-222-3850
Email: rchristensen@arnolditkin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Lawrence Van Gelder**
Greene Broillet and Wheeler, LLP
222 North Pacific Coast Highway Suite
2100
PO Box 955
El Segundo, CA 90245
310-576-1200
Fax: 310-576-1220
Email: avangelder@gbw.law
*ATTORNEY TO BE NOTICED*

**Alexandra Poulson**
Arnold and Itkin LLP
6009 Memorial Drive

Houston, TX 77007
713-222-3800
Fax: 713-222-3850
Email: apoulson@arnolditkin.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cory D. Itkin**
Arnold and Itkin LLP
6009 Memorial Drive
Houston, TX 77007
713-222-3800
Fax: 713-222-3850
Email: citkin@arnolditkin.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gretchen M. Nelson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Ralph Hillsman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carlos Felipe Llinas Negret**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States of America**                 represented by **Eric J Kaufman-Cohen**
US Department of Justice
Torts Branch Civil Division
450 Golden Gate Avenue Room 7-5395
P O Box 36028
San Francisco, CA 94102-3463
415-436-6648
Fax: 415 436 6632
Email: eric.kaufman-cohen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frank J Anders**
US Department of Justice
Torts Branch - Civil Division
450 Golden Gate Avenue, 7th Floor, Room 5395
P.O. Box 36028
San Francisco, CA 94102
415-436-6644
Fax: 415-436-6632

1/3/25, 3:41 PM

CM/ECF - California Central District

Email: franklin.j.anders@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kyle Fralick**
U.S. Department of Justice
Torts Branch, Civil Division
450 Golden Gate Avenue 7th Floor Room 5395
PO Box 36028
San Francisco, CA 94102-3463
415-436-6647
Fax: 415-436-6632
Email: kyle.fralick@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Scott Perrygo**
U.S. Department of Justice
Torts Branch, Civil Division
450 Golden Gate Avenue 7th Floor Room 5395
P.O. Box 36028
San Francisco, CA 94102-3463
415-436-6648
Fax: 415-436-6632
Email: scott.perrygo@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/01/2021 | 1 | COMPLAINT Receipt No: ACACDC-31914671 - Fee: $402, filed by Plaintiffs Estate of PATRICIA BEITZINGER, Anthony Beitzinger, DANIEL POH-HOCK CHUA, Estate of YUKO HATANO, Katie Osborne, Yadira Alvarez, Estate of RAYMOND SCOTT CHAN, Estate of CHARLES McILVAIN, SUSANA SOLANO ROSAS, Jean Anne Allen, Estate of Berenice Felipe, Estate of Carol Diana Adamic, Mark Adamic, YUKA OHASHI MERRITT, Estate of MICHAEL QUITASOL, Estate of NEAL BALTZ, Estate of SANJEERI DEOPUJARI, Sarma Williams, ARIEL TAKVAM, Ryan Sims, Estate of Wei Tan, Dominic Micael Selga, Estate of KAUSTUBH NIRMAL, Estate of KRISTINA OLINE FINSTAD, Estate of VAIDEHI DEVI CAMPBELL WILLIAMS, Estate of Tia Nicole Adamic Salika, Estate of TED STROM, Jasmine Lord, ROBERT KURTZ, ANGELIKA ADAMIC, Estate of Steven John Salika, Estate of EVANMICHEL SOLANO QUITASOL, Estate of KENDRA CHAN, Shirley Salika, Estate of ALEXANDRA HALEY KURTZ, Estate of LISA FIEDLER, VICTORIA E. MOORE, Nancy Fiedler, Eric Baltz, Estate of JUHA-PEKKA AHOPELTO, Sejay Tan, Margaret Strom, Estate of JUSTIN DIGNAM, James E. Adamic, Estate of KRISTIAN TAKVAM, Nina Huttegger, Cherie McDonough, RICHARD X. LIU, VIKRAM SINGH, Estate of ANGELA ROSE SOLANO QUITASOL, Estate of SUNIL SINGH SANDHU, CHRISTINE ALEXANDRA DIGNAM, Estate of YULIYA KRASHENNAYA, Atlee Fritz, Matthew Guiney, Estate of FERNISA JUNE SISON, Christina Quitasol, Estate of NICOLE SOLANO QUITASOL, Estate of Daniel Garcia, Seema Sharma, Estate of MARYBETH GUINEY, SHRUTI DEOPUJARI, Estate of ANDREW FRITZ, Estate of XIANG LIN, Olga Faynshteyn. (Attachments: # 1 Ex A to Complaint) (Attorney Carlos Felipe Llinas Negret added to party ANGELIKA ADAMIC(pty:pla), Attorney Carlos Felipe Llinas Negret added to party James E. Adamic(pty:pla), Attorney Carlos Felipe |

**ER 818**

Llinas Negret added to party Mark Adamic(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Jean Anne Allen(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Yadira Alvarez(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Eric Baltz(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Anthony Beitzinger(pty:pla), Attorney Carlos Felipe Llinas Negret added to party SHRUTI DEOPUJARI(pty:pla), Attorney Carlos Felipe Llinas Negret added to party CHRISTINE ALEXANDRA DIGNAM(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of EVANMICHEL SOLANO QUITASOL (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of ALEXANDRA HALEY KURTZ(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of ANDREW FRITZ (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of ANGELA ROSE SOLANO QUITASOL (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Berenice Felipe(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of CHARLES McILVAIN (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Carol Diana Adamic(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Daniel Garcia(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of FERNISA JUNE SISON(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of JUHA-PEKKA AHOPELTO (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of JUSTIN DIGNAM(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of KAUSTUBH NIRMAL(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of KENDRA CHAN (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of KRISTIAN TAKVAM(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of KRISTINA OLINE FINSTAD (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of LISA FIEDLER(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of MARYBETH GUINEY (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of MICHAEL QUITASOL (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of NEAL BALTZ (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of NICOLE SOLANO QUITASOL (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of PATRICIA BEITZINGER(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of RAYMOND SCOTT CHAN(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of SANJEERI DEOPUJARI (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of SUNIL SINGH SANDHU (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Steven John Salika(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of TED STROM (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Tia Nicole Adamic Salika(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of VAIDEHI DEVI CAMPBELL WILLIAMS (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of Wei Tan(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of XIANG LIN(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of YUKO HATANO (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Estate of YULIYA KRASHENNAYA(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Olga Faynshteyn(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Nancy Fiedler(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Atlee Fritz(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Matthew Guincy(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Nina Huttegger(pty:pla), Attorney Carlos Felipe Llinas Negret added to party ROBERT KURTZ (pty:pla), Attorney Carlos Felipe Llinas Negret added to party RICHARD X. LIU(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Jasmine Lord(pty:pla), Attorney Carlos Felipe Llinas Negret added to party YUKA OHASHI MERRITT(pty:pla), Attorney Carlos Felipe Llinas Negret added to party VICTORIA E. MOORE(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Cherie McDonough(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Katie Osborne(pty:pla), Attorney Carlos Felipe Llinas Negret added to party DANIEL POH-

         

|  |  |  |
|---|---|---|
|  |  | HOCK CHUA(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Christina Quitasol(pty:pla), Attorney Carlos Felipe Llinas Negret added to party VIKRAM SINGH(pty:pla), Attorney Carlos Felipe Llinas Negret added to party SUSANA SOLANO ROSAS(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Shirley Salika(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Dominic Micael Selga(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Seema Sharma(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Ryan Sims(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Margaret Strom(pty:pla), Attorney Carlos Felipe Llinas Negret added to party ARIEL TAKVAM(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Sejay Tan (pty:pla), Attorney Carlos Felipe Llinas Negret added to party Sarma Williams(pty:pla))(Llinas Negret, Carlos) (Entered: 09/01/2021) |
| 09/01/2021 | 2 | CIVIL COVER SHEET filed by Plaintiffs ANGELIKA ADAMIC, James E. Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, SHRUTI DEOPUJARI, CHRISTINE ALEXANDRA DIGNAM, Estate of EVANMICHEL SOLANO QUITASOL, Estate of ALEXANDRA HALEY KURTZ, Estate of ANDREW FRITZ, Estate of ANGELA ROSE SOLANO QUITASOL, Estate of Berenice Felipe, Estate of CHARLES McILVAIN, Estate of Carol Diana Adamic, Estate of Daniel Garcia, Estate of FERNISA JUNE SISON, Estate of JUHA-PEKKA AHOPELTO, Estate of JUSTIN DIGNAM, Estate of KAUSTUBH NIRMAL, Estate of KENDRA CHAN, Estate of KRISTIAN TAKVAM, Estate of KRISTINA OLINE FINSTAD, Estate of LISA FIEDLER, Estate of MARYBETH GUINEY, Estate of MICHAEL QUITASOL, Estate of NEAL BALTZ, Estate of NICOLE SOLANO QUITASOL, Estate of PATRICIA BEITZINGER, Estate of RAYMOND SCOTT CHAN, Estate of SANJEERI DEOPUJARI, Estate of SUNIL SINGH SANDHU, Estate of Steven John Salika, Estate of TED STROM, Estate of Tia Nicole Adamic Salika, Estate of VAIDEHI DEVI CAMPBELL WILLIAMS, Estate of Wei Tan, Estate of XIANG LIN, Estate of YUKO HATANO, Estate of YULIYA KRASHENNAYA, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, ROBERT KURTZ, RICHARD X. LIU, Jasmine Lord, YUKA OHASHI MERRITT, VICTORIA E. MOORE, Cherie McDonough, Katie Osborne, DANIEL POH-HOCK CHUA, Christina Quitasol, VIKRAM SINGH, SUSANA SOLANO ROSAS, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Margaret Strom, ARIEL TAKVAM, Sejay Tan, Sarma Williams. (Llinas Negret, Carlos) (Entered: 09/01/2021) |
| 09/01/2021 | 7 | [NOTICE OF CLERICAL ERROR ISSUED ON 9/2/2021, SEE ITEM NOTICE 8] NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Ernest D. DiSandro. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) Modified on 9/2/2021 (car). (Entered: 09/02/2021) |
| 09/02/2021 | 3 | NOTICE OF ASSIGNMENT to District Judge Percy Anderson and Magistrate Judge Pedro V. Castillo. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 5 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 09/02/2021) |

| 09/02/2021 | 6 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Jeffrey P Goodman. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 8 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: Pro Hac Vice Application Due (G-109) form, 7 has the wrong filed date. A Corrected Notice will be docketed with the correct date. Item 7 should be disregarded. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 9 | NOTICE of Interested Parties filed by Plaintiffs James Adamic, Jean Anne Allen, Yadira Alvarez, Sejay Tan, identifying Yadira Alvarez, Sejay Tan, Jean Allen, James Adamic, Chik Ping Yap, Cheng Leng Tan, Shirley Salika, Estate of Berenice Felipe, Estate of Wei Tan, Estate of Carol Diana Adamic, Estate of Steven John Salika, Estate of Tia Nicole Adamic Salika. (Llinas Negret, Carlos) (Entered: 09/02/2021) |
| 09/02/2021 | 10 | CORRECTED NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Ernest D. DiSandro, Jr.. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 11 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Cory Itkin. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 09/02/2021) |
| 09/02/2021 | 12 | STANDING ORDER by Judge Percy Anderson. READ THIS ORDER CAREFULLY. IT CONTROLS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES. (See document for details) (mrgo) (Entered: 09/02/2021) |
| 09/03/2021 | 13 | CERTIFICATE of Interested Parties filed by Eric Baltz - Eric Baltz, identifying Estate of Neal Baltz (Deceased); Candace Baltz, Beneficiary of the Estate of Neal Baltz (Deceased); Estate of Patricia Beitzinger (Deceased); Anthony Beitzinger; Elizabeth Beitzinger, Beneficiary of the Estate of Patricia Beitzinger (Deceased); Estate of Sanjeeri Deopujari (Deceased); Shruti Deopujari; Satish Deopujari, Beneficiary of the Estate of Sanjeeri Deopujari (Deceased); Sandhya Deopujari, Beneficiary of the Estate of Sanjeeri Deopujari (Deceased); Estate of Andrew Fritz (Deceased); Atlee Fritz; Atlee Fritz Beneficiary of the Estate of Andrew Fritz (Deceased); Linda Fritz, Beneficiary of the Estate of Andrew Fritz (Deceased); Estate of Kaustubh Nirmal (Deceased); Seema |

**ER 821**

CM/ECF - California Central District

| | | |
|---|---|---|
| | | Sharma; Patanjali Sharma, Beneficiary of the Estate of Kaustubh Nirmal (Deceased); Lakshmi Sharma, Beneficiary of the Estate of Kaustubh Nirmal (Deceased); Estate of Ted Strom (Deceased); Margaret Strom; Margaret Strom, Beneficiary of the Estate of Ted Strom (Deceased); Kestrel Strom, Beneficiary of the Estate of Ted Strom (Deceased); Pfeiffer Strom, Beneficiary of the Estate of Ted Strom (Deceased); Estate of Alexandra Haley Kurtz (Deceased); Robert Kurtz; Cherie McDonough; Gregory Krashenny, Beneficiary of the Estate of Yuliya Krashennaya (Deceased); Henry Garcia, Beneficiary of the Estate of Daniel Garcia (Deceased). (Glassman, Robert) (Entered: 09/03/2021) |
| 09/03/2021 | 14 | NOTICE of Appearance filed by attorney Theodore Derk Poppinga on behalf of Plaintiff Susana Solano Rosas (Poppinga, Theodore) (Entered: 09/03/2021) |
| 09/03/2021 | 15 | RESPONSE filed by Pro Hac Vice attorney Jeffrey P. Goodman on behalf of Plaintiffs Eric Baltz, Anthony Beitzinger, Shruti Deopujari, Atlee Fritz, Matthew Guiney, Robert Kurtz, Cherie McDonough, Seema Sharma, Margaret Strom. RE: Notice of Filing Fee Due. PHV fee N/A. Please see attached addendum to the Notice of Pro Hac Vice Application Due. (lt) (Entered: 09/03/2021) |
| 09/03/2021 | 16 | RESPONSE filed by Pro Hac Vice attorney Ernest D. DiSandro Jr. on behalf of Plaintiffs Eric Baltz, Anthony Beitzinger, Shruti Deopujari, Atlee Fritz, Matthew Guiney, Robert Kurtz, Cherie McDonough, Seema Sharma, Margaret Strom. RE: Notice of Filing Fee Due. PHV fee N/A. Please see attached addendum to the Notice of Pro Hac Vice Application Due. (lt) (Entered: 09/03/2021) |
| 09/03/2021 | 17 | **STRICKEN** APPLICATION of Non-Resident Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-31930794) filed by Plaintiff Ryan Sims. (Christensen, Roland) Modified on 9/7/2021 Per Response 19 (iv). (Entered: 09/03/2021) |
| 09/07/2021 | 18 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-31930794) 17 . The following error(s) was/were found: Local Rule 83-2.1.3.3(b) Proposed order not attached. Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. Local Rule 5-4.3.4 Application not hand-signed. Other error(s) with document(s): The attorney seeking to appear pro hac vice must complete Section 1 of this Application, personally sign, in ink, the certification in Section II, and have the designated Local Counsel sign in Section III. ELECTRONIC SIGNATURES ARE NOT ACCEPTED. See Instructions for Applicants (1) (G-64). (lt) (Entered: 09/07/2021) |
| 09/07/2021 | 19 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: Application of Non-Resident Attorney 17 by Judge Percy Anderson. The document is stricken. Application not hand-signed. Proposed order not attached. Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. (iv) (Entered: 09/07/2021) |
| 09/08/2021 | 20 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Appearance 14 . The following error(s) was/were found: Incorrect document is attached to the docket entry. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 09/08/2021) |
| 09/08/2021 | 21 | NOTICE of Interested Parties filed by Plaintiffs Christine Alexandra Dignam, identifying Christine Dignam, Jasmine Lord, Victoria Moore, Yuka Ohashi Merritt, Vikram Singh. (Hillsman, John) (Entered: 09/08/2021) |

ER 822

| 09/13/2021 | 22 | NOTICE of Interested Parties filed by Richard X. Liu, Personal Representative of the Estate of Xiang Lin Richard X. Liu, (Frangos, Ilya) (Entered: 09/13/2021) |
|---|---|---|
| 09/17/2021 | 23 | Corrected APPLICATION of Non-Resident Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32004172) filed by Plaintiff Ryan Sims. (Attachments: # 1 Proposed Order) (Christensen, Roland) (Entered: 09/17/2021) |
| 09/18/2021 | 28 | ORDER by Judge Percy Anderson: denying 23 Non-Resident Attorney Cory D. Itkin APPLICATION to Appear Pro Hac Vice on behalf of plaintiff Ryan Sims. Terming Attorney Cory D. Itkin. (mrgo) (Entered: 09/20/2021) |
| 09/20/2021 | 24 | APPLICATION of Non-Resident Attorney Ernest D. DiSandro, Jr. to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32010454) filed by Plaintiff Eric Baltz. (Attachments: # 1 Proposed Order ISO PHV Application) (Glassman, Robert) (Entered: 09/20/2021) |
| 09/20/2021 | 25 | APPLICATION of Non-Resident Attorney Jeffrey P. Goodman to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. BCACDC-32010539) filed by Plaintiff Eric Baltz. (Attachments: # 1 Proposed Order ISO PHV Application) (Glassman, Robert) (Entered: 09/20/2021) |
| 09/20/2021 | 26 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: Corrected APPLICATION of Non-Resident Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32004172) 23 . The following error(s) was/were found: Local Rule 83-2.1.3.4 Local counsel does not maintain an office within the District. (lt) (Entered: 09/20/2021) |
| 09/20/2021 | 27 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Jeffrey P. Goodman to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. BCACDC-32010539) 25 , APPLICATION of Non-Resident Attorney Ernest D. DiSandro, Jr. to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-32010454) 24 . The following error(s) was/were found: Local Rule 5-4.3.4 Application not hand-signed. Other error(s) with document(s): The attorney seeking to appear pro hac vice must complete Section I of this Application, personally sign, in ink, the certification in Section II, and have the designated Local Counsel sign in Section III. ELECTRONIC SIGNATURES ARE NOT ACCEPTED. See Instructions for Applicants (1) (G-64). (lt) (Entered: 09/20/2021) |
| 09/22/2021 | 29 | Second APPLICATION of Non-Resident Attorney Ernest D. DiSandro, Jr. to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500.00 Previously Paid on 9/20/2021, Receipt No. 32010454) filed by Plaintiff Eric Baltz. (Attachments: # 1 Proposed Order) (Glassman, Robert) (Entered: 09/22/2021) |
| 09/22/2021 | 30 | Second APPLICATION of Non-Resident Attorney Jeffrey P. Goodman to Appear Pro Hac Vice on behalf of Plaintiff Eric Baltz (Pro Hac Vice Fee - $500.00 Previously Paid on 9/20/2021, Receipt No. 32010539) filed by Plaintiff Eric Baltz. (Attachments: # 1 Proposed Order) (Glassman, Robert) (Entered: 09/22/2021) |
| 09/22/2021 | 31 | ORDER RE TRANSFER PURSUANT TO Local Rule 83-1.3.1 and General Order 21-01 -Related Case- filed. Related Case No: 2:19-cv-07693 PA(MRWx). Case referred from Magistrate Judge Pedro V. Castillo to Magistrate Judge Michael R. Wilner for Discovery. The case number will now read as follows: 2:21-cv-07065 PA(MRWx). Signed by Magistrate Judge Michael R. Wilner. (rn) (Entered: 09/22/2021) |
| 09/24/2021 | 32 | MINUTE ORDER IN CHAMBERS - COURT ORDER by Judge Percy Anderson. In both Fiedler v. United States, Case No. CV 21-7065 PA (MRWx) ("Case No. 21-7065"), |

**ER 823**

| | | and Huttegger v. United States, Case No. CV 21-7073 PA (MRWx) ("Case No. 21-7073"), the families of the victims of the fire aboard the vessel "Conception," which killed 34 people on September 2, 2019, assert claims for wrongful death, a survival action, and on behalf of Ryan Sims, a surviving member of the Conceptions crew, a claim for personal injuries. The Plaintiffs in both actions allege that the United States is liable for the plaintiffs' damages because the United States Coast Guard was negligent in inspecting and certifying the vessel. (See document for details). Huttegger's response to this Order to Show Cause shall be filed by no later than October 6, 2021. Failure to timely or adequately respond to the Order to Show Cause by that date may, without further warning, result in the dismissal of Case No. 21-7073 without prejudice. (mrgo) (Entered: 09/27/2021) |
|---|---|---|
| 09/28/2021 | 33 | ORDER by Judge Percy Anderson: granting 30 Non-Resident Attorney Jeffrey P. Goodman APPLICATION to Appear Pro Hac Vice on behalf of plaintiffs Eric Baltz, Anthony Beitzinger, Shruti Deopujari, Atlee Fritz, Seema Sharma, Margaret Strom, Robert Kurtz, and Cherie McDonough, designating Robert S. Glassman as local counsel. (mrgo) (Entered: 09/29/2021) |
| 09/28/2021 | 34 | ORDER by Judge Percy Anderson: granting 29 Non-Resident Attorney Ernest D. DiSandro, Jr. APPLICATION to Appear Pro Hac Vice on behalf of plaintiffs Eric Baltz, Anthony Beitzinger, Shruti Deopujari, Atlee Fritz, Seema Sharma, Margaret Strom, Robert Kurtz, and Cherie McDonough, designating Robert S. Glassman as local counsel. (mrgo) (Entered: 09/29/2021) |
| 10/05/2021 | 35 | REQUEST to Consolidate Cases, as to 2:21-cv-07073, filed by Plaintiff Nina Huttegger. (Llinas Negret, Carlos) (Entered: 10/05/2021) |
| 10/05/2021 | 36 | MINUTE ORDER IN CHAMBERS - COURT ORDER by Judge Percy Anderson. The Court has reviewed the Response filed by plaintiff Nina Huttegger to the Court's September 24, 2021 Order to Show Cause. Ms. Huttegger's Response requests that the Court consolidate Huttegger v. United States, Case No. CV 21-7073 PA (MRWx), with Fiedler v. United States, Case No. CV 21-7065 PA (MRWx) ("Case No. 21-7065"). The Court concludes that, pursuant to Federal Rule of Civil Procedure 42(a)(2), consolidation of the two actions is warranted. The Court therefore consolidates Case No. 21-7073 into Case No. 21-7065 and deems the documents filed to date in Case No. 21-7073 to have been filed in Case No. 21-7065. All future filings shall be filed in Case No. 21-7065. The Court administratively closes Case No. 21-7073. (mrgo) (Entered: 10/06/2021) |
| 11/15/2021 | 37 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,, 1 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Llinas Negret, Carlos) (Entered: 11/15/2021) |
| 11/16/2021 | 38 | NOTICE OF DEFICIENCIES in Request to Issue Summons RE: Summons Request,, 37. The following error(s) was found: The caption of the summons must match the caption of the complaint verbatim. If the caption is too large to fit in the space provided, enter the name of the first party and then write "see attached."Next, attach a face page of the complaint or a second page addendum to the Summons. The summons cannot be issued until this defect has been corrected. Please correct the defect and re-file your request. (mrgo) (Entered: 11/16/2021) |

| 11/16/2021 | 39 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 1 filed by Plaintiff Angelica Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Llinas Negret, Carlos) (Entered: 11/16/2021) |
|---|---|---|
| 11/17/2021 | 40 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to defendant United States of America. (mrgo) (Entered: 11/17/2021) |
| 12/01/2021 | 41 | PROOF OF SERVICE Executed by Plaintiff Anthony Beitzinger, Daniel Poh-Hock Chua, Katie Osborne, Yadira Alvarez, Victoria E. Moore, Nancy Fiedler, Eric Baltz, Susana Solano Rosas, Jean Anne Allen, Sejay Tan, Margaret Strom, Mark Adamic, Yuka Ohashi Merritt, James Adamic, Nina Huttegger, Sarma Williams, Cherie McDonough, Ariel Takvam, Richard X. Liu, Vikram Singh, Christine Alexandra Dignam, Ryan Sims, Dominic Micael Selga, Matthew Guiney, Atlee Fritz, Christina Quitasol, Jasmine Lord, Robert Kurtz, Seema Sharma, Angelika Adamic, Shruti Deopujari, Shirley Salika, Olga Faynshteyn, upon Defendant All Defendants. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Civil Process Clerk. Executed upon the Attorney Generals Office of the United States by delivering a copy to Civil Process Clerk. Executed upon the officer agency or corporation by delivering a copy to Civil Process Clerk United States Attorney's Office, Civil Process Clerk Attorney General of the United States. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration attached. Registered or certified mail return receipt attached. (Llinas Negret, Carlos) (Entered: 12/01/2021) |
| 12/01/2021 | 42 | PROOF OF SERVICE Executed by Defendant Nina Huttegger, upon Defendant United States of America served on 11/22/2021, answer due 1/21/2022. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Civil Process Clerk. Executed upon the Attorney Generals Office of the United States by unspecified means. Executed upon the officer agency or corporation by delivering a copy to Civil Process Clerk United States Attorney's Office. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration attached. Registered or certified mail return receipt attached. (Llinas Negret, Carlos) (Entered: 12/01/2021) |
| 01/04/2022 | 43 | Joint STIPULATION Extending Time to Answer the complaint as to United States of America answer now due 2/17/2022, re Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 1 filed by Plaintiffs Yadira Alvarez.(Llinas Negret, Carlos) (Entered: 01/04/2022) |
| 02/09/2022 | 44 | STRICKEN, see docket entry no. 46 - FIRST AMENDED COMPLAINT against Defendant All Defendants amending Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,,,,,,,,,, 1 , filed by Plaintiffs Anthony Beitzinger, Daniel Poh-Hock Chua, Katie Osborne, Yadira Alvarez, Victoria E. Moore, Nancy Fiedler, Eric Baltz, Susana Solano Rosas, Jean Anne Allen, Sejay Tan, Margaret Strom, Mark Adamic, Yuka Ohashi Merritt, James Adamic, Nina Huttegger, Sarma Williams, Cherie McDonough, Ariel Takvam, Richard X. Liu, Vikram Singh, Christine Alexandra Dignam, Ryan Sims, Dominic Micael Selga, Matthew Guiney, Atlee Fritz, Christina Quitasol, Jasmine Lord, Robert Kurtz, Seema Sharma, Angelika Adamic, Shruti Deopujari, Shirley Salika, Olga Faynshteyn(Attorney Carlos Felipe Llinas Negret added to party Angelika Adamic(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Mark Adamic(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Eric Baltz(pty:pla), |

Attorney Carlos Felipe Llinas Negret added to party Anthony Beitzinger(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Daniel Poh-Hock Chua(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Shruti Deopujari(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Christine Alexandra Dignam(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Olga Faynshteyn(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Nancy Fiedler(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Atlee Fritz(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Matthew Guiney(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Robert Kurtz(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Richard X. Liu(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Jasmine Lord(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Cherie McDonough(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Yuka Ohashi Merritt(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Victoria E. Moore(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Katie Osborne(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Christina Quitasol(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Susana Solano Rosas(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Dominic Micael Selga(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Seema Sharma(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Ryan Sims(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Vikram Singh(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Margaret Strom(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Ariel Takvam(pty:pla), Attorney Carlos Felipe Llinas Negret added to party Sarma Williams(pty:pla))(Llinas Negret, Carlos) Modified on 2/10/2022 (lom). (Entered: 02/09/2022)

| 02/10/2022 | 45 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: First Amended Complaint 44 . The following error(s) was/were found: F.R.Civ.P 15 Amended pleading is untimely. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lom) (Entered: 02/10/2022) |
|---|---|---|
| 02/10/2022 | 46 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: First Amended Complaint 44 by Clerk. Document is stricken. F.R.Civ.P 15 Amended pleading is untimely. (lom) (Entered: 02/10/2022) |
| 02/24/2022 | 47 | Joint STIPULATION to AMEND Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,, 1 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Exhibit 1 (First Amended Complaint), # 2 Declaration, # 3 Proposed Order)(Llinas Negret, Carlos) (Entered: 02/24/2022) |

**ER 826**

CM/ECF - California Central District

| 02/24/2022 | 48 | ORDER ON PARTIES' STIPULATION CONSENTING TO PLAINTIFFS FILING AMENDED COMPLAINT AND SEEKING TO EXTEND DEFENDANT'S DEADLINE TO FILE RESPONSIVE PLEADINGS 47 by Judge Percy Anderson. It is ORDERED:1. Plaintiffs shall have leave to file their Amended Complaint; 2. Defendant will file an answer pleading 45 days after the service of thePlaintiffs' Amended Complaint on the Attorney General and the United States'Attorney's Office, pursuant to Fed. R. Civ. P. 4(i) (1)(A). 3. Plaintiffs shall file their Amended Complaint within 7 days of the date of this Order. (lom) (Entered: 02/25/2022) |
|---|---|---|
| 02/25/2022 | 49 | FIRST AMENDED COMPLAINT against DEFENDANT All Defendants amending Complaint (Attorney Civil Case Opening),,,,,,,,,,,,,,,,,,,,,,, 1 , filed by Plaintiffs Anthony Beitzinger, Daniel Poh-Hock Chua, Katie Osborne, Yadira Alvarez, Victoria E. Moore, Nancy Fiedler, Eric Baltz, Susana Solano Rosas, Jean Anne Allen, Sejay Tan, Margaret Strom, Mark Adamic, Yuka Ohashi Merritt, James Adamic, Nina Huttegger, Sarma Williams, Cherie McDonough, Ariel Takvam, Richard X. Liu, Vikram Singh, Christine Alexandra Dignam, Ryan Sims, Dominic Micael Selga, Matthew Guiney, Atlee Fritz, Christina Quitasol, Jasmine Lord, Robert Kurtz, Seema Sharma, Angelika Adamic, Shruti Deopujari, Shirley Salika, Olga Faynshteyn(Llinas Negret, Carlos) (Entered: 02/25/2022) |
| 04/14/2022 | 50 | Request for Clerk to Issue Summons on Amended Complaint/Petition,, 49 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Llinas Negret, Carlos) (Entered: 04/14/2022) |
| 04/15/2022 | 51 | 60 DAY Summons Issued re Amended Complaint/Petition 49 as to Defendant United States of America. (iv) (Entered: 04/15/2022) |
| 06/13/2022 | 52 | PROOF OF SERVICE Executed by Plaintiff Anthony Beitzinger, Daniel Poh-Hock Chua, Katie Osborne, Yadira Alvarez, Victoria E. Moore, Nancy Fiedler, Eric Baltz, Susana Solano Rosas, Jean Anne Allen, Sejay Tan, Margaret Strom, Mark Adamic, Yuka Ohashi Merritt, James Adamic, Nina Huttegger, Sarma Williams, Cherie McDonough, Ariel Takvam, Richard X. Liu, Vikram Singh, Christine Alexandra Dignam, Ryan Sims, Dominic Micael Selga, Matthew Guiney, Atlee Fritz, Christina Quitasol, Jasmine Lord, Robert Kurtz, Seema Sharma, Angelika Adamic, Shruti Deopujari, Shirley Salika, Olga Faynshteyn, upon Defendant United States of America served on 5/23/2022, answer due 7/22/2022. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to C. Veloz. Executed upon the officer agency or corporation by unspecified means. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration attached. Registered or certified mail return receipt attached. (Llinas Negret, Carlos) (Entered: 06/13/2022) |
| 07/13/2022 | 53 | ANSWER to Amended Complaint/Petition,, 49 for Wrongful Death and Survival Damages Under the Suits in Admiralty Act filed by Defendant United States of America. (Attorney Eric J Kaufman-Cohen added to party United States of America(pty:dft)) (Kaufman-Cohen, Eric) (Entered: 07/13/2022) |
| 07/14/2022 | 54 | NOTICE of Appearance filed by attorney Scott Perrygo on behalf of Defendant United States of America (Attorney Scott Perrygo added to party United States of America(pty:dft))(Perrygo, Scott) (Entered: 07/14/2022) |

ER 827

| 07/14/2022 | 55 | NOTICE of Appearance filed by attorney Frank J Anders on behalf of Defendant United States of America (Attorney Frank J Anders added to party United States of America(pty:dft))(Anders, Frank) (Entered: 07/14/2022) |
|---|---|---|
| 07/14/2022 | 56 | NOTICE of Appearance filed by attorney Kyle Fralick on behalf of Defendant United States of America (Attorney Kyle Fralick added to party United States of America(pty:dft))(Fralick, Kyle) (Entered: 07/14/2022) |
| 07/14/2022 | 57 | SCHEDULING MEETING OF COUNSEL [FRCP 16, 26(f)] SCHEDULING CONFERENCE set for September 12, 2022, at 10:30 a.m. by Judge Percy Anderson. This action has been assigned to the calendar of United States District Judge Percy Anderson. (SEE DOCUMENT FOR FURTHER DETAILS). (aco) (Entered: 07/15/2022) |
| 08/29/2022 | 58 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 15 days, filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams.. (Llinas Negret, Carlos) (Entered: 08/29/2022) |
| 08/30/2022 | 59 | NOTICE of Association of Counsel associating attorney ALAN VAN GELDER on behalf of Plaintiff Ryan Sims. Filed by Plaintiff Ryan Sims (Attorney Alan Lawrence Van Gelder added to party Ryan Sims(pty:pla))(Van Gelder, Alan) (Entered: 08/30/2022) |
| 08/31/2022 | 60 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Association of Counsel 59 . The following error(s) was/were found: Notice of Association of Counsel not signed by Arnold and Itkin LLP. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 08/31/2022) |
| 09/08/2022 | 61 | TEXT ONLY ENTRY ORDER by Judge Percy Anderson: On the Courts own motion, Scheduling Conference currently set for hearing on September 12, 2022 is hereby VACATED. No appearances are necessary. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kss) TEXT ONLY ENTRY (Entered: 09/08/2022) |
| 09/09/2022 | 62 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. Having reviewed the Joint Report, the Court continues the Scheduling Conference from September 12, 2022, to September 26, 2022, at 11:00 a.m. The supplemental joint report shall be filed by September 22, 2022. (See document for further details). (aco) (Entered: 09/09/2022) |
| 09/19/2022 | 63 | STATUS REPORT *Joint Supplemental Rule 26 Report* filed by Plaintiff Nancy Fiedler. (Hillsman, John) (Entered: 09/19/2022) |
| 09/21/2022 | 64 | TEXT ONLY ENTRY ORDER by Judge Percy Anderson: On the Courts own motion, Scheduling Conference currently set for hearing on September 26, 2022 is hereby VACATED. No appearances are necessary. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kss) TEXT ONLY ENTRY (Entered: 09/21/2022) |

| 09/22/2022 | 65 | APPLICATION of Non-Resident Attorney Alexandra F. Poulson to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-34031332) filed by Plaintiff Ryan Sims. (Attachments: # 1 Proposed Order) (Van Gelder, Alan) (Entered: 09/22/2022) |
|---|---|---|
| 09/22/2022 | 66 | Corrected APPLICATION of Non-Resident Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-34033567) filed by Plaintiff Ryan Sims. (Attachments: # 1 Proposed Order) (Van Gelder, Alan) (Entered: 09/22/2022) |
| 09/22/2022 | 67 | ORDER GRANTING APPLICATION of Non-Resident Attorney Alexandra Poulson to appear Pro Hac Vice on behalf of Plaintiff Ryan Sims and designating Alan Van Gelder as local counsel 65 by Judge Percy Anderson. (lc) Modified on 10/7/2022 (lc). (Entered: 09/23/2022) |
| 10/06/2022 | 69 | ORDER ON APPLICATION OF NON-RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Percy Anderson. APPLICATION of Attorney Cory D. Itkin to Appear Pro Hac Vice on behalf of Plaintiff Ryan Sims, designating Alan Van Gelder as local counsel.; granting 66 Non-Resident Attorney Cory D. Itkin. (aco) (Entered: 10/07/2022) |
| 10/07/2022 | 68 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: Pro Hac Vice Order Alexandra Poulson 67 was Linked to wrong application no.66 re attorney Itkin...both link and text corrected and now linked to application no.65. (lc) (Entered: 10/07/2022) |
| 10/14/2022 | 70 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. Accordingly, the Court will stay the rest of the action pending a further order of the Court. The Court orders the Government to submit within fourteen days of the date of this order its proposal, not to exceed 5 pages, on the scope of discovery necessary for a determination of whether Plaintiffs' claims are barred by the DFE. Plaintiffs shall then have fourteen days, from the date the Government files its report, to file its response not to exceed 5 pages. (See document for further details). (aco) (Entered: 10/14/2022) |
| 10/28/2022 | 71 | RESPONSE filed by Defendant United States of Americato Staying Case,, 70 *Proposal Re: Discovery* (Kaufman-Cohen, Eric) (Entered: 10/28/2022) |
| 11/11/2022 | 72 | RESPONSE filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williamsto Response 71, *PROPOSAL OF DEFENDANT UNITED STATES OF AMERICA RE: DISCOVERY RELATING TO DEFENDANT'S CLAIM THAT PLAINTIFFS' CLAIMS ARE BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION* (Nelson, Gretchen) (Entered: 11/11/2022) |
| 12/01/2022 | 73 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. The discovery cutoff date is March 13, 2023. Defendant shall file its motion for summary judgment on or before April 24, 2023. Plaintiff's opposition shall be filed by May 8, 2023, and Defendant's reply, if any, is due on or before May 15, 2023. The Court will hear Defendant's motion for summary judgment on May 29, 2023, at 1:30 p.m. The dates set by the Court are firm dates. Absent extraordinary circumstances, which must satisfy the requirements of Federal Rule 16 and be brought to the Court's attention in a timely manner, the Court will not modify these dates. (See document for further details). (aco) (Entered: 12/02/2022) |

ER 829

| 02/25/2023 | 74 | EX PARTE APPLICATION for Enlargement of Time to File Motion for Summary Judgment and to Extend Close of Discovery filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Declaration Declaration of John Hillsman in Support of Joint Administrative Motion to Enlarge Time, # 2 Supplement Stipulation in Support of Joint Administrative Motion to Enlarge Time, # 3 Proposed Order Proposed Order Granting Joint Administrative Motion to Enlarge Time) (Attorney John R Hillsman added to party Angelika Adamic(pty:pla), Attorney John R Hillsman added to party James Adamic(pty:pla), Attorney John R Hillsman added to party Mark Adamic(pty:pla), Attorney John R Hillsman added to party Jean Anne Allen(pty:pla), Attorney John R Hillsman added to party Yadira Alvarez(pty:pla), Attorney John R Hillsman added to party Eric Baltz(pty:pla), Attorney John R Hillsman added to party Anthony Beitzinger(pty:pla), Attorney John R Hillsman added to party Daniel Poh-Hock Chua(pty:pla), Attorney John R Hillsman added to party Shruti Deopujari(pty:pla), Attorney John R Hillsman added to party Olga Faynshteyn(pty:pla), Attorney John R Hillsman added to party Nancy Fiedler(pty:pla), Attorney John R Hillsman added to party Atlee Fritz(pty:pla), Attorney John R Hillsman added to party Matthew Guiney(pty:pla), Attorney John R Hillsman added to party Nina Huttegger(pty:pla), Attorney John R Hillsman added to party Robert Kurtz(pty:pla), Attorney John R Hillsman added to party Richard X. Liu(pty:pla), Attorney John R Hillsman added to party Cherie McDonough(pty:pla), Attorney John R Hillsman added to party Katie Osborne(pty:pla), Attorney John R Hillsman added to party Christina Quitasol(pty:pla), Attorney John R Hillsman added to party Susana Solano Rosas(pty:pla), Attorney John R Hillsman added to party Shirley Salika(pty:pla), Attorney John R Hillsman added to party Dominic Micael Selga(pty:pla), Attorney John R Hillsman added to party Seema Sharma(pty:pla), Attorney John R Hillsman added to party Ryan Sims(pty:pla), Attorney John R Hillsman added to party Margaret Strom(pty:pla), Attorney John R Hillsman added to party Ariel Takvam(pty:pla), Attorney John R Hillsman added to party Sejay Tan (pty:pla), Attorney John R Hillsman added to party Sarma Williams(pty:pla)) (Hillsman, John) (Entered: 02/25/2023) |
| 02/28/2023 | 75 | ORDER GRANTING STIPULATION FOR AN ORDER ENLARGING TIME TO CONDUCT DISCOVERY ON DISCRETIONARY FUNCTION DEFENSE AND CONTINUING THE FILING DATE ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT by Judge Percy Anderson. IT IS HEREBY ORDERED that the discovery cutoff on the discretionary function exception is extended to May 26, 2023, and further that Defendant's time to file the motion for summary judgment is extended to July 28, 2023.; granting 74 EX PARTE APPLICATION for Enlargement of Time to File Motion for Summary Judgment and to Extend Close of Discovery. (aco) (Entered: 02/28/2023) |
| 06/16/2023 | 76 | NOTICE OF MOTION AND Joint MOTION for Protective Order for Confidential Internal Coast Guard Documents filed by Defendant United States of America. (Attachments: # 1 Exhibit A)(Kaufman-Cohen, Eric) (Entered: 06/16/2023) |
| 06/16/2023 | 77 | PROTECTIVE ORDER by Magistrate Judge Michael R. Wilner re Stipulation for Protective Order 76 . (see document for details) (hr) (Entered: 06/20/2023) |
| 07/14/2023 | 78 | Joint NOTICE OF MOTION AND MOTION to Continue Deadline for United States to File Motion for Summary Judgment from July 28, 2023 to October 30, 2023 filed by Defendant United States of America. (Attachments: # 1 Declaration of Eric Kaufman- |

| | | Cohen, # 2 Stipulation, # 3 Proposed Order) (Kaufman-Cohen, Eric) (Entered: 07/14/2023) |
|---|---|---|
| 07/19/2023 | 79 | ORDER GRANTING JOINT ADMINISTRATIVE MOTION FOR AN ORDER CONTINUING THE FILING DATE ON THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT by Judge Percy Anderson. IT IS HEREBY ORDERED, pursuant to Civil Local Rule 7-1 and 7-3, that the United States' time to file its the motion for summary judgment is extended to October 30, 2023.; granting 78 MOTION to Continue Deadline for United States to File Motion for Summary Judgment. (aco) (Entered: 07/20/2023) |
| 09/29/2023 | 80 | Joint NOTICE OF MOTION AND MOTION to File a Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction Pursuant to FRCP 12(b)(1) and Order Continuing the Filing Date of Motion filed by defendant United States of America. (Attachments: # 1 Declaration of Eric Kaufman-Cohen, # 2 Stipulation in Support of Motion, # 3 Proposed Order) (Kaufman-Cohen, Eric) (Entered: 09/29/2023) |
| 10/02/2023 | 81 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: Joint NOTICE OF MOTION AND MOTION to File a Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction Pursuant to FRCP 12(b)(1) and Order Continuing the Filing Date of Motion 80 . The following error(s) was/were found: Hearing information is missing, incorrect, or untimely. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (aco) (Entered: 10/02/2023) |
| 10/02/2023 | 82 | ORDER GRANTING JOINT ADMINISTRATIVE MOTION FOR AN ORDER GRANTING THE UNITED STATES LEAVE TO FILE A MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO FED. R. CIV. P. 12(b)(1) AND ORDER CONTINUING THE FILING DATE OF MOTION by Judge Percy Anderson. IT IS HEREBY ORDERED, pursuant to Civil Local Rule 7-1 and 7-3, that the United States' is hereby granted leave of Court to file a motion to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). IT IS FURTHER ORDERED that the deadline to file the motion is extended to January 15, 2024.; granting 80 MOTION to File a Motion to Dismiss Plaintiffs' First Amended Complaint (aco) (Entered: 10/03/2023) |
| 01/03/2024 | 83 | NOTICE OF MOTION AND MOTION to Continue Filing date on Defendant US MSJ from January 15, 2024 to May 15, 2024 filed by plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guincy, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Declaration Declaration of John Hillsman in Support of Joint Motion to Continue MSJ Filing Date, # 2 Stipulation in Support of Joint Motion to Continue MSJ Filing Date, # 3 Proposed Order Granting Joint Motion to Continue MSJ Filing Date) (Hillsman, John) (Entered: 01/03/2024) |
| 01/04/2024 | 84 | ORDER GRANTING THE ADMINISTRATIVE MOTION OF THE PARTIES BY STIPULATION FOR AN ORDER CONTINUING THE FILING DATE ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT 83 by Judge Percy Anderson. IT IS HEREBY ORDERED, pursuant to Civil Local Rule 7-1 and 7-3, that the that |

| | | |
|---|---|---|
| | | Defendant's time to file the motion for summary judgment is extended from January 15, 2024, to May 15, 2024. (rolm) (Entered: 01/05/2024) |
| 03/28/2024 | 85 | APPLICATION to Exceed Page Limitation As to the United States' Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)) filed by defendant United States of America. Application set for hearing on 4/29/2024 at 01:30 PM before Judge Percy Anderson. (Perrygo, Scott) (Entered: 03/28/2024) |
| 03/28/2024 | 87 | ORDER GRANTING UNITED STATES' UNOPPOSED APPLICATION TO EXTEND PAGE LIMITATION ON UNITED STATES' MOTION TO DISMISS by Judge Percy Anderson. IT IS HEREBY ORDERED that the United States may file a memorandum of points and authorities supporting its motion to dismiss of up to 35 pages.; granting 85 APPLICATION for Leave to File Excess Pages. (aco) (Entered: 03/29/2024) |
| 03/29/2024 | 86 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: APPLICATION to Exceed Page Limitation As to the United States' Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1)) 85 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (aco) (Entered: 03/29/2024) |
| 05/15/2024 | 88 | NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction filed by Defendant United States of America. Motion set for hearing on 8/12/2024 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Memorandum, # 2 Declaration of Scott Perrygo, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Proposed Order) (Perrygo, Scott) (Entered: 05/15/2024) |
| 05/15/2024 | 89 | NOTICE OF ERRATA filed by Defendant United States of America. correcting NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction 88 (Attachments: # 1 Exhibit H)(Perrygo, Scott) (Entered: 05/15/2024) |
| 05/16/2024 | 90 | MINUTES IN CHAMBERS COURT ORDER by Judge Percy Anderson. Before the Court is a Motion to Dismiss for Lack of Jurisdiction filed by defendant United States ("Defendant") (Docket No. 88 ). Defendant filed the Motion on May 15, 2024, and set it for hearing on August 12, 2024. The Court's Standing Order, however, states: "No motion shall be noticed for hearing for more than thirty-five (35) days after service of the motion unless otherwise ordered by the Court." None of the parties' prior Stipulations seeking continuances of the deadline for Defendant to file the Motion, or the Defendant's most recent Application to Exceed Page Limitation, sought to modify the briefing deadlines contained in the Court's Standing Order. Nor has Defendant sought leave of Court to set the hearing on the Motion more than 35 days after it was served. The Court therefore advances the hearing to June 24, 2024, at 1:30 p.m. (aco) (Entered: 05/16/2024) |
| 05/22/2024 | 91 | Joint NOTICE OF MOTION AND MOTION to Continue hearing on United States' Motion to Dismiss Plaintiffs' Amended Complaint for Lack of Jurisdiction from June 24, 2024 to August 5, 2024 Re: Minutes of In Chambers Order/Directive - no proceeding held,,,, Set/Reset Deadlines/Hearings,,, 90 filed by Defendant United States of America. (Attachments: # 1 Declaration of Eric Kaufman-Cohen, # 2 Declaration of John R. Hillsman, # 3 Declaration of Gretchen T. Nelson, # 4 Declaration of E. Douglas DiSandro, # 5 Proposed Order) (Kaufman-Cohen, Eric) (Entered: 05/22/2024) |

| 05/22/2024 | 92 | MINUTES IN CHAMBERS - COURT ORDER by Judge Percy Anderson. The Court has before it a Joint Administrative Motion for an Order Continuing Hearing Date on the United States' Motion to Dismiss and Granting Plaintiffs Leave to File an Overlength (sic) Brief in Opposition (the "Motion"). The Motion is granted in part and denied in part. Plaintiffs' brief, which shall not exceed 35 pages in length, shall be filed by July 8, 2024. The government's reply, if any, shall be filed by July 22, 2024. The Court will notify the parties once it has resolved the Motion or the date and time of a hearing should the Court conclude that oral argument will assist the Court's resolution of the Motion.; granting in part and denying in part 91 MOTION to Continue hearing. (aco) (Entered: 05/23/2024) |
|---|---|---|
| 07/03/2024 | 93 | APPLICATION to file document *(U.S. Government Report, Exhibit 2 in Opposition to Defendant's Motion To Dismiss)* under seal filed by Plaintiff Nancy Fiedler. (Attachments: # 1 Unredacted Document Unredacted Declaration and Unredacted Exhibits A - C, # 2 Proposed Order)(Llinas Negret, Carlos) (Entered: 07/03/2024) |
| 07/03/2024 | 94 | MINUTES IN CHAMBERS COURT ORDER by Judge Percy Anderson. Despite Plaintiffs' violations of the Local Rules, to prevent the unauthorized disclosure of a document that may qualify for sealing, the Court has provisionally sealed the entirety of Docket Entry 93 , including the Exhibit attached to the Application. Counsel for Plaintiffs are ordered to review Local Rule 79-5.2.2 and the Court's Guide to Electronically Filing Under-Seal Documents in Civil Cases. Plaintiffs shall re-file their Application in compliance with Local Rule 79-5.2.2. (See document for further details). (aco) (Entered: 07/05/2024) |
| 07/05/2024 | 95 | Amended APPLICATION to file document *Exhibit* under seal filed by Plaintiff Nancy Fiedler. (Attachments: # 1 Proposed Order GRANTING PALINTIFFS APPLICATION FOR LEAVE TO FILE DOCUMENTS UNDER SEAL, # 2 Redacted Document Exhibit 2 to the Declaration of John Hillsman to be submitted in Support of Response in Opposition to Defendant United States Motion to Dismiss)(Llinas Negret, Carlos) (Entered: 07/05/2024) |
| 07/05/2024 | 96 | SEALED DECLARATION IN SUPPORT OF Amended APPLICATION to file document *Exhibit* under seal 95 filed by Plaintiff Nancy Fiedler. (Attachments: # 1 Exhibit 1 the Declaration of John Hillsman, # 2 Unredacted Document Exhibit 2 to the Declaration of John Hillsman to be submitted in Support of Response in Opposition to Defendant United States Motion to Dismiss, # 3 Exhibit 3 to the Declaration of John Hillsman)(Llinas Negret, Carlos) (Entered: 07/05/2024) |
| 07/05/2024 | 97 | PROOF OF SERVICE filed by plaintiff Nancy Fiedler, re Sealed Declaration in SupportDeclaration, 96 served on July 5, 2024. (Llinas Negret, Carlos) (Entered: 07/05/2024) |
| 07/08/2024 | 98 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction 88 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Declaration of John Hillsman ISO Opposition to United States' Motion to Dismiss Plaintiffs' First Amended Complaint, # 2 Exhibit 1 to John Hillsman Declaration ISO, # 3 Exhibit 3 to John Hillsman Declaration ISO, # 4 Exhibit 4 to John Hillsman Declaration ISO, # 5 Exhibit 5 to John Hillsman Declaration ISO, # 6 Exhibit 6 to John Hillsman Declaration ISO, # 7 Exhibit 7 to John Hillsman Declaration ISO, # 8 Exhibit 8 to John Hillsman Declaration ISO, # 9 Exhibit 9 to John |

**ER 833**

CM/ECF - California Central District

|  |  | Hillsman Declaration ISO, # 10 Exhibit 10 to John Hillsman Declaration ISO, # 11 Exhibit 11 to John Hillsman Declaration ISO, # 12 Exhibit 12 to John Hillsman Declaration ISO, # 13 Exhibit 14 to John Hillsman Declaration ISO, # 14 Exhibit 15 to John Hillsman Declaration ISO, # 15 Exhibit 17 to John Hillsman Declaration ISO, # 16 Exhibit 18 to John Hillsman Declaration ISO, # 17 Exhibit 21 to John Hillsman Declaration ISO, # 18 Exhibit 22 to John Hillsman Declaration ISO, # 19 Exhibit 23 to John Hillsman Declaration ISO)(Attorney Gretchen M. Nelson added to party Angelika Adamic(pty:pla), Attorney Gretchen M. Nelson added to party Mark Adamic(pty:pla), Attorney Gretchen M. Nelson added to party Eric Baltz(pty:pla), Attorney Gretchen M. Nelson added to party Anthony Beitzinger(pty:pla), Attorney Gretchen M. Nelson added to party Daniel Poh-Hock Chua(pty:pla), Attorney Gretchen M. Nelson added to party Shruti Deopujari(pty:pla), Attorney Gretchen M. Nelson added to party Christine Alexandra Dignam(pty:pla), Attorney Gretchen M. Nelson added to party Olga Faynshteyn(pty:pla), Attorney Gretchen M. Nelson added to party Nancy Fiedler(pty:pla), Attorney Gretchen M. Nelson added to party Atlee Fritz(pty:pla), Attorney Gretchen M. Nelson added to party Matthew Guincy(pty:pla), Attorney Gretchen M. Nelson added to party Robert Kurtz(pty:pla), Attorney Gretchen M. Nelson added to party Richard X. Liu(pty:pla), Attorney Gretchen M. Nelson added to party Jasmine Lord(pty:pla), Attorney Gretchen M. Nelson added to party Cherie McDonough(pty:pla), Attorney Gretchen M. Nelson added to party Yuka Ohashi Merritt(pty:pla), Attorney Gretchen M. Nelson added to party Victoria E. Moore(pty:pla), Attorney Gretchen M. Nelson added to party Katie Osborne(pty:pla), Attorney Gretchen M. Nelson added to party Christina Quitasol(pty:pla), Attorney Gretchen M. Nelson added to party Susana Solano Rosas(pty:pla), Attorney Gretchen M. Nelson added to party Dominic Micael Selga(pty:pla), Attorney Gretchen M. Nelson added to party Seema Sharma(pty:pla), Attorney Gretchen M. Nelson added to party Ryan Sims(pty:pla), Attorney Gretchen M. Nelson added to party Vikram Singh(pty:pla), Attorney Gretchen M. Nelson added to party Margaret Strom(pty:pla), Attorney Gretchen M. Nelson added to party Ariel Takvam(pty:pla), Attorney Gretchen M. Nelson added to party Sarma Williams(pty:pla)) (Nelson, Gretchen) (Entered: 07/08/2024) |
|---|---|---|
| 07/08/2024 | 99 | DECLARATION of Daryl Ebersole, P.E. re MEMORANDUM in Opposition to Motion,,,,,,,,,,,,, 98 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guincy, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Nelson, Gretchen) (Entered: 07/08/2024) |
| 07/08/2024 | 100 | Notice of Errata re the Declaration of John Hillsman ISO Opposition to United States' Motion to Dismiss filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guincy, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Nelson, Gretchen) (Entered: 07/08/2024) |
| 07/08/2024 | 101 | STATEMENT of Disputed Material Facts NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction 88 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy |

CM/ECF - California Central District

|  |  |  |
|---|---|---|
|  |  | Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Nelson, Gretchen) (Entered: 07/08/2024) |
| 07/09/2024 | 102 | ORDER GRANTING PLAINTIFFS' APPLICATION FOR LEAVE TO FILE DOCUMENTS UNDER SEAL by Judge Percy Anderson. The Application is Granted. Plaintiffs have leave to file under seal the following document in support of their Response in Opposition to Defendant United States of America's Motion to Dismiss for Lack of Personal Jurisdiction: Exhibit 2 to the Declaration of John Hillsman consisting of the 197-page ATF Report and attachments.; granting 95 Amended APPLICATION to file document *Exhibit* under seal. (aco) (Entered: 07/10/2024) |
| 07/11/2024 | 103 | Notice of Electronic Filing re Order on Motion for Leave to File Document Under Seal,, 102 e-mailed to rhz@szs.com bounced due to no longer with the firm. The primary e-mail address associated with the attorney record has been deleted. Pursuant to Local Rules it is the attorneys obligation to maintain all personal contact information including e-mail address in the CM/ECF system. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (rolm) TEXT ONLY ENTRY (Entered: 07/11/2024) |
| 07/11/2024 | 104 | SEALED DOCUMENT re MEMORANDUM in Opposition to Motion,,,,,,,,,,,,,,, 98 , Order on Motion for Leave to File Document Under Seal,, 102 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Exhibit 2)(Nelson, Gretchen) (Entered: 07/11/2024) |
| 07/11/2024 | 105 | PROOF OF SERVICE filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams, re Sealed Document,,, 104 served on July 11, 2024. (Nelson, Gretchen) (Entered: 07/11/2024) |
| 07/22/2024 | 106 | REPLY in support NOTICE OF MOTION AND MOTION to Dismiss for Lack of Jurisdiction 88 filed by Defendant United States of America. (Attachments: # 1 Declaration of Scott Perrygo, # 2 Exhibit K, # 3 Exhibit L, # 4 Exhibit M)(Perrygo, Scott) (Entered: 07/22/2024) |
| 07/22/2024 | 107 | NOTICE OF MOTION AND MOTION to Strike NTSB report, ECF 98-2 MEMORANDUM in Opposition to Motion,,,,,,,,,,,,, 98 filed by defendant United States of America. (Attachments: # 1 Proposed Order) (Kaufman-Cohen, Eric) (Entered: 07/22/2024) |
| 07/23/2024 | 108 | MINUTES IN CHAMBERS - COURT ORDER by Judge Percy Anderson. Defendant United States (the "Government") has filed a Motion to Strike NTSB Report (Docket No. 107 ). The Motion to Strike does not have a hearing date as required by Local Rules 6-1 and 7-4 and there is no statement of compliance with Local Rule 7-3's meet and confer requirement. The Court construes the Motion to Strike as an objection to evidence. |

| | | |
|---|---|---|
| | | Plaintiffs' Opposition, if any, to the Government's evidentiary objection shall be filed by no later than July 29, 2024. After that date, the matter shall be deemed under submission. Future violations of the Federal Rules of Civil Procedure, the Local Rules, or the Court's Orders may result in the imposition of sanctions. (aco) (Entered: 07/23/2024) |
| 07/29/2024 | 109 | Opposition to Defendant's Motion to Strike and Undisputed Cross-Motion to Amend their Statement of Disputed Material Facts re: NOTICE OF MOTION AND MOTION to Strike NTSB report, ECF 98-2 MEMORANDUM in Opposition to Motion,,,,,,,,,,,,, 98 107 filed by Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (Attachments: # 1 Exhibit 1-Amended Statement of Facts, # 2 Declaration of John Hillsman in Support of Plaintiffs' Opposition to Defendant's Motion to Strike and Undisputed Cross-Motion to Amend their Statement of Disputed Material Facts, # 3 Exhibit 24 to John Hillsman Declaration in Support of, # 4 Proposed Order Granting Undisputed Cross-Motion to Amend their Statement of Disputed Material Facts)(Llinas Negret, Carlos) (Entered: 07/29/2024) |
| 08/01/2024 | 110 | MINUTES IN CHAMBERS-COURT ORDER by Judge Percy Anderson. For all of the foregoing reasons, the Court grants the Government's Motion to Dismiss and dismisses this action for lack of subject matter jurisdiction. The parties resolved the dispute concerning the Government's Motion to Strike (Docket No. 107) and the Court has not relied on any of the evidence the Government sought to strike. The Court therefore denies that Motion as moot. The Court will issue a Judgment consistent with this Order. (See document for further details).; granting 88 MOTION to Dismiss for Lack of Jurisdiction; denying as moot 107 MOTION to Strike NTSB report. (aco) (Entered: 08/02/2024) |
| 08/01/2024 | 111 | JUDGMENT OF DISMISSAL by Judge Percy Anderson. In accordance with the Court's August 1, 2024 Minute Order granting the Motion to Dismiss for Lack of Subject Matter Jurisdiction filed by defendant United States of America ("Defendant"), IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the action filed by plaintiffs is dismissed for lack of subject matter jurisdiction. It is further ORDERED, ADJUDGED, AND DECREED that plaintiffs take nothing and Defendant shall have its costs of suit. RE: MINUTES IN CHAMBERS-COURT ORDER, 110 . (MD JS-6, Case Terminated). (aco) (Entered: 08/02/2024) |
| 08/14/2024 | 112 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. Appeal of Judgment,, 111 , Order on Motion to Dismiss/Lack of Jurisdiction,,, Order on Motion to Strike,, 110 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-38024690.) (Hillsman, John) (Entered: 08/14/2024) |
| 08/19/2024 | 113 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 24-5064 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 112 as to Plaintiffs Angelika Adamic, James Adamic, Mark Adamic, Jean Anne Allen, Yadira Alvarez, Eric Baltz, Anthony Beitzinger, Daniel Poh-Hock Chua, |

CM/ECF - California Central District

Shruti Deopujari, Christine Alexandra Dignam, Olga Faynshteyn, Nancy Fiedler, Atlee Fritz, Matthew Guiney, Nina Huttegger, Robert Kurtz, Richard X. Liu, Jasmine Lord, Cherie McDonough, Yuka Ohashi Merritt, Victoria E. Moore, Katie Osborne, Christina Quitasol, Susana Solano Rosas, Shirley Salika, Dominic Micael Selga, Seema Sharma, Ryan Sims, Vikram Singh, Margaret Strom, Ariel Takvam, Sejay Tan, Sarma Williams. (car) (Entered: 08/19/2024)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/03/2025 15:40:38 | | | |
| **PACER Login:** | gbarenfeld4589 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-07065-PA-MRW End date: 1/3/2025 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**ER 837**