No. 24-5064

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

NANCY FIEDLER, Personal Representative of
the ESTATE OF LISA FIEDLER, *et al*.,

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Central District of California
No. 2:21cv7065 – Hon. Percy Anderson

_____

## BRIEF OF APPELLEE UNITED STATES OF AMERICA

_____

YAAKOV M. ROTH
  *Acting Assistant Attorney*
  *General, Civil Division*

BILAL A. ESSAYLI
  *United States Attorney*

DAVID M. HARRIS
  *Assistant U.S. Attorney*
  *Chief, Civil Division*

GERARD SINZDAK
  *Assistant Director, Appellate Staff*
  *Civil Division*

ERIC KAUFMAN-COHEN
  *Attorney in Charge, West Coast*
  *Office*
JILL DAHLMANN ROSA
  *Senior Trial Counsel*
SCOTT PERRYGO
  *Trial Attorney*
  U.S. Department of Justice
  Civil Division, Torts Branch
  450 Golden Gate Avenue, 7-5395
  San Francisco, California 94102
  Telephone: (415) 436-6648
  Facsimile: (415) 436-6632
  Eric.Kaufman-Cohen@usdoj.gov
  Jill.Rosa@usdoj.gov
  Scott.Perrygo@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

ISSUES PRESENTED............................................................................3

STATUTORY AND REGULATORY AUTHORITIES ...........................4

STATEMENT OF THE CASE.................................................................4

    A.    Statutory and Regulatory Background ........................................ 4

    B.    Internal Coast Guard Guidance .................................................. 9

    C.    Local Coast Guard Practice...................................................... 13

    D.    *Conception* Certification and Inspections............................... 13

    E.    Fire and Sinking of *Conception*............................................. 14

    F.    Prior Proceedings ..................................................................... 15

    G.    District Court Ruling ................................................................ 16

SUMMARY OF ARGUMENT ..............................................................17

STANDARD OF REVIEW ...................................................................18

ARGUMENT ........................................................................................18

I.    The Discretionary Function Exception Bars Plaintiffs' Suit........................18

    A.    The Challenged Conduct Is the Coast Guard's Inspection and Certification Policies in their Totality..................................... 20

    B.    Prong One: The Controlling Statutes, Regulations, and Policies Vest the Coast Guard with Discretion. ............................................ 21

1.      The Statutes, Regulations, and Policies Demonstrate the Coast Guard's Discretion in Conducting Inspections. ......................... 22

2.      To the Extent Individual Subchapter T Standards Are Relevant, None Require the Coast Guard to Conduct its Vessel Inspection and Certification in a Particular Manner. .................................... 28

3.      Plaintiffs' Misinterpretations of Coast Guard Testimony Cannot Override Regulations or Formal Policies. .................................... 33

C.      Prong Two: The Coast Guard's Establishment and Implementation of a Maritime Safety Program Is Susceptible to Political, Social, and Economic Policy Analysis. ......................................................... 38

II.     The Discretionary Function Exception Is Established Law. ......................... 47

A.      Plaintiffs Offer No Reason They Did Not Raise This Issue Below and Have Thus Waived Their Right to Raise It Now. ................................. 47

B.      The SIAA's Implied Discretionary Function Exception Is the Established Law of This and Every Other Circuit to Consider It. ...... 52

C.      *Thacker* Has No Bearing on the Facts or Issues Presented Here. ....... 54

III.    Plaintiff's Procedural Arguments Are Flawed and Unsupported .................. 55

CONCLUSION .................................................................................................. 57

Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6 .................. 59

Form 8. Certificate of Compliance for Briefs ........................................................ 60

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bear Medicine v. United States*,

    241 F.3d 1208 (9th Cir. 2001) ...................................................................... 43, 44

*Bearce v. United States*,

    614 F.2d 556 (7th Cir. 1980) ...................................................................53

*Begay v. United States,*

    768 F.2d 1059 (9th Cir. 1985) ...........................................................44

*Berkovitz v. United States*,

    486 U.S. 531 (1988)...........................................................21

*Canadian Transp. Co. v. United States*,

    663 F.2d 1081 (D.C. Cir. 1980)...........................................................53

*Cassens v. St. Louis River Cruise Lines, Inc.*,

    44 F.3d 508 (7th Cir. 1995) ...................................... 20, 23, 32, 33, 39, 40, 42, 45

*Chadd v. United States*,

    794 F.3d 1104 (9th Cir. 2015) ...................................................... 38, 56

*Chotin Transp., Inc. v. United States*,

    819 F.2d 1342 (6th Cir. 1987) ...........................................................53

*Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*,

    532 F. Supp. 2d 369 (D.P.R. 2008)...........................................................43

*Dalehite v. United States*,

    346 U.S. 15 (1953)...........................................................46

*Dearborn v. Mar Ship Operations, Inc.*,

    113 F.3d 995 (9th Cir. 1997) ...........................................................56

iv

*Drake Towing Co. v. Meisner Marine Constr. Co*.,

    765 F.2d 1060 (11th Cir. 1985) ..............................................53

*Earles v. United States*,

    935 F.2d 1028 (9th Cir. 1991) ................................ 3, 18, 19, 52, 53

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,

    525 F.3d 822 (9th Cir. 2008) ..............................................56

*Fed. Housing Admin. v. Burr,*

    309 U.S. 242 (1940)........................................................54

*Fiedler, et al. v. Truth Aquatics, et al*,

    No. 21STCV08121 (Cal. Super. Ct. Nov. 5, 2024)....................1, 15

*G & G Prods., LLC v. Rusic,*

    902 F.3d 940 (9th Cir. 2018) ..............................................49

*Gasho v. United States,*

    39 F.3d 1420 (9th Cir. 1994) ..............................................45

*GATX/Airlog Co. v. United States*,

    286 F.3d 1168 (9th Cir. 2002) .................................... 18, 21, 45

*Gercey v. United States*,

    540 F.2d 536 (1st Cir. 1976).............................................53

*Gonzalez v. United States,*

    814 F.3d 1022 (9th Cir. 2016) .................................... 44, 45

*Gonzalez v. United States,*

    851 F.3d 538 (5th Cir. 2017) ..............................................32

*Graves v. United States*,

    872 F.2d 133 (6th Cir. 1989) ..............................................53

*Greger v. Barnhart,*

    464 F.3d 968 (9th Cir. 2006) ..............................................48

*Ignatiev v. United States,*
  238 F.3d 464 (D.C. Cir. 2001) ........................................................57

*In re Glacier Bay,*
  71 F.3d 1447 (9th Cir. 1995) ..........................................................3

*In re Joint E. & S. Dists. Asbestos Litig.,*
  891 F.2d 31 (2d Cir. 1989).......................................................... 52, 53

*In re Ocean Ranger Sinking Off Newfoundland on Feb. 15, 1982,*
  632 F. Supp. 72 (E.D. La. 1985).....................................................25

*Indemnity Ins. Co. of N. Am. v. United States,*
  569 F.3d 175 (4th Cir. 2009) .........................................................42

*Irving v. United States,*
  162 F.3d 154 (1st Cir. 1998)........................................................ 34, 39

*Kohl v. United States,*
  699 F.3d 935 (6th Cir. 2012) .........................................................20

*Lam v. United States,*
  979 F.3d 665 (9th Cir. 2020) ................................... 19, 20, 21, 38, 39, 43, 44, 57

*Lebron v. Nat'l R.R. Passenger Corp.,*
  513 U.S. 374 (1995)...................................................................51

*Line Ins. Co. of N. Am. v. Reichardt,*
  591 F.2d 499 (9th Cir. 1979) .........................................................47

*Matter of Truth Aquatics, Inc.,*
  No. 2:19-CV-07693 (C.D. Cal. Jan. 28, 2021)......................................2

*McCoy v. Mass. Inst. of Tech.,*
  950 F.2d 13 (1st Cir. 1991)...........................................................47

*McMahon v. United States,*
  342 U.S. 25 (1951)....................................................................54

*McMellon v. United States*,

    387 F.3d 329 (4th Cir. 2004) ................................................53

*Miller v. Gammie*,

    335 F.3d 889 (9th Cir. 2003) ................................................53

*Myers v. United States*,

    17 F.3d 890 (6th Cir. 1994) ................................................27

*Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*,

    20 F.3d 987 (9th Cir. 1994) ................................................18

*Sabow v. United States*,

    93 F.3d 1445 (9th Cir. 1996) ................................................18

*Sea-Land Serv., Inc. v. United States*,

    919 F.2d 888 (3d Cir. 1990) ................................................53

*Smith v. U.S. Coast Guard*,

    220 F. Supp. 2d 275 (S.D.N.Y. 2002) .............................. 24, 25, 26, 42

*Terbush v. United States*,

    516 F.3d 1125 (9th Cir. 2008) ................................................45

*Tew v. United States*,

    86 F.3d 1003 (10th Cir. 1996) .................................................. 43, 53

*Thacker v. Tennessee Valley Authority*,

    587 U.S. 218 (2019) .................................................. 47, 54, 55

*Thompson v. Runnels*,

    705 F.3d 1089 (9th Cir. 2013). .................................................. 48, 49, 50

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*,

    508 U.S. 439 (1993) ................................................51

*United States v. Alameda Gateway*,

    213 F.3d 1161 (9th Cir. 2009) ................................................50

*United States v. Boylan*,

No. 2:22-cr-004820 (C.D. Cal. 2022)...................................................15

*United States v. Gaubert*,

499 U.S. 315 (1991)............................................ 19, 20, 21, 38, 39, 40

*United States v. Mitchell*,

445 U.S. 535 (1980).................................................................18

*United States v. Patrin*,

575 F.2d 708 (9th Cir. 1978) .....................................................48

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,

467 U.S. 797 (1984)................................................ 17, 19, 27, 28, 46

*Valdez v. United States*,

56 F.3d 1177 (9th Cir. 1995) ....................................................18

*Whisnant v. United States*,

400 F.3d 1177 (9th Cir. 2005) ........................................... 43, 44, 45

*Wiggins v. United States*,

799 F.2d 962 (5th Cir. 1986) ....................................................53

*Wood v. Milyard,*

566 U.S. 463 (2012)..............................................................47

*Yee v. Escondido*,

503 U.S. 519 (1992)..............................................................48

Statutes

6 U.S.C. § 468...............................................................4, 43

14 U.S.C. § 101................................................................55

14 U.S.C. § 102.......................................................... 4, 23, 39

14 U.S.C. § 501.................................................................4

14 U.S.C. § 503............................................................4, 46

14 U.S.C. § 504 ...................................................................5, 46

16 U.S.C. § 831 ........................................................................54

16 U.S.C. § 831c ......................................................................54

18 U.S.C. § 1115 ......................................................................15

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 2680 ......................................................................19

46 U.S.C. § 2101 ........................................................................6

46 U.S.C. §§ 3101-4901 .............................................................5

46 U.S.C. §§ 3301-3318 .............................................................5

46 U.S.C. § 3301 ..................................................................6, 23

46 U.S.C. § 3305 ................................................. 5, 16, 17, 23, 24

46 U.S.C. § 3306 ........................................................................5

46 U.S.C. § 3307 ..................................................................7, 23

46 U.S.C. § 3315 ......................................................................23

46 U.S.C. § 30903 ....................................................................18

Rules

Fed. R. App. P. 4 ........................................................................3

Regulations

46 C.F.R. § 71.25-15 ................................................................33

46 C.F.R. § 72.05-55 ................................................................36

46 C.F.R. § 116.423 .................................................................36

46 C.F.R. § 175.01-1-185.30-30 (1995) ......................................9

46 C.F.R. § 175.100 ...................................................................6

46 C.F.R. § 175.112 ...................................................... 9, 30, 36

46 C.F.R. § 175.400 ............................................................8, 30

46 C.F.R. § 175.550 ................................................................41

46 C.F.R. §§ 176.1-176.930 ......................................................6

46 C.F.R. § 176.100 ............................................................7, 24

46 C.F.R. § 176.105 ................................................................6

46 C.F.R. § 176.110 ..............................................................41

46 C.F.R. § 176.400 ............................................................7, 24

46 C.F.R. § 176.402 ........................................... 6, 7, 22, 24, 34

46 C.F.R. § 176.404 ............................................................7, 24

46 C.F.R. § 176.500 ........................................................ 6, 7, 24

46 C.F.R. § 176.600 ................................................................7

46 C.F.R. § 176.610 ..............................................................37

46 C.F.R. §§ 176.800-176.840 ..............................................8, 29

46 C.F.R. § 176.800 ........................................... 8, 26, 41, 42

46 C.F.R. § 176.802 ................................................................7

46 C.F.R. § 176.804 ................................................................7

46 C.F.R. § 176.806 ................................................................8

46 C.F.R. § 176.808 ............................................................7, 8

46 C.F.R. § 176.810 ............................................................7, 8

46 C.F.R. § 176.814 ................................................................7

46 C.F.R. § 176.816 ................................................................8

46 C.F.R. § 176.830 ........................................... 28, 29, 30, 31, 35

46 C.F.R. § 176.840 ................................................................8

46 C.F.R. § 177.30-7 (1995) ....................................................31

46 C.F.R. § 177.115 ........................................... 8, 9, 35, 36

46 C.F.R. § 177.405 ........................................... 28, 29, 30, 31, 35, 36

46 C.F.R. § 177.410 ........................................................ 29, 36

46 C.F.R. § 182.115 ................................................................9

x

46 C.F.R. § 183.115 ................................................................ 9, 30, 36, 37

46 C.F.R. § 183.420 ...............................................................................37

46 C.F.R. § 183.430 ...............................................................................37

46 C.F.R. § 185.410 ........................................................................ 14, 15

Other Authorities

H.R. Rep. No. 98-338, 1983 U.S.C.C.A.N. 924 .........................................5

## INTRODUCTION

This case arises from a fire aboard the dive boat *Conception*, a 75-foot wood-and-fiberglass passenger vessel that docked in Santa Barbara Harbor. During the early morning hours of September 2, 2019, a fire broke out while the boat was anchored off Santa Cruz Island. The fire engulfed the boat, tragically resulting in the deaths of 34 people below deck. Only the captain and four crewmembers survived.

Much litigation followed. The United States charged the captain of the vessel, Jerry Boylan, with "seaman's manslaughter." Following a ten-day trial, the jury found him guilty. The court sentenced him to four years in prison. Plaintiffs here have also sued 72 named defendants in state court, including the vessel's owners, vessel repair entities, and numerous manufacturers of cell phones, cameras, lights, dive gear, and other battery-powered devices brought onto the vessel by passengers.[1] There, they allege that "[t]he fire started after lithium-ion batteries ignited on the vessel in the middle of the night."[2] The vessel owner also

---

[1] *See* Corrected Fourth Am. Master Compl., ¶ 48, *Fiedler, et al. v. Truth Aquatics, et al.*, No. 21STCV08121 (Cal. Super. Ct. Nov. 5, 2024).

[2] *See id.*, Pls.' Mem. of Points and Authorities in Support of Doe Defs.' Joint Notice of Mot. to Strike Market Share Allegation in Pls.' Fourth Am. Master Compl., 1:4-5 (Cal. Super. Ct. Feb. 3, 2025).

filed a lawsuit seeking to limit its liability; that action is stayed pending the other state court claims.[3]

Here, the United States is the sole defendant. No federal employee was present at the time of the fire or was otherwise involved in the voyage. Rather, Plaintiffs challenge the regulatory oversight activities of the U.S. Coast Guard. In this oversight role, the Coast Guard promotes safety in the maritime industry in numerous ways, such as by promulgating vessel safety standards, conducting vessel inspections, investigating accidents, engaging in education efforts, and more. The design and implementation of these maritime safety programs are replete with discretionary, policy-based judgments.

Plaintiffs allege that the vessel owner violated safety regulations and the Coast Guard failed to catch those violations. Yet it was always the responsibility of *Conception*'s owners and operators to comply with the required safety standards and to conduct safe maritime operations. The Coast Guard's regulatory oversight role does not make it liable for a private party's violation of the regulatory scheme.

The district court properly dismissed this action under the discretionary function exception. The discretionary function exception to the United States' waiver of sovereign immunity bars this challenge to the Coast Guard's oversight

---

[3] *See* Order, ECF 179, ¶ 2, *Matter of Truth Aquatics, Inc.*, No. 2:19-cv-07693 (C.D. Cal. Jan. 28, 2021).

role because Congress did not intend to impose liability on the United States for the type of regulatory enforcement activities at issue in this case. Because the United States has not waived its sovereign immunity, the Court lacks subject matter jurisdiction, and the dismissal should be affirmed.

## JURISDICTIONAL STATEMENT

Plaintiffs alleged jurisdiction under the Suits in Admiralty Act (SIAA). 4−ER−735-82. The district court dismissed for lack of jurisdiction because the case falls within the discretionary function exception, 1−ER−3-11; *Earles v. United States*, 935 F.2d 1028 (9th Cir. 1991); *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir. 1995) (the discretionary function exception to the waiver of sovereign immunity found in the FTCA "applies equally to the Suits in Admiralty Act.")

The district court entered final judgment on August 1, 2024. 1−ER−2. Plaintiffs timely noticed an appeal on August 14, 2024. 4−ER−787-95; Fed. R. App. P. 4. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

Whether the district court correctly dismissed the complaint for lack of subject matter jurisdiction, where the complaint challenges the U.S. Coast Guard's inspection and certification of the private vessel *Conception*, which later caught fire resulting in the deaths of 34 people, because the Coast Guard's conduct was

discretionary and subject to policy considerations, and thus the discretionary

function exception to the Suits in Admiralty Act deprived the court of jurisdiction.

## STATUTORY AND REGULATORY AUTHORITIES

The relevant statutory and regulatory authorities appear in Appellants'

Addendum and the United States' Supplemental Addendum.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Congress tasks the Coast Guard with eleven missions, including defense,

homeland security, law enforcement, environmental protection, and marine safety.

6 U.S.C. § 468(a). Title 14 of the U.S. Code establishes the Coast Guard's

authority, charging it with promoting maritime safety and directing it to

"promulgate and enforce regulations for the promotion of safety of life and

property" at sea. 14 U.S.C. § 102(3). Congress granted the head of the Coast Guard

general powers to "do any and all things necessary to carry out the purposes of this

title," 14 U.S.C. § 501(h), and specific powers to "promulgate such regulations and

orders as he deems appropriate to carry out the provisions of this title or any other

law applicable to the Coast Guard." 14 U.S.C. § 503. One of the ways in which the

Coast Guard promotes maritime safety is by promulgating vessel safety standards,

14 U.S.C. § 503, as well as inspecting vessels, investigating accidents, licensing

mariners, documenting vessels, administering navigation rules, maintaining aids to navigation, and more. 14 U.S.C. § 504(c).

The maritime industry is heavily regulated. Over 200 years, Congress has enacted many laws applicable to the shipping industry, now gathered in Title 46. The purpose of this section is to "make maritime safety and seaman protection law easier for the Coast Guard to administer, [and] to make [the law] less cumbersome for the maritime community to use." H.R. Rep. No. 98-338 at 113 (1983), *reprinted in* 1983 U.S.C.C.A.N. 924, 925. The Coast Guard "administers" these shipping laws, while the maritime industry "is governed by them." *Id*.

Title 46, Subtitle II, Part B, §§ 3101-4901 describes Congress's vessel safety scheme. It defines categories of regulated vessels and the contours and general goals of vessel inspections. *See generally* 46 U.S.C. §§ 3301-3318. It empowers the Coast Guard to administer this regime by "prescrib[ing] necessary regulations to ensure the proper execution of, and to carry out, this part in the most effective manner . . . ." 46 U.S.C. § 3306(a). Congress instructs the Coast Guard, in exercising this regulatory authority, to balance competing policy goals and "interpret regulations and standards under this subtitle . . . to avoid disruption and undue expense to industry." 46 U.S.C. § 3305(d)(1). But these statutes do not specifically mandate what regulations the Coast Guard must prescribe, how it must

interpret them, or how, specifically, it must perform inspections beyond those broad goals.

One such category of regulated vessels is "small passenger vessels." *See* 46 U.S.C. § 3301(8). Small passenger vessels are regulated under 46 C.F.R. Ch. 1, Subchapter T, §§ 175.100 to 185.910. Small passenger vessels are a separate classification from other "passenger vessels," which are regulated under 46 C.F.R. Subchapter H. 46 U.S.C. § 2101(31), (47) (distinguishing "small passenger vessel" from "passenger vessel" by passenger capacity and tonnage limitations); *see also* 46 U.S.C. § 3301(4), (8); 46 C.F.R. §§ 175.100, 175.110(a) (2019). Small passenger vessels are known as "T-boats."

Subchapter T has two structural components. The first two Parts, 175 and 176, are informative and procedural. Part 175 describes the purpose, definitions, and applicability of Subchapter T. *See* 46 C.F.R. §§ 175.100-175.900 (2019). Part 176 defines requirements for certification and describes the general Coast Guard inspection process. *See* 46 C.F.R. §§ 176.1-176.930 (2019). The structure and express language of Part 176 shows that these regulations are directed at vessel owners and operators. *See, e.g.*, 46 C.F.R. §§ 176.105 ("How to obtain or renew" certificate); 176.402(c) ("[t]he owner or managing operator of a vessel shall . . ."; 176.500(b)(1) ("*Your* vessel must . . ."; "*You* must contact . . .") (2019).

6

Part 176 requires that a T-boat must have a Coast Guard Certificate of Inspection ("COI") to carry passengers for hire. 46 C.F.R. § 176.100(a) (2019). To obtain a COI, a vessel must first undergo an initial inspection by the Coast Guard. 46 C.F.R. §§ 176.400-176.402 (2019). After five years, a vessel must be reinspected to renew its COI—a "five-year" or "COI" inspection. 46 C.F.R. § 176.404 (2019). These inspections are required by statute. 46 U.S.C § 3307(2). The Coast Guard additionally requires T-boats to undergo an annual inspection.[4] 46 C.F.R. § 176.500(b) (2019). Separately, a T-boat must also have its hull inspected out of the water periodically. 46 C.F.R. § 176.600(c) (2019).

Part 176 expressly places on owners and operators the duty to comply with the substantive requirements of Subchapter T. 46 C.F.R. § 176.402(c) (2019) ("[T]he owner or managing operator of a vessel shall ensure that the vessel complies with the laws and regulations applicable to the vessel . . ."); *see, e.g.*, *id.* §§ 176.802(a) ("[T]he owner or managing operator shall be prepared to conduct tests and have the vessel ready for inspections . . ."), 804, 806, 808(a), 810(a), 814,

---

[4] Plaintiffs say that Congress mandated this annual inspection by statute. Pls.' Br. 58. This is incorrect. The statute requires annual inspections only for "passenger vessel[s]" and "small passenger vessel[s] allowed to carry more than 12 passengers on a foreign voyage." 46 U.S.C. § 3307(1).  *Conception* was classified in the "small passenger vessel" category—distinct from the "passenger vessel" category—but there is no evidence it was authorized to carry passengers on a foreign voyage. *See* COI, 4–ER–627.

816 (2019).[5] The substantive standards are set forth in the remaining parts of Subchapter T, Parts 177-185. Part 176 Subpart H outlines the organization of these Parts: construction and arrangement, operation, and various equipment and systems. *See* 46 C.F.R. §§ 176.800-176.840 (2019). The requirements in Parts 177-185 for T-boat construction, operation, and equipment are the "requirements" or "standards" with which a vessel must comply. These are the standards that the Coast Guard inspects a vessels' compliance with. 46 C.F.R. § 176.800(a) (2019). But vessels must comply with the requirements, regardless of whether an inspector spots a violation.

Not all these standards apply to all T-boats, however. In 1996, the Coast Guard revised Subchapter T, adopting "New T" regulations that took effect on March 11, 1996. Vessels that existed before 1996—known as "Old T" vessels—are generally allowed to follow the "regulations that were applicable to the vessel on March 10, 1996." 46 C.F.R. § 177.115(a) (2019); *see id.* § 175.400 (defining "new vessel" and "existing vessel") (2019). Because of this "grandfathering" allowance,

---

[5] Plaintiffs mischaracterize these regulations, patently omitting the "owner or managing operator" language to argue that these regulations are directed at Coast Guard inspectors. Pls.' Br. 16 (citing 46 C.F.R. § 176.806(a)). In fact, this Subpart says nothing about what Coast Guard inspectors must do other than what tests they *may* require. *See, e.g.*, §§ 176.800(a), 176.808(g), 176.810(d), 176.840 (2019). Plaintiffs omitted the same language below, which the District Court held to be a "mischaracterization[]" of the regulation. 1–ER–9.

the substantive requirements that apply to Old T vessels are in the version of Subchapter T just before the adoption of New T.[6] *See* 46 C.F.R. §§ 175.01-1– 185.30-30 (1995). This version of Subchapter T is no longer codified in the current C.F.R., but its provisions still govern Old T vessels. "[A]s an alternative," however, "[Old T] vessel[s] may comply with the regulations in [New T]." *See, e.g.*, 46 C.F.R. § 177.115(a) (2019). *Conception* was an Old T vessel.

## B.    Internal Coast Guard Guidance

The Coast Guard's Marine Safety Manual (the "Manual") provides "information and guidance" for inspectors. Manual Vol. 2 at A1-13, 4–ER–574. The Manual does not prescribe step-by-step procedures that must be used on every inspection. Hodgdon Dep. 103:7–105:7, 4–ER–591–92 (the Manual "is used as guidance" and allows inspectors to make "reasonable, discretionary decisions on case-by-case situations"); Hodgdon Dep. 226:14-229:16, 4–ER–599-600 (inspectors have discretion in how they determine compliance with particular requirements). The Manual "should be used as a guide . . . without undue hampering of independent action and judgment by marine safety personnel."

---

[6] Every substantive Part in Subchapter T makes an allowance for "existing vessel[s]," with only limited exceptions that prohibit grandfathering. *See* 46 C.F.R. § 175.112 (2019); *see, e.g.*, 46 C.F.R. § 183.115(a) (2019) (specifying two exceptions to grandfathering for electrical standards). The New T regulations also allow Old T vessels to repair or replace existing equipment without losing their grandfathered status. *See*, *e.g.*, 46 C.F.R. § 182.115(b) (2019).

9

Manual Vol. 1 at 1-2(1)(B), 4–ER–609. The Manual calls for inspectors to use their own judgment, as its guidance is "no substitute for experience and sound judgment to ensure that good marine practice is being followed." Manual Vol. 2 at A1-13, 4–ER–574.

Per the Manual, an inspection is intended to reflect a vessel's "reasonable, probable compliance" with the minimum safety standards. Manual Vol. 2 at A1-14, 4–ER–575. The Manual states that the inspector must be "reasonably satisfied" that the vessel's "degree of compliance with statutes, regulations, and the terms of its [COI] warrants continued possession of the COI." *Id.* at B2-1, 4–ER–580. The Manual emphasizes the inspectors' broad discretion: they "should vary the degree of attention they give to individual items as circumstances require." *Id.* "The inspector has great latitude in the scope of these inspections, which is based on his or her evaluation of the vessel's overall condition." *Id.*

The Coast Guard also provides inspectors with the T-Boat Inspection Book, known as the CG-840-TI or the 840 book, and other job aids. CG-840, 4–ER–613. These are collections of Subchapter T regulations that inspectors may use. The "[r]eferences given are only general guides" and that "[n]ot all items in th[e] book are applicable to all vessels." *Id.* at 4, 4–ER–615. These checklists and job aids are merely guides. No policies require that inspectors check all the boxes, follow them

10

line-by-line, or use them at all. *See* Hodgdon Dep. 111:23-112:9, 115:7-14, 116:8-19, 166:19-167:2, 177:16-21, 179:18-22, 4–ER–582-602.

One reason for this level of discretion in vessel inspection is the wide variation in vessels and their operational needs. Inspectors evaluate each vessel individually, to realistically assess its safety given its individual circumstances. "When determining inspection requirements and procedures . . . the overall safety of a vessel and its operating conditions, such as route, hours of operation, and type of operation, should be considered." Manual Vol. 2 at A1-14–A1-15, 4–ER–575-76. Inspectors must avoid "unreasonable requirements"; as such, "requirements may vary for similar vessels because of different proposed routes or service and other circumstances." Manual Vol. 1 at 3-13, 4–ER–610. "The steps required in such cases will naturally vary in each case." *Id.* at 3-24, 4–ER–612.

This individualized focus applies especially to Subchapter T, which encompasses a wide variety of vessels. T-boats can range from small launches and water taxis limited to a small harbor to larger vessels on multi-day ocean voyages carrying up to 150 passengers. T-boat inspections "require a realistic appraisal of the operational needs of this industry." Manual Vol. 2 at B4-1, 4–ER–581. For this reason, inspectors should be aware of "regulations that seem applicable [but] are actually inappropriate for the situation or not in the best interest of overall safety." *Id.* at A2-6, 4–ER–577. Inspectors must "take care to ensure that each regulation

11

being applied is relevant to the vessel and situation." *Id*. Inspectors may also accept "local practices" that are "safe and appropriate for local conditions, even if they do not conform specifically to regulations." *Id.* at A2-15, 4–ER–578.

The Manual also reflects a second reason for discretion: the competing goals of promoting safety and facilitating commercial operations. Manual Vol. 2 at A1-15, 4–ER–576. For example, the Manual instructs the Officer in Charge, Marine Inspection ("OCMI," the senior field officer with final authority to issue a COI) to "avoid unreasonable requirements and arbitrary or unreasonable decisions in the discharge of the marine safety programs." Manual Vol. 1 at 3-13, 4–ER–610. This is because "[i]t is not the Coast Guard's intent to place unnecessary economic and operational burdens upon the maritime industry." Manual Vol. 2 at A1-14, 4–ER–575-76. OCMIs should "promote a reasonable level of safety and . . . minimize unnecessary expenses on the part of vessel and facility owners and operators." Manual Vol. 1 at 3-13, 4–ER–610. For this reason, inspectors should use "[s]ound judgment and understanding . . . so that appropriate safety standards are maintained without imposing unnecessary or unreasonable standards on vessel and facility owners, operators, and crews." *Id.* at 3-24, 4–ER–612. Inspectors should be "capable of balanced decisions with consideration of how they affect commerce, public safety, and environmental risk." Manual Vol. 2 at A7-4, 4–ER–579.

12

### C.     Local Coast Guard Practice

Coast Guard inspectors from its Santa Barbara detachment conduct annual inspections, with authority to endorse a current COI, allowing a vessel to continue operating. Hodgdon Dep. 90:15-20, 174:19-23, 4–ER–582-602. During an inspection of a vessel, an inspector creates an Activity Summary Report in the electronic database system, which serves as the Coast Guard's official record of the inspection. Price Larson Dep. 89:1-17, 4–ER–622. As mentioned, in documenting an inspection, however, an inspector is not required to "check the[] boxes" on the report, nor include details of all items inspected. *Id.* 88:2-93:3, 4–ER–621-23. Rather, the report merely reflects when and where a vessel was inspected and generally what systems were inspected, relying on inspectors' training, experience, and judgment for how to inspect those systems. *Id.* 91:6-92:8, 4–ER–622. If an inspector finds a deficiency, greater detail is added to document that deficiency.

### D.     *Conception* Certification and Inspections

Built in 1981, *Conception* was an Old T vessel and was allowed to comply with either Old T or New T regulations. COI, 4–ER–627-28; Hodgdon Dep. 84:13-17, 4–ER–589; Caputo Dep. 92:9-22, 4–ER–632. The Coast Guard most recently issued a COI to *Conception* on November 14, 2014. COI, 4–ER–627-28. *Conception*'s COI required as a "condition of operation" that a member of the vessel's crew be designated as a "roving patrol" at all times when the passengers'

13

bunks are occupied, as on the night of the casualty. *Id*. This is also required on all T-boats by regulation. 46 C.F.R. § 185.410(a) (2019).

In February 2019, about seven months before the fire, *Conception* underwent an annual inspection and hull exam by Coast Guard Chief Warrant Officer Daniel Hager, an experienced T-boat inspector. Activity Summary Reports, 3–ER–511-16. The first day of the inspection was on February 13, 2019, while the vessel was in dry dock. *Id*., 3–ER–512, 515. Mr. Hager visited the vessel again on March 1, 2019, for a post-drydock check ride. *Id*. Following the inspection, Mr. Hager endorsed the COI, allowing *Conception* to continue operating; he determined that, "[i]n [his] opinion, the vessel is fit for route and service as specified on the current COI." *Id*.

### E.    Fire and Sinking of *Conception*

This paragraph's facts are taken from the First Amended Complaint. ¶¶ 103, 126-29, 4–ER–756, 766-67. In the early morning hours of September 2, 2019, the *Conception*, a dive boat owned and operated by Truth Aquatics, Inc., sailed out of Santa Barbara on an overnight dive trip with thirty-three passengers and six crewmembers onboard. After a day of diving, the vessel anchored off the Channel Islands. That night, a fire broke out somewhere on the vessel. By the time the crew awoke from their bunks on the upper deck, fire raged across the main deck. The captain abandoned ship, jumping overboard to safety, and directed his crew to

follow suit. Thirty-four people—all thirty-three passengers and one crewmember—were trapped in the bunk room directly below the fire. The vessel burned to the waterline before the remaining hull sank. All thirty-four persons aboard perished.

Although the cause of the fire remains unknown, its tragic outcome was the result of Captain Boylan's failure to assign a nighttime roving patrol to detect emergencies. He was convicted of violating 18 U.S.C. § 1115 ("seaman's manslaughter"). *United States v. Jerry Boylan*, Case No. 2:22-cr-004820 (C.D. Cal.); *see also id.,* Indictment (Oct. 18, 2022) (failure to maintain a night watch or roving patrol, despite his duty to do so under 46 C.F.R. § 185.410 and as set forth in the COI posted onboard *Conception*).

### F.    Prior Proceedings

In March 2021, Plaintiffs sued multiple defendants in state court; that action is still pending. *See Fiedler, et al. v. Truth Aquatics, et al*., Case No. 21STCV08121, (Cal. Super. Ct.). Plaintiffs sued the United States in September 2021. This case was stayed for a period of time due to the criminal proceedings against Captain Boylan. *See generally* Supp. Joint R. 26(f) Rep. (Sept. 19, 2022), 4−ER−678-90. In October 2022, the district judge opened discovery in this case limited to the application of the discretionary function exception, contemplating a motion for summary judgment on the issue. Order (Oct. 14, 2022), 4−ER−677; Order (Dec. 1, 2022), 4−ER−663. Discovery was open until the end of May 2023. Order, (Feb. 28,

2023), SER–22-24. The United States later clarified, by stipulation with Plaintiffs, that a motion to dismiss was the proper procedure to challenge subject matter jurisdiction. Joint Admin. Mot., SER–14-21; Stipulation, 4–ER–654-60. The district court granted the United States leave to file a motion to dismiss. Order, SER–11-13. Following further delays to coordinate this case with other pending cases, *see generally* SER–3-10, the United States filed the motion to dismiss that is the subject of this appeal. 3–ER–517-63.

### G.    District Court Ruling

The district court granted the United States' motion to dismiss. 1–ER–3-11. It ruled that the applicable statutes, regulations, and policies governing the Coast Guard's inspection of passenger vessels vested both the Coast Guard and its inspectors with discretion. 1–ER–8. The court further ruled that the discretion was of the type meant to be protected from suit against the United States. 1–ER–8-11. In particular, the court held that both the governing statute, 46 U.S.C. § 3305(d)(1), and internal Coast Guard guidance encourage inspectors to use judgment and discretion. 1–ER–8. The court quoted at length the Marine Safety Manual, which grants an inspector great latitude in the scope of an inspection. 1–ER–8-9. With respect to vessel safety regulations, the court ruled that "the relevant regulations actually impose obligations on vessel owners and grant to the Coast Guard and its inspectors considerable discretion when conducting vessel inspections." 1–ER–9.

16

The court found that Plaintiffs mischaracterized both the regulations and the testimony of the Coast Guard's Rule 30(b)(6) deponent. 1−ER−9-10. The court agreed that the duty to comply with the regulations lies on vessel owners/operators, while the Coast Guard has discretion as to how to inspect vessels regarding this compliance. *Id*.

The district court cited relevant Ninth Circuit precedent, 1−ER−6-8, 10, in addition to the cases of *Cassens*, *Smith*, and *Varig Airlines*. 1−ER−10-11.

## SUMMARY OF ARGUMENT

The district court correctly dismissed this action against the United States. Plaintiffs failed to establish that the Coast Guard had a mandate to catch any and all violations of safety regulations by the owner/operator. To the contrary, the statutory and regulatory scheme granted discretion to the Coast Guard in its oversight of the private vessel and operator. This type of discretion is the classic "discretionary function" explained in the seminal *Varig Airlines* case: "[W]hatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813-14 (1984).

Plaintiffs' new, last-ditch argument that the discretionary function exception does not apply to claims brought under the SIAA is untimely and contrary to the

17

law of this Circuit. The decision in *Earles v. United States*, 935 F.2d 1028, 1032 (9th Cir. 1991), holding that the discretionary function exception applies to the SIAA, remains the law and governs this action.

## STANDARD OF REVIEW

"The existence of subject matter jurisdiction is a question of law reviewed de novo." *Sabow v. United States*, 93 F.3d 1445, 1450 (9th Cir. 1996) (citing *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995)). However, "[t]he district court's factual findings on all jurisdictional issues must be accepted unless clearly erroneous." *Id.* (citing *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 990 (9th Cir. 1994)). The government bears the burden of proving that the discretionary function exception applies. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002).

## ARGUMENT

**I.      The Discretionary Function Exception Bars Plaintiffs' Suit.**

*Standard of Law*:  The United States is immune from suit unless it expressly waives its sovereign immunity. Absent a waiver, federal courts lack subject matter jurisdiction. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Plaintiffs bring this action under the SIAA, 46 U.S.C. § 30903. The SIAA does not waive sovereign immunity for discretionary, policy-based conduct by an employee or agency of the United States. This exception is the same as that explicitly stated in

the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *Earles*, 935 F.2d at 1032. Courts lack subject matter jurisdiction over tort claims challenging such conduct. *United States v. Gaubert*, 499 U.S. 315 (1991). The exception is intended to protect discretionary decisions that, if exposed to tort liability, could "seriously handicap efficient government operations." *Varig Airlines*, 467 U.S. at 814. It reflects Congress's intent to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . ." *Gaubert*, 499 U.S. at 323 (quoting *Varig Airlines*, 467 U.S. at 813).

Negligence is not considered in the analysis. The exception applies "whether or not the discretion involved be abused." *Lam v. United States*, 979 F.3d 665, 672 (9th Cir. 2020) (quoting 28 U.S.C. § 2680(a)). As this Circuit explained, "even if the employee's discretionary act is negligent, the district court should dismiss plaintiff's case." *Id.* at 673.

To decide a question of discretionary function, the Court first defines the challenged conduct. *Gaubert*, 499 U.S. at 322. Next, the Court applies a two-step analysis, determining: (1) whether the challenged act involved an element of judgment or choice, and (2) whether the act is susceptible to policy considerations – *i.e.*, was the conduct the type that the exception was designed to shield. *Lam*, 979 F.3d at 673-74.

19

### A. The Challenged Conduct Is the Coast Guard's Inspection and Certification Policies in their Totality.

The "crucial" threshold inquiry in the discretionary function analysis is defining the scope of conduct at issue. *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012); *see also Gaubert*, 499 U.S. at 322. The analysis is not limited to the individual allegedly negligent act, but the *type* of conduct involved. In *Lam*, the plaintiffs challenged an agency's management of hazards in a park after they were injured by a falling tree. 979 F.3d at 670, 675. The Ninth Circuit held that the scope of the inquiry was not the management of that specific tree, but rather "all the relevant policies in their totality and how they fit together to determine if they are discretionary or mandatory." *Id*. at 676.

The Seventh Circuit defined the scope of the challenged conduct in a case involving Coast Guard vessel inspections, like this one. *Cassens v. St. Louis River Cruise Lines, Inc*., 44 F.3d 508 (7th Cir. 1995). There, the court considered a claim that the Coast Guard was negligent in inspecting and certificating a passenger vessel. *Id.* at 515. The court rejected plaintiffs' narrow framing of the issue as whether the inspector had discretion to miss or ignore a missing handrail. Rather, the question was whether the Coast Guard "was required by statute or regulation to follow a specific course of action when inspecting the ship as a whole," or whether it had "the discretion to formulate and conduct a specific inspection procedure."

*Id*.; *see also Gaubert*, 499 U.S. at 324-25, 329, 331-32 (purpose of controlling statute defines challenged conduct).

In the present case, Plaintiffs allege that the Coast Guard negligently inspected and certificated *Conception,* despite the vessel's alleged violations. 4–ER–768-69, Am. Compl. ¶ 132. Plaintiffs essentially frame the issue as the inspectors' alleged negligence in failing to spot violations in inspections prior to the fire—just as the *Cassens* plaintiffs alleged that the Coast Guard inspector failed to spot the missing handrail. But the proper scope of the inquiry is whether the applicable statutes, regulations, and policies allow inspectors discretion in how to inspect vessels and issue certificates. As demonstrated below, they do.

### B. Prong One: The Controlling Statutes, Regulations, and Policies Vest the Coast Guard with Discretion.

The first prong examines whether the challenged conduct "involves an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). This prong examines only the statutes, regulations, or official policies governing the type of conduct, not how individual employees carried out those acts. *See generally GATX*, 286 F.3d at 1174-75. "[A]ll that matters is that there was, in fact, discretion." *Lam*, 979 F.3d at 672 n.3. The Court considers "all the relevant policies in their totality and how they fit together to determine if they are discretionary or mandatory." *Lam*, 979 F.3d at 676; *see also Gaubert*, 499 U.S. at 422; *Berkovitz*, 486 U.S. at 539.

21

### 1. The Statutes, Regulations, and Policies Demonstrate the Coast Guard's Discretion in Conducting Inspections.

Through the relevant statutes in Titles 14 and 46, Congress established a regime of vessel safety and compliance and vested discretion in the Coast Guard in how to implement and enforce this regime. This regime imposes safety requirements on vessels and places the duty on vessels to comply with the requirements. A Coast Guard inspection merely checks a vessel's compliance with its duty to meet these standards. Neither the regulations nor Coast Guard guidance divest Coast Guard inspectors of their discretion to determine the scope of their inspections and whether to issue Certificates of Inspection.

Plaintiffs fail to identify any specific mandates requiring the Coast Guard to conduct its vessel inspections in a particular way.[7] Rather, Plaintiffs allege the vessel violated certain regulations that the Coast Guard failed to catch. Yet the regulations impose a duty of compliance on the *vessels*, not on the Coast Guard. "The owner or managing operator of a vessel shall ensure that the vessel complies with the laws and regulations applicable to the vessel and that the vessel is otherwise satisfactory for the intended service." 46 C.F.R. § 176.402(c) (2019). The Coast Guard must rely on "the trust [it] place[s] in a licensed master" to

---

[7] Plaintiffs implicitly acknowledge the Coast Guard's discretion in the Amended Complaint, alleging that Coast Guard employees "[a]bused their discretion." 4–ER–768-69, Am. Compl. ¶ 132.

uphold their duty and follow the regulations, as well as "the responsibility of the master to report whether or not they can in fact comply with those requirements." Caputo Dep. 114:1-11, 4–ER–634; *see also* Price Larson Dep. 95:16-97:11, 4–ER–623-24 (Coast Guard must "trust that the licensed mariner is going to operate the vessel within the confines of" the regulations and "the bounds of their license"). Licensed mariners are required by statute to assist Coast Guard inspectors by "point[ing] out defects and imperfections known to the individual in matters subject to regulations and inspection." 46 U.S.C. § 3315(a).

Both the statute and the regulations are "devoid of specific directives"; neither prescribe "specific steps for inspectors to follow in conducting their inspection." *Cassens*, 44 F.3d at 513-14. The circuit court in *Cassens* found it irrelevant that regulations prescribe hundreds of highly specific requirements with which vessels must comply because the inspection procedure itself involves the type of discretion protected from suit. *Id*. at 513.

Plaintiffs claim that a single "shall" in the enabling statutes "eliminat[es] any discretion" from the entire vessel safety regulatory scheme. The only mandate they identify is that the Coast Guard "shall" promulgate and enforce marine safety regulations. Pls.' Br. 49 (quoting 14 U.S.C. § 102). The Coast Guard has done that. *See* 46 C.F.R. Subchapter T. Congress further specifies only the broad contours and goals of vessel inspections. *See* 46 U.S.C. §§ 3301, 3305, 3307. Inspections

are intended to determine that a vessel is of a structure "suitable" for the service in which it is to be employed; is equipped with "proper" appliances for lifesaving, fire prevention, and firefighting; is in a condition to be operated with safety to life and property; and complies with applicable laws and regulations. 46 U.S.C. § 3305(a)(1). Beyond that, Congress has not mandated *what* regulations the Coast Guard must promulgate, nor how, specifically, it must enforce them.

The Coast Guard's regulations, in turn, vest discretion in individual inspectors, using language such as "may be checked," 46 C.F.R. § 176.402(b) (2019), "may include," *id*. § 176.402(c) (2019), and "normally includes," *id*. § 176.404(a) (2019)). The regulation about annual spot checks, for example, leaves it to the inspector to determine the scope of the inspection – as well as discretion to change the scope of the inspection depending on the inspector's findings. 46 C.F.R. § 176.500(b)(1)(ii) (2019). These regulations neither mandate any specific inspection procedures nor require inspectors to examine all or any particular requirements out of the many hundreds that Subchapter T imposes on vessels. *See generally Smith v. U.S. Coast Guard*, 220 F. Supp. 2d 275, 280-81 (S.D.N.Y. 2002) (citing 46 C.F.R. § 176.100, 46 C.F.R. §176.400(a), and 46 U.S.C. § 3305(a)); *see also* Hodgdon Dep. 166:17-168:16, 4–ER–595; Price Larson Dep. 49:7-50:3, 4–ER–620.

In a similar case, passengers who were injured when a water taxi capsized sued the United States. They alleged the Coast Guard negligently inspected and certificated the vessel, which was later found to violate certain regulations. *Smith*, 220 F. Supp. 2d at 277. The district court granted the United States' motion to dismiss based on the discretionary function exception. The court found that although Subchapter T imposes "highly detailed" requirements for vessels, the regulations "do not specify the means by which the Coast Guard inspector is to determine compliance" with these standards. *Id.* at 281. While the regulations and statutes require the Coast Guard to do an inspection before issuing a COI, neither mandate any "specific tests or inspections prior to issuing a COI." *Id.* at 280-81. Instead, they leave it "to the discretion of the Coast Guard inspector to determine which inspections to conduct." *Id.* at 281 n.8. The court rejected plaintiffs' argument that Subchapter T "required" an inspector "to determine compliance with each of these regulations before issuing a COI." *Id. Accord In re Ocean Ranger Sinking Off Newfoundland on Feb. 15, 1982*, 632 F. Supp. 72, 75-76 (E.D. La. 1985) (ruling that claims of Coast Guard negligence in inspection and certification of vessel fell within the discretionary function exception as defined by *Varig Airlines*).

As the *Smith* court found, the Subchapter T regulations and Coast Guard policies expressly allow Coast Guard inspectors to determine which requirements

25

they will impose on a vessel. The Coast Guard has no duty to ensure compliance with every regulation before issuing a COI but may exercise discretion to decide what to inspect on any given vessel. *Smith*, 220 F. Supp. 2d at 282 (citing 46 C.F.R. § 176.800(b)); *see also* Manual Vol. 2 at A1-14, B2-1, 4–ER–575, 580. A COI is not a guarantee that a vessel complies with every regulation; it merely attests to the "reasonable probability" that a vessel complies with minimum safety standards. Manual Vol. 2 at A1-14, 4–ER–575.

Coast Guard inspectors are expressly given discretion to focus on each vessel's particular circumstances. Part 176 allows that "[i]n the application of inspection standards due consideration must be given to the hazards involved in the operation permitted by a vessel's Certificate of Inspection." 46 C.F.R. § 176.800(b) (2019). The requirements the Coast Guard places on a vessel "may vary in accordance with the vessel's area of operation or any other operational restrictions or limitations." *Id*. Citing this section, the *Smith* court dismissed the claim that if a T-boat failed to comply with any regulation, the Coast Guard was liable. Rather, Coast Guard inspectors "are given discretion to vary the application of inspection standards." 220 F. Supp. 2d at 282 (citing 46 C.F.R § 176.800(b)). Inspectors are given "great latitude" to "vary the degree of attention they give to individual [regulations] as circumstances require . . . based on his or her evaluation of the vessel's overall condition." Manual Vol. 2 at B2-1, 4–ER–580; *see also*

*Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994) (United States is not "an insurer for every private party's violation of a federal regulat[ion]").

The situation here is like *Varig Airlines*, where an airliner crashed following a fire that began in a trash receptacle. *Varig Airlines*, 467 U.S. at 814. The plaintiffs argued that the FAA negligently certified the aircraft despite its violation of a safety regulation requiring that trash receptacles be fire-resistant and incorporate features for containing fires. *Id.* at 801; 2–ER–104-12 (*Varig Airlines* complaint excerpt, alleging inspection should have caught flammable trash receptacle design). The Supreme Court found the FAA's inspection program—a "spot check" program, not a comprehensive compliance review—was discretionary even without any evidence that the inspector actually checked the trash receptacle. *Varig Airlines*, 467 U.S. at 814, 818-19. The Court concluded that "the FAA's alleged negligence in failing to check certain specific items in the course of certificating a particular aircraft falls squarely within the discretionary function exception." *Id.* at 820.

That reasoning applies equally to Coast Guard vessel inspections. Plaintiffs focus on the safety regulations requiring vessels to use non-combustible materials for trash receptacles and chairs. *See* Pls.' Br. 13. But nothing in the statutes, regulations, or any formal Coast Guard policy requires inspectors to examine those requirements, out of hundreds of applicable requirements. Rather, as with the

FAA's "spot check" system in *Varig Airlines*, inspectors have discretion to determine which specific regulations to focus on and what items to inspect.

### 2. To the Extent Individual Subchapter T Standards Are Relevant, None Require the Coast Guard to Conduct its Vessel Inspection and Certification in a Particular Manner.

The Coast Guard's inspection policies and regulations in their totality allow ample discretion for inspectors to determine the scope and focus of their inspections. To the extent any individual Subchapter T regulation is relevant to the discretionary function question, none identified by Plaintiffs defeats the exception.

In their Complaint, Plaintiffs allege the United States is liable because the Coast Guard certificated the *Conception* despite issues with the vessel's "electrical wiring and systems, her fire detection and suppression systems, her passenger-accommodation escape hatch, her watch logs and training logs." 4–ER–768-69, Am. Compl. ¶ 132. In discovery, however, including in depositions of all six Coast Guard witnesses, Plaintiffs pursued a more specific theory that the fire started in a trash receptacle onboard the vessel.[8] They focused questions on two New T regulations, 46 C.F.R. §§ 176.830(a) and 177.405(f). The former directs vessel owners generally that after each inspection, "all observed unsafe practices, fire

---

[8] When it better suits them, Plaintiffs claim that the fire started elsewhere. They alleged earlier here that the fire was caused by lithium-ion batteries or other electrical equipment plugged in to the ship's outlets. *See* 4–ER–767, ¶ 128. In their state court action, Plaintiffs allege unequivocally that the fire was ignited by lithium-ion batteries manufactured by defendants. *See* note 2, *supra.*

hazards, and other hazardous situations must be corrected and all required guards and protective devices must be in satisfactory condition." 46 C.F.R. § 176.830(a) (2019). The latter requires that "[u]nless other means are provided to ensure that a potential waste receptacle fire would be limited to the receptacle, waste receptacles must be constructed of noncombustible materials with no openings in the sides or bottom." 46 C.F.R. § 177.405(f) (2019). Plaintiffs point to mandatory-sounding language in these regulations to suggest that they bind Coast Guard inspectors. But these regulations establish no mandatory course of conduct for an inspector. No statute or regulation requires inspectors to ensure compliance with those particular regulations out of all requirements in Subchapter T.

More specifically, § 176.830(a) is not a specific mandate on Coast Guard inspectors. First, both the structure of Part 176 and language throughout that part make clear that it speaks to owners/operators, not inspectors. *See* 46 C.F.R. §§ 176.800-840 (2019). Second, this generic, catch-all language falls short of imposing a specific mandate. It does not define what might constitute "unsafe practices" or "fire hazards." Rather, like the other general duties Part 176 imposes on owners/operators, it is the substantive standards in Parts 177-185 that define hazards and violations for specific equipment and systems.[9] In its proper context,

---

[9] Here, for example, § 177.405(f) defines what may constitute a hazardous trash can; for furnishings, it is § 177.410. And an entire Part, 183, defines numerous electrical requirements and hazards.

§ 176.830(a) directs that *if* something is observed and deemed to be a hazard, per those standards, the owner/operator must correct it.

Furthermore, a plastic trash can is not necessarily a fire hazard per § 176.830(a).[10] The only standard governing trash cans is § 177.405(f). This regulation does not prohibit non-steel receptacles; it requires that they be made of "noncombustible materials," but only applies "*[u]nless* other means are provided" to limit a potential fire. 46 C.F.R. § 177.405(f) (2019) (emphasis added). It does not define acceptable "other means," leaving it to inspectors' discretion whether a trash can is a fire hazard.[11] For this reason, Commander Stephanie Hodgdon, Chief of the Coast Guard's Domestic Vessel Compliance Division, testified that the mere existence of a plastic trash can was not an "obvious violation" of § 177.405(f), because "the first part of the regulation . . . says 'unless other means are provided.'" Hodgdon Dep. 232:7-233:8, 4–ER–600-01; *see also* Caputo Dep. 104:4-12, 4–ER–633.

---

[10] To the extent Plaintiffs cite New T regulations, the New T standards were not mandatory for *Conception*. Neither § 177.405 nor § 176.830 are specified as exceptions to the general rule for grandfathering, which are expressly stated in each part. *See* 46 C.F.R. § 175.112 (2019) (exceptions to grandfathering for "existing" [Old T] vessels are specified in each part); *cf.* 46 C.F.R. § 183.115(a), (b) (2019) (specifying two Part 183 regulations excluded from grandfathering).

[11] "Noncombustible material" includes, *inter alia*, any "other standard specified by the Commandant," leaving it to the discretion of the Coast Guard what is permissible in any given circumstance. 46 C.F.R. § 175.400 (2019).

*Conception*, an Old T vessel, was not required to comply with § 177.405(f), a New T regulation; rather, it could choose to comply with either New T or Old T. Old T regulates trash cans only in certain locations. It requires "[c]overed metal trash containers," only in "areas located below the main deck," and does not regulate trash cans anywhere else. 46 C.F.R. § 177.30-7(d), (a) (1995). Thus, *Conception* was not prohibited from having the plastic trash cans Plaintiffs suggest she carried on her main deck.

For these reasons, there is no mandatory duty for an inspector to identify all plastic trash cans on a T-boat, nor to determine that all plastic receptacles are fire hazards and require corrective action. Rather, an inspector has discretion to observe a plastic trash can and deem it not a fire hazard or to simply not inspect trash cans. Only if the inspector (1) inspected a trash can, and (2) determined it to be, in his discretion, a fire hazard, could he arguably have a nondiscretionary duty under § 176.830(a) to require corrective action.[12]

---

[12] Commander Hodgdon testified that the regulations leave discretion to inspectors about what requirements to inspect and how to inspect them. For example, she testified that pursuant to § 176.830(a), "a non-steel trash can" *could* be a fire hazard. Hodgdon Dep. 229:24-230:24, 4–ER–600. If an inspector observed such a trash can *and* deemed it to be a fire hazard, he would be required to at least note it as a deficiency and require corrective action. *Id.* 231:4-8. Implicit in these questions—and apparent on the face of these regulations—is that this requirement applies only if a fire hazard is "observed." *See* Hodgdon Dep. 230:11-16, 4–ER–600 ("Q . . . all *observed* fire hazards must be corrected? A. Yes.") (emphasis added), 231:4-8 ("Q . . . w[h]ere such a fire hazard, a non-steel trash can is *observed* . . . the inspector should take action . . .") (emphasis added).

The *Cassens* court discussed this very hypothetical, where an inspector identifies a violation but fails to require the vessel to correct it. The court distinguished this from situations where, as happened here, the inspector simply does not inspect a particular requirement, or where he inspects something, but does not find a violation. *Cassens*, 44 F.3d at 515; *see also Gonzalez v. United States*, 851 F.3d 538, 546-47 (5th Cir. 2017) (where policy required agency to conduct inspections but did not specify precisely how, it was irrelevant to the discretionary function exception analysis that the employee could not recall whether he inspected a specific requirement, because the policy as a whole allowed "room for choice" in deciding what to inspect).[13]

The United States acknowledges that not every aspect of a vessel inspection is necessarily discretionary, without exception. In the present case, however, no specific mandate required the inspector to "catch" any of the violations that

---

[13] Plaintiffs mischaracterize the testimony of Chief Warrant Officer Hager to mirror the *Cassens* hypothetical. They claim that he "admitted" plastic chairs were "obvious fire hazards," Pls.' Br. 10, and "recalled seeing the plastic garden chairs, knew they were potential fire hazards, yet failed to write them up." *Id.* at 14. Mr. Hager said none of this. Plaintiffs asked whether plastic chairs were "*potentially* a fire hazard"; Mr. Hager responded by referring only generally to a "regulation that speaks to . . . furnishings," and gave no answer whether "a polypropylene chair" might be a fire hazard under that regulation. Hager Dep. 93:25-94:15, 3–ER–389-90. He remembered few specifics about his 2019 inspection of *Conception*; even after watching a video of the vessel, he remembered only "generally what the vessel looked like." Hager Dep. 62:20-63:17, 3–ER–384-86. Plaintiffs never asked him whether he even saw plastic chairs, much less whether he determined them to be a fire hazard.

Plaintiffs allege. By contrast, certain Coast Guard regulations do prescribe specific, mandatory procedures. The Seventh Circuit in *Cassens* recognized that "when Coast Guard inspectors are required to follow specific inspection procedures, the regulations carefully specify those procedures." 44 F.3d at 514. The *Cassens* court cited a regulation in 46 C.F.R. Subchapter H, a more rigorous set of regulations governing larger passenger vessels, requiring that "[a]t each annual inspection, *the inspector shall conduct* the following tests" followed by "detailed provisions" and step-by-step procedures for testing lifeboats. *Id.* (emphasis added) (quoting 46 C.F.R. § 71.25-15). "The obvious implication is that where such specific directives are absent, it is within the individual inspector's discretion how to conduct the inspection." *Id.* Just like *Cassens*, Plaintiffs identify no mandatory, step-by-step inspection procedures here.

### 3. Plaintiffs' Misinterpretations of Coast Guard Testimony Cannot Override Regulations or Formal Policies.

Plaintiffs argue that the district court erred in its interpretation of Coast Guard testimony, claiming it ignored Commander Hodgdon's testimony about inspectors' duties. Pls.' Br. 54-56, 71-72. To the contrary, the district court considered and declined to accept these arguments: "Plaintiffs similarly mischaracterize the testimony of the Coast Guard's 30(b)(6) deponent . . . ." 1−ER−9-10. Furthermore, resorting to witness testimony is not a substitute for the "statutes, regulations, and agency guidelines" that are the "competent sources" for

33

the first step analysis. *Irving v. United States,* 162 F.3d 154, 166 (1st Cir. 1998) (*en banc*) (anecdotal testimony is a "last ditch resort" to analyze relevant policies).

A thorough retelling of Plaintiffs' mischaracterization can be found in the United States' reply memorandum, 2–ER–92-95. In brief, Plaintiffs' questions did not pinpoint *who* was bound by the regulatory mandates at issue. No one testified that the regulations placed a mandate *on the Coast Guard. See* 2–ER–255-56. The regulations themselves make clear that the vessel owner/operator has the ultimate duty to ensure compliance. (*i.e.*, to correct unsafe practices and fire hazards). *See* 46 C.F.R. § 176.402(c). Further, Plaintiffs' hypothetical questions assumed an inspector actually observed a particular regulatory violation. Hodgdon Dep. at 325:13-22, 2–ER–259 ("for the purposes of my hypothetical right now, I'm asking you to assume that . . . ."). There is no evidence here that any inspector saw any deficiency that, in his discretion, constituted a hazard to the vessel. Inspectors make numerous decisions and judgment calls during an inspection; they cannot examine every part of every vessel at every inspection. Doing so would be contrary to Congress's instruction that the Coast Guard balance safety with the need to facilitate and safeguard commerce.

Additionally, Plaintiffs' questions failed to distinguish between Old T and New T standards. But *Conception* was not required to comply with New T regulations except for a specified few excluded from grandfathering. Plaintiffs

34

asked Commander Hodgdon about two specific New T regulations they cited by number: 46 C.F.R. § 176.830(a) and 46 C.F.R. § 177.405, and she testified about those regulations specifically. Pls.' Br. 12-13. They did not ask whether those two New T regulations would have applied to *Conception*; even though she also testified that *Conception* "would have been inspected under Old T." Hodgdon Dep. at 84:16-17, 4–ER–589. Commander Hodgdon's testimony cannot create a mandate where one does not otherwise exist.[14]

Plaintiffs further argue that New T and Old T regulations are nearly the same because both require a vessel owner/operator to correct unsafe practices and hazards observed on an inspection. Pls.' Br. 15, citing 46 C.F.R. § 176.830(a). But, as explained above, this regulation is directed at owners and operators, like the rest of Part 176, not inspectors. Further, it falls well short of being a specific mandate because it does not define what may be such a hazard; that is the purpose of the hundreds of substantive regulations under each category of Parts 177-185.

---

[14] The same goes for Captain Robert Compher's testimony, which Plaintiffs argue proves that trash cans and plastic chairs are "furnishings" governed by 46 C.F.R. § 177.115(b). Pls.' Br. 13 (citing 3–ER–367:21-373:23). This does not change the fact that, per the regulations themselves, a separate regulation governs trash cans, and that the "furnishings" standard does not apply to plastic deck chairs. *See* note 15, *infra.* Similar to Cmdr. Hodgdon, Capt. Compher's answer was based on a hypothetical with extensive assumptions. *See* Compher Dep. at 144:8-14, 3–ER–374 ("We're not asking what inspectors actually in real life knew. I'm asking you as a hypothetical, . . . and assuming that you either knew . . . .").

Plaintiffs also argue the New T standards for "furnishings" apply. Pls.' Br. 53 (citing 46 C.F.R. § 177.410). Yet the New T regulations, even if they applied here, do not prohibit the plastic deck chairs that Plaintiffs allege *Conception* carried. *See* 46 C.F.R. § 177.410 (2019).[15] Nor can this generic "furnishing" regulation be read to refer to trash cans, which are the subject of their own regulation. *See* 46 C.F.R. § 177.405(f) (2019); Caputo Dep. at 94:8-23, 2–ER–121.

Not only do Plaintiffs ignore the distinction between New T and Old T, Pls.' Br. 12-13, they also fail to acknowledge that grandfathering is the rule, not the exception. The regulatory scheme states that "an existing [Old T] vessel must comply with" the regulations applicable before 1996. 46 C.F.R. § 177.115 (2019). Section 175.112 provides that each substantive Part defines limited exceptions to this rule where "an existing vessel must comply with certain portions of [New T]." The electrical regulation cited by Plaintiffs, § 183.115, proves this point. Pls.' Br.

---

[15] The only requirement for "furnishings" in Subchapter T regulates those made of "general purpose resin," which "must comply with 116.423 in subchapter K of this chapter." 46 C.F.R. § 177.410(c)(5) (2019). But this requirement from Subchapter K—more rigorous regulations for larger passenger vessels—regulates only "upholstered furniture," and only in "[p]assageways and stairway enclosures." 46 C.F.R. § 116.423 (2019). Subchapter K also allows, as an alternative, compliance with § 72.05-55 of Subchapter H. *Id.* Subchapter H contains the most rigorous regulations for the largest passenger vessels. Yet even that most stringent set of regulations similarly only requires these "fire resistant furnishings" in "[p]assageways and stairway enclosures." 46 C.F.R. § 72.05-55(c) (2019). In short, none of these regulations prohibit non-upholstered chairs in *Conception's* main deck lounge area that Plaintiffs repeatedly cite as a violation.

12-13, 58. It restates the general rule and specifies just two requirements out of 32 sections in Part 183 that may not be grandfathered. 46 C.F.R. § 183.115(a), (b) (2019). These apply to navigation and emergency lighting, which are irrelevant here. *Id.* (citing §§ 183.420, 183.430).

Plaintiffs also claim the Coast Guard repeatedly "failed to inspect any part of Conception's electrical system." Pls.' Br. 56; *see also id.* at 18 (citing inspections in 2004, 2011, 2013, and 2015). In fact, the inspections they cite were hull or drydock inspections, which examine underwater hull structures, not electrical systems. Activity Summary Reports, 3–ER–299, 313, 329, 336 (each with "Hull" or "Hull Exam" as the "Title/Description"); *see also* 46 C.F.R. § 176.610 (2019).[16] This includes the 2013 hull inspection in which Plaintiffs allege that Chief Warrant Officer DeCamp cleared a deficiency—ordering replacement of non-marine-grade cable at the vessel's next drydocking—without logging an inspection of the electrical system. Pls.' Br. 18-19; *see also* Activity Summary Report, 3–ER–329-

---

[16] The only exception is the 2019 annual by Chief Warrant Officer Hager, whose report did not list an inspection of the electrical system. He testified, however, that this was most likely a clerical error in logging the report, because it would be highly unlikely for him to do no inspection of an electrical system whatsoever. Hager Dep. at 129:3-132:11, 2–ER–116; *see also* Hodgdon Dep. at 166:17-167:2, 4–ER–595 (to log an inspection of the electrical system, inspector merely need inspect any element of that system).

31.[17] Inspectors have discretion in how to verify that deficiencies have been corrected. Mr. DeCamp did not need to log a full inspection of the electrical system to clear a single wiring deficiency. *See* Hodgdon Dep. at 95:21-96:9, 97:1-98:17, 2–ER–237-40. Plaintiffs presented no evidence that Mr. DeCamp improperly cleared the deficiency.

### C. Prong Two: The Coast Guard's Establishment and Implementation of a Maritime Safety Program Is Susceptible to Political, Social, and Economic Policy Analysis.

In the second prong of the discretionary function exception analysis, the Court considers whether the discretion is the kind the exception "was designed to shield," *i.e.*, those decisions that involve economic, social, or political concerns. *Lam*, 979 F.3d at 673-74. This is an objective, not subjective, analysis. The challenged conduct itself "need not be actually grounded in policy considerations" but must merely involve a decision of a "nature [that is] susceptible to policy analysis." *Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015). "The focus of the inquiry is not on the agent's subjective intent . . . but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Lam*, 979 F.3d at 674 (quoting *Gaubert*, 499 U.S. at 325). The exception shields a

---

[17] Plaintiffs attempt to have it both ways by claiming the Coast Guard never inspected the electrical system and "never issued any deficienc[ies]," Pls.' Br. 56, but also arguing that the Coast Guard was at fault for issuing deficiencies for electrical wiring and improperly following up.

discretionary act from judicial review, regardless of whether the employee actually made a policy judgment. *Irving*, 162 F.3d at 168; *see also Cassens*, 44 F.3d at 515 (exception applied even if inspector did not make a "policy judgment" but merely "failed to look at the stairway and notice that there was no handrail").

Where the first prong is satisfied, the United States is entitled to a "strong presumption" that the second prong is also satisfied. *Gaubert*, 499 U.S. at 324; *see also Lam*, 979 F.3d at 681 ("[I]t must be *presumed* that the agent's acts are grounded in policy when exercising that discretion."). At the second prong, the United States "has no burden of production" and "may rest . . . on the *Gaubert* presumption." *Irving*, 162 F.3d 168.

The Coast Guard's marine safety programs, including the inspection and certification decisions at issue here, balance competing policy interests in at least three ways: (1) balancing vessel safety with the goal of facilitating commerce; (2) balancing uniformity with evaluating the safety of each vessel on an individual basis; and (3) operating within a finite budget to accomplish numerous statutory missions. 14 U.S.C. § 102(3); 46 U.S.C. § 3305(d)(1).

First, Congress directly ordered the Coast Guard "to avoid disruption and undue expense to industry" in vessel inspections. 46 U.S.C. § 3305(d)(1). The maritime industry is critical to commerce and national security. Maritime Commerce Strategic Outlook, 4–ER–637-45. Risk is inherent—the only absolutely

39

safe ship is one that never goes to sea. Congress granted the Coast Guard broad authority and flexibility to develop a certification and inspection program with goals of both reducing casualties and promoting shipping. The Coast Guard seeks "a balance between risks and costs to support the efficient flow of commerce." *Id.* at 18, 4–ER–645. The Coast Guard's goal is a "regulatory approach that strikes the right balance between facilitating and safeguarding commerce." Coast Guard Strategic Plan 2018-2022 at 18, 4–ER–651. As applied to vessel inspections, these competing policies require that "[a] balance must be maintained between the requirements of safety and practical operation." Manual Vol. 2 at A1-15, 4–ER– 576. The court in *Cassens* quoted this same language, holding that it requires Coast Guard inspectors "to make choices and exercise judgment in conducting their inspections." *Cassens*, 44 F.3d at 514. These choices "require balancing considerations of safety and economics" and as such "meet the second requirement for the application of the discretionary function exception." *Id.* at 514-15 (quoting *Gaubert*, 499 U.S. at 323).

The second kind of policy balancing involved in the Coast Guard's vessel inspection program is the need to evaluate each vessel's unique characteristics and circumstances, balanced against the goal of promoting a uniform level of safety. Coast Guard inspectors are not expected to follow a rote, identical procedure on every vessel. Rather, inspectors are expected to consider each vessel individually

40

and are given discretion to vary the attention they give to different requirements based on a vessel's individual circumstances. Manual Vol. 2 at B2-1, 4–ER–580. The requirements applied to a vessel "may vary in accordance with the vessel's area of operation or any other operational restrictions or limitations." 46 C.F.R. § 176.800(b) (2019). The Coast Guard's policies allow an inspector to consider the actual hazards faced by a particular vessel, based on its routes, capabilities, and other operational limits. *Id*.; *see also* 46 C.F.R. § 176.110 (2019); 46 C.F.R. § 175.550 (2019) (allowing "departures" from requirements when "circumstances or arrangements warrant such departures and an equivalent level of safety is provided").

This discretion enables inspectors to realistically evaluate each vessel's condition, thus more effectively promoting vessel safety. Subchapter T encompasses a wide variety of vessels and environments, ranging from small tenders carrying only a few people, to much larger vessels farther offshore. Tailoring inspections to individual vessels enables the Coast Guard to better evaluate the safety of each vessel. To best promote safety in each case, inspectors must consider "situations in which regulations that seem applicable are actually inappropriate for the situation or not in the best interest of overall safety." Manual Vol. 2 at A2-6, 4–ER–577. For this reason, inspectors must "take care to ensure that each regulation being applied is relevant to the vessel and situation." *Id*. This

41

discretion allows inspectors to focus on systems and requirements that, in their judgment, present a greater hazard or require more attention on a given vessel.

Both the *Smith* and *Cassens* courts recognized the reasons for this policy. In *Smith*, Coast Guard inspectors relied on the vessel's limited area of operation in deciding what requirements were relevant to that vessel's safety. 220 F. Supp. 2d at 282. The court found that this discretion to modify inspection standards met the second prong of the discretionary function test. *Id.* (citing 46 C.F.R. § 176.800(b)). In *Cassens*, the court found that inspectors "are required to make choices and exercise judgment in conducting their inspections," which includes "balancing considerations of safety and economics with reference to the needs and the uses of the particular vessel being inspected." 44 F.3d at 514-15; *see also Indemnity Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 181 (4th Cir. 2009) (policy permitting inspectors to use "judgment concerning the application of inspection standards based on the intended use of the vessel" meets the second prong of the test).

Absent such discretion, Coast Guard inspectors would perform the same rote inspection on every T-boat, without considering the individual capabilities of and hazards faced by each vessel. This one-size-fits-none approach is not the vessel safety regime that Congress ordered the Coast Guard to implement, and would directly harm future passenger vessel safety.

42

Finally, the Coast Guard must balance its resources among its eleven statutory missions. *See* 6 U.S.C. § 468 (a), (c). The Coast Guard makes policy-based decisions about how to commit its financial, personnel, equipment, and training resources among these missions to best serve national priorities. *See* Strategic Plan at 8, 22, 4–ER–647-53. Such considerations—whether it would be "economically or operationally feasible" to commit Coast Guard resources to a particular mission—"are a proper basis for the exercise of discretion." *Tew v. United States*, 86 F.3d 1003, 1006 (10th Cir. 1996); *see also Lam*, 979 F.3d at 681 ("competing policy considerations, such as safety, budget, staffing . . . are all the type of policy decisions that are protected under the [discretionary function exception]"); *Compagnie Maritime Marfret v. San Juan Bay Pilots Corp.*, 532 F. Supp. 2d 369, 382 (D.P.R. 2008) (Coast Guard decisions that balance "the needs of society and maritime commerce" with "the expenditure of federal funds" are inherently "grounded in social and economic policy").

Turning to case law, Plaintiffs point to the "thorny" nature of the policy prong analysis, citing *Whisnant* and *Bear Medicine*. Pls.' Br. 45. No such "thorniness" is present in this case, a classic discretionary function scenario. *Whisnant* arose from injuries caused by toxic mold in a grocery store on a Navy base. The case concerned maintenance of federal property. *Whisnant v. United States*, 400 F.3d 1177, 1184 (9th Cir. 2005). While acknowledging a lack of

43

discretion in the government's cleaning of its own meat department, the Ninth Circuit distinguished the discretion accorded to the government's regulatory compliance schemes: "maximizing compliance with regulations[] and allocation of limited resources among competing safety-promoting tasks hardly resemble the type of decision Whisnant attributes to [grocery] safety personnel." *Whisnant*, 400 F.3d at 1184. Similarly, in *Bear Medicine v. United States*, 241 F.3d 1208, 1217 (9th Cir. 2001), the Court applied a "design-implementation" analysis to find no policy basis for the BIA's failure to oversee a contract for a timber operation on Indian lands held under trust.

This "design-implementation" distinction must be applied "cautiously" and only in the narrow circumstances where, as is not the case here, "a private party would likely be held liable for the same conduct or omission." *Gonzalez v. United States*, 814 F.3d 1022, 1035 (9th Cir. 2016) (ruling that a broad interpretation of *Whisnant* and *Bear Medicine* "would simply swallow" the discretionary function exception); *see also Lam*, 979 F.3d at 683, 687 (Royal, J., concurring) (noting that *Whisnant* is not in harmony with other Ninth Circuit cases). Beyond this specific application, the "design-implementation" distinction made by *Whisnant* and *Bear Medicine* is indistinguishable from the "planning level/operational level dichotomy" that has otherwise been rejected by this Circuit in cases such as *Begay v. United States,* 768 F.2d 1059, 1062 n.5 (9th Cir. 1985) (rejecting the distinction

"in light of the Supreme Court's recent decision in *Varig*"), *Gasho v. United States,* 39 F.3d 1420, 1435 (9th Cir. 1994) (Supreme Court and Ninth Circuit "subsequently rejected this dichotomy"), and *Terbush v. United States,* 516 F.3d 1125, 1130 (9th Cir. 2008) (discretionary protection "not confined to the policy or planning level").

Even under its own terms, the "design-implementation" distinction does not apply where, as here, "the implementation itself implicates policy concerns," such as when a safety inspector must "weigh various regulatory objectives in deciding whether to certify" a commercial aircraft. *Whisnant,* 400 F.3d at 1182 n.3 (citing *GATX*, 286 F.3d at 1175-77); *see also Gonzalez*, 814 F.3d at 1035. *Cassens* and *Lam* show that the discretionary function exception applies under the *Whisnant/Gonzalez* analysis, because implementation of Coast Guard vessel inspections implicates policy concerns. Not only has Congress vested the Coast Guard with high-level discretion to design a vessel safety program, so too has the Coast Guard vested its inspectors with significant discretion in implementing this program through their inspections. *See Cassens*, 44 F.3d at 513.

Further, the Supreme Court's analysis in *Varig Airlines* is on point. The Court concluded that the acts of FAA inspectors fell under the discretionary function exception because the agency's "[d]ecisions as to the manner of enforcing regulations directly . . . require the agency to establish priorities for the

45

accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." *Varig Airlines*, 467 U.S. at 820. The Court recognized that "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 819-20; *see also Dalehite v. United States*, 346 U.S. 15, 42-43 (1953) (discretionary function exception applied to allegations that Coast Guard negligently inspected the loading of a cargo ship that later caught fire and exploded because the Coast Guard's actions were in furtherance of a statutory scheme that gave it discretion to regulate vessel loading).

In sum, Congress did not order the Coast Guard to conduct a rote and exhaustive inspection of every regulatory requirement on every vessel. *E.g.*, 14 U.S.C §§ 503, 504. Instead, the system relies on owners and operators to comply with the regulatory standards and their COIs, while the Coast Guard spot checks for compliance. Increasing the level of certification and inspection would require the Coast Guard to alter its priorities or require additional appropriations from Congress. This is exactly the type of policy balancing that is exempt from review in a tort action.

## II.    The Discretionary Function Exception Is Established Law.

In a last-ditch attempt to avoid the discretionary function exception, Plaintiffs raise a new argument that the exception should no longer apply to the SIAA, in light of the Supreme Court's decision in *Thacker v. Tennessee Valley Authority*, 587 U.S. 218 (2019). This argument fails for at least three reasons. First, Plaintiffs failed to raise this argument below and offer no compelling reasons it should not be considered forfeited. Second, Plaintiffs' argument would require this court to overrule precedent long established in this Circuit and in every other Circuit to consider the issue. Third, *Thacker,* the primary case on which Plaintiffs rely, deals with a different statute and expressly allows for an implied exception for discretionary government acts.

### A.    Plaintiffs Offer No Reason They Did Not Raise This Issue Below and Have Thus Waived Their Right to Raise It Now.

"It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." *Wood v. Milyard,* 566 U.S. 463, 470 (2012) (quoting *McCoy v. Mass. Inst. of Tech.,* 950 F.2d 13, 22 (1st Cir. 1991) (issue plaintiff failed to raise in opposition to motion to dismiss was "procedurally defaulted" on appeal; a "plaintiff has an affirmative responsibility to put [their] best foot forward in an effort to present some legal theory that will support [their] claim")). The Ninth Circuit will not review an issue "not submitted to [the district

47

judge] and upon which he has had no opportunity to pass." *Line Ins. Co. of N. Am. v. Reichardt,* 591 F.2d 499, 505-06 (9th Cir. 1979).

Plaintiffs cite *Thompson v. Runnels*, which held that an appeals court is not limited to "the precise arguments [parties] made below" in deciding a claim. 705 F.3d 1089, 1098 (9th Cir. 2013). However, this applies "[o]nce an issue or claim is properly before the court," the proponent having "fairly presented the substance of" his or her claim. *Id*. at 1095, 1098. The Supreme Court's opinion in *Yee* is illustrative of this threshold. *Yee v. Escondido*, 503 U.S. 519 (1992). In that case, plaintiffs challenged an action as a physical taking. On petition to the Supreme Court, they argued for the first time that it was also a regulatory taking. *Id.* at 533-34. The Court did not consider this claim because it was not "fairly included []in" the issues raised below. *Id.* at 537. The regulatory taking claim was merely "*related* to" the physical taking claim, but the two "exist side by side, neither encompassing the other." *Id.* Deciding "whether a regulatory taking occurred would not assist in resolving whether a physical taking occurred." *Id.*

As a "narrow exception to the general rule," a court "may consent to consider" an issue raised on appeal that "is purely one of law." *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). Even so, the Court "will only excuse a failure to comply with this rule when necessary to avoid a manifest injustice." *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006). The Court thus will

generally not exercise its discretion to consider an issue not raised below "[a]bsent exceptional circumstances." *G & G Prods., LLC v. Rusic,* 902 F.3d 940, 950 (9th Cir. 2018). An "unexplained failure to raise an argument that was indisputably available below is perhaps the least 'exceptional' circumstance warranting [the] exercise of this discretion." *Id.*

Yet Plaintiffs here do exactly that: raise on appeal an issue "indisputably available" to them below. Plaintiffs argue that because it is a "legal issue" this Court has discretion to consider it. But they base their argument primarily on *Thacker,* decided *five years* prior to the briefing on the United States' motion to dismiss below. Before that, Plaintiffs were afforded seven months of discovery and multiple extensions to the briefing schedule at their request. They have shown no "exceptional circumstances" to excuse their failure to raise the issue below.[18] They offer no reason at all, except to assert baselessly that it is "of no moment" that they did not. Pls.' Br. 41. Accordingly, the new claim should be deemed forfeited.

Plaintiffs cite four cases, all of which present different procedural postures and legal questions than here. In *Thompson v. Runnels,* the plaintiff claimed that police violated his Fifth Amendment rights; this claim depended on what

---

[18] In opposition to the motion to dismiss below, Plaintiffs argued three issues: that the motion should be decided on a summary judgment standard; that Plaintiffs needed further discovery to oppose the motion; and, on the merits, that the challenged conduct was not discretionary. 2–ER–144-45.

constituted "clearly established federal law" at the time. 705 F.3d at 1094. The suit was pending in state court when the Supreme Court issued a new controlling decision. *Id*. Because the plaintiff had at least "fairly presented the substance of his claim," the Ninth Circuit considered the new decision as part of an argument that was "properly before the court." *Id*. at 1095, 1098. That is not the case here. Plaintiffs never put the SIAA's implied discretionary function exception "properly before the court." Plus, the *Thompson* court's decision was an exception to the rule that it would "generally take care to avoid the unfairness inherent in deciding cases on bases not raised or passed upon in the tribunal below." *Id*. at 1099.

Second, Plaintiffs rely on *United States v. Alameda Gateway*, 213 F.3d 1161 (9th Cir. 2009). In that case, the United States sued for the cost to remove an obstruction from a navigable waterway; defendants alleged that the agency ignored its own regulation in removing the obstruction. *Id*. at 1164, 1167. The court considered an argument not raised below: that the regulation did not have the force of law and was not binding on the agency. *Id*. at 1167. The court was required to review that issue first to avoid "the unsavory prospect of reviewing a regulation . . . which our case law specifically precludes us from reviewing." *Id*. at 1168. That is not the case here. This Court is not precluded from deciding the merits of the discretionary function question without considering Plaintiffs' untimely new argument.

Plaintiffs also cite *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, 508 U.S. 439 (1993). This involved a particularly unusual question of law—if the statute the parties relied on had been "inadvertently repealed" decades prior—even though neither party raised the issue below. *Id.* at 444. The Supreme Court held that the court did not err in considering the issue: given "honest doubt about whether [the statute] existed as a law," the court "need not render judgment on the basis of a rule of law whose nonexistence is apparent on the face of things." *Id.* at 447. Plaintiffs here do not question whether a statute exists; they simply disagree with a 50-year body of law interpreting that statute.

Lastly, in *Lebron v. Nat'l R.R. Passenger Corp.*, the plaintiff sued Amtrak, alleging interference with his First Amendment rights. 513 U.S. 374, 377 (1995). The plaintiff originally claimed only that Amtrak's "close ties" to the government imposed a First Amendment duty. *Id.* At the Supreme Court, he argued that Amtrak was, in fact, a government agency. *Id.* at 379. The Court allowed this new argument as "not a new claim," but simply "a new argument to support . . . his consistent claim" that Amtrak was bound by the First Amendment. *Id.* at 379. Because the issues shared elements and were "dependent upon many of the same fact[s]," the new argument was "fairly embraced within the question" raised below. *Id.* at 379, 382. The court distinguished *Yee*, *supra*, wherein the two issues were "two distinct questions," neither of which was "included" in the other. *Id.* at 381.

51

Here, Plaintiffs' argument about the construction of the SIAA is not "fairly embraced within" their claim below that the Coast Guard's conduct was not discretionary per the applicable policies, nor are the facts of the discretionary function issue relevant to the construction and history of the SIAA necessary to decide the new argument.

## B.    The SIAA's Implied Discretionary Function Exception Is the Established Law of This and Every Other Circuit to Consider It.

The Ninth Circuit's decision in *Earles* is the established law of this Circuit. 935 F.2d 1028 (9th Cir. 1991). In that case, a jet ski crashed into a Navy buoy, killing five persons and injuring four more. *Id.* at 1030. The plaintiffs alleged the Navy negligently failed to illuminate the buoy. *Id*. The district court ruled that the discretionary function exception did not apply to claims under the SIAA. *Id*. The Ninth Circuit reversed, holding that the discretionary function exception applies to the SIAA, based on the doctrines of sovereign immunity and separation of powers. *Id*. at 1032, 1030 (citations omitted). The doctrine of sovereign immunity "is a doctrine to which the courts must adhere even in the absence of an explicit statutory command." *Id*. at 1030 (quoting *In re Joint E. & S. Dists. Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir. 1989)). Prior to enacting the FTCA, Congress "believed that claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction" regardless of any statutory exception; thus, the FTCA's express

52

exception "was drafted merely as a 'clarifying amendment.'" *Earles*, 935 F.2d at 1031 (quoting *In re Asbestos Litig.*, 891 F.2d at 354). There is no conflict among Circuits on this point. Every Circuit to address the question has concluded that the SIAA's waiver of sovereign immunity includes an implied discretionary function exception.[19] Nonetheless Plaintiffs urge a "wholesale retreat from a body of law that has been developed and refined over the course of almost fifty years." *McMellon v. United States,* 387 F.3d 329, 349 (4th Cir. 2004).

The Circuit is bound by its own precedent absent higher intervening authority. *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (*en banc*). A three-judge panel cannot overrule a prior panel's decision based on later Supreme Court precedent unless the prior decision is irreconcilable with the new precedent. *Id*. at 900. There is no such conflict here; Plaintiff's new argument applies only to circumstances quite different from this case. *See below.*

---

[19] *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1086 (D.C. Cir. 1980); *Gercey v. United States*, 540 F.2d 536, 539 (1st Cir. 1976), *cert. denied*, 430 U.S. 954 (1977); *In re Joint E. & S. Dists. Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir. 1989); *Sea-Land Serv., Inc. v. United States*, 919 F.2d 888, 891 (3d Cir. 1990), *cert. denied*, 500 U.S. 941 (1991); *McMellon v. United States*, 387 F.3d 329, 349 (4th Cir. 2004) (*en banc*), *cert. denied*, 544 U.S. 974 (2005); *Wiggins v. United States*, 799 F.2d 962, 966 (5th Cir. 1986); *Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) (*citing Chotin Transp., Inc. v. United States*, 819 F.2d 1342, 1347 (6th Cir. 1987) (*en banc*), *cert. denied*, 484 U.S. 953 (1987)); *Bearce v. United States*, 614 F.2d 556, 559-560 (7th Cir. 1980), *cert. denied*, 449 U.S. 837 (1980); *Earles*, *supra*; *Tew v. United States*, 86 F.3d 1003, 1005 (10th Cir. 1996); *Drake Towing Co. v. Meisner Marine Constr. Co*., 765 F.2d 1060, 1063-1064 (11th Cir. 1985).

### C.  *Thacker* **Has No Bearing on the Facts or Issues Presented Here.**

The primary case upon which Plaintiffs rely for their new, untimely

argument is *Thacker*. Pls.' Br. 38-41. But the *Thacker* opinion does not deal with

the SIAA's implied discretionary function exception, nor the Coast Guard or any

similar agency. Rather, the defendant in *Thacker* was the Tennessee Valley

Authority ("TVA"), a hybrid government-commercial corporation with a unique

enabling statute, the Tennessee Valley Authority Act ("TVA Act"), 16 U.S.C. §

831 *et seq*. *Thacker*, 587 U.S. at 220-221.

The TVA Act established the TVA as a "sue and be sued" entity, creating a

waiver of sovereign immunity unrelated to the SIAA. *Id.* at 221 (quoting 16 U.S.C.

§ 831c(b)). In holding that this waiver did not include an exception for the TVA's

discretionary commercial conduct, the *Thacker* court relied heavily on its decision

in *Fed. Housing Admin. v. Burr*. *Id.* at 224 (citing 309 U.S. 242 (1940)). The *Burr*

decision held that sue-and-be-sued clauses "should be construed liberally." 309

U.S. at 245-246. This is unlike traditional waivers of sovereign immunity, like the

SIAA, which must be "construed strictly in favor of the sovereign." *McMahon v.*

*United States,* 342 U.S. 25, 27 (1951). Later, when Congress passed the FTCA, it

again "made a considered decision *not* to apply the FTCA"—and its limitations—

to the TVA's pre-existing waiver of immunity. *Thacker,* 587 U.S. at 225.

The *Thacker-Burr* analysis is unique to sue-and-be-sued clauses and entities and is inapplicable to the SIAA or any other waivers of sovereign immunity. Nor is the Coast Guard a sue-and-be-sued corporation; it is a branch of the armed forces. 14 U.S.C. § 101. *Thacker* thus has no bearing on whether the SIAA waives sovereign immunity for the Coast Guard's discretion in its regulatory oversight role. It plainly did not overrule 50 years of jurisprudence from every circuit that has repeatedly held the discretionary function exception to apply to SIAA cases. Additionally, even if this case involved a sue-and-be-sued statute and the *Thacker-Burr* analysis applied, *Thacker* expressly left open the possibility that sovereign immunity would still apply to the exercise of government functions, exactly what Plaintiffs here argue it precluded. 587 U.S. at 229.

## III. Plaintiff's Procedural Arguments Are Flawed and Unsupported.

Plaintiffs tack two meritless procedural arguments onto the end of their brief. First, they argue that the court below applied the wrong standard to decide the motion. Pls.' Br. 68-70. They argue that because there are "factual disputes" as to the regulations and policies governing Coast Guard inspections, the court should have used a summary judgment standard. Yet Plaintiffs' own brief shows that the court applied the correct Rule 12(b)(1) standard, because the United States brought a factual attack. In a factual attack, disputed facts do not preclude dismissal; the court "evaluate[s] for itself the merits" and may "resolv[e] factual disputes." Pls.'

55

Br. 69. The parties specifically agreed, and the court ordered, that the discretionary function defense should be a Rule 12(b)(1) motion.[20] 1–ER–4, Pls.' Br. 25; Order, SER–11-13; Joint Admin Mot., SER–14-21.

Second, Plaintiffs argue that they needed additional discovery to oppose the motion to dismiss. Plaintiffs had seven months of discovery—deposing six Coast Guard officials and obtaining over 3,900 pages of documents—into the discretionary function, the *only* issue at this stage. Plaintiffs additionally had the burden to show specific additional facts they expected to discover that were "essential to oppose summary judgment." 1–ER–4 (quoting *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.,* 525 F.3d 822, 827 (9th Cir. 2008)). Plaintiffs failed to carry that burden below, and they fail here.

Plaintiffs say they seek physical evidence recovered from the scene of the fire. Pls.' Br. 73. They also seek attachments containing data underlying the ATF report they obtained in discovery. *Id.* at 28.[21] None of this is relevant. The scope of

---

[20] Plaintiffs additionally argued below that the motion must be decided on a summary judgment standard because the merits of their claim are "intertwined" with the subject matter jurisdiction question. 2–ER–167. Not so. This doctrine applies only when the same statute provides both the source of subject matter jurisdiction and the substantive cause of action. Here, the SIAA provides *only* the "jurisdictional hook," not the cause of action, which is common law negligence. *Dearborn v. Mar Ship Operations, Inc.,* 113 F.3d 995, 996 n.1 (9th Cir. 1997); *see also Chadd,* 794 F.3d at 1111-12 (analysis of discretionary function is "distinct from . . . the merits").

[21] Plaintiffs obtained the report itself, including its conclusions.

56

the discretionary function inquiry is limited to "the applicable government policies" and whether "they authorize or imply discretion," not how those policies were carried out here. *Lam*, 979 F.3d at 673 n.3 ("all that matters is that there was, in fact, discretion"); *see also Ignatiev v. United States,* 238 F.3d 464, 467 (D.C. Cir. 2001) ("the only discovery necessary to establish jurisdiction pertains not to the facts of the governmental action but to existence *vel non* of internal governmental policies guiding that action"). The ATF report is on "the origin and cause" of the fire, not how the Coast Guard inspected the vessel months or years prior. Plaintiffs have not explained why its attachments would discuss Coast Guard inspection policies. Nor is the physical evidence from the vessel relevant. It has no impact on the discretionary function issue because none of the relevant policies impose a mandatory duty to inspect those items during any given inspection, much less a mandatory duty to *find* any of them to be a violation—as the district court found as a matter of fact.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

DATED:  April 23, 2025

Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

57

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

YAAKOV M. ROTH
Acting Assistant Attorney General

GERARD SINZDAK
Assistant Director, Appellate Staff
Civil Division

*/s Jill Rosa*
ERIC KAUFMAN-COHEN
Attorney in Charge, West Coast Office
JILL DAHLMANN ROSA
Senior Trial Counsel
SCOTT PERRYGO
Trial Attorney
U.S. Department of Justice
Civil Division, Torts Branch

Attorneys for United States of America

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s):**  24-5064

The undersigned attorney or self-represented party states the following:

[  ] I am unaware of any related cases currently pending in this court.

[ x ]   I am unaware of any related cases currently pending in this court other than
the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case
number and name of each related case and its relationship to this case are:

**Signature** s/ *Jill Rosa*_____ **Date**  April 23, 2025_____
*(use "*s/[typed name]*" to sign electronically filed documents)*

59

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs
*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-5064

I am the attorney or self-represented party.

**This brief contains** 13,909 words, including 0 words manually counted in

any visual images, and excluding the items exempted by FRAP 32(f). The brief's

type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Jill Rosa*_____ **Date** April 23, 2025____
*(use "*s/[typed name]*" to sign electronically filed documents)*

60